**Blake Dorning**

---

Page 1

```
1         IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF ALABAMA
3              NORTHEASTERN DIVISION
4
5  MADISON COUNTY SHERIFF BLAKE   )
   DORNING, et al.,              )
6                                )
        Plaintiffs,     )
7                                )
        vs.             ) 5:15-CV-01997-HGD
8                                )
   EVANSTON INSURANCE COMPANY,   )
9  et al.,                       )
                                 )
10       Defendants.    )
11  _____
12
13  VIDEO DEPOSITION OF:  SHERIFF BLAKE DORNING
14  _____
15
16        S T I P U L A T I O N
17
18        IT IS STIPULATED AND AGREED by and between the
19  parties through their respective counsel that the
20  deposition of SHERIFF BLAKE DORNING may be taken on
21  July 27, 2017, before Anne E. Miller, Commissioner and
22  Notary Public, at Morris, King & Hodge, PC, 200 Pratt
23  Avenue NE, Huntsville, Alabama.
```

Page 2

```
1       IT IS FURTHER STIPULATED AND AGREED that the
2  signature to and the reading of the deposition by the
3  witness is waived, the deposition to have the same
4  force and effect as if full compliance had been had
5  with all laws and rules of court relating to the taking
6  of depositions.
7       IT IS FURTHER STIPULATED AND AGREED that it
8  shall not be necessary for any objections to be made by
9  counsel to any questions except as to form or leading
10  questions, and that counsel for the parties may make
11  objections and assign grounds at the time of trial or
12  at the time said deposition is offered in evidence or
13  prior thereto.
14
15
16
17
18
19
20
21
22
23
```

Page 3

```
1             A P P E A R A N C E S
2
3  Appearing For The Plaintiff:
4        MORRIS, KING & HODGE, PC
         Mr. David J. Hodge
5        200 Pratt Avenue
         Huntsville, Alabama 35801
6
7        MR. J. JEFFERY RICH
         Attorney at Law
8        100 North Side Square
         Suite 700
9        Huntsville, Alabama 35801
10
11  Appearing For The Defendant:
12        SWIFT, CURRIE, McGHEE & HIERS, LLP
          Mr. Brandon J. Clapp
13        2 North 20th Street
          Suite 1405
14        Birmingham, Alabama 35203
15
16        BRADLEY, ARANT, BOULT, CUMMINGS, LLP
          Mr. Harold Stephens
17        200 Clinton Avenue West
          Suite 900
18        Huntsville, Alabama 35801
19
20  Court Reporter:  Anne E. Miller
    Videographer:  Brandon Brown
21
22
23
```

Page 4

```
1             I N D E X
```

```
2  Examination by Mr. Clapp ..................... 6
3  Examination by Mr. Stephens .................. 81
   Examination by Mr. Clapp ..................... 173
4
5  Defendant's Exhibit No. 1 ................... 9
     (Notice -- attached)
6  Defendant's Exhibit No. 2 ................... 41
     (Interrogatories -- attached)
7  Defendant's Exhibit No. 3 ................... 43
     (Elliott -- attached)
8  Defendant's Exhibit No. 4 ................... 56
     (Woods -- attached)
9  Defendant's Exhibit No. 5 ................... 84
     (Certificate of Insurance -- attached)
10  Defendant's Exhibit No. 6 ................... 86
     (Certificate of Insurance -- attached)
11  Defendant's Exhibit No. 7 ................... 89
     (Certificate of Insurance -- attached)
12  Defendant's Exhibit No. 8 ................... 90
     (Certificate of Insurance -- attached)
13  Defendant's Exhibit No. 9 ................... 144
     (Department of Forensic Sciences -- attached)
14  Defendant's Exhibit No. 10 .................. 153
     (Department of Forensic Sciences -- attached)
15  Defendant's Exhibit No. 11 .................. 155
     (Huntsville Hospital consult -- attached)
16  Defendant's Exhibit No. 12 .................. 156
     (Offense report -- attached)
17  Defendant's Exhibit No. 13 .................. 161
     (Letter -- attached)
18  Defendant's Exhibit No. 14 .................. 166
     (Autopsy -- attached)
```
```
19
20
21
22
23
```

---

Page 5

1    I, Anne E. Miller, a Court Reporter of the State of

2  Alabama, acting as Commissioner, certify that on this

3  date there came before me at the law offices of Morris,

4  King & Hodge, PC, 200 Pratt Avenue NE at Huntsville,

5  Alabama, on July 27, 2017, beginning at or about 10:21

6  a.m., SHERIFF BLAKE DORNING, witness in the above

7  cause, for oral examination, whereupon the following

8  proceedings were had:

9

10      THE VIDEOGRAPHER:  This begins disc number

11  one in the deposition of Blake Dorning in the matter of

12  Madison County, Alabama, Sheriff Blake Dorning versus

13  Evanston Insurance, case number 5:15-CV-01997-HNJ.  We

14  are on the record at 10:21 a.m. on Thursday, July 27,

15  2017.  This deposition is taking place in Huntsville,

16  Alabama.  My name is Brandon Brown, representing

17  Freedom Court Reporting.  Would counsel identify

18  yourself and state whom you represent?

19      MR. HODGE:  David Hodge on behalf of the

20  plaintiff.

21      MR. STEPHENS:  I'm Harold Stephens.  I

22  represent Advanced Correctional Healthcare.

23      MR. CLAPP:  Brandon Clapp for Evanston

Page 6

1  Insurance Company.

2      MR. RICH:  And Jeff Rich on behalf of the

3  plaintiff.

4      THE VIDEOGRAPHER:  Would the court reporter

5  please swear in the witness?

6

7      BLAKE DORNING,

8  having been first duly sworn, was examined and

9  testified as follows:

10

11      THE REPORTER:  Usual stipulations?

12      MR. HODGE:  That will be fine.

13

14  EXAMINATION BY MR. CLAPP:

15    Q.  Sheriff Dorning, my name is Brandon Clapp, and

16  my firm represents Evanston Insurance Company.  And we

17  are here today for your deposition, and I presume that

18  you have given depositions before in the past?

19    A.  That is correct.

20    Q.  And I will just remind you to try to give verbal

21  answers as opposed to head nods and head shakes to help

22  out our court reporter.  And then also if you need a

23  break, let me know, and we will take a break.  And I

Page 7

1  will just ask that you answer whatever question has

2  been posed before we take a break.  Is that fair?

3    A.  That is.

4    Q.  Will you please state your name for the record,

5  please?

6    A.  Blake Lee Dorning.

7    Q.  And what is your address?

8    A.  Business or home?

9    Q.  Business would be fine.

10   A.  It's 603 Fiber Street, Huntsville, Alabama,

11  35801.

12   Q.  You are employed as the sheriff for Madison

13  County, Alabama, correct?

14   A.  I'm the elected sheriff of Madison County.

15   Q.  And how long have you been in that position?

16   A.  Right at -- well, over 14 and a half years.

17   Q.  Will you please describe your educational

18  background?

19   A.  Sure.  I graduated high school from Sparkman

20  High School in Toney, Alabama.  I attended UAH, Athens

21  State.  Went to Jacksonville State University for

22  police academy training at the age of 21.  I have been

23  to the FBI National Academy where I got credits under

Page 8

1  the University -- with the University of Virginia.  I

2  went to homicide investigation school at the University

3  of Louisville.  I have college credits at the

4  University of Louisville.  And, oh, my gosh.  I have

5  attended like 23 or 20 -- more than that -- federal

6  training programs and things throughout my career.

7    Q.  Prior to being elected sheriff, how were you

8  employed?

9    A.  I was a captain with the Madison County

10  sheriff's office.

11   Q.  And it would be fair to say that you have spent

12  your entire career in law enforcement?

13   A.  Yes, that's correct.

14   Q.  We are here today in a matter in which you are a

15  plaintiff involving an insurance and contractual

16  dispute arising out of several prison inmate lawsuits.

17  What do you know about this lawsuit?

18   A.  Very little.

19   Q.  And when you say very little, could you be more

20  specific as to what you know about the allegations in

21  this complaint?

22   A.  Well, basically the only thing that I truly know

23  is that during our -- my time as sheriff and when

Page 9

1 Advanced Correctional Healthcare was part of our

2 medical provider in the jail, that there was an

3 agreement that they would provide a certain insurance

4 policy that covered the sheriff and his employees

5 during the time for any kind of a medical issue that

6 may arise and would defend us during that time should a

7 medical issue arise and a lawsuit. And that's

8 basically about all that I know about it.

9    Q. Okay. I marked as Defendant's Exhibit 1 a copy

10 of the notice of deposition for today.

11         (Defendant's Exhibit 1 was marked for

12              identification.)

13    Q. (BY MR. CLAPP) This document, it sets forth some

14 categories of documents. And I believe we have

15 probably received all these documents that have been

16 requested in the notice prior to today. But you did

17 not bring any documents with you here today, did you?

18    A. No, sir.

19         MR. CLAPP: And, David, everything we have

20 asked for, I presume, has been previously produced?

21         MR. HODGE: I believe so.

22         MR. CLAPP: Okay.

23    Q. Did you review any documents to prepare for

Page 10

1 today's deposition?

2    A. Yes, I did.

3    Q. What did you review?

4    A. I just reviewed some of the documents that the

5 -- my attorney had provided me with, and it was just

6 basically scanning certain things that may be asked.

7    Q. Do you recall what any of those documents were

8 titled or how would you describe them?

9    A. It was -- I think two of them were like a letter

10 from Dr. Johnson from Advanced Healthcare where he and

11 I had probably first met or after we had first met at a

12 conference. And I can't even remember which conference

13 that was. It might have been Indianapolis or it was at

14 a National Sheriff's Conference. And then I think that

15 I had saw him also at the National Sheriff's Conference

16 in, if I recall correctly, Fort Lauderdale at one of

17 his booths for Advanced Healthcare. And we just

18 talked.

19    Q. Other than the letters that you exchanged with

20 Dr. Johnson, did you review any other documents in

21 preparation for today?

22    A. Also I saw some -- like -- I guess it would be

23 like an insurance provider where, you know, the

Page 11

1 coverage and the amounts of coverage. And I just

2 scanned over it. I couldn't tell you exactly what all

3 it said.

4    Q. An insurance policy?

5    A. Well, you know, you get a homeowner's policy and

6 it shows you what you are covered for.

7    Q. Right.

8    A. That's what I saw.

9    Q. Anything else?

10    A. Not that I -- well, I saw this.

11    Q. Did you review any of the complaints in the

12 Elliot, Foster, Jefferson or Woods cases?

13    A. No.

14    Q. In the complaint, you and Madison County and

15 others assert that the underlying actions -- and I will

16 refer to the Davis -- or not the Davis but the Woods,

17 Elliot, Foster and Jefferson cases as the underlying

18 cases or underlying actions. So if I use the term

19 "underlying actions," that's what I'm referring to.

20    A. Okay.

21    Q. What is the factual basis that the allegation in

22 the claims that you have asserted are based on

23 malpractice or professional personal injury sustained

Page 12

1 by a patient caused by medical services by ACH or one

2 of its employees?

3         MR. HODGE: Object to the form. You can

4 answer.

5    A. Okay. The -- well, all I -- when you start

6 talking about medical malpractice, those are things

7 that I don't have any dealings with personally or

8 professionally. The only thing that I'm aware of is

9 that when we contract with a medical provider, we

10 expect them to provide the medical -- the medical --

11 address the medical needs to the inmates within the

12 facility and provide us with a certain amount of

13 coverage should their medical reactions or treatments

14 become involved in a lawsuit. That's in the gist,

15 that's my understanding.

16    Q. Are any of the allegations in the underlying

17 actions against the sheriff's office or you based on

18 the malpractice by ACH or its employees?

19    A. Repeat that.

20    Q. Are any of the allegations in the underlying

21 actions against you as the sheriff based on the

22 malpractice or medical malpractice of ACH or its

23 employees?

**Blake Dorning**                                    **4 (13 - 16)**

Page 13

1          MR. STEPHENS:  Object to the form.
2     A. The lawsuits against me are -- that were against
3  me or against me are based on medical issues that arose
4  in the jail involving these individuals.
5     Q. (BY MR. CLAPP) Have you reviewed the complaints
6  in the underlying actions?
7     A. I may have reviewed one in a long history past
8  ago. I don't know that I have seen every one of them.
9     Q. Are there claims against you that are
10 independent of any alleged malpractice of ACH or its
11 employees?
12    A. Not that I'm aware of.
13    Q. Have you looked at the complaints and seen
14 allegations against you based on actions of the
15 correctional officers?
16    A. I pretty much get blamed for everything.  So,
17 you know, I'm sure the wording is in there that says
18 I'm the guy that's held responsible because I'm always
19 the guy that's being sued regardless of if I was
20 present or not during the actions in which they
21 occurred.
22    Q. But have you seen that there are allegations
23 against you based on the actions of the correctional

Page 14

1  officers in the underlying actions?
2     A. There was at least one that I saw that said that
3  it was my fault.
4     Q. What is the factual basis for your claim as the
5  sheriff that you as the sheriff is entitled to coverage
6  under the ACH insurance policy as an additional
7  insured?
8     A. It's my understanding that when we had contract
9  agreements with ACH is that they would provide a policy
10 that would basically indemnify the office of sheriff
11 and my employees in the event that we were sued or a
12 lawsuit was filed based upon medical health care.
13    Q. Was ACH required to obtain insurance for you as
14 the sheriff to insure you for allegations based on the
15 correctional officers' conduct?
16    A. Based on correction officers' conduct?  It was
17 required that it would indemnify all my corrections
18 officers, myself, and those that would be deemed to be
19 under my authority for any actions resulting from a
20 health care lawsuit.  That's my understanding of it.  I
21 have no other understanding.
22    Q. I think my question was slightly different.  But
23 was ACH required to obtain insurance for you as the

Page 15

1  sheriff to insure you for allegations based on the
2  correctional officers' conduct?
3          MR. HODGE:  Object to form.
4     A. I don't understand that.  I don't understand
5  when you say conduct.  I mean, I don't --
6     Q. (BY MR. CLAPP) What the correctional officers
7  did or did not do --
8          MR. HODGE:  Object to form.
9     Q. (BY MR. CLAPP) -- that wasn't ACH's
10 responsibility, was it?
11    A. Corrections officers are required to do their
12 job as correctional officer.  They are not required to
13 do anything that would be -- other than a lifesaving
14 measure, anything -- they would have no involvement in
15 the medical treatment of an inmate.
16    Q. I think my question is more general outside of
17 the -- take aside or step outside of the context of
18 this case.  ACH was not required to obtain insurance
19 for you to insure you as the sheriff against
20 allegations based solely on the correctional officers'
21 conduct?
22          MR. HODGE:  Object to form.
23    A. So I'm trying to understand what you are saying.

Page 16

1  Would we have coverage based upon the conduct of a
2  correctional officer if they were intoxicated on duty?
3  That would be no.  If they were -- were they -- if they
4  were following the rules and regulations of the office
5  of sheriff in the housing of a prisoner, if it was
6  medically related and they were following all of their
7  requirements, then yes.  They would be required.
8     Q. (BY MR. CLAPP) Did ACH obtain insurance naming
9  you as an additional insured?
10    A. Sir, I would -- based on what I know, it was my
11 understanding that they had.
12    Q. Okay.  Have you ever reviewed any of the ACH
13 insurance policies during their contract with the
14 sheriff's office?
15    A. No, no.
16    Q. Did you ever receive any of those policies?
17    A. I would say that my office may have received
18 them, but that would have been sent either to the jail
19 commander and to the county attorney's office.
20    Q. Did you ever ask to see any of the ACH insurance
21 policies during the contract period?
22    A. I relied on my attorney to say whether we had
23 received them or not.  I don't have the expertise to

Page 17

1  review an insurance policy of this type.

2     Q.  And I think I understand you to say generally

3  that you don't recall one way or the other if you ever

4  received or your office ever received a copy of any of

5  the insurance policies; is that fair?

6     A.  They may have -- we get a tremendous amount of

7  mail.  And so the mail that comes in, if there may be

8  -- if there may have been something from Advanced

9  Correctional Healthcare, but if it's something that's

10  not involving -- if it's involving an insurance thing

11  or if it's involving something that is along the

12  medical field or it's involving the jail, that would

13  have been sent to a commander or would have been -- and

14  copies would have also been sent to our county

15  attorney's office.

16     Q.  Have you personally had any communications with

17  OneBeacon, Madison County's insurance carrier,

18  regarding the insurance coverage in this case?

19     A.  I'm sure I may have, but I don't remember.  I

20  mean, we may have -- but we have not met and discussed

21  this case.  I have not met with OneBeacon to discuss

22  this case.

23     Q.  Do you recall having any communications with

Page 18

1  OneBeacon regarding a proposal by Evanston Insurance to

2  share the costs of defending either Madison County or

3  you in the underlying actions?

4     A.  Being in a meeting?  No, I don't recall that.

5     Q.  Have you ever had any communications with

6  Evanston Insurance or its predecessor, Essex Insurance?

7     A.  No, sir.

8     Q.  Did you ever receive or your office ever receive

9  a reservation of rights letter from OneBeacon regarding

10  insurance in the underlying actions?

11     A.  I do not recall receiving that into my office,

12  but also understand, there are things that come to my

13  office that my personnel direct to other places.  So

14  I'm not saying it didn't come there.  I'm saying it

15  never came and was put into my box.

16     Q.  Okay.  In the complaint that Madison County and

17  you as sheriff of Madison County filed against Evanston

18  Insurance and ACH, it makes a claim for damages.  What

19  damages have you sustained that you are claiming in

20  this case?

21     A.  There are certain moneys that's been taken out

22  of the sheriff's office operational budget to pay the

23  deductibles in these cases, and I'm sure that our

Page 19

1  attorneys and the attorneys that work on it aren't

2  doing it for the goodness of their heart.  But I don't

3  know what those figures would be so --

4     Q.  I'm going to ask you a couple of follow-ups to

5  make sure I understand --

6     A.  Sure.

7     Q.  -- what that process was.  I understand that

8  there were deductibles that were paid to OneBeacon for

9  the defense and in some instances the settlement costs

10  of at least three of the underlying cases.

11     A.  Okay.

12     Q.  Were those deductibles paid out of the sheriff's

13  office pool of money to OneBeacon?  Is that your

14  understanding of how that worked?

15     A.  That -- the understanding is deductibles removed

16  from my budget.

17     Q.  Okay.

18     A.  I can't tell you the amounts, what line item

19  they came from, how it was removed.  But I do know that

20  based on the new operations of the County in

21  accounting, those funds were removed from my office

22  budget.

23     Q.  Okay.  Is it your understanding that all of the

Page 20

1  deductible payments were taken from the sheriff's

2  budget or was there some money that was taken out of a

3  different Madison County budget form?

4     A.  Sir, I couldn't tell you.

5     Q.  Okay.

6     A.  We have two budgets.

7     Q.  Did the sheriff's office directly pay any of the

8  lawyers that were defending either you or the

9  correctional officers in the underlying cases?

10     A.  I have not yet been given a bill that I'm aware

11  of.

12     Q.  Is it your understanding that OneBeacon paid for

13  those defense costs with the exception of the

14  deductible?

15     A.  That's my understanding.

16     Q.  And there are three cases that have been

17  resolved by a settlement.  Is it your understanding

18  that OneBeacon paid for Madison County, the sheriff and

19  the correctional officers' share of those settlements?

20     A.  It's my understanding that the settlements that

21  occurred -- there were settlements that occurred, and

22  that there was a deductible to be collected.  And that

23  that deductible was to be collected from my budget.

Page 21

1    Q. And whatever settlement moneys were paid were
2  paid by OneBeacon?
3    A. That's my understanding.
4    Q. Okay. So the sheriff's office has not paid any
5  moneys to the plaintiffs in the underlying actions, has
6  it?
7    A. No, not that I'm aware of.
8    Q. Other than the payment of the deductible, has
9  the sheriff's office sustained any other damages that
10 it's claiming in this lawsuit?
11   A. Sir, I don't know how to answer that question.
12 When you say damages, I have had employee loss of time
13 and loss of productivity to answer questions about
14 these lawsuits and things of that nature. So I
15 couldn't really put a dollar figure on that, and I'm
16 not aware that based upon as part of our public duty to
17 -- and that I'm paying their salary regardless of where
18 they are at as long as they are operating within the
19 sheriff's office realm of responsibility. I'm not
20 aware of any other.
21   Q. But that's not a claim that the sheriff's office
22 is making in this lawsuit, is it?
23   A. Not that I'm aware of.

Page 22

1    Q. Because the sheriff's employees would have had
2  to have taken time out of their day to provide
3  testimony and other things regardless of who was
4  insuring them, correct?
5    A. They would take time out of the day to answer
6  any -- anything that would be construed to be part of
7  their job responsibilities.
8    Q. Do you have any information regarding a claim
9  that Madison County's insurance rating has been
10 affected or its insurance premiums have been affected
11 by any of these underlying cases?
12   A. I have -- I've heard that it may, but I have not
13 seen it.
14   Q. Do you have any personal knowledge of whether it
15 has or has not been affected?
16   A. I do not have any personal knowledge, no.
17   Q. Do you know how many claims have been made
18 against you as the sheriff in the last five years?
19   A. No, sir, I don't.
20   Q. Could you provide us with your best judgment of
21 that figure?
22   A. Sir, I couldn't even tell you. I get sued
23 probably about once a week.

Page 23

1    Q. Let's limit that. About -- could you provide an
2  estimate of how many claims have been made against you
3  as the sheriff resulting from some action that occurred
4  at the jail?
5    A. No, sir. Every time a person feels that they
6  are being incarcerated for any length of time greater
7  than what they do, I get a lawsuit for it. And
8  sometimes it's three a week. Sometimes that's only
9  once a week, but very seldom does a week go by that I
10 don't have a lawsuit based on a reason that somebody
11 feels that they shouldn't be in jail, that I'm holding
12 them there illegally.
13   Q. And so it would be fair to say that it comes
14 with the territory of being sheriff that you will have
15 frivolous lawsuits filed against you?
16   A. Sir, when I became sheriff, when I became
17 sheriff, the first week after taking office, I was
18 brought to my attorney's office, who was then Julian
19 Butler. And Jeff was also part of that, and they
20 explained to me the probably 30 or 35 lawsuits that
21 were pending that were now being transferred to my
22 name.
23        THE WITNESS: Do you remember that, Jeff?

Page 24

1  I remember it.
2        MR. RICH: I'm sure you do.
3    A. I remember it.
4    Q. (BY MR. CLAPP) Kind of switching gears, we
5  discussed some of the claims that have been presented
6  in the complaint and then your knowledge of some of the
7  damages claims. There is also a bad faith claim that
8  has been filed against Evanston. Do you have any
9  knowledge or facts that support the claim that Evanston
10 wrongfully denied coverage for you as an additional
11 insured?
12   A. Well, the information that I have -- and I know
13 that we had some before that Evanston had covered us
14 with. And then it came to this last -- it seemed like
15 in the last couple of years in our -- or maybe two or
16 three years in our business relationship that they
17 stopped feeling that they should cover us. And that
18 was, you know, something that I really didn't
19 understand.
20   Q. When you reference prior claims, do you remember
21 the plaintiffs or the claimants in those claims?
22   A. No, sir. I don't -- I don't have them. I just
23 -- I know that the medical provider normally in the

Page 25

1  past, you know, that he'll have claims.  And these are
2  the only ones that I know that there was not a joint
3  working relationship to handle those.
4     Q.  When the underlying claims were initially filed
5  against you and Madison County, did you make a claim on
6  the Evanston policy or was that handled by somebody
7  else?
8     A.  That was handled by our attorneys.
9     Q.  Okay.  So you were not involved in the process
10 of actually making the claim?
11    A.  No, sir.
12    Q.  And do you have any personal knowledge of any of
13 the documents that were submitted in support of that
14 claim?
15    A.  Actually seeing, physically holding them, no.  I
16 was made aware by my county attorney that we were going
17 to have to possibly file a claim because of them not
18 responding to our request for assistance.
19    Q.  In the documents that supported the claim for
20 additional insurance coverage, would that be the
21 complaints in the underlying cases?
22    A.  Repeat that, please.
23    Q.  Let's see if I can remember what I just said.

Page 26

1  But in supporting the claim for additional insurance
2  coverage that you made on ACH's policy, were you and
3  your attorneys relying on the language of the
4  complaints in the underlying cases to support those
5  claims for coverage?
6     A.  I think it was based -- the complaints were
7  based on medical performance, and that would -- that
8  would go back to ACH and their insured.
9     Q.  Do you have any facts that support the
10 allegation that Evanston acted in bad faith with
11 respect to any of its decisions on coverage?
12    A.  They didn't help.
13    Q.  But do you have any facts or information that
14 would support that allegation?
15    A.  Do I personally?
16    Q.  Yes.
17    A.  I don't personally.
18    Q.  Okay.  Did you receive any of the reservation of
19 rights letters or coverage letters that Evanston
20 Insurance is -- either Evanston sent or its lawyers
21 sent to the sheriff's office regarding coverage?
22    A.  What would they look like?
23    Q.  It would be letters from a lawyer where the

Page 27

1  insurance carrier discussing coverage decisions as it
2  relates to you as the sheriff.
3     A.  If it was sent to my office, it was probably
4  forwarded to my county attorney.
5     Q.  Sitting here today, do you remember ever looking
6  at any of those reservation of rights letters?
7     A.  I don't recall any.
8     Q.  Generally speaking, a jail has policies and
9  procedures that govern the conduct of its correctional
10 officers and employees, correct?
11    A.  Yes, sir, and the inmates.
12    Q.  And the inmates?
13    A.  And the inmates.
14    Q.  Are those policies and procedures created by you
15 as the sheriff along with probably counsel for the
16 County?
17    A.  They are created from best practices from
18 national organizations and operation of jail facilities
19 of similar size.  It's also reviewed by our county
20 attorney.  It's also reviewed by our jail commander and
21 his training staff.  So it's -- I review them.  But as
22 far as -- I have a manual.  As being able to go and
23 recite something to you from that manual, I would have

Page 28

1  to go pull it up and look at it.
2     Q.  Sure.  And I believe that there are standards
3  that are created or prepared by the National Sheriffs
4  Association that your office has access to?
5     A.  We look at two different standards that we --
6  there is a legal-based guideline that's provided by the
7  National Institute of Corrections, and there is also
8  guidelines by the American Jail Association.  There is
9  also guidelines by the --
10       MR. RICH:  ACA.
11    A.  Yeah, which is ACA.
12    Q.  (BY MR. CLAPP) Okay.  And those recommendations
13 are incorporated into the policies and procedures there
14 at the jail?
15    A.  We find that it's best practices that is being
16 used, and we incorporate that into our manual.
17    Q.  And to the extent that your office compiles and
18 creates the procedures, that would be done by you and
19 the jail administrator?
20    A.  Primarily by the training staff and the jail
21 administrator.
22    Q.  Do those policies provide recommendations for
23 how the correctional officers observe inmates?

Page 29

1    A.  Yes.

2    Q.  Do those policies provide recommendations for

3  how officers examine inmates with respect to potential

4  medical issues?

5    A.  It provides them direction on what they do if

6  they were to witness an inmate that would be in duress.

7  It does not provide them with a medical response

8  training --

9    Q.  Sure.

10    A.  -- based on what an observation may be.  They

11  are -- they are basically directed that if you see

12  something happen, then you are to notify the nursing

13  staff.  If it's something -- if you see an inmate

14  hanging, if an inmate tries to hang himself, they go

15  and try to relieve while calling the medical staff

16  because they are not trained to determine what types of

17  damages this inmate may have done to themselves.  If an

18  inmate were to go into some type of a convulsion that's

19  just pretty much common sense, if you see somebody

20  acting in a way that they normally wouldn't act, if it

21  looks as if they are going to endanger themselves or

22  someone else, notify the nursing staff, get them there

23  and see if you can do whatever remedial help you can

Page 30

1  do.  But they are not trained as medical people.

2    Q.  Right.  And the way I would characterize those

3  policies and procedures would be a chain of command

4  for, you know, if you see something, tell somebody.

5  And here is who you would tell.  Would that be a very

6  broad --

7    A.  Very broad.

8    Q.  -- characterization?

9    A.  You could possibly say yes.

10    Q.  And so the officers had some policies and some

11  training that would guide them if they saw something

12  unusual for how they would respond?  And when I say how

13  they would respond, I'm not referring to administering

14  medical care.

15    A.  Well, then you would have to say how would you

16  categorize something unusual because there is stuff

17  over there that those inmates do every day that you

18  could write a book on and not finish it.  We still see

19  them doing things today that -- so -- that doesn't meet

20  the realm of any training they have ever seen.

21    Q.  Sure.  But I guess if I could rephrase, if they

22  see something that would be unusual relating to an

23  inmate's medical state, then they would report that?

Page 31

1    A.  To the nurse.

2    Q.  To the nursing staff or to some other person who

3  would have --

4    A.  Primarily to the nursing staff.

5    Q.  Okay.  Are there any other jail policies and

6  procedures that would apply to how officers interact

7  with inmates from a medical standpoint?

8      MR. HODGE:  Object to form.

9      MR. STEPHENS:  Same objection.

10    A.  I don't know of any policy that would put them

11  in a position that makes them do a medical evaluation.

12  I hope that's answering your question.

13    Q.  (BY MR. CLAPP) So, for example, if an officer or

14  a correctional officer observes an inmate in -- I guess

15  the easy example would be in a seizure-like state, the

16  policy would be for that officer to contact the medical

17  professionals on staff at the jail?

18    A.  Yes.

19    Q.  And if some emergency-type care was available to

20  help that during the intermediary time period?

21    A.  Basically you would just -- their training would

22  be very remedial.  And like all police officers, if you

23  were to encounter someone that's going through a

Page 32

1  seizure, the main thing you would do is make sure that

2  they have a clear airway, try to see that they have a

3  clear airway.  If a person is trained in CPR, if you

4  see a person that is nonresponsive and not breathing

5  and does not appear to have a pulse, they are trained

6  in CPR, and that's their basic -- that's their basic

7  responsibility.  There is no training of any kind of a

8  diagnosis-type training.  There is no training -- I

9  mean, that's what we have the medical group for.

10    Q.  Are the correctional officers provided any first

11  aid type training before they are put into the jail?

12    A.  They receive first aid training.  The whole

13  curriculum of first aid training, I mean, I couldn't

14  tell you exactly what it is.

15    Q.  Sure.

16    A.  If you see a cut, if you can put pressure on it

17  to stop the bleeding, that's part of first aid

18  training.  CPR is part of first aid training.  Like you

19  said, you see a seizure, as long as they have a clear

20  airway, you don't try to hold them because that could

21  cause more injury.  So that is just basic remedial

22  training for corrections officers and all of law

23  enforcement.

Page 33

1   Q. Okay. Switching gears, I would like to talk a
2   little bit about ACH generally. ACH was the medical
3   care independent contractor that provided medical
4   services at the jail from -- let's see -- approximately
5   2005 until 2015; is that about right? Or 2014?
6   A. Yes, sir. It could be -- they were there for
7   quite some time.
8   Q. And you were the sheriff during that entire
9   period?
10   A. That's correct.
11   Q. Okay. Did you ever have any concern about the
12   medical care that was provided by ACH at the jail?
13   A. No, sir, not until the last few months.
14   Q. Did you handle inmate medical grievances?
15   A. No.
16   Q. Would that have been --
17   A. The staff, jail staff.
18   Q. Jail staff. And I guess during his tenure,
19   Administrator Morrison's staff?
20   A. Yes, his staff.
21   Q. And then after the Listau, Woods and Jefferson
22   deaths, ACH was selected for a new contract, correct?
23   A. Yes, if I recall correctly. Yes. Their

Page 34

1   contract was up for renewal, and we had offered -- we
2   had accepted their contract.
3   Q. And Morrison recommended that ACH continue their
4   contract, right?
5   A. That's correct.
6   Q. And he didn't believe that ACH had done anything
7   wrong in regards to the Listau, Woods or Jefferson
8   deaths, did he?
9       MR. HODGE: Object to the form. Asking him
10   what he would have thought Steve Morrison's thought
11   process.
12   A. I don't know what he would have thought.
13   Q. (BY MR. CLAPP) From what you could see in your
14   capacity as a sheriff, ACH provided good quality care
15   to the inmates during the tenure, right?
16   A. From the information that I had received that
17   the ACH had provided the care that was necessary for us
18   to continue operating within the jail.
19   Q. Following the inmate deaths of Listau, Woods and
20   Jefferson, did you or your office perform any type of
21   investigation?
22   A. My office did not. When you say my office --
23   Q. Broadly the sheriff's office is how I was

Page 35

1   referring to that.
2   A. If there was questions and things that arose
3   within the jail, Chief Morrison may have done some of
4   those things. But I'm not aware.
5   Q. Did he report to you any investigation findings
6   that he --
7   A. When you say investigation, there was no
8   criminal investigation ever initiated.
9   Q. I understand that. But just in terms of an
10   internal investigation, was one done to figure out the
11   cause of the deaths of these three inmates?
12   A. Did we conduct a civil investigation on the
13   death? We conducted an investigation -- our crime
14   scene unit was involved as we do with any jail death to
15   make sure there was not something that could be
16   construed to be anything like an assault.
17   Q. Sure.
18   A. That we do an investigation upon the health care
19   contractor to make sure they were providing the
20   services necessary, that's not our expertise.
21   Q. Did Morrison ever tell you that the deaths of
22   Listau, Woods and Jefferson appeared to have been
23   natural deaths?

Page 36

1   A. If it's not an act of aggression, if it's not --
2   in the law enforcement arena, if it's not an act of
3   aggression, if it's not something that was caused by
4   another individual, then everything would be a natural
5   death.
6   Q. Following the three deaths at the jail, were
7   there any changes to how the officers were trained?
8   A. Our training is continuous so you are basically
9   following best practices. So was there a change in
10   training? There was not an absolute "we are going to
11   do this differently," but our training is based on best
12   practices. So could I say no, there wasn't any
13   difference training? I could not say there. Could I
14   say there was additional training? It probably was,
15   but it would not be based upon those occurrences. It
16   would be based upon new training techniques or
17   increased amounts of training in certain areas as to
18   meet what everyone else across the country is doing.
19   Q. Do you know if there was some reiteration of
20   officer training regarding the need to look at the
21   cells and check on the inmates following the deaths of
22   Listau, Woods and Jefferson?
23       MR. HODGE: Brandon, how is this -- I guess

Page 37

1  I'm not really following how this is relevant to our
2  case.  Are you going much further than this in this
3  area?
4         MR. CLAPP:  Well, one of the claims --
5  well, several of the claims in the complaints in the
6  underlying actions relate to in my opinion and our
7  position the correctional officers.  And to the extent
8  that there are claims against the correctional officers
9  and Sheriff Dorning that do not relate to the medical
10  staff, we are exploring, you know, some of that
11  evidence because those claims would not be covered
12  clearly under the policy.  If they are --
13         MR. HODGE:  And you -- and you are asking
14  about after the fact events and after the events that
15  gave rise to the claims?  I don't really know how that
16  would be relevant, what they did after.
17         MR. CLAPP:  This is a deposition, and we
18  have all agreed to the usual stipulations.  And so, you
19  know, to the extent you have an objection to form, we
20  will deal with that.  But a relevancy objection, I
21  think, has been waived under the usual stipulations.
22         MR. HODGE:  I would disagree.  There is no
23  discovery of evidence that is not likely to lead or

Page 38

1  information that's likely to lead to the discovery of
2  relevant evidence.  I just -- what I'm a little worried
3  about for y'all's sake -- I'm not trying to be
4  difficult -- is there is a pending lawsuit.  And I
5  don't know how far either one of y'all want to go down
6  this line in this deposition in light of that, but I
7  guess you can do that but --
8         MR. CLAPP:  And that was one of the reasons
9  why I had been limiting the questions to Listau, Woods
10  and Jefferson.  And there has already been -- a lot of
11  these questions have been answered by other people in
12  that case, in those cases.
13         MR. HODGE:  Okay.
14         MR. STEPHENS:  Maybe we should discuss --
15  maybe we should --
16         MR. CLAPP:  Do you want to go off the
17  record for just a minute?
18         THE VIDEOGRAPHER:  We are going off the
19  record at 11:09 a. m.
20         (Discussion off the record.)
21         THE VIDEOGRAPHER:  This begins disc number
22  two.  We are back on the record at 11:25 a. m.
23         MR. CLAPP:  And during the off-the-record

Page 39

1  break, the parties had a discussion about the previous
2  line of questioning.  And the parties have agreed that
3  the questions and answers here in this deposition as
4  relates to the issues are solely related to the Listau,
5  Woods and Jefferson cases and have no bearing on any
6  other litigation that is pending or could be pending.
7  So with that caveat --
8         MR. STEPHENS:  And that's certainly our
9  agreement and understanding.
10         MR. CLAPP:  Could you reread whatever the
11  last question I had was because I think there was an
12  objection?
13         (Record read.)
14  A.  To my recollection, those inmates were all in
15  medical.  In our medical area, the medical area is
16  primarily controlled by the medical staff.  It's
17  staffed by a medical professional.
18  Q.  Okay.
19  A.  The corrections officers that are in there are
20  there in the event that there is -- an inmate that were
21  to act out while receiving treatment, should an inmate
22  be moved for a court appearance or for some reason,
23  that is their primary responsibility while they are

Page 40

1  there.  The health care is -- primarily is the
2  responsibility of the medical contractor in that area.
3  Q.  All right.  So you had responded to my question,
4  but I don't think you actually answered the question
5  that I had asked, which is whether there was any
6  reiteration of training for officers regarding the need
7  to look at the inmates or check their cells following
8  these incidents?
9  A.  If that were to have occurred, it would have
10  occurred by the jail commander, not myself.
11  Q.  So that would not have been within your
12  immediate purview at that time?
13  A.  That would have been -- if that were to have
14  occurred, it would have been by the jail commander.
15  Q.  Okay.
16  A.  My office is not in the jail.
17  Q.  If an inmate wants to receive medical care, do
18  they communicate that directly to the correctional
19  officers first?
20  A.  They have the ability to request to see the
21  nurse.  They have that ability.  They also -- and
22  nurses do pill call, which they visit each cell.
23  Sometimes they can ask to see -- get to be seen by the

Page 41

1  nurse in direct contact.

2    Q.  Okay.  So there is not really one specific

3  method?  It could be --

4    A.  Not that I'm aware of.

5    Q.  It could be the inmate says to an officer who

6  just happens to be walking by, "I need to seek medical

7  treatment," or it could be during an interaction with a

8  nurse who happens to be walking on that particular

9  block or servicing that inmate?

10    A.  That's correct, to my knowledge.

11        (Defendant's Exhibit 2 was marked for

12            identification.)

13    Q.  (BY MR. CLAPP) I have marked as Defendant's 2 a

14  copy of the answers to interrogatories that you have

15  signed in this case.  I didn't give you a copy with any

16  writing on it, did I?

17        MR. HODGE:  I have highlights.  There is no

18  writing, but it is highlighted.

19        MR. STEPHENS:  Just ask him about the

20  highlighted portion.

21        MR. CLAPP:  I gave you my copy, David.

22        MR. HODGE:  I'm sorry.  I was just flipping

23  through it.  There is no writing.

Page 42

1    Q.  (BY MR. CLAPP) Specifically if you will look

2  with me on number three.  The question was, "State all

3  facts you contend support your allegation that as it

4  relates to you, the plaintiffs' claims in the Listau,

5  Jefferson, Woods or Foster actions are merely

6  derivative of the alleged constitutional torts

7  committed by ACH and its physicians and nurses."  And

8  in the response, your lawyer registers an objection and

9  then refers to the complaints in the cases.  Correct?

10    A.  That's what it says.

11    Q.  Outside of the complaints, do you have any other

12  basis for your claim as described in that

13  interrogatory?

14        MR. HODGE:  Other than his testimony today?

15    A.  Not that I'm aware of.

16    Q.  (BY MR. CLAPP) Okay.  If you will look at number

17  eight on page five, it says, "State with specificity

18  every fact you contend supports your allegation that

19  Essex denied, withdrew or failed to provide coverage

20  for you and identify every person with knowledge."  And

21  the answer is, "Essex refused to provide a defense and

22  indemnity for these claims despite previously agreeing

23  to provide defense and indemnity for similar claims."

Page 43

1  Is there any other basis for your claim that Essex

2  denied or failed to provide coverage for you?

3    A.  Prior to these?  I'm not aware of.

4    Q.  You can put that document aside.  I want to

5  discuss with you now some of the language in the

6  underlying complaints.  Let's start by looking at

7  Elliot, which I have marked as Defendant's 3.

8        (Defendant's Exhibit 3 was marked for

9            identification.)

10    Q.  (BY MR. CLAPP)  Looking at Elliot, you would

11  agree that you are only sued based on your capacity as

12  Sheriff of Madison County, right?

13    A.  That's correct.

14    Q.  And as sheriff, you're responsible for

15  management of the jail, right?

16    A.  That's correct.

17    Q.  And in the complaint, it alleges that you have a

18  statutory duty to attend to the medical needs of the

19  inmates, right?

20    A.  That's correct.

21    Q.  And that is a true statement, that as sheriff,

22  you do have a statutory duty to attend to the medical

23  needs of the inmates, right?

Page 44

1    A.  I have a duty to operate the jail and tend to

2  the needs of inmates as far as housing, feeding and any

3  medical needs, basic medical needs.

4    Q.  If you will turn with me to page nine.  We will

5  look at some of the allegations.  Looking at paragraph

6  50, it states, "All defendants were jointly and

7  severally the proximate cause of Listau's pain and

8  suffering and eventual death."  Do you see that?

9    A.  I do.

10    Q.  And all defendants would include each individual

11  party who is named as a defendant, which would include

12  Madison County, ACH, Dorning, Sheriff Dorning, you,

13  Steve Morrison, and then the several nurses and

14  correctional officers who are identified?

15    A.  Uh-huh (yes).

16    Q.  And I'm not submitting that there is any truth

17  or merit to any of these allegations.  We are just

18  looking at what's alleged.

19    A.  Sure.

20    Q.  In looking at paragraph 51, it alleges, "The

21  actions of jail and ACH personnel indicates systemic

22  breaches of fundamental standards of correctional

23  management and correctional health care."  Do you see

Page 45

1  that?

2  A. I do.

3  Q. Do you have any idea what fundamental standards

4  of correctional management would refer to?

5  A. I do not.

6  Q. Then at 57, it contends that, "With deliberate

7  indifference to the serious medical needs of the

8  inmates, defendants Madison County, Sheriff Dorning,

9  Morrison, Williams and ACH failed to develop and

10  implement adequate policies and procedures for handling

11  inmates with serious health conditions and failed to

12  adequately train jail -- jailers and medical staff with

13  the foreseeable result that inmates such as Listau

14  would not receive appropriate treatment." Did I read

15  that correctly?

16  A. Yes. You read it correctly.

17  Q. So one of the allegations in this paragraph is

18  that there was a failure to develop and implement

19  policies relating to training of the jailers?

20  MR. HODGE: Object to the form. You just

21  read what the allegation was.

22  Q. (BY MR. CLAPP) You can answer the question.

23  A. Could you ask it again?

Page 46

1  Q. Sure. So in paragraph 57, one of the

2  allegations or contentions is that there was a failure

3  to develop and implement policies and procedures

4  regarding the training of the jailers?

5  MR. HODGE: Object to the form.

6  Incomplete.

7  A. It's an accusation.

8  Q. (BY MR. CLAPP) Sure, sure. Absolutely. But

9  that's one of the accusations?

10  A. Uh-huh (yes). That's correct.

11  Q. In looking at paragraph 62 on page 11, it

12  alleges, "To a large extent, these constitutional

13  deficient policy and practices regarding inmate health

14  care were created and implemented by agreement between

15  Madison County, Dorning and ACH," correct? That's what

16  it is alleging?

17  A. That's just -- you read correctly. That's an

18  allegation.

19  Q. Looking at paragraph 64, it alleges, "In whole

20  or in part because of the agreement, Madison County,

21  Dorning and Morrison have failed and refuse to address

22  known systemic deficiencies regarding medical care at

23  the Madison County Jail." Did I read that right?

Page 47

1  A. Yes. That's the allegation.

2  Q. So this allegation is relating to Madison

3  County, you as Sheriff and Mr. Morrison as the

4  administrator of the jail?

5  MR. HODGE: Object. That's not accurate.

6  The reference is the agreement with ACH.

7  Q. (BY MR. CLAPP) I'm sorry. Did you answer the

8  question?

9  A. You are reading -- you read 64. And, yes,

10  that's an allegation.

11  Q. Right. And it doesn't say in 64 that Madison

12  County -- well, ACH is not referenced in 64, is it?

13  A. It's not in here.

14  MR. HODGE: I object because it references

15  in the agreement, which is the agreement with ACH. So

16  I would disagree that ACH is not involved in the

17  allegation contained in paragraph 64 of the complaint.

18  Q. (BY MR. CLAPP) But it doesn't say ACH has failed

19  and refused to address known systemic deficiencies,

20  does it?

21  MR. HODGE: It says in whole or in part

22  because of the agreement, the agreement which Madison

23  County, Dorning and ACH entered into.

Page 48

1  Q. (BY MR. CLAPP) Looking at paragraph 74 on page

2  13, it alleges in the second sentence, "Each defendant

3  had the duty and the opportunity to protect Listau, to

4  obtain necessary medical treatment for Listau in a

5  timely manner and/or to establish policies and

6  procedures and implement training regarding such

7  treatment, but each defendant failed and refused to

8  perform such duty, thereby approximately causing

9  Listau's pain and suffering and eventual death."

10  That's what that allegation says in part, doesn't it?

11  A. That's correct.

12  Q. And then in paragraph 76, it states or alleges,

13  "All defendants acted with intent to violate Listau's

14  constitutional rights or with reckless disregard for

15  those rights, justifying punitive damages against the

16  individual defendants and ACH," correct?

17  A. That's what it says, yes.

18  Q. And among the individual defendants, that would

19  include the jail personnel?

20  A. It says all defendants.

21  Q. And turning to page 14 and looking at paragraph

22  79, the complaint alleges, "Defendants Dorning,

23  Morrison and Williams are supervisory officials for the

Page 49

1  jail and were responsible for development and
2  implementation for policies and procedures for medical
3  care at the jail and by action and inaction established
4  the unconstitutional customs and policies described
5  above.  These defendants did thereby deprive Listau of
6  his rights as a pretrial detainee under the 14th
7  Amendment to the Constitution of the United States."
8  And I will just end the quote there so we don't have to
9  add that statute.  But that's what it alleges, correct?
10  A.  Yes.  That's what it alleges.
11        (Discussion off the record.)
12  A.  Listau is a her.
13  Q.  (BY MR. CLAPP) It's a typo.
14        MR. HODGE:  I agree.  She is.  Yeah.
15  A.  Not very accurate.
16  Q.  (BY MR. CLAPP) In paragraph 79, it does not
17  reference ACH's medical malpractice, does it?
18        MR. HODGE:  I will object to the form of
19  that.
20  A.  It does not in there.
21  Q.  (BY MR. CLAPP) Looking at count two on page 15,
22  there is the negligence and wantonness claim,
23  specifically paragraphs 83 and 84.  And I won't read

Page 50

1  all that into the record if I don't have to.
2        MR. HODGE:  We'll stipulate it says what it
3  says.  We will stipulate all these complaints state
4  what they say.
5  Q.  (BY MR. CLAPP) There is no allegation against
6  you as the sheriff for negligence or for ACH's
7  negligent malpractice or negligent provision of medical
8  care in this section, is there?
9  A.  Eighty-four says ACH is liable for the
10  negligence.
11  Q.  Correct.  But I'm referring to you as Sheriff
12  Dorning, there is no reference that you are liable for
13  ACH's negligence or wantonness, is there?
14        MR. HODGE:  I would object.  I will
15  stipulate -- I will stipulate in count two, there is no
16  mention of the sheriff or any sheriff employees.
17  However you have earlier pointed out that they are
18  jointly and severally liable for the death of this
19  complainant.  So I would object to the implication that
20  there is no interrelation between the two based on the
21  earlier allegation.
22  Q.  (BY MR. CLAPP) But in this specific count, we
23  can agree that there is no reference to the sheriff or

Page 51

1  Madison County?
2        MR. HODGE:  I think anyone that could read
3  English would agree with that in this count.
4        MR. CLAPP:  I appreciate your answer but --
5        MR. HODGE:  It's disingenuous to say in
6  this count there is no relation to the case as a whole
7  is my point.  And I'm not trying to be difficult, but
8  it is.  You started out by reading joint and several
9  allegations and then say that this count doesn't relate
10  to the sheriff at all.  Well, that's not true.  Of
11  course, it does.  But explicitly, no.
12  A.  When I read it, when I see "defendants" --
13  Q.  (BY MR. CLAPP) When it says the ACH or the
14  individual ACH defendants?
15  A.  I look at it as me too just because of it saying
16  defendants.  Because if it was going to be just ACH, it
17  would have named them specifically as their defendants.
18  Q.  And I don't want to parse words here, but it
19  does say the individual ACH defendants and unknown ACH
20  employees, right?
21  A.  I didn't write it so I couldn't tell you what
22  defendants that they put in there meant.
23  Q.  Okay.  Are you familiar with the circumstances

Page 52

1  of Nikki Listau's death?
2  A.  Vaguely.
3  Q.  Are you familiar with the death certificate that
4  was issued for Nikki Listau?
5  A.  No.
6  Q.  Are you aware of the fact that the death
7  certificate indicated she had several broken bones,
8  including a broken femur at the time of her death?
9  A.  Yes.  This is -- this is the one that had been
10  beat by her husband.
11        MR. CLAPP:  David, some of these that I'm
12  now going to get into were previously marked as
13  exhibits to Jeff's deposition.  Do you want me to -- do
14  you want us to remark them?
15        MR. HODGE:  Whatever you want to do is fine
16  with me.  I don't care.  Do you?
17        MR. STEPHENS:  I think it's easier if we
18  just refer to them as previously marked as exhibit
19  whatever to Jeff's deposition.
20        MR. CLAPP:  I agree.
21  Q.  So I'm handing you what was Defendant's Exhibit
22  3 to Jeff Rich's deposition.  It's a copy of the first
23  amended complaint in Jefferson.  I will represent to

Page 53

1 you that the allegations of this complaint are
2 substantially similar to the one that we just looked
3 at, but I do have a couple of questions about it.
4 Specifically, let's turn to page 26. And looking at
5 paragraph 134, this is the supervisory officials'
6 allegation that appears to be generally consistent with
7 what was in the Elliot complaint that we just looked
8 at. And it alleges that you, Morrison, Johnson and
9 Williams are supervisory officials for the jail and
10 were responsible for development and implementation of
11 policies and procedures for medical care at the jail
12 and by action and inaction established the
13 unconstitutional customs and policies described above.
14 Did I read that allegation in part correctly?
15    A. Yes.
16    Q. Okay. Looking at page 27 once again as the
17 negligence and wantonness count, which is similar to
18 the one in Elliot, once again the negligence count in
19 paragraph 38, it only mentions the individual ACH
20 defendants and unknown ACH employees, correct?
21    A. Still says defendants, but I understand.
22       MR. HODGE: Same objection as before.
23    Q. (BY MR. CLAPP) Looking at page 22, paragraph

Page 54

1 127, this allegation says, "In summary, deliberate
2 indifferent -- deliberately indifferent policies and
3 practices of Dorning, Morrison, Johnson, Williams,
4 Robinson and ACH in place at the Madison County Jail
5 include but are not limited to the following, A, not
6 investigating serious known incidences of deliberate
7 indifference by ACH and correctional personnel; B, not
8 evaluating or responding to inmate grievances regarding
9 medical care; D, training correctional officers to
10 defer to ACH medical decisions even when it is obvious
11 the inmate needs to immediately go to the hospital; G,
12 relying on untrained correctional officers to monitor
13 seriously ill inmates who are placed in medical watch;
14 H, not training correctional officers regarding what
15 signs to look for and document all monitoring inmates
16 under suicide or medical watch; K, not monitoring the
17 food and water intake of inmates, not to be eating or
18 drinking or to be doing so only in limited amounts."
19 And I'm not going to go through each and every one of
20 these, but generally did I read the ones that I chose
21 to read correctly?
22    A. Uh-huh (yes). You did.
23    Q. So there are allegations in paragraph 127 which

Page 55

1 relate to the correctional officers and their training
2 and practices, correct?
3    A. That's correct.
4    Q. Are you familiar with the circumstances of
5 Jefferson's death?
6    A. I don't remember, sir.
7    Q. Okay. Jefferson was the inmate who had some
8 sort of bowel issue, I think was at least the cause of
9 her death. Looking at paragraph 28 on page six, the
10 complaint alleges, "By October 29, 2013, at the latest,
11 the individual defendants except Dorning and Morrison
12 were aware that Jefferson had not had a bowel movement
13 in at least 13 days, that she was having stomach pain
14 so bad she told fellow inmates and jail staff
15 (Williams, the nurses and correctional officers) she
16 thought she would explode, that she was so weak and in
17 pain she could hardly walk." Did I read that
18 correctly?
19    A. Yes.
20    Q. So in that allegation, they allege at least in
21 part that the correctional officers knew of her medical
22 needs, right, or medical complaints?
23    A. That's what they allege.

Page 56

1    Q. Right. And as I have said previously, I'm not
2 suggesting that there is any truth or merit to any of
3 the allegations, just looking at what they allege. All
4 right. I'm going to turn to looking at the Woods'
5 complaint, which I will mark as Defendant's 4.
6       (Defendant's Exhibit 4 was marked for
7          identification.)
8    Q. (BY MR. CLAPP) Just double checking I'm not
9 giving anybody highlighted.
10       MR. HODGE: Hey, Brandon, this one did have
11 highlights, but that was Jeff's. That's Jeff's anyway
12 so you are not going to make it a part of this record
13 anyhow, right?
14       MR. CLAPP: It must have been entered as an
15 exhibit with the highlighting. I just printed off the
16 exhibits.
17    Q. All right. We are going to look at Woods, the
18 first amended complaint. And before we really get into
19 looking at some of the specific allegations, do you
20 have any knowledge about the circumstances of Woods,
21 his death there at the jail?
22    A. I -- the knowledge I have was after action, but
23 I do have a little knowledge about it.

**Blake Dorning**

**15 (57 - 60)**

Page 57

1    Q.  Tell us a little bit about what you do know
2  about the circumstances of his death.
3    A.  I know that he was in our facility and had been
4  in there, and there was some -- our corrections
5  officers had witnessed that he was doing some things
6  that seemed abnormal.  They had contacted the medical
7  staff.  They moved him to medical and started some -- I
8  don't know what type of treatment they provided there
9  at medical.  He -- his health continued to decline.  He
10  was moved to Huntsville Hospital, and he died.
11    Q.  Looking at paragraph -- paragraph 23 on page
12  five, and the complaint alleges because of Woods'
13  uncooperative behavior, Woods was tased on at least
14  three occasions.  And then it goes on to allege a few
15  dates.  Do you have any knowledge as to whether he was
16  or was not tased by officers there at the jail?
17    A.  Sir, all I have is the information that was
18  provided, and I would have to -- I would have to go
19  back and review all the documentation.
20    Q.  So sitting here today, you do not know one way
21  or the other?
22    A.  No.
23    Q.  Then looking at paragraph 25, it alleges, "From

Page 58

1  August 7th until Woods was found near death on August
2  19th, Woods' intake of food and water was not
3  monitored, though correctional and medical personnel
4  was aware that Woods was not eating or drinking."  Do
5  you see that?
6    A.  I see that allegation, yes.
7    Q.  Are you aware of any issues regarding Woods'
8  ability to obtain food or water during his
9  imprisonment?
10    A.  No.
11    Q.  At the bottom of page five, it says or alleges,
12  "From the evening of August 14, 2013, until Woods was
13  found near death on August 19, Woods lay in his cell
14  dying before the eyes of correctional and ACH
15  personnel."  Did I read that allegation correctly?
16    A.  That's the allegation, yes.
17    Q.  So in that allegation, it does say or they
18  contend that there was some knowledge of correctional
19  officers of his condition?
20       MR. HODGE:  And ACH.
21    Q.  (BY MR. CLAPP) And ACH?
22    A.  Yes.
23    Q.  Looking at paragraph 35 on the next page, it

Page 59

1  alleges, "On August 15, Woods was dressed and taken in
2  a wheelchair to court because he could not stand or
3  walk.  When Woods' mother saw him, he was confused,
4  nonresponsive and did not recognize her -- or did not
5  even recognize her.  She was asked what she -- she
6  asked what was wrong with her son.  A correctional
7  officer responded that it was a mental issue, and
8  Woods' mother told him her son did not have mental
9  problems, that he needed to go to the hospital.  She
10  begged the court and the correctional officers to take
11  him to the hospital."  Do you see that allegation?
12    A.  I see that allegation.
13    Q.  Are you aware of any of the facts regarding
14  Woods' court appearance and his appearance at that
15  court appearance?
16    A.  No.
17    Q.  Okay.  Do you know whether a --
18    A.  At the time?
19    Q.  Well, are you aware now?
20    A.  I'm aware now because I have read it.  And, of
21  course, I had seen the allegation before.
22    Q.  Okay.
23    A.  But I was not -- I was not made aware at the

Page 60

1  time.
2    Q.  Okay.  So this allegation alleges that there was
3  some communication between Woods' mother and the
4  correctional officers regarding some abnormality of
5  Woods at that appearance?
6    A.  That's what the allegation reads.
7    Q.  All right.  Then down at the bottom of that
8  page, paragraph 38, the complaint alleges that, "By
9  August 17th, the odor" -- and this is referring to a
10  gangrene condition -- "was so bad, correctional
11  officers dragged Woods from his cell to the shower,
12  sprayed him with water and then placed him still naked
13  in a different cell."
14    A.  That's the allegation as you read it.
15    Q.  And that refers to correctional officers and not
16  ACH personnel, right, in the allegation?
17    A.  That's the allegation, yes.
18    Q.  And in 39, it says, "Still no correctional
19  officer or ACH nurse did anything to even check Woods,
20  let alone help him."  Did I read that right?
21    A.  That's correct.
22    Q.  And turning to the next page of paragraph 43,
23  the complaint alleges, "Woods went from normal to

Page 61

1  aggressive and disruptive to barely responsive to all

2  but dead as correctional and medical staff watched."

3      A. That's what it reads.

4      Q. That's what it alleges. Then so we don't have

5  to repeat ourselves, the basic allegations regarding

6  the policies and procedures and the other things are

7  substantially the same in this complaint -- and if you

8  want to look at the language, I will certainly allow

9  you to do so. But would you agree that the rest of the

10 complaint largely mirrors the other ones?

11         MR. HODGE: Object to the form.

12     A. They are different individuals.

13     Q. (BY MR. CLAPP) Sure, sure. I understand that.

14 But just the general kind of what I will call

15 boilerplate allegations that are made against all the

16 various parties are substantially the same in the

17 Listau, Jefferson and Woods complaints, right?

18         MR. HODGE: Object to form.

19     A. In the way that I read it and the way that I

20 have seen these, it all looks like that there is

21 medical issues that medical ought to have addressed.

22     Q. (BY MR. CLAPP) And there are also allegations

23 that there are -- that there was some wrongful conduct

Page 62

1  or failure to do things on the part of correctional

2  officers?

3         MR. HODGE: Object to the form.

4      A. They are not medical experts.

5      Q. (BY MR. CLAPP) And I'm not suggesting that they

6  should or should not or had any duty, but that's just

7  what is alleged?

8      A. In the alleged, yes.

9      Q. For example, page eight of the Woods' complaint

10 that we have been looking at, paragraph 49, it says,

11 "Woods' need for evaluation and treatment in the

12 hospital was such that it would have been obvious even

13 to a layperson." And then paragraph 50, "It was

14 obvious to correctional officers and medical personnel

15 alike." Did I read that right?

16     A. Yes. That's what it says.

17     Q. I'm handing you what's been marked as

18 Defendant's Exhibit 4 to Jeff Rich's deposition, which

19 is a copy of the first amended complaint in the Foster

20 case.

21         MR. STEPHENS: Can we go off the record?

22         THE VIDEOGRAPHER: We are going off the

23 record at 12:10 p.m.

Page 63

1         (Discussion off the record.)

2         THE VIDEOGRAPHER: This begins disc number

3  three. We are back on the record at 1:31 p.m.

4      Q. (BY MR. CLAPP) Sheriff Dorning, before we broke

5  for lunch, I had handed you what's been previously

6  marked as Defendant's Exhibit 4 to Jeff Rich's

7  deposition. It's a copy of the first amended complaint

8  in the Foster matter. I have got a few questions about

9  some of the allegations in that complaint. If you will

10 first turn to page two and look at paragraph nine, it

11 alleges, "Defendant Blake Dorning was a Madison County

12 Sheriff at all relevant times. As the Sheriff, he is

13 responsible for the management of the Madison County

14 Jail. He has a nondedelegable statutory duty under

15 Alabama law to attend to the needs of detainees and

16 jailees in the Madison County Jail. He is sued in his

17 individual capacity only." Did I read that correctly?

18     A. Yes. That's what it says.

19     Q. And is it true that you have as the sheriff a

20 nondelegable statutory duty under Alabama law to attend

21 to the medical needs of detainees and jailees in

22 Madison County?

23         MR. HODGE: I'm going to object to asking

Page 64

1  him of his statutory duties.

2      A. Yeah. I don't know -- this nondelegable duty, I

3  don't know that that's correct.

4      Q. (BY MR. CLAPP) But you are not denying that you

5  have a duty under Alabama law to attend to the medical

6  needs of the detainees and jailees as the sheriff?

7      A. I have a duty under Alabama law to operate the

8  jail.

9      Q. And then looking at the next page, specifically

10 paragraph 11, alleges "Defendants Cassie Maloney, Joyce

11 Williams, Benzila Anderson, Mildred Patton, Sherry

12 King, Charity Beasley, Shelby Spicer, Felecia Deshields

13 and Emily Nibbles, hereafter the officers, were

14 correctional officers under the employment of Sheriff

15 Dorning. All their actions and monitoring and caring

16 for Whitney were done within the course and scope of

17 their employment with Dorning and under the supervision

18 of Dorning and Morrison. The officers are only sued in

19 their individual capacity." Did I read that provision

20 or allegation correctly?

21     A. Yes. You read that correctly.

22     Q. And in this allegation, once again we are just

23 discussing what's alleged, not facts or evidence or

**Blake Dorning**                                        **17 (65 - 68)**

Page 65

1  anything like that.  It's alleging that these
2  correctional officers, what's alleged in this complaint
3  arises out of their role as correctional officers in
4  monitoring and caring for Whitney Foster under their
5  employment, correct?
6        MR. HODGE:  Object to form.
7    A.  Well, that's what it says.  I mean, but it's --
8  caring for, if it's a medical thing, they don't have
9  the responsibility to care for medically.
10   Q.  (BY MR. CLAPP)  And I understand what you are
11 distinguishing between.
12   A.  An accusation and what's being said.
13   Q.  Correct.  If you will turn to page five at the
14 bottom, paragraph 19, this allegation, it states -- I'm
15 not going to read the entire thing, but if you will
16 look about midway through, it says, "With deliberate
17 indifference to the serious medical needs of inmates,
18 Madison County, Dorning, Morrison, ACH, and
19 Dr. Williams, A, failed to develop and implement
20 adequate policies and procedures for the handling of
21 detainee and jailees with serious health conditions, B,
22 failed to develop and implement adequate policies and
23 procedures for the training of correctional officers

Page 66

1  and medical staff to respond to the serious medical
2  needs of detainees and jailees.  Moreover, correctional
3  officers were trained to defer to ACH regarding medical
4  matters and to not contact outside emergency personnel
5  even if there is a medical emergency.  Correctional
6  officers who have contacted outside emergency personnel
7  directly have been disciplined."  Did I read that
8  allegation correctly?
9    A.  Yeah.
10   Q.  In this paragraph 19, the allegations deal with
11 more than just a medical malpractice claim, correct?
12        MR. HODGE:  Object to form.
13   A.  I don't see where it says medical malpractice in
14 that.
15   Q.  (BY MR. CLAPP) These allegations relate to
16 training and policies and procedures, right?
17        MR. HODGE:  Regarding medical treatment.
18   A.  It just talks about ACH medical policies,
19 medical matters.
20   Q.  (BY MR. CLAPP) And if you look at B, "failed to
21 develop and implement adequate policies and procedures
22 for the training of correctional officers," so it does
23 reference the correctional officers in addition to ACH

Page 67

1  personnel too, right?
2    A.  That -- part of that does.
3    Q.  Okay.  And in the final sentence, it also
4  alleges that correctional officers who have contacted
5  outside emergency personnel directly have been
6  disciplined, right?
7    A.  Yes.  That's what it says, but that's false.
8    Q.  I understand.  We are separating here between
9  allegations and what you know to be true or evidence.
10   A.  Well, I know that's false.
11   Q.  Turning to page eight, paragraph 30, paragraph
12 30 states in summary the deliberately indifferent
13 policies and practices of ACH, Dr. Williams, Dorning,
14 Morrison and Madison County in place at the Madison
15 County Jail include but are not limited to the
16 following."  And then it goes on to list several
17 different subparagraphs of the allegations, and just
18 look at a few of these.  Paragraph -- subparagraph D,
19 it says, "Training correctional officers to defer to
20 ACH medical decisions even when it is obvious the
21 inmate needs to immediately go to the hospital."  And
22 paragraph F, "Training correctional officers to defer
23 to ACH decisions to allow inmates in medical watch to

Page 68

1  deteriorate over the course of hours and days without
2  taking the person to the hospital for evaluation and
3  treatment of the obvious deterioration.  G, relying on
4  untrained correctional officers to monitor seriously
5  ill inmates who are placed in medical watch.  H, not
6  training correctional officers regarding what signs to
7  look for and document while monitoring inmates under
8  suicide and medical watch," and then several others.
9  Did I read those correctly?
10   A.  Yeah.  That's what it says.
11   Q.  And so these allegations were referring to
12 correctional officers and their training, right, some
13 of these?
14   A.  And ACH.
15   Q.  And ACH's personnel.  If you will look at page
16 16 under count one, Section 1983, "deliberate
17 indifference to medical needs."  Paragraph 69 alleges
18 Whitney suffered from a medical need that posed a
19 substantial risk of serious harm.  Whitney's condition
20 was so obvious that even a layperson would easily
21 recognize the necessity for attention and hospital
22 treatment.  Furthermore, even a layperson would have
23 known that if left unattended Whitney's condition

Page 69

1  rendered her exposed to a substantial risk of serious
2  injury, harm and/or death." Did I read that correctly?
3     A. Yes, number 69.
4     Q. And then paragraph 70, "Dr. Williams, the
5  nurses, Morrison and the officers all subjectively knew
6  that Whitney suffered from a serious medical need and
7  that she was unable to get medical attention for
8  herself. They also subjectively knew that the failure
9  to get treatment for Whitney's condition would result
10 in serious injury, harm and/or death. They were not
11 only aware of facts from which these conclusions could
12 be drawn, they in fact each subjectively drew such
13 conclusions. Nevertheless, they disregarded the risk
14 to Whitney and, in doing so, they acted with more than
15 gross negligence." Did I read that allegation
16 correctly?
17    A. You read it correctly.
18    Q. So in this paragraph, it alleges that Morrison
19 and the officers subjectively knew about her medical
20 needs, right?
21    A. That's what it alleges.
22    Q. And just --
23       MR. HODGE: Have y'all changed your mind

Page 70

1  about the Foster and Davis case or am I missing
2  something?
3       MR. CLAPP: Well, the Foster case is one of
4  the -- part of your claims. We went over this -- this
5  was an exhibit to Jeff's deposition. I'm just reading
6  through the allegations. I'm not asking him to comment
7  on the truth or validity of any of them.
8       MR. STEPHENS: I don't think any of the
9  prior -- I think per our agreement, none of the prior
10 questions or answers are in any way related to Foster
11 or Davis. And as I understand, all Brandon is doing is
12 asking him about allegations in the Foster complaint.
13      MR. HODGE: Is that as far as you are
14 going, I guess?
15      MR. STEPHENS: Yeah.
16      MR. CLAPP: Yes.
17      MR. HODGE: Okay.
18    Q. (BY MR. CLAPP) And then looking at paragraph 71
19 on the same page, "Whitney's serious medical needs were
20 ignored in part because of the deliberately indifferent
21 customs or policies of Madison County, Dorning,
22 Morrison, ACH and Dr. Williams, the serious medical
23 needs of prisoners in the Madison County Jail. The

Page 71

1  actions of the officers, the nurses and Dr. Williams
2  themselves indicates the breaches of fundamental
3  standards of correctional management and correctional
4  health care. Their actions are also themselves
5  indicative of inadequate policies and practices and
6  inadequate training and supervision. Madison County,
7  Dorning, Morrison, ACH and Dr. Williams subjectively
8  knew that the failure to get treatment for the serious
9  medical needs and conditions of detainees and jailees
10 would result in serious injury, harm and/or death."
11 And then it goes on, but for the part that I read, did
12 I read that correctly?
13    A. The part that you read, that's what this says.
14    Q. Okay. And in 71, at least part of the
15 allegations are directed towards you as the sheriff,
16 Morrison as the jail administrator and Madison County
17 for failing to have adequate policies and management,
18 correct?
19       MR. HODGE: To the serious medical needs of
20 prisoners. I object to partially taking the sentence
21 that we have all read today out of context. It's
22 talking about customs or policies addressing medical
23 needs.

Page 72

1     A. It's talking about Dr. Williams in here also
2  with ACH. I mean --
3     Q. (BY MR. CLAPP) Sure, yeah. And I agree that it
4  says that, but I'm also focussing in part on the
5  allegations about correctional management in the
6  policies and practices of Madison County, Sheriff
7  Dorning, and Jailer Morrison, which are all included in
8  this allegation as well, correct?
9     A. Well, if you are asking me whether you read 71
10 and it was what it says, that's what it says.
11    Q. I mean, there is nothing in that allegation that
12 says "we only sued Madison County, Sheriff Dorning and
13 Steve Morrison because of ACH's actions," is there?
14       MR. HODGE: It says there is a law --
15    A. I think it's -- I think it says we are going to
16 sue everybody we can. That's what I think it looks
17 like.
18    Q. (BY MR. CLAPP) Paragraph 74 on the next page, it
19 alleges, "To be clear Madison County is only sued under
20 this count for its deliberate indifference to the
21 constitutional rights of detainees, jailees at the
22 Madison County Jail by its policy of funding as
23 described above," correct?

Page 73

1   A. That's what that says.

2   Q. And so the allegation is about its funding,

3   right, and policy?

4   A. That's what it says.

5   Q. In 75, it alleges, "All defendants acted with

6   malice and/or reckless disregard for Whitney's

7   constitutional rights and her health and safety,"

8   right?

9   A. That's what that says.

10  Q. So all defendants would mean each and every one

11  that's named, right?

12  A. What did you say?

13  Q. All defendants would include Madison County, you

14  as the Sheriff?

15  A. It would be all these folks right here.

16  Q. Correct?

17  A. Correct.

18  Q. Yes.

19  A. Pointing to the plaintiff area. I mean, the

20  defendant area. It's poorly written.

21      MR. STEPHENS: And, Sheriff, just so we are

22  all clear -- and I think we are. But for everybody's

23  sake, when you are saying in response to Mr. Clapp's

Page 74

1   questions that you agree that that's what is stated in

2   the complaint, you are only agreeing that those are the

3   words that are written there. You are not saying that

4   those things are factually true?

5       THE WITNESS: That's true.

6       MR. CLAPP: Yeah. I have tried to make

7   that clear as we have gone along.

8   Q. In count three, on page 18, is a count for

9   negligent medical malpractice. Paragraph 79 through

10  83, and then the next paragraph starting with

11  "wherefore all form the basis of the negligent medical

12  malpractice claim," if you read through there, I think

13  you will agree with me that the sheriff, Madison

14  County, Morrison and the correctional officers are not

15  included in those allegations?

16      MR. HODGE: Object to form.

17  A. It depends -- well, that's what this says, if

18  you read it. But if you look at defendants, that's

19  everybody.

20  Q. (BY MR. CLAPP) Where are you specifically

21  looking?

22  A. You read, "Wherefore, premises considered,

23  Whitney respectfully requests this honorable court,

Page 75

1   one, to enter judgment against ACH, Dr. Williams and

2   the nurses; two, to award Whitney compensation for

3   damages from these defendants."

4   Q. Referring to ACH, Dr. Williams and the nurses,

5   right?

6   A. So in that sentence there, it's not referring to

7   Dr. Williams, ACH and the nurses.

8   Q. In looking at the paragraphs numbered 79, 80,

9   81, 82 and 83 that form this claim, you do not see any

10  references to the County, you, Morrison or any of the

11  correctional officers being alleged to be liable for

12  ACH and its employees' negligent medical malpractice,

13  do you? And if you can read one of these counts or

14  paragraphs and say, "this is one that does," I'm all

15  ears. Please tell me.

16      MR. HODGE: What's the question? What's

17  the question?

18  A. Okay. In number 82, "As a direct and proximate

19  result of the combining and concurrent negligent

20  malpractice of ACH, its supervisors and its employees,

21  including Dr. Williams and the nurses, and the

22  combining and concurrent wrongful conduct of the other

23  defendants," which is everybody else. That's part of

Page 76

1   that.

2   Q. Then separately in count four, it alleges

3   strictly negligent correctional care if you look there

4   at the bottom of 19, correct?

5       MR. HODGE: Object to form.

6   A. Would that be 84?

7   Q. (BY MR. CLAPP) Count four, starting with

8   paragraph 84. I'm sorry.

9   A. Okay.

10  Q. Do you see that count?

11  A. I do, number 84. I have read it.

12  Q. Then if we look at paragraph 86 on page 20, it

13  alleges, "The officers negligently, carelessly and/or

14  skillfully assessed Whitney. They knew or should have

15  known that Whitney needed medical attention. However,

16  they negligently, A, monitored Whitney, B, ignored

17  Whitney's medical needs, C, placed too much reliance on

18  ACH and its supervisor and employees and/or, D, delayed

19  and denied Whitney treatment." Did I read that right?

20  A. That's what it says, yes, sir.

21  Q. So these allegations deal with the officer's

22  conduct, correct?

23      MR. HODGE: Object to form.

Page 77

1    A. That's what 86 says, the officers.

2    Q. (BY MR. CLAPP) And this whole count is entitled

3  "negligent correctional care," right?

4    A. Count four, yes, that's what it says.

5    Q. So it alleges -- and obviously we are talking

6  about allegations and not truth and fact in evidence.

7  But it alleges specific malfeasance or wrongful conduct

8  on the part of these individual officers, right?

9    A. That's what it says.

10    Q. Looking at count five, wantonness at the bottom

11  there on page 20, paragraph 90 says or alleges, "By

12  consciously doing and/or not doing the acts set forth

13  above, defendants" -- and I read that to mean everybody

14  that's alleged to be a defendant in this case --

15  "subjectively knew that injury would likely or probably

16  result to Whitney or someone in a substantially similar

17  position. Their conduct was wanton, reckless and

18  oppressive." Did I read that correct?

19    A. That's what it says, yes, sir.

20    Q. So this allegation says that each and every

21  defendant subjectively knew that an injury would occur

22  and characterizes that conduct as wanton, reckless or

23  oppressive, right?

Page 78

1    A. Correct.

2    Q. I believe I understood you earlier to say that

3  you did not recall yourself specifically looking at any

4  of the letters from the insurance companies or their

5  lawyers regarding insurance coverage, correct?

6    A. I can't remember. I mean, there may be some --

7  something that I viewed and then just sent it on. But,

8  I mean, I don't recall ever reading a complete letter

9  from an insurance company.

10    Q. Were you aware of the fact that Evanston had

11  offered to share the cost of defending Madison County

12  and you and Morrison in the underlying cases with

13  Madison County's insurer, OneBeacon?

14    A. I don't remember.

15    Q. I'm handing you what's been marked as

16  Defendant's 15 to Mr. Rich's deposition. It's a series

17  of e-mails between ACH personnel, OneBeacon personnel,

18  Chief Morrison and Mr. Rich, and there is no indication

19  that you were copied on this e-mail but some of this

20  has been redacted. And I was just wondering if you

21  ever saw this exchange of emails or are aware of its

22  content?

23    A. No.

Page 79

1    Q. Did you say you weren't aware of its contents?

2    A. I don't see that I received it.

3    Q. Okay. For example, one of Madison County's

4  positions that it took in this series of e-mails is

5  that OneBeacon, its insurer and Marquell who acts on

6  behalf of Essex could not agree to some coverage

7  arrangement without the agreement of the County and the

8  Sheriff. Do you see that in about the middle of the

9  first full e-mail, December 30th?

10    A. Who is Mr. Blue?

11    Q. He is a representative of for simplicity's sake

12  we'll say Essex or Evanston.

13    A. Okay. Okay. What's your question?

14    Q. Were you aware of the position taken by Madison

15  County that OneBeacon and Marquell could not agree to

16  some coverage arrangement without the agreement of the

17  County and the sheriff? That would be you.

18      MR. HODGE: You are asking him to opine on

19  the --

20      MR. CLAPP: I was just asking if he was

21  aware of that. I just asked him if he was aware of

22  that position.

23    A. I was aware that our -- that Jeff was in contact

Page 80

1  with whomever the insurance companies were or whoever

2  the representatives were. But I'm not aware of, I

3  guess, exactly what you are saying.

4    Q. Okay. Did you as the sheriff take the position

5  that OneBeacon and Essex could not come to an agreement

6  or an arrangement regarding coverage?

7    A. I had no instrument in that.

8    Q. Okay.

9    A. I had no input.

10    Q. Handing you what was marked as Defendant's

11  Exhibit 75 to Mr. Rich's deposition. This is a letter

12  from Lane Finch as attorney for Essex or Evanston to

13  both you -- well, to you, in care of Jeff Rich. This

14  is an example of one of those letters that I referred

15  to as a coverage letter or a reservation of rights

16  letter earlier. In looking at 75, is that something

17  that you ever saw or received?

18    A. No. I never received this.

19    Q. I'm also handing you what's been marked as

20  Defendant's Exhibit 82 to Mr. Rich's deposition. Just

21  generally the same question, is this a letter which is

22  addressed to you in care of Jeff Rich that you would

23  have ever looked at and reviewed?

Page 81

1   A.  I have not -- I have not.

2       MR. CLAPP:  I think I will turn it over to

3   Harold at this point.  Thank you for your time, and I

4   may have a few follow-up questions at the end.  But I'm

5   done for right now.

6

7   EXAMINATION BY MR. STEPHENS:

8       Q.  Sheriff, we met previously.  I'm Harold

9   Stephens.

10      A.  Yes, sir.

11      Q.  I represent ACH.  If at any time you don't hear

12  or understand one of my questions, Sheriff, just please

13  let me know, and I will be happy to repeat it or

14  rephrase it --

15      A.  Yes, sir.

16      Q.  -- for you, okay?  I want to start out just

17  showing you some documents and go through these briefly

18  with you.  The first was Exhibit 58 to Mr. Rich's

19  deposition, I believe.  Sheriff, this is entitled

20  "certificate of liability insurance."  And if we look

21  in the upper right-hand corner, it's dated August 10,

22  2005.  Do you see that?

23      A.  Yes, sir.

Page 82

1       Q.  And it's from Calendar and Company.  The insured

2   is shown as Advanced Correctional Healthcare.  Do you

3   see that information?

4       A.  Yes, sir.

5       Q.  I'm going to run through several of these

6   certificates of insurance, but let me just ask you

7   generally, Sheriff:  Do you recall in particular seeing

8   certificates of liability insurance during the time

9   that ACH was providing health care at the Madison

10  County Jail?

11      A.  Sir, there could have been one put in my box,

12  but it was marked to go to the County attorneys.

13      Q.  I don't want to put words in your mouth, but I

14  think I understand what you are saying.  Would it be

15  fair to say with regard to certificates of liability

16  insurance, whether they were addressed to your

17  attention or not, those are the type of documents that

18  ultimately you would have just passed along to Mr. Rich

19  as the attorney for the County --

20      A.  That's correct.

21      Q.  -- to handle?

22      A.  Him or Julian Butler at the time.

23      Q.  Okay.  Any independent recollection as to

Page 83

1   whether you saw Defendant's Exhibit 58 or not?

2       A.  No, sir.  I don't remember.

3       Q.  Let me show you next what was Exhibit 59 to

4   Mr. Rich's deposition, and this is another certificate

5   of liability insurance.  This one is dated June 27,

6   2006, in the top right corner.  Do you see that?

7       A.  Yes, sir.

8       Q.  Now this one does show, if you look at the

9   bottom left, "certificate holder, Madison County Jail."

10  Do you see that, Sheriff?

11      A.  Yes, sir.

12      Q.  And it shows the address of the jail as 100

13  North Side Square.  Is that where the jail was located

14  back in 2006?

15      A.  Yes, sir.

16      Q.  This would have been when it was on the top

17  floor of the Madison County courthouse?

18      A.  That's -- that's back when it was on the 9th and

19  10th floors, but all mail came to there.

20      Q.  Okay.  And again, no independent recollection of

21  whether you saw or didn't see this document?

22      A.  No, sir.

23      Q.  And I would just note for the record,

Page 84

1   Defendant's Exhibit 58 was Bates number Madison County

2   ACH 0166, and Defendant's Exhibit 59 is Madison County

3   0164.

4       (Defendant's Exhibit 5 was marked for

5                  identification.)

6       Q.  (BY MR. STEPHENS) Sheriff, the next document I'm

7   going to show you, I'm not sure it's been marked

8   before.  I'm going to mark it just so we will be

9   consecutive in our numbering.  I'm going to mark it as

10  Defendant's Exhibit 5.  This is another certificate of

11  liability insurance.  And if you look, Sheriff, the

12  upper right-hand corner on this document is dated

13  September 5, 2006.  Do you see that?

14      A.  Yes, sir.

15      Q.  And again under certificate holder, it has the

16  Madison County Jail at the 100 North Side Square

17  address in the lower left corner; is that correct?

18      A.  Yes, sir.

19      Q.  Let me show you next what's marked as

20  Defendant's Exhibit 60 to Mr. Rich's deposition.  And

21  this document consists of two pages, Bates numbered

22  Madison County 0260 and 0261.  If you look at the

23  second page of the document, Sheriff, this is a

Page 85

1  certificate of liability insurance dated November 9,
2  2006. Do you see that?
3    A. Yes, sir.
4    Q. And again if you look on this one, the
5  certificate holder is Madison County Jail at the bottom
6  left. Do you see that?
7    A. Yes, sir.
8    Q. And then just above that, do you see where it
9  says "Madison County AL d/b/a Madison County Jail and
10  the Sheriff of Madison County, Alabama, are included as
11  additional insureds under the general liability,
12  professional liability and civil rights liability
13  coverage as required by contract and writing." Do you
14  see that?
15    A. Yes, sir.
16    Q. Any recollection, Sheriff, at all, about reading
17  this description in terms of being an additional
18  insured or discussing that with anyone? And let me
19  digress and say this: If you had any discussions with
20  Mr. Rich or Mr. Butler while they were acting as your
21  attorney, please don't tell me about that. It's not my
22  intention to have you disclose anything related to the
23  attorney/client privilege. So -- and same thing with

Page 86

1  regard to Mr. Hodge in connection with this matter.
2  But other than your attorneys, do you recall discussing
3  this additional insured provision with anyone else?
4    A. No, no.
5    Q. Did you ever talk with anyone at ACH about
6  additional insured or named insured?
7    A. No.
8      (Defendant's Exhibit 6 was marked for
9          identification.)
10    Q. (BY MR. STEPHENS) Sheriff, I'm not sure this one
11  has been marked previously either. So let me show you
12  what I'm going to mark as Defendant's Exhibit 6 to your
13  deposition. This is another certificate of liability
14  insurance, and this one, if you look in the upper
15  right, is dated August 21, 2007. Do you see that?
16    A. Yes, sir.
17    Q. And this language says -- if you look under that
18  description of operations, it says, "Madison County,
19  Alabama, and the sheriff of Madison County, Alabama,
20  are included as additional insured under the general
21  liability, professional liability and civil rights
22  liability coverages." Do you see that?
23    A. Yes, sir.

Page 87

1    Q. Any recollection about discussing that language
2  or provision with ACH or their insurance agent or
3  representative?
4    A. No, sir. No, sir.
5    Q. I will show you next Sheriff what's been marked
6  as Defendant's Exhibit 28 to Mr. Rich's deposition
7  previously, Bates number ACH 383 and 384. And let me
8  just get you to look at the second page, if you would,
9  of this document, Sheriff. This is another certificate
10  of liability insurance. If you look at the upper
11  right-hand side, it's dated July 24, 2009, correct?
12    A. Yes, sir.
13    Q. And if you look under description of operations,
14  there is the same language that we looked at earlier
15  there about additional insured. Do you see that?
16    A. Yes, sir.
17    Q. Defendant's Exhibit 61 to Mr. Rich's deposition
18  is what I'm going to show you next, Sheriff. And this
19  letter actually is addressed to you. This is a letter
20  dated July 30, 2010, addressed to Madison County Jail,
21  Sheriff Blake Dorning, 815 Wheeler Avenue, Room 206,
22  Huntsville, Alabama, 35801, correct?
23    A. Yes, sir.

Page 88

1    Q. That's who it's addressed to?
2    A. Yes, sir.
3    Q. And just so we are clear on this, Sheriff, so
4  the 815 Wheeler Avenue address, that is where the jail
5  is currently located, correct?
6    A. That's correct.
7    Q. But your office that you maintain as sheriff is
8  actually in the Madison County courthouse?
9    A. At this time, correct.
10    Q. So would your testimony about -- would your
11  testimony about this letter be the same as what you
12  indicated to us earlier, that if it came to your
13  attention, you would simply have passed it along to
14  Mr. Rich, Mr. Butler, your legal counsel?
15    A. Yes, sir. That's correct.
16    Q. Do you recall any discussion back in July 2010
17  with Mr. Neal Leuthold, L-e-u-t-h-o-l-d, at ACH about
18  insurance or the insurance certificate?
19    A. No, sir, I do not.
20    Q. And if you look at Defendant's Exhibit 61 is
21  Bates numbered ACH 381 and 382. If you look at the
22  second page, the certificate of insurance here in the
23  upper right-hand corner, Sheriff, is dated July 29,

Page 89

1  2010.  Do you see that?

2  A. Yes, sir.

3  Q. And again that same language down toward the

4  bottom of the page about Madison County and the Sheriff

5  of Madison County being an additional insured is

6  included on this certificate of insurance; is that

7  correct?

8  A. Yes, sir.

9  Q. Sheriff, let me show you what was marked as

10  Defendant's Exhibit 29 to Mr. Rich's deposition.  And

11  this is a letter dated August 1, 2011, again addressed

12  to you from Neal Leuthold at ACH; is that correct?

13  A. Yes, sir.

14  Q. And the letter indicates that he is enclosing a

15  current certificate of insurance.  Do you see that?

16  A. Yes, sir.  That's what it says.

17  Q. And just with the prior letter from 2010, the

18  last paragraph of Mr. Leuthold's letter says if there

19  are any questions, feel free to contact him.  Do you

20  see that?

21  A. Yes, sir.

22       (Defendant's Exhibit 7 was marked for

23            identification.)

Page 90

1  Q. (BY MR. STEPHENS) And then let me show you what

2  I'm going to mark as Defendant's Exhibit 7, Sheriff, to

3  your deposition.  This is a certificate of liability

4  insurance, and this particular one is dated July 29,

5  2011, up in the upper right-hand corner.  Do you see

6  that?

7  A. Yes, sir.

8  Q. And this also has the same language we have

9  looked at earlier about Madison County and the sheriff

10  being included as additional insureds under the general

11  liability and professional liability coverages.  Do you

12  see that?

13  A. Yes, sir.

14  Q. Sheriff, let me show you what I'm going to mark

15  as Defendant's Exhibit 8 to your deposition.

16       (Defendant's Exhibit 8 was marked for

17            identification.)

18  Q. (BY MR. STEPHENS) And this is another

19  certificate of liability insurance.  This one in the

20  upper right-hand corner is dated October 4, 2012.  Do

21  you see that?

22  A. Yes, sir.

23  Q. And again the same language about the Sheriff

Page 91

1  and the County are additional insureds towards the

2  bottom of the page.  Do you see that language?

3  A. Yes, sir.

4  Q. Defendant's Exhibit 62 to Mr. Rich's deposition

5  is Bates number ACH 388, and this is another

6  certificate of liability insurance.  This one is dated

7  in the upper right-hand corner August 1, 2013, Sheriff.

8  Do you see that date?

9  A. Yes, sir.

10  Q. And again Madison County and the Sheriff are

11  included as additional insureds under the general

12  liability and professional liability coverages.  Do you

13  see that language?

14  A. Yes, sir.

15  Q. Sheriff, Defendant's 63 to Mr. Rich's deposition

16  was ACH 387 and another certificate of liability

17  insurance.  If you look in the upper right-hand corner,

18  Sheriff, this one is dated March 8, 2014.  Do you see

19  that?

20  A. Yes, sir.

21  Q. And this particular one under certificate holder

22  is directed to the Neaves Davis Center For Children on

23  -- I'm sorry, it's stricken through, but it's Cook

Page 92

1  Avenue, right?

2  A. Yes, sir.

3  Q. And that would be the juvenile detention

4  facility?

5  A. That is correct.

6  Q. But above that, it also indicates Madison

7  County, Alabama, and the director of the Neaves Davis

8  Center For Children are included as additional

9  insureds.  Do you see that?

10  A. Yes, sir.

11  Q. And then, Sheriff, Defendant's Exhibit 64 to

12  Mr. Rich's deposition, this is a certificate of

13  liability insurance dated July 28, 2014, in the upper

14  right-hand corner.  Do you see that?

15  A. Yes, sir.

16  Q. And this one, if you look under certificate

17  holder, it's for the Madison County Jail, correct,

18  although it has the 100 North Side Square?

19  A. Yes, sir.

20  Q. It's got the wrong address.  I just noticed

21  that, right?

22  A. Yes, sir.

23  Q. But in any event, it indicates Madison County,

**Blake Dorning**                                                24 (93 - 96)

Page 93

1  Alabama, and the Sheriff of Madison County, Alabama,
2  are included as additional insureds.  Do you see that?
3      A.  Yes, sir.
4      Q.  And the last one, Sheriff, this is what was
5  Defendant's Exhibit 65 to Mr. Rich's deposition is
6  another certificate of liability insurance, and this
7  one is dated July 29, 2014, in the upper right-hand
8  corner.  Do you see that?
9      A.  Yes, sir.
10     Q.  This one also, if we look under certificate
11  holder, is for the Neaves Davis Center For Children; is
12  that correct?
13     A.  Yes, sir.
14     Q.  And again it indicates that Madison County and
15  the director of the Neaves Davis Center For Children
16  are included as additional insureds; is that correct?
17     A.  Yes, sir.
18     Q.  And, Sheriff, just so we are on the same page
19  about these certificates of liability insurance, I
20  think I'm correct in this understanding.  You don't
21  have an independent recollection of receiving every one
22  of these documents, do you?
23     A.  No, sir.

Page 94

1      Q.  But if there is documentation through
2  correspondence or if the County has produced these
3  documents and records, you are also not disputing that
4  these documents were provided to the County; is that
5  right?
6      A.  If they were addressed, the County Jail and the
7  sheriff's office is 100 North Side Square.  So we get
8  mail -- anything that pertains to the office of the
9  Sheriff or the jail normally comes to that address, and
10  it still does today.
11     Q.  All right.  And if the County produced these
12  documents, which they did, several of them, by the
13  Bates number Madison County, you are not disputing that
14  the County would have received them at some point,
15  right?
16     A.  No.  I'm not disputing that.
17     Q.  If I added correctly, it appears to me, Sheriff,
18  that between 2006 and 2014 -- let me back up and just
19  make this clear.  I don't think there is any dispute or
20  disagreement about this.  The first contract between
21  you, Madison County, and ACH, I believe, was in July of
22  2006.  Is that consistent with your recollection?
23     A.  In and about that time, yes, sir.

Page 95

1      Q.  Fair enough.  And we will look at the agreement
2  in just a minute.  And then the contract between you,
3  the County, and ACH for health care services at the
4  jail was terminated, I believe, in June of 2015.  Does
5  that sound right?
6      A.  Yes, sir, close.
7      Q.  Do you ever remember receiving during that time
8  period, 2006 to 2015, a certificate of liability
9  insurance that in this box we have looked at used the
10  description of the County and you, the Sheriff, being
11  named insureds?  Do you remember seeing those words?
12     A.  In these?
13     Q.  Right.  And let me withdraw that question and
14  ask it to you this way:  You can look through several
15  of these, and we have looked at them.  And the word or
16  two words "additional insured" is used repeatedly.  Do
17  you see that?
18     A.  I see it on the one that's 10/4/2012.
19     Q.  Okay.
20     A.  So 7/29 of '14, that's the Neaves Davis Center,
21  which is not associated with the office of sheriff.
22     Q.  Look at the one right before that for 2014.
23     A.  7/28 of '14 was additional insured.  I see that.

Page 96

1  14 -- 3/8 of '14, that's probably Neaves Center.
2      Q.  That's Neaves Center.
3      A.  Okay.  13 -- 8/1 of '13, additional insured.  10
4  of 12, it's got in there of additional insured.  11,
5  it's got additional insured.  Seven of 10 has
6  additional insured.  Seven of nine has additional
7  insured.  Eight of seven has additional insured.
8  Eleven of six has additional insured.  Nine of six has
9  additional insured.  Six of six --
10     Q.  Just says Madison County, right?
11     A.  -- is included as additional insured.  August of
12  '05 --
13     Q.  Does not?
14     A.  -- does not.
15     Q.  Okay.  Do you ever remember seeing any
16  certificate of liability insurance that used the words
17  quote "named insureds," end quote?
18     A.  No, sir.  I do not see named insured.
19     Q.  And, Sheriff, as we looked at and discussed
20  earlier, all of them except the '05 one used the term
21  "additional insured," quote, unquote, right?
22     A.  Yes, sir.
23     Q.  We looked at that.  Do you recall personally

**Freedom Court Reporting, Inc**                    **877-373-3660**

Page 97

1 ever complaining to anyone at ACH that you and/or the
2 County needed to be a named insured as opposed an
3 additional insured?
4    A. No, sir.  I do not recall.
5    Q. To your knowledge did anyone else in your
6 department or anyone else on behalf of Madison County
7 that you are aware of complain about that between 2006
8 and 2014 to ACH?
9    A. No, sir, not aware of it.
10    Q. Sheriff, I think I know the answer to this, but
11 you are not currently and haven't ever been employed in
12 the field of insurance, right?
13    A. Never.
14    Q. Do you consider yourself to be an expert on the
15 topic of insurance?
16    A. Absolutely not.
17    Q. Have you ever gone to law school?
18    A. No, sir.
19    Q. Do you consider yourself to be any kind of legal
20 expert in any way?
21    A. No, sir.
22    Q. Same question about nursing or medical field.
23 Do you have any formal nursing or medical training

Page 98

1 other than, of course, CPR, emergency response
2 training?
3    A. I do not.
4    Q. Do you consider yourself to be a medical expert
5 in any way?
6    A. No, sir.
7    Q. I know you told us you went to Sparkman,
8 Sheriff.  Were you born and raised here in Madison
9 County?
10    A. I was.
11    Q. I'm just going to ask in the interest of --
12 respect for your time, if down the road you would
13 kindly provide to David -- and I know this sounds like
14 a nosy, obnoxious lawyer question.  But if you would
15 provide to David a list of relatives that you or your
16 wife have that live in north Alabama -- and I would
17 just say sort of Birmingham north -- who are 18 years
18 of age.  If you would just agree to get that to
19 Mr. Hodge, and we can deal with that that way.  That is
20 probably a long list.
21    A. It's going to be a great, big list.
22    Q. So let me sort of define this a little for you
23 to help you out providing a list.  So I would start

Page 99

1 with if you or your wife had grandparents that live in
2 north Alabama, parents that live in north Alabama,
3 brothers or sisters that live in north Alabama,
4 children that live in north Alabama, and then I would
5 probably stop at aunt and uncles.  We are not going to
6 get into cousins and all that, but if you could at
7 least sort of go through that.
8    A. Yes, sir.
9    Q. All right.  Thank you.
10    A. You want addresses too, don't you?
11    Q. Well, I would really just like name, if they are
12 employed, where they are employed, spouse's name and,
13 if spouse is employed, where spouse is employed.  Okay?
14    A. Okay.
15    Q. But again we can do that down the road.  We
16 won't take your time up doing that today.  Have you
17 ever served in any branch of the military?
18    A. No, sir.
19    Q. Tell me about what you recall in terms of your
20 initial contact with ACH.  How did you get up with them
21 or how did they get up with you?
22    A. I met Dr. Johnson at the National Sheriff's
23 Conference.  It would be a summer conference, and I

Page 100

1 can't remember when.  I can't remember which city, but
2 it's been some time ago.
3    Q. And ACH had some type of booth or something set
4 up?
5    A. That's correct, yes, sir.
6    Q. And you would have talked to Dr. Johnson about
7 their providing health care services in a jail setting,
8 what ACH did in that regard, I guess?
9    A. Just basically, "Hi.  How are you?  What size
10 jail do you run?"  And very, very informal.
11    Q. Anything else you recall about that initial
12 discussion?
13    A. No, sir, not that I can remember.
14    Q. Let me go backwards just a little bit from
15 there, Sheriff.  Who was the provider of health care
16 services for the jail prior to ACH?
17    A. Southern -- well --
18    Q. Southern Health Partners?
19    A. Well, no, sir.  Southern Health Partners was our
20 provider, and they felt that when we had the
21 instantaneous growth to take in all of the city
22 inmates, that they could not properly fulfill because
23 of the size/structure of their organization.  And so we

Page 101

1 started looking for a health care provider vendor.  I
2 had received a card just as I'm walking through at some
3 -- prior to that from Dr. Johnson.  And so I told my
4 folks when we put the bid out, make sure these folks
5 get a copy of it.  And it was Health Assurance, I
6 believe, out of Mississippi.
7    Q.  Health Assurance, LLC, of Jackson, Mississippi,
8 does that sound right?
9    A.  Yes, sir.  They were one of the bidders.  We
10 initially awarded them the bid, and they had started to
11 move in to start doing the health care at the facility.
12 Could not provide all the requirements required by our
13 bid.
14    Q.  In particular, were they able to provide
15 insurance or insurance coverage as you recall?
16    A.  As I recall, they could not provide certain
17 items as a requirement, and one of those may have been
18 the insurance or they failed -- or they failed to do
19 so.  They said they could, but then they failed to
20 produce it, which led to me terminating their contract.
21    Q.  Prior to the selection of ACH, did you have any
22 further meetings or discussions with Dr. Johnson or
23 anyone with ACH before they were actually selected?

Page 102

1    A.  Prior to?
2    Q.  Right.
3    A.  Sir, it's hard to recall.  I may have met him.
4 You know, they may have came and visited, and I may
5 have met him during that time.  It's just hard to
6 recall.
7    Q.  And then do you recall at some point after ACH
8 had been awarded the contract that Dr. Johnson came
9 down, I think, to Sirote and Permutt's office,
10 Mr. Butler and Mr. Rich's office, and made a
11 presentation to you and other representatives from the
12 County?
13    A.  I remember him coming -- I remember him coming
14 into town.
15    Q.  Okay.
16    A.  That's about as far as I can remember.
17    Q.  Let me show you what was marked as Defendant's
18 Exhibit 26 to Mr. Rich's deposition.  And this is a
19 letter from Dr. Johnson dated June 8, 2007.  Sheriff,
20 you are not copied on this letter.  Do you have any
21 recollection at all about receiving a copy of the
22 letter?
23    A.  No, sir.  I don't have a recollection of it.  In

Page 103

1 all honesty, I don't know that I would have been
2 excluded from that meeting.  But there again, it would
3 have been -- I would have to go back and look at my
4 calendar and see if I was available.
5    Q.  If Dr. Johnson recalls that you and Mr. Rich and
6 Julian Butler and Major Hancock and Charlotte Turner
7 and Mike Gillespie and Kathy Webster were present
8 there, you wouldn't dispute?
9    A.  I'm not going to dispute it.  No, sir.
10    Q.  And do you recall him giving sort of an overview
11 of how the first three quarters from July of '06 to
12 March of '07 had gone at the jail in terms of the
13 health care that ACH was providing?
14    A.  Sir, it would be hard for me to tell you that I
15 remember when I can't remember if I was there.
16    Q.  That's fine.  Let's do it this way then, and
17 we'll make it quick and short.  You don't have any
18 independent recollection of what was said or not said
19 at that --
20    A.  No, sir, I do not.
21    Q.  -- meeting; is that correct?
22    A.  I do not have any notes or anything.
23    Q.  Let me show you what was previously marked, I

Page 104

1 believe, at Mr. Rich's deposition as Defendant's
2 Exhibit 21.  It's a letter, Sheriff, to you from
3 Dr. Johnson.  Would it be fair to say, Sheriff, that
4 your testimony would be the same about this document as
5 previous documents?  You don't independently recall
6 seeing or getting this document, but you are not going
7 to deny that you did?
8    A.  Yes, sir.  That's fair.
9    Q.  Is that fair enough?  Okay.  And then
10 Defendant's Exhibit 22 is a September 12, 2006, letter
11 to you from Dr. Johnson.  Let me ask you just a couple
12 of things as we are kind of going through, Sheriff.
13    A.  Yes, sir.
14    Q.  On the first page, the paragraph that's next to
15 the bottom of the page about medical records, have you
16 had a chance to look through that or read that?
17    A.  Yes, sir.
18    Q.  And this is a follow up, Dr. Johnson says if you
19 look at the top of the page to his Huntsville visit of
20 September 8, 2006.  Do you see that?
21    A.  Yes, sir.
22    Q.  He says during that visit, he met with Kathy
23 Webster, with Jeff, and he says it was good to see you.

Page 105

1  So do you recall anything in particular about this
2  meeting or discussion on that date? Let me withdraw
3  that and just ask it to you this way. Do you recall
4  Dr. Johnson did come down in September 2006 to visit?
5     A. He says he did.
6     Q. Okay. You don't have any reason to dispute or
7  disagree with that, do you?
8     A. No, sir, I do not.
9     Q. So then back to the medical records, he says the
10  medical records were in some degree of chaos. He says
11  things are now markedly improved. There are only four
12  boxes of alphabetized records still to be filed. There
13  are about 2000 medical administration record sheets, he
14  says, and then he says this is a massive improvement
15  from the prior situation in which we had 50 boxes of
16  records that had not been appropriately filed. Do you
17  see that?
18     A. Yes, sir.
19     Q. Any reason for you dispute or disagree with his
20  characterization about what the medical records had
21  been like at the jail?
22     A. No, sir.
23     Q. And then, Sheriff, if you look over on the next

Page 106

1  page, he says at the top of the page, "A continuing
2  quality improvement meeting has been set for three on
3  Wednesday at the jail." And he says, "At that meeting
4  they will plan to have doctors, nursing staff,
5  Mr. Rich, Kathy Webster, Major Weaver and you if your
6  time permits." Did you ever go to a CQI meeting at the
7  jail?
8     A. I may have stepped in, but not sat through the
9  entire meeting.
10     Q. But you knew they were taking place, right?
11     A. I knew they were having some types of -- some
12  meetings. Sometimes it may not have included
13  Dr. Johnson.
14     Q. Okay. And then the next paragraph, he says,
15  "The policies and procedures have been completed, and
16  they are in Mr. Rich's office. And he is going to need
17  some more time before getting final approval." Do you
18  see that?
19     A. Yes, sir.
20     Q. And then look down, skip a paragraph. Then he
21  says, "Enclosed I have sent a copy of a certificate of
22  liability insurance." And if you look attached to this
23  letter, it's Bates number ACH 1239 is the certificate

Page 107

1  of liability insurance from September 5, 2006. Do you
2  see that?
3     A. Yes, sir.
4     Q. He says that the sheriff and County have
5  additional insurance and that he showed this to
6  Mr. Rich, who pointed out the entities are not legal
7  entities. And, Sheriff, if you look back -- I'm sorry
8  to jump around on you. But if you look back at the
9  certificate of liability insurance, the description
10  that's used on this certificate frankly is different, I
11  think, from some of the others. It says Madison County
12  Jail, Alabama, and the Madison County sheriff's office,
13  Alabama. Do you see that?
14     A. Yes, sir.
15     Q. So back to the letter, Dr. Johnson says that
16  Mr. Rich pointed out to him that these two entities are
17  not legal entities, and the names need to be contacted.
18  And Dr. Johnson says he is going to contact Rob
19  Bielenberg, their agent, to correct that. Do you see
20  that?
21     A. Yes, sir.
22     Q. And then he also points out that Mr. Rich had
23  said to him he doesn't think the wording is adequate,

Page 108

1  but that Jeff understood that ACH had been led to
2  believe they were going to get the exact wording
3  requested. At the last minute, the insurance company
4  refused to do that. And he says Jeff -- referring to
5  Mr. Rich -- is now investigating other ways to handle
6  this. Do you see that?
7     A. Yes, sir.
8     Q. And then he says they were looking for other
9  solutions, and then he says at this point in time,
10  they, we, have done everything -- ACH has done
11  everything they can, including firing our prior
12  insurance company and hiring a new one, but still
13  haven't been able to solve the problem. Do you see
14  that?
15     A. I see that.
16     Q. Any recollection about any discussions with
17  Dr. Johnson in this September 2006 time frame about
18  insurance or insurance coverages?
19     A. No, sir, not that I can recollect.
20     Q. And if we look at the certificate of insurance
21  that's attached, it identified Essex Insurance Company
22  as providing medical professional liability coverage,
23  their insurer. See up at the top of the page, Sheriff?

Page 109

1  Do you see that?

2  A.  Yes, sir.

3  Q.  Have you personally had any contact, telephone

4  calls, e-mails exchanged, letters to or from Essex

5  Insurance Company that you recall?

6  A.  Not that I'm aware.

7  Q.  Let me show you what's marked as Defendant's

8  Exhibit 24.  This is an October 23, 2006, letter,

9  Sheriff, to you from Dr. Johnson.  And I will give you

10  a minute to look through that.

11  A.  Yes, sir.

12  Q.  All right.  So again, Sheriff, I assume no

13  independent recollection of receiving this letter, but

14  you also would not dispute that you received it; is

15  that fair?

16  A.  Yes, sir.  Yes, sir.

17  Q.  At the beginning of the letter, Dr. Johnson

18  says, "It was good to see you at the CQI meeting at

19  your jail on October 18, 2006."  So you would have gone

20  to that CQI meeting, it appears, right?

21  A.  Yes, sir, or made an appearance.

22  Q.  Or at least appeared there?

23  A.  Yes, sir.

Page 110

1  Q.  And then in the second paragraph, he says,

2  "Overall, Dr. Johnson says the project is operating

3  very smoothly in spite of some recent staff changes,

4  and he also says the medical record backlog is almost

5  completely resolved."  Do you see that?

6  A.  Yes, sir.

7  Q.  And then he also says, "Because of the increase

8  in census with the jail approaching over a thousand

9  inmates, ACH is going to have to make some minor

10  staffing changes," right?

11  A.  Yes, sir.

12  Q.  Sheriff, Defendant's Exhibit 27 is a letter

13  dated July 7, 2009, also addressed to you from

14  Dr. Johnson.

15  A.  Yes, sir.

16  Q.  He references seeing you at a Fort Lauderdale

17  Sheriff's Association meeting, right?

18  A.  Yes, sir.  He would have had a booth there.

19  Q.  Okay.  And then he says he is glad to hear

20  things are going well with the health care program at

21  your facility, correct?

22  A.  Yes, sir.

23  Q.  He says the program has been stable for quite a

Page 111

1  while now, right?

2  A.  Yes, sir.

3  Q.  Overall he says things are quiet, no active

4  lawsuits, which he says is a good thing.  Do you see

5  that?

6  A.  Yes, sir.

7  Q.  So, Sheriff, I want to talk next about the role

8  of ACH at the jail.  You, as sheriff, certainly did not

9  expect ACH to take over the entire jail operation, did

10  you?

11  A.  No, sir.

12  Q.  You expected them to provide health care

13  services at the jail, correct?

14  A.  That's correct.

15  Q.  You did not expect them, for example, to operate

16  your kitchen at the jail, did you?

17  A.  I did not.

18  Q.  And if an inmate developed food poisoning

19  because of the food that was served at the jail and a

20  lawsuit was filed against you, you did not expect ACH

21  to defend or indemnify you in some food poisoning

22  lawsuit, did you?

23  A.  No, sir.

Page 112

1  Q.  And you didn't expect them to train your jailers

2  in terms of use of force, did you?

3  A.  No.

4  Q.  And again if an inmate was assaulted by a jailer

5  and a lawsuit was filed alleging excessive force, you

6  wouldn't have expected ACH to defend you and your

7  jailer in that lawsuit, would you?

8  A.  That's correct.

9  Q.  Cleaning and janitorial services, that wasn't

10  the responsibility of ACH at the Madison County jail,

11  was it?

12  A.  No.  You are correct.

13  Q.  So if a visitor came to the jail and slipped and

14  fell on a wet spot that had been left by the janitor or

15  the jail custodian and you as the sheriff and the jail

16  custodian got sued, you wouldn't expect ACH to defend

17  and indemnify you in that lawsuit, would you?

18  A.  No, sir.

19  Q.  You understood that the claims for which ACH

20  agreed to defend and indemnify you were claims related

21  to health care services; is that true?

22  A.  That's correct.

23  Q.  If you were sued based upon something which you

Page 113

1 as the sheriff or one of your employees had done, you
2 would not expect ACH to defend you or your employee for
3 your own wrongful conduct, would you?
4       MR. HODGE: Object to the form.
5    A. Could you repeat that for me?
6    Q. (BY MR. STEPHENS) Yes, sir. If you were sued
7 based upon something which you as the sheriff had done
8 or one of your employees as a jailer had done that did
9 not have anything to do with health care, you would not
10 have expected ACH to defend or indemnify you for your
11 wrongful conduct or the jailer's wrongful conduct,
12 true?
13    A. As long as it had nothing to do with medical,
14 that's true. And backing up though, sir, the medical
15 group has always -- even though we have a dietitian,
16 they have always had input on special meals that we
17 have to give people with diabetes, you know, things
18 like that. So they do have certain input on that.
19    Q. But they weren't actually preparing the meals?
20    A. No. That's correct.
21    Q. Sheriff, who makes the decision as to how much
22 Madison County, Alabama, spends on health care at the
23 jail? Is that the Madison County Commission?

Page 114

1    A. That is correct.
2    Q. You would agree, of course, that ACH does not
3 have a vote on the Madison County Commission, does it?
4    A. They do not.
5    Q. And with all due respect -- and we are grateful,
6 Sheriff, for your service. But you as the sheriff
7 don't have a vote on the Madison County Commission, do
8 you?
9    A. As hard as I have tried, no, sir, I don't.
10    Q. I'm not going to go through this. We have
11 talked about this some at Mr. Rich's deposition. I
12 will show it to you just so you can be sure that you
13 know what I'm talking about. But what was marked as
14 Exhibit 49 to Mr. Rich's deposition, this is a court
15 order from the United States District Court for the
16 Northern District of Alabama regarding the providing of
17 medical care to inmates at the Madison County Jail,
18 right?
19    A. Yes, sir.
20    Q. And in all fairness to you, Sheriff, this order
21 was entered actually before you were sheriff, correct?
22    A. Yes, sir.
23    Q. Sheriff Whisenant, I believe, was sheriff at the

Page 115

1 time; is that right?
2    A. Yes, sir.
3    Q. But this order continues in effect today, and
4 you are currently included under the folks who were
5 responsible for complying with the order, right?
6    A. Yes, sir.
7    Q. Sheriff, is it fair to say that there have been
8 lawsuits filed against you as sheriff since ACH took
9 over health care services at the jail where neither you
10 nor the County made a demand against ACH to come in and
11 defend and indemnify on the lawsuit? Does that make
12 sense? You are looking at me funny. Maybe not. Let
13 me withdraw the question because I want to be sure we
14 are on the same page. After ACH took over health care
15 services at the jail in 2006, have there been lawsuits
16 filed against you and/or the County that don't have
17 anything to do with health care?
18    A. Yes.
19    Q. And I'm not going to go through all these, but I
20 know there are some examples just because they have
21 been in the news and otherwise. Horatia Rice, you are
22 familiar with that matter?
23    A. Oh, yes, sir.

Page 116

1    Q. And that was -- without getting into all the
2 details -- and again you are not saying true or not
3 true, Sheriff. But the allegation there was an
4 excessive use of force claim; is that right?
5    A. That's true.
6    Q. Was Mr. Rice at the Madison County Jail when
7 that incident happened?
8    A. Yes.
9    Q. And there was no demand for defense or indemnity
10 against ACH in that matter as far as you know, true?
11       MR. HODGE: Harold, I don't think there has
12 ever been a lawsuit filed.
13    A. I don't think there has ever been a lawsuit
14 filed.
15       MR. RICH: If you read from the newspaper
16 article, then that's a different issue than the demand
17 or lawsuit, neither of which has to come to my
18 attention as the county attorney. So there would be no
19 reason to put Advanced Correctional on notice of that
20 unless they want to be put on advance notice of every
21 newspaper article that's written that addresses the
22 sheriff.
23    Q. (BY MR. STEPHENS) Okay. What about Mr. Robert

Page 117

1  Bryant?  Was there a lawsuit filed there?

2  A.  Yes.

3  Q.  And again the allegations there were related to

4  excessive force; is that right?

5  A.  That was the allegations, yes, sir.

6  Q.  And ACH was not requested to defend or indemnify

7  that matter, right?

8  A.  No, sir.

9  Q.  I believe a Madison County electrical engineer

10  claimed that he was tasered by a deputy who was

11  responding to a noise complaint at his house.  Are you

12  familiar with that matter?  You are looking funny so

13  probably not.

14  A.  When you say an engineer, I don't know who you

15  are talking about.

16      MR. HODGE:  The house party case.

17  A.  The house party with the drunks and stuff?

18  Yeah.  Yes, sir.  I remember that one.

19  Q.  (BY MR. STEPHENS) Okay.  No demand for defense

20  or indemnity by ACH in that matter?

21  A.  No, sir.  No, sir.

22  Q.  And again that was a claim, not that you agree

23  with it at all, but that was a claim related to the use

Page 118

1  of force or use of a Taser against someone?

2  A.  Yes, sir.

3  Q.  If a lawsuit is filed for a worker's

4  compensation case by a jail employee, you don't expect

5  ACH to defend and indemnify that, do you?

6  A.  No, sir.

7  Q.  And if there is a motor vehicle accident

8  involving a Madison County deputy or jail personnel,

9  you don't expect ACH to defend or indemnify that case,

10  right?

11  A.  No, sir.

12  Q.  I'm going to show you, Sheriff, what was marked

13  at Mr. Rich's deposition as Exhibit 18, and this is

14  Bates numbered ACH 301 to 321.

15      MR. STEPHENS:  I'm sorry, David and

16  Brandon, I don't have a copy of it.  But this was the

17  original agreement with ACH, as I understand it.

18  Q.  Sheriff, I just want to run through a few things

19  about this document.  First of all, did you draft any

20  portion of the document yourself?

21  A.  No, sir, I did not.

22  Q.  Do you know whether there were any changes made

23  between the agreement and the agreement that was

Page 119

1  entered into with the prior health care provider before

2  ACH?

3  A.  No, sir, I do not.

4  Q.  The document is entitled "Health Care Services

5  Agreement."  Is that right?

6  A.  Yes, sir.

7  Q.  And if you look at paragraph one, Sheriff, the

8  scope of ACH's responsibility is to develop, maintain

9  and staff a comprehensive health care services system

10  at the Madison County Jail.  Do you see that?  It's in

11  paragraph number one.

12  A.  "Whereas ACH is in the business"?  Is that where

13  you are --

14  Q.  I'm sorry.  I think it's down in actually the

15  text, Sheriff.  It's past the whereas clauses, I

16  believe.  "ACH is to develop, manage and staff" --

17  A.  Yes, sir.  I see that.

18  Q.  -- "comprehensive health care services"?

19  A.  Yes, sir.

20  Q.  And then the second paragraph of the agreement

21  describes this as a health care services contract with

22  ACH in paragraph number two.  Do you see that?

23  A.  Yes, sir.  Yes, sir.

Page 120

1  Q.  And paragraph three says that ACH will be the

2  sole supplier of health care services, correct?

3  A.  Yes, sir, first line.

4  Q.  Okay.  Go over to paragraph 6(b) that deals with

5  the topic of insurance, Sheriff.

6  A.  Yes, sir.

7  Q.  Have you ever had any discussion with anyone at

8  ACH related to this paragraph?

9  A.  It says they are going to meet minimum

10  requirements.

11  Q.  Right.  And my question simply is:  Do you ever

12  recall personally having any conversation with anyone

13  at ACH, Dr. Johnson or anybody else about this

14  paragraph?

15  A.  No, sir.

16  Q.  And what about paragraph 6(d), Sheriff, deals

17  with indemnification.  Do you -- well, let me back up.

18  You didn't draft the insurance provision in this

19  agreement, and you didn't draft the indemnification

20  part of this agreement.  And you didn't draft any part

21  of this agreement, right?

22  A.  That's correct.

23  Q.  With regard to indemnification, which is in

Page 121

1  paragraph 6(d), any conversation that you recall with

2  Dr. Johnson or anyone at ACH about this language

3  related to indemnification?

4     A. No, sir, I do not recall.

5     Q. Look over, Sheriff, to 6(h)(2). It's on page

6  ACH 309. It's entitled "duties and obligations of the

7  Sheriff." Paragraph six, letter H, subparagraph two.

8     A. Yes, sir. I see that.

9     Q. And in this regard, the agreement says, quote,

10  "The Sheriff shall maintain the responsibility for the

11  physical security of the detention facility and the

12  continuing" -- it says "securing of the inmates" end

13  quote. Is that right?

14     A. Yes, sir. Security.

15     Q. Is it security?

16     A. Yes, sir.

17     Q. Okay. There was either a typo on mine or yours.

18  I wasn't sure which one.

19         MR. STEPHENS: Yeah. Thanks, Jeff.

20     Q. And then, Sheriff, I don't have it in front of

21  me, but if you will turn to the -- I think it's the

22  last, maybe the next to the last page of Exhibit 18.

23  Do you recognize your signature? And what's the date

Page 122

1  beside of that?

2     A. 7/6 of '06.

3     Q. And then Defendant's Exhibit 50 to Mr. Rich's

4  deposition was Bates numbered ACH 280. It's a letter

5  dated May 12, 2009, addressed to Dr. Johnson. You are

6  copied on it. And it says that he is attaching a copy

7  of the 2009 health care services agreement. Do you see

8  that?

9     A. Yes, sir.

10     Q. And then Defendant's Exhibit 51 to Mr. Rich's

11  deposition, Sheriff, this is the 2009 agreement. I

12  believe it says "effective May 1, 2009, through April

13  30, 2012" on the front page, I think.

14     A. Yes, sir.

15     Q. Do you see that? Again, Sheriff, I assume you

16  didn't play any role in drafting this document, did

17  you?

18     A. No, sir. I did not.

19     Q. Did you ever have any discussion with anyone at

20  ACH about what type of insurance should be provided as

21  far as general liability, medical malpractice, Section

22  1983 insurance? Do you recall discussing that with

23  anyone at ACH?

Page 123

1     A. No, sir, I did not.

2     Q. Did you ever talk to ACH about what policy

3  limits they needed to provide in their insurance,

4  Sheriff?

5     A. No, sir.

6     Q. Did you ever talk to anyone at ACH about being a

7  named insured on their insurance policy?

8     A. Could you repeat that, please?

9     Q. Sure. Did you ever talk to anyone at ACH about

10  being a named insured on the ACH insurance policy?

11     A. No, sir.

12     Q. Sheriff, do you understand the distinction

13  between primary insurance coverage and excess insurance

14  coverage?

15     A. Not really.

16     Q. Okay. Did you ever -- we'll go at it this way.

17  Did you ever have any conversation with anyone at ACH

18  about whether their insurance coverage was primary or

19  excess?

20     A. No, sir.

21     Q. Did you personally ever receive a copy that you

22  recall of the actual insurance policy itself from ACH

23  or ACH's insurance agent?

Page 124

1     A. Not that I recall.

2     Q. Do you ever recall requesting either verbally or

3  in writing that ACH provide you a copy of the actual

4  insurance policy?

5     A. No, sir, I do not recall.

6     Q. You don't deny though that you would have

7  received from time to time certificates of insurance

8  related to ACH's insurance coverage, correct?

9     A. If they mailed them to us, then it would

10  probably have came to the sheriff's office.

11     Q. Defendant's Exhibit 53 to Mr. Rich's deposition

12  was ACH 259 dated July 11th, 2012. And it just

13  indicates that it's forwarding a copy of the 2012

14  health care services agreement, and that agreement is

15  reflected in Defendant's Exhibit 54, which is ACH 260

16  through 279, Sheriff. Did you keep at your office

17  copies of these different versions of the jail health

18  care services agreement, Sheriff?

19     A. As far as the actual contract itself?

20     Q. Right.

21     A. Sir, I don't -- I don't know.

22     Q. Not sure?

23     A. I don't think so, but I'm not sure.

Page 125

1    Q.  All right.  And the document I just showed you,
2  does your signature appear on the last page or next to
3  the last page?
4    A.  Yes, sir, it does.
5    Q.  And what's the date by it, Sheriff?
6    A.  June 4, 2012.
7    Q.  And then I'm sorry to do this to you, but if you
8  would look back at the agreement prior to this one that
9  I gave you and tell me if your signature is on that
10  document and what the date is there?
11    A.  May the 4th, 2009.
12    Q.  And that's your signature on that document?
13    A.  Yes, sir.
14    Q.  Okay.  And again, Sheriff, did you play any role
15  at all in drafting the 2009 or 2012 --
16    A.  No, sir.
17    Q.  -- agreements?  Let's stop there and take a
18  break.  I think we are about to run out of tape.
19        THE VIDEOGRAPHER:  We are going off the
20  record at 3:13 p.m.
21          (Recess taken.)
22        THE VIDEOGRAPHER:  This begins disc number
23  four.  We are back on the record at 3:29 p.m.

Page 126

1    Q.  (BY MR. STEPHENS) Sheriff, I'm going to show you
2  what was marked as Defendant's Exhibit 55 at Mr. Rich's
3  deposition.  It's ACH 237, a letter dated May 21, 2013,
4  to Dr. Johnson.  And Mr. Rich indicates that he is
5  forwarding the 2013 agreement, which I would show you
6  was marked as Defendant's Exhibit 56, Bates number ACH
7  238.  Do you recognize on Exhibit 56 there, Sheriff, is
8  that --
9    A.  My signature.
10    Q.  -- your signature on there?
11    A.  Yes.
12    Q.  What's the date by your signature?
13    A.  May 17, 2013.
14    Q.  And then I think the final agreement,
15  Defendant's Exhibit 57, which was ACH 7 through 27 to
16  Mr. Rich's deposition.  If you would look, Sheriff, at
17  the last page of that document.  Is that your
18  signature?
19    A.  Yes, sir, it is, dated February 26, 2014.
20    Q.  Okay.  Again, Sheriff, did you draft any portion
21  of this agreement?
22    A.  No, sir, I did not.
23    Q.  Look over, if you would, at paragraph 6(t) as in

Page 127

1  Tom, entitled "Cost Sharing/Cost Pool".
2    A.  What page is that?
3    Q.  I am unfortunately -- check ACH 014.  No.  It's
4  going to be after that.
5        MR. HODGE:  Sixteen.
6    Q.  (BY MR. STEPHENS) Page 16?
7    A.  Sixteen?  Okay.  Yes, sir.
8    Q.  Okay.  So tell me just in general about this
9  cost sharing, cost pool, Sheriff.  How did that work?
10    A.  Sir, if I understand it correctly, okay?  This
11  would be for moneys that are utilized for outside
12  health care costs.
13    Q.  And do you know who would have determined that
14  $761,074.76 would be allocated on a quarterly basis for
15  health care at the jail?
16    A.  That would have been ACH.
17    Q.  How would they have made that determination?
18    A.  Sir, I -- I guess it's by experience at the
19  facility.
20    Q.  Did the Madison County Commission play any role
21  in setting that number?
22    A.  No, sir, not that I'm aware of.
23    Q.  They provided the total funding, and then ACH

Page 128

1  allocated costs for outside health care is your
2  understanding?
3    A.  It's my understanding that this is what they
4  would -- they determined that it would cost, and that
5  it was set up that there would be payments of $200,000
6  to -- for those costs, I guess, quarterly, I guess, to
7  be used or however necessary.
8    Q.  Sheriff, do you have any knowledge that would
9  indicate that Essex Insurance Company or Evanston
10  Insurance Company has become insolvent?
11    A.  No, sir.
12    Q.  Did you ever have any discussion with
13  Dr. Johnson or anyone else at ACH as to whether their
14  insurance carrier was authorized to do business in the
15  State of Alabama?
16    A.  No, sir, not that I'm aware.
17    Q.  Sheriff, you were never deposed in the Woods,
18  Jefferson or Listau cases; is that correct?
19    A.  No, sir, I was not.
20    Q.  Mr. Morrison was deposed in those cases but has
21  subsequently passed away, as I understand it.  Is that
22  right?
23    A.  He has passed away.  I couldn't answer as to

Page 129

1  whether he was deposed or not.

2      Q. Have you ever seen or read his deposition that

3  was given in the underlying cases?

4      A. No, sir.

5      Q. If Mr. Morrison in his deposition described the

6  health care services provided by ACH as excellent,

7  would you dispute or disagree with his assessment?

8      A. At that particular time, I would not dispute

9  what Chief Morrison would have said.

10     Q. You were shown a copy by counsel for Essex this

11  morning the complaint in the -- in this case here,

12  which I think is Exhibit 5 maybe.  Let me take a look

13  at that.

14     A. It is Exhibit No. 3.  Is that it?

15     Q. That's not it.

16         MR. CLAPP:  I don't think I showed it.

17         MR. HODGE:  I don't think he showed him.

18     Q. (BY MR. STEPHENS) Let me show you then what was

19  marked as Exhibit 5 to Mr. Rich's deposition, Sheriff.

20  That's a complaint that was filed in the case that we

21  are here about.  Did you read this complaint before it

22  was filed?

23     A. Did I read it in its entirety?  No, sir.  No,

Page 130

1  sir.

2      Q. Is Christy Collier still employed at the Madison

3  County Jail?  You are looking at me funny.  You are not

4  going to know the answers to these questions, are you?

5      A. Sir, I don't know.  I would have to check.

6      Q. That's fine.  Do you recall ever sending or

7  receiving any e-mails to Dr. Norman Johnson or anyone

8  at ACH about health care services at the jail?

9      A. Ever?  I don't --

10     Q. By e-mail?

11     A. I don't recall.

12     Q. I don't remember seeing any.

13     A. I don't ever recall getting anything e-mailed

14  from him.

15     Q. Did you at any time from 2006 until 2014

16  personally put anything in writing to Dr. Johnson or

17  anyone else at ACH complaining that they had failed to

18  comply with the health care services agreement?

19     A. No, sir, not that I'm aware of.

20     Q. Sheriff, who would have made the decision not to

21  renew ACH's health care services agreement?

22     A. I would have.

23     Q. And what was the basis for that decision?

Page 131

1      A. Did not get a signed contract, if I remember

2  correctly.

3      Q. Did you ever send anything in writing to

4  Dr. Johnson from 2006 to 2014, complaining about any of

5  their doctors or nurses or the quality of health care

6  that they were providing?

7      A. No, sir, not from me directly.  No, sir.

8      Q. From July 2006 when the first contract with

9  Madison County and you as the Sheriff until June 2015,

10  you are aware that ACH did procure at its own expense

11  general liability, professional liability and medical

12  malpractice insurance, correct?

13     A. Based on what I have seen, yes, sir.

14     Q. And ACH also provided liability insurance

15  coverage with regard to claims asserted pursuant to 42

16  USC Section 1983?  You saw that when we looked at

17  several of the certificates of insurance, right?

18         MR. HODGE:  Object to form.

19     Q. (BY MR. STEPHENS) If you know.

20     A. Sir?

21     Q. If you know.

22     A. I don't know.

23     Q. That's fine.  Sheriff, I want to ask you some

Page 132

1  questions about the underlying cases, and again I would

2  use the same definition of underlying cases that

3  counsel for Essex did.  We are going to talk about

4  Listau and Woods and Jefferson.  Do you have a copy of

5  the Listau complaint in front of you?  That's right

6  here, Sheriff.  I'm sorry.  This is Exhibit 3 to your

7  deposition.  You have it in your right hand there.

8      A. Okay.  Yes, sir.

9      Q. Flip over, if you would, to paragraph 23 of the

10  Listau complaint.  ACH, its physicians and nurses,

11  would not have been involved in any way in the arrest

12  of Nikki Listau; is that right?

13     A. That's correct.

14     Q. Looking back through the documents, Sheriff, it

15  looks like to me the actual arrest leading to this

16  incarceration was actually made by the Huntsville

17  Police Department.  Are you familiar with that?

18     A. Yes, sir.  I understand that's who brought

19  her in for booking.

20     Q. So it wasn't you or the Madison County sheriff's

21  department that arrested her or brought her in, right?

22     A. No, sir.

23     Q. Do you recall seeing any report that Ms. Listau

Page 133

1  was resisting arrest at the time she was arrested by
2  the police department?
3     A.  No, sir.  I don't recall any report.
4     Q.  Do you know, Sheriff, whether Ms. Listau had any
5  broken bones when she was taken into custody on March
6  the 10th, 2013?
7     A.  I have no knowledge of that.
8     Q.  Look at paragraph 23, if you would.  The
9  complaint alleges that she was unresponsive on the
10  following day.  Do you see that in paragraph 23?
11        MR. HODGE:  It doesn't say that.
12        MR. STEPHENS:  Am I on the wrong paragraph?
13        THE WITNESS:  Yes, sir.
14     Q.  (BY MR. STEPHENS) Look at -- well, I think are
15  we looking -- do you have the second amended complaint?
16        MR. HODGE:  No.  We just have the
17  complaint.
18     A.  We just have the --
19        MR. HODGE:  This is just the complaint.
20     Q.  Okay.
21        MR. CLAPP:  Do you need to look at a copy
22  of one, Harold?  I can offer you mine.
23     Q.  (BY MR. STEPHENS) I tell you what.  Let's do

Page 134

1  this:  Just in the interest of being on the same page,
2  Sheriff, let me show you, I have this marked as
3  Defendant's Exhibit 34.  I think it was 34 to
4  Mr. Rich's deposition, but I'm not positive.
5        MR. STEPHENS:  Do you have one, Brandon?
6  David, here you go.
7     Q.  I'm sorry.  So look back with me now at
8  paragraph 23, which is on pages four and five, if you
9  would, Sheriff.
10     A.  Yes, sir.
11     Q.  So the complaint filed in the Listau case
12  alleges that she was arrested on the morning of March
13  10, booked into the jail and found unresponsive the
14  following day on March 11.  Do you see that?
15     A.  Yes, sir.
16     Q.  So are you familiar, Sheriff, with how
17  frequently inmates are to be checked on or observed by
18  jailers or correctional officers?
19     A.  There is a -- there is certain protocols that
20  they follow, but I don't have them in front of me.
21     Q.  But there is a jail policy or procedure with
22  regard to how frequently inmates are supposed to be
23  checked on?

Page 135

1     A.  That's correct, yes, sir.
2     Q.  Are you aware -- and you may or may not be,
3  Sheriff.  But are you aware in this case that Ms.
4  Listau, even though Dr. Williams was sued in the case,
5  that she was never actually seen by Dr. Williams?
6     A.  Not aware of that.
7     Q.  Do you have any knowledge or understanding about
8  what medical care or treatment she received while she
9  was in the jail?
10     A.  No, sir.  I do not.
11     Q.  Are you aware that Ms. Listau was in the jail
12  less than 24 hours before she was taken to Huntsville
13  Hospital?
14     A.  That's what the report indicates.
15     Q.  Look at paragraph 24, if you would, Sheriff.  It
16  says -- alleges in the complaint when Ms. Listau was
17  booked into the jail, she was not ambulatory without
18  assistance.  Do you see that allegation?
19     A.  Yes.
20     Q.  Do you know whether that's true or not?
21     A.  No, sir, I do not.
22     Q.  If Ms. Listau could not walk without assistance,
23  should she have been admitted to the Madison County

Page 136

1  Jail?
2     A.  Well, you can't just -- you can't say that for
3  that purpose because we have individuals that are
4  incarcerated all the time that some of them require
5  wheelchairs.  Some of them are so overweight that they
6  cannot support themselves.  So you can't really
7  categorize it for one particular item.
8     Q.  Let me show you what I have marked as
9  Defendant's 38.  And this is Bates No. Dorning 1769
10  through 1771.
11        MR. STEPHENS:  And, Brandon, I'm sorry I
12  don't have a copy, but I will give you mine in just a
13  second.
14        MR. CLAPP:  I have got it.
15     Q.  (BY MR. STEPHENS)  Sheriff, if we look over on
16  page 31, it says, "Any person exhibiting any of the
17  following behavior or characteristics will be denied
18  admission to the jail until evaluated by onsite medical
19  staff and/or emergency room staff at a local hospital."
20  Do you see that?  Do you see where I am reading?
21     A.  Yes, sir, I do.
22     Q.  And then if we look down at paragraph G, what
23  does it say?

Page 137

1   A.  Persons who cannot walk under their own power.

2   Q.  Do I read this to say that it was the Madison

3  County Jail policy that if you were not able to walk

4  under your own power, you would be denied admission to

5  the jail until you were either evaluated on site by

6  medical staff or you were sent to the local emergency

7  room?  Am I reading that right?

8   A.  Yes, sir.

9   Q.  Do you know whether Ms. Listau was evaluated by

10  any medical staff at the jail before she was admitted?

11   A.  I know that we had a person in booking of the

12  medical staff, but I can't tell you whether she was

13  checked or not.

14   Q.  But based on this policy, would you agree that

15  if it is true -- and I'm not saying whether it was or

16  wasn't.  But if it was true that she was not ambulatory

17  under her own power, then she should have been denied

18  access to the jail until she was either checked out by

19  onsite medical staff or until she was taken to the

20  emergency room at the hospital; is that right?

21   A.  From what this says, yes, sir.  So that she

22  would have had to have been checked by onsite medical

23  staff.

Page 138

1   Q.  But if she wasn't, she should not have been

2  admitted to the jail but should have been taken to the

3  emergency room, right?

4   A.  Yes, sir.

5   Q.  And would you agree if she had been taken to the

6  Huntsville Hospital emergency room on March 10th, 2013,

7  as opposed to being booked into the jail, you and I

8  probably wouldn't be having this conversation and there

9  wouldn't have been a lawsuit about her?

10       MR. HODGE:  Object to the form.  He can't

11  opine on something like that.

12   A.  If she was ever brought to our custody, yes,

13  sir, I'm going to be sued.  I don't mean to laugh.

14   Q.  (BY MR. STEPHENS) I understand.

15   A.  I'm not laughing at the situation.  I mean --

16   Q.  Can we agree that if the Madison County jailers

17  or correctional officers violate one of their own

18  policies and someone is injured because of it, that is

19  not the fault or responsibility of ACH, its doctors or

20  nurses?

21       MR. HODGE:  Object to form.

22   A.  Could you repeat that question, please?

23   Q.  (BY MR. STEPHENS) Yes, sir.  Can we agree that

Page 139

1  if a jailer or correctional officer at the Madison

2  County Jail violates a jail policy and someone is

3  harmed, that that harm is not the fault or

4  responsibility of ACH or its employees?

5       MR. HODGE:  Object to the form.

6   A.  The actual harm would not.  The care as a result

7  of the harm would fall under the responsibility of the

8  medical provider.

9   Q.  (BY MR. STEPHENS) Well, what if the medical

10  provider is never consulted at booking them and someone

11  is booked into the jail when they shouldn't have been,

12  is that ACH's fault?

13   A.  If they are placed in a medical cell, then that

14  is medical.  And the medical is the domain of the

15  health care provider.

16   Q.  Would you agree if your correctional officers or

17  jailers book someone into the jail in violation of jail

18  policy, you would not expect ACH to defend or indemnify

19  you for that?

20   A.  I would -- I would expect ACH to provide

21  necessary medical treatment to anyone booked into the

22  Madison County Jail at any time.

23   Q.  But you are aware that ACH did not agree to

Page 140

1  defend and indemnify you or any of your employees for

2  their own wrongful acts, true?

3   A.  We would not expect a health care provider to

4  represent us or one of the jailers if they violated the

5  rights of an inmate.  If it involved -- if that

6  violation had to do with the health care of that

7  inmate, we would expect them to provide services to the

8  inmate.

9   Q.  Look at -- in the Listau complaint, paragraph

10  24, I believe, says that when -- after Ms. Listau was

11  booked in, she required a wheelchair to get to her

12  cell.

13       MR. HODGE:  Object to the form.

14   Q.  (BY MR. STEPHENS) And I'm sorry.  The Listau

15  complaint, paragraph 24 on page five, Sheriff.  It

16  says, "When Listau was booked into the jail, she was

17  not ambulatory without assistance and required a

18  wheelchair to get to her cell."  Do you see that

19  allegation?

20   A.  Yes.

21   Q.  Do you know whether that allegation is true or

22  not?

23   A.  No, sir, I do not.

Page 141

1  Q. Would you agree that if she required a
2 wheelchair to get to her cell, then under the policy
3 that we just looked at, Exhibit 38, she should not have
4 been booked into the jail unless she was first checked
5 out by onsite medical staff or she was sent to the
6 emergency room?
7      MR. HODGE: I'm going to -- object to the
8 form of the question in that.
9  A. We have individuals booked in that don't have
10 legs. So, therefore, we have to take them to their
11 cell.
12      MR. HODGE: And, Harold, I'm objecting that
13 the allegation that you are pointing to also says that
14 when she was booked, she was identified as suffering
15 from DT's and was in -- was placed in medical watch.
16 So I don't know if there is a gap in time, but the
17 allegation you are pointing to implies that when she
18 was booked, she was identified as having delirium
19 tremens and was placed in a medical watch cell. So to
20 the extent that is not being referenced but it is in
21 part of that allegation, I object.
22  Q. (BY MR. STEPHENS) Part of my question is long
23 before she is -- well --

Page 142

1      MR. HODGE: I mean, I disagree because it
2 says when she was booked, she was identified as having
3 DT's and placed under medical watch.
4  Q. (BY MR. STEPHENS) So my question is this,
5 Sheriff: As I read this policy, if you were a person
6 who cannot walk under your own power, the policy says
7 that you quote "will be denied admission to the jail
8 until evaluated by onsite medical staff and/or
9 emergency room staff at a local hospital," end quote.
10 Is that what the policy states?
11  A. Yes, sir. That is correct.
12  Q. So doesn't it follow that if a person,
13 regardless of what other medical complications they may
14 have, if they require a wheelchair to get to their
15 cell, then that person should have been denied
16 admission to the jail until they were evaluated by
17 onsite medical staff or until they were taken to the
18 emergency room, right?
19  A. If they -- they don't go to medical unless, A,
20 someone from the medical staff says take them to
21 medical because medical is not at booking.
22  Q. Who makes the decision as to whether a person
23 can be booked into the jail or not? The jailers or ACH

Page 143

1 or both?
2  A. Both.
3  Q. Can a jailer or correctional officer decide not
4 to book an individual into the jail?
5  A. Can they?
6  Q. Yes.
7  A. Based on certain circumstances, they can, but
8 only after they have contacted supervisors. That could
9 range from improper documentation, you know, something
10 wrong with the warrant that's being produced, things
11 like that.
12  Q. All right. Based on this policy we are looking
13 at, could a jailer or correctional officer in Ms.
14 Listau's case, if she truly could not walk under her
15 own power and required a wheelchair, could a jailer or
16 correctional officer have said "we are going to deny
17 you admission to the jail and send you straight to the
18 emergency room"? Could that have been done?
19  A. Yes. It can be done.
20  Q. And if we look at paragraph 25 back to the
21 lawsuit and the complaint that was filed on behalf of
22 Ms. Listau, it alleges that she died from severe blunt
23 force injuries. Do you see that?

Page 144

1  A. Yes, sir.
2  Q. Do you know whether that's true or not?
3  A. No, sir.
4  Q. Have you seen the autopsy for Ms. Listau?
5  A. No, sir.
6      (Defendant's Exhibit 9 was marked for
7          identification.)
8  Q. (BY MR. STEPHENS) I'm going to mark this as
9 Defendant's Exhibit 9, Sheriff. So, Sheriff, the
10 document I have shown you is from the Alabama
11 Department of Forensic Sciences, and it's dated March
12 12, 2013, entitled "report of autopsy." Do you see
13 that?
14  A. Yes, sir.
15  Q. And the deceased is Nikki K. Listau. Do you see
16 that?
17  A. Yes, sir.
18  Q. Date of death of March 12, 2013. Do you see
19 that?
20  A. Yes, sir.
21  Q. "Final diagnosis, I, multiple blunt force
22 injuries." Do you see that?
23  A. Yes, sir.

Page 145

1   Q. And then II identifies acute pancreatitis,
2   right?
3   A. That's correct. Yes, sir.
4   Q. Cause of death is stated as "multiple blunt
5   force injuries." Do you see that?
6   A. Yes, sir.
7   Q. Look over, if you would, at the next page, page
8   two of Exhibit 9, "evidence of injury. There is a
9   fracture of the left femur just below the lesser
10  trochanter. It is bayonetted." Do you see that?
11  A. Yes, sir.
12  Q. So she has a broken left leg, right? Correct?
13  A. Yes, sir.
14  Q. Then a couple of sentences later, it says,
15  quote, "There are multiple rib fractures present," end
16  quote. Do you see that?
17  A. Yes, sir.
18  Q. Then it says, "There is a contusion of the left
19  upper shoulder six inches in diameter," right?
20  A. Yes, sir.
21  Q. And that means there is a bruise that's six
22  inches in diameter on her upper left shoulder, correct?
23  A. Yes, sir.

Page 146

1   Q. "There are multiple contusions, bruises, of the
2   left and right legs," correct?
3   A. Yes, sir.
4   Q. And then it says, "These appear to be of varying
5   age," correct?
6   A. Yes, sir.
7   Q. Then it says, "There is also a contusion, a
8   bruise, over the left hip six inches in diameter,"
9   correct?
10  A. That's correct.
11  Q. So, Sheriff, would you agree that only one of
12  two things can be true. Nikki Listau had to suffer
13  these injuries that we are looking at either before she
14  was locked up in the jail or after she was incarcerated
15  in the Madison County Jail, one or the other, right?
16  A. Yes, sir.
17  Q. I know you made a reference to earlier you said,
18  I believe, that you think she was beat up by her
19  husband or boyfriend. And we will look at -- there are
20  some investigation documents about that, right?
21  A. Yes, sir.
22  Q. And is that your belief in terms of how she
23  received these injuries that we are talking about?

Page 147

1   A. Yes, sir. That's the best -- that's -- they are
2   pretty serious injuries.
3   Q. Well, they are, aren't they, Sheriff?
4   A. Yes, sir.
5   Q. And, you know, just to be fair to my clients, I
6   mean, there is no allegation in the complaint that
7   Dr. Arthur Williams or any of the nurses at the jail
8   caused any of these blunt force injuries that I have
9   seen. Are you aware of anybody making that claim or
10  allegation?
11      MR. HODGE: Object to the form.
12  A. No, sir.
13  Q. (BY MR. STEPHENS) At this point, Sheriff, do
14  you know one way or the other whether Nikki Listau's
15  left leg was broken before she was booked into the jail
16  on March 10, 2013?
17  A. Sir, I have no way to know.
18  Q. Same thing on the broken ribs?
19  A. Yes, sir.
20  Q. No way to know? Do you know, Sheriff, whether
21  the jail has the video of Ms. Listau being booked into
22  the jail on March 10, 2013, or not?
23  A. Sir, I have no idea.

Page 148

1   Q. And I'm not going to go through, Sheriff, all --
2   and it's my intention candidly not to repeat any of the
3   things that Brandon went over with you earlier. But if
4   we jump ahead in the complaint, if you look at
5   paragraph 33, for example, it's alleged that Ms. Listau
6   was found unresponsive. And it says that both ACH and
7   correctional personnel had numerous opportunities to
8   save her life by sending her to the hospital is the
9   allegation. Do you see that?
10  A. Yes, sir, I do.
11  Q. And then paragraph 34 says all of the individual
12  defendants, except for you personally, were aware of
13  Ms. Listau's condition but failed to act. Do you see
14  that?
15  A. I do.
16  Q. And if you look over at paragraph 41 on page
17  seven, paragraph 41 says, "In her medical watch cell,
18  Listau was checked by correctional officers every 15
19  minutes." Do you see that?
20  A. Yes.
21  Q. And that allegation makes no reference to ACH or
22  its employees, does it?
23  A. Number 41?

Page 149

1    Q.  Yes, sir.

2    A.  No, sir.

3    Q.  Look over at paragraph 49.  Paragraph 49 talks
4  about Defendant Collier finding Ms. Listau on the floor
5  and her rambling incoherently.  Defendant Collier was a
6  jailer and correctional officer at the time; is that
7  correct?

8    A.  Correct.

9    Q.  And then paragraphs 50 and 51, it says she
10 informed Defendant Fields, who is also a correctional
11 officer at the jail, right?

12   A.  Yes.

13   Q.  And then paragraph 51, she also informed
14 Defendant Wallace, who was her superior at the jail, as
15 well as Batie, who was also her superior at the jail,
16 about Ms. Listau's condition, right?

17   A.  That's what it says, yes, sir.

18   Q.  And to be candid and in all fairness and for
19 purpose of completeness, paragraph 51 also says she
20 told medical personnel.  And it lists several ACH
21 nurses there as well, correct?

22   A.  It lists certain names.  I don't know whether
23 they are --

Page 150

1    Q.  All right.  And then paragraph 54 says,
2  "Nevertheless, correctional and medical personnel did
3  nothing for her," for Ms. Listau.  It's what the
4  allegation says?

5    A.  It's what it says, yes, sir.

6    Q.  And paragraph 62, if you look down at the bottom
7  of page nine, talks about Defendants Wallace, Hooper
8  and Guyton finding Ms. Listau on the floor, and they
9  picked her up and put her on the bed.  Again, Wallace,
10 Hooper and Guyton are all jailers or correctional
11 officers, correct?

12   A.  Yes.

13   Q.  None of them are ACH employees, right?

14   A.  That's correct.

15   Q.  And then paragraph 67 says, "All defendants were
16 jointly and severally the proximate cause of Ms.
17 Listau's death" is what's alleged in the complaint,
18 correct?

19   A.  Say that again, sir.

20   Q.  Yes.  Paragraph 67 alleges that all defendants
21 were jointly and severally the cause of Ms. Listau's
22 death is what it alleges?

23   A.  It's what it says.

Page 151

1    Q.  And look over at paragraph 15 -- I'm sorry.
2  Page 15, paragraph 98 at the bottom of the page,
3  Sheriff.  Paragraph 98 makes an allegation solely
4  related to you about an alleged refusal to investigate,
5  right?

6    A.  That's what it says.

7    Q.  And paragraph 99 also talks about an alleged
8  failure to investigate by you, correct?

9    A.  That's what it says.

10   Q.  And paragraph 102 talks about an alleged failure
11 to investigate the death of an inmate whose last name
12 was Jean is alleged in the complaint against you or
13 your designee, correct?

14   A.  That's what it says, yes, sir.

15   Q.  And again, Sheriff, I'm not saying any of these
16 things are true.  I'm just saying that's what's claimed
17 in the lawsuit.  And then, Sheriff, if you look over at
18 paragraph 143 on page 22, paragraph 143 alleges that
19 you and Mr. Morrison failed and refused to address
20 deficiencies in medical care at the jail, correct?

21        MR. HODGE:  Object to the form.  It says
22 because of the agreement with ACH they did.

23   Q.  (BY MR. STEPHENS)  So I will rephrase the

Page 152

1  question.  Paragraph 143 of the Listau complaint says
2  that "In whole or in part because of the agreement,
3  particularly its indemnification provision, Dorning and
4  Morrison failed and refused to address known systemic
5  deficiencies regarding medical care at the Madison
6  County Jail," end quote.  Is that what's alleged?

7    A.  That's what is alleged.

8    Q.  And in 143, there is no mention of ACH or any
9  ACH employees; is that right?

10        MR. HODGE:  Object to the form.  It
11 references the agreement.

12   Q.  (BY MR. STEPHENS)  Is there any reference to any
13 ACH employees by name in paragraph 143, Sheriff?

14   A.  It references medical care.

15   Q.  Is there any reference to any ACH employee by
16 name in paragraph 143?

17   A.  Not in 143 by name.

18   Q.  The only named people in 143 are Dorning and
19 Morrison, correct?

20   A.  That is correct.

21   Q.  Look over at paragraph 149 on the next page, and
22 that alleges that Madison County caused or contributed
23 to the above described customs or policies by not

Page 153

1 providing adequate funds for inmate medical care. Do
2 you see that?
3    A. I do. I see that.
4    Q. Have you seen any documentation that would
5 confirm whether Ms. Listau was brought into the jail in
6 a wheelchair or whether she was nonambulatory?
7    A. I have not seen anything other than what's in
8 the alleged accusation.
9       (Defendant's Exhibit 10 was marked for
10          identification.)
11    Q. (BY MR. STEPHENS) Sheriff, let me show you what
12 I'm going to mark as Defendant's Exhibit 10 to your
13 deposition, and this is ACH 1239 and 1240. Sheriff,
14 Exhibit 10 is entitled "report of death investigation
15 by the Alabama Department of Forensic Services"; is
16 that right?
17    A. That's correct.
18    Q. Have you seen this document before?
19    A. No, sir, I have not.
20    Q. Look at the second page with me, if you would.
21 It says, "Nikki Listau died at Huntsville Hospital
22 while incarcerated at Madison County Jail. She was
23 pronounced dead at 03:05 hours on March 12, 2013." Do

Page 154

1 you see that?
2    A. Yes, sir.
3    Q. Then it goes on to say, "According to Huntsville
4 police investigator Charlie Gray, the decedent's
5 boyfriend called 911 on March 10 to have the decedent
6 taken to the hospital for a shoulder injury. He said
7 she had fallen and injured her shoulder." Then it
8 says, "Huntsville police responded to the 911 call as
9 well. Normal standard operating procedure, SOP." And
10 then it says, "At the scene, the responding officer
11 determined the decedent had active arrest warrants for
12 harassment and resisting arrest. Instead of going to
13 the hospital, the decedent was arrested for the
14 outstanding warrants and taken to the Madison County
15 Jail." Do you see that?
16    A. Yes, sir.
17    Q. So the Huntsville police arrived at a 911 call
18 when someone needed to be taken to the hospital. But
19 because there was an outstanding warrant, instead of
20 taking the person to the hospital, they took the person
21 to the jail is what I get from that. Is that right?
22       MR. HODGE: Object to the form.
23    A. That's what it says.

Page 155

1    Q. (BY MR. STEPHENS) And then the next paragraph --
2 and we are not going to go through all this. But at
3 the jail, it says, "The decedent was unable to walk and
4 was taken into the jail by a wheelchair." Do you see
5 that?
6    A. Yes, sir.
7       (Defendant's Exhibit 11 was marked for
8          identification.)
9    Q. (BY MR. STEPHENS) Let me show you the next one
10 I'm going to mark as Defendant's Exhibit 11, Sheriff.
11 And this is a Huntsville Hospital consultation report
12 for Nikki Listau dated March 11, 2013. Do you see
13 that?
14    A. Yes.
15    Q. If we look at the third sentence in the history
16 under "history of present illness," do you see where it
17 says she was actually taken to jail in a wheelchair?
18    A. Yes, sir.
19    Q. And then if you look at the second page under
20 assessment and plan, toward the bottom of the second
21 page, Sheriff, item two, says "left hip fracture. This
22 may have occurred several days ago as she went to jail
23 in a wheelchair." Do you see that?

Page 156

1    A. Yes, sir.
2    Q. And then item four says "cardiac arrest,
3 etiology is uncertain," correct?
4    A. Yes, sir.
5       THE WITNESS: Can I take a moment to check
6 my phone?
7       MR. STEPHENS: Absolutely, sure. And catch
8 that, if you need to, Sheriff. Do you need to take a
9 break?
10       THE WITNESS: No, sir.
11       (Defendant's Exhibit 12 was marked for
12          identification.)
13    Q. (BY MR. STEPHENS) Sheriff, lastly, on the
14 Listau matter, let me show you what I have marked as
15 Defendant's Exhibit 12. I'm not going to go through
16 this, but this is a document that's on Madison County
17 sheriff's office letterhead. It's entitled "offense
18 report," and dated March 12, 2013, regarding a death
19 investigation. Correct?
20    A. Yes, sir.
21    Q. And the person or victim is Nikki Listau; is
22 that right?
23    A. Yes, sir.

Page 157

1    Q.   Have you seen or reviewed this document before,
2  Sheriff?
3    A.   No, sir.
4    Q.   Sheriff, the claim in Listau that we have looked
5  at previously was that all of the individuals, except
6  you, had knowledge of Ms. Listau's condition and failed
7  to take action.  You recall that allegation, right?
8    A.   Yes.
9    Q.   In fact, if we look at paragraph 40 of the
10 lawsuit, paragraph 40 of the second amended complaint
11 in Listau says that at the time she was booked into the
12 jail due to her severe DT's, Ms. Listau's need for
13 medical care was such that it would have been obvious
14 even to a layperson is what's alleged in the complaint.
15 Correct?
16   A.   That's what number 40 says, yes, sir.
17   Q.   And isn't it true, Sheriff, that the jail
18 personnel or correctional officers, they have the
19 ability themselves to call 911 or to send someone to
20 the emergency room, don't they?
21   A.   Yes, sir.
22   Q.   Let's talk about the Woods case for just a
23 minute.  Are you aware that Deundrez Woods was tased

Page 158

1  while he was an inmate at the Madison County Jail?
2    A.   I am now.
3    Q.   Were you before today?
4    A.   No, sir.  I didn't recall.
5    Q.   Let me show you what I'm going to mark as
6  Defendant's Exhibit 12, Sheriff, and this is Bates
7  numbered County 48.  This is an incident report in
8  August, August 2013.  In fact if we sort of start at
9  the top and work down, August 7, 2013, under comments,
10 it says, "Clean cell due to Inmate Woods scattering
11 food items."  Do you see that?
12   A.   Yes, sir.
13   Q.   And then August 8, 2013, the next day, "Deundrez
14 Woods located in G2 refused to give back his tray at
15 breakfast chow.  Inmate was given numerous verbal
16 commands to give back his tray, in which he failed to
17 comply.  Force was used to get the tray back."  And
18 then August 9, 2013, under comments, "Inmate Woods
19 refused verbal commands, became aggressive by swinging
20 his arms, lunged at officers.  Tased to gain control."
21 Do you see that?
22   A.   Yes, sir.
23   Q.   And then if we look down at the bottom, the

Page 159

1  justification for use of force, it explains that
2  Deundrez Woods would not return his tray.  He was given
3  a loud verbal command through the door, told to go to
4  the back of the cell and get on his knees.  He went to
5  the back of the cell, but Inmate Woods would not get on
6  his knees."  Do you see that?
7    A.   Yes.
8    Q.   "Officer Lewter opened the door, pulled the
9  Taser to attempt red dot compliance."  What is that,
10 Sheriff?
11   A.   There is a red dot that comes -- that's
12 projected from a Taser to the location in which the
13 projectiles or the darts will hit.
14   Q.   It says, "Inmate refused to go to his knees, was
15 aggressive by swinging his arms.  He lunged at the
16 officers.  Officer Lewter deployed the Taser X26,
17 hitting Inmate Woods in the chest and stomach."  Do you
18 see that?
19   A.   Yes.
20   Q.   He was tased for five seconds.  So that's one
21 time that he is tased, right?
22   A.   Yes, sir.
23   Q.   "Inmate was given loud verbal commands to roll

Page 160

1  over to his stomach.  Did not comply.  Inmate Woods
2  became more aggressive in getting up off the floor.
3  Was tased for five seconds and given loud verbal
4  commands to stop resisting and roll over on his
5  stomach."  So that's twice he has been tased, right?
6    A.   Yes, sir.
7    Q.   "Inmate Woods began to get up again.  Inmate was
8  tased for five more seconds."  So that's three times he
9  is tased, right?
10   A.   Yes.  That's what it says.
11   Q.   "Then Officer Sullivan and Officer Matthew Hill
12 grabbed one arm each and placed handcuffs on Inmate
13 Woods.  He is escorted out of the cell down on the
14 floor," correct?
15   A.   On the floor outside the cell, that's correct.
16   Q.   Okay.  Now we can agree that no tasing of
17 Deundrez Woods was done by ACH, Dr. Williams, or any of
18 ACH's nurses or medical personnel, correct?
19   A.   That's what it says.
20   Q.   The only tasing that would have been done of
21 Deundrez Woods would have been done by the jailers or
22 correctional officers, correct?
23   A.   That's correct.

Page 161

1    Q. And on this one occasion they tased him three
2    times, correct?
3    A. That's correct.
4    Q. Are you aware that Deundrez Woods was fighting
5    with other inmates?
6    A. No, sir.
7    Q. Sheriff, I'm sorry. The document I gave you
8    last was that Exhibit 11, Exhibit 12?
9    A. Exhibit 12.
10        (Defendant's Exhibit 13 was marked for
11            identification.)
12    Q. (BY MR. STEPHENS) Let me show you what I'm going
13    to mark as Defendant's Exhibit 13 to your deposition.
14    And, Sheriff, I'm sorry. I may have asked you, but had
15    you seen Exhibit 12 before today? Do you remember
16    seeing the report we just looked at?
17    A. No, sir. No, sir.
18    Q. Some of this is easy to read, Sheriff. Some of
19    it is hard, but the part I'm really interested in is
20    just kind of right here in the middle and there is
21    about two sentences. This is a letter I would tell you
22    that Deundrez Woods wrote to his girlfriend, the mother
23    of his child. He stated July 30, 2013, in the upper

Page 162

1    right. Do you see that?
2    A. Yes, sir.
3    Q. He writes in this letter, quote, "I done built
4    me up a goon squad in here. And even though I'm the
5    youngest person" -- do you see where I'm reading from,
6    Sheriff? It's kind of right about in the middle here.
7    It's -- I think it's ten lines down, Sheriff.
8    A. Yes, sir.
9    Q. It begins, "I done built me."
10    A. Yes, sir.
11    Q. Are you with me now?
12    A. Yes, sir. I'm reading it.
13    Q. Okay. So he wrote on July 30, 2013, "I done
14    built me up a goon squad in here. And even though I'm
15    the youngest person in here, people refer to me as the
16    alpha male. I have gotten into a couple of
17    altercations since I have been here. I literally
18    picked a guy up and power bombed his -- him, I think --
19    "on his head. About killed him for real, but I didn't
20    even get in trouble." Do you see that?
21    A. I see it.
22    Q. Has anyone indicated to you, Sheriff, that the
23    jail personnel or correctional officers were afraid of

Page 163

1    Deundrez Woods?
2    A. No, sir.
3    Q. If I told you Deundrez Woods was 18 years old
4    and weighed 300 pounds, could you realize how someone
5    would find him physically threatening or intimidating?
6    A. Yes, sir.
7    Q. Particularly in view of what we just read when
8    he is picking a guy up and dropping him on his head,
9    right?
10    A. Well, that's what he says. You don't know.
11    Q. Maybe he did, maybe he didn't?
12    A. Yeah. It's --
13    Q. Okay. Are you aware that Deundrez Woods was
14    moved into a separate cell and started refusing to eat
15    food or was throwing food around? Were you aware of
16    that?
17    A. After I read it, yes, sir.
18    Q. And then I'm not sure where it's documented, but
19    do you recall hearing or being told at all that he
20    actually covered up the drain in his cell and flooded
21    his cell with water at one time?
22    A. I don't -- I can't recall. That happens every
23    day.

Page 164

1    Q. In Deundrez Woods' case -- well, let me back up.
2    What's the usual response when an inmate does that if
3    they are in a cell by themselves?
4    A. Remove them -- extract them from the cell.
5    Q. And then is water to the cell sometimes turned
6    off?
7    A. If their sprinkler is broken, then it will --
8    we'll turn it off to repair the sprinkler head, and
9    then it's turned back on.
10    Q. Are you aware of allegations in this case that
11    jail personnel turned the water off in Deundrez Woods'
12    cell?
13    A. I'm not aware.
14    Q. Are you aware that there are allegations with
15    regard to Deundrez Woods that neither jail nor
16    correctional officers were monitoring his fluid intake
17    or his food intake?
18    A. Just in the allegation.
19    Q. And in the Woods case, just like in the Listau
20    case and the Jefferson case, there is also an
21    allegation that Madison County itself was not
22    adequately funding health care at the jail, correct?
23    A. That's in the allegation.

Page 165

1    Q.   Who would have had responsibility in August 2013
2    for monitoring an inmate's intake of fluid or
3    consumption of food?
4    A.   It would -- if a person was in the County Jail
5    that was having a medical issue and they were in the
6    medical cell, they would be the responsibility of the
7    medical personnel.
8    Q.   Do you know or have any evidence that the
9    medical personnel were told that Deundrez Woods' water
10   was cut off to his cell?
11   A.   I have no knowledge of that.
12   Q.   Are you aware that Steve Morrison testified that
13   after Deundrez Woods passed away, a policy was changed
14   with regard to jail personnel monitoring fluid and food
15   intake?
16   A.   I would have to review that.
17   Q.   So in the Jefferson case, your complaint that's
18   been filed, Exhibit 5, alleges in the complaint that
19   Ms. Jefferson died of a bowel obstruction.  Are you
20   aware of that allegation?
21   A.   Yes, I am.
22   Q.   Have you ever seen the autopsy for Ms.
23   Jefferson?

Page 166

1    A.   I don't recall that I have.
2    Q.   Sheriff, I'm going to show you what we are going
3    to mark as Exhibit 14 to your deposition.
4         (Defendant's Exhibit 14 was marked for
5              identification.)
6    Q.   (BY MR. STEPHENS) Exhibit 14 is an autopsy
7    report dated November 1, 2013.  Do you see that?
8    A.   Yes.
9    Q.   And the deceased is Tanisha Rayshell Jefferson.
10   Do you see that?
11   A.   I do.
12   Q.   Date of death is October 31, 2013, correct?
13   A.   Yes.
14   Q.   Look over, if you would, Sheriff, at -- sorry.
15   I'm trying to let the train get by.
16   A.   Sure.
17   Q.   Look over at page four of six.  It's Dorning
18   169.  "Gastrointestinal system" right about in the
19   middle of the page.  Do you see that, Sheriff?
20   A.   Yes, sir.
21   Q.   So the next to last sentence states, quote, "The
22   small and large intestines occupy their usual positions
23   within the peritoneal cavity and are unremarkable," end

Page 167

1    quote.  Do you see that?
2    A.   Yes, sir.
3    Q.   Now I know you told me you are not a doctor, and
4    you are not a nurse.  But is there any description of a
5    bowel obstruction there?
6    A.   If it was, I couldn't tell you.
7    Q.   I think you could find it, Sheriff, if it was.
8    It says that they are in their usual position, and it
9    says they are unremarkable, correct?
10   A.   Correct.
11   Q.   So let's flip back to the front page.  "Final
12   diagnosis, hypertensive cardiovascular disease."  Do
13   you see that, number one?
14   A.   Yes, sir.
15   Q.   So heart issues.  Cardiomegaly, when means
16   enlarged heart.  Other pulmonary cardiac issues.
17   Nothing under I about a bowel obstruction, is there?
18   A.   No, sir.
19   Q.   And then II says "blunt force injuries,"
20   correct?
21   A.   Yes, sir.
22   Q.   And under that is listed as "contusions of the
23   right upper extremity and lower extremity."  Do you see

Page 168

1    that?
2    A.   Yes, sir.
3    Q.   And "cause of death, cardiomyopathy, heart
4    related complications," okay?
5    A.   Yes, sir.
6    Q.   Look at the top of the next page though,
7    Sheriff, under evidence of injury.  For Ms. Jefferson,
8    it says, "A half-inch red contusion is on the medial
9    right wrist."  Do you see that?
10   A.   Yes.
11   Q.   So a bruise on her right wrist, correct?
12   A.   Yes, sir.
13   Q.   "A half by 5/16th inch red contusion and 5/16th
14   inch red contusion are clustered on the posterior
15   medial aspect of the right forearm."  So bruises on her
16   right forearm.  Do you see that?
17   A.   Yes, sir.
18   Q.   "A focal red confusion is on the posterior
19   medial aspect of the distal right forearm."  So another
20   bruise on her forearm, correct?
21   A.   That's correct.
22   Q.   "A one-and-a-quarter-inch red contusion is on
23   the right knee."  So a bruise on her right knee,

Page 169

1  correct?

2  A. Yes, sir.

3  Q. "A one-inch red contusion on the proximal

4  lateral right leg." So another bruise on her right

5  leg, correct?

6  A. Yes, sir.

7  Q. "A one-half inch red contusion is on her left

8  knee." So a bruise on her left knee, correct?

9  A. Yes, sir.

10  Q. "A three-quarter inch red contusion is on the

11  lateral left knee." So another bruise on her left

12  knee, correct?

13  A. Yes, sir.

14  Q. And then a three-quarter inch red contusion on

15  the proximal interior medial left leg. So another

16  bruise on her left leg; is that correct?

17  A. Yes, sir.

18  Q. I would be astounded if you do, Sheriff, but do

19  you have any knowledge or information about where Ms.

20  Jefferson got all these bruises from?

21  A. I have no idea.

22  Q. But this autopsy report does report blunt force

23  injuries just like Ms. Listau's reported blunt force

Page 170

1  injury, correct?

2  A. These are very small.

3  Q. Okay. And there aren't any broken bones

4  reported that I saw in the Jefferson autopsy, right?

5  A. That's true.

6  Q. Sheriff, did you read the deposition of

7  Dr. Williams that was given in the underlying cases?

8  A. No, sir.

9  Q. Are you aware that with regard to Ms. Jefferson,

10  he testified that she in fact did not have a bowel

11  obstruction?

12  A. I'm unaware.

13  Q. Are you aware of that?

14  A. I am now.

15  Q. In fact are you aware that there is

16  documentation in the jail records of her having a bowel

17  movement after being seen and treated by Dr. Williams?

18  A. No, sir. I'm not aware of that.

19  Q. Back to Deundrez Woods, if he was put in a

20  solitary cell, Sheriff, by himself, is that a decision

21  that jail personnel would have made or medical

22  personnel would have made?

23  A. Both.

Page 171

1  Q. Do you have any knowledge or information about

2  the maintenance of inmate records by ACH?

3  A. Could you repeat that?

4  Q. Yes, sir. Do you have any knowledge or

5  information about the maintenance of medical records by

6  ACH?

7  A. Knowledge, no, sir.

8  Q. In this case in particular, Sheriff, do you know

9  for insurance coverage purposes if it made any

10  difference whether you were an additional insured or a

11  named insured under the Essex or Evanston insurance

12  policy? Do you know one way or the other?

13  A. I wouldn't know.

14  Q. Other than your legal counsel, Sheriff, have you

15  discussed the allegations in the lawsuit against Essex

16  and ACH with anyone else?

17  A. No, sir.

18  Q. Do you agree that the claim against Madison

19  County for failing to adequately fund health care at

20  the jail relates to the acts or omissions of the County

21  and not of ACH?

22  A. Can you repeat that?

23  Q. Yes, sir. Do you claim that the claim against

Page 172

1  Madison County for failing to adequately fund health

2  care at the jail relates to the acts or omissions of

3  the County and not of ACH?

4  A. Sir, I don't know how to answer other than the

5  County has never not paid a medical bill that's been

6  presented to them.

7  Q. So let's go at it a different way. And I think

8  we talked about this briefly earlier, but I don't want

9  to replow this field. But the County makes the

10  ultimate decision in terms of how much money will be

11  allocated to pay for health care at the jail. Is that

12  right?

13  A. It's based upon the contract by the provider.

14  Q. But the provider doesn't have a vote to

15  determine the amount of money that's going to be

16  allocated. That's the County Commission, right?

17  A. The County Commission has the voting authority.

18  Q. And neither you nor the health care provider as

19  we talked about earlier get a vote, right?

20  A. Do not get a vote.

21  MR. STEPHENS: Let's take a break. I think

22  I'm through, David. Let me just look at a couple of

23  things, but I think I'm done.

Page 173

1         THE VIDEOGRAPHER:  We are going off the
2   record at 4:54 p.m.
3         (Recess taken.)
4         THE VIDEOGRAPHER:  This begins disc number
5   five.  We are back on the record at 5:04 p.m.
6
7   EXAMINATION BY MR. CLAPP:
8     Q.  Sheriff Dorning, I have just a couple of
9   follow-up questions, and then we will get everybody out
10  of here.  We have discussed the Woods, Jefferson and
11  Elliot cases -- Elliot has also been referred to as
12  Listau -- in a fair amount of detail here today, right?
13    A.  That's correct.
14    Q.  You are familiar with the fact that all three of
15  those cases have settled, right?
16    A.  Yes.
17    Q.  And OneBeacon has paid or contributed to that
18  settlement on behalf of Madison County, Sheriff Dorning
19  or the sheriff's office, Morrison and correctional
20  officers, correct?
21    A.  That's my understanding.
22    Q.  And in none of those cases has Madison County or
23  the other entities, your office, Morrison, have

Page 174

1   exhausted their policy limits under that OneBeacon
2   policy, right?
3     A.  Sir, I don't know.
4     Q.  Okay.  And in those settlements, in each of
5   those three cases, that was a decision that ultimately,
6   I guess, was made by OneBeacon and the lawyers
7   representing y'all, correct?
8     A.  I can't answer.  I don't know.
9         MR. CLAPP:  Okay.  That's all I have.
10  Thank you.
11        MR. STEPHENS:  I don't have anything
12  further.
13        THE VIDEOGRAPHER:  We are going off the
14  record at 5:06 p.m.  This concludes the deposition.
15
16        (Deposition concluded at 5:06 p.m.)
17
18
19
20
21
22
23

Page 175

1                 C E R T I F I C A T E
2
3   STATE OF ALABAMA)
4   JEFFERSON COUNTY)
5
6      I hereby certify that the above and foregoing
7   proceeding was taken down by me by stenographic means,
8   and that the questions and answers therein were
9   produced in transcript form by computer aid under my
10  supervision, and that the foregoing represents, to the
11  best of my ability, a true and correct transcript of
12  the proceedings occurring on said date at said time.
13      I further certify that I am neither of counsel
14  nor of kin to the parties to the action; nor am I in
15  anywise interested in the result of said case.
16      Signed the xxth day of xxxxxx, 2017.
17
18         _____
19           /s/ Anne E. Miller
20              ACCR #486
21             Expires 9/30/18
22       My commission expires 11/19/19
23

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

MADISON COUNTY SHERIFF          )
BLAKE DORNING; *et al.*,         )
     Plaintiffs,               )    CASE NO. 5:15-cv-01997-HNJ
                        )
v.                               )
                        )
EVANSTON INSURANCE               )
COMPANY; *et al.*,               )
        DEFENDANTS.              )

**THIRD NOTICE TO DEPOSE BLAKE DORNING
AND REQUEST FOR DOCUMENTS**

Please take notice that pursuant to Rule 30, Fed. R. Civ. P., Defendant Evanston Insurance Company will take the oral and videotaped deposition of Blake Dorning at Morris, King & Hodge, PC, 200 Pratt Avenue, Huntsville, Alabama, on July 24, 2017 at 9:00 a.m.

The deposition will be recorded stenographically and on videotape pursuant to Rule 30(b)(3)(A). The stenographic recording will be taken before a court reporter, or before some other officer authorized by law to administer oaths. Such deposition will be taken for the purpose of discovery or for use as evidence at trial in this action, or for both purposes. This deposition will be videotaped and Evanston provides notice to Plaintiffs and any other parties to this action that the deposition may be used at the time of trial. Videotaping the deposition is necessary

1



or desirable to aid the fact finder in their understanding of the evidence and testimony presented in this deposition and for other reasons.

The deposition will continue from day to day until completed. You are invited to attend and cross-examine.

## REQUEST FOR DOCUMENTS

The Deponent is requested pursuant to Rule 30(b)(2) to produce the following documents and Electronically Stored Information (collectively "documents"):

1.    All documents that you contend support your allegation at Doc. 28, ¶ 50, that: "Essex ... wrongfully [denied] coverage" and "Essex ... [acted] in bad faith."

2.    All documents that refer to or reflect any "Claim Expenses [incurred by you or on your behalf] associated with the investigation and defense of the claims asserted in the *Listau, Jefferson, Woods, and Foster* actions" as alleged at Doc. 28, ¶ 58.

3.    All documents that refer to or reflect any payments made directly by you for attorney's fees, court costs, Claim Expenses, settlement payments, and other expenses associated with your investigation and defense of the claims asserted in the *Listau, Jefferson, Woods, and Foster* actions.

4.     All documents that refer to or reflect any payments made on your behalf for attorney's fees, court costs, Claim Expenses, settlement payments, and other expenses associated with your investigation and defense of the claims asserted in the *Listau, Jefferson, Woods, and Foster* actions.

5.     All documents that refer to or reflect any communication between you and One Beacon or any other insurer regarding your defense for the claims asserted in the *Listau, Jefferson, Woods, and Foster* actions.

6.     All documents that refer to or reflect any communication between you and One Beacon or any other insurer regarding your coverage for the claims asserted in the *Listau, Jefferson, Woods, and Foster* actions.

7.     All documents that refer to or reflect any communication between you and One Beacon or any other insurer regarding attorney's fees, court costs, Claim Expenses, settlement payments, and other expenses associated with your defense of the claims asserted in the *Listau, Jefferson, Woods, and Foster* actions..

8.     All documents that refer to or reflect any communication between you and Essex Insurance Company, Evanston Insurance Company, or Markel Service, Incorporated.

3

DATED: July 14, 2017                    RESPECTFULLY SUBMITTED,

_____
F. Lane Finch, Jr. (ASB-0027-I58F)
Brandon J. Clapp (ASB-3990-D82W)
*Attorneys For Evanston Insurance Co.*

**OF COUNSEL**:
**Swift, Currie, McGhee & Hiers, LLP**
2 North 20th Street, Suite 1405
Birmingham, AL 35203
T: (205) 314-2401
F: (205) 244-1373
lane.finch@swiftcurrie.com
brandon.clapp@swiftcurrie.com

4

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following counsel of record via United States mail, postage prepaid and properly addressed on July 14, 2017.

David J. Hodge, Esquire
Joseph D. Aiello, Esquire
Morris, King & Hodge, PC
200 Pratt Avenue
Huntsville, AL 35801

J. Jeffrey Rich, Esquire
Madison County Attorney
Madison County, Alabama
100 Northside Square, 7th Floor
Huntsville, AL 35801
*Attorneys for Plaintiffs*

H. Harold Stephens, Esquire
Harold D. Mooty, III, Esquire
Amanda James Turnage, Esquire
Bradley Arant Boult Cummings, LLP
200 Clinton Avenue West, Suite 900
Huntsville, AL 35801
*Attorneys for Advanced Correctional Healthcare*

OF COUNSEL

5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

MADISON COUNTY SHERIFF BLAKE )
DORNING, et al.,                          )
                                          )
                    Plaintiffs,           )
                                          )
v.                                        )        CASE NO.: 5:15-cv-01997-HGD
                                          )
ESSEX INSURANCE COMPANY,                  )
et al.,                                   )
                                          )
                    Defendants.           )

## PLAINTIFF SHERIFF BLAKE DORNING'S ANSWERS TO
## ESSEX INSURANCE COMPANY'S FIRST SET OF INTERROGATORIES

COMES now the Plaintiff, Sheriff Blake Dorning, in the above styled cause and for
answers to Defendant Essex Insurance Company's first interrogatories states as follows:

### GENERAL OBJECTIONS

All general objections are incorporated into specific responses below where indicated.
Any objection or lack of objection to any of defendant's discovery requests should not be
deemed an admission that plaintiff has the information sought by a particular discovery request.

A.      Plaintiff objects to defendant's discovery requests to the extent that they do not
conform to the Federal Rules of Civil Procedure.

B.      Plaintiff objects to defendant's discovery requests to the extent that the
information/documents called for, if any, were obtained and prepared in anticipation of litigation
or for trial, and plaintiff has made no showing that he has substantial need for the
information/documents in the preparation of his case and that he is unable without undue

1



PENGAD 800-631-6989   DEFENDANT'S EXHIBIT 2

hardship to obtain a substantial equivalent of the information/documents by some other means. Plaintiff further objects to defendant's discovery requests to the extent that the information/documents called for, if any, are privileged and are not discoverable under Federal Rule of Civil Procedure 26(b)(3) and *Hickman v. Taylor*, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947).

C.    Plaintiff objects to defendant's discovery requests to the extent that they seek information protected by the attorney/client privilege or any other privilege or immunity.

D.    Plaintiff objects to defendant's discovery requests to the extent that they purport to seek confidential or proprietary information, or information otherwise inappropriate for public disclosure, prior to entry of an order of confidentiality.

E.    Plaintiff objects to defendant's discovery requests to the extent that they purport to set an unreasonable and unduly burdensome time for the responses thereto. Plaintiff will respond as indicated herein, or provide such responses at a time mutually agreeable to plaintiff and to defendant, or as otherwise ordered by the Court.

F.    Plaintiff objects to defendant's discovery requests to the extent that they seek irrelevant, inadmissible information and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. Any information and/or document supplied by plaintiff in response to any discovery request of defendant does not constitute an admission by plaintiff that such information/document is relevant to the issues in this lawsuit, or is admissible at trial.

G.    Plaintiff objects to defendant's discovery requests to the extent that they are overly broad, oppressive, unduly burdensome, expensive, and beyond the permissible scope of discovery under the Federal Rules of Civil Procedure.

H.    Plaintiff objects to defendant's discovery requests to the extent that they seek

2

information/documents that are equally available to defendant and for which the burden on defendant to obtain the information/documents requested is not greater than the burden on plaintiff.

    I.    Plaintiff objects to defendant's discovery requests to the extent that they seek a response or document involving an opinion or contention that relates to fact or the application of law to fact before discovery has been completed or until a pretrial conference or other later time.

## ANSWERS TO INTERROGATORIES

1.    State with specificity all facts you contend support your allegation that you "are affirmatively afforded coverage under the policy as [an] Additional Insured []," as stated at Doc. 28, ¶ 31, and identify every person who has knowledge of any fact stated.

**ANSWER:   Essex certified and issued a policy agreeing to insure Madison County and the Sheriff as an "Additional Insured".**

2.    Identify by claimant's name, date, case title and court, all of "the same or substantially similar claims" against which you contend Essex defended and indemnified you "over the years," as alleged in Doc. 28, ¶¶ 33, 49.

**ANSWER:   Pursuant to FRCP Rule 33(d) Plaintiffs direct Essex to its own records of previously providing coverage for similar claims.**

3.    State all facts you contend support your allegation at Doc. 28, ¶ 41, that: "As it relates to [you], the plaintiffs' claims in the *Listau, Jefferson, Woods* or *Foster* actions are merely derivative of the alleged constitutional torts committed by ACH and it physicians and nurses. Stated differently, but for the alleged deliberate indifference to serious medical needs of ACH and its physicians and nurses, no supervisory liability or inadequate funding claim would exist."

**ANSWER:   Plaintiff objects to this interrogatory as it calls for information subject to the attorney/client privilege, prepared in anticipation of litigation or in anticipation for trial, or the Attorney Work Product Doctrine which is confidential or proprietary in nature, or any other privilege.  Without waiving any objection please refer to the respective complaints alleging ACH provided inadequate health care.**

3

4.     State all facts you contend support your allegation at Doc. 28, ¶ 42, that: "Any damages sustained by [you] in the *Listau, Jefferson, Woods,* and *Foster* actions are the sole result of the acts and/or omissions of ACH and its physicians and nurses. If [you] are found liable in the *Listau, Jefferson, Woods,* and/or *Foster* actions, it would be derivative, secondary, and passive as compared to the primary and active deliberate indifference or other acts and/or omissions by ACH and its physicians and nurses related to the diagnosis and provision of medical care to *Listau, Jefferson, Woods,* and *Foster.*"

**ANSWER:   See response to Interrogatory number 3.**

5.     Identify every person who has knowledge of any fact stated in response to interrogatory nos. 3 or 4.

**ANSWER:   Plaintiff objects to the vagueness and overbroad request of "every person" with knowledge of the above requests.  The parties involved in the underlying cases would have knowledge of the respective claim allegation along with witnesses disclosed in the underlying litigation.   It is unknown which Essex employees possess this knowledge.  Plaintiff reserves the right to supplement this interrogatory as discovery progresses.**

6.     State with specificity every fact you contend supports your allegation at Doc. 28, ¶ 50, that: "Essex ... wrongfully [denied] coverage" and "Essex ... [acted] in bad faith" and identify every person who has knowledge of the facts.

**ANSWER:   Plaintiff objects to this interrogatory as it calls for information subject to the attorney/client privilege, prepared in anticipation of litigation or in anticipation for trial, or the Attorney Work Product Doctrine which is confidential or proprietary in nature, or any other privilege.  Without waiving said objection, Essex has denied coverage previously provided without any legitimate basis. Employees of Essex involved in the claims decision would possess knowledge of the claim denial along with the parties to this case.  Plaintiff reserves the right to supplement this interrogatory as discovery progresses.**

7.     State with specificity every fact you contend supports your allegation at Doc. 28, ¶ 52, that: "Essex has failed to provide ... a complete defense for [you] for the *Foster* action" or any other pending action and identify every person you contend has knowledge of any facts stated.

**ANSWER:   Essex has refused to provide any defense to any pending action for this insured.**

4

8       State with specificity every fact you contend supports your allegation at Doc. 28, ¶ 56, that "Essex denied, withdrew or failed to provide coverage for [you]" and identify every person with knowledge of the facts stated.

**ANSWER:   Essex refused to provide a defense and indemnity for these claims despite previously agreeing to provide defense and indemnity for similar claims.**

9.      Specifically, and separately, identify each allegation at Doc. 28, ¶ 57, that: "ACH's (and its physician' and nurses') acts and/or omissions in performance of the Agreement (for which [you] are allegedly liable) gave rise to the claims asserted by the plaintiffs in the *Listau, Jefferson, Woods* and *Foster* actions" and identify every person who has knowledge of the facts stated.

**ANSWER:   See respective underlying complaints.**

10.     State with specificity all facts you contend support the allegation at Doc. 28, ¶ 57, that: "[you] are, therefore, entitled to indemnification from ACH under the Agreement" and identify every person who has knowledge of the facts stated.

**ANSWER:   Pursuant to FRCP Rule 33(d) see every agreement entered into between the plaintiff and defendant ACH.  These documents have been previously produced by defendant ACH.**

11.     State with specificity the date, amount, and nature of all "Claim Expenses associated with the investigation and defense of the claims asserted in the *Listau, Jefferson, Woods,* and *Foster* actions" incurred by you as alleged at Doc. 28, ¶ 58.

**ANSWER: This amount increases daily as the respective cases are litigated.  Essex should be aware of the general nature of the expense and litigation cost as it is presumably paying the costs and fees for ACH's defense.  This response will be supplemented upon entry of a protective order and as expenses continue to mount.**

12.     Specifically describe the nature, date, and patient associated with the "health services" referenced at Doc. 28, ¶ 63, and identify every person who has knowledge of the facts stated.

**ANSWER:   Plaintiff would refer to the parties to those cases along with disclosed witnesses in the respective cases.  Essex should be aware of these persons as Essex is presumably providing defense for its other insured, ACH.**

5

13.    State with specificity each act or omission by ACH, and identify the ACH employee or agent committing each act or omission, that you contend is alleged against you by the "plaintiffs in the *Listau, Jefferson, Woods,* and *Foster* actions," as asserted in Doc. 28, ¶ 64 and identify every person who has knowledge of the facts stated.

> **ANSWER:   Please refer to the respective complaints alleging ACH provided inadequate health care. As to individuals with knowledge of the respective cases plaintiff would refer to the parties to those cases along with disclosed witnesses in the respective cases.  Essex should be aware of these persons as Essex is presumably providing defense for its other insured, ACH.**

14.    Specifically, and separately, identify each allegation in the "*Listau, Jefferson, Woods,* and *Foster* complaints ... that [you contend] triggered coverage for [you] under the Policy," as alleged at Doc. 28, ¶ 65.

> **ANSWER:   Plaintiff objects to this interrogatory as it calls for information subject to the attorney/client privilege, prepared in anticipation of litigation or in anticipation for trial, or the Attorney Work Product Doctrine which is confidential or proprietary in nature, or any other privilege.  Without waiving said objection, see respective complaints.**

15.    State with specificity every fact you contend support the allegation at Doc. 28, ¶ 68, that "Essex has breached the contract because it failed to assume the defense of the referenced complaints and indemnify [you] and otherwise provide coverage under the Policy" and identify every person who has knowledge of the facts stated.

> **ANSWER:   Plaintiff objects to this interrogatory as it calls for information subject to the attorney/client privilege, prepared in anticipation of litigation or in anticipation for trial, or the Attorney Work Product Doctrine which is confidential or proprietary in nature, or any other privilege.  Without waiving said objection, Essex refused to provide a defense and indemnity for these claims despite previously agreeing to provide defense and indemnity for similar claims.**

16.    State with specificity every fact you contend supports the allegation at Doc. 28, ¶ 69 that: "Essex has improperly denied that some or all of the claims are covered by the policy and/or that it has any defense obligations and failed to pay the costs of defense in the referenced actions."

> **ANSWER:   Essex has refused to pay the cost of defending the underlying actions and has denied coverage for any potential liability.**

17.    State with specificity every fact you contend supports the allegation at Doc. 28, ¶ 70 that: "As a result of Essex's breach of contract, [you] have incurred and will continue to incur substantial attorney's fees, court costs, Claim Expenses and other expenses in defending the *Listau, Jefferson, Woods,* and *Foster* actions, without any participation by Essex and in the bringing of this action" and itemize all such attorney's fees, court costs, Claim Expenses and other expenses.

**ANSWER:    See response to interrogatory number 11.**

18.    State with specificity every fact you contend supports the allegation at Doc. 28, ¶ 73 that Essex "will not provide and/or failed to provide a complete defense or indemnity for [you] under the Policy in the *Listau, Jefferson, Woods,* and *Foster* actions."

**ANSWER:    Essex refused to provide a defense and indemnity for these claims.**

_____
Blake Dorning, as Madison County Sheriff

STATE OF ALABAMA
COUNTY OF MADISON

I the undersigned notary public, in and for said county and state, do hereby certify that Blake Dorning, in his capacity as Sheriff of Madison County, whose name is signed to the foregoing Answers to Interrogatories and who is known to me, and after being duly sworn, acknowledged before me on this day that the information contained in the foregoing Answers to Interrogatories is true and correct and with full authority as Sheriff of Madison County he executed the same voluntarily on this the 21st day of September , 2016.

_____
Notary Public
My Commission Expires: 6·10·2018

7

Respectfully Submitted,


/s/ David J. Hodge
David J. Hodge (asb-4617-I71H)
Attorney for Plaintiff

Of Counsel:
Morris, King & Hodge, P.C.
200 Pratt Avenue
Huntsville Alabama 35801
(256) 536-0588
dhodge@mkhlawyers.com

Of Counsel:
J. Jeffery Rich, Esq.
100 North Side Square, Suite 700
Huntsville, Alabama 35801
jrich@madisoncountyal.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this the 27 day of September, 2016, I e-mailed a copy of the foregoing to the following counsel of record:

*Atty for Essex Insurance Company*
Mr. F. Lane Finch, Esq.
Mr. Brian C. Richardson, Esq.
Attorneys for Essex Insurance Company
Swift Currie McGhee & Hiers LLP
2 North 20th Street, Suite 1405
Birmingham, Alabama 35203
lane.finch@swiftcurrie.com

*Atty for Advance Correctional Healthcare*
Mr. Robert Cooper, Esq.
White Arnold & Dowd, PC
2025 Third Ave., North, Suite 500
Birmingham, Alabama 35203
rcooper@whitearnolddowd.com


/s/ David J. Hodge
David J. Hodge

8

**FILED**

2014 Jul-08  PM 01:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

ROBERT ELLIOTT, as the personal )
representative of the Estate of Nikki )
Listau, )
            )
       Plaintiff )
            )
v. )    CASE NO.
            )
MADISON COUNTY, ALABAMA; )
ADVANCED CORRECTIONAL )
HEALTHCARE, INC.; )
BLAKE DORNING; )
STEVE MORRISON; )
ARTHUR M. WILLIAMS, M.D.; )
PAMELA BATIE; )
_____ POTHIER; )
CHRISTINE COLLIER; )
VANESSA FIELDS; )
NICK WALLACE; )
_____ GUYTON; )
RANDY HOOPER; )
MICHELLE KIRK; )
DEONDRA MONTGOMERY; )
TANYA JONES; and )
TINA ADAMS, )
            )
       Defendants. )

## COMPLAINT

Plaintiff Robert Elliott complains of defendants, stating as follows:

### Nature of the Action

1.     This is a civil action brought by Elliott, whose decedent, Nikki Listau,



DEFENDANT'S
EXHIBIT
3

was denied certain constitutional rights by defendants while incarcerated in the Madison County Jail. Specifically, defendants were deliberately indifferent to Listau's serious medical needs in violation of Listau's rights as a pretrial detainee under the Fourteenth Amendment to the United States Constitution. Plaintiff also brings state law claims against the health care defendants.

## Jurisdiction and Venue

2.     This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and Title II of the Americans with Disabilities Act. The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

3.     This judicial district is an appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the suit happened in this judicial district.

## Parties

4.     Robert Elliott is of legal age and a citizen and resident of the state of Alabama. He resides in Madison County, Alabama.

5.     Defendant Madison County, Alabama is an Alabama county. It is responsible for funding the Madison County Jail, including medical care at the jail. It contracted with defendant Advanced Correctional Healthcare, Inc. to provide

2

medical services at the Madison County Jail.

6.      Defendant Advanced Correctional Healthcare, Inc. (ACH) is a private for-profit corporation that is under a contractual obligation to provide medical care for inmates in the Madison County Jail.

7.      Defendant Arthur M. Williams, M.D. is a physician who was employed by ACH to provide physician medical services and to be the director of the medical program for inmates at the Madison County Jail.

8.      Defendant Blake Dorning was the Madison County Sheriff at all relevant times. As the sheriff, among other things, he is responsible for management of the Madison County Jail. Defendant has a statutory duty under Alabama law to attend to the medical needs of inmates in the Madison  County Jail.  He is sued in his individual capacity only.

9.      Defendant Steve Morrison served as the jail administrator of the Madison County Jail at all relevant times.  He is sued in his individual capacity only.

10.      Defendant Pamela Batie was a correction officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

11.      Defendant _____ Pothier was a correction officer at the Madison County Jail at all relevant times.  She/he is sued in her individual capacity only.

12.      Defendant Christine Collier was a correction officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

3

13.     Defendant Vanessa Fields was a correction officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

14.     Defendant Nick Wallace was a correction officer at the Madison County Jail at all relevant times.  He is sued in his individual capacity only.

15.     Defendant ____ Guyton was a correction officer at the Madison County Jail at all relevant times.  She/he is sued in her individual capacity only.

16.     Defendant Randy Hooper was a correction officer at the Madison County Jail at all relevant times.  He is sued in his individual capacity only.

17.     Defendant Michelle Kirk is a Licensed Practical Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

18.     Defendant Deondra Montgomery is a Registered Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

19.     Defendant Tanya Jones is a Licensed Practical Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

20.     Defendant Tina Adams is a Licensed Practical Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

4

## Facts

21.    Nikki Listau was arrested at her home on March 10, 2013, at approximately 10:45 a.m.

22.    According to the autopsy, Listau suffered severe blunt force injuries, including a broken left femur and multiple rib fractures and died as a result of these injuries.

23.    It is not entirely clear at this time when Listau suffered these injuries.

24.    She could have suffered them before her arrest, during her arrest, or at the jail.

25.    Listau may have suffered these injuries as a result of falling off of her bunk while in a medical watch cell at the jail.

26.    Listau may have suffered these injuries as a result of seizures related to delirium tremens.

27.    In any event, according to the autopsy report, Listau died as a result of these injuries.

28.    According to hospital records, when Listau was booked into the jail, she was not ambulatory and required a wheelchair.

29.    Jail records show Listau was not even able to dress herself when she was admitted into the jail.

5

30. Either due to other health problems or due to blunt force injuries (alone or in combination with other health problems), Listau was in severe medical distress when she was admitted to the jail on March 10, 2013.

31. At the time Listau was admitted into the jail, Listau was suffering from alcohol withdrawal, also referred to as delirium tremens (DTs).

32. According to jail records, on March 11, 2013, at 11:19 a.m., approximately 24 hours after she was arrested, Listau was found unresponsive in her cell. She never recovered and was pronounced dead at the hospital on March 12, 2014.

33. Before she was found unresponsive, ACH and jail personnel had numerous opportunities to save Listau's life by sending her to the hospital.

34. Between booking on March 10 and shortly before 11:19 a.m. on March 11, 2013, all of the individual defendants except for Dorning were aware of Listau's condition yet failed to act.

35. Listau was obviously weak and suffering from serious health problems of a potentially life-threatening nature.

36. At the time of her admission to the jail, due to her severe blunt force injuries and/or other health problems, including DTs, Listau was in desperate need of medical care.

37. At a minimum, Listau was suffering from DTs at the time of her

6

admission to the jail.

38.     From prior jail admissions, Listau was known to be an alcoholic with a history of seizures during withdrawal.

39.     As a result of DTs and possibly other health issues, Listau was so weak she could not walk without assistance at the time of her admission to the jail.

40.     At the time of Listau's admission to the jail, due to DTs and possibly other health problems, Listau's need for medical care was such that it would have been obvious even to a layperson.

41.     Within a few hours of her arrest, on March 10, 2013, at approximately 2:00 p.m., Listau was placed in a medical watch cell on the instruction of ACH nurse Kirk. Listau was taken there by defendant Pothier, who observed Listau's condition and reported it to Batie, who in turn informed Morrison.

42.     In addition to defendant Kirk, ACH nurse defendants Montgomery, Jones, and Adams and jail physician Williams were also aware of Listau's condition on March 10.

43.     On the morning of March 11, 2013, at approximately 8:42 a.m., defendant Collier observed Listau naked on the floor of her cell, rambling incoherently, though at least responsive.  Defendant Collier canceled Listau's scheduled court appearance that morning (to be done by video) and reported Listau's condition to defendant Fields and defendant Batie, who in turn informed ACH

7

personnel and Morrison.

44.     By 9:00 a.m. on March 11, Listau's terrible condition had become well known at the jail.  By personal observation or otherwise, numerous persons at the jail were aware of Listau's terrible condition, including all of the individual defendants except Dorning.

45.     Later on the morning of March 11, 2013, at approximately 9:40 a.m., defendants Wallace, Hooper, and Guyton found Listau on the floor mostly non-responsive, picked her up and put her on the bed, and reported Listau's condition to Batie, who in turn reported Listau's condition to defendant Batie, who in turn informed ACH personnel and Morrison.

46.     Between 2:00 p.m. on March 10, 2013, and shortly before 11:19 a.m. on March 11, 2013, Listau's severe (and deteriorating) condition was observed by or known to numerous correction officials, including all of the individual defendants except Dorning.

47.     Despite Listau's condition, Listau received no treatment; defendants just watched Listau deteriorate and eventually die.

48.     By 11:19 a.m. on March 11, 2013, Listau was completely unresponsive and was found so.  She eventually died.

49.     As a direct and proximate result of the failure and refusal of the individual defendants except Dorning to secure emergency medical treatment for

8

Listau, Listau suffered pain and suffering and eventually died.

50.     All defendants were jointly and severally the proximate cause of Listau's pain and suffering and eventual death.

51.     The actions of jail and ACH personnel indicate systemic breaches of fundamental standards of correctional management and correctional health care.

52.     These breaches are indicative of inadequate policies and practices and inadequate training and supervision.

53.     The treatment of Listau falls far below the standard of correctional health care.

54.     Because Listau was not appropriately treated, she experienced unnecessary pain and suffering and eventually died.

55.     All of the individual defendants identified above acted with malice and/or with reckless disregard for Listau's constitutional rights.

56.     Listau's serious medical needs were ignored because of the customs or policies of defendants Madison County, Dorning, Morrison, Williams, and ACH of deliberate indifference to the serious medical needs of prisoners in the Madison County Jail.

57.     With deliberate indifference to the serious medical needs of inmates, defendants Madison County, Dorning, Morrison, Williams, and ACH failed to develop and implement adequate policies and procedures for the handling of inmates

9

with serious health conditions and failed to adequately train jail jailers and medical staff, with the foreseeable result that inmates such as Listau would not receive appropriate treatment.

58.   More generally, defendants Madison County, Dorning, Morrison, Williams, and ACH have established deliberately-indifferent customs or policies concerning inmate medical care, including but not limited to a custom or policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills.

59.   Defendants Madison County, Dorning, Morrison, Williams, and ACH were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to avoid having to pay for medical care for the inmate.  This plan included a custom or policy of delaying or denying necessary medical treatment by outside providers.  Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates.

60.   Defendants Madison County, Dorning, Morrison, Williams, and ACH were on notice that the above-described customs or policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and suffering due to delay and denial of necessary medical care. Defendants had such knowledge from prisoner complaints, communications from jailers, from their own observations, from common sense, from other lawsuits, and

10

in other ways.

61.     During 2013 at least 2 other inmates died while in the Madison County Jail under similar circumstances, Deundrez Woods (date of death August 21, 2013) and Tanisha Jefferson (date of death October 31, 2013).

62.     To a large extent, these constitutionally-deficient policies and practices regarding inmate medical care were created and implemented by the agreement between Madison County, Dorning, and ACH.

63.     The agreement, among other things, requires ACH to provide substantial insurance coverage, to name the county and the sheriff as additional insureds, and to indemnify the sheriff, the county, and their agents and employees in connection with any claim related to health care services.

64.     In whole or in part because of the agreement, Madison County, Dorning, and Morrison have failed and refused to address known systemic deficiencies regarding medical care at the Madison County Jail.

65.     Under the agreement, for Madison County to avoid liability for excess medical care expenses, it was necessary for defendants Dorning and Morrison and the jailers they managed to cooperate with ACH in controlling costs.

66.     Defendants Madison County and ACH and all individual defendants were aware the cost control measures implemented at the Madison County Jail by ACH resulted in the denial of constitutionally-required medical care for inmates with

11

serious medical needs such as Listau.

67. ACH's business model, implemented in the agreement, succeeds by underbidding the competition and implementing severe cost control measures, the necessary result of which is unnecessary inmate suffering and liability claims (dealt with through liability insurance).

68. The primary areas in which cost control measures were implemented were staffing, medications, and referrals to outside providers.

69. In order to control costs, defendant ACH, with the knowledge and consent of defendants Madison County, Dorning, and Morrison, staffed the Madison County Jail inadequately, hired sub-standard medical personnel willing to put costs over inmate health and safety, denied inmates medications, and delayed or denied medically-necessary referrals to outside providers, including necessary medical treatment like that denied Listau.

70. Alabama law vests final policymaking authority for inmate medical care in Dorning, as the representative of Madison County.

71. Defendants Madison County and Dorning, in turn, via the agreement with ACH, have delegated final policymaking authority regarding inmate medical care to ACH, and, therefore, they are liable for ACH decisions.

72. Defendant ACH acted through one or more individuals who acted as final policymakers for ACH, including defendant Williams.

12

73.     Defendant Madison County caused or contributed to the above-described customs or policies by not providing adequate funds for medical treatment for the prisoners in its custody, by continuing to retain ACH despite knowledge of ACH's policies and practices, and in other ways.

74.     All defendants acted jointly and in concert with each other. Each defendant had the duty and the opportunity to protect Listau, to obtain necessary medical treatment for Listau in a timely manner and/or to establish policies and procedures and implement training regarding such treatment, but each defendant failed and refused to perform such duty, thereby proximately causing Listau's pain and suffering and eventual death.

75.     All defendants, acting under color of state law, inflicted or caused to be inflicted cruel and unusual punishment upon Listau in violation of the Fourteenth Amendment to the United States Constitution. All defendants acted with deliberate indifference.

76.     All defendants acted with intent to violate Listau's constitutional rights or with reckless disregard for those rights, justifying punitive damages against the individual defendants and ACH.

77.     As a result of the conduct of defendants, Listau suffered physical and emotional injuries and then died.

13

## Count I - 42 U.S.C. § 1983 -
### Deliberate Indifference to Serious Medical Needs

78.    The individual defendants except Dorning, acting under color of state law within the meaning prescribed by 42 U.S.C. § 1983, were deliberately indifferent to Listau's serious medical needs as described above.  These defendants, despite knowledge of a serious medical need, took no action or clearly inadequate action and did thereby deprive Listau of her rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983.

79.    Defendants Dorning, Morrison, and Williams are supervisory officials for the jail and were responsible for development and implementation of policies and procedures for medical care at the jail and by action and inaction established the unconstitutional customs and policies described above.  These defendants did thereby deprive Listau of his rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983.

80.    Defendant Madison County intentionally refused to adequately fund medical care as described above with deliberate indifference to the serious medical needs of inmates such as Listau, had a policy of not adequately funding inmate medical care, and did thereby contribute to cause Listau's injuries and the individual defendants' denial of necessary medical treatment for Listau's serious medical need.

81.    Defendants Madison County and Dorning are also liable for the acts of

14

ACH and its policymakers, including Williams, as Madison County and Dorning delegated their final policymaking authority to them.

82.   As a result of the conduct of defendants, Listau was caused to suffer physical and emotional injuries and damages and died.

## Count II - Negligence / Wantonness

83.   The individual ACH defendants and unknown ACH employees involved with Listau's care owed a duty to Listau to meet the standard of care applicable to inmates and/or to make sure those under their supervision were trained adequately regarding the proper care of such inmates and that adequate policies and procedures regarding the proper care of such inmates were in place.  This standard of care required, among other things, appropriate monitoring of Listau's deteriorating condition and referral of Listau for emergency medical treatment outside of the jail. These defendants negligently and/or wantonly violated this standard of care or caused it to be violated with the foreseeable result that Listau suffered unnecessary pain and suffering and died.

84.   Because ACH personnel were acting within the scope of their employment, defendant ACH is liable for their negligence and/or wantonness.

## Other Matters

85.   All conditions precedent to the bringing of this suit have occurred.

## Relief Sought

86.    As relief, plaintiff seeks the following:

    a.    That plaintiff be awarded such compensatory damages as a jury shall determine from the evidence plaintiff is entitled to recover;

    b.    That plaintiff be awarded against the individual defendants such punitive damages as a jury shall determine from the evidence plaintiff is entitled to recover;

    c.    That plaintiff be awarded prejudgment and postjudgment interest at the highest rates allowed by law;

    d.    That plaintiff be awarded the costs of this action, his reasonable attorney's fees, and his reasonable expert witness fees;

    e.    That plaintiff be awarded appropriate declaratory and injunctive relief; and

    f.    That plaintiff be awarded such other and further relief to which plaintiff is justly entitled.

**Dated: July 8, 2014.**

Respectfully submitted,

Henry F. Sherrod III (ASB-1200-D63H)
HENRY F. SHERROD III, P.C.
119 South Court Street (35630)
P. O. Box 606
Florence, Alabama 35631-0606
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

Attorney for Plaintiff

**Jury Demand**

Plaintiff requests a trial by jury.

Henry F. Sherrod III

17

FILED
2014 Oct-29  PM 03:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

TANYATTA WOODS, as the )
personal representative of the Estate of )
DEUNDREZ WOODS, )
         )
        Plaintiff )
         )
v. )      CASE NO. 5:14-cv-01964-IPJ
         )
MADISON COUNTY, ALABAMA; )
et al., )
         )
        Defendants. )

### FIRST AMENDED COMPLAINT

Plaintiff Tanyatta Woods complains of defendants, stating as follows:

### Nature of the Action

1.     This is a civil action brought by Tanyatta Woods, whose decedent,

Deundrez Woods, was denied certain constitutional rights by defendants while

incarcerated in the Madison County Jail. Specifically, defendants were deliberately

indifferent to Deundrez Woods' serious medical needs in violation of his rights as

a pretrial detainee under the Fourteenth Amendment to the United States Constitution.

Plaintiff also brings state law claims against the health care defendants.

### Jurisdiction and Venue

2.     This action arises under the Fourteenth Amendment to the United States

Constitution and 42 U.S.C. § 1983. The Court has jurisdiction of this matter pursuant



DEFENDANT'S
EXHIBIT
4

to 28 U.S.C. §§ 1331 and 1343(a)(3).

3.     This judicial district is an appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the suit happened in this judicial district.

### Parties

4.     Tanyatta Woods is of legal age and a citizen and resident of the state of Alabama. She resides in Madison County, Alabama. She is the mother of Deundrez and the duly-appointed representative of his estate.

5.     Defendant Madison County, Alabama is an Alabama county. It is responsible for funding the Madison County Jail, including medical care at the jail. It contracted with defendant Advanced Correctional Healthcare, Inc. to provide medical services at the Madison County Jail.

6.     Defendant Blake Dorning was the Madison County Sheriff at all relevant times. As the sheriff, among other things, he is responsible for management of the Madison County Jail. Defendant has a statutory duty under Alabama law to attend to the medical needs of inmates in the Madison County Jail. He is sued in his individual capacity only.

7.     Defendant Steve Morrison served as the jail administrator of the Madison County Jail at all relevant times. He is sued in his individual capacity only.

2

8.      Defendant Advanced Correctional Healthcare, Inc. (ACH) is a private for-profit corporation that is under a contractual obligation to provide medical care for inmates in the Madison County Jail.

9.      Defendant Norman R. Johnson , M.D. is a physician who serves as the CEO of ACH.  He is sued in his individual capacity only.

10.     Defendant Arthur M. Williams, M.D. is a physician who was employed by ACH to provide physician medical services and to be the director of the medical program for inmates at the Madison County Jail.

11.     Defendant Janice Robinson is a Licenced Practical Nurse who was employed by ACH as the health services administrator and oversaw medical care at the jail on a day-to-day basis.

12.     Defendant Mary Ann Jones is a Licensed Practical Nurse employed by ACH to provide nursing services at the Madison County Jail at all relevant times. She is sued in her  individual capacity only

13.     Defendant Demetrus Johnson is a Licensed Practical Nurse who was employed by ACH to provide nursing and medical services for inmates at the Madison County Jail at all relevant times.

14.     Defendant Maria Sanchez is a Licensed Practical Nurse who was employed by ACH to provide nursing services for inmates at the Madison County Jail at all relevant times.

15.     Defendant Theresa Sylvestre a Licensed Practical Nurse who was employed by ACH to provide nursing services for inmates at the Madison County Jail at all relevant times.

### Facts

16.     Deundrez Woods, a 19-year-old Huntsville resident, was arrested on third degree assault and shoplifting charges and placed in the Madison County Jail on or about June 24, 2013.

17.     Woods experienced a severe and sudden change in mental functioning in late July and early August 2013 that led to Woods being moved into a medical observation cell on August 6, 2013.

18.     From August 6 until he was found near death on August 19, 2013, Woods' condition deteriorated. During this time period, it was clear that something was seriously wrong with Woods.

19.     On August 19, Woods was found completely non-responsive, and emergency personnel were called, but it was too late. Woods died two days later at Huntsville Hospital.

20.     While Woods had behaved normally for over a month, jail records show that by August 6, Woods was confused, hallucinating, and unable to communicate with correctional and medical personnel.

4

21.    Woods was suffering from the effects of gangrenous right foot.

22.    Woods' mental status change was due to that infection, and he ultimately died from a blood clot that originated in his gangrenous foot.

23.    Because of Woods' uncooperative behavior, Woods was tased on at least 3 occasions (on August 6, 9, and 14 (early morning)).

24.    From August 7 until Woods was found near death on August 19, Woods' vital signs were never taken.

25.    From August 7 until Woods was found near death on August 19, Woods' intake of food and water was not monitored, though correctional and medical personnel were aware Woods was not eating or drinking.

26.    There is no record of Woods eating or drinking after he was placed in a medical observation cell on August 6, and jail records affirmatively show Woods did not eat from August 14-19 and that as of August 12 Woods' water supply was cut off.

27.    Jail records also show Woods was naked during this period.

28.    From the evening of August 14, until emergency personnel were called on August 19, Woods lay naked in his cell not responsive to verbal commands.

29.    From the evening of August 14, 2013, until Woods was found near death on August 19, Woods lay in his cell dying before the eyes of correctional and ACH personnel.

30.    He did not drink.

5

31.   He did not eat.

32.   He did not make any noise.

33.   He did not stand.

34.   He just lay there, naked, sometimes changing positions.

35.   On August 15, Woods was dressed and taken in a wheelchair to court because he could not stand or walk. When Woods' mother saw him, he was confused, non-responsive, and did not even recognize her. She asked what was wrong with her son. A correctional officer responded that it was a mental issue, and Woods' mother told him her son did not have mental problems and that he needed to go to the hospital. She begged the court and the correctional officers to take him to the hospital.

36.   By August 17 at the latest, the gangrenous wound on the top of Woods' right foot was clearly visible had anyone bothered to look.

37.   By August 17 at the latest, Woods produced a foul odor due to his gangrenous foot and the leakage of bodily fluids.

38.   By August 17, the odor was so bad correctional officers dragged Woods from his cell to the shower, sprayed him with water, and then placed him, still naked, in a different cell.

39.   Still, no correctional officer or ACH nurse did anything to even check Woods, let alone help him.

6

40.   During this entire period (August 14 to 19), no ACH nurse took Woods' temperature, checked his blood pressure, checked his blood sugar, or otherwise attempted to assess Woods' condition.

41.   In fact, after August 14, no ACH nurse even bothered to enter Woods' cell until August 19, when he was already all but dead.

42.   Defendant Williams, though aware of Woods' condition, did not even bother to check him after August 7.

43.   Woods went from normal, to aggressive and disruptive, to barely responsive, to all but dead as correctional and medical staff watched.

44.   Woods died as a result of defendants' complete failure to assess or address his obvious medical needs.

45.   Each of the individual defendants except for Dorning and Johnson worked on or after August 14, observed or was informed regarding Woods' condition, knew Woods was not eating or drinking, knew Woods was barely or non-responsive, understood Woods' condition was serious and life-threatening, yet took no action.

46.   Woods' condition as of August 14, at the latest, clearly indicated a potentially life-threatening problem.

47.   By August 14, at the latest, the individual defendants except Dorning and Johnson were aware that Woods had gone from normal to barely or non-responsive over the course of 2-3 weeks.

48.     By August 14, at the latest, it was obvious to all that came in contact with Woods that his condition was serious and that he needed to go to a hospital for evaluation and treatment.

49.     Woods' need for evaluation and treatment in a hospital was such that it would have been obvious even to a layperson.

50.     It was obvious to correctional officers and medical personnel alike.

51.     Despite Woods' condition, Woods received no medical assessment or treatment of any kind; defendants just watched Woods' condition deteriorate until he was all but dead.

52.     As a direct and proximate result of the failure and refusal of the individual defendants except Dorning and Johnson to refer Woods for evaluation and treatment in a hospital, Woods suffered pain and suffering and eventually died.

53.     All defendants were jointly and severally the proximate cause of Woods' pain and suffering and eventual death.

54.     The actions of correctional and medical personnel indicate systemic breaches of fundamental standards of correctional management and correctional health care.

55.     These breaches are indicative of inadequate policies and practices and inadequate training and supervision.

56.     The treatment of Woods falls far below the standard of correctional

8

health care.

57.   Because Woods was not appropriately treated, he experienced unnecessary pain and suffering and eventually died.

58.   All of the individual defendants identified above acted with malice and/or with reckless disregard for Woods' constitutional rights.

59.   Woods' serious medical needs were ignored because of the customs or policies of defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH of deliberate indifference to the serious medical needs of prisoners in the Madison County Jail.

60.   With deliberate indifference to the serious medical needs of inmates, defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH failed to develop and implement adequate policies and procedures for the handling of inmates with serious health conditions and failed to adequately train correctional officers and medical staff, with the foreseeable result that inmates such as Listau would not receive appropriate treatment.

61.   More generally, defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH have established deliberately-indifferent customs or policies concerning inmate medical care, including but not limited to a custom or policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills.

9

62.     Defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to avoid having to pay for medical care for the inmate. This plan included a custom or policy of delaying or denying necessary medical treatment by outside providers. Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates.

63.     Defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH were on notice that the above-described customs or policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and suffering due to delay and denial of necessary medical care. Defendants had such knowledge from prisoner complaints, communications from correctional officers, from their own observations, from common sense, from other deaths, from other lawsuits, and in other ways.

64.     During 2013 at least three inmates died as a result of the failure of ACH and correctional personnel at the Madison County Jail to provide inmates with medical care, and the undersigned has filed suit on behalf of each of the families.

65.     Listau died in March. The circumstances of her death are described in detail in the second amended complaint. A motion for leave to file the second amended complaint was filed in that case today, October 29, 2014. The case number is 5:14-CV-1309-CLS.

10

66.    Listau died from broken bones she suffered as a result of one or more falls caused by delirium tremens-related seizures.   Listau was suffering from advanced DTs when she arrived at the jail and clearly needed to go to the hospital, as severe DTs is a life-threatening condition that needs to be treated as a medical emergency.    *See*    Medline    Plus,    online    at www.nlm.nih.gov/medlineplus/ency/article/000766.htm. Even though Listau was identified as suffering from severe DTs shortly after she arrived in the jail, she was not taken to the hospital.  She was placed in a medical watch cell.  She deteriorated rapidly over the course of 24-plus hours in the jail.  Listau's deterioration was observed by correctional and ACH personnel.  No action was taken to help Listau until she was found non-responsive.  By then it was too late.

67.    Woods died in August.

68.    Tanisha Jefferson died in October.  The circumstances of her death are described in detail in the first amended complaint filed in that case today, October 29, 2014. The case number is 5:14-cv-01959-AKK.

69.    For several days before her death, Jefferson complained of severe abdominal pain.  She cried and begged to be able to go to the hospital.  She had been unable to have a bowel movement for approximately two weeks and died from a bowel obstruction.  Her severe abdominal pain, an obvious sign something was seriously wrong, was known to correctional and ACH medical personnel for many

11

days prior to her death, yet the only treatment she received was a laxative.  Even when her bowel burst, emergency personnel were not contacted.  Instead, Jefferson was taken to the medical department.  Emergency personnel were only contacted when Jefferson became non-responsive.

70.   All three inmates died even though they had been seen by ACH personnel.

71.   All three inmates died when ACH personnel refused to send them to the hospital.

72.   In all three cases, correctional officers deferred to ACH medical personnel even though it was obvious ACH was doing nothing for the inmate.

73.   In all three cases, correctional officers deferred to ACH medical personnel even though it would have been obvious to a layperson that the inmate needed to be sent to a hospital for evaluation and treatment.

74.   Correctional officers deferred to ACH personnel because they were trained to do so.

75.   Correctional officers did not defer to ACH in ignorance, however.

76.   ACH had been the contractor at the Madison County Jail since before 2010.

77.   It was well known to Madison County correctional officers that ACH had a practice of delaying or denying referrals of inmates for outside medical care.

12

78.     Correctional officers were aware that ACH was making medical care decisions regarding inmates that put cost control over inmate health and safety.

79.     Dorning and Morrison made it clear to correctional officers that inmate healthcare costs were a problem at the jail, that one trip to the hospital could potentially blow the county's healthcare budget, and that they needed to cooperate with ACH to control costs.

80.     These concerns with inmate healthcare costs have been reported in the media. Thus, an April 2014 AL.com article, for which Morrison and ACH CEO Norman Johnson were interviewed, does not mention the three 2013 deaths or improving inmate healthcare but rather discusses the budget problems created by catastrophic cases that can "really cripple your budget," in the words of Morrison, and the "aggressive pursuit" of cost savings by Morrison.   A copy of the article is attached as Exhibit 2.

81.     Consistent with this deferral-to-ACH policy, neither Dorning nor Morrison took any steps to investigate the circumstances of the three deaths.

82.     This has been a longstanding practice of Dorning and, since he was hired in October 2010, Morrison.

83.     Morrison was hired to cut costs at the jail.

84.     The failure and refusal to investigate serious incidents is a more general practice of Dorning, who has refused to investigate serious allegations against his

13

deputies, as reflected by the public comments of Dorning's chief deputy regarding the revenge beating of Robert Bryant. *See* AL.com article attached as Exhibit 4.

85.    Dorning has completely failed and refused to investigate serious allegations against those he supervises, whether as law enforcement officers or correctional officers.

86.    The uninvestigated 2013 deaths followed on the heals of at least three deaths in the preceding two-and-a-half years.

87.    In August 2010, Julie Jean died under circumstances similar to those in the 2013 deaths, particularly Woods' death. Like Woods, Jean, during her final days, was in medical watch, was checked by correctional officers every 15 minutes, did not eat or drink in substantial amounts, did not have her vital signs monitored, was completely out of touch with reality, and deteriorated over the course of days until she became non-responsive.  She died as a result of lithium toxicity.

88.    There was no investigation of the death of Jean by Dorning or his designee.

89.    In December 2011, Emanuel Patterson died from lithium toxicity under nearly identical circumstances to those in the Jean case.  Patterson was in medical watch, was checked by correctional officers every 15 minutes, did not eat or drink in substantial amounts, did not have his vital signs monitored, was completely out of touch with reality, and deteriorated over the course of days until he became non-

responsive.

90.    There was no investigation of the death of Patterson by Dorning or Morrison.

91.    Frederick Foster died in a restraint chair in a medical watch cell in May 2012. Like Jean and Patterson (and Woods), Foster was out of touch with reality, did not eat or drink in substantial amounts, did not have his vital signs monitored, and deteriorated over the course of several days as correctional officers and ACH personnel watched. No action was taken until he became non-responsive.

92.    There was no investigation of the death of Foster by Dorning or Morrison.

93.    Of course, others have suffered and been lucky enough to survive.

94.    As a result of publicity regarding the 2013 death lawsuits, the undersigned has received information regarding other incidents involving deliberate indifference to medical needs under ACH, including a woman who could have died from an abscessed tooth that was ignored for two months and more than one inmate who was not taken to the hospital for many hours despite obvious heart attack symptoms.

95.    Medical care at the jail is and has been a regular subject of inmate grievances.

96.    While not all inmate grievances have merit, pursuant to longstanding

15

practice, grievances related to medical care are not investigated by Madison County correctional personnel or ACH.

97.     Pursuant to longstanding practice, all grievances regarding jail medical care are turned over to ACH and are not reviewed by Dorning or Morrison or any other correctional officer or correctional supervisor.

98.     ACH does not respond to inmate grievances.  It simply ignores them.

99.     Pursuant to longstanding practice, jail healthcare is treated as solely within the discretion of ACH personnel.

100.    Dorning, Morrison, Johnson, Williams, Robinson, and ACH have failed and refused to evaluate the quality of inmate medical care and address the obvious systemic problems that led to at least 6 deaths over the course of just over three years (August 2010 to October 2013).

101.    Even after the 2013 death lawsuits, Dorning's comments to the media (*see* AL.com article attached as Exhibit 3) make clear Dorning believes the responsibility for the deaths and for making changes lies with ACH. "I'm sure ACH will evaluate how they do things," Dorning told the reporter.

102.    Dorning's claim that he believes ACH will reevaluate in light of the lawsuits is not credible.

103.    Dorning knows from years of experience with ACH, and from ACH's failure to respond to the deaths themselves and to other incidents, that ACH will

conduct no evaluation and institute no training or other changes.

104.   Dorning and Morrison know that they never requested ACH to make changes or improve the care of inmates.

105.   Dorning and Morrison have never even requested that ACH report to them regarding the quality of the care provided inmates.

106.   The sole basis used by Dorning and Morrison to evaluate ACH is cost control.

107.   Consistent with Dorning's and Morrison's laser focus on costs and lack of concern about the quality of inmate healthcare provided by ACH, in the April 2014 AL.com article referenced above (Exhibit 2), Morrison does not mention the 6 inmates who died while being overseen by ACH personnel since 2010, only the one inmate, Patterson, who "crippled" the budget with over $300,000 in charges because he was in a coma for an extended period.

108.   The deferral of correctional officers to ACH decisions to delay and deny necessary medical care in the name of cost control is not only a matter of longstanding practice, it is also a matter of contract.

109.   Deferral by correctional officers to ACH deliberate indifference is caused by both the letter of the contract and the structure of the contractual relationship.

110.   ACH has had the Madison County contract since before 2010.

17

111.   ACH underbid other competitors to get the contract.

112.   ACH got the contract by touting its ability to control the expenses Madison County would incur for outside medical care like that needed by Listau, Woods, and Jefferson.

113.   ACH, Madison County, and Dorning negotiated a $200,000 per quarter cap on outside medical care.

114.   If outside medical care costs exceeded $200,000 in a quarter, Madison County would be responsible.

115.   Based on historical healthcare expenditure numbers for the Madison County Jail and reasonable predictions based on data for the inmate population at the jail, the $200,000 per quarter number was designed to give ACH a financial incentive to control outside medical costs, which in turn has led ACH to delay and deny referrals to outside providers.

116.   Under the contract, if ACH beats the cap, ACH gets to keep the difference between actual outside costs and the cap as profit.

117.   As Morrison, to whom Dorning has delegated responsibility for managing the jail, has stated publically, hospitalizations can quickly deplete the quarterly budget (*see* Exhibit 3).

118.   Pursuant to this agreement, correctional officers are trained to defer to ACH regarding medical matters regardless of the severity of the inmate's conditon.

18

119.   Correctional officers are trained not to contact emergency personnel even if there is a medical emergency; instead, they are trained to contact ACH nurses on duty.

120.   Correctional officers who have contacted emergency personnel directly have been disciplined.

121.   Moreover, the agreement requires ACH to provide substantial insurance coverage, to name the county and the sheriff as additional insureds, and to indemnify the sheriff, the county, and their agents and employees in connection with any claim related to healthcare services.

122.   Under the contract, as long as correctional officers let ACH medical personnel make medical decisions, correctional officers are indemnified by ACH's insurance carrier.

123.   Thus, the contract encourages correctional officers to defer to ACH personnel.

124.   Correctional officers have claimed or are expected to claim they cannot be responsible for deficient medical care by ACH personnel.

125.   Dorning, Morrison, and the correctional officers they supervised, however, were well aware that ACH provided substandard and frequently inhumane medical care.

126.   Correctional officers had this knowledge from the incidents described

19

above, from other similar incidents over the years, from their daily observations regarding how ACH personnel treated inmates, and in other ways.

127.   Defendant Williams has been the Madison County Jail physician for many years, worked under prior contractors, and was known to provide substandard care to inmates.

128.   Defendant Robinson as well has been at the Madison County Jail for years and was known to be deliberately indifferent to inmate medical needs.

129.   In whole or in part because of the agreement, particularly its indemnification provision, Dorning and Morrison have failed and refused to address known systemic deficiencies regarding medical care at the Madison County Jail.

130.   Under the agreement, for Madison County to avoid liability for excess medical care expenses, it was necessary for defendants Dorning and Morrison and the correctional officers they managed to cooperate with ACH in controlling costs.

131.   Defendants Madison County and ACH and all individual defendants were aware the cost control measures implemented at the Madison County Jail by ACH resulted in the denial of constitutionally-required medical care for inmates with serious medical needs.

132.   ACH's business model, reflected in the agreement, succeeds by underbidding the competition and implementing severe cost control measures, the necessary result of which is unnecessary inmate suffering and liability claims (dealt

with through liability insurance).

133.   Defendants Dorning and Madison County were aware of ACH's business model, were aware ACH put cost control over inmate health and safety, yet retained ACH as the contractor  (initially and via contract renewals) because it saved the county money.

134.   Madison County and Dorning rejected other contractors because they believed ACH saved them money.

135.   Thus, Madison County caused or contributed to the above-described customs or policies by not providing adequate funds for inmate medical care.

136.   The primary areas in which ACH implemented cost control measures were staffing, medications, and referrals to outside providers.

137.   In order to control costs, defendant ACH, with the knowledge and consent of defendants Dorning and Morrison, staffed the Madison County Jail inadequately, hired sub-standard medical personnel willing to put costs over inmate health and safety, denied inmates medications, and delayed or denied medically-necessary referrals to outside providers, including necessary medical treatment like that denied Listau, Woods, and Jefferson.

138.   Alabama law vests final policymaking authority for inmate medical care in Dorning, as the representative of Madison County.

139.   Defendant Dorning, in turn, via the agreement with ACH and

21

longstanding practice, has delegated final policymaking authority regarding inmate medical care to ACH, and, therefore, he is liable for ACH decisions.

140.    While the agreement gives Dorning and Madison County the authority to hold ACH accountable regarding the costs of inmate healthcare, it provides no mechanism for reporting and accountability regarding the quality of inmate healthcare, and neither Dorning nor Madison County have made any effort to hold ACH accountable for how it handles inmate healthcare.

141.    Directly applicable to the death of Listau, defendants Dorning, Morrison, Williams, Robinson developed a policy and practice regarding treatment of inmates withdrawing from alcohol and drugs.   While defendants were aware that severe withdrawal symptoms, including DTs, could only be safely treated in the hospital, these defendants established a custom or policy that withdrawal would **always** be managed inside the jail or by getting the person released from jail, regardless of the severity of the symptoms.  Defendants were aware of the risk of harm of such a policy but explicitly or implicitly agreed to this practice to avoid the huge cost associated with   a   hospitalization.   *See*  Medline  Plus,  online  at www.nlm.nih.gov/medlineplus/ency/article/000766.htm (noting that a person experiencing DTs may need to be kept in a sedated state for a week or more).

142.    Dorning's public comments regarding the three lawsuits (*see* Exhibit 3)

22

reflect a callous attitude toward inmates suffering from alcohol or drug withdrawal.

143. In summary, the deliberately-indifferent policies and practices of Dorning, Morrison, Johnson, Williams, Robinson, and ACH in place at the Madison County Jail include, but are not limited to, the following:

a.  Not investigating serious known incidents of deliberate indifference by ACH and correctional personnel;

b.  Not evaluating or responding to inmate grievances regarding medical care;

c.  Placing inmates with serious medical conditions in medical watch when they obviously need, at a minimum, further testing and evaluation at a hospital;

d.  Training correctional officers to defer to ACH medical decisions even when it is obvious the inmate needs to immediately go to the hospital (i.e., severe abdominal pain and clear heart attack symptoms);

e.  Allowing inmates in medical watch to deteriorate over the course of hours and days without taking the inmate for evaluation and treatment at a hospital;

f.  Training correctional officers to defer to ACH decisions to allow inmates in medical watch to deteriorate over the course of hours and days without taking the person to a hospital for evaluation and treatment

23

of the obvious deterioration;

g.    Relying on untrained correctional officers to monitor seriously ill inmates who are placed in medical watch;

h.    Not training correctional officers regarding what signs to look for and document while monitoring inmates under suicide or medical watch;

i.    Not monitoring the vital signs of inmates who are placed in medical watch;

j.    Not requiring correctional officers to document their observations of inmates being monitored for suicide or medical risk;

k.    Not monitoring the food and water intake of inmates known not to be eating or drinking or to be doing so only in limited amounts;

l.    Treating the responses of incoherent inmates as refusals to cooperate;

m.    Not treating an inmate's deterioration to the point they are no longer ambulatory as a condition requiring evaluation and treatment in a hospital;

n.    Not investigating, by testing or otherwise, the causes of significant deteriorations of inmate health or symptoms that obviously indicate potentially life-threatening conditions;

o.    Continuing failed treatment regimens even after they have proven ineffective (i.e., Jefferson's constipation);

24

p.   Denying inmates with serious pain appropriate pain medication, including narcotics;

q.   Not taking inmates suffering from serious complications related to detoxification from alcohol and drugs to the hospital; and

r.   Ignoring possible medical needs of inmates with mental health issues (or perceived mental health issues) that limit or prevent the inmate from communicating with correctional and medical personnel regarding their medical needs.

144.   Defendant ACH acted through one or more individuals who acted as final policymakers for ACH, including defendants Johnson, Williams, and Robinson.

145.   All defendants acted jointly and in concert with each other. Each defendant had the duty and the opportunity to protect Woods, to obtain necessary medical treatment for Woods in a timely manner and/or to establish policies and procedures and implement training regarding such treatment, but each defendant failed and refused to perform such duty, thereby proximately causing Woods's pain and suffering and eventual death.

146.   All defendants, acting under color of state law, inflicted or caused to be inflicted cruel and unusual punishment upon Woods in violation of the Fourteenth Amendment to the United States Constitution. All defendants acted with deliberate indifference.

25

147.   All defendants acted with intent to violate Woods's constitutional rights or with reckless disregard for those rights, justifying punitive damages against the individual defendants and ACH.

148.   As a result of the conduct of defendants, Woods suffered physical and emotional injuries and then died.

## Count I - 42 U.S.C. § 1983 -
### Deliberate Indifference to Serious Medical Needs

149.   The individual defendants except Dorning and Johnson, acting under color of state law within the meaning prescribed by 42 U.S.C. § 1983, were deliberately indifferent to Woods' serious medical needs as described above.  These defendants, despite knowledge of a serious medical need, took no action or clearly inadequate action and did thereby deprive Woods of his rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983.

150.   Defendants Dorning, Morrison, Johnson, and Williams are supervisory officials for the jail and were responsible for development and implementation of policies and procedures for medical care at the jail and by action and inaction established the unconstitutional customs and policies described above.  These defendants did thereby deprive Woods of his rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42

U.S.C. § 1983.

151.   Defendant Madison County intentionally refused to adequately fund medical care as described above with deliberate indifference to the serious medical needs of inmates such as Woods, had a policy of not adequately funding inmate medical care, and did thereby contribute to cause Woods' suffering and eventual death and the individual defendants' denial of necessary medical treatment for Woods' serious medical needs.

152.   Defendant Dorning is also liable for the acts of ACH and its policymakers, including Johnson, Williams, and Robinson, as Dorning delegated his final policymaking authority to ACH.

153.   As a result of the conduct of defendants, Woods was caused to suffer physical and emotional injuries and damages and died.

### Count II - Negligence / Wantonness

154.   The individual ACH defendants and unknown ACH employees involved with Woods' care owed a duty to Woods to meet the standard of care applicable to inmates and/or to make sure those under their supervision were trained adequately regarding the proper care of such inmates and that adequate policies and procedures regarding the proper care of such inmates were in place.   This standard of care required, among other things, proper treatment of Woods' deteriorating condition,

27

appropriate monitoring of Woods' deteriorating condition, testing to determine the cause of Woods' mental status change and deteriorating condition, and referral of Woods for evaluation and treatment outside of the jail. These defendants negligently and/or wantonly violated this standard of care or caused it to be violated with the foreseeable result that Woods suffered unnecessary pain and suffering and died.

155. Because ACH personnel were acting within the scope of their employment, defendant ACH is liable for their negligence and/or wantonness.

### Other Matters

156. All conditions precedent to the bringing of this suit have occurred.

### Relief Sought

157. As relief, plaintiff seeks the following:

a. That plaintiff be awarded such compensatory damages as a jury shall determine from the evidence plaintiff is entitled to recover;

b. That plaintiff be awarded against the individual defendants such punitive damages as a jury shall determine from the evidence plaintiff is entitled to recover;

c. That plaintiff be awarded prejudgment and postjudgment interest at the highest rates allowed by law;

d. That plaintiff be awarded the costs of this action, reasonable attorney's fees, and reasonable expert witness fees;

e. That plaintiff be awarded appropriate declaratory and injunctive relief; and

f.    That plaintiff be awarded such other and further relief to which plaintiff is justly entitled.


Respectfully submitted,



s/ Henry F. Sherrod III
Henry F. Sherrod III (ASB-1200-D63H)
HENRY F. SHERROD III, P.C.
119 South Court Street (35630)
P. O. Box 606
Florence, Alabama 35631-0606
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

Jerry D. Roberson (ASB-8283-O71J)
P.O. Box 657
Haleyville, Alabama 35565
Phone: 205-485-1020
Fax: 205-485-2660
Email: jerry@jdrlaw.org

Attorneys for Plaintiff

## Jury Demand

Plaintiff requests a trial by jury.

s/ Henry F. Sherrod III
Henry F. Sherrod III

29

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
09/05/2006

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| CALLENDER & CO. 1815 CANDLETREE DR PEORIA, IL 61614 | |

| | INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED Advanced Correctional Healthcare P.O. Box 10260 Peoria, IL 61612-0260 | INSURER A: WESTFIELD INS. CO. | |
| | INSURER B: NEW HAMPHIRE INS. CO. | |
| | INSURER C: ESSEX INS. CO. | |
| | INSURER D: | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | GENERAL LIABILITY X COMMERCIAL GENERAL LIABILITY CLAIMS MADE X OCCUR | CWP3409591 | 08/01/2006 | 08/01/2007 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY [ ] PRO-JECT [ ] LOC | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| A | | AUTOMOBILE LIABILITY ANY AUTO ALL OWNED AUTOS X SCHEDULED AUTOS X HIRED AUTOS X NON-OWNED AUTOS | CWP3409591 | 08/01/2006 | 08/01/2007 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN EA ACC AUTO ONLY: AGG | $ $ |
| A | | EXCESS/UMBRELLA LIABILITY X OCCUR [ ] CLAIMS MADE DEDUCTIBLE RETENTION $ | CWP3409591 | 08/01/2006 | 08/01/2007 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | AGGREGATE | $ 1,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| B | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | WC3551445 | 08/01/2006 | 08/01/2007 | X WC STATU-TORY LIMITS [ ] OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| C | | OTHER MEDICAL PROFESSIONAL LIABILITY | GPD5304AZ | 08/21/2006 | 08/21/2007 | $1,000,000 EACH CLAIM $3,000,000 AGGREGATE LIMIT | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

Madison County Jail, AL and the Madison County Sheriff's Office, AL are included as additional insured under the General Liability and Professional Liability coverage if required by contract in writing. Coverage applies to operations in correctional facilities.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Madison County Jail 100 Northside Square Huntsville, AL 35801 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 10 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)

© ACORD CORPORATION 1988

Received Time Sep. 19. 1:23PM

DEFENDANT'S EXHIBIT 5

| ACORD. CERTIFICATE OF LIABILITY INSURANCE | | DATE (MM/DD/YYYY) 08/21/2007 |
|---|---|---|

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|

CALLENDER & CO.
1615 CANDLETREE DR
PEORIA, IL 61614

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|

| INSURED | Advanced Correctional Healthcare | INSURER A: WESTFIELD INS. CO. | |
|---|---|---|---|
| | P.O. Box 10260 | INSURER B: NEW HAMPHIRE INS. CO. | |
| | Peoria, IL 61612-0260 | INSURER C: ESSEX INS. CO. | |
| | | INSURER D: GENERAL STAR INDEMNITY CO. | |
| | | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | GENERAL LIABILITY | CWP3409591 | 08/01/2007 | 08/01/2008 | EACH OCCURRENCE | $ 1,000,000 |
| | | X COMMERCIAL GENERAL LIABILITY | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | CLAIMS MADE X OCCUR | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | POLICY PRO-JECT LOC | | | | | |
| A | | AUTOMOBILE LIABILITY | CWP3409591 | 08/01/2007 | 08/01/2008 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | ANY AUTO | | | | | |
| | | ALL OWNED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | X | SCHEDULED AUTOS | | | | | |
| | X | HIRED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | X | NON-OWNED AUTOS | | | | | |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | ANY AUTO | | | | OTHER THAN EA ACC | $ |
| | | | | | | AUTO ONLY: AGG | $ |
| A | | EXCESS/UMBRELLA LIABILITY | CWP3409591 | 08/01/2007 | 08/01/2008 | EACH OCCURRENCE | $ 10,000,000 |
| | X | OCCUR CLAIMS MADE | | | | AGGREGATE | $ 10,000,000 |
| | | | | | | | $ |
| | | DEDUCTIBLE | | | | | $ |
| | | RETENTION $ | | | | | $ |
| B | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | WC0891165 | 08/01/2007 | 08/01/2008 | X WC STATU-TORY LIMITS OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | If yes, describe under SPECIAL PROVISIONS below | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| | | OTHER C) MEDICAL PROF. LIAB. | GPD5304AZ | 08/21/2007 | 08/01/2008 | $1,000,000/$3,000,000 | |
| | | D) CIVIL RIGHTS LIAB. | IJA964177 | 11/01/2006 | 11/01/2007 | $1,000,000/$3,000,000 | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

Madison County, AL and the Sheriff of Madison County, AL are included as additional insured under the General Liability, Professional Liability and Civil Righrts Liability coverage. Coverage applies to ACH operations in correctional facilities only.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Madison County Jail 100 Northside Square Huntsville, AL 35801 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __10__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)

© ACORD CORPORATION 1988

DEFENDANT'S EXHIBIT
tabbies
6

MADISON COUNTY (ACH) 0252

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
7/29/2011

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| CALLENDER & CO. 1615 CANDLETREE DR PEORIA, IL  61614 | PHONE (A/C, No, Ext): 309 693-1313 | | FAX (A/C, No): 309 693-7969 |
| | E-MAIL ADDRESS: | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : WESTFIELD INS. CO. | | |
| INSURED    Advanced Correctional Healthcare 3922 Baring Trace Peoria, IL  61615 | INSURER B : CHARTIS INC | | |
| | INSURER C : ESSEX INS. CO. | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY   CLAIMS-MADE  X  OCCUR | X | | CWP3409591 | 08/01/2011 | 08/01/2012 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY  PRO- JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** ANY AUTO ALL OWNED AUTOS  X  SCHEDULED AUTOS  X  HIRED AUTOS  X  NON-OWNED AUTOS | | | CWP3409591 | 08/01/2011 | 08/01/2012 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X  **UMBRELLA LIAB**  X  OCCUR   EXCESS LIAB   CLAIMS-MADE | | | CWP3409591 | 08/01/2011 | 08/01/2012 | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | | AGGREGATE | $ 10,000,000 |
| | DED    RETENTION $ | | | | | | | $ |
| B | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**  Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N / A | | WC1646222 | 08/01/2011 | 08/01/2012 | X  WC STATU- TORY LIMITS   OTH- ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| C | MEDICAL PROFESSIONAL LIAB incl CIVIL RIGHTS | | | MM-820821 | 08/01/2011 | 08/01/2012 | $1mil/$3mil | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

Madison County, AL and the Sheriff of Madison County, AL are included as additional insured under the General Liability and Professional Liability coverage. Coverage applies to ACH operations in correctional facilities only.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Madison County Jail 100 Northside Square Huntsville, AL 35801 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)          The ACORD name and logo are registered marks of ACORD



DEFENDANT'S EXHIBIT 7

MADISON COUNTY (ACH) 0247

ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
10/4/2012

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: | Rob Bielenberg | |
|---|---|---|---|---|
| CALLENDER & CO. 1615 CANDLETREE DR PEORIA, IL 61614 | | PHONE (A/C, No, Ext): (309) 693-1313 | | FAX (A/C, No): (309) 693-7969 |
| | | E-MAIL ADDRESS: | | |
| | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | | INSURER A: SELECTIVE INSURANCE CO of SC | | |
| INSURED Advanced Correctional Healthcare 3922 W Baring Trace Peoria, IL 61615-2500 | | INSURER B: TECHNOLOGY INS CO | | |
| | | INSURER C: ESSEX INSURANCE CO | | |
| | | INSURER D: | | |
| | | INSURER E: | | |
| | | INSURER F: | | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** ☒ COMMERCIAL GENERAL LIABILITY CLAIMS-MADE ☒ OCCUR | ☒ | | S1997699 | 08/01/2012 | 08/01/2013 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY ☐ PRO- JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** ☒ ANY AUTO ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | S1997699 | 08/01/2012 | 08/01/2013 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | ☒ **UMBRELLA LIAB** ☒ OCCUR ☐ **EXCESS LIAB** ☐ CLAIMS-MADE | | | S1997699 | 08/01/2012 | 08/01/2013 | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | | AGGREGATE | $ 10,000,000 |
| | DED ☐ RETENTION $ | | | | | | | $ |
| B | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | TARAL46394-00 | 08/01/2012 | 08/01/2013 | ☒ WC STATU- TORY LIMITS ☐ OTH- ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| C | MEDICAL PROFESSIONAL LIAB Incl CIVIL RIGHTS | ☒ | | MM-822295 | 08/01/2012 | 08/01/2013 | $1,000,000 ea occ | $3,000,000 agg |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

Madison County, AL and the Sheriff of Madison County, AL are included as additional insured under the General Liability and Professional Liability coverage. Coverage applies to ACH operations in correctional facilities only.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Madison County Jail 100 Northside Square Huntsville, AL 35801 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |
| | *Biclenberg* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)    The ACORD name and logo are registered marks of ACORD



DEFENDANT'S EXHIBIT
8

MADISON COUNTY (ACH) 0256

02/06/2014  09:31   2565332855                                    PAGE  08/19

55- 017343



**ALABAMA**
**DEPARTMENT OF FORENSIC SCIENCES**

716 ARCADIA CIRCLE
HUNTSVILLE, ALABAMA 35801
(256) 539-1401
FACSIMILE (256) 533-2855

## REPORT OF AUTOPSY

| | | | | |
|---|---|---|---|---|
| **CASE NO.:** | 13HV02638 | | **DATE:** | March 12, 2013 |
| | | | **TIME:** | 1507 hours |
| **NAME:** | NIKKI KAY LISTAU | | **DATE OF DEATH:** | March 12, 2013 |
| **COUNTY:** | Madison | | | |

**AGE:** 60 years      **RACE:** W      **SEX:** F      **LENGTH:** 72 inches      **WEIGHT:** 174 pounds

### FINAL DIAGNOSES

I. Multiple blunt-force injuries.

II. Acute pancreatitis.

> **CAUSE OF DEATH:**      Multiple blunt-force injuries.
>
> **MANNER OF DEATH:**      Accident.



Page 1 of 4

Case #        13HV02638
Name          NIKKI KAY LISTAU

## EVIDENCE OF INJURY

There is a fracture of the left femur just below the lesser trochanter.  It is bayonetted.  There is external rotation and shortening of the left leg.  There are multiple rib fractures present.  There is a contusion of the left upper shoulder 6 inches in diameter.  There are multiple contusions of the left and right legs.  These appear to be of varying age.  There is a contusion over the left hip 6 inches in diameter.

## EXTERNAL EXAMINATION

The following excludes any previously described injuries.

BODY HABITUS:  The body is that of a White female consistent with the given age of 60 years.

CONDITION OF BODY:  There is no evidence of previous embalming or decomposition.

IDENTIFYING MARKS:  There is a tattoo on the right upper back.

HEAD AND FACE:  The normocephalic head is covered by brown hair.

EYES:  The irides are blue.  The conjunctivae and sclerae are unremarkable.

NOSE:  The nose is unremarkable.

ORAL CAVITY:  The mouth contains native teeth in poor repair.  The tongue and frenula are intact.

EARS:  The ears are unremarkable.

NECK:  The neck is unremarkable.

CHEST:  The chest is unremarkable.

ABDOMEN:  The abdomen is unremarkable.

EXTERNAL GENITALIA:  The genitalia are normal adult female external genitalia.

UPPER EXTREMITIES:  The upper extremities are unremarkable.

LOWER EXTREMITIES:  The lower extremities display scars surrounding the right and left knees bilaterally.

BACK AND ANUS:  The back displays a linear scar in the central portion of the back 8 inches in length.

02/06/2014  09:31   2565332855

Case #       13HV02638
Name         NIKKI KAY LISTAU

## EVIDENCE OF MEDICAL INTERVENTION

There is an orogastric tube in place. There is an endotracheal tube in place. There is a urinary catheter present. There are multiple intravenous lines.

## INTERNAL EXAMINATION

The following excludes any previously described injuries.

SEROSAL CAVITIES: The pleural, pericardial and peritoneal cavities are unremarkable.

CENTRAL NERVOUS SYSTEM: The 1320-gram brain is unremarkable.

ORGANS OF THE NECK: There is a metallic plate present in the neck. The neck organs are otherwise unremarkable.

CARDIOVASCULAR SYSTEM: The 560-gram heart is unremarkable.

RESPIRATORY SYSTEM: The 940- and 500-gram right and left lungs demonstrate congestion. They are otherwise unremarkable.

HEPATOBILIARY SYSTEM:  The 1960-gram liver displays fatty change.  The gallbladder is unremarkable. The pancreas displays acute hemorrhagic pancreatitis.

IMMUNOLOGIC SYSTEM: The 200-gram spleen is unremarkable.

ENDOCRINE SYSTEM:

GASTROINTESTINAL SYSTEM: There is distention of the gastrointestinal organs.

GENITOURINARY SYSTEM: The 140- and 180-gram right and left kidneys are unremarkable. The calyces are unremarkable. The urinary bladder is unremarkable.

REPRODUCTIVE SYSTEM: Not mentioned.

MUSCULOSKELETAL SYSTEM: The musculoskeletal system is unremarkable.

HEMATOPOIETIC SYSTEM: The hematopoietic system is unremarkable.

## ANCILLARY STUDIES

POSTMORTEM RADIOGRAPHS, CHEMISTRIES, GENETIC STUDIES AND MICROBIOLOGY: Radiographs are obtained.

Case #   13HV02638
Name   NIKKI KAY LISTAU

TOXICOLOGY:  See attached report.

## LOGISTICS

**AUTHORIZATION:**  Code of Alabama (1975), Section 36-18-2; Robert Broussard, District Attorney.

**IDENTIFICATION:**  The body was identified by Deputy Coroner Stan Clemons to Robert Griffith, Forensic Investigator.

**PERSONS PRESENT:**  Gerald Howard, Pathology Technician, Brandi Abbott, Laborer and Robert Griffith, Forensic Investigator were present during the autopsy.

**EVIDENCE:**  Photographs, fingerprints, urine, blood, bloodstain card, serum, plasma, toxicology specimens and vitreous humor are obtained.

The facts stated herein are correct to the best of my knowledge and opinion at the time of report completion.

Stephen F. Boudreau, MD
Senior State Medical Examiner
Signing for Emily W. Ward, MD
Senior State Medical Examiner

September 10, 2013
Date Signed

The above signature is for administrative purposes.  This dictation was prepared by Emily Ward, M.D., Senior State Medical Examiner, and reviewed by Stephen F. Boudreau, M.D., Senior State Medical Examiner, based upon and limited to case information, photographs and notes prepared by Dr. Ward. The facts stated herein are correct to the best of my knowledge and opinion at the time of report completion.

SFB/EWW/kv/kvn

02/06/2014  09:31   2565332855



**ALABAMA**
# DEPARTMENT OF FORENSIC SCIENCES

2026 Valleydale Road
Hoover, Alabama 35244-2005

Telephone (205) 982-9292
Facsimile (205) 463-2025

## TOXICOLOGICAL ANALYSIS REPORT

| Subject deceased | Case No. |
|---|---|
| **LISTAU, NIKKI KAY** | **13HV02638** |

| Report to | Emily W. Ward, MD | Case Date | 03/12/2013 |
|---|---|---|---|
| | Alabama Department of Forensic Sciences | Reported | 09/05/2013 |
| | 716 Arcadia Circle | | |
| | Huntsville, AL 35801-5908 | | |

**Evidence analyzed (including sub-items)**

| Item | Specimen | Analyte | Result | Method(s) | Notes |
|---|---|---|---|---|---|
| 1E1 | Vitreous Humor | Ethanol | Negative | HS/GC | |
| 1E2 | Urine | | NA | | |
| 2A | Blood, hospital | Ethanol | Negative | HS/GC | |
| 2A | Blood, hospital | Acetone | 78 mg/L | HS/GC | |
| 2A | Blood, hospital | Drugs | ND | EIA | |
| | Specimen labeled in part: "...Doe, Whiskey. . .03/11/2013  1219. . .". | | | | |
| 2B | Blood, hospital | | NA | | |
| 2C, 2D | Serum, hospital | | NA | | |
| 2E | Plasma | | NA | | |
| 2F | Urine | | NA | | |

**Footnotes**

NA -    Not analyzed/Not applicable
ND -    None detected



Accredited
October 2003

cilleb4ewsl60059600.RPT

ONE DEPARTMENT ● ONE GOAL ● EXCELLENCE

Customer Satisfaction
Surveys are available at
www.adfs.alabama.gov



### ALABAMA
# DEPARTMENT OF FORENSIC SCIENCES

2026 Valleydale Road
Hoover, Alabama 35244-2095

Telephone (205) 982-9292
Facsimile (205) 409-2025

## TOXICOLOGICAL ANALYSIS REPORT

| Subject deceased | Case No. |
|---|---|
| **LISTAU, NIKKI KAY** | **13HV02638** |

**Comments**

Evidence was received in sealed plastic bags.

SCOPE OF DRUG ANALYSIS IS LIMITED TO THE FOLLOWING:
Amphetamine class, barbiturate class, benzodiazepine class, cannabinoids, carisoprodol/meprobamate, cocaine and/ or metabolite(s), cyclobenzaprine, dextromethorphan, fentanyl, methadone, opiate class, tramadol, tricyclic antidepressants, zolpidem.

*Remaining evidence will be disposed 6 months from the date of this report unless storage space becomes limited or alternate arrangements are made prior thereto.*

*Rachel C. Beck*   08/26/2013

Rachel C. Beck, BS, DFTCB
Forensic Scientist

──── End of Report ────



DEFENDANT'S EXHIBIT 10



Alabama Department of Forensic Sciences
Report of Death Investigation

| CASE NUMBER | 13HV02638 | DATE | March 12, 2013 | COUNTY | MADISON |
| District Attorney | ROBERT BROUSSARD | Judicial Circuit | 23rd | Coroner | CRAIG WHISENANT |

### DECEDENT INFORMATION

| NIKKI | | KAY | | LISTAU | | | 60 | W | F | |
| FIRST | | MIDDLE | | LAST | | | AGE | RACE | SEX | DATE OF BIRTH |
| | | Adult | | S | none | | n/a | | | |
| SOCIAL SECURITY NUMBER | | ADULT / JUVENILE | | MARITAL STATUS | OCCUPATION | | EMPLOYER | | | |

### HOME ADDRESS

| | | |
| NUMBER AND STREET | CITY, STATE OR COUNTY | ZIP CODE |

### NEXT OF KIN INFORMATION

| Brian Elliott | | brother | | | none |
| NEXT OF KIN | | RELATIONSHIP | PHONE NUMBER | | ALT. PHONE NUMBER |
| unknown | | | March 12, 2013 | Hospital Staff |
| ADDRESS | | | DATE NOTIFIED | BY |

| DATE PRONOUNCED DEAD | 03/12/2013 | | | | Coroner Whisenant | Undecided |
| | | DEATH CERTIFICATE DFS | NO | | | |
| TIME PRONOUNCED DEAD | 03:05 | | | M.D. / CORONER SIGNING DEATH CERTIFICATE | FUNERAL HOME |

| TYPE OF DEATH (N, A, S, H, U) | | SUDDEN IN APPARENT GOOD HEALTH | ☐ | VIOLENT OR UNNATURAL | ☐ | IN PRISON, JAIL OR POLICE CUSTODY | ☒ |
| Undetermined | | UNATTENDED BY PHYSICIAN | ☐ | SUSPICIOUS | ☐ | UNUSUAL | ☐ |

| DOMESTIC VIOLENCE RELATED DEATH | Yes | ☒ | No | ☐ | Unknown | ☐ | HISTORY OF TOBACCO USE | Yes | ☐ | No | ☐ | Unknown | ☒ |

| | LAST SEEN OR HEARD ALIVE | INJURY / ILLNESS | DEATH / FOUND | DOA | DFS NOTIFIED | POLICE NOTIFIED | VEHICLE INDICATE |
| DATE | 03/10/2013 | | 03/11/2013 | | 03/12/2013 | | DRIVER ☐ |
| | | | | | | | PASSENGER ☐ |
| TIME | 22:00 | | 12:00 | | 08:30 | | WHERE SEATED |
| | | | | | | | PEDESTRIAN ☐ |

| LOCATION | | ADDRESS | CITY, STATE OR COUNTY | PREMISES (HOME, WORK, STREET, ETC.) |
| INJURY OR ILLNESS | unknown | | | |
| DEATH | Huntsville Hospital | | Huntsville, AL | hospital |
| BODY FOUND | | | | |

### INVESTIGATING AGENCY

| 1. Agency | Madison County SO | Case Number | |
| Investigator | Pete Hose | Phone Number | (256) 990-7341 |
| 2. Agency | | Case Number | |
| Investigator | | Phone Number | |

### MEDICAL HISTORY (operations, illnesses, alcoholism, drug abuse, suicide attempts, etc.: birth records (infants))

| Physician / Institution | | Diagnosis | | Date |
| Address | | | Phone Number | |
| Physician / Institution | | Diagnosis | | Date |
| Address | | | Phone Number | |
| Physician / Institution | | Diagnosis | | Date |
| Address | | | Phone Number | |

### IDENTIFICATION

| Identification made by | Deputy Coroner Stan Clemons to Robert Griffith | Notification of Eye Bank | Yes ☐ | No ☒ |
| | | ANY ANATOMICAL DONATION | | |
| Source of Information / Official Title, Relationship to Decedent | Charlie Gray, HPD | Yes ☐ | No ☒ | Unknown ☐ |

Form DFS-18

Page 1 of 2

| CASE NUMBER | | 13HV02638 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

**SCENE INFORMATION**

| DFS at Scene | no | At | n/a | Hours | DFS left scene at | n/a | Hours | First Officer at Scene | n/a | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Photos | yes | By | Joe Washington | | Scene Temp. | n/a | Humidity | n/a | Weather | n/a | |
| Resuscitation Attempted | yes | By EMT | XX | ER | XX | of | HV Hospital | | Drugs given | see medical records | |
| Person removing body from scene | | HEMSI | | | Body now (to be picked up at) | | died at Hv Hospital | | | | |

**DESCRIPTION OF BODY**

| Clothed | | Undothed | | Partly clothed | | Sitting | | Body heat | | ARMS: | Straight | Flexed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Body Position | | | On Back | | On Front | | R side | | L side | LEGS: | Straight | Flexed |
| Describe | died at hospital | | | | | | | | | NECK: | Straight | Flexed |

**MEANS/WEAPONS**

| Revolver | | Semi-auto | | Shotgun | | Rifle | | Shots Fired | | Knife | | Blade Length | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cal / Gauge / Make / Model | | | | | | | | Found | Where | | | | |
| VEHICLE: (color/year/make/model/damage) | | | | | | | | | Other weapon(s) | | | | |

**NARRATIVE**

| DFS Notified by | Joe Washington | | Official Title | CSI |
|---|---|---|---|---|

Narrative summary of circumstances surrounding death:

Nikki Listau (decedent) died at Huntsville Hospital while incarcerated at Madison County Jail. She was pronounced dead at 0305 hours, on March 12, 2013.

According to Huntsville police investigator Charlie Gray, the decedent's boyfriend called 911 (on March 10) to have the decedent taken to the hospital for a shoulder injury. He said she had fallen and injured her shoulder. Huntsville Police responded to the 911 call as well (normal SOP). At the scene, the responding officer determined the decedent had active arrest warrants for harassment and resisting arrest. Instead of going to the hospital, the decedent was arrested for the outstanding warrants, and taken to Madison County Jail.

At the jail, the decedent was unable to walk and was taken into the jail by wheelchair. She was placed in a cell. The next morning (11th) she was found unresponsive in the cell.

Investigator Gray says Huntsville police officers responded to the decedent's address on March 4, 2013 for another medical call. On that call, the decedent had fallen and injured her hip. She was taken to Huntsville hospital for that injury. Medical records will be obtained.

ADA Bill Starnes authorized the examination on March 12, 2013.

| Report Prepared by: | Robert Griffith |
|---|---|
| Signature | *[signature]* |
| | [ Signed Copy in Case File ] |

ACH_001240

**Huntsville Hospital**　　　**MRN: 02012682 Acct: 020126827401**　　　**Pt Name: LISTAU,Nikki**

CONSULTATION REPORT

Patient Name:　　LISTAU, NIKKI KAY　　　Room Number:　6NEM CC01C
Medical Record #:　02012682　　　　　Billing Number:
　　　　　　　　020126827401
Consulting Physician:　Stephan G. Moran, M.D.　　Date of Birth:
Attending Physician:　M. Scott Sarrels, M.D.　　Patient Type:　Inpatient
Date of Admission:　03/11/2013　　　　Date of Consultation:
　　　　　　　03/11/2013

EMERGENCY ROOM PHYSICIAN: Dr. O'Hare

HISTORY OF PRESENT ILLNESS: The patient is a late middle-aged female
brought in by HEMSI after full arrest at the jail. According to the
officer, she was admitted yesterday after resisting to arrest. She was
actually taken to jail in a wheelchair. She was placed upon the psych
ward. One of the officers was speaking with her early this morning
about going to court. They later checked on her again and she was found
to be unresponsive. The nurse was called, cardiopulmonary resuscitation
was started, and she was transported via HEMSI in full arrest. She had
had prolonged cardiopulmonary resuscitation prior to arrival. When she
initially arrived in full arrest, Dr. Harris started her resuscitation.
Because of the questionable history of resisting arrest and then low
hemoglobin on her arterial blood gases, Dr. O'Hare contacted me. I
recommended a FAST. There was trace fluid seen on FAST and she was
upgraded to a level I. Dr. O'Hare and I then continued resuscitation.
We were able to stop doing cardiopulmonary resuscitation. She did get
her pulse back with a very wide complex. She was profoundly acidotic
and got well over 10 units of bicarbonate, multiple units of packed
cells as well as plasma. She started to perfuse and multiple arterial
blood gases were rechecked to continue to guide her resuscitation. She
was on full pressors. Chest x-ray was clear. Pelvis film showed a left
intertrochanteric fracture. We then transported the patient to CT. I
viewed her films in CT and then reviewed them with Dr. Leon Bell. The
only abnormalities that we could find were probable right aspiration and
a very large liver and diffusely enlarged pancreas. There was some
fluid at the tail of the pancreas, a small amount around the tip of the
liver as well as some in the pelvis. No other intraabdominal pathology
is identified. She did have a left intertrochanteric fracture. The
patient was taken back to the emergency room and discussed with Dr.
O'Hare.

PAST MEDICAL HISTORY, FAMILY HISTORY, SOCIAL HISTORY AND REVIEW OF
SYMPTOMS: Unobtainable.

PHYSICAL EXAMINATION:

GENERAL: This is a female in bed A3. She is markedly cachetic.

HEENT: Pupils are fixed and dilated. No corneals, no gag and has

DEFENDANT'S
EXHIBIT

PENGAD 800-631-6989

**Huntsville Hospital**          **MRN: 02012682 Acct: 020126827401**          **Pt Name: LISTAU,Nikki**

endotracheal tube/orogastric tube.

CHEST:  Breathing over sternum from cardiopulmonary resuscitation.  She has a small bruise 5 to 10 centimeters in left upper chest.  Breath sounds are equal.

HEART:  Regular rate and rhythm.

ABDOMEN:  She has a lower midline scar.  It was soft and nondistended.

RECTAL:  Heme positive.

EXTREMITIES:  She has marked wasting.  She has shortening lateral rotation of the left hip.  She has bruising over the knees.

BACK:  Small areas of bruising versus being on the backboard from cardiopulmonary resuscitation.  Upper extremities have no deformity.

NEUROLOGIC:  Glasgow Coma Score is 3T.

LAB:
1. Lactic acid is 16.8.
2. INR is 3.1.
3. Platelets are 53.
4. Troponin is 0.27.
5. Potassium is 6.7 and creatinine is 1.2.
6. Bilirubin is 2.9.
7. Lipase is 5300.

ASSESSMENT AND PLAN:
1. Profound cachexia with probable complex past medical history to include pancreatitis.
2. Left hip fracture.  This may have occurred several days ago as she went to jail in a wheelchair.
3. Chronic pancreatitis.
4. Cardiac arrest.  Etiology is uncertain.  She has been profoundly hypotensive with prolonged cardiopulmonary resuscitation.  Grave prognosis at best.

TIME SPENT:  I spent a total of one hour and five minutes delivering critical care type service to this patient during her resuscitations and workup.


Stephan G. Moran, M.D.

2732332 tr   2801321
D:  03/11/2013 01:41 P
T:  03/12/2013 04:11 A

**Huntsville Hospital**          **MRN: 02012682 Acct: 020126827401**          **Pt Name: LISTAU,Nikki**

cc:  Stephan G. Moran, M.D.
     M. Scott Sarrels, M.D.
Electronically Signed by STEPHAN MORAN, MD on 2013-03-28 13:18:53



**MADISON COUNTY SHERIFFS OFFICE**
100 NORTHSIDE SQUARE
HUNTSVILLE, AL 35801
256-532-3416

SUPPLEMENT NUMBER
2

# OFFENSE REPORT

| Agency Case Number MCSO55OFF017343 | Report Date / Time 03/12/2013 07:58 AM | Offense Description 035 DEATH INVESTIGATION | | |
|---|---|---|---|---|
| CAD Incident Number 13012714 | External Case Reference Number | Range of Occurrence Date/Time 03/11/2013 09:15 AM to 03/11/2013 11:17 AM | | |

### LOCATION OF OCCURRENCE

| County MADISON | Address 815 NE WHEELER AVE , HUNTSVILLE, AL 35801 | | | Latitude | | Longitude | |
|---|---|---|---|---|---|---|---|
| Location Category Non-residence | Location Type Prison/correctional inst. | Location Description | | Location Status | | Lighting Condition Artificial interior | |

| Weather | ☐ Clear | ☐ Cloudy | ☐ Fog | ☑ Rain | ☐ Snow | ☐ Hail | ☐ Other | ☐ Unknown |
|---|---|---|---|---|---|---|---|---|

### PERSON: COMPLAINANT

| First Name STEVE | Middle Name | Last Name WILLIAMS | | Suffix | Date of Birth | Age | Race | Sex | Height | Weight 0 | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Master Name Index Number MCSO13MNI004673 | Place of Birth | Nation | | Driver's License or Other ID | | | State | | Class or Type | | | |
| Address | | | City | | County | | | State | Zip Code | | Phone | |
| Residence Status Within jurisdiction | | Vehicle on Report Associated with Person | | | | | ☐ Arrested | | | ☐ Wanted | | |
| Occupation CORPORAL DETENTION OFFICE | | Employer MADISON COUNTY SHERIFF'S OFFIC | | | | | | | | Master Business Index Number | | |
| Address 815 WHEELER AVE | | | City HUNTSVILLE | | | State AL | Zip Code 35801 | | Phone 256-519-4802 | | | |

### PERSON: VICTIM

| First Name NIKKI | Middle Name KAY | Last Name LISTAU | | Suffix | Date of Birth | Age 60 | Race W | Sex F | Height 5'11" | Weight 160 | Hair BRO | Eyes HAZ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Master Name Index Number MCSO00MNI066552 | Place of Birth HANOVER | Nation US | | Driver's License or Other ID | | | State AL | | Class or Type | | | |
| Address 2901 AZALEA ROAD | | | City HUNTSVILLE | | County | | | State AL | Zip Code 35805 | | Phone | |
| Residence Status Within jurisdiction | | Vehicle on Report Associated with Person | | | | | ☐ Arrested | | | ☐ Wanted | | |
| Occupation | | Employer RETIRED | | | | | | | | Master Business Index Number | | |
| Address | | | City | | | State | Zip Code | | Phone | | | |

### INITIAL NARRATIVE: 03/12/2013 08:20 AM

| Reporting Officer | | | | Approving Supervisor | | |
|---|---|---|---|---|---|---|
| Call Number 6085 | Officer Name REED, KEITH | | Permanent ID Number MCSO11PER000138 | Approved ☑ | Supervisor Name FREE, G | Permanent ID Number MCSO11PER000063 |

Writer responded to the main facility for a unconscious inmate. Upon arrival, writer noticed a white female laying on the floor, hemsi paramedics administering CPR. Writer notified supervisor (Sgt Free), who responded to the jail. Writer followed hemsi to Huntsville hospital and inmate was taken to room A3. She was put on a ventilator. Writer notified Sgt. Free. Doctors then notified writer, inmate was categorized as level 1 trauma with multiple trauma and was rushed to have a CT scan done. Crime scene investigator Washington responded and writer advised him of details. Investigator Hose also responded and was given details. While in CT scan, Dr. Marand came out and asked the writer "has anyone notified the family? Because she is going to die". She has internal bleeding on both sides and a lot of trauma .After retuning to room A3, crime scene went into the room and took pictures. Writer called the jail and asked Sgt. Batie could she tell writer what happened, she stated the inmate was on suicide watch and when the correction officer (Guyton) walked pass she noticed the inmate was not moving, she then notified the nurses, who went in and stated CPR. This report was filed and writer was relived by Dep. Burruss. Writer learned in row call this morning, that the inmate expired at 0442hr on this date.  CSI Washington also responded to and processed the jail cell that the victim was in.

### SUPPLEMENTAL NARRATIVE: 03/12/2013 02:20 PM

| Reporting Officer | | | | Approving Supervisor | | |
|---|---|---|---|---|---|---|
| Call Number 6415 | Officer Name WASHINGTON, JOE | | Permanent ID Number MCSO11PER000143 | Approved ☑ | Supervisor Name CHAFFIN, BRIAN | Permanent ID Number MCSO11PER000067 |

WRITER RESPONDED TO 815 WHEELER AVE HUNTSVILLE, AL REFERENCE TO UNRESPONSIVE INMATE. ON ARRIVAL AT THE JAIL WRITER MET WITH D.O. STEVE WILLIAMS WHO ADVISED WRITER THE INMATE HAS BEEN TRANSPORTED TO HUNTSVILLE HOSPITAL FOR MEDICAL TREATMENT. MR. WILLIAMS ESCORTED WRITER TO THE MEDICAL WARDS CELL NO.3. WRITER MADE PHOTOGRAPHS OF THE INTERIOR OF THE CELL NOTHING WAS COLLECTED FROM INSIDE THE CELL AS EVIDENCE. ONCE WRITER COMPLETED PROCESSING THE CELL, WRITER RESPONDED TO HUNTSVILLE HOSPITAL E.R. BED A3. ON WRITER ARRIVAL AT BED A3 THE INMATE WAS STILL UNRESPONSIVE THE MEDICAL STAFF WERE STILL WORKING ON THE INMATE. INMATE WAS PLACED ON LIFE SUPPORT BY THE E.R. DOCTOR. WRITER RETURNED BACK TO THE MAIN FACLILTY COLLECTED THE

Offense Report

Page 1 of 2



DEFENDANT'S
EXHIBIT
12

| Agency Case Number<br>MCSO55OFF017343 | Report Date / Time<br>03/12/2013 07:58 AM | Offense Description<br>035 DEATH INVESTIGATION | | |
|---|---|---|---|---|
| CAD Incident Number<br>13012714 | External Case Reference Number | Range of Occurrence Date/Time<br>03/11/2013 09:15 AM to 03/11/2013 11:17 AM | | |

**INMATE JACKET AND PANTS FOR SAFE KEEPING.**

**INVESTIGATIVE NARRATIVE: 05/06/2013 03:15 PM**

| Reporting Officer | | | Approving Supervisor | | |
|---|---|---|---|---|---|
| Call Number<br>5136 | Officer Name<br>HOSE, PETER B | Permanent ID Number<br>MCSO11PER000037 | Approved<br>☑ | Supervisor Name<br>CHAFFIN, BRIAN | Permanent ID Number<br>MCSO11PER000067 |

On, 03/11/13, I responded to the Madison County Detention Facility in reference to an Inmate Death in Custody. I made contact with Detention Officer, Roslyn Guyton, who stated she was working the Medical Unit on 03/11/13. Officer Guyton stated she observed, Inmate Nikki Listau, laying in her bunk, with pale skin, at 1119. Officer Guyton stated she went into the medical cell and attempted wake up Inmate Listau, and found Inmate Listau was unresponsive. Officer Guyton stated she immediately contacted Nurse Deondra Montgomery, at 1120, who was in the medical unit at the time, Inmate Listau was found unresponsive. Officer Guyton stated Nurse Montgomery started to medically check Inmate Listau, and advised Officer Guyton to have an Ambulance respond. Officer Guyton stated that she notified Corporal Nick Wallace over the radio that an Ambulance was needed in the medical unit. Corporal Wallace stated that he was notified by Officer Guyton that an ambulance was needed in the medical unit, and he immediately contacted HEMSI. Corporal Wallace stated that he went to the medical unit and observed Nurse Montgomery and Nurse Tanya Jones conducting CPR on Inmate Listau. Corporal Wallace stated he also observed an AED being used on Inmate Listau. HEMSI arrived at the County Jail at 1127 and transported Inmate Listau to Huntsville Hospital at 1147. Sergeant Greg Free responded to the County Jail to secure the scene. Investigator Washington responded to the County Jail to process the scene. Deputy Keith Reed responded to the County Jail and escorted HEMSI to Huntsville Hospital.

Corporal Wallace stated that this incident with Inmate Listau, was the second time that day that they had to assist Inmate Listau. Corporal Wallace stated that around 0940 he was notified by Officer Guyton that Inmate Listau was laying in the floor of her medical cell covered by her suicide smock. Corporal Wallace stated that he and Officer Randy Hooper, picked Inmate Listau up off of the floor and placed her in her bed. Corporal Wallace stated that after she was placed back in her bed that Officer Guyton had verbal contact with Inmate Listau. Officer Guyton asked Inmate Listau if she wanted to shower and Inmate Listau stated she did, but Inmate Listau refused to follow the direction Officer Guyton, so Officer Guyton secured her cell and continued with her daily task.

While at Huntsville Hospital Inmate Listau was moved from the emergency room to the Intensive Care Unit to receive medical care. Inmate Listau was pronounced dead at Huntsville Hospital on 03/12/13 at 0442, by Doctor Nix. Inmate Listau's body was sent to the Madison County Coroner's Office, for an Autopsy. The cause of this death is still pending until a complete medical examination is returned by the Coroner's Office.

I along with members of the Madison County Sheriff Department Investigative Unit, and Huntsville Police Department went to victim's residence located at 2901 Azalea Road. Where officers searched for clues to victims death. present was a white male believed to be victim's husband / Boyfriend. Inside the residence was empty alcohol bottles everywhere. On one of the pillows was a reddish substance believed to be blood. On the kitchen counter there was a reddish substance believed to be blood. Huntsville Police Crime Scene processed the scene.

On 01/27/2014 I received a report from forensic science office manner of death is pending. I scanned this form in.

On 02/06/2014 I received a fax from Patty Blood who is with the Alabama Department of Forensic Science, the report showed blunt force injuries manner of death accident. Inmate falling could explain Blunt force injuries.

**REPORTING OFFICER / SUPERVISOR APPROVAL**

| Reporting Officer | | Approving Supervisor | | |
|---|---|---|---|---|
| Call Number<br>6085 | Name<br>REED, KEITH | ID Number<br>6371 | Rank<br>DEPUTY SGT | Name<br>CHAFFIN, BRIAN |
| Signature | | Signature<br>*Le BChaffin* | | |

Offense Report

Page 2 of 2

Booking No: MCSO13JBN009248          MNI No: MCSO13MNI008853          Cell No: MCDC*HH*001

---

### Incident Number: EVN0005                                                  ☐ Use of Force

| | | |
|---|---|---|
| Report Date: 08/07/2013 | Reporting Officer | Supervising Officer |
| Occurrence Dates From: 08/07/2013  18:00 | Name: GUNN, DONNA E | Name: GREEN, WILLIAM |
| To: 08/07/2013  19:15 | Number: MCSO10PER000074 | Number: MCSO10PER000073 |

Comments:  cleaned cell due to Inmate Woods scattering food items

---

### Incident Number: EVN0006                                                  ☐ Use of Force

| | | |
|---|---|---|
| Report Date: 08/08/2013 | Reporting Officer | Supervising Officer |
| Occurrence Dates From: 08/06/2013  05:45 | Name: CANTRELL, KELLY WADE | Name: MARTIN, MARK A |
| To: 08/06/2013  06:10 | Number: MCSO10PER000031 | Number: MCSO10PER000114 |

Comments:  Inmate Deundrez Woods located in G2 refused to give back his tray at breakfast chow. Inmate was numerous verbal
commands to give back tray in which he failed to comply with. Force was used to get the tray back from Inmate Woods
. Sergeant Mark Martin #7193 was notified of this event.

---

### Incident Number: EVN0007                                                  ☑ Use of Force

| | | |
|---|---|---|
| Report Date: 08/09/2013 | Reporting Officer | Supervising Officer |
| Occurrence Dates From: 08/06/2013  05:20 | Name: LEWTER, EDWARD L | Name: VELEZ, JAIME  JR. |
| To: 08/06/2013  06:00 | Number: MCSO10PER000101 | Number: MCSO10PER000168 |

Comments:  INMATE WOODS REFUSED VERBAL COMMANDS. INMATE BECAME AGGRESSIVE BY SWINGING HIS ARMS. INMATE
WOODS LUNGED AT OFFICERS. INMATE WAS TASED TO GAIN CONTROL. INMATE WOODS WAS SEEN BY NURSE
ASHLEY CASEY, LPN  AND CLEARED FOR HOUSING.

#### Use Of Force Details

**Injuries Suffered by Staff**
NO

**Injuries Sustained by Inmate**
NO

**Injuries Noted on Inmate Prior to Use of Force**
N/A

**Medical Treatment Offered to Inmate**

Place of Treatment:        ☐ Jail Hospital          Treatment Offered:
                           ☐ Hospital ER
                           ☐ EMS
                           ☐ Medical Clinic

**Type of Medical Treatment Offered to Inmate**
CHECKED ENTRY OF TASER PRONGS

**List of Medical Personnel Administering Treatment**
Nurse Ashley Casey,LPN

**Justification for Use of Force**
AT ABOUT 0520 HOURS C.E.R.T. OFFICER EDWARD LEWTER WAS ADVISED BY CORPORAL KELLY CANTRELL #8689 THAT INMATE WOODS, DEUNDREZ
B/M #MCSO13MNI008853 WOULD NOT RETURN HIS TRAY. OFFICER LEWTER CALLED C.E.R.T. OFFICER DEONTE SULLIVAN #8958 BY RADIO FOR
ASSISTANCE. OFFICER LEWTER GAVE LOUD VERBAL COMMANDS THROUGH THE DOOR OF G UNIT CELL#2 FOR INMATE WOODS TO GO TO THE BACK
OF THE CELL AND GET ON HIS KNEES. INMATE WOODS WENT TO THE BACK OF THE CELL, BUT WOULD NOT GO TO HIS KNEES. OFFICER LEWTER
OPENED THE DOOR AND PULLED THE TASER X26 #X00-344008 TO ATTEMPT RED DOT COMPLAINCE. INMATE REFUSED TO GO TO HIS KNEES. INMATE
WAS AGGRESSIVE BY SWINGING HIS ARMS. INMATE LUNGED AT OFFICERS. OFFICER LEWTER DEPLOYED THE TASER X26 HITTING INMATE WOODS IN
THE CHEST AND STOMACH. INMATE WAS TASED FOR 5 SECONDS. INMATE WAS GIVEN LOUD VERBAL COMMANDS TO ROLL OVER TO HIS STOMACH.
INMATE WOODS DID NOT COMPLY. INMATE WOODS BECAME MORE AGGRESSIVE AND GETTING UP OFF THE FLOOR. INMATE WAS TASED FOR 5
SECONDS AND GIVEN LOUD VERBAL COMMANDS TO STOP RESISTING AND ROLL OVER ON HIS STOMACH. INMATE WOODS BEGAN TO GET UP AGAIN.
INMATE WAS TASED FOR 5 MORE SECONDS. OFFICER SULLIVAN AND OFFICER MATHEW HILL #9153 GRAB ONE ARM EACH AND PLACED HANDCUFFS
ON INMATE WOODS. OFFICER SULLIVAN AND OFFICER HILL ESCORTED INMATE WOODS OUT OF THE CELL AND PLACED INMATE FACE DOWN ON THE
FLOOR OUTSIDE OF THE CELL. AT ABOUT 0545 OFFICER LEWTER REMOVED THE TASER PROBES FROM INMATE WOODS AND NURSE ASHLEY
CASEY,LPN ASSESSED AND CLEARED INMATE WOODS TO RETURN TO CELL #2. CELL#2 WAS SEARCHED, CLEANED AND FOOD TRAY REMOVED ALONG
WITH THE BROKEN PROPERTY BOX.  NO CONTRABAND WAS FOUND. INMATE WAS ESCORTED BACK TO CELL #2 WERE HANDCUFFS WERE REMOVED
AND DOOR SECURED. SERGEANT JAMIE VELEZ
#6860 WAS ADVISED OF THE LISTED EVENT.  END OF REPORT......

Reviewed J.Velez 6860 --Nothing follows----

**Interview with Inmate Involved**
N/A

---



DEFENDANT'S
EXHIBIT
12
PENGAD 800-631-6989

DEFENDANT'S
EXHIBIT
11
PENGAD 800-631-6989

Dominique                                                    July 30, 2013

Yeah we ended on bad terms but like you said in your letter we know we gonna be back together. All i'm doing in my cell is thinking about you and our beautiful son. I met an old wise man while i was in here and every day I share with him about the kind of life I live; he's more of a kind of a mentor to me and slowly but surely he's shaping me into a better man. last night I wrote a poem to you and even though I don't have a dollar on my books I make sure that these letters get to you I don't care if I have to take a stamp, envelope, and a piece of paper. I want you to know that i'm strate in here. I done built me up a goon squad in here. And even though i'm the youngest person in here people refer to me as the altamale. I've gotten into a couple of altercations since I been here; I litterly picked a guy up and power-bombed his on his head bout killed him for real but I didn't even get in trouble. I've got some bad news though babe I could be possibly facing some serious time but if all goes well I'll get out of here August 7th. I fucking hate the idea that i'm gonna miss Jailyn's first bday. But you know when I spent that counterfeit 100 dollar bill it was all on stuff for you and Jailyn. So I risked my freedom for you and my son. I bought Jailyn 80 dollars worth of shit for his bday and got caught but hell I did the crime so I gotta do the time but I'mma bout to wrap this letter up boo. I truly want you to know that I LOVE YOU!!! I swear my player card is turned in. I realized being in here that I really love you more than you'll ever know. MWAHHH!!! And kiss Jailyn for me too. P.S. Daddy coming home soon.

Plaintiff 00000
2015-12-17

DEFENDANT'S
EXHIBIT
13
PENGAD 800-631-6989

Oh yeah I been writing a lot of raps in here I been having the whole jail crunk off my rhymes so i'm gonna write a genuine love song for soon. I FUCKING LOVE BABYGTRL !!!! I'm getting Jo name tatted on me asap so you know it's real. Baby please I beg of you, don't be with no other dude while i'm in here it'll break my heart to the point where somebody's gonna die. I love you that much girl I'd kill over you. I can't even stop writing this pen just keeps moving cause I have so much to say to you but im really wrapping this letter up this time. MWUAHH I LOVE YOU BABYGTRL !!!

P.S.S.S. I just found out that I get out in so long July the 30th

Make sure I get pics from you Desiree Jailyn, and see if you can send some from my tani. Get a big envelope and send that to calendar of me you and Jailyn, I need a calendar plus I want to see un a small pic of each color we wore OK PLEEASE get that done Im is all you, much love to all yall



Plaintiff 00000□
2015-12-17



ALABAMA
DEPARTMENT OF FORENSIC SCIENCES

716 ARCADIA CIRCLE
HUNTSVILLE, ALABAMA 35801
(256) 539-1401
FACSIMILE (256) 533-2855



# REPORT OF AUTOPSY

**CASE NO.:** 14HM00046                    **DATE:** November 1, 2013
                                           **TIME:** 1059 hours

**NAME:** TANISHA RAYSHELL JEFFERSON   **DATE OF DEATH:** October 31, 2013

**COUNTY:** Madison

**AGE:** 30 years    **RACE:** B    **SEX:** F    **LENGTH:** 70 inches    **WEIGHT:** 200 pounds

## FINAL DIAGNOSES

I. Hypertensive cardiovascular disease
   A. Cardiomegaly (460 grams)
   B. Biventricular hypertrophy (right ventricle 0.6 centimeter in thickness; left ventricle 1.8 centimeters in thickness)
   C. Bilateral pulmonary congestion and edema (combined weight, 1420 grams)
   D. Pericardial fluid (200 milliliters)

II. Blunt force injuries
   A. Contusions of the right upper extremity and lower extremities

**CAUSE OF DEATH:**    Cardiomyopathy.

**MANNER OF DEATH:**    Natural.

**COPY**



DEFENDANT'S EXHIBIT 14

DORNING 000166

Case #      14HM00046
Name        TANISHA RAYSHELL JEFFERSON

## EVIDENCE OF INJURY

A 1/2-inch red contusion is on the medial right wrist. A 1/2 by 5/16-inch red contusion and a 5/16-inch red contusion are clustered on the posterior medial aspect of the right forearm. A focal red contusion is on the posteromedial aspect of the distal right forearm. A 1-1/4-inch red contusion is on the right knee. A 1-inch red contusion is on the proximal lateral right leg. A 1/2-inch red contusion is on the left knee. A 3/4-inch red contusion is on the lateral left knee. A 3/4-inch red contusion is on the proximal anteromedial left leg.

## EXTERNAL EXAMINATION

The following excludes any previously described injuries.

**BODY HABITUS:** The body is that of a normally developed, well-nourished, adult Black female, appearing the reported age of 30 years, with a weight of 200 pounds and a height of 70 inches.

**CONDITION OF THE BODY:** The body is cold to the touch with the presence of rigor mortis. Livor mortis is fixed on the posterior surface of the body, except in areas exposed to pressure. The body is well preserved and is not embalmed.

**IDENTIFYING MARKS:** Tattoos are on the bilateral lateral aspects of the neck, the lateral bilateral arms, the right lateral leg, and the superior back within the midline.

**HEAD AND FACE:** The scalp is atraumatic and covered with black cornrow hair.

**EYES:** The irides are brown; the pupils are of equal size at 6 millimeters in diameter. The conjunctivae are congested and without hemorrhage, petechiae or jaundice. The medial aspect of the superior right lid is focally edematous with a pinpoint red mark on the superior palpebral conjunctiva.

**NOSE:** The nose is symmetrical, without acute trauma. The nasal bones and septum are palpably intact.

**MOUTH:** The lips and frenula are without contusion, abrasion, or laceration. The teeth are natural and in fair condition. The left superior canine tooth is broken.

**EARS:** The ears are symmetrical and without acute trauma. The earlobes are without piercings.

**NECK:** The neck is symmetrically developed and atraumatic.

**CHEST:** The chest is symmetric and normal in shape. A 5-1/2 by 2-1/2-inch cluster of petechial hemorrhages is on the superior aspect of the left chest. A 2-1/2 by 2-inch cluster of petechial hemorrhages is on the lateral left arm. A 2-1/2 by 1-inch cluster of petechial hemorrhages is on the superior right chest overlying the breast. A 2 by 1-inch cluster of petechial hemorrhages is in the epigastric region. A 1-5/8 by 1/2-inch cluster of petechial hemorrhages is in the medial aspect of the superior left abdominal quadrant. Multiple striae are along the inferior abdominal quadrant.
ABDOMEN: The abdomen is unremarkable.

DORNING 000167

Case #        14HM00046
Name          TANISHA RAYSHELL JEFFERSON

EXTERNAL GENITALIA:  The external genitalia are that of a normally developed adult female with black pubic hair.

LOWER EXTREMITIES:  The lower extremities have symmetric musculature, with no edema or changes of chronic venous stasis.

UPPER EXTREMITIES:  The upper extremities have symmetric musculature, with no hesitation scars or needle tracks.  The hands are atraumatic with shortly cropped fingernails.

BACK AND ANUS:  The anus and back are symmetric and developmentally normal.  A 1-1/8 by 1/4-inch cluster of petechial hemorrhages is on the mid left back.

## EVIDENCE OF MEDICAL INTERVENTION

An endotracheal tube is in the mouth.   An intravenous catheter is in the right lateral neck. Electrocardiogram leads are on the chest and abdomen. Defibrillator pads are on the inferior left chest and left mid back.  An identification band encircles the right ankle.

## INTERNAL EXAMINATION

The following excludes any previously described injuries.

SEROSAL CAVITIES:  Approximately 200 milliliters of amber fluid are within the pericardial sac.  An insignificant amount clear free fluid is in the pleural and peritoneal cavities.  No adhesions are in the pericardial, pleural, or peritoneal cavities.  The organs are in normal anatomic position.

CENTRAL NERVOUS SYSTEM: No scalpular or subscalpular hemorrhages are present.  No epidural or subdural hemorrhage is associated with the tan-white dura.  The 1420 gram brain is covered with thin, transparent meninges without hemorrhage or exudate.  The vessels of the vertebrobasilar and circle of Willis arterial systems have a standard symmetric configuration with no atherosclerosis or aneurysms.  The cerebral gyri have a normal developmental configuration with no atrophy or edema.  The cerebral cortical ribbon has a uniform normal thickness and the gray-white junction is distinct.  The major deep nuclei, mamillary bodies, and hippocampi are symmetric and unremarkable.  The ventricular system has a standard symmetric configuration with no dilatation or compression.  The cerebellar folia are normally formed with no sclerosis or atrophy.  The cerebellar white matter and dentate nuclei are unremarkable.  The brainstem nuclei and white matter tracts are unremarkable.

ORGANS OF THE NECK:  The right aspect of the anterior neck is hemorrhagic and is most likely associated with the needle puncture mark is seen in the right lateral aspect of the neck. The musculature on the left side of the neck is free of contusions.  The laryngeal cartilages and hyoid bone are intact.  The laryngeal mucosa is smooth, pink-white with no petechiae or ulcerations.  The epiglottis is thin and delicate.

DORNING 000168

Case #        14HM00046
Name          TANISHA RAYSHELL JEFFERSON

CARDIOVASCULAR SYSTEM:  The 460 gram heart has a smooth, glistening epicardium with a moderate amount of adipose tissue.  The coronary arteries arise from their usual positions within the respective sinuses of Valsalva and follow a right dominant distribution. Petechial hemorrhages are along the epicardium and endocardium of the heart.  The coronary arteries are patent and without significant atherosclerotic change. The myocardium is uniformly red-brown with no fibrosis, hemorrhage, softening or other focal lesions.  The left and right ventricular free walls average 1.8 centimeters and 0.6 centimeter in thickness, respectively.  The papillary muscles and chordae tendineae are intact.  The valve cusps and leaflets are thin and delicate.  The aorta is intact and has fatty atherosclerotic streaks along its intimal surface.  The vena cava and its major tributaries return to the heart in the usual distribution and are unremarkable.  A focus of fibrosis is within the posterior left ventricle as it extends into the septum of the heart.  Multiple petechial hemorrhages are visualized within the myocardium of the left and right ventricles.

RESPIRATORY SYSTEM:  The right and left lungs are 620 grams and 800 grams, respectively.  The pleural surfaces are blue-red, smooth and glistening with no anthracosis. The pulmonary parenchyma is diffusely red, congested and edematous, exuding moderate amounts of bloody fluid.  No focal lesions, consolidation or exudate is evident.  The tracheobronchial tree is lined with a smooth, tan white mucosa.  Red tinged fluid and mucus are within the tracheobronchial tree.  The pulmonary vasculature is normally developed and the pulmonary vessels are thin, delicate, and free of atherosclerosis and thromboemboli.

GASTROINTESTINAL SYSTEM:  The esophagus is unremarkable.  The gastroesophageal junction is well demarcated with no varices.  The stomach contains approximately 100 milliliters of greenish-tan liquid with no intact pill residue or obvious food fragments.  The gastric mucosa is tan-pink and has the usual rugal folds.  The small and large intestines occupy their usual positions within the peritoneal cavity and are unremarkable.  The appendix is present and unremarkable.

HEPATOBILIARY SYSTEM:  The 1740 gram liver has a smooth, translucent, glistening capsule.  The hepatic parenchyma is red-brown and lobular with no visible or palpable fibrosis.  The gallbladder contains liquid bile without stones.  The mucosa is smooth and velvety.  The gallbladder wall is thin and delicate.

GENITOURINARY SYSTEM:  The right and left kidneys are 180 grams and 200 grams, respectively.  The subcapsular cortical surfaces have foci of blackened cortex on both kidneys, but are otherwise red brown with diffuse fine granularity.  The corticomedullary junction is well demarcated.  This blackened cortex does not appear to extend into the deeper regions of the kidney.  A 3-millimeter well-circumscribed white nodule is within the medullary area of the left kidney.  The renal calyces, pelves and ureters follow their course to the bladder and are not dilated.  The bladder is empty.  The bladder mucosa is pink-white and unremarkable.  The non-gravid uterus and appendages are partially covered with a moderate amount of adhesions.  The bilateral fallopian tubes have been previously ligated.  Foci of blackened tissue and adhesions are along the uterus and broad ligament.  The left ovary contains two hemorrhagic corpus luteum.

ENDOCRINE SYSTEM:  The thyroid gland has a normal shape and size with a uniform red-brown parenchyma. The parathyroid glands are inconspicuous.  The adrenal cortices are golden-yellow and have a normal uniform thickness.  The medullae are thin, tan-brown, and uniform.  The pancreas has a normal shape and size with uniform pale pink to tan and firm, lobular parenchyma.

DORNING 000169

Case #        14HM00046
Name          TANISHA RAYSHELL JEFFERSON

MUSCULOSKELETAL SYSTEM:  The skull and vertebral column are intact with no fractures.  The second and third right anterior ribs are fractured with a small amount of associated soft tissue hemorrhage.  The third and fourth left anterior ribs are fractured with a small amount of associated soft tissue hemorrhage.  The pelvis and long bones of the extremities are palpably intact with no fractures.  The skeletal muscle is uniformly red-brown.

IMMUNOLOGIC SYSTEM:  The 160 gram spleen has a blue-gray, intact capsule.  The parenchyma is dark red with inconspicuous white pulp.  The regional lymph nodes are unremarkable.

## ANCILLARY STUDIES

POSTMORTEM RADIOGRAPHS, CHEMISTRIES, GENETIC STUDIES AND MICROBIOLOGY: A swab of the pericardial fluid is submitted for bacterial culture.

MICROSCOPIC EXAMINATION:

Slide #1:      Pancreas, spleen – unremarkable.
               Liver – congestion.
               Heart – unremarkable.

Slide #2:      Heart – focal fibrosis.
               Kidney – nephrosclerosis
               Trachea – acute submucosal hemorrhage.

Slide #3:      Heart – unremarkable.
               Lung – congestion.

Slide #4:      Lung – congestion.

Slide #5:      Central Nervous System – unremarkable.

TOXICOLOGY: Samples of blood and vitreous fluid are submitted for toxicological analysis.

## LOGISTICS

AUTHORIZATION:  Code of Alabama (1975) Section 36-18-2; Robert Broussard, District Attorney.

IDENTIFICATION:  The body was identified by David Young, Madison County Coroner's Office to ADFS Forensic Investigator, Robert Griffith.

PERSONS PRESENT: Katie Adams, Pathology Technician, and ADFS Forensic Investigators, Robert Griffith and Buford Knopps, are present during the autopsy.

DORNING 000170

Case #       14HM00046
Name         TANISHA RAYSHELL JEFFERSON

EVIDENCE: Photographs, fingerprints, blood, vitreous for toxicology and specimens for forensic biology are obtained.

The facts stated herein are correct to the best of my knowledge and opinion at the time of report completion.


_Dr. Stephen F. Boudreau, M.D._
Dr. Stephen F. Boudreau, M.D.
Senior State Medical Examiner
Signing for Valerie Green, M.D.
State Medical Examiner


January 22, 2015
Date Signed


The above signature is for administrative purposes.  This dictation was prepared by Dr. Valerie Green, M.D., Medical Examiner, and reviewed by Dr. Stephen F. Boudreau, M.D., Senior State Medical Examiner, based upon and limited to case information, photographs and notes prepared by Dr. Green. The facts stated herein are correct to the best of my knowledge and opinion at the time of report completion.


SFB/VSG/kv/kvn/pab

DORNING 000171

**3.1.5 Booking Cards**. A Booking Card is required to be completed for all persons admitted to the Jail. Booking Cards used at the Jail facilities will be white with color labels to indicate inmate/arrestee status. Jail personnel are responsible for selecting one of the following colored labels to indicate arrestee/inmate status:

1. Green Tab - Federal or In-Transit inmate.

2. Plain Booking Card – County Detainee.

3. Orange Tab - County Inmate.

4. Blue Tab - State sentenced inmate.

5. Red Tab - City of Huntsville inmate (pre-trial and sentenced).

6. Purple Tab - All other agencies.

**INFORMATION IS ALSO REQUIRED TO BE KEPT ON THE JAIL COMPUTER SYSTEM. COMPUTER INFORMATION ON INMATES MUST BE KEPT UP-TO-DATE AT ALL TIMES.**

**3.1.6 Injured or Sick Arrestees or Transfers**. No arrestee or inmate transferee will be accepted into the Jail who exhibits any behavior indicating that such person is in need of immediate medical or mental health evaluation or care. When an arrestee or inmate transferee is brought to the Jail to be admitted, Jail personnel will observe the person and determine if the individual appears to be in need of immediate medical or mental health attention. Jail personnel will also ask the arrestee or inmate transferee pertinent questions related to the person's medical and mental health status. Such questions are contained on the inmate questionnaire form. If Jail personnel determine that the arrestee or inmate transferee appears to need immediate medical or mental health attention, Jail personnel will immediately request the assistance of the on-site medical staff for evaluation, treatment or referral of the arrestee or inmate transferee to other off-site medical providers. **Refer to other Sections of this Manual for further procedures to follow regarding screening of persons before their admission to the Jail.**

**3.1.7 Intake Screening of Arrestees and Inmate Transferees:** The "screening" of arrestees and inmate transferees by Jail personnel during the admission process is important in determining whether arrestees and inmate transferees should be admitted into the Jail. Arrestees and inmate transferees may have medical or mental health problems that need immediate or continuing care, and the screening of such persons for medical and mental health care conditions requiring treatment identify potential problems, allows Jail personnel to promptly notify on-site medical staff and ultimately serves as one basis for denying the arrestee or

29


DEFENDANT'S
EXHIBIT
38

DORNING 001769

inmate transferee's admission to the Jail if necessary. The intake screening process at the Jail involves both Jail personnel and on-site medical staff. The intake screening process begins with Jail personnel the moment an arrestee or inmate transferee arrives at the Jail for possible admission.

Jail personnel should observe and communicate with arrestees and inmate transferees prior to admitting such persons into the Jail to determine whether such persons exhibit behavior indicating a need of immediate medical or mental health care. Arrestees and inmate transferees will not be admitted into the Jail if such persons exhibit any behavior indicating a need of immediate medical or mental health care until on-site medical staff personally evaluate the arrestee or inmate transferee and determine that immediate medical or mental health care is not necessary. If on-site medical staff or a Shift Supervisor determines that an arrestee or inmate transferee is in need of immediate medical or mental health care, a Shift Supervisor should refuse to admit the arrestee or inmate transferee if such treatment cannot be or is not ordinarily rendered by the on-site medical staff at the Jail. Jail personnel or on-site medical staff should instead inform the arresting or transporting officer to transport the person to a local hospital for treatment. The arrestee or inmate transferee should not be admitted into the Jail. The Shift Supervisor may refuse to admit any arrestee or inmate transferee based upon his or her belief that the arrestee or inmate transferee needs immediate medical or mental health care, even if on-site medical staff determines that such refusal is unnecessary.

If an arrestee or inmate transferee is not in obvious need of immediate medical or mental health care upon arrival, Jail personnel will continue the admission process. As part of the admission process, Jail personnel will assist arrestees and inmate transferees in completing an "Inmate Intake Screening" Form. The Inmate Intake Screening Form contains numerous questions relating to arrestee and inmate transferee health conditions. If, during the completion of the form, Jail personnel observe the need for medical staff to examine the arrestee or inmate transferee, Jail personnel shall immediately request that the on-site medical staff perform an examination before continuing the admission process. If the on-site medical staff determines a person should receive medical treatment before the admission process continues, medical staff will direct Jail personnel to inform the arresting or transporting officer to transport the person to a local hospital for treatment before the arrestee or inmate transferee will be allowed to continue the admission process. (If an arrestee or inmate transferee is initially denied admission for a medical or mental health reason, the arrestee or inmate transferee will not be subsequently admitted unless the transporting officer provides medical documentation including any doctor's orders regarding further treatment or medication to be administered. The medical staff must examine the returning arrestee or inmate transferee to determine whether the inmate may be admitted.)

30

Arrestees and inmate transferees who appear at intake to be suffering from serious mental illness, including those indicating a suicidal threat by words or actions will be immediately referred to the onsite medical staff for evaluation..

Any person exhibiting any of the following behavior or characteristics will be denied admission to the Jail until evaluated by on-site medical staff and/or Emergency Room staff at a local hospital:

    (a)    Persons who are unconscious.

    (b)    Persons who are having or who have recently had convulsions.

    (c)    Persons with any significant external bleeding.

    (d)    Persons with any obvious fractures.

    (e)    Persons with signs of head, neck or spinal injuries.

    (f)    Persons with any type of serious injury.

    (g)    Persons who cannot walk under their own power.

    (h)    Persons who display symptoms of internal bleeding.

    (i)    Persons with abdominal bleeding.

    (j)    Pregnant women in labor.

    (k)    Pregnant women with any other serious problem(s).

    (l)    Persons with extremely intoxicated or incapacitated behavior.

    (m)    Persons with breathing difficulties.

    (n)    Persons having seizures.

    (o)    Persons exhibiting apparent hallucinations.

    (p)    Persons with other serious medical indications.

The screening process conducted by Jail personnel will include inquiry into communicable diseases the arrestee or inmate transferee may have, (including tuberculosis and sexually transmitted diseases), chronic conditions requiring immediate review, and inquiry into medications the arrestee or inmate transferee has been taking before his or her arrival at the Jail. During intake screening, Jail personnel shall determine, if possible,

31

DORNING 001771