**Jeff Rich - Madison County  Representative**

FILED

2018 Jan-12 PM 04:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

1    IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF ALABAMA
2     NORTHEASTERN DIVISION
    Civil Action No. 5:15-cv-01997-HGD

3

  MADISON COUNTY SHERIFF BLAKE DORNING, et al.,
4    Plaintiffs,

5 V.

6 EVANSTON INSURANCE COMPANY, ADVANCED

7 CORRECTIONAL HEALTHCARE, INC, et al.,

8    Defendants.

9

10

11

12 **************************************************

13

14   DEPOSITION TRANSCRIPT OF JEFF RICH

15    June 13 and 21, 2017

16     9:00 a.m.

17

18 **************************************************

19

20

21

22

23

1                S T I P U L A T I O N S

2                Deposition of JEFF RICH, taken

3    pursuant to the provisions of the Federal Rules

4    of Civil Procedure, before Vicki Couts, Court

5    Reporter and Notary Public, State of Alabama at

6    large.

7

8                By agreement of the parties, all

9    formalities required by the Federal Rules of

10   Civil Procedure pertaining to the taking of

11   depositions are waived.

12

13               The parties hereto respectively

14   reserve all objections as to the admissibility

15   of any question asked of the witness or any

16   answer elicited from the witness until such time

17   as the deposition, or any portion thereof, is

18   offered in evidence on the trial of the above

19   cause, except that objections as to the form of

20   the questions asked of the witness must be made

21   at the time of the taking of the deposition or

22   otherwise such objections are waived.

23

1              The parties stipulate and agree

2    that the reading and signing of the deposition

3    to/by the witness is waived.

4

5              It is further stipulated and agreed

6    that notice of filing of this deposition by the

7    Commissioner is waived.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1                     I  N  D  E  X

2                                             PAGE

3    Examination by Mr. Finch                 12

4    Examination by Mr. Stephens              205

5    Examination by Mr. Clapp                 372

6

7

8                  E X H I B I T S

9

10                                            PAGE

11   Defendant's Exhibit 1                    18

12        Notice.

13   Defendant's Exhibit 2                    67

14        February 23, 2017 Letter.

15   Defendant's Exhibit 3                    80

16        Jefferson Complaint.

17   Defendant's Exhibit 4                    89

18        Foster Complaint

19   Defendant's Exhibit 5                    91

20        Second Amended Complaint.

21   Defendant's Exhibit 6                    146

22        E-mail.

23

1    Defendant's Exhibit 7                      154

2          E-mail.

3    Defendant's Exhibit 8                      157

4          Letter, October 16, 2006.

5    Defendant's Exhibit 9                      160

6          Letter, July 30, 2010.

7    Defendant's Exhibit 9(a)                   307

8          Letter, July 30, 2010.

9    Defendant's Exhibit 10                     161

10         Letter, July 26, 2011.

11   Defendant's Exhibit 11                     166

12         E-mail chain.

13   Defendant's Exhibit 12                     169

14         E-mail chain.

15   Defendant's Exhibit 13                     174

16          E-mail chain.

17   Defendant's Exhibit 14                     175

18         E-mail chain.

19   Defendant's Exhibit 15                     175

20         E-mail chain.

21   Defendant's Exhibit 16                     175

22         E-mail chain.  (Confidential.)

23

**Jeff Rich - Madison County  Representative**                    **6**

1    Defendant's Exhibit 17                    186

2         E-mail chain.

3    Defendant's Exhibit 18                    192

4         Heathcare Services Agreement.

5    Defendant's Exhibit 19                    272

6         Health Services Agreement.

7    Defendant's Exhibit 20                    276

8         RFP.

9    Defendant's Exhibit 21                    278

10        Letter, August 3, 2006.

11   Defendant's Exhibit 22                    279

12        Letter, September 12, 2006.

13   Defendant's Exhibit 23                    279

14        Letter, September 14, 2006.

15   Defendant's Exhibit 24                    285

16        Letter, October 23, 2006.

17   Defendant's Exhibit 25                    286

18        Letter, October 23, 2006.

19   Defendant's Exhibit 26                    294

20        Letter, June 8, 2007.

21   Defendant's Exhibit 27                    295

22        Letter, July 7, 2009.

23

**Jeff Rich - Madison County  Representative**        **7**

1  Defendant's Exhibit 28                     304

2       Letter, July 27, 2009.

3  Defendant's Exhibit 29                     308

4       Letter, August 1, 20011.

5  Defendant's Exhibit 31                     372

6       Letter, July 9, 2014.

7  Defendant's Exhibit 49                     317

8       Consent Order.

9  Defendant's Exhibit 50                     295

10       Letter, May 12, 2009.

11  Defendant's Exhibit 51                    296

12       Healthcare Services Agreement.

13  Defendant's Exhibit 53                    298

14       Letter, July 11, 2012.

15  Defendant's Exhibit 54                    298

16       Healthcare Services Agreement.

17  Defendant's Exhibit 55                    299

18       Letter, May 21, 2013.

19  Defendant's Exhibit 56                    299

20       Section 2, Healthcare Services Agreement.

21  Defendant's Exhibit 57                    300

22       Healthcare Services Agreement.

23

1    Defendant's Exhibit 58                     300

2         Certificate of Insurance.

3    Defendant's Exhibit 59                     301

4         Certificate of Insurance.

5    Defendant's Exhibit 60                     302

6         Letter, November 9, 2006.

7    Defendant's Exhibit 61                     306

8         Letter, July 30, 2010.

9    Defendant's Exhibit 62                     310

10        Certificate of Insurance.

11   Defendant's Exhibit 63                     310

12        Certificate of Insurance.

13   Defendant's Exhibit 64                     311

14        Certificate of Insurance.

15   Defendant's Exhibit 65                     312

16        Certificate of Insurance.

17   Defendant's Exhibit 66                     338

18        Letter, January 5, 2011.

19   Defendant's Exhibit 67                     341

20        RFP.

21   Defendant's Exhibit 68                     342

22        Proposal Submission Checklist.

23

**Jeff Rich - Madison County  Representative** **9**

1    Defendant's Exhibit 75                    360

2         Letter, October 27, 2014.

3    Defendant's Exhibit 76                    373

4         Letter, July 6, 2015.

5    Defendant's Exhibit 77                    374

6         Letter, August 27, 2015.

7    Defendant's Exhibit 79                    375

8         Moore Complaint.

9    Defendant's Exhibit 80                    376

10        Moore Amended Complaint.

11   Defendant's Exhibit 81                    384

12        E-mail chain.

13   Defendant's Exhibit 82                    386

14        Letter, January 15, 2015.

15   Defendant's Exhibit 83                    396

16        Letter, March 4, 2015.

17   Defendant's Exhibit 85                    404

18        Policies and Procedures Manual.

19

20

21

22

23

1                 A P P E A R A N C E S

2

3     For the Plaintiffs:

4           Mr. David Hodge

5           MORRIS KING & HODGE

6           200 Pratt Avenue NE

7           Huntsville, AL  35801

8

9     For the Defendants:

10          Mr. H. Harold Stephens

11          BRADLEY ARANT BOULT CUMMINGS

12          200 Clinton Avenue West, Suite 900

13          Huntsville, AL  35801

14

15          Mr. F. Lane Finch, Jr. (Day 1)

16          Mr. Brandon J. Clapp (Day 2)

17          SWIFT CURRIE McGHEE & HIERS

18          2 North 20th Street, Suite 1405

19          Birmingham, AL  35203

20

21    Also Present:

22          Mr. Blake Dorning (Day 1)

23          Mr. Thad Brooks,  Videographer

1                      On June 13, 2017, at the offices of

2      Morris, King & Hodge, 200 Pratt Avenue,

3      Huntsville, Alabama, came before the undersigned

4      authority, Vicki G. Couts, CSR, and a Notary

5      Public for the State of Alabama, JEFF RICH, who,

6      being by me first duly sworn to speak the truth,

7      the whole truth, and nothing but the truth,

8      testified as follows:

9

10                     THE VIDEOGRAPHER:  We are now on the

11     record.  Today's date is June 13, 2017.  The

12     time is now 9:04 a.m., and we're here for the

13     deposition of Mr. Jeff Rich in case no.

14     5:15-cv-01997-HGD, in the matter of Madison

15     County, Alabama, versus Evanston Insurance

16     Company.

17                     The deposition is being taken here at

18     Morris, King & Hodge in Huntsville, Alabama.

19     Would all the attorneys please identify

20     yourselves for the record, and would the court

21     reporter please swear in the witness.  We'll

22     start to my left.

23                     MR. STEPHENS:  My name is Harold

1    Stephens.   I represent Advanced Correctional

2    Healthcare, Inc.

3              MR. FINCH:   Lane Finch on behalf of

4    Evanston Insurance Company.

5              MR. HODGE:   David Hodge on behalf of

6    the plaintiffs.

7              (Witness sworn.)

8              THE COURT REPORTER:   Usual

9    stipulations?

10             MR. FINCH:   That's fine.

11             MR. STEPHENS:   Yes.

12   EXAMINATION BY MR. FINCH:

13        Q   One correction, we are starting off

14   with the deposition of Madison County, and I

15   understand, Mr. Rich, that you have been

16   designated as the representative of Madison

17   County to testify under Rule 30(b)(6); is that

18   correct?

19        A   Correct.

20        Q   State your full name, please.

21        A   John Jeffery, J-E-F-F-E-R-Y, Rich,

22   R-I-C-H.

23        Q   What is your position with the

1    County?

2          A   I'm the County attorney.

3          Q   And recognizing that and your past

4    work history, I know you're familiar with

5    depositions; correct?

6          A   Correct.

7          Q   Of course, if you don't understand my

8    question at any time for any reason, speak up

9    and make me come up with a question you do

10   understand; all right?

11         A   All right.

12         Q   Then you know all the other

13   admonitions; right?

14         A   I'm not sure I know all of yours, but

15   I know all of mine.

16         Q   We'll work off of yours then.

17             Give me a little bit of background.

18   Where were you practicing prior to becoming the

19   County attorney?

20         A   I graduated in 1987 from Auburn

21   University with a civil engineering degree.  I

22   graduated in 1991 from the University of Alabama

23   School of Law.  I went to work with Sirote and

1   Permutt in Huntsville and I practiced with

2   Sirote and Permutt until 2012, at which time I

3   became a full-time employee of Madison County.

4   In that capacity I represent the County

5   Commission, the Madison County sheriff, the

6   Madison County tax assessor, the Madison County

7   tax collector, the Madison County probate judge,

8   pretty much the sales tax department, the

9   license document -- pretty much anybody that's

10  in the courthouse, I am involved with on a daily

11  basis.

12          Prior to leaving private practice I

13  had a general litigation practice.  I did a fair

14  amount of patent litigation.  I am admitted to

15  the patent bar.  I represented Madison County

16  and the Madison County Commission throughout the

17  course of my time at Sirote in conjunction with

18  Julian Butler who was the long-time appointed

19  County attorney for Madison County at that time.

20          Q  Did you review any documents to

21  prepare for your testimony today?

22          A  Yes.

23          Q  What did you review?

1        A  I reviewed your deposition notice to

2   Madison County.  I reviewed some e-mail

3   correspondence.  I reviewed your coverage

4   letters related to the coverage issues in this

5   lawsuit.  I reviewed the contract for healthcare

6   at the Madison County detention facility.  And I

7   reviewed some additional documents, that I don't

8   recall specifically at this point what they

9   were.

10       Q  The e-mails that you referenced, were

11  those Bates numbered indicating they had been

12  produced in this litigation?

13       A  I think all the documents I reviewed

14  have been produced in this litigation or

15  pleadings in this litigation or other related

16  litigations.

17       Q  That brings up a good point.  Did you

18  review any of the complaints in the four cases

19  that are mentioned in the complaint filed by

20  Madison County -- those are the Listau or

21  Elliott matter, the Woods matter, the Jefferson

22  matter, and the Foster matter?

23       A  I think your question is

1    inappropriate.  I think there are other

2    complaints that are related to the lawsuit

3    that's been filed by Madison County.  But to

4    answer your question the best I can, I did not

5    review complaints in underlying cases

6    specifically in preparation for this deposition.

7        Q  Do you know where in the second

8    amended complaint filed by Madison County it

9    references suits other than the ones that I

10   think are initially referenced in paragraph 12,

11   which are Listau, Jefferson, Woods and Foster?

12       A  No.  It's a 30-page complaint, so I

13   can't tell you where the specific references

14   are.  I do believe the complaint has been

15   amended to add references to other lawsuits that

16   Madison County and the sheriff have been sued in

17   related to healthcare at the jail.

18       Q  The second amended complaint is the

19   last amended complaint.  I will make that

20   representation.  And those are the only four

21   actions that are mentioned in it, so when I talk

22   about the four underlying complaints, I'm

23   talking about the Listau, Jefferson, Woods and

1   Foster actions which are referenced in more

2   detail beginning at page 16 of the second

3   amended complaint, which is document 28 in this

4   litigation.

5           MR. HODGE:  Lane, just to clarify,

6   we've amended to add Davis with regard to the

7   ACH complaint.

8           MR. FINCH:  I haven't seen an amended

9   complaint.

10          MR. HODGE:  They have now filed an

11  answer for Davis.

12          MR. STEPHENS:  Okay.

13          MR. FINCH:  But that is only with

14  respect to ACH?

15          MR. HODGE:  That's correct.

16       Q  (By Mr. Finch:)  With respect to

17  the -- since y'all would like me to include

18  Davis -- with respect to the five underlying

19  actions, did you review each of the complaints

20  and amended complaints in those to prepare for

21  your deposition today?

22       A  No.

23       Q  Did you review any of the pleadings

1    filed in any of those cases or any of the orders

2    issued in any of those cases to prepare to

3    testify today?

4          A  No.

5          Q  Did you meet with anyone other than

6    attorneys for Madison County to prepare for your

7    deposition today?

8          A  No.

9             (Defendant's Exhibit 1 marked for

10   identification.)

11         Q  Let me show you Exhibit 1, which is a

12   copy of the notice for Madison County's

13   deposition.

14            I just want to confirm that you are

15   here to testify as to all 21 of the matters for

16   examination listed on pages 2 through 6.  Is

17   that correct?

18         A  For clarification, was there a

19   previous deposition notice for Madison County?

20         Q  Yes.  There was one earlier this

21   year.

22         A  Is this one different than that one?

23         Q  I believe they are the same with

1    respect to everything except probably the dates

2    and possibly the location -- but probably not

3    the location.

4         A  Yes.

5            MR. FINCH:  And David, I'll ask you

6    this, with respect to the request for documents

7    that was part of this notice, have y'all

8    produced all responsive documents to date?

9            MR. HODGE:  Subject to objections,

10   yes.

11        Q  Have you ever testified as a company

12   representative or an entity representative

13   before?

14        A  No.

15        Q  Have you done any independent

16   research to determine what your obligations are

17   in testifying in that role?

18        A  In preparation for this deposition,

19   no.

20        Q  I'll cover these matters and am

21   asking you for your testimony as Madison

22   County's representative.  If for any reason you

23   are intending your testimony not to be on behalf

**Jeff Rich - Madison County  Representative**                                    **20**

1    of Madison County, I would appreciate it if

2    you'll let me know that you're digressing,

3    offering a personal opinion, or anything of that

4    nature; okay?

5           A   I'm not sure I understand that

6    question.

7           Q   Well, you're here to testify on

8    behalf of Madison County.  If your testimony is

9    anything other than on behalf of Madison County,

10   I would like for you to point that out.

11          A   I'm here to testify for Madison

12   County.

13          Q   What is the factual basis for Madison

14   County's allegation that the claims asserted

15   against Madison County in the Listau, Jefferson,

16   Woods, and Foster actions are based on

17   malpractice or professional personal injury

18   sustained by a patient arising out of the

19   conduct of medical services by ACH or one of its

20   employees?

21          A   Are you reading from the deposition

22   notice?

23          Q   Yes, I am.  Number 1.

1            A   The claims that were certificated in

2     Listau, Jefferson, Woods, and Foster all related

3     to the provision or allegation of the lack of

4     provision of adequate medical care to inmates

5     while they were incarcerated in the Madison

6     County detention facility.

7            Q   More specifically, are any of the

8     allegations in the four underlying actions

9     against Madison County based on malpractice by

10    ACH or its employees?

11           A   The claims asserted against Madison

12    County and the Madison County sheriff are

13    derivative of the underlying medical claims.

14    But for the underlying medical claims, neither

15    the sheriff nor the County would have been

16    parties to those lawsuits.  The underlying

17    claims were related to the provision of

18    healthcare in the jail, which is what Advanced

19    Correctional had been paid to do by the County.

20           Q   My question is specifically related

21    to malpractice.  Are there claims against

22    Madison County that are independent of any

23    alleged malpractice by ACH or its employees?

**Jeff Rich - Madison County  Representative**                    **22**

1         A  No.

2         Q  Have you looked at the underlying

3   cases and seen the allegations against Madison

4   County for its own alleged constitutional

5   violations?

6         A  I've reviewed the underlying

7   complaints.  I'm aware of the allegations in the

8   underlying complaints.

9         Q  Have you seen any of the positions

10   taken by Madison County in the underlying

11   complaints with respect to the allegations

12   against it for its own alleged constitutional

13   violations?

14         A  I've reviewed pleadings and motions

15   and filings in those cases, yes.

16         Q  And are you familiar with those

17   allegations by Madison County?

18         A  I'm not sure Madison County made any

19   allegations in those underlying cases.  They

20   made arguments and they responded accordingly to

21   the complaint through pleadings.  But if you're

22   asking am I familiar with the pleadings, yes.

23   If you're asking can I quote them or tell you

1      exact line by line what they say, no, I can't.

2            Q   Are you familiar with Madison

3      County's acknowledgment in the underlying cases

4      that there are allegations against it for its

5      own alleged constitutional violations?

6            A   No.

7            Q   Are you familiar with any orders in

8      the underlying cases that have found that there

9      are independent allegations against Madison

10     County for its own alleged constitutional

11     violations?

12           A   To the extent that I understand your

13     question, no.

14           Q   Are you aware that in the underlying

15     claims the malpractice claims against ACH are

16     not asserted against Madison County?

17           A   Yes.  Let me say no, I am not, not

18     without having reviewed the complaints.  If

19     you've got one of the complaints and you want me

20     to look at it, I will be happy to do so.  I

21     don't remember if there were independent

22     malpractice, state law malpractice claims in

23     those complaints or not.

1          So if you want to ask me questions

2     about a document, if you give me the document I

3     will be glad to look at it and answer as best I

4     can.

5          Q  We'll get there in a little while

6     then.

7          What is the factual basis for Madison

8     County's allegation that it is affirmatively

9     afforded coverage under the policy as an

10    additional insured?  And that is matter

11    number 2.

12         A  The language of the policy, the

13    affirmative representations of Advanced

14    Correctional throughout the duration of the

15    relationship between Advanced Correctional and

16    Madison County, the past actions of Essex, which

17    I understand is now Evanston Insurance, with

18    respect to other lawsuits that were filed

19    against Madison County and the Madison County

20    sheriff related to healthcare in the facility --

21    or in the detention facility.  The language of

22    the healthcare services agreement between

23    Madison County and the Madison County sheriff,

1    and Advanced Correctional.  Letter that you, as

2    the lawyer for Essex or Evanston have written

3    with respect to coverage under applicable

4    insurance policies.

5            Q  Is it Madison County's position that

6    there were affirmative representations by ACH

7    that have created additional insured coverage

8    for Madison County?

9            A  I don't understand your question.

10           Q  Well, I asked you the factual basis

11   for Madison County's allegation that it is

12   afforded coverage under the policy as an

13   additional insured.  One of the items you said

14   was affirmative representations of ACH.  What

15   representations were made by ACH?

16           A  From the beginning of the

17   negotiations with respect to the contract for

18   healthcare services throughout the duration of

19   the various contract periods, ACH affirmatively

20   represented that they had procured the insurance

21   that was required under the healthcare services

22   agreement, which also required Madison County

23   and the Madison County sheriff and the employees

**Jeff Rich - Madison County  Representative**                                    **26**

1   to be additional insureds under the policies.

2              They confirmed -- ACH confirmed with

3   respect to specific litigation that Madison

4   County and the sheriff were afforded coverage

5   under the policy for healthcare related claims

6   in the detention facility.

7              Q  Is it the County's contention that

8   representations by ACH bind Evanston Insurance

9   with respect to coverage?

10             A  I think they could bind them.

11             Q  Is that the County's contention in

12   this litigation?

13             A  I think that's a legal conclusion

14   ultimately, but I think the representations

15   could bind the insurance policy.

16             Q  What representations were made by ACH

17   that the County contends binds Evanston

18   Insurance with respect to additional insured

19   coverage?

20             A  The representations I previously

21   testified to.

22             Q  Is there any other factual basis that

23   you are aware of for the contention or potential

1    contention that ACH's representations somehow

2    bind Evanston Insurance?

3        A  Not that I am aware of, if I

4    understand your question correctly.

5        Q  Is there anything about my question

6    you don't think you understand?

7        A  No.

8        Q  What representations were made by ACH

9    with respect to the scope of additional

10   coverage?

11       A  That the additional insurance

12   coverage provided complied with the contractual

13   requirements in the healthcare services

14   agreement and afforded coverage for claims

15   asserted against Madison County and the sheriff

16   related to healthcare in the jail and related to

17   the healthcare services agreement.

18       Q  Was ACH required to obtain insurance

19   for Madison County to insure Madison County for

20   allegations based on its own alleged acts or

21   omissions?

22       A  Not separate and distinct from the

23   provision of healthcare in the jail.  ACH was

1   required to get coverage that was described in

2   the healthcare services agreement.

3          Q   In fact, ACH did obtain insurance

4   naming Madison County as an additional insured;

5   correct?  Or including Madison County within

6   that definition; correct?

7          A   That's my understanding.

8          Q   You, in fact, reviewed those

9   policies, didn't you?

10         A   No, I did not.

11         Q   Did you ever receive any policies on

12   behalf of Madison County?

13         A   I have received insurance policies on

14   behalf of Madison County.

15         Q   Let me make sure that I'm specific

16   enough.

17             Did you ever receive any insurance

18   policies issued to ACH and your receipt of those

19   being on behalf of Madison County?

20         A   No.

21         Q   Did Madison County ever review any of

22   the insurance policies issued to ACH which

23   purport to provide additional insured coverage

1    to Madison County?

2           A  Those policies were reviewed by me

3    after demands had been made for indemnification

4    and defense for the underlying lawsuits when you

5    wrote multiple letters to the County saying

6    there was no coverage.  And I think we

7    ultimately obtained copies of the policies for

8    the first time at that point in time.  And in my

9    capacity as the lawyer for the County, I

10   reviewed the policies at that point in time.

11          Q  So prior to receipt of a letter that

12   I authored, Madison County never received any

13   insurance policies that were issued to ACH?

14          A  Not to my knowledge.

15          THE VIDEOGRAPHER:  Before you ask

16   your next question, I need to go off the record.

17          THE VIDEOGRAPHER:  It is 9:28.  We're

18   going off the record.

19          (Off the record discussion between

20   the videographer and the witness.)

21          THE VIDEOGRAPHER:  It is 9:28.  We

22   are back on the record.

23          Q  (By Mr. Finch:)  One of the other

1   reasons Madison County contends it is entitled

2   to additional insured coverage you said was

3   because of past actions of Essex.  What past

4   actions of Essex are you referring to?

5         A  Essex provided coverage for lawsuits

6   in the past that involved allegations similar to

7   the allegations in these underlying lawsuits

8   that you've identified for this deposition.

9         Q  What were the other prior lawsuits?

10        A  The one that is I think most

11  comparable is the Randolph Moore lawsuit, which

12  was a lawsuit by an inmate against Madison

13  County and the Madison County sheriff regarding

14  allegations of problems with healthcare in the

15  facility and claims against Madison County that

16  Madison County didn't fund the operation of the

17  facility so it could be operated in a safe and

18  secure manner.  And ultimately, ACH was put on

19  notice of that lawsuit.  ACH responded that

20  there was coverage for Madison County and the

21  sheriff through its insurer.  And Trey Ireland's

22  law firm in Birmingham was hired to defend the

23  case on behalf of Madison County and the

1   sheriff.

2        Q  What communications did Madison

3   County receive from the insurance company with

4   respect to coverage for that suit?

5        A  I believe there's a letter from Essex

6   related to coverage for that suit.

7        Q  What position did the insurance

8   company take in that letter?

9        A  I don't know.  If you give it to me,

10  I'll be glad to read it and tell you what I

11  think about it.  But I, from memory, don't

12  remember.  From the County's perspective the

13  insurance company's position was that Madison

14  County and the sheriff were additional insureds.

15  The suit related to healthcare and to the health

16  services agreement in the facility, and Essex

17  agreed to defend and indemnify the County and

18  the sheriff under the terms of the policy.

19       Q  Was there an allegation in the Moore

20  suit against ACH based on its rendering of

21  professional services?

22       A  Mr. Finch, I think there was.  But if

23  you want to ask me questions about a document,

1    it would help if you let me see the document.

2         Q  Right now what I'm doing is I'm

3    asking you about the factual basis for Madison

4    County's allegations against my client.  And

5    I've asked Madison County to produce a

6    representative to testify with respect to those

7    factual allegations, so that's what I'm

8    exploring at this point.

9         A  Yes, sir.  But in fairness, I think

10   if you're going to ask me something specific

11   about a complaint filed in an underlying

12   lawsuit, to expect me to remember allegations

13   from a complaint that was filed six or seven

14   years ago is not reasonable.

15        Q  Since you raised that as one of the

16   factual bases for Madison County, I thought you

17   would know more about it, but we'll get into

18   that a little bit later.

19             MR. HODGE:  I object.  He answered as

20   best he can.  If you want to get into anything

21   specific, show him the document.  That's a fair

22   point.

23             MR. FINCH:  If he has any other facts

1   I'm welcoming him to share those now and we can

2   get to documents a little bit later.

3          Q   (By Mr. Finch:)   Do you recall any

4   other suits that Essex defended Madison County

5   against that you think provide a basis for

6   establishing coverage for the four suits

7   referenced in this current complaint by Madison

8   County against Essex?

9          A   I'm sorry, can you repeat your

10  question?

11         Q   Do you recall any other prior suits

12  that you think provide a factual basis for

13  Madison County's claim that it is an additional

14  insured with respect to the Listau, Jefferson,

15  Woods, or Foster actions?

16         A   I think there is a lawsuit filed by

17  an inmate named Hammonds, that I recall, that I

18  believe Essex defended through Trey Riley's

19  [sic] firm.

20         Q   What are the similarities between the

21  Hammonds suit and any of the four cases

22  referenced in this matter?

23         A   It related to the provision of

1  healthcare in the facility and health services

2  agreement that was entered into by Advanced

3  Correctional.

4       Q  In Hammonds, was there an allegation

5  of ACH's negligence in rendering professional

6  services?

7       A  I don't recall specifically whether

8  there was a malpractice claim or whether there

9  was a 1983 claim.

10      Q  Was Madison County defended under a

11  reservation of rights in the Hammonds matter?

12      A  I don't recall there being a

13  reservation of rights letter written in

14  Hammonds.

15      Q  Was Madison County defended under a

16  reservation of rights in the Randolph Moore

17  matter?

18      A  I believe the letter I referenced

19  earlier that has been produced already contains

20  language in the sense of a reservation of

21  rights, yes.

22      Q  Are there any other past acts of

23  Essex that Madison County claims are part of the

1  factual basis for its allegations that it is

2  afforded coverage under the additional insured

3  provision of the policy for the four actions?

4      A  Yes.  Your letters related to the

5  Foster lawsuit and the Davis lawsuit in which

6  Essex agrees to provide defense to Madison

7  County and to the Madison County sheriff.

8      Q  What is it about those letters that

9  provide a factual basis for Madison County's

10  claim?

11      A  I presume if Essex didn't consider

12  Madison County and the sheriff their insureds

13  they wouldn't be providing a defense of lawsuits

14  that they've been named defendants in.

15      Q  Is the defense under a reservation of

16  rights with respect to either the Foster or the

17  Davis matter?

18      A  Essex, despite their representations

19  through your letter, has not provided a defense.

20  The lawyer suggested had a conflict and couldn't

21  represent the County, and despite repeated

22  correspondence regarding resolution of that,

23  there's been no response other than the initial

1   letter that acknowledged that the County and the

2   sheriff were additional insureds for purposes of

3   providing a defense in those lawsuits.

4          Q  Are you aware that in the Davis

5   matter the judge has dismissed all claims

6   against Madison County except the claims based

7   solely on its own acts?

8          A  I have not reviewed the pleadings or

9   the orders in the Davis case to acknowledge what

10  claims remain or don't remain in that lawsuit.

11  I do understand the Davis matter remains pending

12  and there hasn't been a final order entered in

13  that case with respect to any of the claims.

14         Q  What is the basis for that

15  understanding?

16         A  Correspondence from the lawyers who

17  are defending those cases -- or that case -- on

18  behalf of the County and the sheriff.

19         Q  Are there any claims asserted against

20  Madison County in Listau -- this is item number

21  4, and I'm sort of paraphrasing.

22             Are there any claims alleged against

23  Madison County other than claims based on the

1   alleged deliberate indifference to serious

2   medical needs by ACH and its physicians and

3   nurses?

4        A   There are allegations against Madison

5   County that Madison County conspired with ACH to

6   deny medical care to inmates through an

7   allegation of some scheme to limit the cost of

8   medical care.

9        Q   Looking at item number 5 and sort of

10  breaking that down.  The second amended

11  complaint in this case states that any damages

12  sustained by the plaintiffs, which would include

13  Madison County, and the underlying actions, are

14  the sole result of the acts or omissions of ACH

15  and its physicians and nurses.

16            To break that down, what damages has

17  Madison County sustained in the Listau,

18  Jefferson, Woods, or Foster actions?

19       A   Madison County has been required to

20  pay deductibles under its policy with OneBeacon

21  Insurance related to the defense and settlement

22  of three of those claims.  Madison County has

23  incurred attorney's fees related to the defense

1   of those claims.  Madison County's rating for

2   purposes of the cost of the insurance to the

3   taxpayers for Madison County has been impacted

4   by being named as a defendant and having to

5   participate in the defense and settlement of

6   those claims.  Madison County has been damaged

7   by the amount that was paid to settle the three

8   claims of those four that have been settled thus

9   far.

10          Madison County has incurred expense

11  that Madison County contends to be an element of

12  damage through the prosecution of this case

13  seeking insurance and indemnification -- or

14  defense and indemnification -- for those claims

15  against Essex and ACH.

16          Q  Anything else before I ask about

17  those elements?

18          A  I believe that's all.

19          Q  With respect to the defense cost

20  incurred by Madison County in the underlying

21  cases, has Madison County paid any amount above

22  its deductible?

23          A  Madison County has not paid direct

1  invoices from the lawyers who are defending

2  those cases, if that's your question.  The

3  County has paid the deductible, which in each

4  case I think is $50,000.  OneBeacon has paid the

5  defense cost under the policy that Madison

6  County had to purchase with OneBeacon.

7       Q  Just to make sure I'm understanding

8  what you're saying -- and I may not be, so

9  that's why I want to ask a couple of questions.

10  With respect to the defense expenses in the

11  underlying cases, has Madison County made any

12  payments itself?

13       A  Madison County has not paid the

14  defense lawyers in those cases itself.  Madison

15  County bought an insurance policy that has a

16  $50,000 deductible.  They have paid for the

17  policy, and the County has paid its deductible,

18  and the insurance company has paid the cost to

19  defend those lawsuits.

20       Q  And I'm not trying to split hairs,

21  I'm just trying to understand it because I've

22  seen defense policies or liability policies work

23  in a lot of different ways.  So I'm wondering,

1    the $50,000 deductible, did Madison County pay

2    any amount within that $50,000 deductible

3    directly to any provider, whether it's attorneys

4    or someone who's providing, for example, court

5    reporters, other services, which would be under

6    the umbrella of defense expenses?

7          A   No.  I think all the expenses of the

8    defense, including services for court reporters

9    and such, were paid by OneBeacon.

10          Q   And then did Madison County pay

11   OneBeacon the $50,000 deductible?

12          A   Yes.

13          Q   I was working out the mechanics of

14   that.

15          A   Yes.

16          MR. STEPHENS:  I'm sorry, but, Jeff,

17   just to clarify, is it $50,000 deductible per

18   case or is that the total amount paid?

19          THE WITNESS:  It's per case.

20          MR. STEPHENS:  Sorry.

21          MR. FINCH:  No, that's fine.

22          Q   And I'm just going to sort of sum

23   that up.  So with respect to each of the four --

1    or if you include Davis, five cases -- with

2    respect to each of those cases, is Madison

3    County's maximum out-of-pocket damage $50,000?

4         A   No.

5              MR. HODGE:   Object to the form.

6         Q   Let me rephrase it then.   Is Madison

7    County's out-of-pocket damages related to the

8    defense expenses and settlement of those

9    five cases limited to $50,000 per case?

10        A   Well, let me say an additional

11   element is, the County has cost in paying me.   I

12   am involved in the defense of all of those

13   cases, so I am a cost.   Now, we haven't

14   qualified how much of my day is spent on cases

15   like this or not.   But that is something that I

16   guess is costing the County directly to pay me

17   to participate in the defense of those cases.

18              I don't know how to answer your

19   question any better than I've answered it.   The

20   County has an insurance policy and under that

21   policy it is required to pay a $50,000

22   deductible in each one of these cases.   I

23   believe that has been paid in each one of the

1   cases.  And the payment to the lawyers and the

2   court reporters and the other people involved in

3   the defense of those cases then is by OneBeacon.

4   I'm not sure how to answer your question any

5   clearer than that.

6        Q  Have all of these settlements been

7   paid directly by OneBeacon to the claimants?

8        A  Yes.

9        Q  Have you made an appearance in each

10  of the five underlying cases?

11       A  Let me back up and answer your

12  question.  Either to the claimants or the

13  claimants' attorneys.  And I'm not sure how the

14  checks are made.

15       Q  I'm certainly not splitting that

16  hair.

17       A  Well, I don't know what hair you may

18  be splitting, but I want to be as accurate as I

19  can be.  So I don't know if the checks went to

20  their attorneys or went to them or went to a

21  combination.  In one case I think there is an

22  annuity involved, or something of that nature,

23  and so there could have been a check that was

1   paid to annuity company.  I'm not sure.

2           Q  Maybe to clarify, were all of the

3   settlements fully funded by OneBeacon as opposed

4   to any payment from Madison County other than

5   the $50,000 deductible?

6           A  The County did not write a check to

7   any claimant or any attorney for a claimant or

8   anyone related to this settlement.  The

9   settlements weren't fully funded by OneBeacon

10  because ACH and others funded portions of the

11  settlements of those lawsuits as well.

12          Q  Now getting back to the question of

13  your defense in the underlying actions, have you

14  made an appearance in each of those or did you

15  make an appearance in each of those five

16  underlying actions?

17          A  No.

18          Q  Did you make an appearance in any of

19  them?

20          A  I don't believe so.

21          Q  Did you keep your time with respect

22  to each or any of those five underlying actions?

23          A  No.

1      Q   Has Madison County made any request

2   to OneBeacon to be reimbursed for any of your

3   time?

4      A   No.

5      Q   Are you aware of any facts to support

6   the contention that Madison County's rating has

7   been impacted by being named as a defendant in

8   any of the five underlying cases?

9      A   Yes.

10     Q   What evidence do you have of that?

11     A   Conversations with the insurance

12   consultant who is paid by the County to assist

13   with procuring the various insurance that the

14   County pays for.

15     Q   Who is that consultant?

16     A   He's an employee of J. Smith Lanier.

17   His name is Craig Herr.

18     Q   How do you spell his last name?

19     A   H-E-R-R.

20     Q   Specifically, what did Mr. Herr tell

21   you with respect to the County's rating and how

22   it is impacted by being named as a defendant in

23   the five underlying suits?

**Jeff Rich - Madison County Representative**          **45**

1       A   Specifically, I can't tell you what

2   he specifically said. He and I have had

3   multiple discussions and cooperate regularly

4   with respect to trying to keep the County's

5   insurance cost as low as possible through

6   managing risks, through doing things that are

7   possible to limit the County's claims history.

8   We've talked about the claims history and how

9   that impacts premiums and the cost to the

10   taxpayers for that insurance.

11       So we have had multiple general

12   conversations about these claims and the

13   potential of the impact on premiums associated

14   going forward with OneBeacon, or the fact that

15   the County could be put in a difficult position

16   of even procuring insurance if the claims

17   history was bad enough.

18       Q   Let me ask it this way: When you

19   first mentioned that topic you said that Madison

20   County's rating has been impacted by being named

21   as a defendant and having to participate in

22   those cases. Does that sound right?

23       A   I don't recall the specific wording I

**Jeff Rich - Madison County  Representative**                    **46**

1  used.

2        Q  The reason I am asking is, it seemed

3  to me that your answer was two parts, and I

4  don't know if that was intentional or you sort

5  of mean the same thing.

6             In your mind, is there a difference

7  on the impact and rating by being named as a

8  defendant versus having to participate in the

9  litigation, or is that the same thing?

10       A  Well, as I understand insurance, the

11  number of claims is a factor that an underwriter

12  would look at in addition to the severity of the

13  claims.  A claim that can be resolved or settled

14  for a dollar is not going to impact the County's

15  ability to procure insurance.  As a claimant it

16  might have to be settled for lots and lots more

17  money than a dollar.

18       Q  But whether the County's defense

19  costs were paid by OneBeacon or paid by Evanston

20  wouldn't impact the County's rating, would it?

21       A  I believe it would.

22       Q  How so?

23       A  Just based on what I just said.

**Jeff Rich - Madison County  Representative**                                    **47**

1          Q   Do you have any more specifics other
2     than what you just said?
3          A   No.
4          Q   Do you have anything in writing from
5     Mr. Herr about any potential impact on the
6     County's rating because of OneBeacon's defense
7     of the County versus Evanston's defense of the
8     County in the underlying cases?
9          A   I don't believe so.
10          Q   Do you have anything in writing from
11     him regarding the impact of the mere fact that
12     the County was sued in those underlying cases?
13          A   I don't believe so.
14          Q   Has the County -- how long has the
15     County been insured by OneBeacon?
16          A   I believe since 2011 or '12.  I would
17     have to look at records to give you the exact
18     date.  2012, I believe.
19          Q   What is your understanding or what is
20     the County's understanding of what the OneBeacon
21     policy covers?
22          A   I don't think I can answer that.
23          Q   Well --

1          A   Because the policy is like many

2    insurance policies.   It covers a myriad of

3    things.

4          Q   Why did the County buy insurance with

5    OneBeacon?

6          A   To provide coverage for claims to

7    protect the taxpayers' money and the taxpayers'

8    assets.

9          Q   Is it designed to cover claims

10   against the County based on the County's alleged

11   acts or omissions?   Is that the County's

12   understanding?

13         A   That would be part of what it's for.

14         Q   To your knowledge are there any

15   additional insureds listed on any of the

16   policies issued by OneBeacon to Madison County?

17         A   I believe so.

18         Q   Who are listed as additional insureds

19   under any of those policies?

20         A   I would have to get that information

21   from either OneBeacon or Mr. Herr.   From time to

22   time the County will enter into contractual

23   agreements that require additional insureds

**Jeff Rich - Madison County  Representative**                                    **49**

1   status for the parties of the contracts.  And

2   because it's a public entities policy, I don't

3   remember the language or how the language -- how

4   it is worded with respect to all the public

5   officials who may or may not be provided

6   coverage under it since there are a myriad of

7   public officials that fall under the umbrella of

8   Madison County.  Like I named earlier, when I

9   told you generally what I do.  You know, the

10  probate judge, for example, is a Madison County

11  official for some purposes and a State of

12  Alabama official for other purposes.

13          Q  With respect to the OneBeacon policy,

14  is that a liability policy?

15          A  In part.

16          Q  Does it also cover property?

17          A  No.  The property coverage is through

18  a different provider.

19          Q  One area I don't normally deal in --

20  and it will be apparent by this question.  How

21  or is the County insured for workers comp?

22          A  The County is self-insured but

23  maintains an excess policy for certain limits.

1          Q  It that part of this OneBeacon's

2     public entities policy?

3          A  No, it's not.

4          Q  Other than providing liability

5     coverage, what is the County's understanding of

6     what else is covered under the public entities

7     policy?

8          A  Again -- and I think it has been

9     produced in the litigation -- my view of it is

10    it provides liability coverage for claims

11    asserted against the County or various County

12    officials or the sheriff as a State official,

13    because he's deemed a County official for

14    purposes of that policy.  But, I mean, it's a

15    broad policy.  So I don't know how to answer

16    your question any clearer than it covers what it

17    covers.

18         Q  But does the County refer to it as a

19    public entities policy?

20         A  The County refers to it as the

21    OneBeacon policy.

22         Q  What was the premium for the

23    OneBeacon policy when it was first issued to the

1    County?

2           A   I don't know.  Is that something you

3    had asked me to be prepared to answer?

4           Q   No.  You brought up a new topic that

5    had not been disclosed in discovery, which is

6    the allegation there is an effect on the

7    County's ratings that would impact its ability

8    to obtain insurance and the price of insurance,

9    so I'm following up on that.

10          A   Okay.

11          Q   Has the premium for the OneBeacon

12   policy increased since it was first issued to

13   the County in either 2011 or 2012?

14          A   Again, I think I said my best

15   estimate was 2012, but don't hold me to that.

16          Q   Correct.

17          A   Yes, it has increased.

18          Q   What have been the annual increases

19   either percentage-wise, dollar-wise, ballpark,

20   anything that you're comfortable telling me?

21          A   Don't know that off the top of my

22   head.  But there have been increases each year

23   of the policy is my recollection.

1        Q   Has anyone explained to the County

2    the reason -- or alleged reason -- for the

3    increases in the premiums?

4        A   My conversations with Craig Herr,

5    it's related to all the factors that would go

6    into how an insurance company prices a policy,

7    which is not just the claims history of the

8    insured, but that's part of it.  National trends

9    with respect to liability and claims being paid

10   nationally, a whole host of factors as to how an

11   insurance company prices its policy.  But I'm

12   not an insurance expert or executive, so I can't

13   tell you each and every one of those.

14       Q   How many claims have been made

15   against Madison County in the past five years

16   other than these five suits that are the subject

17   of this federal litigation?

18       A   I couldn't answer that.  There is a

19   distinction between -- and maybe I should ask

20   you, what do you mean by claims?

21       Q   I can refine that, hopefully.  Claims

22   reported to OneBeacon.

23       A   I couldn't tell you.

1        Q  Are you comfortable giving an

2   estimate without me playing my silly game of

3   more than one, less than a million, in trying to

4   get it narrower?

5        A  It's more than one and less than a

6   million.  And I'm not trying to be cute.

7        Q  That's fine, and I'm not taking it as

8   cute, because, you know, that's one way to do

9   it, as I'm sure you know, in trying to get to a

10  range you are comfortable with.

11       A  I understand.  But I'm not --

12       Q  Let me ask you -- since you're not

13  sure of the number, let me see if we can find it

14  a different way.

15          Are you aware of Madison County

16  receiving any loss history reports that show the

17  number of claims reported to OneBeacon?

18       A  Yes.

19       Q  Where would those loss history

20  reports be kept by the County?

21       A  If they're kept, either by the County

22  administrator or in my office as the County

23  attorney.

1            MR. FINCH:  We will make a request

2    for those.  David, I see you're circling that.

3            Q  We will ask for that and we'll go

4    that route rather than trying to quiz you about

5    it.  Okay?

6            A  (Nods head.)

7            Q  Has OneBeacon paid any expenses

8    relating to this particular case, which is the

9    Madison County versus Evanston Insurance case?

10           A  No.

11           Q  Has any other insurer?

12           A  No.

13           Q  Is there any agreement between

14   Madison County and OneBeacon with respect to

15   what will happen with any recovery made by

16   Madison County in this case?

17           A  No.

18           Q  Topic No. 6 on the deposition notice

19   asks for the factual basis for Madison County's

20   allegation -- and I reference the paragraph in

21   the complaint -- that Evanston wrongfully denied

22   coverage and Evanston acted in bad faith.

23                To break that down, are you aware of

1   any other facts to support the County's

2   allegation that Evanston wrongfully denied

3   coverage other than what we've already discussed

4   this morning?

5          A  I think we've touched on all of it.

6   The language of the policy itself, the

7   assertions of Advanced Correctional with respect

8   to the existence of coverage, the language of

9   the underlying complaints, the facts related to

10  the underlying complaints, the pleadings in the

11  underlying cases, the settlements in the

12  underlying cases, the previous conduct of Essex

13  and Advanced Correctional with respect to

14  previously filed lawsuits, the coverage opinions

15  which your authored.

16         Q  Anything else?

17         A  I believe that's all.

18         Q  And I really do not want to replow

19  old ground, so I will touch on these and if you

20  have already given me all of the factual

21  information the County has with respect to each

22  of these you can tell me that and I'm not going

23  to ask you to repeat any of it; okay?

1          A   All right.

2          Q   You said one of the factual bases for

3   the allegation of wrongful denial of coverage is

4   the language of the policy.  Have you already

5   told me about all of the information the County

6   has on that item?

7          A   I'm not sure how to answer that

8   question.  I think the language of the policy is

9   what is in the policy.

10          Q   Is there any specific language that

11   the County is referencing?

12          A   Mr. Finch, without an insurance

13   policy in front of me I can't point you to

14   specific language other than what is alleged in

15   the amended complaint and, again, the language

16   contained in the policy with respect to the

17   coverages and to the status of the County and

18   the sheriff and employees as additional insureds

19   under the policy.

20          Q   Why does the County think any of its

21   employees other than perhaps Sheriff Dorning are

22   additional insureds under the Evanston policy?

23          A   I can't answer that question based on

**Jeff Rich - Madison County  Representative**                              **57**

1    how you asked it.

2         Q   Have you told me all of the facts

3    related to ACH's representations that the County

4    thinks are a basis for its wrongful denial of

5    coverage claim?

6         A   Again, ACH's statements and

7    representations and its previous correspondence

8    to me, to the County, to the sheriff, its

9    involvement with the insurance defense lawyers

10   who were hired to defend previous litigation,

11   the allegations in the underlying complaints

12   against ACH and the factual circumstances

13   surrounding those allegations, and the pleadings

14   and the settlement agreements in those cases as

15   it would relate to any position Advanced

16   Correctional might have taken in these cases.

17        Q   What specifically is the County

18   referring to when you say ACH's involvement with

19   the defense lawyers in the underlying cases?

20        A   ACH was specifically involved in the

21   case that we talked about earlier where there

22   was a defense provided through Trey Ireland's

23   firm.

1          Q  Are you talking about Moore or

2      Hammonds?

3          A  I'm talking about Moore.

4          Q  What was it about ACH's involvement

5      with the defense lawyers in that case that you

6      think is a factual -- or that the County thinks

7      is a factual basis for its wrongful denial of

8      coverage claim?

9          A  In that case there was correspondence

10     with Norm Johnson and Neil -- and I'll pronounce

11     his last name.  I've never really known how to

12     pronounce it even though we've dealt with him --

13     Leuthold.

14              THE WITNESS:  (To Mr. Stephens:)  And

15     maybe you can help, Harold.  L-E-O-T-H-O-L-D, I

16     believe.

17              MR. STEPHENS:  I'm not positive.  I

18     would have pronounced it "Leuthold."

19          A  Leuthold.  However it's pronounced.

20     But there was correspondence with Trey Ireland's

21     office, with the ACH officials that I've just

22     mentioned, with respect to obtaining coverage in

23     defense of those lawsuits and reimbursement of

1    the expenses that had been incurred in the

2    defense of those lawsuits while that law firm

3    was being engaged by Essex and ACH to defend the

4    case.

5         Q   And this person whose name we have

6    trouble with, Mr. Leuthold, who is he with?

7         A   ACH.   I believe he was a corporate

8    officer of ACH and may still be.

9         MR. STEPHEN:   For the court reporter,

10   it's L-E-U-T-H-O-L-D.

11        THE WITNESS:   Yes.   I even misspelled

12   it.   Sorry.

13        Q   Other than sending Evanston and --

14   just to clarify, or maybe for the record, when I

15   say Evanston, as you are aware Essex Insurance

16   issued policies, but it has been -- I hope I

17   didn't misstate it -- merged into Evanston.   So

18   when I am talking about Evanston, I'm also

19   talking about Essex and those policies; okay?

20        A   I'll agree that we're talking about

21   those policies.   I don't know whether it was a

22   merger or a name change, don't know what the

23   legal significance of it was, but I will agree

1   we're talking about the same policy.

2          Q   When I say Evanston, we're talking

3   about Essex as well?

4          A   I'll agree we're talking about the

5   same policy.

6          Q   Other than sending Essex or Evanston

7   copies of the complaints in the five underlying

8   actions, did Madison County provide any

9   additional information to Essex or Evanston that

10  you included or would include under what you

11  said was the underlying facts?

12         A   I don't understand your question.

13         Q   Did Madison County, to your

14  knowledge, send Essex or Evanston copies of the

15  five underlying complaints?

16         A   I don't know whether those were

17  provided to you as the lawyer for Essex or

18  Evanston during the early stages of discussion

19  regarding coverage, or whether you had those

20  independent.  I don't recall in my capacity ever

21  sending the complaints filed in the underlying

22  actions directly to Evanston or Essex.

23         Q   To your knowledge did -- well, not to

1    your knowledge.  The question is did Madison

2    County ever send to Evanston or a representative

3    of Evanston -- and I include myself as an

4    attorney for Evanston -- any of the pleadings in

5    the five complaints other than -- you know, the

6    five underlying complaints -- other than the

7    complaints themselves?

8            A  Not that I am aware of, unless

9    sending complaints or other pleadings to ACH

10   with the direction that ACH provide those to the

11   insurer for those claims as required under the

12   healthcare services agreement would fall within

13   an answer to your question.

14           Q  My question is more specific than

15   what did Madison County perhaps send to ACH with

16   directions for ACH to do something.  I'm trying

17   to find out what information was directly

18   provided from Madison County to Essex or

19   Evanston -- and by directly, I include through

20   me -- to the extent you think that's where

21   information was sent.  Were any pleadings beyond

22   the initial complaints ever sent by Madison

23   County to Essex or Evanston?

**Jeff Rich - Madison County  Representative**                                    **62**

1           A  Anything that Essex or Evanston

2   requested, Madison County would have provided.

3   But I have no personal knowledge of providing

4   copies of pleadings to anyone other than what

5   might have been provided to you that would be

6   Evanston or Essex.

7           Q  Do you recall sending any pleadings

8   to me?

9           A  No.  But as you know, you dealt with

10  Matt Reeves a fair amount early on, who was the

11  lawyer that was previously representing the

12  County and the sheriff in this lawsuit, and I

13  can't say what Matt may or may not have sent

14  you.  I just don't know.

15          Q  Other than pleadings -- and I will

16  expand that to say pleadings or orders in the

17  underlying complaints -- did Madison County ever

18  send any information to Essex or Evanston

19  regarding the factual allegations being made in

20  the underlying complaints?

21          A  Do you mean outside the -- I mean,

22  you know, there were pleadings out there,

23  pleadings, motions -- there were pleadings and

1   motions that were filed in those cases that you

2   got copies of, I presume.

3        Q  Well, a minute ago in answer to my

4   question about topic six you said the underlying

5   complaints; you then said the underlying facts;

6   you then said the underlying pleadings.  So

7   we've talked about complaints and we've talked

8   about pleadings.  And so I'm trying to find out

9   what information, if any, did Madison County

10  send Essex regarding the underlying facts other

11  than what is contained in a complaint, a

12  pleading, or a court order?

13       A  I don't think Evanston or Essex ever

14  asked for any information regarding the

15  underlying facts from Madison County.  So to my

16  knowledge, there was nothing sent.

17            MR. HODGE:  When you get to a good

18  stopping point, can we take a break?

19            THE VIDEOGRAPHER:  It is 10:13.

20  We're going off the record.

21            (Recess taken.)

22            THE VIDEOGRAPHER:  It is 10:28.

23  We're back on the record.

1           Q   (By Mr. Finch:)  Going back through

2     the list of items you referenced when we were

3     talking about the County's factual basis for its

4     allegation of wrongful denial of coverage -- and

5     again, with the caveat that I am not trying to

6     get you to go over things we have already

7     covered, but on the other hand I want to make

8     sure there's not something that we haven't

9     covered.

10          A   Sure.

11          Q   One of the subitems you had listed

12    was Essex's prior conduct.  Have we already

13    covered that when we were talking earlier about

14    the prior actions of Moore and Hammonds, or is

15    there anything else you're referring to when you

16    say Essex's prior conduct?

17          A   The only thing -- and we may have

18    already covered it, so I'll try not to be

19    repetitive.  Moore and Hammonds and any of the

20    lawsuits that I haven't been able to remember

21    where Essex may have provided a defense, and

22    then Essex's position with respect to each one

23    of the lawsuits that are the subject of this

1    action, whether it's their coverage letters that

2    you wrote, whether it's their failure to provide

3    a defense, you know, whatever their actions in

4    those lawsuits, to me, would be further evidence

5    of their wrongful denial of coverage.

6         Q   Is there any different or additional

7    evidence that Madison County -- let me rephrase

8    that.

9              Is there any different or additional

10    factual basis to support Madison County's

11    allegation that Evanston acted in bad faith?

12         A   I don't believe so, other than what

13    we've already covered, as it would relate to

14    these existing -- and the continuation of the

15    two pending lawsuits -- the Davis lawsuit and

16    the Foster lawsuit -- where Evanston has agreed

17    to provide defense subject to reservation of

18    rights, but then has not taken any additional

19    action over the course of several months to

20    actually provide that defense.

21              And the position that Evanston or

22    Essex has taken with respect to the question of

23    whether or not the insurance provided by

1    Evanston or Essex was what has been termed

2    excess or primary coverage, and the position

3    stated by Essex or Evanston with respect to

4    whether or not the sheriff and the County were

5    additional insureds throughout the course of

6    this litigation, and any previous -- any

7    positions taken in regard to Listau, Jefferson,

8    Woods, Foster, and Davis.

9          Q  Are you aware that with respect to

10   the Foster claim that Evanston stated that it

11   would provide the defense of Madison County

12   through John Burbach and Frank Corley of Sirote

13   and Permutt?

14         A  I think there were questions -- and

15   without the letter you are holding in front of

16   me, the questions with respect to what the scope

17   of that defense was and who was going to pay for

18   it were not clear, that I believe Mr. Hodge

19   wrote you a letter about and never got a

20   response to.

21         Q  I believe that -- well, whether he

22   did or not, you may not know.

23               But was there anything about this

1  letter -- I will go ahead and mark it as

2  Exhibit 2.

3           (Defendant's Exhibit 2 marked for

4  identification.)

5           Q  Do you remember receiving Exhibit 2,

6  which is my February 23, 2017, letter, relating

7  to the Foster action?

8           A  Yes.

9           Q  Is there anything in that letter that

10  Madison County understood limited the scope of

11  the defense by the Sirote firm?

12           A  I'm sorry, I wanted to take a minute

13  and try to read through as much of that now.

14  Could you ask the question again for me?

15           Q  Sure.

16           The letter appoints or tells the

17  County at page 2, Evanston will provide the

18  defense of Madison County through John Burbach

19  and Frank Corley of Sirote and Permutt, PC;

20  right?

21           A  The letter says that, yes.

22           Q  And has the Sirote firm, in fact,

23  been defending Madison County in the Foster

1   action?

2          A   Not subject to this appointment.

3          Q   Why not subject to this appointment?

4          A   I think they are sending their bills

5   to OneBeacon.

6          Q   Were they directed to not send bills

7   to Evanston?

8          MR. HODGE:  I'm going to object,

9   Lane.  We wrote a letter in response to this

10  pointing out some questions that we had that

11  were important, one being --

12         MR. FINCH:  No, David.  No, David.

13         MR. HODGE:  Yes.

14         MR. FINCH:  No, you are not going to

15  testify during this deposition.

16         A   Then let me testify.

17         MR. HODGE:  I'm just saying, you're

18  pretending --

19         MR. FINCH:  No, I'm asking questions.

20  He can answer my questions however he wants to

21  answer them.

22         MR. HODGE:  To pretend there wasn't a

23  response to this piece of information is

1    inappropriate.  It's just not reality.

2              MR. FINCH:  What you're saying is not

3    reality either.  So you and I can debate --

4              Let's go off the record.

5              THE VIDEOGRAPHER:  It's 10:39.  We're

6    going off the record.

7              (Discussion off the record.)

8              THE VIDEOGRAPHER:  It's 10:40.  We

9    are back on the record.

10             MR. FINCH:  Re-read the last

11   question, please.

12             (Requested question read by court

13   reporter.)

14        A   When the County got your letter there

15   were a number of questions that were related to

16   wording you had included.  For example, one

17   issue was Evanston reserved its right to demand

18   a pro rata share of the expenses to be

19   reimbursed.  Evanston reserved its right to

20   demand all the expenses to come back to Evanston

21   under some sort of claim or theory, I guess.

22             The lawyer who is representing the

23   County and the sheriff in this lawsuit wrote you

**Jeff Rich - Madison County  Representative**                    **70**

1   a letter asking for clarification, and to our

2   knowledge there has been no response.

3          So I can't answer questions that

4   would appear to be directed to what action was

5   taken in regard to the defense of the County and

6   the sheriff in light of this letter, when

7   apparently we're missing a piece of

8   correspondence that's related to that letter.

9          MR. FINCH:  Would you please read the

10  question again.

11         (Requested question read by court

12  reporter.)

13     Q  The question earlier was, was Sirote

14  directed to not send bills to Evanston

15  Insurance?

16     A  There has been no discussion to my

17  knowledge with respect to where the bills needed

18  to go other than pursuant to the original

19  retention of the Sirote lawyers by OneBeacon.

20  The County did not consider this conditional

21  agreement to defend with a number of unanswered

22  questions about the scope of who was going to

23  pay for the defense and what that meant as an

1    appropriate response to the tender of the

2    complaint.

3         Q  Did Madison County have any

4    discussion with Sirote regarding the scope of

5    the defense that it was to provide according to

6    Evanston's letter?

7              MR. HODGE:  Object to attorney-client

8    privilege and instruct him not to answer.

9         Q  Is the Sirote firm representing

10   Madison County with respect to the coverage

11   litigation?

12        A  You mean with respect to this

13   lawsuit?

14        Q  Yes.

15        A  No.

16        Q  Were there any discussions between

17   Madison County and Sirote about the scope of the

18   defense that Evanston was offering pursuant to

19   this Exhibit 2?

20             MR. HODGE:  Same objection.

21   Attorney-client privilege.

22             MR. FINCH:  Well, he's claiming that

23   there's a limitation on the scope of the

1  defense, and I'd like to know if there was a

2  discussion with the defense lawyers about the

3  scope.

4          MR. HODGE:  Unfortunately, that would

5  be a privileged communication.  That would not

6  be subject to discovery.

7          MR. FINCH:  We'll take that up with

8  the Judge.

9          MR. HODGE:  Is there a reason why it

10  wouldn't be privileged?  I mean, I'm not trying

11  to be --

12          MR. FINCH:  Yes.  I'm not asking for

13  any legal advice, I'm asking if there was a

14  discussion about the scope.  Since he raised the

15  question of the scope of the defense, I'd like

16  to know if there is any information regarding

17  the scope.

18          MR. HODGE:  I don't understand, but

19  to the extent it asks for communications with

20  counsel for the County, I'm going to object.

21          MR. FINCH:  Not all communications

22  with an attorney are privileged.  And if Madison

23  County is raising the claim that Evanston

1    limited the scope of Sirote's defense I would

2    like to know if that was discussed with Sirote.

3    Are you standing on your objection?

4              MR. HODGE:  I will tell you, I don't

5    think it was, because the only discussion that

6    I'm aware of is the letter I wrote asking for

7    clarification on several of these issues.

8              MR. FINCH:  Well, I'm not asking

9    about that, David.  I'm asking -- I would like

10   to know if Madison County had a discussion with

11   Sirote regarding the scope of the defense that

12   Evanston offered to provide.

13             MR. HODGE:  I think communications

14   with the client regarding the scope of the

15   defense, the type of defense, what the defense

16   is, who's paying for it, would all fall under

17   the umbrella of privilege.  I don't want to

18   waive privilege.

19             MR. FINCH:  You've already produced

20   all the defense bills from the other defense

21   lawyers.

22             MR. HODGE:  Those were redacted and

23   subject to the protective order that you

1    requested.  I don't think that waives

2    attorney-client privilege.

3             MR. FINCH:  I'm just saying I

4    disagree with you on that and we can take it up

5    with the Judge and perhaps find out through

6    written questions whether there were discussions

7    with Sirote about the defense.

8             MR. HODGE:  Great.

9    Examination Resumed by Mr. Finch:

10        Q  Are you aware of allegations in the

11   Foster matter that the jailer, Morrison, and the

12   correctional officers all subjectively knew that

13   Whitney Foster suffered from a serious medical

14   need that would result in serious injury and

15   they nonetheless disregarded that risk?

16        A  I have read the complaint in Foster,

17   and so to the extent that that's an allegation

18   included in the complaint, I'm aware of it.

19        Q  And isn't that an allegation of

20   Morrison's own culpability?

21        A  It's an allegation that Morrison was

22   aware that she suffered from -- or allegedly

23   suffered from -- a serious medical need.

1        Q  And that he himself disregarded the

2  risk.  That's the allegation; right?

3        A  If that allegation is included in the

4  complaint, then I'm aware of it because I've

5  read the complaint.

6        Q  That allegation is not derivative of

7  anything ACH did, is it?

8        A  It is related to the provision of

9  healthcare in the jail.  And so it is.

10        Q  So is it Madison County's position

11  that if its personnel were aware of a serious

12  medical need of an inmate -- or a detainee, I

13  believe is the correct term -- and they ignore

14  that serious medical need, that that would be

15  the fault of ACH?

16        A  Not necessarily.  But it would depend

17  on a lot of factors related to the provision of

18  healthcare in the jail.  It would depend on who

19  else was aware of it.  It would depend on what

20  policies they were following with respect to

21  putting ACH on notice or making sure ACH was

22  aware of the condition.  It would depend on

23  where the inmate was housed, whether the inmate

1    was housed in the medical unit or somewhere

2    outside.  So I don't know that I can answer your

3    hypothetical without having all the relevant

4    facts that would be related to it.

5              Q  Let's stick to the Foster claim then.

6                 Are you aware that there is a

7    deliberate indifference to medical needs

8    allegation against each defendant separately?

9         A  If that's in the complaint, I'm aware

10   of it.  I think the Foster complaint is a

11   relatively lengthy complaint.

12             Q  They all are, aren't they?

13             A  I'm sorry?

14             Q  All of the underlying complaints are

15   relatively lengthy, aren't they?

16             A  They differ in some regards.  But

17   again, I am happy to read through the complaint

18   and agree with you that it says what it says.

19             Q  Are you aware that the Foster

20   complaint alleges that her medical needs were

21   ignored in part because of the deliberate

22   indifferent customs and policies of Madison

23   County?

1           A   Again, Mr. Finch -- and I'm not

2    trying to be difficult -- if it's alleged in the

3    complaint, I have read the complaint.  So to the

4    extent that puts knowledge in my brain, then I

5    have that.  So I've read it.  I'm happy to agree

6    that it alleges what it alleges on the pages

7    that --

8           Q   Well, if I read that allegation

9    correctly, isn't that an allegation of Madison

10   County's own liability independent of any

11   malpractice by ACH?

12          A   What, read the allegation again.

13          Q   Whitney's serious medical needs were

14   ignored in part because of the deliberately

15   indifferent customs or policies of Madison

16   County to the serious medical needs of prisoners

17   in the Madison County jail.

18          A   And what's your question?

19          Q   Isn't that an allegation directed to

20   Madison County independent of any alleged

21   malpractice by ACH?

22          A   I can't answer that because I don't

23   know what policies and practices and customs it

1    is referring to.  So the sheriff's policies with

2    respect to healthcare were developed and

3    implemented and carried out by ACH.  ACH was

4    paid by the County to do that because that's the

5    limited scope of the County's involvement with

6    respect to the jail.  So if those policies that

7    are alleged in there are policies that ACH might

8    have developed or been part of developing, then

9    that might be related to ACH's malpractice.

10       Q  Are you denying that there's an

11   allegation in each of these complaints that

12   Madison County itself developed policies for the

13   healthcare of its detainees?

14       A  If the allegations are in the

15   complaint, I'm not denying the fact that the

16   allegations are made in a complaint.  If the

17   words are on the paper, if they're on the paper

18   I'm not denying that.  Factually, Madison County

19   made no policies with respect to the operation

20   of the jail.  If the complaint -- the words that

21   are used in the complaint, I'm not going to

22   dispute that those words were used in the

23   complaint if they're in fact there.

1          Q   If they are in fact there, that is an

2     allegation against Madison County independent of

3     any potential professional negligence by ACH,

4     isn't that true?

5               MR. HODGE:   Object to the form.

6          A   No, it's not true for the same reason

7     I stated earlier.   There are a myriad of

8     policies that could be the subject of that broad

9     allegation.   If those are policies that ACH

10    drafted, adopted, implemented, carried out, then

11    that's clearly related to the healthcare

12    services agreement and the obligations that ACH

13    had under that agreement.

14         Q   If in the Jefferson action the

15    complaint alleges that Madison County failed to

16    develop and implement adequate policies and

17    procedures for the handling of inmates with

18    serious health conditions, is that an allegation

19    independent of any potential professional

20    services rendered by ACH?

21         A   No.

22         Q   It's not?

23         A   Uh-uh.

1         Q   If there's an allegation that Madison

2    County failed to adequately train its

3    correctional officers, how does that relate to

4    any potential malpractice by ACH?

5         A   Can I see the allegation?

6         Q   Sure.

7              MR. FINCH:   We can go off the record

8    a minute.

9              THE VIDEOGRAPHER:   It is 10:53.   We

10   are going off the record.

11             (Recess taken.)

12             THE VIDEOGRAPHER:   It is 10:59.   We

13   are back on the record.

14        Q   (By Mr. Finch:)   Look at Exhibit 3,

15   which is the first amended complaint in the

16   Jefferson matter.

17             (Defendant's Exhibit 3 marked for

18   identification.)

19        Q   Turn to page 26.   If you would, read

20   out loud paragraph 135.

21        A   Defendant Madison County

22   intentionally refused to adequately fund medical

23   care as described above with deliberate

1  indifference to the serious medical needs of

2  inmates such as Jefferson, had a policy of not

3  adequately funding inmate medical care, and did

4  therefor contribute to cause Jefferson's

5  suffering and eventual death and the individual

6  defendants' denial of necessary medical

7  treatment for Jefferson's serious medical needs.

8      Q  The part of that allegation that says

9  Madison County intentionally refused to

10  adequately fund medical care as described above

11  with deliberate indifference to the serious

12  medical needs of inmates such as Jefferson, is

13  that based on the -- is that based on any

14  malpractice by an ACH person, that allegation?

15      A  As I understand medical malpractice,

16  that singular portion of the sentence taken with

17  no context in the rest of the complaint is not

18  based on malpractice by a particular ACH

19  individual that I am aware of.

20      Q  I am not asking if the allegation is

21  true or not, and quite honestly I don't care if

22  it's true or not, because that's not what we

23  were considering.  But the allegation is Madison

1   County intentionally refused to adequately fund

2   medical care with serious indifference to the

3   medical needs of its inmates.  Isn't that the

4   allegation?

5           A   No.  I mean, the allegation is what's

6   stated in the complaint.  And again, this

7   complaint, when taken as a whole, is clearly

8   related to the provision of medical care or

9   allegations regarding why medical care was

10  alleged not to have been provided to these

11  inmates who were in the jail.  It all relates to

12  the provision of healthcare in the detention

13  facility by ACH and its employees and

14  contractors.

15          Q   That's not true, is it?

16          A   Yes, sir, that's true.

17          Q   This complaint also alleges that

18  Madison County personnel such as Sheriff Dorning

19  and jail administrator Morrison were not

20  investigating serious known incidents of

21  deliberate indifference by correctional

22  officers; right?

23              MR. HODGE:  Where is that?

1          MR. FINCH:  Look on page 22,

2     paragraph 127, subparagraph a.

3          Q  The complaint alleges that Madison

4     County sheriff and Madison County jailer did not

5     investigate serious known incidents of

6     deliberate indifference by correctional

7     personnel; isn't that true?

8          MR. HODGE:  Object to the form.

9          A  No, sir, that is not true.  You're

10    not even reading sentences.  You're trying to

11    parse words to make this complaint say something

12    that it doesn't say.

13          Paragraph 127, which is what you're

14    quoting from, says, in summary, the deliberate

15    indifferent policies and practices of Dorning,

16    Morrison, Johnson, Williams, Robinson and ACH in

17    place at the Madison County jail, include but

18    are not limited to, not investigating serious

19    known incidents of deliberate indifference by

20    ACH and correctional personnel.

21          So, again, the complaint, the wording

22    of the complaint, I admit that wording is

23    clearly stated in the complaint.

1        Q  Does Madison County deny the

2   complaint alleges its personnel were

3   deliberately indifferent with respect to not

4   investigating serious known incidents of

5   deliberate indifference by correctional

6   personnel?

7        A  Well, this is technically -- and I

8   don't think it necessarily matters -- the

9   sheriff and Steve Morrison and the jailers are

10  not Madison County personnel, they are sheriff's

11  department employees, employees of the sheriff,

12  who is not a Madison County employee.  But

13  separate and apart from that, the complaint

14  alleges what the wording in the complaint says,

15  not bits and pieces of it that are put together

16  by you to conveniently suit your argument.

17       Q  Well, what's convenient about the

18  allegation that the jailer and the sheriff were

19  deliberately indifferent with respect to

20  investigations by correctional personnel?

21       A  It is convenient that you leave out

22  that paragraph 127, which is where you have

23  directed me to look, encompasses Dorning,

1    Morrison, Johnson, Williams, Robinson, and ACH,

2    and speaks of not investigating serious known

3    incidents of deliberate indifference by ACH.

4            Again, all intertwined and

5    interrelated to the provision of healthcare

6    services in the Madison County detention

7    facility pursuant to the agreement for

8    healthcare services that brings us here today.

9        Q  So Madison County denies this

10   complaint alleges or contains an allegation

11   based on not investigating serious known

12   incidents of deliberate indifference by

13   correctional personnel?

14       A  Madison County denies that the

15   allegation in the complaint is that limited when

16   it clearly encompasses in the same sentence --

17       Q  I'm not saying --

18       A  No, you are.  You're asking me to

19   agree to something that you're quoting out of

20   the complaint when that is not an accurate quote

21   of the allegations in the complaint.

22       Q  Is there an allegation in the

23   complaint that there was a failure to

**Jeff Rich - Madison County  Representative**                                   **86**

1   investigate deliberate indifference by

2   correctional officers?

3        A  The allegation in the complaint does

4   not limit itself to the investigation of

5   deliberate indifference by correctional

6   officers.  It is expressly worded to include

7   allegations related to ACH and correctional

8   personnel.

9        I don't know how to more clearly

10  answer it; I'm sorry.

11       Q  Look at page 68 of the complaint.

12       A  I don't think I have 68 pages.

13       MR. HODGE:  Paragraph 68.

14       Q  I'm sorry, paragraph 68, page 13.

15       A  All right.

16       Q  The complaint, in fact, alleges that

17  Sheriff Dorning refused to investigate serious

18  allegations against his deputies; is that true?

19       MR. HODGE:  Object to the form.

20       A  The paragraph says that Sheriff

21  Dorning, who has refused to investigate serious

22  allegations against his deputies as reflected by

23  the public comments of Dorning's chief deputy

1  regarding the revenge beating of Robert Bryant.

2  See AL.com article attached as Exhibit 4.

3      Q  And it goes on to allege that in

4  paragraph 69 that Dorning completely failed and

5  refused to investigate serious allegations

6  against those he supervises whether as law

7  enforcement officers or correctional officers;

8  is that correct?

9      A  That is a fair summary of the reading

10  of allegations contained in paragraph 69.

11      Q  Did Madison County understand that

12  the plaintiff in Jefferson alleged Madison

13  County was liable for, among other things, a

14  policy of not adequately funding inmate medical

15  care?

16      A  Are you referring to paragraph 135?

17      Q  I am.

18      A  Paragraph 135 say, defendant Madison

19  County intentionally refused to adequately fund

20  medical care as described above with deliberate

21  indifference to the serious medical needs of

22  inmates such as Jefferson, had a policy of not

23  adequately funding inmate medical care, and did

**Jeff Rich - Madison County  Representative**                                        **88**

1    thereby contribute to cause Jefferson's

2    suffering and eventual death and the individual

3    defendants' denial of necessary medical

4    treatment for Jefferson's serious medical needs.

5              And Madison County was and has been

6    aware of that allegation contained in the

7    complaint.

8         Q  Are you aware that the Judge in the

9    Jefferson case has ruled that the plaintiff

10   sufficiently pled a claim that Madison County

11   failed to adequately fund its jail?

12        A  I have read the Judge's orders in

13   these cases.  But I don't recall specifically

14   the language that would have been used in the

15   Judge's order.  I haven't read it recently.

16        Q  So based on the Judge's order,

17   Madison County is aware that the Judge has found

18   that there are allegations based on the County's

19   own actions; isn't that true?

20        A  No.

21        Q  Madison County is not aware that the

22   Judge has found the plaintiff adequately pleaded

23   that the County created a policy that resulted

1    in inadequate funding of inmate healthcare via

2    the incentive provision in the ACH contract?

3           A   If that's a sentence in the Judge's

4    order I won't deny that that sentence is

5    contained in his order, but it would be in

6    context of the discussion of the conspiracy

7    allegations that would again involve ACH and the

8    provision of healthcare pursuant to the

9    healthcare services agreement.  I am not willing

10   to agree without having the order in front of me

11   to look at it that that somehow is a sentence

12   that is taken in isolation and establish some

13   independent claim against the County.

14          Q   Are you aware of anything in the

15   Judge's holding that indicates the allegation

16   against the County is based on malpractice by

17   ACH?

18          A   I'm not comfortable answering

19   questions about the Judge's order when it's not

20   something I have read recently and you haven't

21   given me a copy of to look at.

22               (Defendant's Exhibit 4 marked for

23   identification.)

**Jeff Rich - Madison County  Representative**                    90

1          Q  Exhibit 4 is a copy of the first

2     amended complaint on the Foster action.  If you

3     would, look at count 3, the negligent medical

4     malpractice count that starts on page 18.

5               I would ask you to look at count 3 in

6     the Foster complaint which starts at page 18.

7          A  Okay.

8          Q  The negligent malpractice count does

9     not make any allegations against Madison County,

10    does it?

11         A  No.

12         Q  On item 8 of the deposition notice,

13    which is Exhibit 1 --

14         A  Okay.

15         Q  What is the factual basis for the

16    County's allegation that Evanston withdrew

17    coverage for the County?

18         A  This references Document 28 at

19    paragraph 56, which I think is the last amended

20    complaint, so if I could look at the exhibits.

21         Q  I'll get you a copy.

22         A  Because you didn't include the whole

23    sentence, I'm not sure what that refers to.

1            (Defendant's Exhibit 5 marked for

2    identification.)

3        Q  We'll mark this as Exhibit 5.  Take a

4    look at that.  That's the second amended

5    complaint, which is Exhibit 5.

6        A  You said paragraph 8; right?

7            I'm sorry, can you ask the question

8    again now?

9        Q  Is there any factual basis for the

10   claim that Evanston or Essex withdrew coverage

11   for the County?

12       A  I don't know whether withdrawing

13   would be the right word to describe the current

14   state of the Davis and Foster complaints.  There

15   was a tender of a defense, but -- and we went

16   through it earlier -- there were questions about

17   that tender that hadn't been answered, and I

18   don't know what Evanston's position is with

19   respect to the defense of those claims and

20   Madison County and the sheriff at this point.

21           But other than what might be related

22   to Davis and Foster --

23       Q  Are Davis and Foster the only two

1    matters that Madison County claims Evanston has

2    failed to offer a defense in?

3         A  I'm sorry, say that again.

4         Q  Are Foster and Davis the only two

5    underlying actions that Madison County contends

6    Evanston has failed to provide a defense for?

7         A  No.  The County contends Evanston has

8    failed to provide a defense for Listau,

9    Jefferson, Woods, Foster, and Davis.

10        Q  Even though Evanston offered to share

11   the defense cost with OneBeacon for those cases?

12        A  I don't believe Evanston offered to

13   share the defense cost with OneBeacon for those

14   cases.

15        Q  Are you aware of Evanston offering to

16   share the defense cost with OneBeacon for any of

17   those cases?

18        A  I'm aware that there was discussion

19   between Jagady Blue and a OneBeacon adjuster in

20   regard to whether or not an arrangement could be

21   worked out with respect to sharing of defenses

22   going forward.  But there was never a formal

23   offer in that regard made to the County or the

1   sheriff, and no agreement to that effect.

2         Q  Why did the County refuse to allow

3   OneBeacon to enter into an agreement to share

4   defense costs with Evanston?

5         A  It wasn't OneBeacon's position to

6   enter into such an agreement since it related to

7   the defense and indemnification of the County

8   and the sheriff who are OneBeacon's insureds in

9   the first place.

10         And in the second place, it has been,

11   from the beginning through today, the County and

12   the sheriff's belief and position that ACH and

13   Essex owed a duty to defend and to indemnify for

14   each one of these claims.  There's nothing in

15   the policy or the language of the policy that

16   I've seen that would provide for any kind of

17   sharing arrangement or split of the defense

18   costs.  So there would be no basis to enter into

19   that agreement even if an offer to that effect

20   had been actually tendered to the County.

21         Q  Did OneBeacon owe a duty to defend

22   Madison County with respect to these four

23   actions?

1       A   OneBeacon defended Madison County

2   with respect to these four actions.

3       Q   Is it Madison County's position that

4   OneBeacon was required to defend it with respect

5   to these four actions?

6       A   The County doesn't have a position

7   that I am aware of because that issue has not

8   been raised.  It hasn't been -- OneBeacon did

9   not push back.  So there was never a reason to

10   make a determination that OneBeacon was required

11   to because they accepted the responsibility.

12       Q   Well, do you agree that Madison

13   County tendered these four cases to OneBeacon

14   for a defense?

15       A   Yes.  After they were tendered to ACH

16   for defense.

17       Q   Really?

18       A   I believe that to be the case.

19       Q   Each of the four cases was tendered

20   to OneBeacon only after they were tendered to

21   ACH?

22       A   My recollection is that ACH was put

23   on notice.  And I would have to go back and look

1   to make sure.  But in trying to make sure I'm

2   doing my job to protect the County, I certainly

3   would not hesitate to put both OneBeacon and

4   Advance Correctional on notice of a claim so

5   there would be no allegation that there wasn't

6   adequate notice provided.

7            So the County certainly looked to ACH

8   and its insurer to provide the primary defense

9   of these cases based on the contract, and

10  OneBeacon was placed on notice in the event that

11  ACH and Essex refused to do so, which is exactly

12  where we are.

13       Q  Tell me how specifically the County

14  put OneBeacon on notice of the Listau claim.

15       A  I can't say the date or time.  The

16  normal and routine practice in my office is when

17  I receive a complaint or a claim I prepare a

18  letter to the insurance consultant for the

19  County providing --

20       Q  Is that Mr. Herr?

21       A  -- providing a copy to him, and then

22  ask him to forward it on to any insurers for the

23  County that might provide coverage for the

**Jeff Rich - Madison County  Representative**         **96**

1   claims.  There are times when there's an

2   existing claim that is open and a related or

3   subsequent claim will come along from, for

4   example, the same claimant.  And in that case I

5   might simply put the existing claims adjuster on

6   notice of that claim since they're already

7   involved in a related existing claim.

8           But with respect to each one of these

9   underlying lawsuits, it would be my best

10  recollection that OneBeacon would have been put

11  on notice by a letter to the County's insurance

12  consultant asking that he forward the complaint

13  and direct any further questions to my

14  attention.

15      Q  When you said the County's insurance

16  consultant, are you referring to Craig Herr at

17  J. Smith Lanier?

18      A  For purposes of these underlying

19  cases, yes.

20      Q  That's all I care about.

21        And it's your recollection that you

22  wrote to him with respect to the Listau

23  complaint and asked him to forward that to any

1    insurers?

2           A   Who might provide coverage for the

3    claims.

4           Q   Did you reference OneBeacon

5    specifically?

6           A   I don't know.   I might of.   Normally

7    I will say any insurers because there have been

8    times in the history of Madison County when the

9    County would change insurers, and so you would

10   have policy periods that would either overlap or

11   that would terminate on a day and begin on a

12   day, and there would be different insurance

13   providers.   And so you might have two insurance

14   companies, depending on when the claim might

15   have occurred or over what period of time, but

16   you might have two different insurance companies

17   that would provide coverage.

18          Q   Did the County authorize Mr. Herr to

19   notify appropriate insurers of the claim?

20          A   My letter asked him to -- if it's the

21   typical letter I send, asked him to provide the

22   complaint to any insurers who might provide

23   coverage.

1          Q  And would you keep a copy of that

2     letter?

3          A  Yes.

4          Q  And where would that be kept in your

5     office?

6          A  In the file.

7          Q  How do you have it?  Do you have it

8     separated by Foster, or litigation, or letters

9     to insurance company, or insurance consultant,

10    or how would you have it filed?

11         A  It would typically be in a file that

12    would be set up in relation to that particular

13    claim.

14         Q  So you could expect your Foster

15    file -- excuse me, Listau -- your Listau file to

16    include you letter to Craig Herr asking him to

17    forward the complaint to any insurers who might

18    provide coverage?

19         A  Yes.  Unless there was already a

20    claims person involved.

21         Q  If there was already a claims person

22    involved, what would your communication be?

23         A  It would probably be directly to the

1    claims person.  For example, if we were dealing

2    with an EEOC charge and I send an EEOC charge to

3    J. Smith Lanier and say please forward this on

4    to the insurer.

5             They forward it to the insurer, and I

6    then begin a communication with the claims

7    person at OneBeacon.  If a subsequent lawsuit is

8    filed arising out of that EEOC charge, I would

9    just continue communicating with that same

10   claims person and I wouldn't involve J. Smith

11   Lanier once that lawsuit was filed.

12            So yes, I would expect my Listau file

13   to have a letter to J. Smith Lanier in regard to

14   that complaint unless there had been summaries

15   and that I had been negotiating or -- not

16   negotiating, but corresponding with a claims

17   adjuster already when that complaint was filed.

18       Q  Would you expect your Listau file to

19   also have a response letter from OneBeacon

20   regarding defense of the County in that action?

21       A  It might or might not.

22       Q  Did OneBeacon issue a reservation of

23   rights with respect to the Listau case?

1        A   I don't recall.

2        Q   Did OneBeacon put any limitations on

3   its defense of Madison County with respect to

4   the Listau case?

5        A   I'm not sure how to answer that

6   question.   I'm sure there are limitations based

7   on the policy language of OneBeacon as to what

8   their defense might be, or what their ultimate

9   responsibility might be based on the limitations

10   and the policy.

11        Q   Well, earlier you said that you were

12   concerned about the scope of the defense that

13   Sirote was going to be allowed to engage in in

14   the Foster case.   Do you remember that

15   testimony?

16        A   I remember the dialogue about scope,

17   yes.

18        Q   Did OneBeacon place any limitations

19   on the scope of the defense of Madison County in

20   the Listau matter?

21        A   Yes.

22        Q   What limitations did they place on

23   the scope?

1        A  There would be limitations on the

2    defense based on, again, the language in the

3    policy.  There would be information exchanged

4    regarding the mediation and the ultimate

5    settlement of those claims that would relate to

6    the scope of the defense.  There would be

7    information exchanged about various responses to

8    the complaint and other pleadings or motions

9    that were filed.  That would be something

10   OneBeacon would have some ability to influence

11   or control.

12        Q  Well, at the time you tendered the

13   Foster complaint to Evanston, were there any

14   questions about mediation?

15        A  Did I tender the Foster complaint

16   directly to Evanston?

17        Q  Did Madison County ask Evanston to

18   defend it in the Foster matter?

19        A  I don't remember if there was a

20   letter directly to Evanston.  I don't think

21   there was.  I think Foster followed the same

22   practice that had been followed in the other

23   cases of sending that complaint to Advanced

1   Correctional with the request that Advanced

2   Correctional forward it on to its insurer.

3        Q  Was that an effort by Madison County

4   to have Evanston defend Madison County in the

5   Foster case?

6        A  Yes.

7        Q  And at that point was there any

8   exchange of information regarding mediation?

9        A  I don't believe so, no.

10       Q  So what were your questions with

11   respect to the scope of Sirote's defense at the

12   time you received the February 2017 letter from

13   me?

14       MR. HODGE:  You talking about the

15   Foster letter?

16       MR. FINCH:  Yes.

17       A  I again had questions which are

18   reflected, I believe for the most part, in

19   Mr. Hodges' letter asking you about issues that

20   you stated in this letter that we didn't

21   understand.  And so what Sirote or any other

22   lawyer was being directed to do or not do or

23   would respond to or not respond to or take

1    direction from or not take direction from, was

2    simply a question and continues to be a question

3    based on what I didn't understand about your

4    letter that you had written on February 23rd.

5            Q  Did you have those same questions

6    when OneBeacon agreed to defend Madison County

7    in the Listau action?

8            A  No.

9            Q  And other than what might possibly

10   have been in the OneBeacon policy -- well,

11   strike that and let me just ask you directly.

12           Did OneBeacon specifically point out

13   any limitations on the defense it was providing

14   Madison County in the Listau action?

15           A  I don't know if it was a reservation

16   of rights letter in that case or not, if that's

17   what you're asking.

18           Q  As a practical matter, did Madison

19   County experience any limitations on the defense

20   provided to it by OneBeacon in the Listau

21   matter?

22           A  Yes.

23           Q  How so?

1          A   OneBeacon has the ultimate authority

2    to settle those cases and made a determination

3    as part of the mediation process to settle the

4    cases.

5          Q   Did Madison County experience any

6    other limitations on the defense provided to it

7    by OneBeacon in the Listau case?

8          A   I mean, I can't tell you a specific

9    limitation.  There are certainly limitations.  I

10   mean, OneBeacon hired one group of lawyers, not

11   an entire world of lawyers.  OneBeacon defended

12   pursuant to the terms of its policy.

13             I'm not sure how to answer your

14   question other than in the normal and routine

15   course of defending a case that is being

16   defended by lawyers that are paid by an

17   insurance company, there are necessary

18   limitations on what those lawyers ultimately do

19   spend, how they defend the case.

20         Q   Was OneBeacon, in Madison County's

21   opinion, required to defend it in any manner

22   other than pursuant to the terms of the

23   insurance policy?

1          A   I don't understand your question.

2          Q   Well, you said OneBeacon defended

3   Madison County pursuant to the terms of its

4   policy.  Did I understand that correctly?

5          A   I presume that would be why they

6   would defend the case is because the County had

7   purchased a policy of insurance from them.

8          Q   Did OneBeacon have any duty to defend

9   Madison County other than pursuant to the terms

10   of the policy?

11          A   Not that I am aware of.

12          Q   Do you think Evanston had any duty to

13   defend Madison County other than pursuant to the

14   terms of its policy?

15          A   Yes.

16          Q   So OneBeacon was only required to

17   defend Madison County pursuant to the terms of

18   the OneBeacon policy; correct?

19          A   Correct.

20          Q   But Evanston was required to go

21   beyond the terms of its policy in defending

22   Madison County?  Is that Madison County's

23   position?

**Jeff Rich - Madison County  Representative**                    **106**

1          A  Well, part of Madison County's

2     position is that Evanston never provided a copy

3     of its policy to Madison County, so Madison

4     County doesn't know what its policy says.

5     Madison County paid Advanced Correctional a lot

6     of money, and part of that money was paid to get

7     an insurance policy that would protect the

8     County in the even it was sued because of

9     medical care in the jail.  That's what the

10    County expected.

11         Q  Was that a big issue for the County?

12         A  Was what a big issue?

13         Q  That it was paying lot of money to

14    Advanced Correctional and was expecting

15    insurance coverage?

16         A  It was an important issues, and

17    that's why it was included in the healthcare

18    services agreement.

19         Q  Was it important enough for Madison

20    County to ever ask for a copy of the policy?

21         A  The County did ask for a copy of the

22    policy in the healthcare services agreement

23    where it was required to be provided to the

1   County administrator.  So yes, it was important

2   enough to ask for a copy.

3            Q  Did you get a copy?

4            A  I have not ever seen a copy of

5   Evanston's policy, and to my knowledge no one in

6   the County has.

7            Q  So it was important enough to ask for

8   it, but when the County never got it, it never

9   followed up?

10            A  Never followed up to ask Evanston

11   because you wouldn't have known who at Evanston

12   to ask.

13            Q  No.  That wasn't my question.

14            A  But what would have been the right

15   question is that ACH affirmatively and

16   repeatedly represented that the coverage was in

17   place, that they had been able to obtain the

18   coverage, that their insurance agent had

19   affirmed -- or their insurer, I think they used

20   that language -- had confirmed that coverage

21   existed.  And so there would have been no reason

22   to ask when the person that you have a contract

23   with is telling you that the coverage is there.

1        Q  I didn't ask you why the County

2   didn't ask Evanston for a copy of the policy.

3   But you did have certificates of insurance

4   showing Essex or Evanston had issued the policy;

5   right?

6        A  There were very various certificates

7   of insurance that were provided to Madison

8   County by Advanced Correctional.

9        Q  So you knew who the insurer was;

10  right?

11       A  Whatever was on the certificate.

12  There were various certificates, and I think

13  there were certificates that were provided that

14  had different insurers on them, I believe.

15       Q  So my question is pretty simple.  Did

16  Madison County have information about the

17  insurer based on the certificates of insurance?

18       A  Madison County had whatever

19  information about the insurer that was included

20  on the various certificates of insurance.  That

21  information came to Madison County based on the

22  certificate of insurance.

23       Q  And knowing it did not have copies of

1    the insurance policies, did Madison County take

2    any steps to obtain copies of those policies?

3          A   Knowing that when?

4          Q   Well, from day one.  Madison County

5    received insurance certificates; right?

6          A   Correct.

7          Q   But did not receive a policy, is what

8    you testified to; is that correct?

9          A   That is what we now know, yes.

10         Q   Well, when did you discover -- when

11   did Madison County discover that it never

12   received any insurance policies?

13         A    In the -- ultimately, in the

14   preparation of this lawsuit that we're here on

15   today.

16         Q   This lawsuit was filed October 2 of

17   2015.  Is the fall of 2015 the first time

18   Madison County noticed it did not have copies of

19   any of the insurance policies ACH was required

20   to obtain for it?

21         A   It would have been sometime in the

22   lead-up to this lawsuit during the course of

23   communication and correspondence back and forth

1   with regard to coverage under the policies.

2          Q   Communication with who?

3          A   Part of it, with you.  I remember --

4   I think I recall Matt Reeves having a difficult

5   time getting you to send him copies of the

6   policies.

7          Q   So in roughly the -- the first ACH

8   contract was in 2006.  Does that sound correct?

9          A   I think.

10         Q   So between 2006 and 2015 Madison

11  County made no effort to obtain copies of the

12  insurance policies?

13         MR. HODGE:  Object to form.

14         A   No, that's not true.

15         Q   What effort did you make?

16         A   We included it in every contract that

17  ACH signed, that they would provide copies of

18  the policies to the County administrator.

19         Q   So Madison County put that in every

20  -- were those annual contracts?

21         A   Not necessarily.

22         Q   How many contracts were there between

23  2006 and 2015?

1           A  I don't recall.  Several.

2                MR. STEPHENS:  Four or five.

3           Q  And even though four or five times it

4    was in a contract that a copy of the policy was

5    to be provided, Madison County never followed

6    up?

7           A  Madison County, to my knowledge,

8    never specifically asked Essex or Evanston to

9    provide a copy of the policy because ACH

10   continued to send copies of the certificate of

11   insurance because Essex provided insurance and

12   indemnification in claims.  There would be no

13   reason for it to appear on somebody's radar

14   screen that you better get a copy of the policy,

15   because up until these more serious lawsuits

16   hit, there had never been any indication that

17   coverage didn't exist as intended in the

18   contract.

19          Q  What do you mean coverage did not

20   exist as intended in the contract?  Are you

21   talking about the ACH contracts?

22          A  Correct.

23               MR. FINCH:  We can go ahead and take

1    a break.

2              THE VIDEOGRAPHER:  It is 11:45.  Off

3    the record.

4              (Recess taken.)

5              THE VIDEOGRAPHER:  It is 1:02.  We're

6    back on the record.

7    Examination Resumed by Mr. Finch:

8         Q  Mr. Rich, let's go ahead and get back

9    to your deposition notice which should be

10   number 1.  And if you would, look down to item

11   number 12.  What are the factual and legal

12   reasons why Madison County settled the Listau

13   claim?

14        A  Under its relationship with

15   OneBeacon, OneBeacon reserves the right to

16   settle claims, and OneBeacon was involved in the

17   mediations leading to the settlement of those

18   claims, and decided, based on the risks and

19   exposure of moving forward, that it made sense

20   to resolve them in mediation.

21        Q  Were you at the mediation?

22        A  Yes.

23        Q  And you kind of gave me a mouthful,

1   so let me try to go back and see if I got it

2   all.

3           It was OneBeacon's decision to settle

4   both the Listau and Woods claims?

5           A  Yes.

6           Q  And it's your understanding it did so

7   based on the risks and exposure to Madison

8   County for which it would have to indemnify you;

9   right?

10          A  Risks and exposure.  As you well

11  know, insurance companies are businesses and

12  they evaluate based on what they believe their

13  exposure might be at the end of the day.

14          Q  Was it your understanding they were

15  paying for the risk and exposure based on the

16  claims against Madison County?

17          A  They settled the cases based on the

18  allegations in the complaint and the risk and

19  exposure to OneBeacon and all of its insureds in

20  each one of those cases moving forward.

21          Q  Did its insureds include Madison

22  County, Sheriff Dorning, Steve Morrison, and the

23  correctional officers?

1          A  Yes.

2          Q  To your knowledge, did OneBeacon

3     consider any other person or entity to be its

4     insured for the purpose of these settlements?

5          A  No.

6          Q  And does the same rationale apply to

7     all of the underlying settlements that have

8     occurred to date, or do I need to go through

9     them one by one?  Because I had started off

10    specifically with Listau.

11         A  I think the same -- whatever word you

12    used -- rationale would apply to each one of

13    them.

14         Q  How did the topic come up between

15    Madison County and OneBeacon about paying the

16    $50,000 deductible for, let's just say, any one

17    of the claims?

18         A  In general, the staff at OneBeacon

19    will merely invoice Madison County for the

20    deductible and Madison County's finance

21    department will cut a check after they confirm

22    that the deductible is due.

23         Q  So at some point in the history of

**Jeff Rich - Madison County  Representative**                                    **115**

1    the case -- or in the life of the case, I should

2    say -- OneBeacon sent an invoice to Madison

3    County for $450,000?

4          A  I don't recall -- I believe, and I

5    can confirm it.  I believe that they would wait

6    and send that invoice at the conclusion of the

7    case, because it won't always be $50,000.  Maybe

8    you get summary judgment granted and the defense

9    costs are $12,000 and then they would invoice

10   the County for $12,000 because that's within the

11   deductible range.  I believe that in each of

12   these cases where the cost to defend and settle

13   the case exceeded the deductible, that OneBeacon

14   would have sent a single invoice for $50,000 --

15   or sent an invoice for each one of the cases.

16         Q  Right.  In any of these five

17   underlying cases, did OneBeacon send Madison

18   County an invoice for the deductible after

19   defense costs exceeded $50,000, but before a

20   settlement was reached?

21         A  I'm not sure.

22         Q  Were you involved in any discussions

23   with OneBeacon regarding the attorneys' fees

1    that were paid for the defense of the underlying

2    cases?

3         A  Yes.

4         Q  Tell me about the first time you had

5    a discussion with OneBeacon about the attorneys'

6    fees for the underlying cases.

7         A  OneBeacon has been aware since the

8    cases were filed that Madison County and the

9    sheriff were taking the position that ACH and

10   Essex were responsible for the defense and

11   defense costs associated with defending the

12   cases, and so there have been discussions with

13   OneBeacon in regard to this lawsuit and in

14   regard to incurring expenses and fees associated

15   with the underlying lawsuits.

16            There have been discussions with

17   OneBeacon about getting the information from

18   OneBeacon as to how much OneBeacon paid for

19   defense on each one of the claims.  I'm not sure

20   I'm answering your question, but I'm not sure I

21   understand the direction of your question.

22        Q  There's no direction to it.

23        A  Okay.  Well, I'm sorry.

**Jeff Rich - Madison County  Representative**                    **117**

1        Q   The question is intended to be

2    straightforward.   What is the first discussion

3    you had with OneBeacon regarding the attorneys'

4    fees for any of the underlying cases?

5        A   The actual attorneys' fees paid, or

6    who would pay the attorney's fees, or --

7        Q   The topic of attorneys' fees.

8        A   Probably when the first one of these

9    cases -- and I don't remember the sequence of

10   the cases.   Probably when the first case was

11   filed.

12       Q   All right.   The first case that was

13   filed was the Elliott case.

14       A   Okay.

15       Q   I think that's one of your exhibits.

16       A   I don't know.

17       Q   Robert Elliott on behalf of the

18   Estate of Nikki Listau was filed July 8, 2014.

19   Do you recall, after receiving notice of that

20   suit, having a discussion with OneBeacon about

21   the defense of Madison County?

22       A   I don't recall a discreet discussion

23   with them at a particular date and time.   There

1  were multiple discussions with individuals at

2  OneBeacon in regard to OneBeacon's role in

3  defending and indemnifying under their policy,

4  and Madison County and the sheriff's efforts

5  with respect to ACH and with respect to ACH's

6  insurer.

7       Q  I want to limit my questioning for a

8  minute to your discussions with OneBeacon

9  regarding OneBeacon's role in defending Madison

10 County.  What was OneBeacon's position as to its

11 role?

12      A  OneBeacon understood their role to be

13 to defend Madison County and its insureds

14 associated with Madison County, and immediately

15 upon notice that that was what was being

16 requested, moved forward with retaining defense

17 counsel and providing a defense.

18      Q  And who did they retain?

19      A  There are various lawyers for various

20 lawsuits because --

21      Q  No, no, no.  I'm trying to really

22 stick to your first conversation with OneBeacon

23 regarding the defense of the Elliott case.

1          A  I told you I don't recall discreetly

2     my first conversation with OneBeacon, so if you

3     are trying to stick with that I can't tell you

4     what was discussed in the very first

5     conversation.

6               Over time OneBeacon retained defense

7     counsel for the County, defense counsel for the

8     sheriff, and defense counsel for the individual

9     officers that were named in each one of these

10    lawsuits.

11         Q  Did the County and the sheriff share

12    counsel in the Elliott or Listau matter?

13         A  I don't believe so.

14         Q  Do you recall who was first retained

15    to defend Madison County in the Elliott matter?

16         A  I don't.  I'm sure it's whoever filed

17    the first response.

18         Q  After OneBeacon informed you that it

19    understood its role was to defend Madison County

20    in the Elliott matter, did OneBeacon ever inform

21    the County that it did not intend to defend the

22    County in the Elliott matter?

23         A  No.

1        Q   Did OneBeacon ever inform the County

2   that it did not intend to defend the County in

3   any of the other four underlying claims?

4        A   No.

5        Q   Did you ever have a discussion with

6   OneBeacon regarding Essex's or Evanston's

7   obligations?

8        A   Yes.

9        Q   When was the first time you had such

10   a conversation?

11        A   I don't recall the specific date and

12   time.

13        Q   There are some e-mails from the

14   December 2014 timeframe.  Does that -- we'll see

15   those in a while.  Is that about when it was?

16        A   I don't recall the specific date and

17   time.

18        Q   Well, whenever it was, who raised

19   that issue?

20        A   Who raised what issue?

21        Q   I asked you if there were ever any

22   conversations between Madison County and

23   OneBeacon regarding the defense owed by Essex or

1   Evanston, so the topic is the defense owed by

2   Essex or Evanston.

3          A  And your question is who raised that?

4          Q  Right.

5          A  I did.

6          Q  How did you raise it?

7          A  I don't have a specific recollection,

8   but my best memory is that I would have both

9   provided a copy of what I will call the demand

10  letter that was sent to ACH for coverage and

11  indemnification.  I would have provided that to

12  OneBeacon.  And I would have had either e-mail

13  correspondence or telephone conferences with

14  OneBeacon with respect to what that meant, why

15  it was sent, and what, if any, response had been

16  received.

17         Q  Did you make any notes regarding your

18  phone conversations on that topic?

19         A  If I did, they have been produced in

20  this litigation.

21         Q  No such notes have been produced.  Do

22  you have a recollection of making such notes?

23         A  If I did, they have been produced in

1    this litigation.

2         Q  I really -- I just want to know if

3    you have a recollection of making phone notes

4    regarding conversations with OneBeacon regarding

5    the topic of defense by Essex or Evanston?

6         A  I don't have an independent

7    recollection of making any notes, but if I did

8    they would have been included in the files that

9    have been produced in this litigation.

10        Q  Did OneBeacon ever express to you

11   what its position was with respect to sharing

12   defense costs with Evanston?

13        A  I communicated with Barbara McConnell

14   from OneBeacon with respect to a discussion she

15   had had with Mr. Blue at Essex, or Markel, or

16   Evanston, or whatever entity it was, about the

17   possibility of there being a 50/50 split in the

18   defense costs associated with these claims.

19        Q  Did she express to you what her

20   company's position was with respect to another

21   carrier sharing defense costs?

22        A  Her company's position was that that

23   would be something that their insured -- their

**Jeff Rich - Madison County  Representative**                                **123**

1    company, OneBeacon's insured -- would have to

2    agree to.

3         Q  Did she state why that was their

4    position?

5         A  Because it's -- I don't remember her

6    specifically stating why it was their position.

7         Q  Did she state OneBeacon had an

8    objection to paying less than 100 percent of the

9    defense cost?

10        A  I'm sorry?  Did she state that

11   OneBeacon objected to paying less than 100

12   percent of the defense cost?

13        Q  Correct.

14        A  I don't think OneBeacon objected to

15   paying less than 100 percent of the defense

16   cost.

17        Q  Why did Madison County care who paid

18   for the defense cost?

19        A  Madison County cared for the same

20   reason that the original healthcare services

21   agreement required insurance and indemnification

22   separate and apart from the insurance, to make

23   sure if there were claims related to the

1    healthcare services agreement in the jail that

2    related to negligence or malpractice or

3    deliberate indifference claims in the jail

4    related to healthcare, that those claims would

5    be defended and the burden of those claims would

6    be borne by ACH and its insurer.

7              That was what the County and they had

8    contracted for and that's what the County and

9    sheriff expected, not a vague proposal of some

10   50/50 split on some defense cost associated with

11   the claims.

12        Q  Let's assume the proposal wasn't

13   vague.  Lets's assume the proposal was a 50/50

14   split.  Why would the County care if OneBeacon

15   paid 50 percent of the defense cost and Evanston

16   paid 50 percent of the defense cost?

17        A  I've just explained that in my

18   previous answer.

19        Q  There is no other reason?

20        A  The County had contracted for

21   insurance and indemnification.  The County

22   viewed these complaints as related to the

23   provision of medical care in the jail.  The

1   County believes that Advanced Correctional and

2   its insurer are responsibility for those claims.

3   The County is concerned about trying to limit

4   the number of claims and the severity of the

5   claims from a monetary standpoint of its

6   insurance.  The County has an obligation to

7   protect the taxpayers dollars and spend them

8   wisely.  So the County cared for a host of

9   reasons why and who paid for these claims.

10        Q  How does two insurance companies

11  sharing defense cost affect the County's

12  taxpayers dollars?

13        A  Because if OneBeacon is having to pay

14  any portion of those, but shouldn't be having to

15  pay them because they should rest with someone

16  else, that is still money that OneBeacon

17  is having that is paid that, one, the County

18  Commission has to pay a deductible on; and two,

19  the County Commission has to deal with from the

20  standpoint of a claims history going forward,

21  whether it's with OneBeacon or with anybody

22  else.

23        Q  Did OneBeacon ever raise those issues

1    with Madison County?

2         A   Raise what issues?

3         Q   Well, you said one issue was, that --

4    well, I'll let her read that back.

5              MR. FINCH:   (To the court reporter:)

6    Would you read that back?

7              THE COURT REPORTER:   Because if

8    OneBeacon is having to pay any portion of those,

9    but shouldn't be having to pay them --

10             (Discussion off the record between

11   the court reporter and Mr. Finch.)

12        A   OneBeacon and Madison County talked

13   about the County having to pay a deductible that

14   it shouldn't have had to pay if there was

15   coverage or if there was indemnification

16   pursuant to the contract.  Also, the County

17   talked about the effect of these claims

18   generally, but without any specifics as claims

19   against the County.  And certainly OneBeacon was

20   in favor of and supported the County's efforts

21   to try to bring to conclusion the responsibility

22   of ACH and Essex to provide coverage and

23   indemnification for these claims.

**Jeff Rich - Madison County  Representative**                                        **127**

1          Q  So if the County got Essex to agree

2     to pay for 50 percent of the defense cost, was

3     OneBeacon happy with that effort?

4          A  You would have to ask OneBeacon that

5     question.

6          Q  And you say Madison County and

7     OneBeacon discussed the effect of these claims.

8     What do you mean by the effect of these claims?

9          A  That these are generally claims that

10    the County believes it and its insurance company

11    are not responsible for and the County was

12    willing to go to the necessary step of filing a

13    lawsuit to try to prove that.

14         Q  Well, no, you said that Madison

15    County and OneBeacon discussed the effect of

16    these claims.  What effect?

17         A  The effect that they're additional

18    claims on a claims history that Madison County

19    has to deal with today and going forward to try

20    to maintain or continue to have insurance

21    coverage.

22         Q  Did OneBeacon ever tell you how these

23    claims affected Madison County's rating?

**Jeff Rich - Madison County  Representative**                    **128**

1           A  No.

2           Q  Did it tell you how it affected

3    Madison County's premiums either presently or in

4    the future?

5           A  We have not had a specific discussion

6    about that.

7           Q  Did OneBeacon make any threats to

8    non-renew the coverage because of these claims?

9           A  No.

10          Q  And the claims would still reflect on

11   Madison County's loss history even if Essex paid

12   the defense cost, wouldn't they?

13          A  I don't know.

14          Q  The claim is there, isn't it?

15          A  I said I didn't know, Mr. Finch.

16          Q  So what is it about the fact that

17   Madison County got sued that OneBeacon discussed

18   with you?

19          A  I thought that's what we've been

20   talking about.

21          Q  Well, that's what I'm trying to

22   figure out.

23               You seem to be implying that the fact

1    Madison County was sued and OneBeacon had to

2    defend it, was somehow going to adversely affect

3    Madison County, and I'm trying to figure out how

4    that is.  Is it the fact that it was sued, or

5    the fact that OneBeacon had to defend, or some

6    other fact?

7            A  I think it's both of those facts.

8            Q  Why do you think that?

9            A  Because getting sued is -- and

10   OneBeacon as your insurer having to pay the

11   defense costs and the settlement costs and all

12   the costs associated with getting sued affects

13   the County's ongoing relationship with

14   OneBeacon, its ability to get insurance from

15   other insurers.  It's just a necessary fact.

16            Now, OneBeacon has encouraged or been

17   positive about the County's efforts to try to

18   place the responsibility where the County wants

19   it placed, and hopefully that will help in the

20   long run with respect to what the County needs

21   to do with OneBeacon, or whoever its insurer may

22   be in the future.

23            Q  Did OneBeacon say anything specific

1   as to how the topic of who was paying the

2   defense cost was impacting the relationship

3   between Madison County and OneBeacon, if it was

4   even affecting that relationship?

5        A   OneBeacon has -- there have been

6   discussions with OneBeacon about their positive

7   view, for lack of a better way of describing it,

8   of Madison County and the sheriff caring enough

9   to file a lawsuit to try to place responsibility

10  where they believe it should be, and that that's

11  an active approach to trying to work with your

12  insurance company, limit your exposure, keep

13  things where they are, as opposed to just

14  saying, oh, well, there is insurance coverage

15  out there with one company and let's not worry

16  about it.

17        That wasn't something the County

18  wanted to do.  The County felt like there was a

19  reasonable basis to file this lawsuit to try to

20  put responsibility where it should rest.  And

21  OneBeacon has acknowledged that and I think it's

22  appreciative of that.

23        Q   When and how did they acknowledge

**Jeff Rich - Madison County  Representative**                    **131**

1    that?

2             A   There have been discussions during

3    the course of the communication I described

4    earlier with Barbara McConnell.  There have been

5    discussions with Aaron Stone.  There have been

6    discussions with -- oh, gosh, I can't remember

7    her name.  She's the claims person who was at

8    the mediation.  I'm sorry.  I can't remember her

9    name.

10            Q   How is Aaron's name spell?

11            A   A-A-R-O-N, Stone.

12            Q   Were any of those communications in

13   writing?

14            A   I have had e-mail communication with

15   Aaron Stone in the past about the pendency of

16   the underlying claims.  I don't believe there

17   has ever been a written communication from Aaron

18   about this lawsuit.

19            Q   Would there be any reason why your

20   communications with Aaron Stone have not been

21   produced in this case?

22            A   I think those are attorney work

23   product and shouldn't be produced in this case.

1          Q   Who is Aaron Stone?

2          A   Aaron Stone is a OneBeacon employee.

3          Q   And who is Aaron Stone the attorney

4    for?

5          A   He's not an attorney.  Well, I think

6    he actually may be.  He may have a law degree.

7    I'm not sure.

8          Q   Why is there some attorney-client

9    privilege there?

10         A   I didn't say there was.  I said it

11   was attorney work product.  I think my e-mails

12   --

13         Q   Why is there attorney work product

14   privilege there?

15         A   Because my e-mails to him in

16   evaluating and discussing the County's position

17   and various facts and legal issues associated

18   with the sheriff's defense, the County's defense

19   of those underlying lawsuits, my work product.

20         Q   Did those e-mails discuss the

21   County's views on what claims are being asserted

22   against it?

23         A   I don't know.

1        Q   Is Madison County aware of -- or was

2   it aware of its exposure for claims asserted

3   against it in the four underlying cases?

4        A   The County knew it had been named as

5   a defendant in the four underlying cases.

6        Q   Did it consider what the allegations

7   were against it?

8        A   Yes.

9        Q   Did it consider whether it had

10  liability independent of anything ACH did?

11       A   Yes.

12       Q   Is it Madison County's position that

13  it is not responsible for jail operations?

14       A   Yes.

15       Q   Is it Madison County's position that

16  it is -- that its only potential liability in

17  the underlying cases is for the inadequate

18  funding claim?

19       A   Well, three of the underlying cases

20  have been settled.

21       Q   While they were pending, was it

22  Madison County's position that its only

23  potential liability was for the inadequate

**Jeff Rich - Madison County  Representative**                    **134**

1   funding claim?

2        A  The County's potential liability was

3   for the defense of all the claims that the

4   County was still in the lawsuit.  And the

5   funding claim as it relates to the plaintiff's

6   theory that malpractice was committed or

7   negligence was committed by the medical provider

8   because the County and medical provider had a

9   cost pool situation in place that somehow

10  incentivized the medical provider to not provide

11  adequate medical care.

12       So no, not standing alone.  Again, I

13  believe that -- and it's the County's position

14  -- that the medical claims and the funding

15  claims, as you described them, against the

16  County are intertwined and are connected.

17       Q  Is it the County's position that the

18  funding claim is exclusively tied to a

19  malpractice claim against ACH or its personnel?

20       A  No.

21       Q  Let me get back to OneBeacon for a

22  minute.  In our discussion of OneBeacon you were

23  also saying that OneBeacon supported Madison

1    County's efforts to get either ACH or Evanston

2    to pay for those claims.  Did I understand that

3    correctly?

4         A  Correct.

5         Q  Madison County, under the ACH

6    agreement, did not contract for indemnity or

7    insurance for its own actions, did it?

8         A  It contracted for indemnity and

9    insurance for the description of what's required

10   that's in the agreement.

11        Q  Is it Madison County's position that

12   it is entitled to indemnity and insurance for

13   claims related to its own acts?

14            MR. HODGE:  Object to the form.

15        A  Our claims related to its own acts

16   that are intertwined with the provision of

17   medical care to the jail, it would be entitled

18   to insurance and indemnification.

19        Q  What do you mean by intertwined?

20        A  I mean the allegations of the

21   complaints, the underlying complaints are that

22   apparently either deliberate indifference,

23   negligence, or malpractice occurred because ACH

1  and Madison County allegedly agreed to limit the

2  costs or limit the available money or

3  incentivize ACH to not spend money to provide

4  outside medical care.

5         So without the medical care piece of

6  this being in place, there would not be some

7  independent freestanding claim, or whatever you

8  described it, claim against Madison County for

9  the failure to fund the jail.

10         Q  But doesn't Madison County have an

11  independent duty to adequately fund medical care

12  at the jail?

13         A  Madison County has a statutory duty

14  to fund the operation of the jail.

15         Q  Including medical care for inmates or

16  detainees; correct?

17         A  Not all medical care, but medical

18  care that needs --

19         Q  How about some medical care.

20         A  I'm sorry, let me finish and I'll try

21  not to interrupt you.

22         Q  Okay.

23         A  Madison County has a statutory duty

**Jeff Rich - Madison County  Representative**                    137

1   to fund the operation of the jail through the

2   sheriff's budget.  That includes funding at a

3   necessary level to provide constitutional

4   adequate medical care.

5        Q  And if Madison County does not fund

6   to provide for constitutionally adequate medical

7   care, does it have the risk of liability?

8        A  Not if the only factor in your

9   hypothetical is that they simply didn't provide

10  funding.  There have to be other things that

11  would fall into place.

12       Q  Does OneBeacon have any financial

13  incentive in this lawsuit against ACH and Essex?

14       A  I'm not sure I understand your

15  question.  But if I did, no, they do not have a

16  financial incentive.

17       Q  That's probably a poorly-worded

18  question.  Do they have a financial interest, is

19  what I meant to say, and I used the wrong word.

20       A  They have a subrogation interest,

21  legally, I believe, that exists.

22       Q  Has there been any discussion with

23  OneBeacon regarding that subrogation interest?

**Jeff Rich - Madison County  Representative**                    **138**

1          A   No.

2          Q   So y'all filed this lawsuit against

3    ACH and Essex seeking defense costs and

4    indemnity for the four or five underlying

5    actions; correct?

6          A   Yes.

7          Q   OneBeacon has paid the bulk of those

8    costs itself; correct?

9          A   I wouldn't agree with the use of the

10   word bulk.  I think it's clear that the County

11   has actually had to -- and we've covered this

12   already -- come out of pocket for the

13   deductibles, which in each case has been

14   $50,000.  And then OneBeacon has paid the

15   settlement amounts that have been paid on behalf

16   of its insureds and has paid the defense cost.

17         Q   Madison County's out of pocket is

18   $50,000 maximum for fives cases; correct?

19         A   That should be correct, yes.

20         Q   How much was paid to defend the

21   Listau action?

22         A   I think those documents have been

23   produced to you, and my recollection is the

1    total cost to OneBeacon is about 1.2 million for

2    funding of defense and the settlements,

3    somewhere around there -- 1.2, 1.25.

4         Q  But there is no agreement between

5    Madison County and OneBeacon regarding this

6    lawsuit or the outcome of this lawsuit?

7         A  No.

8         Q  Has OneBeacon made any demand on

9    Madison County for repayment of any of that

10   1.2 million or whatever the exact number is?

11        A  No.

12           (Discussion off the record.)

13        Q  (By Mr. Finch:)  Did you have -- did

14   Madison County have any communications with any

15   other insurance company regarding defense of any

16   of the five underlying cases other than

17   OneBeacon and Evanston?

18        A  No.

19        Q  Did you have any communications with

20   anybody associated with Evanston over the phone?

21        A  I mean, I have talked to Trey Ireland

22   who was hired by Evanston -- at least that's my

23   understanding -- to defend lawsuits involving

**Jeff Rich - Madison County  Representative**                    **140**

1    the sheriff and the County.  But as far as

2    directly with anyone who I understood to be an

3    employee of Evanston or Essex, no.

4            Q  Or Markel?

5            A  I don't believe I ever talked to

6    Mr. Blue over the phone.  It's possible, but I

7    don't have a specific recollection of that.

8    Other than Mr. Blue, there wouldn't have been

9    anybody else.

10           Q  To your knowledge did anyone else at

11   Madison County have any contact with anybody at

12   Markel, Essex, or Evanston other than Jagady

13   Blue?

14           A  No.

15           Q  You mentioned another person at

16   OneBeacon.  Was there a third person?  Aaron

17   Stone, Barbara McConnell; was there a third

18   person?

19           A  Yes.  There's an adjuster -- and I'm

20   sorry, I've just drawn a blank on her name --

21   who attended one or all of the mediations.  And

22   I just have drawn a blank on her name.  I'm

23   sorry.

**Jeff Rich - Madison County  Representative**                    **141**

1          Q   Did Barbara McConnell attend any of

2    the mediations?

3          A   No.

4          Q   Did Aaron Stone?

5          A   No.  Not in person.  I think Aaron

6    was on the phone at times with us.  And there is

7    some confidentiality about mediation stuff.

8          Q   Under the ACH agreement, is it

9    Madison County's position that if ACH is sued

10   vicariously for the acts of Madison County that

11   Madison County has to indemnity ACH?

12          MR. STEPHENS:  Object to the form.

13          A   I don't know.

14          Q   Looking at the OneBeacon policy, it

15   was underwritten by a company called Atlantic

16   Specialty Insurance Company.  Did you ever have

17   any contact with that company?

18          A   No.

19          Q   Do you know where that company is

20   located?

21          A   No.

22          Q   Do you know how many employees that

23   company has?

1          A   No.

2          Q   Do you know who answers that

3    company's phones?

4          A   No.  I know when I call OneBeacon

5    they answer.

6          Q   Does Madison County acknowledge that

7    under the additional insured endorsement to the

8    Evanston policy that Madison County is an

9    additional insured for liability caused by the

10   negligence of ACH in rendering professional

11   services?

12         A   I don't have the endorsement in front

13   of me.  If that's the language of the

14   endorsement, Madison County acknowledges that's

15   the language of the endorsement.

16         Q   Does Madison County acknowledge that

17   the additional insured endorsement in effect in

18   July of 2014 when the Listau complaint was filed

19   contained a provision that stated that the Essex

20   insurance shall be excess and noncontributory

21   insurance over any other insurance afforded to

22   the additional insureds?

23         A   I don't know about the dates.

1    Madison County acknowledges that the language

2    included in the endorsement purported to make

3    the Essex Insurance excess up until the period

4    of time when Essex changed that to make it

5    primary going forward.

6              Madison County was not -- because it

7    had not gotten copies of the policies -- aware

8    of the position that Essex has taken in this

9    lawsuit, that the coverage afforded was excess

10   coverage.  Because that's not what had been

11   communicated through certificates of insurance

12   and through ACH in the past, or through Essex's

13   own actions in defending and indemnifying the

14   County and the sheriff in previous lawsuits.

15        Q  What do you mean by purported to make

16   it excess?  Doesn't that language actually make

17   the policy excess?

18        A  I don't know.

19        Q  Does the County have a position one

20   way or the other if the policy states it shall

21   be excess and noncontributory insurance over any

22   other insurance afforded to the additional

23   insured whether it actually is, in fact, excess

**Jeff Rich - Madison County  Representative**                                **144**

1    and noncontributory?

2          A   I'm not sure I followed your

3    question.

4          Q   Is there any policy language that

5    Madison County believes contradicts the

6    endorsement which states that the insurance

7    shall be excess and noncontributory insurance

8    over any other insurance afforded to the

9    additional insureds?

10         A   I'm not aware of any policy language

11   that contradicts that for that policy period.

12         Q   For other policy periods, are you

13   aware of any contradictory policy language?

14         A   I think for policy periods going

15   forward from a date certain, there's language

16   that makes it not excess, but not primary.

17         Q   Well, is that because that excess

18   language is removed or because there's

19   additional language that you think contradicts?

20         A   Mr. Finch, I don't know without the

21   insurance policies in front of me, and even if

22   they were in front me, I'm not sure I could

23   point to the provision.  I just understand that

1    the County and the sheriff believe they had

2    primary insurance through ACH, and Essex takes

3    the position that if it existed it existed as

4    excess up to some point in time.

5         Q   Isn't it true that the real basis for

6    the County and the sheriff's belief it had

7    insurance through ACH is its contacts with ACH

8    and the ACH contract?

9         MR. HODGE:  Object to the form.

10        A   In addition to the other facts that

11   I've identified in response to your past

12   questions, which include Essex's own activity in

13   defending and indemnifying the County and the

14   sheriff in past lawsuits.

15        Q   In the Moore and Hammonds lawsuits?

16        A   Yes.

17        Q   Have the policy limits under the

18   OneBeacon policy been exhausted in any or all of

19   the five cases?

20        A   No.

21        Q   Isn't it true in the Hammonds case

22   there were no allegations regarding any wrongful

23   acts or omissions by Madison County?

1        A   I don't recall the specific

2   allegations of the Hammonds complaint.  I think

3   it was a pro se complaint, so it probably had

4   all sorts of stuff in it that didn't need to be,

5   and stuff that needed to be in it was probably

6   not in it.  But I don't remember the precise

7   allegation.

8              (Defendant's Exhibit 6 marked for

9   identification.)

10        Q   Let me show you what I'm marking as

11   Exhibit 6.  Do you remember corresponding with

12   Shelley Nilsson at ACH regarding ACH's

13   malpractice policy in 2006?

14        A   Yes.

15        Q   And at that point in time there is an

16   e-mail that says -- and it's addressed to you --

17   attached is the ACH malpractice policy; is that

18   correct?

19        A   That's what the e-mail says.  It

20   wasn't actually attached, though.

21        Q   What did you say in response in your

22   first sentence?

23        A   I will review this.  I'm sorry --

1    Shelley, I will review this.

2         Q   And go ahead and read the entire

3    e-mail into the record, please, your response,

4    that is.

5              MR. STEPHENS:  Just for the record --

6    I know the document speaks for itself, but, of

7    course, in the world of e-mails, chronology

8    confuses us all sometimes.  But if you look at

9    the timestamps.

10             MR. FINCH:  It's not the way it

11   normally looks.

12             MR. STEPHENS:  I'm just saying it

13   appears to me that Mr. Rich's e-mail is at 7:25

14   a.m., and Ms. Nilsson's is at 8:15 a.m., unless

15   somebody knows otherwise.

16             MR. FINCH:  No, that's fine.  I'm so

17   used to the convention of the earlier e-mails

18   being on the bottom, I did not notice that.

19             MR. STEPHENS:  I would have expected

20   the exact same thing.

21        Q   (By Mr. Finch:)  Let me ask a

22   different question.  In your e-mail to Shelley

23   Nilsson as ACH, you state, we simply need to

1   make sure that if a jailer or deputy is sued as

2   part of a claim arising out of healthcare in the

3   jail, the insurance will provide coverage.

4            Did I read that correctly?

5        A   That's what I wrote, yes.

6        Q   Did you express to her any other

7   concern about what the insurance would cover

8   under the ACH malpractice policy at that time?

9        A   In this e-mail?

10       Q   In this e-mail.

11       A   This is one of the issues with the

12  current provider.  Please let me know if this is

13  a problem.  The additional insured needs to be

14  adding Madison County, Madison County sheriff,

15  and their employees.  That's not in sequence,

16  that's -- you asked me to read something and I

17  read something afterwards below and after.  So

18  what I read doesn't necessarily reflect the

19  sequence of the words on the paper.

20       Q   What did you mean by the sentence, we

21  simply need to make sure that if a jailer or

22  deputy is sued as part of a claim arising out of

23  healthcare in the jail, the insurance will

1    provide coverage?

2         A  That the County and the sheriff were

3    looking for ACH and its insurer to stand behind

4    the services that they were agreeing to provide

5    and to follow the language.  At this point in

6    time I am not sure whether or not we had an

7    agreement in place or we were negotiating the

8    terms of the agreement.  I just don't remember

9    the sequencing.

10            But it was clear that the County and

11   the sheriff had just been through a circumstance

12   with a previous provider where that provider

13   could not provide the insurance that was

14   necessary, that the County deemed and sheriff

15   deemed appropriate.  And one of the things that

16   ACH had said they could do was to get that

17   insurance, and we wanted to make sure that we

18   were on the same page with respect to what that

19   needed to be.

20         Q  Did Madison County request ACH

21   provide insurance in the instance Madison County

22   or its jailers or deputies were sued for

23   something that was not part of a claim arising

1    out of healthcare?

2          A  No.  If a deputy or a jailer

3    physically assaulted an inmate, standing alone,

4    the County and the sheriff would not look to ACH

5    or its insurer to provide anything.  If an

6    inmate suffered a gash on the head and bled to

7    death because ACH didn't provide medical care,

8    then I think that would be part of the services

9    and the agreement that are spelled out in the

10   healthcare services agreement that ACH would

11   need to be responsible for.

12         Q  Did Madison County intend to hold ACH

13   responsible if a detainee suffered a gash on the

14   head and a jailer noticed it, but did not report

15   it to anyone?

16         A  It would depend on the other

17   allegations of the complaint and the

18   circumstances of that.  Standing alone, I can't

19   answer that question.  If the deputy has been

20   trained by ACH, if there are policies in place

21   that were developed and implemented by ACH with

22   respect to what that deputy should or should not

23   do.  It would depend on the location of the

1    inmate.  It would depend on, as I said

2    previously, when you went down this line of

3    questioning, there are a whole host of

4    circumstances related to being incarcerated in

5    the jail that might impact that ultimate

6    outcome.

7          Q   What if the allegation is a detainee

8    suffered a gash on their head while in jail, the

9    jailer noticed it, and the jailer refused to

10   allow or provide medical care?

11         A   I think that's the same question you

12   just asked, and my answer would be the same.  It

13   would depend on whether or not that jailer was

14   acting pursuant to policies that ACH had had

15   involvement with, whether or not -- there's just

16   a whole host of factors beyond that limited

17   hypothetical that might be relevant to that

18   determination.

19         Q   So there are a whole lot of ways that

20   the jailer or Madison County could be liable

21   beyond just ACH malpractice; right?  I'm talking

22   about medical malpractice.

23         A   I don't understand the question.

1        Q  Aren't there a host of ways that

2   Madison County, its jailer, its deputies, and

3   its sheriff can be liable that are separate and

4   apart from strictly medical malpractice

5   committed by ACH?

6            MR. HODGE:  Object to the form.

7        A  Yes.

8        Q  And, in fact, these five underlying

9   complaints allege a lot of those things, don't

10  they?

11       A  No, they don't.

12       Q  So is it the County's position that

13  none of the five underlying complaints alleged

14  anything that is not triggered by actual medical

15  malpractice by ACH?

16       A  It's the County's position that all

17  of the claims in the underlying lawsuits are

18  related to the provision of healthcare services

19  in the Madison County jail and relate to the

20  scope and the intent of the healthcare services

21  agreement, which is what ACH agreed to provide

22  indemnification and insurance for.

23       Q  No, no.  Let me ask my question

1    again.

2              Is it Madison County's position that

3    all of the allegations against it in the

4    underlying cases spring solely from medical

5    malpractice committed by ACH?

6              MR. HODGE:  Asked and answered.

7              MR. FINCH:  Asked, but not answered.

8              MR. HODGE:  Argumentative.

9         A  Well, first of all, the complaints

10   don't just contain medical malpractice claims

11   against ACH.  There are civil rights claims,

12   there's -- you know, there are other claims.

13   There are policy claims, there are claims that

14   ACH conspired with Madison County and the

15   sheriff to enter into some sort of conspiracy to

16   deny medical care based on mutual financial

17   benefit to all parties.  But they all

18   interrelate and relate back to the provision of

19   healthcare in the jail, which is what ACH was

20   responsible for.

21             So there are not any independent

22   allegations in the underlying complaints that an

23   officer bashed somebody over the head and

1   there's an excessive force claim.  If there was,

2   that would not be something that Madison County

3   and the sheriff would be seeking indemnification

4   and defense coverage from either ACH or Essex

5   for.

6              (Discussion off the record between

7   the witness and the videographer.)

8              (Defendant's Exhibit 7 marked for

9   identification.)

10       Q  Let me show you Exhibit 7.  If you

11  compare Exhibit 6 and Exhibit 7, is the redacted

12  information at the top of Exhibit 7 the

13  information that's shown in Exhibit 6?

14       A  I would presume so.

15       Q  Do you have any reason to believe

16  it's anything different?

17       A  I would presume so.  I mean, it

18  appears to be.

19       Q  Do you have any reason to believe

20  that the redacted information is privileged in

21  some way?

22       A  No, I don't.

23              MR. FINCH:  David, we would like a

1   privilege log so we can find out -- there are

2   quite a number of these with redactions, and

3   this, I think, illustrates that.

4          MR. HODGE:  If that is it it

5   shouldn't be.  But I think -- I thought I had

6   given you a privilege log, but if I haven't I'll

7   get you one.

8          MR. STEPHENS:  Just for the record,

9   Exhibit 7 is Bates numbered Madison County 0165.

10          MR. HODGE:  But I would agree with

11  you, if that's what it is it was redacted

12  inadvertently.

13          MR. FINCH:  No accusation.  I just

14  would like to be able to double check, as I'm

15  sure you did with mine.

16          A  I would say that they may very well

17  be different, because if you look at the date at

18  the bottom left-hand corner of Exhibit 6, it's

19  6/27/06, and if you look at the date at the

20  bottom left-hand corner of Exhibit 7 it's

21  6/23/06.  So this could very well have been

22  where I, as the lawyer for the sheriff or the

23  County, may have been forwarding this to my

1   client or clients.  I don't know, but there is a

2   distinction between the two documents based on

3   the dates.

4           MR. STEPHENS:  And I would just note

5   on the record while we're on this document, we

6   have searched -- David and I have talked about

7   this, Lane; I don't know that you and I have.

8   We have tried to find, including trying to get

9   our IT person to retrieve the full text of

10  Ms. Nilsson's e-mail to Jeff.  Unfortunately, we

11  can't seem to locate it.  But if anybody else

12  runs across a copy in full, we would appreciate

13  getting it.  I think it is simply a function,

14  based on all the people I can talk to, of the

15  font size being used -- which my eyes, on the

16  one hand are very appreciative of.  But --

17          THE WITNESS:  Well, if you look at 7,

18  Harold, it appears to be attached as the ACH

19  malpractice policy that renews every August

20  flight.  And then our flight.  So it's a

21  hodgepodge of the two.

22          MR. STEPHENS:  Well, exactly.  There

23  are words on 6 that are not on 7 and there are

1   words on 7 that are not 6.  So you can piece

2   together more of it, but we still don't have

3   what it says in its entirety.  So if anybody can

4   find it, that would be great.

5            MR. HODGE:  To answer your question,

6   I will double-check the redactions.  I think --

7   I don't want this on the record.

8            (Discussion off the record.)

9            (Defendant's Exhibit 8 marked for

10  identification.)

11           Q  Exhibit 8 is Bates number CAL4, and

12  it appears to be a letter from you to

13  Dr. Johnson at ACH.  In the middle of the first

14  paragraph it says, I have spoken with your

15  insurance agent in regard to the insurance

16  coverage and provided him with information

17  concerning the coverage that was eventually

18  placed on behalf of the prior proprietor, Health

19  Assurance, LLC.

20           Did I read that correctly?

21           A  Yes.

22           Q  Did you -- who is the insurance agent

23  you're referencing?

1          A   I don't recall.  It must have been

2     ACH's insurance agent at the time.

3          Q   Did you provide him with a copy of

4     the insurance policy for Health Assurance, LLC?

5          A   I don't know what information I'm

6     referring to where it says I provided him with

7     the information concerning the coverage.  I do

8     not know whether I would have provided him the

9     policy or just provided him with information

10    regarding the coverage that Health Assurance

11    could get, but that was not sufficient for the

12    County or the sheriff.

13         Q   The next paragraph you start, as we

14    have discussed, insurance coverage is a matter

15    of significant concern to Madison County and to

16    Sheriff Dorning; is that correct?

17         A   Yes.

18         Q   In this letter did you ask

19    Dr. Johnson for copies of any ACH's insurance

20    policies?

21         A   I asked Dr. Johnson to provide an

22    update in regard to the current status of ACH's

23    insurance coverage and the status of Sheriff

1   Dorning and Madison County as additional

2   insureds on the policy.

3          Q  As part of your request, did you ask

4   for a copy of the policy itself?

5          A  I asked for what the letter says I

6   asked for, and it doesn't specifically say send

7   me a copy of the policy.  In fact, at this time

8   I think they were still attempting to work out

9   with their insurance agent and provider the

10  exact coverage that the County and the sheriff

11  needed and that they had said they would get.

12         Q  In followup to this letter, did you

13  ever ask Dr. Johnson specifically for a copy of

14  the insurance policy?

15         A  I do not know whether I did

16  individually.  We covered --

17         Q  Let me rephrase -- and I apologize.

18  When I say you, you are testifying on behalf of

19  Madison County.  So I will rephrase that.

20         Did Madison County, in followup to

21  this letter, ever ask Dr. Johnson for a copy of

22  the insurance policy?

23         A  Not that I am aware of.  Other than

1   as I previously testified, each time the

2   agreement was renewed there was provision in the

3   agreement that said they were to provide a copy

4   of the policy to the County administrator.

5           (Defendant's Exhibit 9 marked for

6   identification.)

7           Q  Let me show you what I'm marking as

8   Exhibit 9.  Exhibit 9 shows that in July of 2010

9   Advanced Correctional Healthcare sent Sheriff

10  Dorning a certificate of insurance; is that

11  correct?

12          A  That's what this letter purports to

13  show, yes.

14          Q  Did the sheriff share this letter

15  with you?

16          A  I don't know.  In all likelihood,

17  yes, but I can't say specifically.

18          Q  Following receipt of this letter by

19  the sheriff, did Madison County request a copy

20  of any of the policies referenced in the

21  certificate of insurance attached to this

22  letter?

23          A  Not to my knowledge.

1      Q  And it says -- in closing, it says,

2   if there are any questions please feel free to

3   contact me.  And this is this Neil Leuthold that

4   we were discussing earlier; is that right?

5      A  Well, in closing it says if there are

6   any questions please feel free to contact me.

7   We appreciate the opportunity to deliver a high

8   standard of evidence-based, quality, affordable

9   healthcare to the inmates of the county.

10      Q  Thank you.

11          Did, in fact, Madison County ask any

12   questions following this letter?

13      A  I don't know.

14          (Defendant's Exhibit 10 marked for

15   identification.)

16      Q  Let me show you a letter from Markel

17   Claims Service Center which I've marked as

18   Exhibit 10, and ask if you recall receiving

19   this?

20      A  I don't specifically recall receiving

21   it, but I have no reason to think I would not

22   have.

23      Q  That may make my question sound a

1    little silly, but I'll ask it anyway.  Do you

2    recall taking any action in response to

3    receiving this letter?

4         A  My recollection is -- my efforts were

5    to get Advanced and its insurer to agree to

6    defend and indemnify the County and the sheriff

7    in this lawsuit, that there had been a

8    significant delay in responding to the letter to

9    Advanced requesting that they defend it and

10   indemnify it and forward it to -- the complaint

11   to their insurer.  There continued after this

12   letter to be delay in the lawyer who was hired

13   by Essex, or Markel, or whoever hired the

14   lawyer.

15        Q  Who is the lawyer?

16        A  Trey Riley.

17        Q  Trey Ireland?

18        A  Trey Ireland.  I apologize.  Trey

19   Riley is the City attorney.  That's more

20   relevant geographically, so I apologize.

21        Q  I just want to get it right.

22        A  I'm glad you did.  Trey Ireland.

23             And ultimately, because there had

1   been a significant delay and the plaintiff's

2   attorney was impatient about the response, I

3   filed a response to the complaint on behalf of

4   my clients.  Ultimately, Trey Ireland did appear

5   and defend the case.  And Markel or Essex or one

6   of the others reimbursed the County and the

7   sheriff's insurer the fees that they had paid to

8   me to file that response and to deal with the

9   lawsuit up until the point that Essex and Markel

10  agreed to accept responsibility.

11          So yes, there was action taken after

12  this letter, but I don't recall the specific

13  sequence of all that.  I continue to have, I

14  think, communications with Dr. Johnson and Neil

15  Leuthold in regard to trying to get the

16  insurance company's lawyer to get something

17  filed.

18      Q  And does this letter relate to the

19  same Moore action that you were talking about

20  earlier today?

21      A  Yes.

22      Q  And do you see on page 4 of this

23  letter it refers to endorsement number 5?

**Jeff Rich - Madison County  Representative**                    **164**

1            A  Yes, I do.

2            Q  Did you actually read the additional

3     insured endorsement which is laid out at pages 4

4     and 5?

5            A  I don't have a specific recollection

6     of reading it, but I have no reason to doubt

7     that I did read it.

8            Q  If you received this letter you would

9     have read it in its entirety; right?

10           A  In all likelihood, yes.

11           Q  Did you raise any questions or issues

12    with anyone regarding the terms of endorsement

13    number 5?

14           A  Not that I recall.  My goal was to

15    get defense and indemnification for this claim

16    and that's what that appeared to accomplish, and

17    I moved on to the next issue.

18           Q  Were there any other issues, as you

19    say, with respect to the Moore claim after this

20    letter?

21           A  Well, yes, there were a lot of

22    issues.  I couldn't get a response and I had to

23    file a response to the complaint.  And then that

1    had cost money, and the insurance company had to

2    reimburse the cost.  And then I had to continue

3    to monitor it to make sure it was being

4    definitive.  So yes, there were a number of

5    issues after this letter.

6        Q  Were there any issues relative to

7    coverage after this letter?

8        A  Not that I recall.

9        Q  Do you see that item 6 of the

10   endorsement on page 5 of this letter, item

11   number 6 says this insurance shall be excess and

12   noncontributory insurance over any other

13   insurance afforded to the additional insured?

14       A  I do see that.

15       Q  Did you raise any issues with anybody

16   about that particular part of endorsement

17   number 5?

18       A  Mr. Finch, I didn't raise any issues

19   regarding coverage after this letter that I can

20   recall or tell you about . Again, my goal was to

21   get ACH and its insured to provide coverage for

22   this claim, and I viewed this letter as an

23   acknowledgement that that's what they were

1   doing.  Not as excess, not as noncontributory,

2   but simply that they were taking responsibility

3   for the claim.

4          Q  Did you see the letter states that

5   the company reserves all rights under the

6   policy?

7          A  Yes, sir, it says that.  Wouldn't

8   know what that means since I didn't have the

9   policy.

10         Q  Did you ask anybody for a copy of the

11  policy?

12         A  No, sir.

13         (Defendant's Exhibit 11 marked for

14  identification.)

15         Q  Let me show you what I've marked as

16  Exhibit 11.

17         MR. STEPHENS:  Could I note for the

18  record, too, that Exhibit 9 is Bates ACH 1495

19  and 1496, and Exhibit 10 is Bates ACH 1577

20  through 1582.

21         MR. FINCH:  I'll do a better job of

22  that.

23         MR. STEPHENS:  Just so when we read

1    this later.

2         Q   Exhibit 11 is Bates numbered Madison

3    County 1190 through 1191.  This is a series of

4    e-mails; is that correct?

5         A   Yes.

6         Q   And the bottom e-mail from Trey

7    Ireland to you states the adjuster for ACH's

8    Insurance carrier want -- that's what it says --

9    want to talk to the OneBeacon adjuster.  Do you

10   have contact info on that individual I can pass

11   along to them?  Thanks.

12           Did I read that correctly?

13        A   Yes.

14        Q   Prior to receiving this e-mail from

15   Trey Ireland, did you have any discussions with

16   him about why the adjuster for ACH's insurance

17   company wanted to talk with OneBeacon?

18        A   I do not believe so, no.

19        Q   And you responded, I have a call

20   scheduled with OneBeacon Monday morning and I

21   will let the examiner know to expect a call

22   sometime after that.

23           Did I read that correctly?

**Jeff Rich - Madison County  Representative**                    **168**

1          A  Yes.

2          Q  Did you, in fact, have a call with

3     someone at OneBeacon after that e-mail?

4          A  I'm sure I did.

5          Q  Do you recall what you discussed with

6     OneBeacon during that Monday morning call?

7          A  I do not have a specific recollection

8     of what would have been discussed during that

9     call with OneBeacon.  And I suspect, and if I

10    recall correctly, defense counsel was also on

11    that call related to whichever of the underlying

12    lawsuits were pending at that particular time.

13         Q  Do you recall one way or the other if

14    the scheduled call for Monday morning discussed

15    coverage issues, or did it just discuss the

16    defense of whatever case it was?

17         A  I don't have a recollection of the

18    specifics of that call.  I am certain at this

19    point that I did let Barbara McConnell know that

20    Mr. Blue was going to be calling her to talk

21    about the issues of who was responsible for what

22    between the insurance companies.

23         Q  Did you document in any way that

1    discussion, that Monday discussion?

2         A  I don't recall.

3         Q  Was it your habit to make notes of

4    phone calls?

5         A  Not necessarily.

6              (Defendant's Exhibit 12 marked for

7    identification.)

8         Q  Let me show you a series of e-mails

9    that are marked Evanston 1661 though 1664.  This

10   is Exhibit 12.

11             Do you recall that e-mail exchange?

12        A  Yes.

13        Q  The e-mail on page Bates number 1663

14   at the top of that page from you to Barbara

15   McConnel, do you see that one?

16        A  Uh-huh.

17        Q  And you cc'd George Royer.  What was

18   George Royer's role?

19        A  George serves as insurance defense

20   counsel on many of the claims that are defended

21   by OneBeacon under its policy with the County,

22   and I felt like it was important because I took

23   these cases very seriously.  I believe they were

1    serious cases.  And I wanted to make sure that I

2    included him as defense counsel in his

3    discussions.  He also was reporting to Barbara

4    McConnell as the adjuster for OneBeacon, so to

5    me it made sense to have him on that call.

6         Q  Was George's role as defense counsel

7    for Madison County or any of the parties in the

8    Foster matter?

9         A  I don't think Foster was pending at

10   that point in time, was it?

11              MR. HODGE:  I don't think.

12        Q  Well, if you'll look at the e-mail

13   directly below, it says re: Claimants, Whitney

14   Elizabeth Foster?

15        A  Uh-huh.

16        Q  Let me ask a more general question.

17        A  Whitney Foster, I think the lawyer

18   submitted a notice of claim prior to the filing

19   of the lawsuit.  So I would have provided the

20   notice of claim -- which, as you know, under

21   Alabama law is a precursor to a State law claim

22   against a governmental entity -- to ACH and to

23   OneBeacon as well.  So that's probably why it

1    references Foster even though the lawsuit was

2    not pending at that time.

3         Q  So was George Royer's role as defense

4    counsel for Madison County for whatever claim

5    you were discussing, whether it was Foster or

6    one of the others?

7         A  I think we were clearly discussing

8    all of the pending claims at that point in time,

9    whether it was a claim or a lawsuit.  In fact, I

10   think one of the other e-mails actually

11   references having not received a response in

12   regard to two of them, but receiving response of

13   them.  So it was a discussion collectively about

14   all the pending matters.

15        Q  But I am still trying to make sure I

16   understand George Royer's role.  Was that as

17   defense counsel for Madison County?

18        A  George is not involved in the

19   coverage issues.

20        Q  So he's defense counsel?

21        A  But George has been, as have other

22   defense lawyers, aware of the coverage issues,

23   aware of the claims asserted by the County and

1  the sheriff against ACH and Essex.  And I've

2  communicated with them in regard to how those

3  claims might impact or might not impact various

4  underlying cases.

5      Q  What did Madison County tell George

6  Royer about how the coverage issue would impact

7  any of the cases?

8          MR. HODGE:  Object to attorney-client

9  privilege.

10          MR. FINCH:  Well, he brought it up.

11  If he is having discussions with --

12          MR. HODGE:  You asked him why he was

13  on the e-mail, and he answered your question.

14  Answering your question doesn't waive

15  attorney-client privilege.

16          MR. FINCH:  I still think it's

17  relevant and it's not privileged with respect to

18  this suit.

19          MR. HODGE:  I disagree.

20          MR. FINCH:  Well, we'll take it up

21  later if we need to.

22          MR. HODGE:  For my part and yours, I

23  think it's probably much ado about nothing, but

**Jeff Rich - Madison County  Representative**                    **173**

1    I know --

2              MR. FINCH:  Probably.

3              MR. HODGE:  To be perfectly frank.

4              MR. FINCH:  I don't want to belabor

5    it.  But you and I can discuss it later and if

6    necessary issue written questions and handle it

7    like that.

8              Q   (By Mr. Finch:)  Then subsequent to

9    that e-mail there is an e-mail on page Bates

10   numbered 1662 at the top of the page, from

11   Barbara McConnell to you.  It starts off, good

12   morning, Jeff.  Is that correct?

13             A  Yes.

14             Q  She says she spoke with Essex

15   adjuster Jagady Blue; is that correct?

16             A  Yes.

17             Q  What is she telling you he proposed?

18             A  Do you want me to read the e-mail?

19             Q  Yes.

20             A  I spoke with Essex adjuster Jagady

21   Blue.  They are modifying the insurance policy

22   as it was not their intention to have the policy

23   excess over any other policy.  In addition, he

1    proposes a 50/50 split on indemnity under the

2    reservation of rights which he states will not

3    come into play until a verdict is entered.  He

4    also proposes paying 50 percent of our defense

5    cost.  I'm not sure if he will agree to pay 100

6    percent of indemnity and defense, but I welcome

7    your thoughts.

8         Q  What were you thoughts in response to

9    Barbara's e-mail?

10        A  I presume, although I can't -- it's

11   an odd copying sequence in that it has from Jeff

12   Rich, sent Monday, December 22, 2014, 2:18 p.m.

13   at the bottom of Bates Evanston 001661.

14        Q  If you hold on one second we have

15   several -- I would say versions, but they're not

16   really that.  Several e-mail chains that include

17   some or all of each other.  So let me show them

18   all to you and try to get the best information I

19   can.

20            (Defendant's Exhibit 13 marked for

21   identification.)

22        Q  The next one I'm marking is

23   Exhibit 13.  It's Bates numbered Madison County

1    1193 through 1196.

2            MR. FINCH:  And I just noted that

3    these are labelled as confidential.  I'm not

4    sure if any of the others were and I overlooked

5    it.

6            MR. HODGE:  One of them was.

7        Q  I have a couple more, and I'm going

8    to go ahead and give them all to you at once so

9    you can look through them so we can try to get a

10   complete picture of the discussion.

11           (Defendant's Exhibits 14, 15, and 16

12   marked for identification.)

13       Q  The next one I'm marking as

14   Exhibit 14.  It's Bates numbered Madison County

15   1197 through 1202.

16           I am also marking Exhibit 15, which

17   is Bates Madison County 1213 to 1217.

18           To complete the set I am marking

19   Exhibit 16, which is Bates numbered Madison

20   County 1218 through 1223.

21           MR. STEPHENS:  Can we go off the

22   record a minute?

23           THE VIDEOGRAPHER:  It's 2:33.  Going

1    off the record.

2            (Recess taken.)

3            THE VIDEOGRAPHER:  It is 2:48.  We

4    are back on the record.

5    Examination Resumed by Mr. Finch:

6        Q  Okay, Mr. Rich.  During the break I

7    had asked you to look at Exhibits 12 through 16,

8    which are sort of variations on a set of e-mails

9    between you and Barbara McConnell and others

10   regarding the issue of who is going to pay for a

11   defense.  Does that sound like a decent

12   description of what those are?

13       A  Fair enough.

14       Q  That's all I can hope for.

15           Having read those -- and we left off

16   with you had read Barbara McConnell's recitation

17   as the proposal from Essex which was in essence

18   a 50/50 split on indemnity and defense cost, and

19   she asks -- I welcome your thoughts.

20           My question was, what were your

21   thoughts?  And we had given you time to try to

22   look at the e-mails and come up with an answer

23   to that question.

**Jeff Rich - Madison County  Representative**                    **177**

```
1           A   I think the sort of longer e-mail

2    that I sent -- but I am still a little bit

3    confused about some of the dates of -- like, I'm

4    not entirely clear when -- if you look at

5    Exhibit -- I think Exhibit 14 sort of captures

6    most of it.  But my thoughts were that there had

7    been a discussion between the OneBeacon adjuster

8    and Jagady Blue -- who I thought at the time was

9    an adjuster for Essex.  I'm not sure that that's

10   actually what he was -- about working out

11   something.  Because for quite some time I had

12   been, at least in my view, kind of diligently

13   trying to move this issue along to get some

14   resolution of it, and I hadn't had much luck

15   doing that either through Essex or ACH or Trey

16   Ireland.

17           And so this was the culmination -- or

18   these e-mails were the culminations of the

19   discussions.  And at some point I believe there

20   -- at least Barbara McConnell believed there had

21   been a proposal to split the defense cost 50/50

22   or split the indemnification obligations 50/50.

23           And then I think there was
```

**Jeff Rich - Madison County  Representative**                    **178**

1    communication from ACH that that was not the

2    proposed agreement, that the agreement was to

3    split the defense cost, but not to deal with the

4    indemnity issue.

5             And there was never, to my knowledge,

6    a formal written proposal on either one of those

7    discussion topics.  And so I think these are

8    just the e-mails that describe those various

9    communications in my efforts to try to get the

10   necessary folks to the table to talk in

11   substance about how we could move forward at

12   that point.

13        Q  In Exhibit 14 on page Bates numbered

14   1198, there is an e-mail from Jessica Young at

15   ACH dated December 26, 2014, at 11:21 a.m.  Do

16   you see that one?

17        A  Yes.

18        Q  And this discusses this.  Is she one

19   of the people you were trying to get to the

20   table, as you say?

21        A  I think I just was making an effort

22   to get whoever might have involvement with the

23   decision engaged in trying to make a decision

1    because it had been languishing for some time.

2    I had had some discussions, as I mentioned, with

3    Trey Ireland.  He was trying to discuss it with

4    whoever from Essex had assigned defense of ACH

5    to him.  I think I communicated with him because

6    I wasn't having any luck getting communication

7    from ACH about it.

8            Q   Wasn't Trey's role as defense counsel

9    for Madison County?

10           A   No.

11           Q   What was his role?

12           A   At this point he was defending ACH in

13   the underlying lawsuits that were pending.

14           Q   So he was not advising you or Madison

15   County on covering, was he?

16           A   No.  I think I just knew he was

17   somebody with some involvement that had a

18   communication link to the Essex folks and to the

19   ACH folks to communicate to them, hey, Madison

20   County and the sheriff are serious about this,

21   we need to see if there is some way we can get

22   some resolution of this?

23           Q   And in Jessica's e-mail that I

1    referenced just a minute ago, if you'll look at

2    the third paragraph, it recites, apparently,

3    what Mr. Blue had told her.  And then the third

4    sentence that starts, additionally, Mr. Blue.

5    Do you see that one?

6            A  Yes.

7            Q  So that paragraph says that Mr. Blue

8    understood Ms. McConnell was going to clear

9    their agreement with her higher ups and get back

10   to him the week of 12/29/14.

11           Now, I'm not asking you to confirm

12   the accuracy of any of this, I'm just sort of

13   giving you background because I'm going to ask

14   you about that last sentence.

15           He clarified that we are indeed

16   addressing all three cases when addressing

17   coverage, and that once he and Ms. McConnell

18   finalize the agreement a formal coverage letter

19   will be issued in each case.

20           Then it says, additionally, Mr. Blue

21   has also agreed to pay for Madison County to

22   select and hire its own coverage counsel to

23   review the proposal and weigh in on the

1   reservation, as well as evaluate both Markel and

2   OneBeacon's obligations under the contract and

3   our respective policies.

4           Did you -- meaning Madison County --

5   take Mr. Blue up on the offer to pay Madison

6   County to hire coverage counsel to review this

7   proposal to share defense cost?

8           A   That offer was never made.

9           Q   Did you explore with anybody this

10  sentence which makes its appear the offer was

11  made?

12          A   Well, it appears that Mr. Blue and

13  Ms. McConnell had discussions which we agreed

14  to, and we know that they had discussions.  If

15  you read further in Jessica Young's e-mail she

16  says Mr. Blue was asked by Barbara McConnell to

17  outline their agreement in writing as to all

18  three cases so he is currently having coverage

19  counsel get something together ASAP.

20          And then I responded and said I want

21  to review that letter, but -- and then went on

22  in the next e-mail to explain the position that

23  I believe my client's had at that point.  And to

1    my knowledge, after that there was never a

2    letter, quote, outlining Essex's agreement in

3    writing as to all three cases as had been

4    communicated by Jessica Young.

5            Q   Did you have any discussions with

6    your counsel at Maynard Cooper about this

7    proposal?

8                MR. HODGE:   Object to attorney-client

9    communication.

10               (Discussion off the record.)

11           Q   Well, let me -- did Maynard Cooper

12   relay any letters or documents to you that he

13   received regarding this proposal regarding

14   defense costs?

15               MR. HODGE:   Object to the extent it

16   calls for privileged communications.

17           Q   You can answer or not.

18           A   If it's privileged, I'm not going to

19   answer it.

20           Q   Well, if you feel it's not privileged

21   you can answer, and you can also ignore his

22   advice.

23               MR. HODGE:   Most people do.

1           Q  But I don't know what communication

2     there was.  But I'm trying to find out since

3     there was discussion of a forthcoming proposal.

4     Did you receive such a proposal from anybody?

5           A  Do you have a copy of it anywhere?

6           Q  I'm asking if you received a proposal

7     from anybody.

8           A  No, I have not.  Is there a copy of

9     it in existence?  I mean, I am happy to look at

10    it if there is a proposal, but I do not believe

11    I ever received a copy.

12          Q  Was there anything about the

13    OneBeacon policy that you're aware of that gave

14    Madison County the right to final say as to who

15    paid the defense cost?

16          A  I don't understand your question.

17          Q  Well, are you familiar with medical

18    malpractice policies which will give the doctor

19    the ultimate decision as to whether or not the

20    case will settle?

21          A  No.

22          Q  You've never heard of that?

23          A  I've never done medical malpractice,

1    but I know Harold Stephens.

2          Q   I think he will represent to you --

3          MR. FINCH:   (To Mr. Stephens:)

4    What's that called again, that clause?

5          MR. STEPHENS:   Consent to settle.

6          MR. FINCH:   I thought it had a

7    different name as well.

8          Q   Anyway, typically there's a consent

9    to settle clause in medical malpractice policies

10   where the doctor has the ultimate decision of

11   whether or not the case is going to be settled.

12   Just assume for a minute that that is a fair

13   recitation of medical malpractice coverage.  Was

14   there anything in the OneBeacon policy that you

15   are aware of that gave Madison County the

16   ultimate authority on the issue of who was going

17   to pay defense cost?

18          A   No, not that I am aware of.

19          Q   So where Barbara McConnell says she

20   is going to have to discuss the matter with you

21   for --

22          A   Where are you reading that?

23          Q   I'm sorry, page 1197 on Exhibit 14.

1          She says, talking about the proposal,

2     I would have to discuss the matter with you

3     before we would agree to any proposal.

4          Did she ever explain why she felt she

5     had to discuss it with you before she could

6     agree to any proposal?

7          A  Because Madison County was the owner

8     of that insurance policy and had paid for that

9     policy, and agreeing to split the cost or doing

10    something outside the parameters of that policy

11    would be an alteration of the policy provisions,

12    which I presume any insurance company would want

13    to make sure that their insured had agreed to,

14    because they're altering what the policy said.

15         Q  Doesn't OneBeacon have the right to

16    decide if or when or how much to pay in

17    settlement?

18         A  As long as Madison County and the

19    sheriff are invoking their insurance, yes.

20         Q  As long as Madison County and the

21    sheriff are invoking their insurance doesn't

22    OneBeacon also have the duty to defend Madison

23    County and its sheriff?

**Jeff Rich - Madison County  Representative**                    **186**

1        A   Within the provisions of the policy,

2   yes.

3        Q   Is there anything in the OneBeacon

4   policy that you're aware of that says how

5   OneBeacon must fund that defense?

6        A   I haven't reviewed the policy in

7   light of that question, so I don't know.

8        Q   Have you reviewed the OneBeacon

9   policy on the topic of the duty to defend or the

10  payment of defense cost?

11       A   No, not recently enough that I could

12  intelligently or unintelligently answer a

13  question about it.  I have read the policy at

14  some point in time, but not as it relates to

15  this deposition.

16            (Defendant's Exhibit 17 marked for

17  identification.)

18       Q   I'm showing you Exhibit 17, which is

19  an e-mail --

20            Just in case you overlooked those,

21  take a minute to look at them because they

22  relate to the series of e-mails we just finished

23  discussing on the topic of the proposed

1  splitting, sharing, or allocation of defense and

2  indemnity.  If either of those exhibits add or

3  change anything to what we just discussed,

4  please point it out so we can cover that.

5  Otherwise, we'll move on.

6          A  I think these are duplicative of the

7  other ones.

8          Q  Turn your attention to Exhibit 17,

9  which is Bates ACH 395 through 398; correct?

10         A  Correct.

11         Q  Do you recall receiving this letter

12 from Jessica Young?

13         A  Yes.

14         Q  Is this part of a continuing dialogue

15 on the topic of allocation or sharing of defense

16 cost and indemnity?

17         A  Not really.  This was part of a

18 continuing dialogue about the contract for

19 healthcare services, using your terminology.

20         Q  If you look at the second paragraph

21 it says Madison County and ACH's insurance

22 companies have been involved in lengthy

23 discussions since fall 2014 regarding our

1    respective insurance and indemnity obligations.

2         Do you see that?

3         A  Yes.

4         Q  Were you involved in those

5    discussions as well on behalf of Madison County?

6         A  I don't know what discussions she is

7    referring to beyond what's captured in these

8    e-mails and, you know, what we've talked about

9    as far as telephone conferences and such.

10        Q  So this letter does relate to the

11   issue of allocation of defense expenses;

12   correct?

13        A  The letter says what it says.  But

14   the real point of the letter is that the County

15   was in a position that they had a healthcare

16   provider in the jail and a sheriff who didn't

17   have a written contract for that current term.

18   And had -- there had been a proposed contract

19   that had been sent, is my recollection, for

20   Advanced Correctional to sign, and they weren't

21   signing the contract.  And the County was in the

22   position of we need to clarify the relationship

23   through a current contract.  And Ms. Young said

1   we can't sign the contract with the language

2   that's currently in it even though that's the

3   same language that had been in it in years past.

4          So I guess you can fairly say it

5   references the issues with regard to coverage

6   and the defense and indemnification.  But it was

7   really, in my opinion, directed toward the issue

8   of we need to get a contract in place or make

9   other arrangements.

10         Q  Look at the last sentence in

11   paragraph 4.  That says, it was never our

12   intention or understanding that we would be

13   responsible for the negligent acts or omissions

14   of County employees.

15         Did I read that correctly?

16         A  That's what she wrote, yes.

17         Q  Do you agree that it was not the

18   intention or the agreement with ACH for ACH to

19   be responsible for the negligent acts or

20   omissions of County employees?

21         A  I can't agree or disagree as to what

22   ACH's intention was.

23         Q  Let me turn it around.  Was it

**Jeff Rich - Madison County  Representative**                    **190**

1    Madison County's intention that ACH would be

2    responsible for the negligent acts or omissions

3    of County employees?

4         A  It was Madison County's intention

5    that ACH would be responsible for the type of

6    claims asserted that fall within the description

7    of the healthcare services agreement.  Whatever

8    the legal determination of the breadth of that

9    provision is, that's what the County intended.

10        Q  Did the County intend that ACH would

11   be responsible for the negligent acts or

12   omissions of County employees?

13        A  If those types of acts or omissions

14   gave rise to claims that fell within the

15   description contained within the healthcare

16   services agreement, yes.

17        Q  And what was the description that you

18   kept referring to?

19        A  If you give me an agreement, I will

20   read it.

21             MR. FINCH:  (To Mr. Stephens:)  Do

22   you have one?

23             (Defendant's Exhibit 18 marked for

1   identification.)

2          MR. STEPHENS:  I believe, just for

3   everyone's sake, this is the first agreement.

4   It looks like the first agreement I could locate

5   in 2006.  I'm not sure if the relevant language

6   changed any.

7          THE WITNESS:  I don't think it did,

8   but without putting them side by side by side by

9   side, I would be hesitant to say.

10       Q  (By Mr. Finch:)  If you would, look

11   at what we've marked as Exhibit 18 which is the

12   ACH document 301 through 321.  It is July 6,

13   2006, healthcare services agreement at the

14   Madison County detention facility.

15       A  All right.

16       Q  You said that Madison County expected

17   ACH to be responsible for the negligent acts or

18   omissions of County employees in circumstances

19   that are referenced in the agreement.  Where are

20   those circumstances referenced in the agreement?

21       A  To the extent those claims would be

22   claims that arise out of the course and scope of

23   the agreement as stated in paragraph 6(B),

1    Madison County would expect ACH and its insurer

2    to be responsible.

3             MR. STEPHENS:  Bates number on the

4    agreement?

5             MR. FINCH:  301 through 321, and he

6    is referencing page 302 through 303.

7         Q  Is the indemnification requirement

8    set out in paragraph 6(D) starting at page 303

9    in this document?

10        A  Yes.

11        Q  And is the insurance requirement

12   broader than the indemnification requirement in

13   Madison County's opinion?

14        A  I'm not sure.

15        Q  From Madison County's perspective was

16   the insurance requirement intended to be broader

17   than the indemnification provision?

18            MR. HODGE:  Object to the form.

19        Q  Or were they intended to essentially

20   coincide?

21        A  I'm not sure.

22        Q  Did you help negotiate this on behalf

23   of the County?

1          A  Yes.

2          Q  Going back to Exhibit 17 which is a

3     letter from Jessica Young to you, if you look at

4     the 6th paragraph.

5          A  Okay.

6          Q  The third sentence says, ACH will

7     indemnify Madison County if Madison County is

8     drawn into a lawsuit because of ACH's

9     negligence.

10          Do you see that?

11          A  Yes.

12          Q  Isn't that what was required under

13     the ACH indemnification clause?

14          A  No.  The indemnification clause is

15     broader than that.

16          Q  And if you turn to Exhibit 18, where

17     in the Exhibit 18 does it show that ACH is

18     required to indemnify Madison County for

19     something other than or in addition to ACH's

20     negligence?

21          A  The language of paragraph 6(D).  It's

22     clear that it's beyond just the level of

23     negligence.  Any act or omission of ACH, its

1    agents, its servants, its employees, related in

2    any way to or while in the performance of the

3    agreement any allegation of any act or omission,

4    conduct or misconduct, of ACH, its agents, its

5    servants, or its employees, not including the

6    paragraph above, and for which the County, the

7    sheriff, or their agents, servants, or employees

8    are alleged to be liable in any allegation of

9    employment discrimination by an ACH employee.

10        Q   Item number 1 of that paragraph, it

11   says acts or omissions of ACH, its agents,

12   servants, or employees related in any way to or

13   while in performance of this agreement.

14            The agreement requires ACH to provide

15   medical care to detainees; is that correct?

16        A   It requires ACH to provide medical

17   care to both inmates and -- I make a distinction

18   between pretrial detainees and inmates.  But any

19   resident.

20        Q   Well, I'm trying not to make -- maybe

21   I was misinformed as to the politically correct

22   term for people in the County jail.

23        A   I don't know that there is one.

**Jeff Rich - Madison County  Representative**                    **195**

1   Folks in the jail, yes, they were required to

2   provide healthcare services to folks in the

3   jail.

4           Q  Let's just call them all inmates,

5   okay, whether they're a pretrail detainee or

6   they've actually been sentences.

7           A  That's fine.  I think that's what's

8   referred to in the agreement.

9           Q  So medical care to inmates.  What

10  else did the agreement require ACH to provide to

11  Madison County?  And I'm not talking about

12  minute details.  You can just give me lay terms.

13  Beyond medical care, which is what would seem to

14  me to be the obvious main point of this.  What

15  other services were to be provided by ACH?

16          A  Well, if you draw a distinction

17  between medical care and dental care, the

18  agreement provided for dental care, it provided

19  for the development and implementation of

20  policies.

21          Q  What type of policies?

22          A  Policies related to a comprehensive

23  healthcare services system at the detention

1   facility.

2        Q  What does that mean, comprehensive

3   healthcare services system?

4        A  It means making sure those folks

5   receive constitutionally adequate medical

6   attention, in my opinion.

7            This agreement was drafted as

8   comprehensively as it could be.  It also

9   incorporated prior federal court consent decrees

10  that the jail operated under, and this came

11  relatively close on the heels of those consent

12  decrees.  And a large part of the underlying

13  class action litigation that was initiated in

14  1978 and had been pending and remains pending

15  related to healthcare provided to inmates in the

16  detention facility, so healthcare was, at least

17  from my perspective, front and center.  I think

18  Judge Clemon was still on the bench in 2006, and

19  I didn't relish going back before Judge Clemon

20  trying to justify why an inmate might or might

21  not have been provided what Judge Clemon deemed

22  as constitutionally adequate healthcare.

23            Q  Was ACH required to provide

1    prescription medicine?

2         A  Yes.

3         Q  Was it required to provide what I

4    would call medical supplies, everything from

5    Band-Aids to ointments and creams?

6         A  I think the scope of services in

7    paragraph 3 is a fair description --

8         Q  What page?

9         A  Page 1 --- of what they were required

10   to provide.

11            But they were the healthcare provider

12   for inmates in the jail from top to bottom.

13   Coordination of outside medical care services,

14   diagnostic services, pharmaceutical services,

15   rental services, OB-GYN services.

16         Q  So the scope of services -- I

17   apologize for my oversight -- that is laid out

18   in paragraph 3, which is on the page that's

19   Bates numbered 301 and 302; is that correct?

20         A  Well, that's a general description of

21   the scope of services.  But in order to

22   definitively state or define everything that is

23   required -- and I think you have to read this

1    agreement in conjunction with the orders entered

2    in the class action inmate conditions case,

3    which are referenced in paragraph F on page 4 --

4    that would be paragraph 6(F) on page 4.

5    Paragraph 6(E), which requires that services be

6    provided in substantial compliance with the

7    National Commission on Correctional Healthcare,

8    which is a national organization that sets

9    standards for healthcare in detention

10   facilities.

11          And I think -- I can't fairly give

12   you a nutshell description of the scope of

13   services when there are some 20-plus pages plus

14   all of the consent decrees that outline really

15   the obligations of the provider.

16        Q  Well, not all 20 pages outline the

17   obligations with respect to the services; right?

18        A  The majority of it does.

19        Q  You've got copayment information,

20   you've got --

21        A  And the copay, they were required --

22        Q  -- transportation, reporting.

23        A  Those are all requirements of

1    Advanced Correctional.

2         Q  What training was ACH required to

3    provide for County personnel?

4         A  There was -- throughout the

5    relationship there were various -- you know, I

6    think from formal sort of training sessions, I

7    think they provided CPR training to some of the

8    officers, or all the officers.

9            There were what they call -- oh,

10   goodness, gracious.  It's references in here,

11   but they were basically quality control meetings

12   that were quarterly or on some regular time

13   interval where the healthcare staff met with the

14   correctional staff and the leadership of the

15   jail.

16           And I was in some of those

17   meetings -- more in regard to issues related to

18   the consent degree than anything -- where there

19   was training that was offered on recordkeeping,

20   training that was offered on cleanliness

21   standards.  I remember there was an outbreak of

22   staph, maybe, at some point in the jail.  And,

23   of course, the healthcare staff was very

1    concerned about that, as was the correctional

2    staff, and there was training given on

3    appropriate cleaning methodology and cleaning

4    supplies, and things of that nature.

5           So as part of their ongoing

6    obligations and responsibilities in the jail

7    there was a -- at least from my perspective --

8    there was a good deal of interaction with the

9    healthcare staff and the correctional staff in

10   regard to various things that the healthcare

11   staff provided training or instruction or

12   direction to the correctional staff.

13        Q  Well, I am trying to figure out in

14   this agreement, where does it set out training

15   requirements?

16        A  I don't know if it's specifically

17   identified or not.  I know it occurred as I've

18   described, and I thought that's what you asked.

19        Q  I did ask that, but I was wondering

20   if it was in the ACH agreement, or if it was

21   just something that occurred during the life of

22   the contract?

23        A  It seems to me that it is also

1   included in the policies and procedures that ACH

2   developed for the operation of the jail.  But I

3   haven't reviewed those in quite some time, so I

4   can't direct you to anything particular.  But my

5   recollection is in their policy manual there was

6   some provisions that related to training or

7   cross training with the correctional staff.

8        Q   Does the ACH agreement require ACH to

9   create a policy manual?

10        A   I believe it did.

11        Q   Where is that in here?

12        MR. HODGE:  Lane, if you're really

13   looking for it, do you want me to point it out?

14        MR. FINCH:  Sure.  It's not a test.

15        A   ACH will provide -- it's paragraph C,

16   page 3.  ACH will provide a healthcare system,

17   including written policies and procedures

18   specifically designed and tailored for the

19   operation of the detention facility.  ACH will

20   participate in required meetings with Health

21   Assurance, LLC, representatives and the

22   sheriff's staff to ensure orderly transition of

23   healthcare service.

1             For the express purpose of educating

2    and training regarding any request of changes to

3    policies and procedures, ACH will be required to

4    provide the sheriff with a written transition

5    plan and a policy and procedure manual

6    specifically designed for use in the detention

7    facility to be used upon transition.

8             And throughout the years the policy

9    manual would have changed in part based on

10   changes in the configuration of the facility.

11   The facility was at one point in time housed in

12   two floors of the courthouse and a jail annex

13   which consisted of three or four metal buildings

14   that had been converted into dormitory size or

15   dormitory style housing.  The jail transitioned

16   to the current facility that it's in that was

17   built by the City of Huntsville and is operated

18   by the sheriff, and so those multiple facilities

19   were consolidated into one facility.

20             MR. HODGE:  There's the training

21   part.

22        A   Then you had asked about whether the

23   agreement specifically required training.  At

**Jeff Rich - Madison County  Representative**                              **203**

1   page 6 of the agreement, providing consultation

2   services to the sheriff and director of

3   corrections on any and all aspects of the

4   healthcare delivery system at the detention

5   facility, including, but not limited to, a

6   comprehensive strategic plan.  Site specific

7   policies, procedures, and protocol peer review,

8   introductory in-service training for

9   correctional officers with regard to assessing

10  inmate healthcare services, continuos quality

11  improvement, cost containment and equalization

12  management, risk management programs, HIPAA and

13  NCCHC compliance programs specific to the

14  detention facility's medical operations.

15       Q  It says introductory in-service

16  training for correctional officers; correct?

17       A  With regard to accessing inmate

18  healthcare services.

19       Q  Who provided the in-service training

20  beyond the introductory training?

21       A  Correctional officers attend what I

22  would describe as in-house.  I think they call

23  it something different.  But the sheriff has

1   training officers here on staff that provide

2   training to correctional officers.  And

3   supervisory personnel are provided from time to

4   time access to training through third-party

5   providers through the National Correctional

6   Association and others.

7        Q  So if I want to find out what

8   training the sheriff's department provided the

9   correctional officers, there is a group within

10  the sheriff's department called training

11  officers?

12       A  I don't know that that is what they

13  call them.  But there is a group --

14       Q  Is that what you call them?

15       A  There is a group within the sheriff's

16  department or an individual who is responsible

17  for continuous training.

18       Q  Does that training include inmate

19  health issues?

20       A  I don't know.  You would have to ask

21  the sheriff and/or the persons responsible for

22  training.

23       Q  Do you know anything about the scope

1    of that training done by the sheriff's

2    department?

3         A  Nothing more than what I've already

4    told you.

5         Q  I appreciate your time, Mr. Rich.  I

6    will turn it over to counsel for ACH.

7    EXAMINATION BY MR. STEPHENS:

8         Q  I'm going to start by just following

9    up on some questions you were just asked by

10   Mr. Finch.  So pardon me if I jump around, but I

11   just want to go through these pretty quickly.

12            In talking about your background you

13   mentioned general litigation and patent

14   litigation.  When you were in private practice

15   did you litigate or handle any insurance

16   coverage disputes?

17         A  Yes, I did.

18         Q  Frequently or infrequently?

19         A  Relatively infrequently.

20         Q  Do you have any published opinions

21   that deal with insurance coverage or insurance

22   disputes?

23         A  I believe so.  Tennent Lee and I

1    litigated a coverage case in Marshall County

2    that I think resulted in a published opinion.

3         Q  Do you recall the name of the

4    insurer?

5         A  I recall that I was a young lawyer

6    when that happened, and that's about it.  I

7    don't remember the parties names.  It was, I

8    think, pollution coverage, maybe.

9         Q  Early on you were asked some

10   questions about the lawsuits encompassed by the

11   complaint we're here about:  Woods, Listau,

12   Jefferson, Davis, and Foster.  Does that cover

13   the universe?

14        A  I think so.

15        Q  Have you seen an order in the Davis

16   case with regard to the County's motion to

17   dismiss?

18        A  I think I reviewed that quickly at a

19   break after I was asked some questions about the

20   meaning of language in the order.  But I hadn't

21   seen the order, so I think I did review it

22   earlier today quickly during a break.

23        Q  I know there's been some discussion,

**Jeff Rich - Madison County  Representative**                    **207**

1   and a couple of them are in front of you and we

2   will get the other ones to fill out the list.

3   But have you performed any kind of particular

4   analysis in the underlying lawsuits -- Woods,

5   Listau, Jefferson, Davis, and Foster -- as to

6   the claims that are made and who those claims

7   are made against?

8          A  Yes.

9          Q  Do you agree that in most -- and

10  we'll go through them individually later.  But

11  do you agree in most of the complaints in those

12  underlying cases, count 2 is for a medical

13  malpractice claim only against ACH,

14  Dr. Williams, and/or ACH employees?

15          MR. HODGE:  Object to form.

16          A  I have no reason to dispute what

17  you're telling me, but I don't know without

18  looking at each complaint what count 2 is or

19  isn't.  I know, I think, in some of the

20  complaints that were malpractice claims, and

21  some of them they're not.  I have litigated with

22  Hank Sherrod a lot throughout the years.  There

23  have been times when he's brought a strictly

1   1983 claim arising out of healthcare and has not

2   included the State law malpractice claim.  And

3   so I can't in my mind distinguish those at this

4   point without having them before me.

5        Q  Can we agree that to the extent a

6   claim is only asserted against ACH,

7   Dr. Williams, or ACH nurses or employees, that

8   is not a claim for which Madison County and/or

9   the sheriff is seeking defense indemnity?

10       A  My hesitancy is because the claims,

11  as you know, I think are pled so that each

12  complaint -- I mean, each count in the complaint

13  incorporates and references every other

14  paragraph previously identified in the

15  complaint.  And that although it doesn't

16  logically seem to follow that the County is

17  seeking defense indemnification for claims that

18  aren't asserted against the County or the

19  sheriff, I think it is -- and I've used the word

20  before, intertwined, because I don't know how to

21  be any more articulate than that -- that the

22  complaints allege the County's derivative

23  liability based on the malpractice.

1          In other words, the allegations of

2    the complaint are such that the malpractice

3    would not occur or would not have occurred

4    unless the County and ACH had somehow agreed to

5    not adequately fund the healthcare.  The alleged

6    malpractice is the result of some agreement or

7    conspiracy to not adequately fund.

8          So although there's not a claim for

9    indemnification or defense for claims that

10   aren't asserted against the County, they are

11   interrelated enough that the malpractice is tied

12   to the funding claim.

13        Q  Let's just look at a couple of

14   specific examples.  And it really is not a

15   memory test.

16        The Jefferson complaint is Exhibit 3.

17   Look at count 2 in the Jefferson complaint.

18        A  All right.

19        Q  It's for a claim of negligence or

20   wantonness, as it describes it, I believe; is

21   that correct?

22        A  That's what it's titled as, count 2

23   negligence, wantonness.

1        Q   Take your time and read through the

2   paragraph subsequent to that.  But do you see

3   that that claim only references ACH and ACH

4   employees?

5        A   I don't know that I can agree with

6   you that it only references ACH employees, and

7   here's why.  The allegation that the standard of

8   care applicable to inmates -- the individual ACH

9   defendants and unknown ACH employees involved

10  with Jefferson's care owed the duty to Jefferson

11  to meet the standard of care applicable to

12  inmates or to make sure those under the

13  supervision were trained adequately.

14           And the reason I hesitate is those

15  under the supervision were trained adequately.

16  And what the drafter of this complaint intended

17  by that phrase, I don't know.  I can foresee a

18  situation where a healthcare provider asks a

19  correctional officer to go retrieve an inmate.

20  And that would be a level of supervision that

21  they are asking them to retrieve an inmate.  So

22  I don't know if that sentence would refer to

23  someone that is not an ACH employee or not.

1          Q   Are there any correctional officers

2    named as individual defendants in the Jefferson

3    case?

4          A   Steve Morrison is named as an

5    individual defendant in the Jefferson case.  And

6    Steve Morrison was the jail administrator of the

7    detention facility.

8          Q   So just to follow --

9          A   He's not a line correctional officer.

10         Q   So do you agree there are not any

11   individual correctional officers named as

12   defendants in what appears to be -- what is

13   that, the second amended complaint or first --

14         A   First amended complaint.

15         Q   So the first amended complaint in

16   Jefferson does not name individual correctional

17   officers as you are looking at it now; fair

18   enough?

19         A   It does not name individual, what I

20   would deem line officers who are in the weeds

21   every day, you know, dealing with inmates.  To

22   the extent that Steve Morrison is a correctional

23   officer, it names Steve Morrison.

1          Q   What was his title or position at the

2     jail?

3          A   His title was jail administrator.

4          Q   So he's the jail administrator.

5     Sheriff Dorning is named as a defendant in the

6     Jefferson lawsuit; correct?

7          A   Correct.

8          Q   And Madison County is named as a

9     defendant in the Jefferson lawsuit; correct?

10         A   Correct.

11         Q   So look back at the count that we

12    were on, count 2, and read to me, if you would,

13    the parties that are described in the first

14    paragraph under count 2, just the names of the

15    parties that are listed there.

16         A   The individual ACH defendants and

17    unknown ACH employees involved with Jefferson's

18    care owe the duty to Jefferson.

19         Q   So can we agree that Sheriff Dorning

20    is not identified there?

21         A   Yes.

22         Q   And take your time to read through.

23    But does Sheriff Dorning's name appear anywhere

**Jeff Rich - Madison County  Representative**                     **213**

1    under count 2 in the Jefferson complaint?

2           A   Not that I see.

3           Q   Can we agree that Mr. Morrison as

4    jail administrator is not named in count 2 and

5    his name does not appear in count 2 of the

6    Jefferson complaint?

7           A   We can agree that his name does not

8    appear in count 2 of the Jefferson first amended

9    complaint.  But I don't know that I can sit here

10   today as the representative for Madison County

11   and agree that whoever drafted this complaint

12   did not intend for Steve Morrison to be one of

13   the people who's described as being under the

14   supervision of ACH for purposes of --

15          Q   So is it your testimony that Steve

16   Morrison as the jail administrator at the

17   Madison County jail was under the supervision of

18   anyone at ACH?  If so, tell me who that person

19   was.

20          A   I wouldn't know.  My testimony is

21   that the healthcare staff and the correctional

22   staff, including Steve Morrison, who is deceased

23   at this point, operate in conjunction with each

1   other each and every day.  And with the goal,

2   hopefully, of taking care of inmates and

3   providing healthcare.  And if ACH asks an

4   officer -- whether it's Steve Morrison or

5   somebody else -- to do something with respect to

6   the healthcare of an inmate, that officer is

7   likely going to do that.

8            Now, whether that would be

9   encompassed in the term supervision or not, I

10  can't tell you.  I'm not telling you that Steve

11  Morrison sitting here today would have said he

12  work for ACH.  That's not what I'm saying.  It's

13  the word supervision and what that means that

14  causes me some pause.  His name is not in this

15  count.  His name is not identified as having

16  done something with respect to providing

17  healthcare, particularly for Jefferson.  But I

18  am hesitant because of the word supervision, and

19  just the common occurrence of the healthcare

20  staff asking for officers to assist them and

21  vice versa.

22       Q  Was Steve Morrison an employee of

23  ACH?

1          A   No.

2          Q   Are you aware of any written

3     employment agreement between ACH and Steve

4     Morrison?

5          A   No.

6          Q   Are you aware of any written

7     agreement that gave ACH or any of its employees

8     the ability to supervise or direct Steve

9     Morrison's conduct?

10         A   The healthcare services agreement has

11    provisions that we talked about earlier with

12    respect to training, with respect to the

13    interaction between the officers and Advanced

14    Correctional.  And to the extent that such a

15    written agreement would exist, I believe that

16    would be it.  I'm not aware of any other written

17    agreement that would identify Steve Morrison's

18    role with respect to ACH's daily function in the

19    facility.

20         Q   Did anyone at ACH tell Steve Morrison

21    what time to come to work?

22         A   I don't know.

23         Q   Did anyone at ACH tell Steve Morrison

1     what time to leave his job?

2          A  I don't know.

3          Q  Did anyone, to your knowledge, at ACH

4     have any supervisory responsibility as confirmed

5     in writing over Mr. Steve Morrison?

6          A  Nothing other than if it's in the

7     healthcare services agreement.

8          Q  And can we agree that Madison County

9     is not mentioned by name in count 2 of the

10    Jefferson complaint?

11         A  Yes.

12         Q  Can we agree as a basic legal

13    principal that a party would not have standing

14    to assert defense or indemnity with regard to a

15    claim which has not been made against that

16    party?

17         A  Yes.

18         Q  So look at Exhibit 4, which is the

19    Foster complaint, under count 3, which is

20    entitled negligence medical malpractice, I

21    believe; is that correct?

22         A  Negligent medical malpractice.

23         Q  Take just a minute and read through

**Jeff Rich - Madison County  Representative**                    **217**

1     that.

2              Just for the record, is this the

3     first amended complaint in Foster, so we all

4     know what we're looking at?

5          A  Yes.

6              Okay.  And I would ask after this

7     line of questioning, I need to take a quick

8     break, please.

9          Q  We can take one right now if you want

10    to.

11         A  I don't mean to interrupt your

12    questions, so go ahead.

13         Q  I'll be real quick.

14             So the named parties under count 3

15    for medical malpractice, could you just read the

16    first sentence?

17         A  Cause of action is asserted against

18    ACH, Dr. Williams, and the nurses.

19         Q  So is there any indication that this

20    claim is made against Madison County?

21         A  Not in count 3.

22         Q  Is there any indication that count 3

23    is made against Sheriff Dorning?

1         A   No.

2         Q   Any indication that count 3 is made

3    against Mr. Morrison?

4         A   No.

5         Q   Any indication that count 3 is made

6    against any individual correction offices?

7         A   No.

8            MR. STEPHENS:  Let's take a break.

9            THE VIDEOGRAPHER:  It is 3:48.  Going

10   off the record.

11            (Recess taken.)

12            THE VIDEOGRAPHER:  It is 4:00 p.m.

13   We are back on the record.

14   Examination Resumed by Mr. Stephens:

15        Q   Let's look back at the Jefferson

16   complaint, which is Exhibit 3, first amended

17   complaint.  Look at paragraph 68, if you would.

18   Could you read that paragraph for us?

19        A   The failure and refusal to

20   investigate serious incidents is a more general

21   practice of Dorning who has refused to

22   investigate serious allegations against his

23   deputies as reflected by the public comments of

1    Dorning's chief deputy regarding the revenge

2    beating of Robert Bryant, see AL.com article

3    attached as Exhibit 4.

4         Q  I'm sorry, that's a longer paragraph

5    than I thought it was.  I was really looking

6    more at 69.  But while we are on that paragraph,

7    the only person or defendant that is mentioned

8    in paragraph 68 is Sheriff Dorning; is that

9    correct?

10         A  Correct.

11         Q  Paragraph 69, I think just generally

12   says Sheriff Dorning has failed to investigate

13   death claims, or something to that effect; is

14   that correct?

15         A  Failed to investigate serious

16   allegations against those he supervises whether

17   it's law enforcement officers or correctional

18   officers.

19         Q  And let me just note for the record I

20   am not suggesting or in any way insinuating that

21   any of the allegations in the underlying

22   complaints are true in the least, and I know

23   that on behalf of the County you would dispute

1   many of the allegations that we are here looking

2   at and talking about.

3           But again, paragraph 69 only refers

4   to Sheriff Dorning; is that correct?

5           A  By name, yes.

6           Q  As far as the parties to the lawsuit.

7   He is the only named party in paragraph 69;

8   correct?

9           A  Correct.

10          Q  Look at paragraph 72.  Who is named

11   in that paragraph in the complaint?

12          A  There was no investigation of the

13   death of Jean by Dorning or his designee.

14          Q  Among the named defendants in the

15   case, again, only Sheriff Dorning is named;

16   correct?

17          A  Correct.

18          Q  Is the same true -- and you can look

19   briefly at paragraph 74 and 76.  Is the same

20   true with those paragraphs as is 72?

21          A  Yes.  I'm sorry, 76 includes a

22   reference to --

23          Q  I'm sorry, 74.

1           A   74 only references by name Sheriff

2      Dorning.   76 references by name Sheriff Dorning

3      and Steve Morrison.   And I believe Morrison was

4      a defendant in the Jefferson case, but I -- yes,

5      he was.

6           Q   We can agree that looking at

7      Exhibit 3, the Jefferson complaint, paragraphs

8      68, 69, 72, 74, and 76 made no reference

9      whatsoever to ACH, Dr. Williams, or any of the

10     ACH nurses or employees; true?

11          A   I agree.

12          Q   Turn if you would back to paragraph

13     135.   And Mr. Finch asked you some questions --

14     I promise I won't repeat those, but I just want

15     to cover a couple of things in paragraph 135.

16             And let me sort of follow up on this,

17     too, Mr. Rich.   You made the allegation -- and I

18     understand where that's coming from, and I don't

19     disagree with you at all -- that this is alleged

20     throughout the underlying lawsuits of this

21     purported conspiracy which I deny existed and I

22     know you deny exist -- but this proposed

23     conspiracy about cost saving and cost cutting.

1   But there is also in each of the underlying

2   cases a very simple standalone allegation

3   against Madison County that Madison County did

4   not adequately fund healthcare at the Madison

5   County jail.  True?

6           A  I mean, there is an allegation in

7   paragraph 135 that Madison County failed to

8   adequately fund medical care.  It does not

9   describe the particulars of how that happened,

10  and even in the order that you referenced

11  earlier by Judge Kallon, I think he equates the

12  failure to fund allegation with the agreement --

13  alleged agreement -- to incentivize ACH not to

14  expend the money that was available to be spent

15  that had been approved as part of the contract.

16          So ACH set the contract price, ACH

17  told the sheriff and the County how much it

18  would cost to provide the level of healthcare

19  that they committed to, and the County provided

20  that funding plus additional funding when

21  required.

22          So I don't know that I can agree that

23  it's a fair statement to say that there is a

1  standalone discrete Madison County simply didn't

2  fund the jail allegation in each of the

3  complaints, especially in light of Judge

4  Calone's determination in that order that that

5  is the equivalent, for purposes of what he

6  looked at, to some agreement to incentivize ACH

7  not to spend money that it was being paid.  I

8  don't know how to distinguish between those two.

9        Q  Read the first portion of paragraph

10  135 in the Jefferson complaint, if you would.

11        A  Defendant Madison County

12  intentionally refused to adequately fund medical

13  care as described above with deliberate

14  indifference to the serious medical needs of

15  inmates such as Jefferson, had a policy of not

16  adequately --

17        Q  Stop, stop, stop.  A, you're going

18  too fast for the court reporter.

19        A  I know, I thought about that as I was

20  doing it.

21        Q  But B, I only wanted you to get to

22  the comma after Jefferson, it sort of starts

23  another thought after that.

1           The first portion of paragraph 135

2     says Madison County failed to adequately fund

3     the healthcare at the jail; correct?

4        A  It says defendant Madison County

5     intentionally refused to adequately fund medical

6     care as described above.

7           And there are 134 paragraphs above

8     that I guess we would have to read to determine

9     what that means.

10       Q  So let me ask you to assume

11    hypothetically, if Madison County and Madison

12    County alone were sued as a defendant, and the

13    only allegation was the sentence that you just

14    read that Madison County had not provided

15    adequate funding for the jail, do you believe

16    that that is a claim which ACH should defend and

17    indemnify Madison County for?

18          MR. HODGE:  Object to the form.

19       A  I don't know.  Based on that limited

20    hypothetical, I don't know.

21       Q  You mentioned the potential impact on

22    the County's insurance rating.  But you would

23    acknowledge -- in fact, I think you said in

1    response to Mr. Finch's questions that a lot of

2    different things, including national trends,

3    could have an impact on insurance premiums;

4    right?

5         A  That's correct.

6         Q  I mean, we all know health insurance

7    premiums have gone up for most of us recently;

8    right?

9         A  Correct.

10        Q  When was the Bryant case settled?

11        A  I don't recall.  If you have a date,

12   I'll agree with you because I don't really

13   remember.

14        Q  Honestly, I don't know either.  I'm

15   just going to say sometime probably after 2012,

16   but before 2014, maybe somewhere in that

17   timeframe, ballpark?

18        A  Probably.

19        Q  The date is what it is.  It's not

20   really that significant.  But it's my

21   understanding from -- and let me say, too, I

22   don't want you to disclose anything that is

23   confidential, but I think this has been widely

1    publicized and I think it's referenced in the

2    Jefferson complaint that is attached to that, I

3    think.

4             The Bryant matter was resolved with a

5    payment of approximately $625,000; is that

6    correct?

7             A   I believe that's the number.

8             Q   And that was a claim in which several

9    Madison County deputies had allegedly assaulted

10   a private citizen; is that correct?

11            A   Correct.

12            Q   And is that the largest payment that

13   would have been made in the last three to five

14   years on behalf of the County?  And if you can't

15   tell me that without violating some kind of

16   confidentiality provision, don't answer that

17   question.

18            A   That's the largest claim that has

19   been paid by Madison County or its insurer in my

20   26 years of representing Madison County.

21            Q   And ACH had nothing to do with that

22   case?

23            A   True.

1          Q   That was not a medical malpractice

2     case; correct?

3          A   That's correct.

4          Q   That was not a healthcare related

5     claim; correct?

6          A   Correct.

7          Q   That was not a claim that arose in

8     the course or scope of the healthcare services

9     agreement with ACH?

10          A   Correct.

11          Q   And Madison County nor the sheriff

12     ever made any demands for defense or indemnity

13     with regard to the Bryant matter against ACH;

14     correct?

15          A   Correct.

16          MR. HODGE:  He wasn't an inmate.

17          MR. STEPHENS:  Right.

18          THE WITNESS:  He actually was booked

19     into the facility, I think, afterwards.  But he

20     was not an inmate at the time of the events

21     giving rise to his complaint.

22          Q   Just so I am clear, is it Madison

23     County's position that if a correctional officer

**Jeff Rich - Madison County  Representative**                    **228**

1   employed by the sheriff knew of a serious

2   medical condition -- and I'll just use as an

3   example, went to a cell and saw an inmate had a

4   wound that was bleeding profusely, and the

5   correctional officer did absolutely nothing

6   about that, called that to no one's attention,

7   did not alert any ACH doctor, nurse, or

8   employee, and there was a death, would Madison

9   County's position be that that is a claim that

10  should be defended and indemnified by ACH?

11          A   Possibly.

12          Q   And tell me under what theory.

13          A   If ACH was contractually obligated to

14  train that officer on recognizing healthcare

15  related issues and the practices and procedures

16  for accessing healthcare within the facility,

17  and they failed to train that employee to do so,

18  then it is possible that a claim could be

19  asserted.

20          Q   Take that same hypothetical, but

21  instead of finding the inmate, as we agreed to

22  describe the person, bleeding, I want you to

23  assume hypothetically that a correctional

1  officer employed by the Madison County sheriff

2  went into a cell and physically assaulted an

3  inmate and caused such harm to the inmate that

4  the inmate died and a wrongful death claim was

5  filed, is that a claim for which Madison County

6  would seek defense and indemnity against ACH?

7          A  On those facts standing alone, no.

8          Q  Am I correct that at no time from

9  July 2006 until sometime in 2014 -- well, let me

10 just say until June 2015, which would have been

11 the end of the ACH agreement, as I understand

12 it.  At any time from July 2006 until June 2015,

13 did you personally ever contact anyone at ACH to

14 request a copy of the relevant insurance policy?

15         A  I cannot say with certainty that I

16 didn't, but I have no recollection of doing

17 that.

18         Q  The County administrator changed at

19 some point in time.  Howard Bates was the County

20 administrator for a long time; correct?

21         A  Yes.

22         Q  And then who placed him?

23         A  Kevin Jones.

1          Q  To your knowledge, did Mr. Jones or

2    Mr. Bates at any time from July 2006 until

3    June 2015 ever contact anyone at ACH to request

4    a copy of the relevant insurance policy?

5          A  No.

6          Q  To your knowledge, did Sheriff

7    Dorning ever do so?

8          A  No.

9          Q  I know your said in response to some

10   of Mr. Finch's questions about your

11   communications with Mr. Craig Herr at J. Smith

12   Lanier -- did you personally ever make a request

13   of Mr. Herr that he contact Essex Insurance

14   Company with regard to any of the underlying

15   cases?

16         A  No.

17         Q  You had some communication we saw

18   early on in some of the letters.  You had some

19   communication with -- I am going to refer to him

20   now as ACH's insurance agent or representative

21   up in Illinois -- early on about the insurance

22   coverage issue; right?

23         A  I had some communication with someone

1   associated with their insurance agent as

2   referenced in the letter that Mr. Finch showed

3   me.  I don't have an independent recollection of

4   that.

5        Q  Do you ever recall contacting whoever

6   that person was upon the filing of the lawsuits

7   in Listau, Woods, Jefferson, Foster, or Davis to

8   report those filings directly to that person?

9        A  No.  They were reported directly to

10  ACH.  And then ACH's outside lawyer, Peter

11  Genatone was involved at various times on

12  various claims.  But he would have been the only

13  person, to my knowledge, outside the corporate

14  structure of ACH that I would have communicated

15  with regarding any claim in the past related to

16  ACH and the sheriff in the County.

17       Q  Certainly at the time of the filing

18  of the Woods, Listau, Jefferson, Foster, and

19  Davis cases, Madison County would have had in

20  its possession a number of certificates of

21  insurance identifying Essex Insurance Company;

22  correct?

23       A  Correct.

1      Q  And each one of those certificates of

2  insurance toward the bottom of the page -- and

3  we'll look at them here in a minute --

4  identifies Madison County and the sheriff as

5  additional insureds under that policy; correct?

6      A  Yes.  And I want to look at it.  I

7  think it identifies them as additional insureds

8  under the professional liability policy and the

9  general liability policy, and I think there is a

10  distinction between those possibly.

11      Q  I think there's one already -- here

12  it is.  Look at Exhibit -- this is actually the

13  one that was sent early on.  We'll come back to

14  that.

15      A  This is the -- Exhibit 7, it refers

16  to their malpractice policy, I think.

17      Q  That's actually June of 2006 before

18  there's a contact in place.

19      A  It took from then until October or

20  so, I think, to get it in place.  But yes, there

21  were --

22      Q  We'll come back to that.  But you

23  have seen, regardless of exactly which policies

1   are in play -- and I think your recollection is

2   correct, that the general liability and the

3   medical malpractice section 1983 claim cover,

4   which is A and C, are referenced.  But you are

5   certainly aware of language toward the bottom of

6   this certificate of insurance that identify the

7   County and the sheriff as, quote, additional

8   insureds, end quote; correct?

9        A  Correct.

10       Q  If Madison County knew or understood

11   that it was an additional insured under those

12   policies at the time of the filing of the Woods,

13   Jefferson, Listau, Foster, and Davis cases, why

14   did the County not contact the carriers directly

15   to report the claims?

16       A  I don't know that I would have known

17   where to send a letter.  I had reported claims

18   in the past directly to ACH and asked them to

19   forward to their insurance company, much like I

20   report claims to J. Smith Lanier and ask them to

21   forward to an insurance company.  That had

22   seemed to work in the past.  ACH had never

23   objected and said please communicate directly

1   with our insurer.  No one had ever said the

2   insurance notification address is anything in

3   particular.  So there doesn't appear to be from

4   my hindsight any reason to have done it any

5   differently than I had done it in the past.

6            If you will give me an address, I'll

7   change that if there are future claims that

8   arise out of the time that ACH was in the jail.

9   I don't guess -- well, I guess we are close to

10   the statute having run out.

11            Q  I think we are.

12            So I want to follow up in two

13   respects.  One, that's not just a you, Jeff Rich

14   person question or you, Jeff Rich attorney

15   question, that's a Madison County in general

16   question.  But is the answer that you just gave

17   the answer for the County?

18            A  Yes.

19            Q  Did you ever have any discussion with

20   Mr. Jones or Mr. Bates about the idea of we'll

21   report these claims directly to Essex Insurance

22   Company?

23            A  No.

1         Q  Did Mr. Bates or Mr. Jones ever ask

2    you to report these claims, the underlying

3    claims, to Essex?

4         A  No.

5         Q  You have alluded to a couple of

6    times -- and while we're on the subject, let's

7    just go ahead and address this, too.  The

8    agreement says -- and we can look at it, but I

9    think you and I both know that it's in there --

10   that the County administrator shall be provided

11   with a copy of the relevant insurance policy, is

12   what I believe?

13        A  In addition to a requirement that the

14   certificate be provided to -- I think the

15   sheriff.

16        Q  But the person to whom the agreement

17   says the policy will be provided is the Madison

18   County administrator, as I recall.  Is that your

19   recollection?

20        A  Yes.

21        Q  But to your knowledge neither

22   Mr. Bates during his tenure, nor Mr. Jones

23   during his tenure, asked for a copy of the

**Jeff Rich - Madison County  Representative**          236

1    policy from ACH, to your knowledge?

2          A   That's correct.   Other than the

3    contractual requirement that it be provided is

4    deemed a request to provide it, then Madison

5    County, the entity, would have asked for that.

6          Q   Was there ever any paperwork in

7    place, such as a checklist, that would have

8    clued Mr. Bates or Mr. Jones into the, we

9    haven't gotten a copy of the insurance policy?

10          A   No.

11          Q   You mentioned in response to

12    Mr. Finch's questions that OneBeacon has or may

13    have a possible subrogation interest.   And I

14    don't want to get us too far afield into that,

15    except they would -- whatever subrogation

16    interest they may or may not have, they would

17    not have a subrogation interest in the County's

18    deductible; right?

19          A   I see no basis for that, but I

20    haven't gone down the road analyzing it

21    discreetly.

22          Q   Look back at -- it's Exhibit 6.   I

23    think we have now determined on Exhibit 6 your

1    e-mail was sent on June 23rd at 7:25 a.m. to

2    Ms. Shelley Nilsoon with a copy to Mr. Julian

3    Butler; correct?

4         A   That's what this document reflects.

5         Q   Your e-mail begins, quote, Shelley, I

6    will review this, end quote.  Do you have any

7    recollection about what this refers to?

8         A   I don't.

9         Q   Have you gone back to track down on

10   the e-mail trail what the e-mail -- strike that

11   and let me ask it this way.

12            The e-mail below yours is timed at

13   8:15 a.m., which makes its appear in response to

14   your e-mail; agreed?

15        A   Looking solely at the time, yes.

16   Looking at the wording, I don't know.

17        Q   Well, since you raised that, do you

18   have any reason to believe that these times are

19   inaccurate or incorrect?

20        A   I don't know.

21        Q   I haven't really thought about it,

22   but are either of you operating off of Eastern

23   or both of you on Central time, as far as I

1    know?

2              MR. HODGE:  I wondered that.  I have

3    no idea how that works.  I don't know where her

4    flight was coming from or where she was.

5              A  I don't know.  And I have provided

6    the -- my file materials with respect to this

7    e-mail and the e-mail traffic surrounding it to

8    David.  And I think those have been produced,

9    and beyond that I --

10             Q  So, well, you're anticipating my next

11   question.  Have you looked to see what the

12   e-mail before this from Ms. Nilsson that you may

13   have been responding to, what that e-mail

14   consisted of or what it was about?

15             A  I provided my file materials that

16   included this e-mail and the e-mails surrounding

17   it to David, and they've been produced, and I

18   haven't gone back and looked.  If you want me to

19   go through the stack of e-mails, I'm happy to,

20   and tell you which one I think preceded it, but

21   I can't tell you that without having them in

22   front of me.

23             Q  You haven't drilled down on this to

1    say, oh, yeah, I remember what this was about

2    and what she said and what I said before that.

3    You haven't gone back to look at that?

4         A  My belief is it all surrounded the

5    question of what type of insurance was requested

6    and would be required as part of the contract,

7    that they had a malpractice policy in place that

8    was not sufficient from the County and the

9    sheriff's perspective to provide coverage for

10   1983 claims, and this was all discussion about

11   trying to move forward toward making sure they

12   understood what was needed and the County and

13   the sheriff received what was needed.

14        Q  And the next sentence of your e-mail

15   on Exhibit 6 to Ms. Nilsson says, quote, the

16   additional insured needs to be adding Madison

17   County, the Madison County sheriff and their

18   employees, end quote; correct?

19        A  That's what it says.  It's not in

20   quotes, but that's what the e-mail says.

21        Q  What I read was verbatim of what's in

22   the e-mail?

23        A  Correct.

**Jeff Rich - Madison County  Representative**                   **240**

1        Q   And the words you used in

2   communicating with Ms. Nilsson was, quote,

3   additional insured, end quote; right?

4        A   That sentence says the additional

5   insured needs to be adding Madison County, the

6   Madison County sheriff, and their employees.  I

7   agree that that's what that says.

8        Q   You did not tell Ms. Nilsson that

9   Madison County and the Madison County sheriff

10  need to be named insureds, did you?

11       A   That is not what this e-mail says.

12       Q   You do have a law degree?  Yes?

13       A   Yes, I have a law degree.

14       Q   And you have practiced law for how

15  many years?

16       A   Since 1991.

17       Q   And you have done, as you told us

18  earlier, some insurance-related work; correct?

19       A   Some, that's correct.

20       Q   And you know that there's a

21  difference between, quote, named insured, end

22  quote, and, quote, additional insured, end

23  quote; correct?

1          MR. HODGE:  Object to the form.

2     A  Generally, yes.

3     Q  The only thing that Madison County

4  and Madison County sheriff requested of ACH was

5  that the County and the sheriff be additional

6  insureds; correct?

7     A  What Madison County and Madison

8  County sheriff requested is what is in the

9  health services agreement that was signed by

10  both parties in July of 2006, not in June of

11  2006.  And in having discussions with Advanced

12  Correctional following a site visit that they

13  conducted where they, in essence, were coming

14  and marketing themselves as being good

15  healthcare providers, there was a discussion via

16  e-mail about insurance.  And I did use the term

17  insured -- the additional insured needs to be

18  added.  I did not say named insured.

19     Q  Are you aware from July 2006 until

20  June 2015 of any communication from Sheriff

21  Dorning, Madison County, or from you, to ACH,

22  indicating that the County and the sheriff need

23  to be, quote, named insureds, end quote?

1          A   I'm aware of the agreement that was

2      signed at the -- as each of the previous

3      agreements terminated and a new agreement was

4      put in place, which requires ACH to maintain

5      insurance and to --

6          Q   The phrase in the agreement is either

7      additional named insured or --

8          A   I think it's additional named

9      insured, is what it says.  I was trying to find

10     it.  Yes, shall be additional named insureds.

11         Q   Other than what's stated in the

12     agreement, are you aware of any correspondence

13     from Sheriff Dorning, from Madison County, or

14     you as the County attorney from June -- July,

15     I'm sorry -- 2006 until June 2015 requesting

16     that ACH have the sheriff and the County be

17     made, quote, named insureds, end quote, under

18     its insurance coverage?

19         A   That was an issue that was discussed

20     in the lawyer's letter that is referenced as one

21     of the exhibits that Mr. Finch and I have

22     discussed.

23         Q   Was that after this dispute arose?

**Jeff Rich - Madison County  Representative**                     **243**

1         A   From Jessica Young.   Well, it was in

2    March of 2015.   The contract required the County

3    and the sheriff to be additional named insureds,

4    and Jessica Young said we can't do that.   So

5    there was some additional communication, at

6    least as it purports to Exhibit 17.

7         Q   Let me rephrase my question.   Between

8    July 2006 and 2014, are you aware of anything in

9    writing from Sheriff Dorning, Madison County, or

10   you as the County attorney, requesting to ACH

11   that Madison County and the sheriff be, quote,

12   named insureds, end quote, under the ACH policy?

13        A   Not other than the healthcare

14   services agreements that were entered into by

15   the parties during that period of time.

16        Q   Other than those agreements, are you

17   aware of anything else in writing being sent to

18   ACH making such a request?

19        A   No.

20        Q   And just to clarify this -- and I

21   think you addressed it -- but Ms. Nilsson's

22   e-mail to you says, quote, attached is the ACH

23   malpractice policy, end quote, is what is stated

1    in the e-mail; correct?

2            A  Correct.

3            Q  But it's your testimony and

4    recollection that what was attached was in fact

5    the certificate of insurance that is attached to

6    the exhibit I believe you have in front of you

7    -- or do you have an attachment?

8            A  There's nothing attached.  But yes,

9    that's correct.  That is my recollection and

10   belief based on the way the documents were in my

11   file.

12           Q  Have you gone back and looked to see

13   if you had an ACH malpractice policy in your

14   file in the 2006 timeframe?

15           A  I did not.  I did not have one in my

16   file.

17           Q  But you did look for one?

18           A  Did look.

19           Q  Then if we try to piece together --

20   as you mentioned, if we try to piece together

21   Exhibits 6 and 7 to read Ms. Nilsson's e-mail,

22   it says, expecting -- and I'm comparing 6 and 7.

23   Have you got both of those in front of you?

1           A  Yes.

2           Q  So the next to the last line on 6 and

3    the next to the last line on 7, expecting a

4    certificate of insurance naming the County as an

5    additional -- and then we don't have the rest of

6    the e-mail; right?

7           A  Correct.

8           Q  But what you did tell Ms. Nilsson in

9    your e-mail is that, quote, we simply need to

10   make sure that if a jailer deputy is sued as

11   part of a claim arising out of healthcare in the

12   jail, the insurance will provide coverage, end

13   quote; right?

14          A  Yes.  And I again believe this was

15   after an initial meeting where there had been a

16   tour of the jail and a general discussion of

17   what the contract parameters would be, and was

18   coming on the heels of a problem with the

19   previous provider being able to provide the

20   necessary insurance.

21          Q  If we look at Exhibit 8, which is a

22   letter you sent to Dr. Johnson at ACH, so the

23   next to the last sentence in Exhibit 8 -- this

**Jeff Rich - Madison County  Representative**                    **246**

1    is an October 16, 2006, letter from you to

2    Dr. Johnson with ACH; correct?

3         A  Yes.

4         Q  The next to last sentence you ask for

5    an update with regard to the current status of

6    ACH's insurance company, and you also say,

7    quote, the status of Sheriff Dorning and Madison

8    County as additional insureds on the policy, end

9    quote; right?

10        A  Correct.  You said insurance company,

11   and it says insurance coverage.  But generally,

12   that's right.

13        Q  I'm sorry, coverage.  I stand

14   corrected.

15            But here again you use the term,

16   quote, additional insureds, end quote, and not

17   the term, quote, named insureds; correct?

18        A  Correct.

19        Q  If we look at Exhibit 9 -- if we look

20   at Exhibit 9, it's a July 30, 2010, letter to

21   Sheriff Dorning from Neil Leuthold as president

22   of ACH; correct?

23        A  Yes.

1      Q   And it says, please find enclosed the

2   current certificate of insurance denoting

3   coverage at the Madison County Sheriff's

4   Department for correctional healthcare; correct?

5      A   Yes.

6      Q   And if we look at the second page,

7   which is Bates number ACH 01496, toward the

8   bottom of the page -- and this is the language

9   we were talking about previously -- it states,

10   quote, Madison County, AL, and the sheriff of

11   Madison County, AL, are included as additional

12   insured under the general liability and

13   professional liability coverage.  And then it

14   says coverage applies to ACH operations in

15   correctional facilities only, end quote;

16   correct?

17      A   Correct.

18      Q   And again, the term that is used on

19   the certificate of insurance is, quote,

20   additional insured, end quote; correct?

21         MR. HODGE:  Object to the form.

22         MR. STEPHENS:  What's your objection

23   to the form?

1           MR. HODGE:  My objection is that they

2      are named on the form, and so to say

3      additional -- it does use the language

4      additional insured after their names are

5      included on the form.

6           Q  Well, I'll go back and we'll go at it

7      this way.

8           If you look at the top of the page,

9      in the box entitled insured, who is named there?

10          A  Advanced Correctional Healthcare,

11     3922 Baring Trace, Peoria, Illinois.

12          Q  Does Madison County, Alabama, or the

13     sheriff of Madison County, Alabama, appear in

14     the block entitled insured?

15          A  No.

16          Q  And at the bottom of the page in the

17     block we were just looking at, Madison County,

18     Alabama, and the sheriff of Madison County,

19     Alabama, are described as, quote, additional

20     insured, end quote; correct?

21          A  I mean, I agree 100 percent with you

22     that this form says Madison County, Alabama, and

23     the sheriff of Madison County, Alabama, are

1    included as additional insured under the general

2    liability and professional liability coverage

3    form.  I agree with that.

4         Q  Let's just jump ahead, and maybe I

5    should have asked this question at the

6    beginning, and I apologize for not.

7              But what's your understanding today

8    as to what difference it makes as to whether

9    Madison County, Alabama, and the sheriff of

10   Madison County, Alabama, for purposes of this

11   case that we're here about, were additional

12   insureds or were named insureds, if any?

13        A  I'm not sure it makes any difference.

14             MR. STEPHENS:  Off the record.

15             (Discussion off the record.)

16        Q  (By Mr. Stephens:)  Look at -- I'm

17   sorry to jump around again -- Exhibit 12.  Page

18   2 of Exhibit 12.

19        A  I'm trying to get them in some

20   semblance of maybe an order, so I'll quit having

21   to flip.

22        Q  That's all right.  And I'm winding

23   down on these.  I think Exhibit 12 out of this

1    sequence is probably the only one I have

2    questions about.

3          A   It's on the bottom, of course.

4          Q   Naturally.

5               So Exhibit 12, look at the second

6    page and at the top -- and it's Bates numbered

7    Evanston 1662.  It's been some questions about

8    this.  But looking at the second sentence of the

9    e-mail to you from Barbara McConnell at

10   OneBeacon, the second sentence of the e-mail

11   states, quote, they are modifying the insurance

12   policy as it was not their intention to have the

13   policy excess over any other policy, end quote;

14   do you see that?

15         A   Correct.

16         Q   Do you know whether that's ever been

17   done or not done?

18         A   My understanding is at some point in

19   time there was a communication that the policy

20   had been modified to make the policy primary on

21   a going-forward basis, but not retroactive to

22   the pertinent cases.

23         Q   Do you know as we sit here today

1   whether it makes any difference or not with

2   regard to the excess endorsement language that

3   was supposedly in the policy?

4                    MR. HODGE:  Do you mean does it make

5   a difference to Essex?

6         Q  Does it make any difference as far as

7   Madison County is concerned?  Do you know

8   whether it impacts the available coverage or

9   not?

10        A  I think it would.

11        Q  Who has told you that it would, and

12   in what way?

13        A  Well, I don't know that anybody has

14   told me that it would.  If it is excess, then my

15   understanding is that it's not --

16        Q  I get it.  I understand excess versus

17   primary.  But my question is, has anybody told

18   you in this case that that excess endorsement or

19   supposed endorsement in the Essex policy is

20   going to have any adverse impact with regard to

21   Madison County or this litigation?

22        A  I believe that's the testimony that

23   Jagady Blue in part gave when he was deposed in

1    this case as part of the justification for not

2    providing defense and indemnification under the

3    policy.

4           Q  Have you communicated with anybody

5    else other than Mr. Blue at Essex about --

6           A  I haven't communicated with Mr. Blue

7    about it.  He was deposed.  I was not there.  I

8    read the transcript of his deposition, and I've

9    talked with the County's lawyer about it.

10          Q  With regard to this excess versus

11   primary issue, have you had any communications

12   at all with Essex or Evanston?

13          A  No.  Well, was Mr. Blue copied on the

14   e-mail chains that we've been talking about

15   where I talked about the question of whether it

16   was primary or excess?  If he was copied on the

17   e-mails or was forwarded those e-mails, then I

18   believe that would constitute a communication

19   with somebody at Essex or Markel -- I'm not sure

20   who he works for -- or Evanston.

21          Q  So let's do this.  Other than the

22   e-mail chain that we're looking at here

23   encompassed by Exhibits 11, 12, 13, and 14, are

1   you aware of any other written communication you

2   would have had with anyone at Essex about this

3   topic of excess versus primary?

4           A   Not that I would have had.  There may

5   have been some communication between the Maynard

6   Cooper law firm and --

7           Q   I'm not interested in those.  That's

8   okay.  I'm just talking about you personally or

9   you on behalf of the County.

10          A   No.

11          Q   There is a reference to in this same

12  e-mail about a proposed 50/50 split on

13  indemnity.  Did you as the County's attorney or

14  did Madison County as an entity ever tell

15  OneBeacon that it was rejecting this proposed

16  50/50 split?

17          A   Which proposed 50/50 split?

18          Q   Well, the one that's referenced in

19  the e-mail.

20          A   I think there's two -- I understand

21  the e-mails to be inconsistent in the sense

22  that, at least what I understood from Barbara

23  McConnell, that Jagady Blue had proposed was a

1   50 percent split of the defense cost and a 50

2   percent split of any indemnification

3   requirement.  And then I understand, or

4   understood, Jessica Young's e-mail to say that

5   that was not the proposal, that there was a

6   50 percent split of defense cost that was the

7   proposal, and that the ultimate responsibility

8   for any judgment or settlement would be left up

9   in the air.  So I don't know which one or both

10  you might be talking about.

11       Q  My question is:  Did you as the

12  County attorney or did Madison County ever

13  communicate to OneBeacon that you were opposed

14  to or rejected either of those proposed 50/50

15  splits?

16       A  I think the e-mail is accurate in the

17  sense that I and Madison County were opposed to

18  some vague discussion point agreement, and that

19  if they wanted to submit -- which they contended

20  they would -- a formal proposal, that I felt

21  like would adequately protect the County and the

22  sheriff and their employees -- or the sheriff's

23  employees -- it would have been considered.  But

1   I don't think that was ever forthcoming.

2         Q  I think that's responsive to my

3   question -- we're on the same page -- but let me

4   just drill down a little bit further.

5         My understanding from some of your

6   responses to Mr. Finch's questions is you didn't

7   ever necessarily see a concrete proposal

8   materialize out of this.  But all I'm trying to

9   get to is if there was never any agreement

10  reached here, was the reason that agreement

11  wasn't reached because Madison County said that

12  is not agreeable to us?

13        A  It was not agreeable to the County or

14  the sheriff to split the defense cost without

15  having a concrete agreement in place regarding

16  what might or might not happen in the future.

17  So it was probably -- and I can't tell you which

18  phone conversation, I can't tell you which

19  communication -- but I think it was conveyed to

20  Barbara McConnell that that in and of itself was

21  not something that the County or the sheriff

22  would agree to.

23        I don't believe that we ever got to

1   the point of really talking in substance about

2   any other proposal at that point.

3        Q  Do you believe that your

4   communication with Ms. McConnell is why there

5   were no further discussions about this?

6        A  I don't know, in honesty.  I mean, in

7   all honesty, I don't know -- I don't recall at

8   what point in time it became apparent that we

9   were not going to be able to convince ACH and

10  its insurer that these were claims that they

11  should be responsible for, and the County

12  engaged the Maynard Cooper firm to go forward

13  and to begin communication and ultimately filed

14  a complaint.  But at that point, once that had

15  happened, there wasn't a proposal really on the

16  table to consider.

17       Q  And so what I am trying to get to --

18  and I think I hear you saying -- is it's not

19  like OneBeacon and Essex had an agreement

20  reached and the agreement was blown up because

21  Madison County said, no, we're not going to do

22  that?

23            MR. FINCH:  Object to form.

1          Q   Is that fair?

2          A   I believe that to be fair, yes.

3          Q   I believe you said this, but I want

4     to be clear about this.  If there were a claim

5     against Sheriff Dorning related to excessive

6     force, you would not expect ACH to defend and

7     indemnify that claim; correct?

8          A   Not a claim against Sheriff Dorning

9     for excessive force standing alone, correct.

10         Q   Lastly, on Exhibit 17 -- and I think

11    you made this clear -- but the timing when

12    Exhibit 17 is going on in March of 2015 is

13    approaching the time at which the ACH agreement

14    is going to expire and Madison County, the

15    sheriff -- and the sheriff are having to decide

16    whether or not they are going to have an

17    agreement going forward with ACH or you are

18    going to have to contract with another provider;

19    right?

20         A   Yes.  But with the clarifying point

21    that it may have already expired by its own

22    terms, and the County Commission had voted to

23    renew it and we were waiting on ACH's signature

1    on the new agreement.  I don't recall the

2    termination date of the agreement that was in

3    place prior to the one that was not signed by

4    ACH.

5          Q  Once again, I think we are kind of in

6    upside down e-mail land.  But starting on the

7    first page of Exhibit 17, which is Bates

8    numbered ACH 395, the bottom e-mail from you to

9    Ms. Young says you want to schedule a call to

10   discuss the agreement for healthcare services.

11   The agreement was sent to ACH for signature in

12   January, but has not been returned; right?

13         A  Correct.

14         Q  And you state that ACH is creating

15   potential issues for your clients by not signing

16   and returning the agreement; right?

17         A  Correct.

18         Q  Then that e-mail was sent on

19   March 16th at 11:12 a.m., and then it appears

20   that Ms. Young responded on March 18, 2015, at

21   11:50 a.m. by saying, please see the attached

22   letter; right?

23         A  I believe that is the correct

**Jeff Rich - Madison County  Representative**                    **259**

1   sequence.

2          Q   When Ms. Young says in her letter --

3   and I'm looking at the third paragraph of her

4   March 18, 2015, letter to you, which, is ACH

5   397.  When she says this is because they --

6   referring to ACH's insurance company -- cannot

7   insure ACH for the negligent acts and omissions

8   of County employees, did you understand that to

9   be that they could not obtain insurance coverage

10  for the independent wrongful acts of County

11  employees?

12         A   I didn't understand what she meant.

13         Q   Look at the last sentence of the next

14  paragraph.  She says it was never our intention

15  or understanding that we would be responsible

16  for the negligent acts and omissions of County

17  employees.  What did you understand her to be

18  saying there?

19         A   I don't read anything into it other

20  than what it appears to say, that she is stating

21  in 2015 that it was not ACH's intention or

22  understanding that ACH would be responsible for

23  negligent acts or omissions of County employees.

1          Q   As a part of the next paragraph she

2     says, during the past nine years neither the

3     additional named insured issue or the primary

4     insurance issue has ever been raised until now.

5              Do you agree with that?

6          A   Not as of March of 2015, I don't.

7          Q   So tell me -- and I don't expect,

8     honestly, an exact date.  But just by reference

9     to event -- when would the named insured or

10    primary insurance issue have been raised for the

11    first time?

12         A   When we finally got a substantive

13    response from ACH and its insurer as to why the

14    request for defense and indemnification had been

15    ignored and not responded to, and the reasons

16    that had ultimately been provided with respect

17    to the coverage provided by Essex was part of

18    the reason given for that.

19         Q   Was that in or around this March 2015

20    timeframe?

21         A   I don't remember.  I don't

22    remember --

23         Q   Would it have been Mr. -- is that

1    Mr. Finch's letter about coverage that you're

2    referring to, or something before that?

3            A   That would be his coverage letters.

4    And I don't remember the dates of the back and

5    forth.  I do remember we needed to review the

6    policies, and had asked for those and couldn't

7    get them, and it took some amount of time to get

8    policies.  I don't remember the timing of all of

9    that.  It all evolved over the course of several

10   months from the time that we initially demanded

11   defense and indemnification, got no response,

12   tried to find out why.  This is not an issue I

13   worked on all day every day.  There were some

14   intervening things, so there are gaps where it

15   was put down and picked back up as things

16   occurred.

17           Q   So just generically -- and, again, I

18   don't expect you to remember the exact day --

19   but generally, is that late 2014, early 2015

20   timeframe?

21           A   That would be my expectation, yes.

22           Q   Ms. Young goes on to state in her

23   letter that ACH will not provide coverage beyond

1    additional insured status which Madison County

2    currently has, and she says this is the industry

3    standard.  Do you know whether that statement is

4    accurate or not accurate?

5            A  I have no idea.

6            Q  Have you done any kind of research to

7    check into that issue?

8            A  No.

9            Q  She says it's how we -- referring to

10   ACH -- operate at every other jail nationwide.

11           Do you dispute that at all, or have

12   any basis to dispute that?

13           A  I don't have any basis to dispute

14   that, no.

15           Q  What was your response to her letter,

16   if you recall?

17           A  I met with my clients.

18           Q  She invited a revised agreement,

19   which she said ACH would provide to you.  Do you

20   recall ever requesting that Ms. Young send you

21   any revised language for the agreement?

22           A  I don't.

23           Q  Without violating any attorney-client

1    privilege -- which I don't want you to do -- was

2    the decision made by the County shortly after

3    this letter to not renew the healthcare services

4    agreement with ACH, or do you recall?

5         A  The decision was made by the sheriff

6    to not renew or continue in a relationship with

7    ACH shortly after this March timeframe.  There

8    were a number of things that had to be done

9    before that decision could be made.  You

10   obviously can't terminate somebody and escort

11   them out of the jail and not have healthcare for

12   1,000 inmates.

13        Q  Was this letter, from the County's

14   perspective, sort of the final straw in terms of

15   this is it and we're not going to renew with

16   ACH, or were there ongoing negotiations after

17   the letter?

18        A  I don't know that I would

19   characterize it as the final straw.  I don't

20   recall any specific ongoing negotiations after

21   this letter.

22        Q  The consent decree, the Federal court

23   consent decree, that's still in place?

1          A   Correct.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1      Q  Who is the judge who currently has

2   that case?

3      A  I'm not sure it's actually assigned

4   to one.  I believe if something was filed in

5   that case it would end up with Judge Kallon, but

6   I'm not sure of that.

7      Q  ACH certainly did not provide all the

8   training that went on of Madison County

9   correctional officers between 2006 and 2015;

10   correct?

11      A  Correct.

12      Q  For example, they didn't train on how

13   to use tasers; correct?

14      A  I'm not in the jail, and the County

15   has no function with respect to the daily

16   operation of the jail.  That would be a question

17   that would appropriately be directed to the

18   sheriff.

19      Q  Fair enough.  I'll take that.  Let's

20   take a break.

21           THE VIDEOGRAPHER:  It is 5:07.  We

22   are going off the record.

23           (Recess taken.)

1            MR. HODGE:  We are going to stop the

2    deposition for now.  We will reconvene and it is

3    my understanding that Harold needs three hours

4    to complete his examination and Lane does not

5    need more than one hour of follow-up questions

6    to Harold's questions.  So at the reconvening of

7    the depo, it will be limited to a total, at

8    most, of four hours.

9            MR. FINCH:  That's fine.

10            MR. STEPHENS:  That's fine.

11            THE VIDEOGRAPHER:  It is 5:25.  This

12    part of the deposition comes to an end.

13

14

15

16

17

18

19

20

21

22

23

1              On June 21, 2017, at the offices of

2     Morris, King & Hodge, 200 Pratt Avenue,

3     Huntsville, Alabama, came before the undersigned

4     authority, Vicki G. Couts, CSR, and a Notary

5     Public for the State of Alabama, JEFF RICH, who,

6     being by me first duly sworn to speak the truth,

7     the whole truth, and nothing but the truth,

8     testified as follows:

9

10             THE VIDEOGRAPHER:  Today's date is

11    June 21, 2017.  The time is now 9:33 a.m., and

12    we are here for the continuation of the

13    deposition of Mr. Jeff Rich in Cause No.

14    5:15-CV-01997-HGD.

15             Would all the attorneys please

16    identify themselves for the record, and would

17    the court reporter please re-swear in Mr. Rich.

18             MR. CLAPP:  Brandon Clapp for

19    Evanston Insurance Company.

20             MR. STEPHENS:  I'm Harold Stephens.

21    I represent Advanced Correctional Healthcare,

22    Inc.

23             MR. HODGE:  David Hodge on behalf of

1    the plaintiffs.

2              (Witness sworn.)

3              THE COURT REPORTER:  Usual

4    stipulations?

5              MR. HODGE:  Yes.

6              MR. STEPHENS:  That's fine.

7    EXAMINATION RESUMED BY MR. STEPHENS:

8         Q  Mr. Rich, just as a reminder, but to

9    be clear for the record, you are here continuing

10   to testify as the representative of Madison

11   County, Alabama; correct?

12        A  Yes.

13        Q  In respect to you and your time, we

14   were just having a brief discussion, my

15   recollection is that there is not a jury demand

16   in this case, but in the event there is, could I

17   just request that you would provide to Mr. Hodge

18   all relatives that you or your wife have who

19   live in the Northern District of Alabama,

20   Birmingham north, as you generally know, and the

21   same request for the current members of the

22   Madison County Commission?  Would y'all do that

23   for us if there is such a demand?

1          A   If you will define relatives.

2          Q   So I would ask 18 years of age or

3    older, and let's just do parents, grandparents,

4    aunts and uncles, brothers or sisters.  And I

5    think that's probably good enough.

6              All right.  Did you at any time serve

7    in the military?

8          A   No.

9          Q   Tell me about when you recall having

10   any initial contact or communication with ACH.

11         A   In the '06 timeframe.

12         Q   And did you contact them, or they

13   contact you?

14         A   I don't recall whether I contacted

15   them or they contacted someone in the sheriff's

16   department.  My recollection is, or at least my

17   best knowledge is, the sheriff was aware of the

18   existence of ACH and communication started with

19   respect to ACH being a healthcare provider for

20   inmates in a detention facility as a result of

21   his familiarity with them.

22         Q   Do you remember any personal meetings

23   with Dr. Norman Johnson or anyone at ACH before

1    they were selected to provide healthcare

2    services for the Madison County jail?

3              A   I believe there was a meeting with

4    Dr. Johnson and other representatives of ACH, at

5    least one meeting if not more, with ACH with

6    Dr. Johnson and other members of our other

7    employees or representatives of ACH at various

8    times before the actual contract was signed.

9              So, yes, there were a series of

10   meetings where ACH responsible employees and

11   officers, whoever they might have been, toured

12   the jail, met with the sheriff, the sheriff's

13   department representatives, to get an idea of

14   what would be expected, and what the capacity of

15   the jail was, number of inmates, things of that

16   nature, that they would have needed to have

17   known prior to signing a contract to provide

18   healthcare services.

19             Q  Did you personally take any notes

20   with respect to any of those meetings?

21             A  In all likelihood, I did.  It would

22   be my practice to do so.

23             Q  Have you checked to see if those

1    notes have been located or produced in this

2    case?

3         A  I have reviewed my files, which would

4    have been produced not as a representative of

5    Madison County, but as the lawyer for Madison

6    County and the Madison County Sheriff.  So to

7    the extent that those notes might exist -- which

8    I don't recall whether they do or don't at this

9    point in time -- I think they would be work

10   product.

11        Q  As we sit here today, do you recall

12   whether there is any reference to insurance in

13   those notes?

14        A  I don't.  I already told you I don't

15   recall specifically whether they exist, don't

16   exist, or what.  You know, there would have been

17   a host of topics that would have been discussed

18   at those meetings because the County and the

19   sheriff had just been through a process, as you

20   are well aware, of terminating the previous

21   provider as a result, in part, of their failure

22   to procure the insurance that was required.

23             Insurance would have been a topic of

1  discussion, and continues to be a topic of

2  discussion, as you see from the e-mails you put

3  before me to talk about previously in that same

4  timeframe.

5      Q  Who was the provider of healthcare

6  services at the Madison County jail prior to

7  ACH?

8      A  There has been more than one.

9      Q  Let me show you what has been marked

10  as Defendant's Exhibit 19.  Could you identify

11  this document for us, please.

12          (Defendant's Exhibit 19 marked for

13  identification.)

14      A  It's an agreement for healthcare

15  services at Madison County Detention Facility

16  between Madison County Sheriff Blake Dorning and

17  Southern Health Partners, Inc.

18      Q  Was Southern Health Partners the

19  healthcare provider immediately prior to ACH?

20      A  No.

21      Q  Who was immediately prior?

22      A  Health Assurance, LLC.

23          MR. STEPHENS:  David, I'm not sure

1    that we have seen -- and I guess I would request

2    a copy of the production of that agreement.  I'm

3    not positive it hasn't been produced, but I

4    don't recall seeing it.

5         Q  Do you recall in Exhibit 19, is there

6    any provision related to insurance in that prior

7    agreement?

8         A  I need to look at it to see.

9    Paragraph 8.1 on page 11 references insurance.

10         Q  Is there any provision in there

11    requiring the County and the sheriff to be named

12    insureds?

13         A  There is a sentence that says

14    Southern Health Partners shall provide a

15    certificate of insurance evidencing the above

16    policy limits and shall name the County and the

17    sheriff as an additional insured.

18              I don't see a reference to a

19    requirement that the County or the sheriff be a

20    named insured on the policy, to the extent there

21    is a difference between that and being named as

22    an additional insured.

23         Q  Did you draft the agreement we are

1   looking at, Exhibit 19, or did someone else

2   draft that?

3        A  In all likelihood, I did.  That was

4   13 years ago, so I don't know.

5        Q  And I'm not seeking any answer that

6   would disclose attorney-client communications,

7   but in any subsequent revisions of the

8   healthcare services agreement, in particular

9   starting in 2006, would any changes to that

10  document have been made by you personally, or

11  was there ever outside counsel involved in

12  revising that document?

13       A  There were other lawyers at my

14  previous law firm that worked on matters for

15  Madison County and the sheriff, including Julian

16  Butler, who had been County Attorney for almost

17  30 years.  So I can't say who might or might not

18  have reviewed or revised this document at some

19  point in time.

20            It was reviewed and revised by

21  lawyers representing the healthcare providers

22  who were providing services in the jail from

23  time to time as well, so I can't say who might

1    or might not be responsible for particular

2    revisions.

3         Q  And I am just trying to identify

4    people.  Would it be fair to say, then, either

5    you or members of the firm at Sirote and Permutt

6    would have been the ones involved in any

7    drafting changes?

8         A  Or lawyers representing other

9    parties.

10        Q  Do you recall in particular who would

11   have changed the phrase "additional insureds" as

12   appears in Exhibit 19, to "additional named

13   insureds" as appears in the ACH agreements?

14        A  I can't tell you who would have made

15   that change.

16        Q  Was the sheriff personally involved

17   in negotiations with regard to the terms of the

18   agreement?

19        A  Yes.

20        Q  Were members of the Madison County

21   Commission involved?

22        A  Not necessarily with respect to

23   negotiation and the terms of the agreement, but

1    ultimately, because of the County Commission's

2    role as the funding source for the Sheriff's

3    day-to-day operations, the County Commission

4    would have been provided and asked to vote on

5    the agreement that was presented to them.

6            But I don't recall there being

7    members of the County Commission that would have

8    actually been in meetings or reviewing drafts or

9    making recommendations for revisions.

10           (Defendant's Exhibit 20 marked for

11   identification.)

12       Q  Let me show you next what we marked

13   for identification as Exhibit 20.  Can you

14   identify that document?

15           Let me just note for the record while

16   you are looking at that, Defendant's Exhibit 19

17   is Bates No. Madison County (ACH 0169 through

18   0184).  And what you have just been shown,

19   Mr. Rich, is Exhibit 20, Bates No. ACH 001412

20   through 1430.

21       A  I'm sorry.  What is your question?

22       Q  I just asked if you could identify

23   this document for us, for the record.

1          A  I can identify portions of the

2     document, but there are handwritten notes that

3     are on this document that I have no idea the

4     source of those, whose they are, where they

5     might have came from.  So I don't know if I can

6     identify this particular document.

7          Q  All right.  The first page of Exhibit

8     20, ADH 001412, is a letter dated July 29, 2005,

9     from Blake Dorning, Sheriff of Madison County,

10    and it is addressed to "Dear Vendor"; correct?

11         A  Yes.

12         Q  And it references an RFP, or request

13    for proposal; is that correct?

14         A  Yes.

15         Q  And then attached is a request for

16    proposal, and if you look at the second line, it

17    says, proposals will not be accepted after

18    Friday, August 26, 2005.

19            Do you see that?

20         A  Yes, it says that in part, yes.

21         Q  Do you know whether this would have

22    been the first time that ACH would have

23    submitted any proposal for healthcare services

1    at Madison County jail?

2            A  No.

3            Q  You don't know?

4            A  No.

5            (Defendant's Exhibit 21 marked for

6    identification.)

7            Q  Let me show you next what has been

8    marked for identification as Defendant's

9    Exhibit 21.  I would just note for the record

10   those are Bates numbered ACH 001244 through

11   1247.

12           A  All right.

13           Q  Exhibit 21 is a letter dated

14   August 3, 2006, from Dr. Norman Johnson at ACH

15   to Sheriff Dorning; is that correct?

16           A  Yes.

17           Q  You were shown as receiving a copy of

18   this letter as well, I assume in your capacity

19   as counsel for the Sheriff of Madison County;

20   correct?

21           A  Yes.

22           Q  And did you receive a copy of this

23   letter?

**Jeff Rich - Madison County  Representative** 279

1          A  I have no reason to expect that I

2     didn't, but I have no independent recollection

3     of receiving it.

4          Q  But just so we are clear, you are not

5     denying that you received it; right?

6          A  No.

7              (Defendant's Exhibit 22 marked for

8     identification.)

9          Q  Let me show you next what has been

10    marked Exhibit 22.  I would note that that

11    document is Bates Nos. ACH 001236 through 1240.

12         A  All right.

13         Q  Exhibit 22 is a letter dated

14    September 12, 2006, from Dr. Norman Johnson to

15    Sheriff Blake Dorning; is that correct?

16         A  Yes.

17         Q  You are not shown as cc'd on this

18    letter.  Do you remember whether you received

19    this letter or not?

20         A  I do not.

21             (Defendant's Exhibit 23 marked for

22    identification.)

23         Q  Let me show you next what is marked

1   as Defendant's Exhibit 23.  This document is

2   Bates numbered as ACH 001228 through 001235.

3        A  The first page of what you gave me

4   doesn't have a Bates number on it, but I presume

5   it goes with the rest of the documents in that

6   order.

7        Q  It actually does, but I think we

8   can't see it because of the black down at the

9   bottom of the page.  But in any event,

10  Exhibit 23 is a letter from Dr. Norman Johnson

11  to you dated September 14, 2006; correct?

12       A  Yes.

13       Q  Do you recall receiving this letter?

14       A  I don't have an independent

15  recollection of it.  But, again, I don't have

16  any reason to believe I didn't receive it.

17       Q  Look back at Exhibit 22, just

18  briefly, if you would, one second.  On the

19  second page of Exhibit 22, second page, fourth

20  paragraph, Dr. Johnson states that he has

21  enclosed a copy of certificate of liability

22  insurance.  Do you see that?

23       A  Yes.

1          Q   If you look at the attachment which

2    is ACH 001239, it's a certificate of liability

3    insurance dated in the upper right-hand corner

4    September 5, 2006; is that correct?

5          A   Yes.

6          Q   And ACH is named as the insured.  Do

7    you see that?

8          A   Yes.

9          Q   Insurer C is listed as Essex

10   Insurance Company, correct?

11         A   Yes.

12         Q   And down at the bottom of the page,

13   Madison County jail, Alabama, and the Madison

14   County Sheriff's Office, Alabama, it says are

15   included as additional insured.

16             Do you see that?

17         A   Yes.

18         Q   Keep on eye on the attachment there,

19   but let's look back to Dr. Johnson's letter.  He

20   says that he showed this to you --

21         A   Which letter?

22         Q   I'm sorry, right where we were.

23         A   22 or 23?

1        Q  22.  Page 2, paragraph 4.

2        A  Okay.

3        Q  All right.  The second sentence

4   there, Dr. Johnson says, I showed this --

5   referring to the certificate of insurance -- to

6   Jeff Rich, and he pointed out that these two

7   entities are not legal entities, and the names

8   need to be changed.

9            Looking back at this certificate of

10  insurance, by "names need to be changed" I

11  assume he was saying Madison County jail,

12  Alabama, Madison County Sheriff's Office,

13  Alabama, are not legal entities?

14           Is that what you would have discussed

15  with him?

16       A  I don't have an independent

17  recollection of it, but that is logical based on

18  how I read this letter today.  Generally, the

19  jail is not an entity recognized by the Courts,

20  nor would be just a sheriff's office.

21           So the point was to try to get

22  insurance in place that would protect the

23  sheriff and the County and their officers and

1   employees in the event there was a claim that

2   arose out of medical care being provided for

3   ACH.  And that is what all this was an effort to

4   do.

5       Q  Okay.  And then if you look on in

6   Dr. Johnson's letter, he says, "I," referring to

7   himself, will contact our insurance agent, Rob

8   Bielenberg, and see to it that these are changed

9   to an appropriate additional insured."  Do you

10  see that?

11      A  Yes.

12      Q  He also notes that you still don't

13  believe the wording is adequate.  Do you see

14  that?

15      A  Yes.

16      Q  And he says they were led to believe

17  they could get the exact wording requested, and

18  then he says that you were investigating other

19  ways to handle this.  Do you recall any of that

20  discussion?

21      A  Again, I don't recall specifics, but

22  this was all an effort, which at the time was

23  ACH's effort, to get Madison County's business

1    by doing what the County and the sheriff would

2    have required for insurance.  I was trying to

3    facilitate that.

4           The County and the sheriff -- or the

5    sheriff, I'm sorry -- was under consent decrees.

6    You are well aware that Federal Courts put a lot

7    of pressure on you to do things, and that was

8    trying to keep the Court happy and trying to

9    make sure the liability risks were where they

10   needed to be.  So I don't have any reason to

11   doubt that I had this discussion with

12   Dr. Johnson.

13        Q  In fact, if we look at the last

14   sentence of that paragraph, he says that we --

15   referring to ACH -- have done everything we can

16   at this point, including firing our prior

17   insurance company and hiring a new one, and

18   still haven't been able to solve the problem.

19           Do You see that?

20        A  I do.

21        Q  And you are aware of documents prior

22   to this that would have identified General Star

23   as an insurance carrier for ACH; correct?

1          A   There was an e-mail we have been

2     through where General Star was identified, and I

3     think they were simply the malpractice carrier

4     for ACH at the time, but ACH started the

5     discussions with the County and the sheriff

6     about getting their business.

7          Q   Have you had any discussion with

8     Craig -- is it Herr, H-E-R-R?

9          A   Yes.

10         Q   -- about additional insured versus

11    named insured with regard to ACH's insurance

12    coverage?

13         A   No.

14             (Defendant's Exhibit 24 marked for

15    identification.)

16         Q   Let me show you next what is marked

17    as Defendant's Exhibit 24.  And I'm sorry, but

18    once again, David, there is a Bates number on

19    this page, and I honestly don't know what it is.

20    It's in the blacked-out area.

21             But can we agree, Mr. Rich, that

22    Exhibit 24 is a letter from Dr. Norman Johnson

23    to Sheriff Blake Dorning dated November 23,

1    2006?

2           A   Yes.  Well, reading it, it appears to

3    be a portion of a letter written to Sheriff

4    Dorning because it references an enclosed letter

5    that supposedly he wrote to me, and other

6    attachments, but those are not attached.

7                (Defendant's Exhibit 25 marked for

8    identification.)

9           Q   Let me show you what is marked

10   Exhibit 25 and that document is Bates No. ACH

11   001224 through 1226.  And this is a letter to

12   you with the same date, October 23, 2006, from

13   Dr. Johnson; correct?

14          A   yes.

15          Q   Let me just start at the very

16   beginning of the letter because that is really

17   where my question is going to focus anyway.

18   Dr. Johnson says, we have continued to discuss

19   this issue with Robert Bielenberg,

20   B-I-E-L-E-N-B-E-R-G, from Callender,

21   C-A-L-L-E-N-D-E-R, Insurance.  And as you had

22   mentioned, he has been talking with you about

23   this.

1            Do you recall discussions with Robert

2    Dielenberg about ACH's insurance?

3        A   I would like to read this letter, if

4    I can, to make sure I can answer your question

5    completely.

6            All right.  I think your question was

7    do I recall talking to Robert Dielenberg from

8    Callender Insurance?

9        Q   Exactly.

10       A   I don't recall any specific

11   discussions that I had with him, or any general

12   discussions, for that matter.  Again, my effort

13   was to try to facilitate moving this agreement

14   forward because that is what my clients wanted

15   to do.  And if that involved talking to him and

16   trying to make sure the insurance coverage was

17   understood and in place, then I have no reason

18   to doubt that I did, but I don't recall specific

19   discussion.

20       Q   Just so I am clear, you don't dispute

21   you would have talked with him, but you don't

22   recall any of the specifics of your conversation

23   or conversations?

**Jeff Rich - Madison County  Representative**                    **288**

1          A   I don't know one way or the other.

2          Q   Do you recall in June 2007 that

3    Dr. Johnson came down to Huntsville and had a

4    meeting at your office with you and various

5    representatives from Madison County about the

6    jail?

7          A   I don't recall that specific time,

8    but, like I said, there were a number and have

9    been a number of meetings from time to time

10   involving Dr. Johnson.  He was much more active

11   in the early parts of the contract period than

12   he was in the latter parts, but he and his staff

13   were in Madison County frequently in regard to

14   what they were doing.

15         Q   Do you recall Dr. Johnson

16   communicating with you and other representatives

17   of Madison County that what they encountered

18   when ACH took over this contact for the jail was

19   a big mess in terms of healthcare?

20         A   I don't -- I mean, I recall there

21   being transition issues like any change in

22   healthcare providers, just like when ACH left

23   the jail the last time and Southern Health

---

**Freedom Court Reporting, Inc**                    **877-373-3660**

1   Partners took over.  They are competitors, so

2   they don't like what the other guys do or don't

3   do.

4           I can't recall there being issues

5   that were so significant that they stand out to

6   me at this point.

7           Q  Was the prior healthcare provider

8   prior to ACH terminated prior to the expiration

9   of their contract?

10          A  Yes.

11          Q  Why were they terminated?

12          A  They were terminated based on the

13  Sheriff's recommendation and his dissatisfaction

14  with the services they were providing and their

15  inability to procure the insurance that was

16  necessary for protection of the County and the

17  sheriff and their employees.

18          Q  Has Madison County, Alabama, and/or

19  the sheriff ever been a named insured on any

20  policy of insurance that you have seen at any

21  time with regard to the healthcare services

22  provider for the Madison County jail?

23          A  I think I understand what you are

1    asking, but to be sure, let me say this.  They

2    are clearly named insureds on the OneBeacon

3    policy, Travelers policies, other policies that

4    have been in place.

5            An insurance policy that has been

6    attained by an outside provider like ACH, I am

7    not aware -- I would have to go back and review

8    the current policy to see, but I never saw the

9    ACH policy, so -- or at least not until this

10   controversy arose.

11           So, no, I am not aware that they were

12   ever a, quote, named insured as opposed to an

13   additional insured on a policy of that nature.

14       Q  And that was my question.  Do you

15   recall any of the specifics about this June 4,

16   2007, meeting at your office with Dr. Johnson

17   where he was giving y'all an update as to the

18   first three quarters of the contract?

19       A  I don't recall any specifics.

20   Dr. Johnson was a -- had a positive outlook on

21   things, and --

22       Q  Do you recall him doing a slide

23   presentation or PowerPoint presentation of some

1    type?

2         A  No, I don't have an independent

3    recollection of that.

4         Q  Do you recall whether insurance was

5    discussed or not at that meeting?

6         A  I do not have a specific recollection

7    of things that were discussed.  That was June of

8    '07?

9         Q  Yes, June of '07.

10         A  No, I don't know.

11         Q  Was there a problem with medical

12    records with the prior healthcare provider

13    before ACH?

14         A  There had been a perceived problem

15    with medical records with every provider that

16    has ever been in the jail.  When ACH left, there

17    were boxes and boxes of medical records that

18    were simply piled on top of each other with no

19    indexing or sorting that Southern Health

20    Partners reported, and they were able to get

21    that under control.

22         So, yes, every provider has

23    complained about the state of medical records

**Jeff Rich - Madison County  Representative**                                    **292**

1    from the prior provider when they have taken

2    over.

3          Q   And is the situation you have

4    described about boxes and boxes of unrecorded --

5          A   How about disorganized?

6          Q   I'm sorry?

7          A   How about disorganized?

8          Q   -- disorganized medical records, do

9    you recall that being the case in the transition

10   to ACH from the prior provider?

11         A   I don't recall the specific issues.

12   I know that it was important to the Sheriff to

13   get an electronic records management system in

14   place so that that would not be as difficult and

15   so that there wouldn't be hard copies of medical

16   records that were not accessible easily or not

17   organized, and I think that is part of what ACH

18   undertook in the agreement and what they

19   ultimately did.

20         Q   Do you recall communicating with

21   Dr. Johnson or others at ACH that you had had

22   difficulty in getting a chart because when you

23   requested it from a prior provider they could

1    never find or locate the chart?

2            A  It could very well have been.  And

3    all of those discussions would have been in my

4    capacity as the lawyer for the sheriff and the

5    County.  But I respond to subpoenas, I respond

6    to lawsuits, I respond to disability requests,

7    records.

8            So getting records from the jail is

9    something that in the capacity as the lawyer for

10   the sheriff I have done a lot throughout the

11   years.

12           Q  If Dr. Johnson or other

13   representatives of ACH testified that when they

14   took over the contract at the jail, they

15   identified 70 two-foot legal boxes with single

16   sheets of medical records that had not been

17   filed, do you have any reason to dispute or

18   disagree with that?

19           A  I wouldn't know one way or the other.

20   I was just the lawyer, I wasn't there counting

21   boxes or looking at things of that nature.  But

22   I do know that the organization of medical

23   records has been an ongoing concern.

1          Q  Do you recall at the end of the

2    June 4, 2007, meeting with Dr. Johnson

3    indicating to him that you were comfortable with

4    ACH's level of insurance as of that date?

5          A  No.

6          Q  Do you recall other county officials,

7    including the sheriff, indicating to Dr. Johnson

8    as the end of the June 4, 2007, meeting that

9    they were comfortable with ACH's level of

10   insurance which was being provided?

11         A  No.

12            (Defendant's Exhibit 26 marked for

13   identification.)

14         Q  Let me show you next what I have

15   marked Exhibit 26.  I would just ask if you can

16   identify this document.  And for the record it

17   is pages ACH 009933 and 934.  It's a letter from

18   Dr. Norman Johnson dated June 8, 2007, to you;

19   is that correct?

20         A  Correct.

21         Q  Do you recall receiving this letter?

22         A  Not independently of you putting it

23   in front of me today, but I have no reason to

**Jeff Rich - Madison County  Representative**                                    **295**

1    doubt I did receive it.

2         Q   And if we look at the first sentence,

3    he just indicates appreciation for being allowed

4    to do the presentation to you and the officials

5    in your office on June 4, 2007.  Do you see

6    that?

7         A   Yes.

8            (Defendant's Exhibit 27 marked for

9    identification.)

10        Q   Let me show you next Defendant's

11   Exhibit 27 -- and I apologize again, there is a

12   Bates number on here, but in this format we

13   can't see it.

14        A   All right.

15        Q   This is a letter from Dr. Johnson to

16   Sheriff Dorning dated July 7, 2009; correct?

17        A   Yes.

18            (Defendant's Exhibit 50 marked for

19   identification.)

20        Q   Let me show you next what has been

21   marked Defendant's Exhibit 50, Bates ACH 00280.

22        A   All right.

23        Q   This is a letter from you to

1    Dr. Johnson dated May 12, 2009; is that correct?

2         A  Yes.

3         Q  And it indicates you are enclosing

4    the healthcare services agreement between

5    Madison County, Alabama, Blake Dorning, and

6    Advanced Correctional Healthcare approved by the

7    Madison County Commission on May 4, 2009;

8    correct?

9         A  Yes.

10        Q  And you indicate that Chairman

11   Gillespie and Sheriff Dorning have signed it and

12   requested Dr. Johnson sign and return it to you;

13   correct?

14        A  Yes.

15             (Defendant's Exhibit 51 marked for

16   identification.)

17        Q  Let me show you next Defendant's

18   Exhibit 51, which is Bates numbered ACH 0239 to

19   258.  If we look at the last page of this

20   agreement, it was signed by Sheriff Dorning and

21   Chairman Gillespie on May 4, 2009; correct?

22        A  In all likelihood, yes.  I wouldn't

23   have witnessed their signature, and at times

1    documents come back to my office that have a

2    signature, but not a date.  And so normally that

3    date will be filled in as the date of approval

4    of the contract if it was voted on.

5          So if it was voted on on May 4th,

6    that is the date that probably would have been

7    inserted.  The sheriff might have signed it on

8    that date or might not have, I don't know.

9          Q  In any event, you believe this would

10   have been the agreement that was attached to

11   your letter of Exhibit 50 to Dr. Johnson?

12         A  I believe so.  Well, actually --

13   sometimes it is hard to take my lawyer view of

14   things, but just to be correct, the copy that I

15   would have sent to Dr. Johnson would not have

16   had Dr. Johnson's signature on it.

17         Q  It would not have his signature on

18   it.

19         A  So this would not necessarily be the

20   exact copy that was forwarded with that letter,

21   because it was requesting his signature.

22         Q  Fair enough.

23              THE VIDEOGRAPHER:  It is 10:17 we are

1    going off the record.

2              (Recess taken.)

3              THE VIDEOGRAPHER:  It is 10:27 we are

4    back on the record.

5              (Defendant's Exhibit 53 marked for

6    identification.)

7         Q  Let me show you next what we have

8    marked for identification as Defendant's Exhibit

9    53, which is Bates ACH 0259.  Can you identify

10   this document?

11        A  Yes.  This is a letter to Neil

12   Leuthold enclosing the fully executed health

13   services agreement approved by the Madison

14   County Commission on June 4th of 2012.

15        Q  That is a letter from you to

16   Mr. Leuthold; is that correct?

17        A  Yes.

18             (Defendant's Exhibit 54 was marked

19   for identification.)

20        Q  Can you identify Exhibit 54 for us?

21        A  This appears to be the fully executed

22   healthcare services agreement for the period of

23   April -- I'm sorry -- the period of May 1st,

1    2012, through April 30th, 2013.

2            Q   And Bates No. ACH 0260 through 0279.

3            (Defendant's Exhibit 55 marked for

4    identification.)

5            Q   Can you identify Defendant's

6    Exhibit 55?

7            A   Exhibit 55 appears to be a letter

8    dated May 21st, 2013, from me to Dr. Norman

9    Johnson enclosing a copy of the Health Services

10   Agreement approved by the Madison County

11   Commission at its meeting on May 17th of 2013.

12           Q   And Exhibit 55 is Bates No. ACH 0237.

13           (Defendant's Exhibit 56 marked for

14   identification.)

15           Q   Can you identify Exhibit 56?

16           A   Exhibit 56 is an agreement to extend

17   the term of the previous healthcare services

18   agreement for an additional period of time

19   signed by Dr. Johnson, Sheriff Blake Dorning,

20   the Chairman of the County Commission, and the

21   County administrator.

22           Q   And all the County signatures are

23   dated May 17, 2013; correct?

**Jeff Rich - Madison County  Representative**                    **300**

1          A   Correct.

2          Q   So Exhibit 56 would have been

3    attached to your letter, Exhibit 55, I presume?

4          A   I believe so.

5          Q   Can you identify next for us what has

6    been marked Defendant's Exhibit 57?

7              (Defendant's Exhibit 57 marked for

8    identification.)

9          A   Bates numbered ACH 7 through 27.  And

10   that would appear to be the Healthcare Services

11   Agreement for the Madison County detention

12   facility for the period of time of January 1st,

13   2014, through December 31st of 2014.  And it is

14   signed by the County officials, the sheriff, and

15   someone named Sherry Miller from Advanced

16   Correctional Healthcare.

17             (Defendant's Exhibit 58 marked for

18   identification.)

19          Q   Can you identify Exhibit 58 for us?

20          A   It's an Acord certificate of

21   liability insurance dated 8/10 of 2005.

22          Q   And dated Madison County (ACH 0166);

23   correct?

1          A   Bates labeled that, yes.

2          Q   This shows Advanced Correctional

3    Healthcare as the insured; correct?

4          A   Yes.

5          Q   And under insurer C it lists General

6    Star; is that correct?

7          A   Correct.

8          Q   And then the block, "Description of

9    operation/location/vehicles and so forth," that

10   block on this particular document is completely

11   blank; correct?

12         A   Correct.

13             (Defendant's Exhibit 59 marked for

14   identification.)

15         Q   Can you identify Exhibit 59 for us?

16         A   It is Bates Madison County (ACH 164.)

17   It's an Acord certificate of liability insurance

18   dated 8/27 -- is that 8/27 or 6/27/2006?

19         Q   I'm not sure, it is either 6 or 8.  I

20   think it is 8.  But in any event, it is summer

21   2006; correct?

22         A   Yes.  And it would -- I would have

23   thought logically it would have been 8 since the

1    policy periods began in August, but I don't

2    know.

3          Q  And then who is the insurer C on this

4    one?

5          A  General Star.

6          Q  And is this similar to one we looked

7    at earlier in terms of who is described down at

8    the bottom in the block -- does it just have

9    Madison County jail in the description?

10         A  No.  I mean, we have looked at

11   several, but this one is different than the one

12   we just looked at in that it says Madison County

13   is included as additional insured under the

14   general liability if required by contract in

15   writing.

16         Q  This one just names Madison County;

17   is that right?

18         A  Well, then it says the certificate of

19   holder is Madison County jail, so I'm not sure

20   what all that means.

21             (Defendant's Exhibit 60 marked for

22   identification.)

23         Q  Can you identify Defendant's

1      Exhibit 60?

2              A   Bates labeled Madison County ACH 260,

3      it appears to be a letter from Robert Dielenberg

4      to me dated November 9, 2006.

5              Q   And it indicates a new certificate

6      for ACH is enclosed, which includes coverage for

7      civil rights; correct?

8              A   The first sentence says, enclosed is

9      a new certificate for ACH that now includes

10     coverage for civil rights.

11             Q   And then the next sentence says what?

12             A   Please note, too, the carriers have

13     agreed to amend the additional insured wording

14     to include Madison County and the sheriff of

15     Madison County.

16             Q   And if we look at the attached page,

17     the second page is a certificate of liability

18     insurance, Bates numbered Madison County ACH

19     0261; correct?

20             A   Yes.

21             Q   And this one is dated 11/9 of 2006;

22     correct?

23             A   Yes.

1          Q   Insurer C on this certificate of

2     insurance is Essex Insurance Company, and

3     insurer D is General Star Indemnity; correct?

4          A   Yes.

5          Q   And if we look under the description

6     of operations block, it says, Madison County,

7     Alabama d/b/a Madison County jail and the

8     sheriff of Madison County, Alabama, are included

9     as additional insureds under the general

10    liability, professional liability, and civil

11    rights liability coverage required by contract

12    in writing; correct?

13         A   Yes.

14         Q   Do you recall receiving Exhibit 60?

15         A   Not independently, but I have no

16    reason to doubt that I received it.

17         Q   I'm not going to ask a lot about it,

18    but just so we know the sequence here, if you

19    would pull Exhibit -- let me show you

20    Exhibit 28 --

21             (Defendant's Exhibit 28 marked for

22    identification.)

23         Q   -- which is Bates numbered ACH 0383

**Jeff Rich - Madison County  Representative**                           **305**

1    and 0384.  Can you identify this document for

2    us?

3          A   Appears to be a letter to me from

4    Neil Leuthold, but it's not signed, dated

5    July 27th, 2009, regarding certificate of

6    insurance for correctional healthcare.

7          Q   Do you recall receiving this letter?

8          A   Not independently.

9          Q   But, again, you are not denying that

10   you received it?

11         A   No, I am not.

12         Q   And attached to this letter is

13   certificate of liability insurance dated

14   7/24/2009; correct?

15         A   Yes.

16         Q   Insurer C is listed as Essex

17   Insurance Company; correct?

18         A   Yes.

19         Q   And listed as additional insured on

20   this certificate of insurance are Madison

21   County, Alabama, and the sheriff of Madison

22   County, Alabama; correct?

23         A   It says Madison County, Alabama, and

**Jeff Rich - Madison County  Representative**                    **306**

1    the sheriff of Madison County, Alabama, are

2    included as additional insureds under the

3    general liability and professional liability

4    coverage, and references also the Madison County

5    jail as the certificate of holder.

6         Q  And if we look at the first page of

7    the document, Exhibit 28, the second sentence of

8    Mr. Leuthold's letter to you says this

9    certificate names Madison County and the sheriff

10   of Madison County as additional insured;

11   correct?

12        A  Yes.

13        (Defendant's Exhibit 61 marked for

14   identification.)

15        Q  Can you identify Exhibit 61, which is

16   Bates numbered ACH 381 and 382.

17        A  It's a letter dated July 30th, 2010,

18   to Madison County jail, Sheriff Blake Dorning,

19   from Neil Leuthold regarding certificate of

20   insurance for correctional healthcare.

21        Q  Now, if you would -- I'm sorry --

22   would you pull out Exhibit 9 from the first

23   session of your deposition?

1          A   (Witness complies.)

2          Q   So am I correct that Exhibit 9 is

3    also a letter from Neil Leuthold dated July 30,

4    2010, but Exhibit 9 is addressed to you; is that

5    correct?

6          A   No.

7          Q   Exhibit 9 is not addressed to you?

8          A   No, it is not.  It's addressed to

9    Madison County jail, Sheriff Blake Dorning.

10         Q   Do you recall whether you got or saw

11   a certificate of insurance in this time period?

12         A   No.

13         (Defendant's Exhibit 9(a) marked for

14   identification.)

15         Q   Look at what we are marking as

16   Exhibit 9(a), which is Bates No. ACH 0380.  Can

17   you identify this document?

18         A   Appears to be a letter dated July 30,

19   2010, addressed to me from Neil Leuthold

20   regarding certificate of insurance for

21   correctional healthcare.

22         Q   And this is the same date as

23   Exhibit 61 and as Exhibit 9, I believe; is that

1    correct?

2          A   61 and 9 are both dated July 30,

3    2010.

4          Q   Do you recall receiving Exhibit 9(a)?

5          A   Not independently, but I don't have a

6    reason to dispute that I would have received it.

7              (Defendant's Exhibit 29 marked for

8    identification.)

9          Q   Let me show you what is marked as

10   Exhibit 29.  Do you have one page or two pages

11   there?

12         A   One.

13         Q   One?  Let's substitute this one.

14             (Defendant's Exhibit 29 marked and

15   substituted.)

16         Q   Exhibit 29 is two pages, ACH 01143 --

17             MR. HODGE:  Do you want to make that

18   29(a) since there was a 29 preexisting?

19             MR. STEPHENS:  Well, 29 is -- what I

20   showed him before is the exact same page.  This

21   one just has the certificate of insurance

22   attached, David.  That is the only difference.

23             MR. HODGE:  I just didn't know -- I

**Jeff Rich - Madison County  Representative**        **309**

1    don't recall.  I don't care.  I just don't

2    recall the questioning he had originally under

3    29, if that causes confusion.

4           MR. STEPHENS:  I don't think it will.

5    I think all I asked him was to identify it, and

6    then I think I said if it was one page or two,

7    and he said one, so --

8        Q  (By Mr. Stephens:)  Can you identify

9    Exhibit 29?  It should be two pages, ACH 001146

10    and 47.  Can you identify those documents for

11    us?

12        A  The Exhibit 29 that I have is 001143

13    and 001144.

14        Q  Okay, very good.  What do those pages

15    consist of?

16        A  It appears to be a letter dated

17    August 1st, 2011, to Madison County jail, Steve

18    Morrison, from Neil Leuthold, enclosing or

19    regarding a certificate of insurance for

20    correctional healthcare.

21        Q  Is the second page a certificate of

22    insurance?

23        A  It is.

**Jeff Rich - Madison County  Representative**                     **310**

1          Q  And what is the date?

2          A  7/29/2011.

3             (Defendant's Exhibit 62 marked for

4    identification.)

5          Q  Can you identify Exhibit 62?

6          A  It is an Acord certificate of

7    liability insurance dated 8/1/2013.

8          Q  And it shows Advanced Correctional

9    Healthcare as the insured and Essex Insurance

10   Company under insurer; correct?

11         A  Correct.

12         Q  And the block has the same language

13   we had seen previously with regard to Madison

14   County, Alabama, and Sheriff of Madison County,

15   Alabama, as additional insured under the general

16   liability and professional liability coverage if

17   required by contract in writing; correct?

18         A  Correct.

19            (Defendant's Exhibit 63 was marked

20   for identification.)

21         Q  Can you identify Defendant's

22   Exhibit 63, which is Bates No. ACH 387?

23         A  It is a certificate of liability

1    insurance dated 3/8/2014.

2          Q  And the certificate holder that is

3    identified as the Neaves-Davis Center for

4    Children down at the bottom left; correct?

5          A  Yes.

6          Q  So this would be for the juvenile --

7    I would describe it, which is probably

8    politically incorrect, but as the juvenile

9    detention center?

10         A  The D-home.

11         Q  All right.  And it has under the

12   additional insured language Madison County,

13   Alabama, and the director of Neaves-Davis Center

14   for Children are included as additional insureds

15   under the general liability and professional

16   liability coverage as required under contract in

17   writing; correct?

18         A  That's what it says, yes.

19            (Defendant's Exhibit 64 marked for

20   identification.)

21         Q  Can you identify Defendant's

22   Exhibit 64?

23         A  It's a certificate of liability

**Jeff Rich - Madison County  Representative**                          **312**

1    insurance dated 7/28/2014.

2           Q   And Bates No. ACH 0386; correct?

3           A   Yes.

4           Q   And the same language regarding

5    Madison County, Alabama, and sheriff of Madison

6    County, Alabama, as additional insureds;

7    correct?

8           A   As additional insureds under the

9    general liability and professional liability

10   coverage if required by contract in writing.

11          (Defendant's Exhibit 65 marked for

12   identification.)

13          Q   What is Defendant's Exhibit 65?

14          A   A certificate of liability insurance

15   dated 7/29/14, Bates labeled ACH 385.

16          Q   Again, the certificate holder is the

17   Neaves-Davis Center for Children; correct?

18          A   Yes.

19          Q   Does the sheriff operate both the

20   D-Home and the jail, or no?

21          A   No.

22          Q   The County operates the D-Home?

23          A   Yes.  Generally, but it's a little

**Jeff Rich - Madison County  Representative**                    **313**

1    more complicated than that.

2         Q  Okay.

3         A  Advanced was asked to provide some

4    ancillary medical care services related to the

5    operation of the D-Home, so there was an

6    amendment to the contract that added those

7    services at some point.

8         Q  When ACH contracted with the sheriff

9    and the County to provide healthcare services at

10   the Madison County jail, Madison County did not

11   expect ACH to take over the entire operation of

12   the jail; true?

13        A  Madison County expected ACH to do

14   what the contract that it signed with ACH

15   required.  That did not include taking over the

16   security aspects of the jail or other aspects

17   that were not related to healthcare.

18        Q  Was ACH expected to operate the

19   kitchen at the jail?

20        A  I think ACH had a role in some of the

21   dietary issues, if I recall.  But as far as

22   providing line cooks to put food on trays, no.

23        Q  Was ACH expected to take over the

1   janitorial services of the jail?

2        A  Again, ACH had a role with respect to

3   the cleanliness of the jail, and I think I

4   testified previously ACH provided instruction

5   and training with respect to controlling

6   infectious diseases and bloodborne pathogens,

7   things of that nature.  But as far as mopping

8   the floors just for the sake of mopping them,

9   no.

10       Q  Was ACH expected to train

11  correctional officers or jailers as to the

12  appropriate use of force?

13       A  I think ACH's training

14  responsibilities are identified in the contract,

15  and I don't believe they include any force

16  continuum or force training, no.

17       Q  The type of services which ACH

18  contracted with Madison County and the sheriff

19  to provide were healthcare services; correct?

20       A  In the broadest sense, yes.

21       Q  Does the County Commission vote on

22  the amount of money that will be allocated for

23  healthcare services at the Madison County jail?

1          A   The County Commission approves a

2      budget for every fiscal year.  Departments

3      within the County or entities that the County

4      has either chosen to be -- and I say the County,

5      I mean County Commission in this regard.

6              Either the County is responsible

7      statutorily for funding or the County has chosen

8      to fund -- will present their budget needs for

9      the upcoming fiscal year.  And part of the

10     sheriff's department budget, as I understand it,

11     includes the necessary cost for healthcare.

12             The County Commission approves that

13     budget and then approves payment of

14     contractually obligated debts associated with

15     the Sheriff's operation of the jail.

16             The County Commission does not -- and

17     I am not sure I am answering your question.  But

18     the County Commission doesn't vote on each

19     medical bill that is presented for payment.

20     There were excess medical bills beyond what was

21     covered in the ACH contract, and they would not

22     take a vote on each one of those medical bills

23     as to whether they paid or not paid.

**Jeff Rich - Madison County  Representative**                    **316**

1        Q   When they vote, do they approve a

2    budget in general for the sheriff, or do they

3    approve a budget that includes a line item for

4    healthcare of the jail?

5        A   I don't know the answer.

6        Q   Does that make sense?

7        A   Yes, it makes sense.  And I don't

8    know the answer to that question.

9        Q   We can certainly agree ACH does not

10   have a vote at the meetings of the Madison

11   County Commission; right?

12       A   I can agree with you on that.

13       Q   Do you agree that legally as sheriff

14   of Madison County, Blake Dorning had a

15   constitutional duty to provide appropriate

16   medical care to inmates at the jail?

17           MR. HODGE:  Object to the form.

18       A   Sheriff Dorning has a

19   constitutionally mandated obligation to provide

20   healthcare to inmates of the Madison County jail

21   that meet the standards that have been imposed

22   by the Court with respect to constitutionally

23   adequate medical care for inmates.  So, yes.

1               (Defendant's Exhibit 49 marked for

2      identification.)

3          Q   Exhibit 49 is Bates ACH 088 through

4      0118.  Can you identify this document for us?

5          A   This is a consent decree entered in

6      the United States District Court for the

7      Northern District of Alabama in the case of

8      Jimmy Marshall, et al., versus Joe Whisante, et

9      al., Case No. CV78-C-5010-NE.

10         Q   Entered on -- you had said this, I'm

11     sorry, but on November 9th, 2000, by United

12     States District Judge U. W. Clemon.

13         A   I don't -- let's see.

14         Q   The enter date is shown on page 1,

15     November 9 --

16         A   That is the clerk's date of entry.

17     His signature date is November 26th of 2001.

18     And I don't know if that's -- I'm sorry, that's

19     an additional order.  There is more than one

20     order attached to it.

21         Q   I'm sorry.

22         A   I'm sorry, that's why I was confused.

23     I was looking at the last page because I

1    presumed you had given me one document.

2          Q  Me, too.  Sorry.

3          A  So the clerk entered it on

4    November 9th, 2000; the Judge entered an order

5    on November 8th, 2000, this particular order.

6              But to more accurately answer your

7    earlier question when I said this was an order

8    entered, I didn't know there were multiple

9    documents that were stapled together.  So this

10   is a series of orders related to the operation

11   of Madison County jail.  And I say "this,"

12   Exhibit -- what is it, 49?

13         Q  Exhibit 49.

14         A  Yeah, okay.  So it's several orders,

15   not just one.

16         Q  Paragraph 1 indicates that the

17   purpose of this order is to resolve issues

18   related to medical care, housing conditions,

19   security, and other practices at the jail;

20   correct?

21         A  Well, it says, this consent order is

22   submitted and entered into as a resolution of

23   the issues raised by the plaintiffs.  All

**Jeff Rich - Madison County  Representative**                    **319**

1  current and future inmates incarcerated at the

2  Madison County jail, (the jail) and pleadings

3  filed on or after May 1, 2000, and in hearings

4  before this Court regarding medical care,

5  housing conditions, security, and other

6  practices of the jail.

7       Q  And my understanding from your prior

8  deposition is that this order is still in effect

9  with regard to the sheriff and operations at the

10  jail; correct?

11       A  I would have to --

12       Q  Or in some form?

13       A  Yes.  I would have to review the

14  subsequent orders related to the operation of

15  the jail to determine what, if any,

16  modifications to this order have been put in

17  place by the subsequent orders.

18          I think when this order was entered,

19  the jail was still operated in multiple physical

20  locations.  It has been consolidated, so there

21  are some provisions of these orders that simply

22  don't apply because they are related to

23  facilities that have been closed at this point.

1           So it is in some form or fashion

2      still in effect.  It has not been sun-setted in

3      any regard in its operation.

4           Q  If we look at the last sentence on

5      the first page, ACH 088, it indicates that

6      because the defendant, which is the sheriff, is

7      dependent upon Madison County for funding

8      necessary to comply with many terms of this

9      consent order, the Madison County Commission has

10     been informed and notified of the terms of the

11     consent order; correct?

12          A  Correct.

13          Q  And is that an accurate statement, I

14     assume -- that the sheriff is dependent upon the

15     County for funding to comply with the order?

16          A  In part.  The sheriff has other

17     sources of funding that are not dependent on the

18     County Commission that are spent with respect to

19     operation of the jail.  So in part he is

20     dependent on the County Commission.

21          The County Commission at the time of

22     this order would have been informed of the

23     contents of the order.  The County Commission as

1    configured today may or may not.

2          Q  If we look at the next page, ACH 089,

3    the section at the bottom of that page is

4    entitled "Healthcare"; correct?

5          A  Yes, paragraph A.

6          Q  And certainly, without getting into

7    all the details, you would agree that a portion

8    of the Court's consent order relates to

9    healthcare at the Madison County jail; correct?

10         A  Yes.

11         Q  Are there currently any lawsuits

12   pending against Madison County, Alabama, or

13   Sheriff Dorning in which no demand for defense

14   or indemnity has been made against ACH?

15         A  Yes.

16         Q  Tell me about those lawsuits.

17         MR. HODGE:  Outside of the jail

18   context, Harold?

19         MR. STEPHENS:  Well, I am really just

20   asking about any lawsuits.  I mean, are there a

21   few, are there a lot, or --

22         A  That are currently pending, there are

23   probably not a lot.  There is a lawsuit related

1    to a demand for excess proceeds from tax sales

2    against the County.   There is some employment

3    litigation that is pending.

4          Q   Workers comp cases?

5          A   There are several workers comp cases

6    that are pending.   There is a case related to

7    flooding that may still be -- it may be on

8    appeal.   It's in -- we got a summary judgment

9    and I think the plaintiff is going to appeal.

10    They haven't, to my knowledge, appealed yet, but

11    it could still be pending in the sense there has

12    been an appeal filed.

13          There is litigation related against

14    the sheriff or officers, Deputy Sheriffs related

15    to excessive force claims unrelated to the jail.

16          Q   Is one of those Horatio Rice?

17          A   No.

18          Q   Did Horatio Rice or his family ever

19    file a lawsuit?

20          A   No.   Not that has been served.   Not

21    that the County or the sheriff would have notice

22    of.

23          Q   And of the matters you have

1    identified, am I correct that no demand for

2    defense or indemnity was made against ACH in the

3    cases you have just described because those

4    cases did not relate to the healthcare services

5    of the jail?

6         A  Yes.  They didn't relate to the jail

7    at all.

8         Q  And they didn't relate to healthcare

9    services at the jail?

10        A  No, they did not.

11        Q  Did any attorney on behalf of ACH

12   ever make any changes in the healthcare services

13   contracts?

14        A  There were changes that were proposed

15   by Jessica Young, but I don't think that there

16   was a contract that was consummated after she

17   proposed changes.

18            I know that throughout the years the

19   name Peter Genatone arose as their -- as ACH's

20   outside counsel with respect to different

21   issues.  And I don't know whether or not he ever

22   made any changes or suggested changes to the

23   contract.

**Jeff Rich - Madison County  Representative**                    **324**

1          Q  Do you recall any particular

2   discussions with Mr. Genitone?

3          A  I'm not sure I've ever talked to him.

4   I don't think that I have.

5          Q  Would it be fair to say that the

6   healthcare services agreements entered into

7   between the County, the sheriff, and ACH would

8   have been drafted by you as outside counsel, you

9   as County Attorney, or attorneys with the law

10  firm of Sirote and Permutt?

11             MR. HODGE:  Object to the form.

12             MR. STEPHENS:  And I'm sorry, David,

13  so I can get a clean question and answer, your

14  objection is --

15             MR. HODGE:  When you say drafted, you

16  mean completely authored by?

17             MR. STEPHENS:  I do.

18             MR. HODGE:  That was the objection.

19             MR. STEPHENS:  That's fine.

20         A  I suspect that all of the word

21  processing, for lack of a better way of

22  describing it, of this agreement, likely

23  occurred either at Sirote and Permutt or, once I

1   left there and became full time with the County,

2   at the County.  There is information and

3   requirements that are incorporated in this

4   agreement that solely came from Advanced

5   Correctional.

6           And I don't remember if it was

7   suggested language and changes such as the

8   letter you showed me earlier from Dr. Johnson

9   that identified several things that he liked or

10  wanted changed.  I think they had input on

11  things such as there was a co-pay policy, there

12  was a concern with respect to the Court's

13  involvement with the operation of the jail that

14  a co-pay could be viewed as a policy that would

15  deter an inmate from asking for medical care.

16          So there was a good deal of care and

17  concern put into coming up with a co-pay

18  provision that would not impede access to

19  medical care, and I believe Advanced

20  Correctional was asked to have input on the

21  language of that.

22          So although the drafting in the sense

23  of typing it would have been done, I believe, at

1    Sirote, it would be a document that I would view

2    as having input from Advanced Correctional as

3    well as the sheriff and the County through their

4    lawyers to generate the final document.

5            I'm not sure if that answers your

6    question, but I tried.

7        Q   Who drafted the insurance and

8    indemnification provisions in the healthcare

9    services agreement between Madison County, the

10   sheriff, and ACH?

11       A   Either I did or someone else at

12   Sirote did.

13       Q   Did the healthcare provider

14   immediately preceding ACH in July of 2006 have

15   any insurance coverage?

16       A   I believe they did.

17       Q   Did they have any insurance coverage

18   that extended to the sheriff or the County?

19       A   I don't remember if they were ever

20   able to get or did get insurance coverage that

21   would extend to the sheriff or the County or the

22   employees.  I think the biggest issue with

23   respect to insurance was they were able to get

1    insurance in the sense of malpractice insurance

2    that would not have covered liability under

3    federal claims that could be associated with

4    constitutionally inadequate medical care, or

5    alleged constitutionally inadequate medical

6    care, and that was the larger concern with

7    respect to their insurance, I believe.

8            Q  I don't want to reinvent the wheel.

9    I know we talked at the first deposition about

10   you or the County administrator, to your

11   knowledge, not ever obtaining a copy of the

12   actual ACH policy.  I'm not sure you were asked.

13   To your knowledge, did Sheriff Dorning ever

14   obtain a copy of the actual policy of insurance

15   from ACH?

16           A  No, not to my knowledge.

17           Q  Do you recall ever having any

18   discussion with Dr. Norman Johnson or any other

19   employee with ACH as to whether their insurance

20   coverage was primary or not?

21           A  Not beyond discussion of the terms of

22   the contract which were clear that it was

23   supposed to be primary.

**Jeff Rich - Madison County  Representative**                    **328**

1        Q   Are you aware of communications from

2    Essex about a willingness to remove the

3    reference to excess coverage in their policy?

4        A   There was some communication about

5    that, yes, that it had been not what was

6    intended.

7        Q   Did you as County attorney, or to

8    your knowledge, did Madison County ever send any

9    e-mail or correspondence to ACH inquiring as to

10   whether their insurance coverage was primary?

11       A   You mean before any controversy with

12   respect --

13       Q   Before this dispute arose, yes.

14       A   No.  There was -- I'm not aware of

15   any communication, other than the contract

16   itself, which was forwarded to ACH each time it

17   was renewed, and the certificate of insurance

18   which named the County and the sheriff as

19   additional insureds and included their names and

20   referenced in accordance with the contract.  So

21   that would have been the only communication that

22   I am aware of with respect to that issue.

23       Q   Have you ever seen any communication

1    from Essex Insurance indicating they would not

2    provide coverage to Madison County, Alabama, or

3    to the sheriff because they were only an excess

4    carrier?

5            A   Prior to this controversy?

6            Q   Right.

7            A   No.

8            Q   Do you know whether General Star was

9    an insurance company authorized by the

10   Commissioner of Insurance of the State of

11   Alabama to do business in the state of Alabama

12   in 2006?

13           A   I do not.

14           Q   Did you, or to your knowledge, did

15   anyone at Madison County take steps to verify

16   whether General Star in 2006 was authorized to

17   do business in the state of Alabama?

18           A   Yes.

19           Q   And tell me about that.

20           A   The steps taken were to rely on the

21   representations of Advanced Correctional that

22   they had obtained the insurance they were

23   supposed to obtain and provided multiple

1    certificates of liability insurance that

2    indicated that they had obtained insurance in

3    accordance with the contract.

4          Q  So did you as County Attorney ever

5    contact the Alabama Department of Insurance to

6    inquire as to whether General Star was

7    authorized to do business in the state of

8    Alabama?

9          A  No.

10         Q  Did you ever as County Attorney

11   contact the Department of Insurance to determine

12   weather Essex Insurance Company was authorized

13   to do business in the state of Alabama?

14         A  I have not.

15         Q  To your knowledge, has anyone else at

16   Madison County made such an inquiry?

17         A  Prior to the date of this dispute,

18   no.

19         Q  Do you have any evidence that Essex

20   Insurance Company is insolvent?

21         A  No.  Well, I don't know the current

22   status, quite frankly, as clear as I would like

23   to, between Essex and its name change or all of

1   these issues.  I don't know what that all would

2   involve or not involve.

3        Q  So just to follow up on that and

4   clarify that, as we sit here today, do you have

5   any evidence that Evanston Insurance Company or

6   Essex Insurance Company is insolvent?

7        A  Are those two different companies?  I

8   haven't been informed by anyone that either one

9   of them are insolvent.

10       Q  Fair enough.

11       A  I'm not trying to be difficult, but I

12  can't answer a question I don't fully

13  understand.

14       Q  I think that is a fair answer, and I

15  think we were on the same page, even though my

16  question may have been unartfully asked.

17       A  As long as we are on the same page.

18       Q  We are.  Tell me what you understand

19  it means for a carrier to withdraw coverage.

20  What do you understand that to mean?

21       A  In general, for a carrier to withdraw

22  coverage, in my mind, would be if a carrier has

23  provided a defense and determines that no

1    coverage exists, then they would withdraw

2    coverage based on the fact that they determined

3    at some point that no coverage exists.

4           Q  In your opinion, is a denial of

5    coverage the same thing as withdrawal of

6    coverage?

7           A  No.

8           Q  To your knowledge, has ACH's

9    insurance carrier ever withdrawn coverage with

10   regard to Madison County, Alabama, or the

11   sheriff?

12          A  Not as I understand the term

13   "withdrawn coverage."

14          Q  I don't think there is any dispute

15   about it, and you have a variety of it in front

16   of you there, but the contract required the

17   policy limits for ACH's carrier to be a

18   1 million per occurrence, $3 million aggregate

19   policy; correct?

20          A  I believe that is correct.

21          Q  And not only did the contract require

22   ACH to do that, but at least according to the

23   certificates of liability that were provided to

**Jeff Rich - Madison County  Representative**                    333

1  the County and the sheriff, those were the

2  policy limits of the ACH policy; correct?

3       A  As I understand it, yes.

4       Q  So just so we are clear, Madison

5  County, Alabama, doesn't have any complaint with

6  regard to the policy limits of the insurance

7  provided by ACH as I understand it; is that

8  correct?

9       A  The issue of whether or not the

10  dollar claim amounts, the limitation on the

11  dollar claim amounts is what is required under

12  the contract, is not an issue in this lawsuit.

13       Q  In fact, as County attorney for

14  Madison County, first as outside counsel and

15  then as in-house counsel, did you ever voice any

16  complaint to Dr. Johnson or anyone else at ACH

17  with regard to the certificates of insurance

18  which were provided?

19       A  Yes.

20       Q  And when would that have first

21  occurred?

22       A  We reviewed a number of them and a

23  number of e-mails about language that was

**Jeff Rich - Madison County  Representative**                    **334**

1    included or not included about them early on in

2    the relationship between the sheriff and ACH.

3           So I don't know that I can, off the

4    top of my head, give you every example of that.

5    But I was concerned about trying to do all I

6    could to get ACH's assurance that the insurance

7    required by the contract was in place.

8           Q  And the letter you are referring to,

9    is that not before there was ever a contract in

10   place with ACH?

11          A  Like I said, I don't recall the

12   specific dates.  And I'm not trying to be

13   evasive.  If you want to go back through the

14   documents, we can line that up.

15          But from the time that ACH was

16   seriously being considered up until it was

17   clear, based on their representations and based

18   on the subsequent actions of their insurer, and

19   ACH for that matter, that the coverage was in

20   place, that was a concern.  And I as a lawyer

21   was trying to do due diligence to make sure they

22   were doing what they said they would do.

23          Q  Do you have any evidence that from

1    2009 to 2014 either you as the County Attorney

2    or anyone at Madison County made any complaints

3    to ACH with regard to the certificates of

4    insurance?

5          A  I don't recall any specific complaint

6    during that time period.

7          Q  If the documents show that from

8    July of 2006 until 2014 that there were at least

9    seven or eight certificates of insurance

10   provided from ACH to Madison County and the

11   sheriff, do you have any reason to dispute or

12   disagree with that?

13         A  No.

14         Q  How many of those certificates of

15   insurance provided by ACH to Madison County

16   and/or the sheriff identified Madison County and

17   the sheriff as named insureds?

18         A  I think they all did to the extent

19   they named the County and the sheriff as

20   insureds in the policy.  We get back into the

21   dispute over what an initial insured and

22   additional named insured means, the certificates

23   of insurance named the County, the named the

**Jeff Rich - Madison County  Representative**                    **336**

1    sheriff, they referenced it and said in

2    accordance with the terms of the contract or

3    something to that effect, the contract required

4    them to be named insureds.

5             The cover letters that were written,

6    or a portion of the cover letters that were

7    written by ACH, identified the insurance for the

8    sheriff and the County in the same context as

9    insurance for ACH and its employees.

10            So I believe that all of those

11   indicated that the County was a named -- and the

12   sheriff -- were named insureds.

13       Q  Well, actually, all of them show --

14   except the three contract one that we looked

15   at -- show that they are additional insureds;

16   correct?

17            MR. HODGE:  Object to the form.

18       A  They show that they are -- they

19   include various wording, and I don't know who

20   prepared them or typed them.  But they identify

21   by name Madison County, and I believe they

22   identify by name the sheriff, and they

23   identify -- the reference to the contract that's

1  between the sheriff, the County, and ACH.

2         Q  But from July 2006 until 2014, none

3  of the certificates of insurance that ACH

4  provided to the County and the sheriff used the

5  words, quote, named insureds, end quote;

6  correct?

7         A  They didn't use that term, I don't

8  believe, with respect to either Madison County,

9  the sheriff, or ACH.

10        Q  But they did use the term, quote,

11  additional insureds, end quote; correct?

12        A  Well, again, the wording on most of

13  them says Madison County, Alabama, and the

14  sheriff of Madison County, Alabama, are included

15  as additional insured under the general

16  liability and professional liability coverage if

17  required by the contract in writing -- or by the

18  contract in writing.

19        Q  And then to jump ahead, but for me to

20  stop asking you questions about all this, are

21  you aware that the additional insured

22  endorsement under the Essex policy explains that

23  for purposes of the policy "additional insured"

**Jeff Rich - Madison County  Representative**                    **338**

1    means "insured"?  Have you seen that?

2         A  I have seen language to that extent.

3         Q  Which would lead you to conclude that

4    whether you are an additional insured or a named

5    insured would not make any difference at all,

6    because either way you would be an insured?

7         A  Unless you are Essex.  I mean, I --

8         Q  So I'm really asking for a legal

9    opinion, not a --

10         A  I'm not being deposed as an expert or

11    a lawyer.  I am being deposed as the County

12    representative, so I really don't know that that

13    is a fair question.

14              (Discussion off the record.)

15              THE VIDEOGRAPHER:  It is 11:27, going

16    off the record.

17              (Discussion off the record.)

18              THE VIDEOGRAPHER:  It is 11:35.  We

19    are back on the record.

20              (Defendant's Exhibit 66 marked for

21    identification.)

22         Q  Let me show you the next exhibit, 66,

23    which is Bates numbered ACH 234 and 235.  Can

**Jeff Rich - Madison County  Representative**                    **339**

1   you identify this document for us?

2         A   Yes.   It is a letter from me dated

3   January 5, 2011, to Mike Hale regarding Advanced

4   Correctional Healthcare.

5         Q   And it's a letter of recommendation

6   by you to the then sheriff of Jefferson County

7   to recommend ACH to them as a healthcare

8   provider; correct?

9         A   Yes.

10         Q   In fact, if we look at the second

11   page of your letter, you state, I recommend the

12   services of ACH without reservation; correct?

13         A   That's stated there, yes.

14         Q   And did you write this letter

15   yourself?

16         A   My recollection is I was contacted by

17   ACH -- I believe Norm Johnson -- and asked if I

18   would be willing to write or provide a

19   recommendation.

20            And Dr. Johnson, or someone from ACH,

21   sent me a letter that they wanted me to sign and

22   send to Mike Hale.   And I think I made some

23   revisions to that letter before it was sent.   So

1   I don't know if I would say I wrote the letter

2   or I revised a draft letter that they had

3   provided.

4          Q   It is fair to say at the time that

5   you did sign the letter?

6          A   I did.

7          Q   At the time you signed the letter,

8   did you agree with the statements in the letter?

9          A   Yes.   I mean, there is nothing in the

10   letter that I would have represented as false

11   or -- I was really trying to be helpful to

12   Dr. Johnson and to the healthcare provider at

13   the jail, so there is nothing I am aware of that

14   I believed to be false at the time that I said

15   it.

16          Q   To your knowledge, does Madison

17   County, Alabama, or the sheriff of Madison

18   County have any tape-recorded conversations with

19   Dr. Johnson or any employee of ACH that relates

20   in any way to this lawsuit?

21          A   No.

22          Q   From July 2006 when it first

23   contracted with Madison County and the sheriff,

1    until June 2015, did ACH procure at its own

2    expense and maintain in force general liability,

3    professional liability, and medical malpractice

4    insurance, as far as you know?

5              A   As far as I know.

6              Q   As far as you know, from July 2006

7    until June 2015 did ACH have in place insurance

8    providing coverage for claims asserted for

9    constitutional tort claims under 42 USC, Section

10   1983?

11             A   As far as I know, some form of 1983

12   coverage was included in their insurance

13   package.

14             (Defendant's Exhibit 67 marked for

15   identification.)

16             Q   Let me show you what has been marked

17   as Defendant's Exhibit 67, and that is

18   certainly -- I would represent to you this is

19   not the entire RFP.  I'm really just using this

20   for identification purposes.  Exhibit 67 is

21   Bates ACH 0064, entitled at the top "Madison

22   County Commission," their address and Request

23   for Proposals, and references proposal No.

1    P-2013-04; correct?

2              A  Yes.

3              Q  And then let me show you next what

4    has been marked as Defendant's Exhibit 68.

5              (Defendant's Exhibit 68 marked for

6    identification.)

7              Q  It is Bates No. ACH 058.  This is a

8    Madison County Purchasing Department document

9    for proposal P-2013-04; correct?

10             A  Correct.

11             Q  And then there is a checklist of

12   various items that are to be included with each

13   proposal, and one of the categories listed is

14   certificates of insurance; is that correct?

15             A  Yes.  So certificates of insurance if

16   applicable.

17             Q  If applicable, right.  Do you know if

18   the County had a checklist that also included

19   copy of insurance policy?  I mean, I haven't

20   seen one, I'm just asking.

21             A  Well, the copy of insurance policy

22   was required under the contract each time it was

23   signed.  So it is not a checklist.  The

1  purchasing department really in the setting of

2  professional services contract, such as the

3  healthcare services agreement, really has

4  minimal involvement and at times no involvement

5  at all.

6          So from the standpoint of what the

7  purchasing department might or might not have

8  had, I am not aware of any other checklist that

9  would have required a copy of a policy.  If a

10  policy was required, that would be part of what

11  would be in the contract document.

12          Q  Let's take a look, and you might look

13  at Exhibit 57.  But the two --

14          (Brief interruption of the

15  deposition.)

16          Q  Pull out, if you would, just one of

17  the healthcare services agreements, Exhibit 54,

18  and take a look, if you would, at paragraph

19  6(d), which lists indemnification.

20          A  In this one it's 6(c).

21          Q  Okay.  I won't promise you that I sat

22  down with every single one and looked at the

23  exact same paragraph in every one of the

1  agreements, but substantively do you recall the

2  indemnification language being any different in

3  the 2011, '12, '13, agreements?

4       And if you are not sure, maybe we

5  ought to pull the agreement which would be

6  applicable to this, which I guess would be the

7  2012 or '13 agreement.  I don't think the

8  language changed.

9     A  I don't believe it did, but without

10  having them side by side, I would be hesitant to

11  say.  But I don't believe it did.

12     Q  See if you can look real quick at the

13  '12 or '13 agreement?

14     A  Right here.

15     Q  And what exhibit number is that?

16     A  54.

17     Q  54, okay.  Looking at paragraph 6 --

18  and you said it's No. (c) there; correct?

19     A  Yes.

20     Q  Under paragraph 6(c) in the first

21  paragraph, there are three separately numbered

22  subparts, 1, 2, and 3; correct?

23     A  Yes.

1          Q   Can we agree that the Woods,

2     Jefferson, Listau, Davis, and Foster cases do

3     not involve any allegation of employment

4     discrimination?

5          A   Yes.

6          Q   So consequently we can agree that

7     with regard to indemnification, paragraph 6(c),

8     subpart 3, does not apply to this dispute;

9     correct?

10         A   Correct.

11         Q   Looking at paragraph 6(c) subpart 1,

12    this provision provides indemnifications for

13    claims which may be brought against Madison

14    County, the sheriff, or the employees as a

15    result of acts or omissions of ACH, its agents,

16    servants, or employees related in any way to or

17    while in performance of this agreement; correct?

18         A   That's a paraphrase of it.

19         Q   Do you understand that to mean if

20    Madison County or the sheriff are sued because

21    of acts of ACH or its employees while providing

22    healthcare services at the Madison County jail,

23    that provision could apply to those claims?

**Jeff Rich - Madison County  Representative**                   346

1            A  Yes.

2            Q  Do you agree that in paragraph 6(c),

3   subpart 1, there is nothing to indicate that ACH

4   is agreeing to indemnify Madison County or the

5   sheriff or their employees if they are sued

6   because of their own acts or omissions?

7            A  I agree that there would be no

8   requirement for indemnification if the County or

9   the sheriff or their employees or agents or

10  officers are sued for issues wholly unrelated to

11  the provision of healthcare in the jail.

12           Q  And take your time and read, but in

13  interest of moving things along, would you agree

14  the same is true with regard to paragraph 6(c),

15  subpart 2?

16           A  Yes.

17           Q  And, in fact, in the second paragraph

18  of paragraph 6(c), the sheriff and the County

19  generally agree to indemnify ACH if ACH is sued

20  because of acts or omissions of the County, the

21  sheriff, or their respective employees while in

22  performance of the healthcare services

23  agreement; correct?

1          A  Generally.

2          Q  Pull, if you would, Exhibit 5 from

3    your original deposition.  I want to go over

4    some matters with regard -- this is the

5    complaint filed in this case.

6              I'll start on paragraph 38, which I

7    believe is page 17 of Exhibit 5.  Are you with

8    me?  All right.  The first bullet in paragraph

9    38 alleges, as was alleged in the underlying

10   case, that Ms. Listau had advanced delirium

11   tremens due to alcohol withdrawal.  Do you see

12   that?

13         A  Yes.

14         Q  Do you know medically whether that is

15   an accurate and true statement or not?

16         A  Do I know whether she had DTs or not?

17         Q  Right.

18         A  No.

19         Q  Correctional officers at the Madison

20   County jail were under obligation to check Ms.

21   Listau ever 15 minutes.  Are you aware of that,

22   or do you recall that?

23         A  I don't recall that specifically.  I

1   believe Ms. Listau was housed in the medical

2   unit, which would have been staffed with ACH

3   employees or contractors, as well as medical

4   officers.

5            So the monitoring requirement,

6   whether it -- my recollection is it rested with

7   ACH, but I don't have a specific recollection

8   that I can point to of where that comes from.

9        Q  Have you seen the autopsy report of

10  Ms. Listau?

11       A  I believe at some point I did.

12       Q  There is also an allegation in the

13  next bullet of paragraph 38 that Ms. Jefferson

14  had a bowel obstruction from constipation that

15  was improperly and ineffectively treated,

16  leading to her death.  Do you know if that is an

17  accurate and true statement or not?

18       A  No.

19       Q  Have you seen the autopsy report for

20  Ms. Jefferson?

21       A  Yes.

22       Q  And you are aware that it describes

23  her large and small bowel as unremarkable?

1        A  I recall something to that effect,

2    yes.

3        Q  With regard to Mr. Woods, do you

4    recall that there were one or more instances

5    where he was tazed while in the jail by

6    correctional officers?

7        A  I recall seeing reports that

8    indicated that officers interacted with him.  I

9    think the reports indicated he was tazed.  But

10   as far as me witnessing or being there or having

11   any personal knowledge of it, I don't.

12       Q  Look over at paragraph 58 on page 25

13   of the complaint.  There is an allegation about

14   the correctional officers having incurred and

15   continuing to incur claims expenses.

16           Am I correct that none of the

17   correctional officers individually are

18   out-of-pocket for any expenditures with regard

19   to Jefferson, Listau, Woods, Davis or Foster?

20       A  I'm not aware of any personal

21   out-of-pocket expense that those officers

22   incurred, but whether or not they consulted with

23   their own private lawyer or with a PBA lawyer

1       through their PBA dues or something of that

2       nature, I do not know.  That would not be

3       unusual.

4               Q  We talked briefly about this.  Look

5       at paragraph 61, if you would, on page 27 with

6       regard to medical records.  You are aware that

7       ACH did maintain electronic medical records

8       while providing healthcare service at the

9       Madison County Jail; correct?

10              A  I'm aware that some medical records

11      were maintained electronically, some medical

12      records were maintained in paper copy.

13              Q  Did you personally examine any of the

14      medical records after ACH's contract was

15      terminated?

16              A  I have personally examined medical

17      records from time to time, even as recently as

18      this week.

19              Q  Are there any instances you can

20      describe for me where after ACH was terminated,

21      but up to the present, you had difficulties or

22      problems locating or retrieving medical records?

23              A  There is an individual in the jail

1   whose name is Robin Baker, who is an

2   administrative person.  She is my contact person

3   for getting records.  She has explained to me on

4   occasion the difficulty of locating in an

5   organized and efficient way medical records

6   associated with inmates in the jail that would

7   have been inmates during the time that ACH was

8   there.

9        Q  Do you know whether the difficulty

10  locating or obtaining those records was directly

11  the fault or responsibility of ACH or not?

12       A  ACH was responsible under the

13  agreement to provide a patient record system

14  that would have allowed for the orderly and

15  efficient retrieval of those records, both from

16  the standpoint of being necessary for the work I

17  do for the sheriff and the County, but also for

18  the physicians and the healthcare providers in

19  the jail to be able to quickly and efficiently

20  reference prior medical records.

21            I would think that would be part of

22  any medical recordkeeping system.  And if I were

23  a physician, I would be able to do that.  So it

1   would be their responsibility to maintain those

2   records in an orderly and researchable format.

3        Q  Have you personally ever tried to

4   access any of the electronic medical records

5   kept by ACH or have you relied upon the

6   administrative person to do that?

7        A  I don't have the ability to access

8   the system other than through a request to the

9   sheriff's department.  Those are the sheriff's

10  records.

11       Q  With regard to settlement of the

12  Woods, Jefferson, and Listau cases, OneBeacon

13  paid money to resolve each of those three

14  claims; correct?

15       A  Those cases were resolved using a

16  combination of money from OneBeacon and money

17  that was paid on behalf of the other insurer,

18  the other parties defendants to those lawsuits,

19  other than -- I think the individual defendants

20  in each one of them were dismissed prior to the

21  settlement, but the money would have been paid

22  on behalf of -- a portion of it on behalf of

23  Madison County and the sheriff by OneBeacon, and

1    then other proceeds were paid by either Advanced

2    or their provider.

3        Q  And OneBeacon's payments to settle

4    Woods, Jefferson, and Listau were voluntary

5    payments made by OneBeacon as the insurer for

6    Madison County and the sheriff; correct?

7        A  Yeah, I don't necessarily agree with

8    your characterization that OneBeacon paid to

9    settle those cases.  That makes it sound like

10   arguably OneBeacon paid all money to settle

11   those cases.

12            As you well know, because you

13   participated in the mediations, there were a

14   number of parties and a number of negotiations

15   and side negotiations about who was going to pay

16   what and who paid what, ultimately.

17            So the portion of the money that was

18   paid to settle the cases by OneBeacon was paid

19   because OneBeacon wanted to settle those claims,

20   from my perspective.

21       Q  And the amount it chose to pay was a

22   decision that OneBeacon made?

23       A  Yes.

1           Q   Are you aware of any contractual

2    agreement between ACH and OneBeacon?

3           A   No.

4           Q   Was it OneBeacon's position that

5    there were claims against the sheriff, the

6    County, and correctional officers that were

7    based upon the sheriff, County, and their

8    employees' own acts or omissions?

9           A   No.

10          Q   Who is the person at the Madison

11   County jail most familiar with the medical

12   records?  Is that the individual you named

13   earlier?

14          A   Most familiar in what regard?  I

15   mean, just where they are kept and how they are

16   kept, probably Robin Baker.

17          Q   What damages, if any, has the County

18   incurred because of the alleged failure of ACH

19   to keep or maintain medical records?

20               Strike that and let me ask you this

21   question first.  What damages, if any, have the

22   individual correction officers, Christine

23   Collier, Vanessa Fields, Nick Wallace, Rosalyn

1    Guyton, Randy Hooper, and Pamela Batie incurred

2    if any, because of ACH's failure to keep and

3    maintain medical records?

4                MR. HODGE:  Object to the form.

5           A   I don't know.

6           Q   What damage, if any, has the sheriff

7    or Madison County incurred because of ACH's

8    alleged failure to keep and maintain medical

9    records?

10          A   I believe -- but that's a question

11   for the sheriff, so I am hesitant to speculate

12   about it.  It would be mere speculation.  About

13   the amount of time and effort associated with

14   retrieving and organizing prior medical records

15   that have been -- that amount of time that has

16   been spent either by the staff or the sheriff or

17   by the staff of the new medical provider at the

18   expense of the sheriff and the County.

19               But it would be logical that if

20   something had to be cleaned up, somebody had to

21   pay to clean it up.

22          Q   Are you aware of what payment, if

23   any, was made?

1        A   Well, payment in the sense of paying

2    employees to do something that they wouldn't

3    normally or otherwise have to do that would take

4    them away from their other job obligations.  So,

5    again, that would be a question better directed

6    to the sheriff and his staff.

7        Q   Look at paragraph 92 of the complaint

8    filed in this case.

9        A   Are you talking about Exhibit 5?

10       Q   Exhibit 5, yes, sir.  So paragraph 92

11   alleges two instances of fraud, and I want to

12   focus on the second one first.  The second one

13   relates to this additional named insureds.  Do

14   you see that?

15       A   Yes.

16       Q   Do you agree that the fact the County

17   and the sheriff were, quote, additional

18   insureds, end quote, is a fact that was provided

19   in writing multiple times to the County and to

20   the sheriff and to their legal counsel from

21   July 2006 to 2014 evidenced by both certificates

22   of insurance and correspondence?

23       A   I agree that the certificates of

1    insurance and correspondence named the sheriff

2    and the County and identified insurance procured

3    in accordance with the contract which would have

4    required the sheriff and the County to be

5    additional named insureds.

6         Q   Are you aware of any false

7    representation made by ACH to the sheriff or the

8    County with regard to the County and sheriff's

9    status as additional insureds under ACH's

10   insurance policy?

11        A   The contract that ACH signed

12   repeatedly required ACH to obtain insurance that

13   included insurance for the sheriff and the

14   County as additional named insureds.  They

15   repeatedly signed that contract.  If, in fact,

16   that is not the case, that would be a

17   misrepresentation.

18        Q   But they also repeatedly provided to

19   the County and the sheriff certificates of

20   insurance that stated that the County and the

21   sheriff were additional insureds; true?

22        A   We have read repeatedly what the

23   certificates of insurance say, and I am not

1    going to agree with you that the only sentence

2    you can read out of the certificate of

3    insurance, or the only two words, are

4    "additional insureds."

5             I think taken as a whole, by naming

6    them by name, by referencing contract that

7    required them to be named as named insureds,

8    that the certificate of insurance does not limit

9    itself to putting the sheriff and the County on

10   notice that they were only additional insureds.

11   So I just will not agree with you on that point.

12        Q  But you do agree with me that you do

13   not have any evidence that the County or the

14   sheriff have been damaged in any way because

15   they were additional insureds as opposed to

16   named insureds; true?

17        A  I believe I understand your question,

18   and if so, that is true, yes.

19        Q  So then moving on to paragraph 92,

20   the other allegation -- and I am winding down

21   now -- the other allegation there is a reference

22   about, quote, adequate insurance.  The word

23   "adequate" doesn't appear anywhere in the

**Jeff Rich - Madison County  Representative**                           **359**

1   agreement between ACH and the sheriff or the

2   County, does it?

3        A   And let me say this, in reference to

4   the prior question, I'm not sure if the County

5   and the sheriff -- and that probably is not

6   going to be determined until the outcome of this

7   lawsuit -- as to whether or not they have been

8   damaged by the distinction between additional

9   insured and additional named insured, I think

10  that is part and parcel to what this lawsuit in

11  part is about.

12           So for me to say I agree, they

13  haven't been damaged, is probably premature,

14  because that is probably part of the issue in

15  this lawsuit.

16       Q   So at the present time you don't have

17  the evidence they have been damaged, based on

18  the documents you have seen and reviewed?

19       A   To be quite honest with you, I didn't

20  fully understand Jagady Blue's deposition

21  testimony.  But if his testimony, as I

22  understand it, is the position of Essex in this

23  case, there may well have been damage as a

1   result of the determination that that

2   distinction was in place because of the denial

3   of coverage under the Essex policy.

4         Q  Let me jump ahead real quick.

5         A  I'm sorry, I interrupted your

6   question.  But the more I thought about my

7   answer, I didn't think it was accurate or

8   complete.

9         Q  We have kind of talked around this,

10  and let's just look at it, Defendant's Exhibit

11  75.

12            (Defendant's Exhibit 75 marked for

13  identification.)

14        Q  If you would identify this document?

15  It is Bates ACH 0412 through 421.  This is a

16  letter dated October 27, 2014, to you from Lane

17  Finch; is that correct?

18        A  Yes.

19        Q  Look over on page --

20        A  I guess it's to the County and to the

21  sheriff in care of Jeff Rich.

22        Q  In care of you, right.  Look over on

23  page 6 of the letter.  We alluded to this

1   earlier, but just so we are clear, it recites

2   endorsement No. 6 as the additional insured

3   endorsement.  Do you see that?

4           A  Yes.

5           Q  If you look at paragraph 1,

6   Section 1, it says the insured is amended by the

7   addition of the following.  "Whenever used in

8   this policy the unqualified word 'insured' shall

9   also mean 'additional insured.'"

10          Do you see that?

11          A  I will agree with you that page 6

12  says whenever used in this policy the

13  unqualified word "insured" shall also mean

14  "additional insured."

15          Q  Can you explain to me -- the other

16  allegation -- and I want to circle back because

17  I'm not sure I got an answer to this.  We got

18  sidetracked.

19          A  Okay.

20          Q  But in terms of ACH being under some

21  duty to provide, quote, adequate, end quote,

22  insurance, the word "adequate" is never used in

23  the agreement between Madison County, the

1    sheriff, and ACH, is it?

2          A  I'm sorry, help me get back where you

3    were.

4          Q  Paragraph 92 of the complaint.  You

5    see there are sort of two subparts, and the

6    first subpart is what I am looking back at now.

7    It says there were false representations made

8    with regard to procuring and maintaining

9    adequate insurance coverage.  Do you see that?

10          A  Yes.

11          Q  And that's why I wanted to ask you

12    the question.  So in terms of policy limits, we

13    are not here to fight about what the policy

14    limits were or were not, I don't think.  Are we?

15          A  I agree.

16          Q  My question now is the word, quote,

17    adequate, end quote.  That also is not a word

18    that appears in the agreement between Madison

19    County, the sheriff, and ACH with regard to

20    insurance coverage, does it?

21          A  I don't recall that word appearing in

22    that provision, no.

23          Q  If we look at your January 5, 2011,

1    letter to Sheriff Mike Hale, which is

2    Exhibit 66, the third paragraph of your letter

3    says, ACH was immediately able to provide the

4    required liability insurance.

5              Do you see that?

6         A  Yes.

7         Q  Can you explain to me how ACH had

8    committed fraud with regard to insurance

9    coverage for Madison County and the sheriff?

10             MR. HODGE:  Object to the form.

11        A  ACH has made representations

12   throughout its relationship with Madison County

13   and the sheriff that it had certain insurance in

14   place when in fact it did not have that

15   insurance in place.

16        Q  And what insurance are you saying is

17   not in place?

18        A  Insurance that would provide coverage

19   for the allegations that are made in the

20   underlying lawsuits that we are here to talk

21   about, and insurance that was required by the

22   express language of the contract that ACH signed

23   on several occasions.

**Jeff Rich - Madison County  Representative**                    **364**

1          Q   And then the letter we just looked at

2     from Mr. Finch to you, Essex did not say that

3     they are not providing insurance, did they?

4          A   Essex has not provided coverage to

5     Madison County and the sheriff and their

6     employees in these underlying lawsuits.

7          Q   Doesn't that letter indicate that

8     they are going to provide a defense under

9     reservation of rights?

10         A   What letter are we talking about now?

11         Q   It's -- I'm sorry, it's this one,

12    which is the October 27, 2014.

13         A   Exhibit 75?

14         Q   75, I'm sorry.  If you look under

15    "Conclusion" on page 9, ACH 0420, the first

16    sentence under "Conclusion" says, Essex

17    Insurance will defend Madison County and Sheriff

18    Dorning, but it reserves the right to assert at

19    a later time any and all coverage defenses that

20    are appropriate.

21             Do you see that?

22         A   Yes.

23         Q   And ACH, from July 2006 until

1   June 2015, provided to Madison County and the

2   sheriff a certificate of insurance identifying

3   who the carrier was, the insurance policy

4   number, the insurance policy term, the insurance

5   policy limits, and a description with regard to

6   Madison County and the sheriff, provided every

7   one of those certificates of insurance; correct?

8        A  I believe so.

9        Q  Is there anything that you know of on

10  any of those certificates of insurance that is

11  false?

12       A  The certificates of insurance and the

13  letters that accompany them represented to the

14  County and to the sheriff that the insurance

15  that was required in the contract had been

16  procured and was in place, when in fact it was

17  not.

18       Q  What insurance are we talking about?

19       A  Insurance that would cover the

20  underlying claims in these underlying lawsuits,

21  and the insurance that was mandated in the

22  contract that was signed by ACH.

23       Q  Well, Exhibit 75 says that Essex is

1    providing coverage with regard to the Listau

2    case; true?

3         A  But they didn't.

4         Q  Has that been resolved as of the

5    present?

6         A  No.

7         Q  What about with regard to Woods or

8    Jefferson, has that been resolved at present as

9    to whether they will or won't?

10        A  Has Essex determined that it will not

11   provide coverage in the underlying cases?  Essex

12   has not provided coverage in the underlying

13   cases.  Essex has not reimbursed OneBeacon for

14   expenses associated with it.  Essex has not

15   reimbursed Madison County for deductibles.

16   Essex was not, to my knowledge, at the

17   mediations on behalf of Madison County or the

18   sheriff agreeing that they would settle those

19   claims.  Essex did not employ lawyers to defend

20   Madison County and the sheriff.

21             So despite what one sentence in Lane

22   Finch's letter of October might say, I don't

23   believe Essex has provided insurance to the

**Jeff Rich - Madison County  Representative**                    **367**

1   County and the sheriff or their employees in

2   those underlying cases.

3       Q  Did Madison County, the sheriff, or

4   any of its attorneys at the mediations of the

5   Jefferson, Woods, and Listau cases say that we

6   are not going to go forward with discussions

7   about settlement of this unless and until Essex

8   takes over the defense of Madison County or the

9   sheriff?

10          MR. HODGE:  Objection to the form.

11      A  There were demand letters that were

12  sent to -- and I don't recall whether they were

13  sent to ACH or Essex or both prior to the

14  mediations that I believe were intended to

15  convey that.

16      Q  Is there anything in the settlement

17  agreements with regard to Listau, Jefferson, or

18  Woods that indicates Madison County and the

19  sheriff are reserving all rights against ACH and

20  Essex as a part of their settlement agreements?

21      A  I don't think there is a specific

22  reservation of any right of the County or the

23  sheriff included in those agreements.  But if

1   you want me to look at them and tell you why or

2   why not I think that, I will happily do that.

3        Q  Do you recall any non waiver

4   provision in the settlement agreements of

5   Listau, Jefferson, and Davis that expressly

6   states that Madison County and the sheriff are

7   not waiving any rights with regard to ACH and

8   Essex?

9        A  I don't believe they are, because I

10  don't believe they were necessary to preserve

11  any rights.  It was not a settlement agreement,

12  nor ever intended to be a settlement agreement,

13  or a mediation agreement between Essex and ACH

14  and Madison County and the sheriff.  It was the

15  settlement agreement entered into to settle the

16  underlying constitutional claims.

17       Q  Do you have any evidence that ACH

18  willfully misrepresented any facts to the County

19  or the sheriff?

20       A  They willfully signed the contract

21  repeatedly that said they would provide coverage

22  that apparently had not been in place.

23       Q  In fact, the fraud claim really is a

1    contract claim, isn't it?

2         A  No.  It's a fraud claim.

3         Q  Do you have any evidence that ACH

4    willfully misrepresented any facts?

5         A  I started telling you that.  But I

6    believe when they signed the contract and

7    coverage was not in place, that they

8    affirmatively represented that that coverage

9    existed, when apparently their communications

10   with their insurer or their agent did not

11   confirm that.

12             Norm Johnson testified at his

13   deposition that he was surprised that ACH or

14   that the County and the sheriff's expenses had

15   not been paid, that he thought they would have

16   been.  So I don't know whether he had given

17   direction that they should be or what.

18             But, again, I believe there were

19   affirmative representations that coverage

20   existed, and the County and the sheriff relied

21   on that to their detriment.  And actions were

22   taken in previous lawsuits that would confirm

23   that that coverage existed through ACH and the

**Jeff Rich - Madison County  Representative**                    **370**

1    action of its insurer, and now we are being told

2    that it doesn't.

3        Q  And so the only evidence you have of

4    willful fraud or suppression by ACH is its

5    signing of the contracts with the County and the

6    sheriff; is that correct?

7        A  I'm not aware of another affirmative

8    statement that the insurance exists beyond the

9    letters that we have been through, the contract

10   we have been through, the position taken by ACH

11   in regard to its obligation to have insurance

12   for previous lawsuits that were covered, or that

13   it appeared were covered.

14       Q  Do you have any evidence that ACH

15   made misrepresentations intentionally to deceive

16   the County and the sheriff other than what you

17   have stated with regard to signing the

18   agreements?

19       A  Ask your question again.

20       Q  Do you have any evidence that ACH

21   made misrepresentations to intentionally deceive

22   the County and the sheriff, other than what you

23   testified to previously, with regard to signing

1   of the agreements?

2          A  No.

3          Q  Is there any reason you know of that

4   Madison County, Sheriff Dorning, or their legal

5   counsel could not read the wording on the

6   multiple certificates of insurance that were

7   provided between July of 2006 and June 2015?

8          A  I can read.  I mean, I don't

9   understand that question.  Madison County is an

10   entity only made up of people.  The sheriff

11   knows how to read and I know how to read.

12          Q  How did ACH suppress information

13   related to its insurance coverage when it was

14   providing you certificates of insurance each

15   year?

16          A  It represented that the insurance

17   that was required by the contract had been

18   obtained when, in fact, it does not appear that

19   it had been obtained.

20          Q  And that is based upon Essex doing or

21   not doing what?

22          A  It's based on Essex not providing

23   coverage for those claims.

1          MR. STEPHENS:  I'm going to stop at

2     this point.  I know you have a meeting to get

3     to, and I know Brandon has some questions, so I

4     am going to stop there in the interest of time

5     and let him finish up.

6          THE VIDEOGRAPHER:  It is 12:25 and we

7     are going off the record.

8          (Recess taken.)

9          THE VIDEOGRAPHER:  It's 12:32 and we

10     are back on the record.

11          (Defendant's Exhibit 31 marked for

12     identification.)

13     Q  (By Mr. Stephens:)  Mr. Rich, the

14     last document I want to show you is identified

15     as Exhibit 31.  It's Bates numbered ACH 01819

16     through 1837.  Can you identify this document

17     for us?

18     A  This is a letter from me to Norman

19     Johnson dated July 9, 2014, regarding the Robert

20     Elliott versus Madison County, et al. case.

21          MR. STEPHENS:  That's all I've got.

22     EXAMINATION BY MR. CLAPP:

23     Q  Mr. Rich, my name is Brandon Clapp.

1   I am here for Evanston Insurance Company.  I

2   have a few follow-up questions for you.  I hope

3   to get you out of here as quickly as I can.

4              There has been discussion about other

5   cases in which Evanston or Essex has provided a

6   defense to Madison County or the sheriff's

7   department for other claims.  Is that right?

8          A  Yes.

9          Q  One of those claims is the Hammonds

10  claim.  Are you familiar with that?

11         A  Generally.

12             (Defendant's Exhibit 76 was marked

13  for identification.)

14         Q  I am handing you what has been marked

15  as Defendant's Exhibit 76.  It's a letter from

16  you to Norm Johnson dated July 6, 2015.  Do you

17  have a recollection of sending this

18  correspondence?

19         A  Yes.

20         Q  And in addition to the letter to

21  Dr. Johnson, you have forwarded a copy of the

22  complaint.  Will you briefly scan the complaint

23  so that you can answer a few questions?  Let me

**Jeff Rich - Madison County  Representative**                                    **374**

1    know when you are ready.

2         A   Okay.

3         Q   In looking at that complaint, there

4    are no allegations against the County or the

5    sheriff for deliberate indifference, are there?

6         A   There is no use of the words

7    "deliberate indifference" in the complaint.

8         Q   And there are no allegations against

9    the County or sheriff for inadequate funding of

10   medical care or healthcare at the jail in that

11   complaint, are there?

12        A   I don't believe so.

13            (Defendant's Exhibit 77 was marked

14   for identification.)

15        Q   I have marked as Defendant's

16   Exhibit 77 a copy of a letter dated August 27,

17   2015, from Lane Finch to the County and Sheriff

18   Dorning in care of you in regards to the

19   Hammonds case.  Do you recall receiving that

20   correspondence?

21        A   I don't have any reason to believe I

22   didn't receive it.

23        Q   And in this letter Evanston or Essex

1    agreed to defend the County pursuant to

2    reservation of rights and appointed Trey Ireland

3    as counsel for Madison County sheriff's

4    department; right?

5              A  Correct.

6              Q  Ultimately that case was dismissed

7    before there was any adjudication on the merits

8    by a jury or payment of money; right?

9              A  I believe so.  I don't think the case

10   was settled.  I presume Trey Ireland was paid

11   for the defense, so there would have been some

12   payment of money, but not to settle the case.

13              (Defendant's Exhibit 79 marked for

14   identification.)

15              Q  I am marking as Defendant's 79 a copy

16   of the complaint in the Randolph Moore and

17   Angela Moore vs. ACH, Blake Dorning, and Madison

18   County Commission.  If you will, read through

19   the allegations of that complaint briefly and

20   let me know when you are ready to discuss it.

21              Have you finished reviewing the

22   document?

23              A  Yes.

1          Q   The Moore case is another case that

2    you all have mentioned as an indication that

3    Evanston or Essex had provided a defense of the

4    County in the past.

5               In reviewing that complaint, do you

6    see any allegations against the County or the

7    sheriff for deliberate indifference for 1983

8    claims?

9          A   No.

10         Q   Do you see any allegations in that

11   complaint in which the County is alleged to have

12   inadequately funded the jail for healthcare

13   services?

14         A   No.  But was there an amended

15   complaint in this case?

16         Q   There was.  And I marked it as 80.

17              (Defendant's Exhibit 80 marked for

18   identification.)

19         Q   And I'll represent to you that there

20   are none in that amended complaint either, but

21   you are free to look at it.

22              MR. HODGE:  None what?

23              MR. CLAPP:  There are no allegations

**Jeff Rich - Madison County  Representative**                    377

1    for deliberate indifference or inadequate

2    funding.

3              MR. HODGE:  Paragraph 14 there is,

4    and 15.

5              THE WITNESS:  Correct.  I agree with

6    that testimony.  That's what I was looking for.

7    I knew in the amended complaint there were such

8    allegations.  That's why I was confused when you

9    gave me the first complaint without providing me

10   the complete --

11        Q  Under the negligence claims, the

12   wantonness claims, and the Alabama Medical

13   Liability Act claim, that is not mentioned?

14        A  Yes, it is.  Each one of those claims

15   starts with -- or each one of the counts, to be

16   more specific, starts with a paragraph that

17   incorporates by reference all of the allegations

18   of the preceding paragraphs of the complaint as

19   if the same were set out fully herein.

20             So each one of those counts would

21   incorporate paragraphs 14 and 15, which both

22   allege -- or 14 alleges that the sheriff's

23   department was not properly funded or staffed to

**Jeff Rich - Madison County  Representative**                                378

1    properly operate.  And paragraph 15 alleges the

2    Madison County Commission acted beyond its

3    authority when it failed to provide proper

4    funding for the safe operation of the sheriff's

5    department.

6         Q  And in those cases the County

7    defendants were ultimately dismissed; right?

8         A  In what cases?

9         Q  In the Moore case.

10        A  I believe so, but I'm not -- without

11   reviewing the Court record, I don't remember.  I

12   don't know if it was a motion to dismiss or a

13   motion for summary judgment or what.

14        Q  I didn't need to mark this as an

15   exhibit, but I will just show you or represent

16   to you that they were.  But there were no

17   allegations against the County or Blake Dorning

18   for 1983 claims in those two complaints that

19   were filed in Moore; right?

20        A  My interpretation of these complaints

21   is they include only State law claims.

22        Q  Okay.  Will you pull out Exhibit 75?

23   It's the October 27, 2014, letter.

1          A   (Witness complies.)

2          Q   If you will, turn to page 8.

3          A   Okay.

4          Q   The top of the page says -- I'm

5   reading the second sentence here, Essex

6   Insurance will nonetheless defend Madison County

7   and Sheriff Dorning in this matter at this time

8   subject to a full and complete reservation of

9   any and all rights, including, but not limited

10  to, the right to withdraw from providing the

11  defense, the right to seek reimbursement of

12  defense costs paid by Essex, the right to file a

13  declaratory relief action to determine coverage,

14  and the right to deny any allegation to pay

15  judgment or settlement.

16          Did I read that correctly?

17          A   Yes.

18          Q   Then it goes on to say Essex

19  Insurance appointed Attorney Trey Ireland to

20  defend you, his contact information -- and then

21  it lists his contact information.

22          Did I read that correctly?

23          A   Yes.

1        Q  Are you aware of any efforts by

2   Madison County to coordinate a defense with Trey

3   Ireland or allow him to represent Madison County

4   following receipt of this letter?

5        A  I have had discussions off and on

6   with Trey Ireland about his involvement in cases

7   involving Madison County or the Madison County

8   sheriff and the potential conflict of interest

9   that he would have in representing multiple

10  parties with respect to the claims when some of

11  those parties are being defended under

12  reservation of rights, or there may be factual

13  issues that would create a conflict of interest

14  under the Alabama Rules of Professional Conduct

15  for Attorneys.

16           So, yes, I have talked to Trey

17  Ireland and other lawyers in his office multiple

18  times.

19       Q  He defended Madison County and the

20  sheriff in the Hammonds and Moore case; right?

21       A  Either he did or -- gosh, why can't I

22  think of his partner's name -- his law firm did.

23       Q  Represented both ACH and the County

**Jeff Rich - Madison County  Representative**                    **381**

1  and the County's representatives; right?

2              MR. STEPHENS:  Lee Quinn?

3              THE WITNESS:  No.

4              MR. STEPHENS:  Larry Harper?

5              THE WITNESS:  No.  E-mail.

6              MR. STEPHENS:  Christie Strange?

7              THE WITNESS:  Yes, Christie Strange.

8  I'm sorry.

9         Q  Are you aware of any documents

10  representing communications that you had with

11  Trey Ireland or Essex Insurance Company

12  following receipt of this letter in which you

13  have coordinated a defense with Trey or have

14  objected to this defense?

15         A  Yes.  I think there was communication

16  with Trey, and there may be -- if it was, it was

17  more than likely in the form of e-mail

18  communication, if there was written

19  communication with Trey about the conflict

20  situation that would arise in the event that he

21  had to represent all parties.

22         Q  So you think there is an e-mail?  Has

23  that e-mail been produced in this case?

**Freedom Court Reporting, Inc**                    **877-373-3660**

1          A   I didn't say I think; I said if there

2     was a written communication, it would have been

3     in the form of an e-mail.  If it was requested,

4     it was produced, to my knowledge.

5               MR. CLAPP:  For the record, we will

6     request that any communications that Mr. Rich

7     had with Trey Ireland regarding the prospects of

8     a defense in this case or in the underlying

9     cases be produced.

10         Q   Did you voice any concerns to Essex

11    about Mr. Ireland representing Madison County in

12    the -- this is in regard to the Elliott case?

13         A   I don't believe I have had any

14    communication directly with Essex.

15         Q   Did you provide an alternative for

16    appointed counsel for Madison County and the

17    sheriff after receiving this letter?

18         A   I don't recall if it was in response

19    to this lawsuit or one of the other underlying

20    lawsuits, but there had been communications with

21    respect to other lawyers.  There are issues with

22    respect to conflict situations with those

23    lawyers as to who they would report to from an

**Jeff Rich - Madison County  Representative**                    **383**

1    insurance defense standpoint.  There were a

2    number of logistical issues to be worked out

3    about how the bills would be submitted given the

4    fact that there is a pending Federal court

5    lawsuit regarding the coverage and the actions

6    of ACH under indemnification requirements and

7    under their insuring requirements and Essex

8    under its insuring requirements.

9         There was a concern about having

10   lawyers representing the County and the sheriff

11   that would report directly to an Essex or a

12   Markel or whoever the insurance company might

13   be, claims adjuster.  And those were not --

14        Q  That was October of 2014; right?  And

15   then those issues regarding a lawsuit between

16   Madison County, ACH, and Evanston did not exist

17   at that time; right?

18        A  Yes, they did.  When these lawsuits

19   were filed and demand was placed on ACH to

20   provide the lawsuits to its insurer and to

21   provide defense indemnification and that did not

22   happen, then these issues existed.

23        Q  And the complaint was filed in this

**Jeff Rich - Madison County  Representative**                    **384**

1   case -- and when I say "this case" I am

2   referring to Madison County versus Essex

3   Insurance, et al., case -- a year later,

4   October 2nd, 2015; right?

5        A  If you are looking at the complaint

6   and the date it was filed, yes.  But the

7   controversy, as you well know, was pending long

8   before the date of filing of the complaint.

9        Q  So my question is, did you object or

10  reject the defense that Essex Insurance

11  appointed Trey Ireland to defend Madison County

12  and the sheriff?

13       A  Trey Ireland could not have defended

14  Madison County and the sheriff because of

15  conflict issues.  And Trey Ireland knew that and

16  I presume communicated that to Essex, but you

17  will have to ask him.

18            (Defendant's Exhibit 81 marked for

19  identification.)

20       Q  I think the e-mails have been marked

21  previously, but I have marked them again as 81.

22  These are a series of e-mails from December of

23  2014 regarding the insurance and indemnification

1    issues.  Are you aware of any other

2    communications that you had with anyone between

3    the October 27, 2014, letter we just looked at

4    and these e-mails regarding the topic of the

5    defense offered by Evanston?

6          A  Say that again.

7          Q  Are you aware of any additional

8    communications that you had with anyone from

9    receipt of the October 27, 2014, letter from

10   Evanston agreeing to defend Madison County under

11   a reservation of rights and this series of

12   e-mails I have marked as Exhibit 81 regarding

13   the topic of a defense offered by Evanston?

14         A  So between October 27th and

15   December --

16         Q  Correct.

17         A  So during the month of November,

18   basically.  I don't -- if they haven't been

19   produced as far as e-mails or correspondence --

20   and I don't know that this is all of those.  I

21   don't know of any additional written

22   communication during that period of time.

23         Q  You referenced that you had

**Jeff Rich - Madison County  Representative**                    386

1    communications with Trey regarding the fact that

2    he was at least initially assigned to defend

3    Madison County.  Do you know when those

4    communications occurred?

5          A  No.

6          Q  Can you describe any documents that

7    you may have which would reflect those

8    communications?

9          A  No.

10         Q  When you are working on behalf of

11   Madison County, do you keep a ledger of your

12   time by task?

13         A  Currently, no.

14         Q  What about in 2014?

15         A  No.  I've not kept a timesheet in

16   that sense since I left private practice.

17              (Discussion off the record.)

18              (Defendant's Exhibit 82 marked for

19   identification.)

20         Q  I'm marking as Defendant's Exhibit 82

21   a letter dated January 15th, 2015, from Lane

22   Finch to you.  If you will review that letter

23   and let me know when you are ready to discuss

---

**Freedom Court Reporting, Inc**                    **877-373-3660**

**Jeff Rich - Madison County  Representative**          **387**

1    it.

2          A  All right.

3          Q  If you will turn first to page 3.

4    First we will note that this correspondence

5    relates to the Elliott, Woods, and Jefferson

6    cases; correct?

7          A  That's what it says.

8          Q  Do you recall receiving this

9    document?

10         A  I don't have any reason to believe

11   that I didn't.

12         Q  Looking at page 3, the second full

13   paragraph, it says the theme of the complaint is

14   summed up in paragraph 159 in Elliott's Second

15   Amended Complaint which states -- and I am going

16   to read it in part -- each defendant had the

17   duty and opportunity to protect detainees, to

18   obtain necessary medical treatment for detainees

19   in a timely manner, and/or to establish policies

20   and procedures and implement training regarding

21   such treatment, but each defendant failed and

22   refused to perform such duty.

23              Did I read that correctly?

**Jeff Rich - Madison County  Representative**                    388

1          A  Yes.

2          Q  So reading the language from the

3    complaint as quoted, the complaint made claims

4    jointly and severally against each specific

5    defendant in the underlying cases; right?

6          A  Define "jointly and severely."

7          Q  Jointly and severely within the

8    context of there are claims against each

9    specific defendant; right?

10         A  They are all defendants to the

11   lawsuit, which means they have claims asserted

12   against them.

13         Q  And the claims are made for their

14   specific conduct; correct?

15         A  The claims are made because the

16   inmates who died didn't get adequate medical

17   care in the jail and ACH was responsible for

18   medical care.

19         Q  In looking further at the last full

20   paragraph, count 2, or the paragraph starting

21   with count 2, it describes that count 2 of the

22   complaint generally alleges negligence and

23   wantonness against an ACH defendants; right?

**Jeff Rich - Madison County  Representative**                                389

1          A   It says count 2 is a general

2     negligence/wantonness claim against the ACH

3     defendants.

4          Q   And you would agree that the

5     negligence/wantonness claim in the complaint

6     solely relates to the ACH defendants; correct?

7               MR. HODGE:  Brandon, I don't mean to

8     be difficult, but Jeff's been deposed beyond the

9     time limit allowed under the Federal Rules.  And

10    when we ended, it was my understanding from Lane

11    that he was going to be kind of limited to

12    follow-up on Harold.  So Lane went through all

13    these complaints in some detail the first go

14    round.

15              MR.  CLAPP:  I understand.

16              MR. HODGE:  So, you know --

17              MR. CLAPP:  I don't have a whole lot

18    more.

19              MR. HODGE:  Okay.  I'm not -- I'm

20    really not trying to be too difficult.

21         Q   There was some discussion with

22    references to the reservation of rights letter,

23    so we wanted to go through those.

1          Those negligence and wantonness

2    claims are the only malpractice claims asserted

3    by the plaintiffs in the underlying cases;

4    right?

5          A  I don't remember.  In the underlying

6    complaints in each one of them the specific

7    allegations in the sense that whether or not

8    there is a negligence claim asserted against the

9    sheriff or County or any of their --

10         Q  You are free to look at them if you

11   want to make certain that that is the case.

12         A  Well, this is referring to count 2 --

13   you have given me the Foster complaint.  You

14   want to bring that into the mix at this point?

15         Q  The Foster complaint is count 3,

16   negligent malpractice?

17         A  You asked me about the last paragraph

18   of page 3, which refers to his letter, which I

19   don't believe was written prior to the Foster

20   complaint being filed.

21         Q  But you would also agree that the

22   same would be true for Foster in the sense that

23   the only malpractice claims or negligence claims

1   relating to medical care are against the ACH

2   defendants?

3        A  I don't think that's what you asked

4   me.  I think what you asked me is if I agreed

5   that count 2 was a general negligence/wantonness

6   claim against the ACH defendants.

7        Q  But I think I subsequently asked you

8   wouldn't it be true that all of the -- or that

9   the only malpractice claims are negligence

10  claims in the complaints against ACH?

11       A  So in Carolyn Jefferson versus

12  Madison County, I will agree with you that count

13  2 entitled "Negligence/wantonness" is only --

14  makes only allegations against the ACH

15  defendants.

16       Q  The same would be true for Elliott?

17       A  I don't have those in front of me.

18       Q  We may come back to that.  But you

19  don't disagree with that proposition?

20       A  That count 2 of the Jefferson

21  complaint alleges a negligence claim against

22  ACH?  No, I do not disagree with that.

23       Q  Of the Elliott and Woods cases as

**Jeff Rich - Madison County  Representative**      **392**

1    well?

2        A  I'm not willing to answer that

3    without looking at the Woods complaint to make

4    sure that it is pled in the same form or

5    fashion.  If it is pled the exact same way as

6    this, as what you represented, then I will

7    agree.  If it is the same count 2, then I will

8    agree.

9        MR. STEPHENS:  I don't think Elliott

10    is an exhibit.

11        Q  Finally, looking at page 8 of this

12    January 15th letter, look at the bottom

13    paragraph.  Do you agree the OneBeacon insurance

14    policy number 791-00-05-33-0001 insures Madison

15    County, Alabama, and its elected or appointed

16    officials and employees for claims involving law

17    enforcement liability?

18        A  I'm not sure.

19        Q  Why not?

20        A  Well, primarily because I haven't

21    looked at OneBeacon Insurance group policy

22    number 791-00-05-33-0001 with that question in

23    mind to make sure that I agree with that.

**Jeff Rich - Madison County  Representative**                       393

1          Q  Do you have any reason to dispute

2     that statement?

3          A  I just don't know.

4          Q  Okay.

5          A  Without having the policy and looking

6     at it and making sure that the law enforcement

7     coverage applies to the County and to the

8     sheriff and not just to the sheriff, I mean,

9     there are a number of things that if I was asked

10    to analyze that question I would go look at to

11    make sure I have before I gave an answer.

12         Q  The OneBeacon policy provides

13    coverage to Sheriff Dorning and Madison County;

14    right?

15         A  It provides certain coverages, yes.

16         Q  You agree the underlying cases

17    asserted covered claims against -- or that the

18    OneBeacon policy covered the claims of the

19    underlying cases in this matter?

20         A  Did OneBeacon provide defense and

21    insurance indemnification to settle the cases

22    pursuant to its policy with Madison County?

23    Yes, it did.

**Jeff Rich - Madison County  Representative**                    **394**

1         Q   You would agree that the Essex policy

2     does not provide any coverage to Sheriff Dorning

3     or Madison County for damages relating to their

4     own actions; correct?

5         A   We have been through this before.  As

6     it would relate to claims totally unrelated to

7     medical care in the jail or totally unrelated to

8     the agreement with ACH such as an excessive

9     force claim against the sheriff which there has

10     been no demand nor indemnification or insurance

11     for, yes, I would agree with that.

12         Q   Looking at page 11 of this same

13     letter, the first paragraph in the conclusion

14     says, Essex Insurance will contribute to the

15     defense of Madison County and Sheriff Dorning as

16     stated above, but it reserves the right to

17     assert at a later time any and all coverage

18     defenses that are appropriate.

19         Did you have any conversations with

20     anyone regarding -- or did you reject this

21     defense offered by this letter?

22         A   What defense was offered?

23         Q   Essex Insurance will contribute to

1    the defense of Madison County and Sheriff

2    Dorning as stated above.

3         A   I don't believe the sentence that

4    says Essex will contribute to the defense of

5    Madison County and the sheriff is an offer of

6    defense.  So I sort of disagree with the premise

7    of your question.

8             I'm not sure what is meant by an

9    offer to contribute to a defense.

10        Q   However you characterize it --

11        A   No, sir, you characterized it, and

12   Lane Finch characterized it that way.  I am just

13   telling you I don't believe that is an offer to

14   provide defense under an insurance policy.

15        Q   But regardless of the

16   characterization, there was an offer set forth

17   that Madison County rejected?

18        A   There was a letter written that

19   characterized the claims very narrowly in this

20   lawsuit as malpractice claims, and appeared to

21   say that there would be some offer to, quote,

22   contribute to a defense as it might relate to a

23   malpractice claim.  But I think -- and I haven't

1    read this letter in detail.  I scanned it when

2    you started asking me questions about it.  But I

3    think the position taken by Essex and Markel and

4    your law partner was that there was no coverage

5    for any kind of claim beyond a malpractice

6    claim.  And the claims against the sheriff and

7    the County in these cases were not -- that there

8    were 1983 claims.

9              (Defendant's Exhibit 83 marked for

10   identification.)

11       Q   I've marked as 83 a copy of a letter

12   dated March 4, 2015, from Matt Reeves, or

13   Matthew Reeves at Maynard Cooper, who at the

14   time was acting as counsel for Madison County,

15   Sheriff Tulane.  If you will review this letter

16   and let me know when you are ready to discuss

17   it.

18              In the interest of time I am only

19   going to ask you about one paragraph, and that

20   is the paragraph on page 2 that starts with

21   "Also."

22              Looking at that paragraph on page 2

23   that begins with "Also," look about halfway down

**Jeff Rich - Madison County  Representative**                    **397**

1    at the sentence starting with "Certainly."  Mr.

2    Blue proposing a 50/50 split of defense cost

3    between Essex and OneBeacon.  That is correct,

4    right, that Mr. Blue proposed --

5            A  I don't know what he proposed.

6            Q  Based on what you have seen in

7    e-mails that were marked as previous exhibits,

8    you understood that there was a 50/50 split

9    agreement; right?

10           A  No, there was not a 50/50 split

11   agreement.

12           Q  Or an offer?

13           A  There was a discussion of -- well, I

14   think the discussion was between Barbara

15   McConnell and Jagady Blue.

16           Q  Okay.

17           A  And Barbara McConnel, I think,

18   understood it to be an offer to split the

19   defense and the indemnification requirement on a

20   50/50 basis between OneBeacon and Essex or

21   Markel or whoever it is.

22           Q  Right.

23           A  That -- when discussions continued

**Jeff Rich - Madison County  Representative**                    **398**

1   about that issue, and a request was made to get

2   further detail about it, it was explained by

3   ACH's lawyer that it was only related to the

4   provision of a 50/50 split between defense cost.

5           We asked for further clarification

6   about those issues, and to my knowledge, none

7   was ever provided.  So there wasn't an

8   agreement, to my knowledge.  There was some

9   discussion back and forth between Barbara

10  McConnell, Jagady Blue --

11          Q  You are not disagreeing with

12  Mr. Reeves' statement here where he says there

13  was a proposal, the 50/50 split of defense cost

14  between Essex and OneBeacon; right?

15          MR. HODGE:  Object to the form, to

16  characterization.

17          A  I just told you what I understand to

18  be the case.

19          Q  Then OneBeacon did not agree to that

20  arrangement; right?

21          A  That's correct.

22          Q  Do you know what the basis was?

23          A  The basis was despite the request

1    that there be some detail provided regarding

2    what that would mean, there was never any detail

3    provided.  That Barbara McConnell did not

4    understand the same thing that apparently ACH

5    and ACH's insurer understood.  OneBeacon was not

6    going to -- and I don't believe could have --

7    agree to that kind of split without having

8    Madison County and the sheriff, its insureds

9    consent to that.  And they wanted to make sure

10   the County and the sheriff understood what was

11   being talked about, and a decision would have

12   been made jointly, and it was not.

13        Q  You reference the next sentence where

14   it says it could not do so -- "it" referring to

15   OneBeacon -- could not do so without approval of

16   its insureds.  What basis do you have to believe

17   that OneBeacon needed Madison County's consent?

18        A  David, that's an exact question that

19   was asked in my previous deposition by your law

20   partner.  I have been through it before.  I

21   don't mind going through it again, but I gave

22   you some time constraints.  It's now 1:20.

23        Q  Okay.

1          A   I don't mind answering questions.

2     I'm happy to do so within the scope of what I'm

3     required to do, but to ask questions that almost

4     verbatim were asked by your law partner seems to

5     be not a wise use of time.

6               MR. HODGE:  The overarching concern,

7     Brandon, I don't really understand how your

8     redirect is related to Harold's, and that is

9     kind of what you are limited to.  And

10    regardless, we have about 11 more minutes.

11              MR. CLAPP:  I understand, and I am

12    trying to go as fast as I can.

13         Q   I think the Foster complaint was

14    already an exhibit.

15         A   This is the Foster complaint.

16         Q   The one that looks different.

17         A   Actually, this is the Foster amended

18    complaint.

19              (Defendant's Exhibit 84 marked, but

20    withdrawn, as was already Exhibit 2.)

21         Q   That's fine.  I am only putting that

22    in front of you to reference this Defendant's

23    84, which is a letter dated February 23rd, 2017.

1              MR. HODGE:  That is already an

2     exhibit and your partner went through it the

3     first time.

4              MR. STEPHENS:  Exhibit 2, I think.

5              MR. CLAPP:  Okay, that's Exhibit 2?

6     Well, if he went through it, then I won't --

7              MR. STEPHENS:  And the complaint is

8     Exhibit 4.

9              MR. CLAPP:  If he went through it, I

10    won't ask any questions.

11         Q   Other than looking at the last --

12    page 16 where it says --

13         A   Of what?

14         Q   That is of Exhibit 2.  Page 16.

15         A   Okay.

16              MR. HODGE:  I am going to object to

17    the extent that has already been covered and

18    violative of the agreement we entered into to go

19    beyond the limits allowed to depose the witness

20    in Federal Court.

21         Q   And there was an offer here.

22    Evanston agrees to allow John Burback and Frank

23    Corley from Sirote Permutt to continue to defend

1   Madison County and David Canuff and George Royer

2   of Lanier Ford Shaver to continue to defend

3   Sheriff Dorning.  And then it goes on to set

4   forth terms of a reservation of rights.  Was

5   this offer ever rejected by Madison County?

6            MR. HODGE:  Brandon, this was

7   specifically covered in the deposition with

8   Mr. Finch.  And I pointed out to Lane that it

9   wasn't rejected, that there was a letter by me

10  asking for clarification as to the mechanics of

11  how this would work, which has never been

12  responded to.

13           MR. CLAPP:  All right.  I'll move on.

14        Q  You had testified previously that

15  Madison County's rating, quote/unquote, was

16  impacted by Evanston's act as a component of

17  damages.  Specifically what rating are you

18  referring to?

19           MR. HODGE:  That was covered in

20  detail and Mr. Stephens did not touch on that, I

21  don't believe at all, in his examination this

22  morning.

23           MR. CLAPP:  So he has not answered

1    the question?

2              MR. HODGE:  I think he has.

3              THE WITNESS:  I already answered it.

4         A  It's the County and the Sheriff's

5    ability to obtain insurance, and the cost of

6    that insurance is what I generally understand

7    and referred to when I was talking about

8    insurance rating.  And maybe "rating" was not

9    the most -- not the best description of that,

10   but generally -- and there was a lot of

11   discussion about it -- so for you to take one

12   word and ask me what I meant by it -- there was

13   a lot of discussion about the impact of claims,

14   the number of claims, the severity of the

15   claims, the liability exposure, the amount of

16   money taken to defend the claims, the amount of

17   money taken to either settle or pay a judgment

18   of the claims, all are factors that I understand

19   insurance companies consider when they determine

20   whether to insure someone and how much to charge

21   for that insurance.

22        Q  And your understanding of this is

23   from Mr. Herr at J. Smith Lanier; right?

1          A   My understanding of what?

2          Q   Of the impact on the rating.

3          A   My understanding of that is just

4   being familiar with insurance, whether it's my

5   homeowners or my auto liability or the County's

6   general liability, that claims history impacts

7   the ability to obtain insurance and the cost of

8   that insurance.

9          Q   How many other lawsuits have been

10   filed against Madison County and Sheriff Dorning

11   since the filing of the Elliott complaint?

12          A   I wouldn't know without going and

13   counting files.  There have been no other death

14   cases filed other than Elliott, Jefferson,

15   Listau, and no other jail healthcare cases filed

16   since Foster and Davis.

17          (Defendant's Exhibit 85 marked for

18   identification.)

19          Q   I have marked as Defendant's

20   Exhibit 85 a copy of the Advanced Correctional

21   Healthcare Policy and Procedure Manual for

22   Healthcare Services in Jails which was produced

23   by Madison County.  Briefly I just want to point

**Jeff Rich - Madison County  Representative**                    **405**

1    out a few things.  Looking at page 382 -- or

2    Madison County ACH 382 -- the bottom of the page

3    says, Advanced Correctional Healthcare policies

4    are to be utilized by Advanced Correctional

5    Healthcare professionals only.

6            Do you see that?

7        A   Yes.

8        Q   If you will flip through to Madison

9    County ACH 0455.  If you will look at the intake

10   screen, or person processed section.  It says,

11   the detention officer completing the booking

12   process as part of the admissions procedure will

13   provide the arrestee with an intake screen form

14   to be completed.  If during the completion of

15   the form, the detention officer observes the

16   need for medical staff to examine the person,

17   the medical staff will be immediately requested

18   to perform an examination.

19           This is a duty that arises to the

20   detention officer; right?

21       A   I don't know what their practice or

22   whether this policy which has someone's

23   handwritten notes on it -- which would indicate

1    to me that it's a draft policy, and it's a --

2    appears to be out of sequence, from what I can

3    tell.

4             Q  This is exactly how it was produced

5    to us.

6             A  I didn't say it wasn't produced to

7    you that way, but you are asking me to give an

8    answer in response to a question, and I'm not

9    sure that this is a policy that was ever adopted

10   or in place.  It may have been, I don't know.

11            Q  Assuming that it was --

12            A  I know that the booking process in

13   the jail involves booking nurses who are

14   actually in the jail in the booking area who

15   examine inmates when they come in.  There is a

16   screening form that is completed that is part of

17   that process.  The screening form is reviewed by

18   the nurses who provide healthcare, who determine

19   if immediate attention is required.

20            So I think there are a number of,

21   hopefully, safeguards in place to provide care

22   to someone who comes in the jail who might need

23   it.  But as far as the applicability of this

1    policy at any given time, I am not really

2    comfortable asking or answering those because,

3    one, I'm not sure Madison County, who I'm here

4    testifying on behalf of, would have any

5    involvement at all in a policy like this in the

6    jail.  And, secondly, my personal knowledge of

7    it, I am not comfortable that it was as to what

8    the document is.

9              MR. HODGE:  It's 1:30.  You're at the

10    four-hour mark that we agreed upon.

11              MR. CLAPP:  Let me ask just a couple

12    more questions and then we will be done.

13         Q  The term "security," as it is used in

14    those policies and procedures, whether it's this

15    version or any other, refers to Madison County

16    personnel; right?

17         A  No.

18         Q  Who does that refer to?

19         A  You would have to show me a document.

20    But Madison County has no role in respect to the

21    security of the Madison County Detention

22    Facility, other than to provide funding for the

23    sheriff to provide those officers needed to

1 provide security.

2 Q And it is certainly not an ACH

3 personnel; right?

4 A I don't know. You would have to ask

5 me about a particular issue as opposed to any

6 policy at all.

7 Q This is out of order, but anyways --

8 MR. HODGE: Brandon, the agreement

9 was four hours and we are beyond it. It was

10 supposed to be limited to followup of Harold's

11 questions. Harold didn't ask about policies and

12 procedures manual of his own client. And it is

13 time to be over.

14 Q Did you have any approval of the

15 healthcare policies and procedures that were

16 adopted at the jail?

17 MR. HODGE: Object to the form.

18 Any --

19 Q Did you sign off on them?

20 A No. They were not my policies.

21 Q As the attorney for the County, did

22 you review them before they were implemented?

23 A I review policies frequently, or

1   fairly frequently, with respect to the operation

2   of the jail, with respect to a number of things

3   involving County government.

4        Q  So whatever the policies and

5   procedures that existed at the jail during the

6   relevant time period, you would have had some

7   involvement in reviewing the drafts; right?

8        A  Not necessarily.  You would have to

9   give me specific policies and -- policies and

10  procedures are two different things.  But you

11  would have to ask me about the particular

12  document before I could tell you whether I had

13  any involvement in that document or not.

14       Q  I am not trying to be difficult, but

15  this is the only Advance Correctional Healthcare

16  policies and procedures manual that has been

17  produced to us.

18            MR. HODGE:  Asked and answered.  We

19  are over.  The agreement was four hours.  We are

20  past four hours.  I have said it several times.

21  I am not trying to be difficult, but we have

22  gone beyond the four-hour limit.

23            MR. CLAPP:  That was my last

1    question.

2              THE VIDEOGRAPHER:  It is 1:33.  The

3    deposition comes to an end.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF ALABAMA

 4     AT LARGE

 5

 6          I hereby certify that the above and
       foregoing deposition of JEFF RICH was taken down
 7     by me in stenotype and the questions and answers
       thereto were transcribed by means of
 8     computer-aided transcription and that the
       foregoing represents a true and correct
 9     transcript of the testimony given by said
       witness upon said hearing.
10
            I further certify that I am neither of
11     counsel, nor of kin to the parties to the
       action, nor am I in anywise interested in the
12     result of said cause.

13          I further certify that I am duly licensed
       by the Alabama Board of Court Reporting as a
14     Certified Court Reporter as evidenced by the
       ACCR number following my name found below.
15
            So certified on this date, June 29, 2017.
16

17

18

19

20
                        /s/Vicki Couts, CCR
21                      ACCR #365, Expires 9/30/2017
                        Commissioner for the State
22                      Of Alabama at Large
                        My Commission Expires 9/9/2017
23
```

### WORD INDEX

**< $ >**
**$12,000**  115:*9, 10*
**$3**  332:*18*
**$450,000**  115:*3*
**$50,000**  39:*4, 16*
40:*1, 2, 11, 17*  41:*3, 9, 21*  43:*5*  114:*16*
115:*7, 14, 19*
138:*14, 18*
**$625,000**  226:*5*

**< 0 >**
**001143**  309:*12*
**001144**  309:*13*
**001146**  309:*9*
**001224**  286:*11*
**001228**  280:*2*
**001235**  280:*2*
**001236**  279:*11*
**001239**  281:*2*
**001244**  278:*10*
**001412**  276:*19*
277:*8*
**001661**  174:*13*
**00280**  295:*21*
**0064**  341:*21*
**009933**  294:*17*
**01143**  308:*16*
**0118**  317:*4*
**01496**  247:*7*
**0165**  155:*9*
**0166**  300:*22*
**0169**  276:*17*
**01819**  372:*15*
**0184**  276:*18*
**0237**  299:*12*
**0239**  296:*18*
**0259**  298:*9*
**0260**  299:*2*
**0261**  303:*19*
**0279**  299:*2*
**0380**  307:*16*
**0383**  304:*23*
**0384**  305:*1*
**0386**  312:*2*
**0412**  360:*15*
**0420**  364:*15*

**0455**  405:*9*
**058**  342:*7*
**06**  155:*19, 21*
269:*11*
**07**  291:*8, 9*
**088**  317:*3*  320:*5*
**089**  321:*2*

**< 1 >**
**1**  4:*11*  7:*4*  10:*15, 22*  18:*9, 11*  20:*23*
90:*13*  112:*10*
194:*10*  197:*9*
310:*7*  317:*14*
318:*16*  319:*3*
332:*18*  344:*22*
345:*11*  346:*3*
361:*5, 6*
**1,000**  263:*12*
**1.2**  139:*1, 3, 10*
**1.25**  139:*3*
**1:02**  112:*5*
**1:20**  399:*22*
**1:30**  407:*9*
**1:33**  410:*2*
**10**  5:*9*  161:*14, 18*
166:*19*  300:*21*
**10:13**  63:*19*
**10:17**  297:*23*
**10:27**  298:*3*
**10:28**  63:*22*
**10:39**  69:*5*
**10:40**  69:*8*
**10:53**  80:*9*
**10:59**  80:*12*
**100**  123:*8, 11, 15*
174:*5*  248:*21*
**11**  5:*11*  7:*14*
166:*13, 16*  167:*2*
252:*23*  273:*9*
303:*21*  394:*12*
400:*10*
**11:12**  258:*19*
**11:21**  178:*15*
**11:27**  338:*15*
**11:35**  338:*18*
**11:45**  112:*2*
**11:50**  258:*21*
**1190**  167:*3*

**1191**  167:*3*
**1193**  175:*1*
**1196**  175:*1*
**1197**  175:*15*
184:*23*
**1198**  178:*14*
**12**  4:*3*  5:*13*  6:*12*
7:*10*  16:*10*  47:*16*
112:*11*  169:*6, 10*
176:*7*  180:*10*
249:*17, 18, 23*
250:*5*  252:*23*
279:*14*  296:*1*
344:*3, 13*
**12:25**  372:*6*
**12:32**  372:*9*
**1202**  175:*15*
**1213**  175:*17*
**1217**  175:*17*
**1218**  175:*20*
**1223**  175:*20*
**1226**  286:*11*
**1240**  279:*11*
**1247**  278:*11*
**127**  83:*2, 13*  84:*22*
**13**  1:*15*  5:*15*  11:*1, 11*  86:*14*  174:*20, 23*  252:*23*  274:*4*
344:*3, 7, 13*
**134**  224:*7*
**135**  80:*20*  87:*16, 18*  221:*13, 15*
222:*7*  223:*10*
224:*1*
**14**  5:*17*  6:*14*
175:*11, 14*  177:*5*
178:*13*  180:*10*
184:*23*  252:*23*
280:*11*  312:*15*
377:*3, 21, 22*
**1405**  10:*18*
**1430**  276:*20*
**146**  4:*21*
**1495**  166:*18*
**1496**  166:*19*
**15**  5:*19*  9:*14*
175:*11, 16*  347:*21*
377:*4, 21*  378:*1*
**154**  5:*1*

**157**  5:*3*
**1577**  166:*19*
**1582**  166:*20*
**159**  387:*14*
**15th**  386:*21*  392:*12*
**16**  5:*4, 21*  17:*2*
175:*11, 19*  176:*7*
246:*1*  401:*12, 14*
**160**  5:*5*
**161**  5:*9*
**164**  301:*16*
**166**  5:*11*
**1661**  169:*9*
**1662**  173:*10*  250:*7*
**1663**  169:*13*
**1664**  169:*9*
**169**  5:*13*
**16th**  258:*19*
**17**  6:*1*  186:*16, 18*
187:*8*  193:*2*  243:*6*
257:*10, 12*  258:*7*
299:*23*  347:*7*
**174**  5:*15*
**175**  5:*17, 19, 21*
**17th**  299:*11*
**18**  4:*11*  6:*3*  90:*4, 6*  190:*23*  191:*11*
193:*16, 17*  258:*20*
259:*4*  269:*2*
**1837**  372:*16*
**186**  6:*1*
**19**  6:*5*  272:*10, 12*
273:*5*  274:*1*
275:*12*  276:*16*
**192**  6:*3*
**1978**  196:*14*
**1983**  34:*9*  208:*1*
233:*3*  239:*10*
341:*10, 11*  376:*7*
378:*18*  396:*8*
**1987**  13:*20*
**1991**  13:*22*  240:*16*
**1st**  298:*23*  300:*12*
309:*17*

**< 2 >**
**2**  4:*13*  7:*20*  10:*16, 18*  18:*16*  24:*11*
67:*2, 3, 5, 17*  71:*19*
109:*16*  207:*12, 18*

209:*17, 22*  212:*12, 14*  213:*1, 4, 5, 8*  216:*9*  249:*18*  282:*1*  344:*22*  346:*15*  388:*20, 21, 21*  389:*1*  390:*12*  391:*5, 13, 20*  392:*7*  396:*20, 22*  400:*20*  401:*4, 5, 14*
**2:18**  174:*12*
**2:33**  175:*23*
**2:48**  176:*3*
**20**  6:*7*  198:*16*  276:*10, 13, 19*  277:*8*
**200**  10:*6, 12*  11:*2*  267:*2*
**2000**  317:*11*  318:*4, 5*  319:*3*
**2001**  317:*17*
**20011**  7:*4*
**2005**  277:*8, 18*  300:*21*
**2006**  5:*4*  6:*10, 12, 14, 16, 18*  8:*6*  110:*8, 10, 23*  146:*13*  191:*5, 13*  196:*18*  229:*9, 12*  230:*2*  232:*17*  241:*10, 11, 19*  242:*15*  243:*8*  244:*14*  246:*1*  265:*9*  274:*9*  278:*14*  279:*14*  280:*11*  281:*4*  286:*1, 12*  301:*18, 21*  303:*4, 21*  326:*14*  329:*12, 16*  335:*8*  337:*2*  340:*22*  341:*6*  356:*21*  364:*23*  371:*7*
**2007**  6:*20*  288:*2*  290:*16*  294:*2, 8, 18*  295:*5*
**2009**  6:*22*  7:*2, 10*  295:*16*  296:*1, 7, 21*  305:*5, 14*  335:*1*
**2010**  5:*6, 8*  8:*8*  160:*8*  246:*20*

306:*17*  307:*4, 19*  308:*3*
**2011**  5:*10*  8:*18*  47:*16*  51:*13*  309:*17*  310:*2*  339:*3*  344:*3*  362:*23*
**2012**  7:*14*  14:*2*  47:*18*  51:*13, 15*  225:*15*  298:*14*  299:*1*  344:*7*
**2013**  7:*18*  299:*1, 8, 11, 23*  310:*7*
**2014**  7:*6*  9:*2*  117:*18*  120:*14*  142:*18*  174:*12*  178:*15*  187:*23*  225:*16*  229:*9*  243:*8*  261:*19*  300:*13, 13*  311:*1*  312:*1*  335:*1, 8*  337:*2*  356:*21*  360:*16*  364:*12*  372:*19*  378:*23*  383:*14*  384:*23*  385:*3, 9*  386:*14*
**2015**  9:*4, 6, 14, 16*  109:*17, 17*  110:*10, 23*  229:*10, 12*  230:*3*  241:*20*  242:*15*  243:*2*  257:*12*  258:*20*  259:*4, 21*  260:*6, 19*  261:*19*  265:*9*  341:*1, 7*  365:*1*  371:*7*  373:*16*  374:*17*  384:*4*  386:*21*  396:*12*
**2017**  1:*15*  4:*14*  11:*1, 11*  67:*6*  102:*12*  267:*1, 11*  400:*23*  411:*14, 21, 22*
**205**  4:*4*
**20-plus**  198:*13*
**20th**  10:*18*
**21**  1:*15*  6:*9*  7:*18*  18:*15*  267:*1, 11*  278:*5, 9, 13*
**21st**  299:*8*

**22**  6:*11*  83:*1*  174:*12*  279:*7, 10, 13*  280:*17, 19*  281:*23*  282:*1*
**23**  4:*14*  6:*13, 16, 18*  67:*6*  155:*21*  279:*21*  280:*1, 10*  281:*23*  285:*23*  286:*12*
**234**  338:*23*
**235**  338:*23*
**23rd**  103:*4*  237:*1*  400:*23*
**24**  6:*15*  285:*14, 17, 22*  305:*14*
**25**  6:*17*  286:*7, 10*  349:*12*
**258**  296:*19*
**26**  5:*10*  6:*19*  80:*19*  178:*15*  226:*20*  277:*18*  294:*12, 15*
**260**  303:*2*
**26th**  317:*17*
**27**  6:*21*  7:*2*  9:*2, 6*  155:*19*  295:*8, 11*  300:*9*  301:*18, 18, 18*  350:*5*  360:*16*  364:*12*  374:*16*  378:*23*  385:*3, 9*
**272**  6:*5*
**276**  6:*7*
**278**  6:*9*
**279**  6:*11, 13*
**27th**  305:*5*  385:*14*
**28**  7:*1*  17:*3*  90:*18*  304:*20, 21*  306:*7*  312:*1*
**285**  6:*15*
**286**  6:*17*
**29**  7:*3*  180:*10*  277:*8*  308:*7, 10, 14, 16, 18, 18, 19*  309:*3, 9, 12*  310:*2*  312:*15*  411:*14*
**294**  6:*19*
**295**  6:*21*  7:*9*
**296**  7:*11*
**298**  7:*13, 15*

**299**  7:*17, 19*
**2nd**  384:*4*

**< 3 >**
**3**  4:*15*  6:*10*  80:*14, 17*  90:*3, 5*  197:*7, 18*  201:*16*  209:*16*  216:*19*  217:*14, 21, 22*  218:*2, 5, 16*  221:*7*  278:*14*  311:*1*  344:*22*  345:*8*  387:*3, 12*  390:*15, 18*
**3:48**  218:*9*
**30**  5:*6, 8*  8:*8*  12:*17*  246:*20*  274:*17*  307:*3, 18*  308:*2*  411:*21*
**300**  7:*21*  8:*1*
**301**  8:*3*  191:*12*  192:*5*  197:*19*
**302**  8:*5*  192:*6*  197:*19*
**303**  192:*6, 8*
**304**  7:*1*
**306**  8:*7*
**307**  5:*7*
**308**  7:*3*
**30-page**  16:*12*
**30th**  299:*1*  306:*17*
**31**  7:*5*  372:*11, 15*
**310**  8:*9, 11*
**311**  8:*13*
**312**  8:*15*
**317**  7:*7*
**31st**  300:*13*
**321**  191:*12*  192:*5*
**338**  8:*17*
**341**  8:*19*
**342**  8:*21*
**35203**  10:*19*
**35801**  10:*7, 13*
**360**  9:*1*
**365**  411:*21*
**372**  4:*5*  7:*5*
**373**  9:*3*
**374**  9:*5*
**375**  9:*7*
**376**  9:*9*

**Jeff Rich - Madison County  Representative**                    **414**

**38**  347:6, 9  348:13
**381**  306:16
**382**  306:16  405:1, 2
**384**  9:11
**385**  312:15
**386**  9:13
**387**  310:22
**3922**  248:11
**395**  187:9  258:8
**396**  9:15
**397**  259:5
**398**  187:9

**< 4 >**
**4**  4:17  9:16  36:21  87:2  89:22  90:1  163:22  164:3  189:11  198:3, 4  216:18  219:3  282:1  290:15  294:2, 8  295:5  296:7, 21  396:12  401:8
**4:00**  218:12
**404**  9:17
**42**  341:9
**421**  360:15
**47**  309:10
**49**  7:7  317:1, 3  318:12, 13
**4th**  297:5  298:14

**< 5 >**
**5**  4:19  8:18  37:9  91:1, 3, 5  163:23  164:4, 13  165:10, 17  281:4  339:3  347:2, 7  356:9, 10  362:23
**5:07**  265:21
**5:15-cv-01997-HGD**  1:2  11:14  267:14
**5:25**  266:11
**50**  7:9  122:17, 17  124:10, 10, 13, 13, 15, 16  127:2  174:1, 1, 4  176:18, 18  177:21, 21, 22, 22  253:12, 12, 16, 16,

17, 17  254:1, 1, 6, 14, 14  295:18, 21  297:11  397:2, 2, 8, 8, 10, 10, 20, 20  398:4, 4, 13, 13
**51**  7:11  296:15, 18
**53**  7:13  298:5, 9
**54**  7:15  298:18, 20  343:17  344:16, 17
**55**  7:17  299:3, 6, 7, 12  300:3
**56**  7:19  90:19  299:13, 15, 16  300:2
**57**  7:21  300:6, 7  343:13
**58**  8:1  300:17, 19  349:12
**59**  8:3  301:13, 15

**< 6 >**
**6**  4:21  9:4  12:17  18:16  54:18  146:8, 11  154:11, 13  155:18, 19, 21  156:23  157:1  165:9, 11  191:12, 23  192:8  193:21  198:4, 5  203:1  236:22, 23  239:15  244:21, 22  245:2  301:18, 19  343:19, 20  344:17, 20  345:7, 11  346:2, 14, 18  360:23  361:2, 11  373:16
**60**  8:5  302:21  303:1  304:14
**61**  8:7  306:13, 15  307:23  308:2  350:5
**62**  8:9  310:3, 5
**63**  8:11  310:19, 22
**64**  8:13  311:19, 22
**65**  8:15  312:11, 13
**66**  8:17  338:20, 22  363:2
**67**  4:13  8:19  341:14, 17, 20

**68**  8:21  86:11, 12, 13, 14  218:17  219:8  221:8  342:4, 5
**69**  87:4, 10  219:6, 11  220:3, 7  221:8
**6th**  193:4

**< 7 >**
**7**  5:1  6:22  154:8, 10, 11, 12  155:9, 20  156:17, 23  157:1  232:15  244:21, 22  245:3  295:16  300:9  305:14  310:2  312:1, 15
**7:25**  147:13  237:1
**70**  293:15
**72**  220:10, 20  221:8
**74**  220:19, 23  221:1, 8
**75**  9:1  360:11, 12  364:13, 14  365:23  378:22
**76**  9:3  220:19, 21  221:2, 8  373:12, 15
**77**  9:5  374:13, 16
**79**  9:7  375:13, 15
**791-00-05-33-0001**  392:14, 22

**< 8 >**
**8**  5:3  6:20  90:12  91:6  117:18  157:9, 11  245:21, 23  294:18  300:21  301:18, 18, 19, 20, 23  310:7  311:1  379:2  392:11
**8.1**  273:9
**8:15**  147:14  237:13
**80**  4:15  9:9  376:16, 17
**81**  9:11  384:18, 21  385:12
**82**  9:13  386:18, 20
**83**  9:15  396:9, 11
**84**  400:19, 23

**85**  9:17  404:17, 20
**89**  4:17
**8th**  318:5

**< 9 >**
**9**  5:5, 7  7:6  8:6  160:5, 8, 8  166:18  246:19, 20  303:4, 21  306:22  307:2, 4, 7, 13, 16, 23  308:2, 4  317:15  364:15  372:19  411:21, 22, 22
**9:00**  1:16
**9:04**  11:12
**9:28**  29:17, 21
**9:33**  267:11
**900**  10:12
**91**  4:19
**92**  356:7, 10  358:19  362:4
**934**  294:17
**9th**  317:11  318:4

**< A >**
**a.m**  1:16  11:12  147:14, 14  178:15  237:1, 13  258:19, 21  267:11
**Aaron**  131:5, 15, 17, 20  132:1, 2, 3  140:16  141:4, 5
**A-A-R-O-N**  131:11
**Aaron's**  131:10
**ability**  46:15  51:7  101:10  129:14  215:8  352:7  403:5  404:7
**able**  64:20  107:17  155:14  245:19  256:9  284:18  291:20  326:20, 23  351:19, 23  363:3
**absolutely**  228:5
**accept**  163:10
**accepted**  94:11  277:17
**access**  204:4  325:18  352:4, 7
**accessible**  292:16

accessing 203:17 228:16
accompany 365:13
accomplish 164:16
ACCR 411:14, 21
accuracy 180:12
accurate 42:18 85:20 254:16 262:4, 4 320:13 347:15 348:17 360:7
accurately 318:6
accusation 155:13
ACH 17:7, 14 20:19 21:10, 23 23:15 25:6, 14, 15, 19 26:2, 8, 16 27:8, 18, 23 28:3, 18, 22 29:13 30:18, 19 31:20 37:2, 5, 14 38:15 43:10 57:12, 20 58:21 59:3, 7, 8 61:9, 10, 15, 16 75:7, 15, 21, 21 77:11, 21 78:3, 3, 7 79:3, 9, 12, 20 80:4 81:14, 18 82:13 83:16, 20 85:1, 3 86:7 89:2, 7, 17 93:12 94:15, 21, 22 95:7, 11 107:15 109:19 110:7, 17 111:9, 21 116:9 118:5 121:10 124:6 126:22 133:10 134:19 135:1, 5, 23 136:3 137:13 138:3 141:8, 9, 11 142:10 143:12 145:2, 7, 7, 8 146:12, 17 147:23 148:8 149:3, 16, 20 150:4, 7, 10, 12, 20, 21 151:14, 21 152:5, 15, 21 153:5, 11, 14, 19 154:4 156:18 157:13 165:21 166:18, 19 170:22 172:1 177:15

178:1, 15 179:4, 7, 12, 19 187:9 189:18, 18 190:1, 5, 10 191:12, 17 192:1 193:6, 13, 17, 23 194:4, 9, 11, 14, 16 195:10, 15 196:23 199:2 200:20 201:1, 8, 8, 15, 16, 19 202:3 205:6 207:13, 14 208:6, 7 209:4 210:3, 3, 6, 8, 9, 23 212:16, 17 213:14, 18 214:3, 12, 23 215:3, 7, 20, 23 216:3 217:18 221:9, 10 222:13, 16, 16 223:6 224:16 226:21 227:9, 13 228:7, 10, 13 229:6, 11, 13 230:3 231:10, 14, 16 233:18, 22 234:8 236:1 241:4, 21 242:4, 16 243:10, 12, 18, 22 244:13 245:22 246:2, 22 247:7, 14 256:9 257:6, 13, 17 258:4, 8, 11, 14 259:4, 7, 22 260:13 261:23 262:10, 19 263:4, 7, 16 265:7 269:10, 18, 19, 23 270:4, 5, 7, 10 272:7, 19 275:13 276:17, 19 277:22 278:10, 14 279:11 280:2 281:2, 6 283:3 284:15, 23 285:4, 4 286:10 288:18, 22 289:8 290:6, 9 291:13, 16 292:10, 17, 21 293:13 294:17 295:21 296:18 298:9 299:2, 12 300:9, 22 301:16 303:2, 6, 9, 18

304:23 306:16 307:16 308:16 309:9 310:22 312:2, 15 313:8, 11, 13, 14, 18, 20, 23 314:2, 4, 10, 17 315:21 316:9 317:3 320:5 321:2, 14 323:2, 11 324:7 326:10, 14 327:12, 15, 19 328:9, 16 332:22 333:2, 7, 16 334:2, 10, 15, 19 335:3, 10, 15 336:7, 9 337:1, 3, 9 338:23 339:7, 12, 17, 20 340:19 341:1, 7, 21 342:7 345:15, 21 346:3, 19, 19 348:2, 7 350:7, 20 351:7, 11, 12 352:5 354:2, 18 357:7, 11, 12 359:1 360:15 361:20 362:1, 19 363:3, 7, 11, 22 364:15, 23 365:22 367:13, 19 368:7, 13, 17 369:3, 13, 23 370:4, 10, 14, 20 371:12 372:15 375:17 380:23 383:6, 16, 19 388:17, 23 389:2, 6 391:1, 6, 10, 14, 22 394:8 399:4 405:2, 9 408:2
ACH's 27:1 34:5 57:3, 6, 18 58:4 78:9 118:5 146:12 158:2, 19, 22 167:7, 16 187:21 189:22 193:8, 19 215:18 230:20 231:10 246:6 257:23 259:6, 21 283:23 285:11 287:2 294:4, 9 314:13 323:19 332:8, 17 334:6 350:14

355:2, 7 357:9 398:3 399:5
acknowledge 36:9 130:23 142:6, 16 224:23
acknowledged 36:1 130:21
acknowledgement 165:23
acknowledges 142:14 143:1
acknowledgment 23:3
Acord 300:20 301:17 310:6
act 193:23 194:3 377:13 402:16
acted 54:22 65:11 378:2
acting 151:14 396:14
Action 1:2 65:1, 19 67:7 68:1 70:4 79:14 90:2 99:20 103:7, 14 138:21 162:2 163:11, 19 196:13 198:2 217:17 370:1 379:13 411:11
actions 16:21 17:1, 19 20:16 21:8 24:16 30:3, 4 33:15 35:3 37:13, 18 43:13, 16, 22 60:8, 22 64:14 65:3 88:19 92:5 93:23 94:2, 5 135:7 138:5 143:13 334:18 369:21 383:5 394:4
active 130:11 288:10
activity 145:12
acts 27:20 34:22 36:7 37:14 48:11 135:13, 15 141:10 145:23 189:13, 19 190:2, 11, 13 191:17 194:11

259:7, 10, 16, 23
345:15, 21  346:6,
20  354:8
**actual**  117:5
152:14  270:8
327:12, 14
**add**  16:15  17:6
187:2
**added**  241:18
313:6
**adding**  148:14
239:16  240:5
**addition**  46:12
145:10  173:23
193:19  235:13
361:7  373:20
**additional**  15:7
24:10  25:7, 13
26:1, 18  27:9, 11
28:4, 23  30:2
31:14  33:13  35:2
36:2  41:10  48:15,
18, 23  56:18, 22
60:9  65:6, 9, 18
66:5  127:17  142:7,
9, 17, 22  143:22
144:9, 19  148:13
159:1  164:2
165:13  222:20
232:5, 7  233:7, 11
239:16  240:3, 4, 22
241:5, 17  242:7, 8,
10  243:3, 5  245:5
246:8, 16  247:11,
20  248:3, 4, 19
249:1, 11  260:3
262:1  273:17, 22
275:11, 12  281:15
283:9  285:10
290:13  299:18
302:13  303:13
304:9  305:19
306:2, 10  310:15
311:12, 14  312:6, 8
317:19  328:19
335:22  336:15
337:11, 15, 21, 23
338:4  356:13, 17
357:5, 9, 14, 21
358:4, 10, 15  359:8,

9  361:2, 9, 14
385:7, 21
**additionally**  180:4,
20
**address**  234:2, 6
235:7  341:22
**addressed**  146:16
243:21  277:10
307:4, 7, 8, 19
**addressing**  180:16,
16
**adequate**  21:4
79:16  95:6  134:11
137:4, 6  196:5, 22
224:15  283:13
316:23  358:22, 23
361:21, 22  362:9,
17  388:16
**adequately**  80:2, 22
81:3, 10  82:1
87:14, 19, 23  88:11,
22  136:11  209:5, 7
210:13, 15  222:4, 8
223:12, 16  224:2, 5
254:21
**ADH**  277:8
**adjudication**  375:7
**adjuster**  92:19
96:5  99:17  140:19
167:7, 9, 16  170:4
173:15, 20  177:7, 9
383:13
**administrative**
351:2  352:6
**administrator**
53:22  82:19  107:1
110:18  160:4
211:6  212:3, 4
213:4, 16  229:18,
20  235:10, 18
299:21  327:10
**admissibility**  2:14
**admissions**  405:12
**admit**  83:22
**admitted**  14:14
**admonitions**  13:13
**ado**  172:23
**adopted**  79:10
406:9  408:16

**Advance**  95:4
409:15
**ADVANCED**  1:6
12:1  21:18  24:13,
15  25:1  34:2  55:7,
13  57:15  101:23
102:1  106:5, 14
108:8  125:1  160:9
162:5, 9  188:20
199:1  215:13
241:11  248:10
267:21  296:6
300:15  301:2
310:8  313:3  325:4,
19  326:2  329:21
339:3  347:10
353:1  404:20
405:3, 4
**adverse**  251:20
**adversely**  129:2
**advice**  72:13
182:22
**advising**  179:14
**affect**  125:11  129:2
**affirmative**  24:13
25:6, 14  369:19
370:7
**affirmatively**  24:8
25:19  107:15
369:8
**affirmed**  107:19
**affordable**  161:8
**afforded**  24:9
25:12  26:4  27:14
35:2  142:21  143:9,
22  144:8  165:13
**afield**  236:14
**age**  269:2
**agent**  107:18
157:15, 22  158:2
159:9  230:20
231:1  283:7
369:10
**agents**  194:1, 4, 7,
11  345:15  346:9
**aggregate**  332:18
**ago**  32:14  63:3
180:1  274:4
**agree**  3:1  59:20,
23  60:4  76:18

77:5  85:19  89:10
94:12  123:2  127:1
138:9  155:10
162:5  174:5  185:3,
6  189:17, 21  207:9,
11  208:5  210:5
211:10  212:19
213:3, 7, 11  216:8,
12  221:6, 11
222:22  225:12
240:7  248:21
249:3  255:22
260:5  285:21
316:9, 12, 13  321:7
340:8  345:1, 6
346:2, 7, 13, 19
353:7  356:16, 23
358:1, 11, 12
359:12  361:11
362:15  377:5
389:4  390:21
391:12  392:7, 8, 13,
23  393:16  394:1,
11  398:19  399:7
**agreeable**  255:12,
13
**agreed**  3:5  31:17
65:16  103:6  136:1
152:21  163:10
180:21  181:13
185:13  209:4
228:21  237:14
303:13  375:1
391:4  407:10
**agreeing**  149:4
185:9  346:4
366:18  385:10
**agreement**  2:8  6:4,
6  7:12, 16, 20, 22
24:22  25:22  27:14,
17  28:2  31:16
34:2  54:13  61:12
70:21  79:12, 13
85:7  89:9  93:1, 3,
6, 19  106:18, 22
123:21  124:1
135:6, 10  139:4
141:8  149:7, 8
150:9, 10  152:21
160:2, 3  178:2, 2

180:9, 18  181:17
182:2  189:18
190:7, 16, 19  191:3,
4, 13, 19, 20, 23
192:4  194:3, 13, 14
195:8, 10, 18  196:7
198:1  200:14, 20
201:8  202:23
203:1  209:6  215:3,
7, 10, 15, 17  216:7
222:12, 13  223:6
227:9  229:11
235:8, 16  241:9
242:1, 3, 6, 12
254:18  255:9, 10,
15  256:19, 20
257:13, 17  258:1, 2,
10, 11, 16  262:18,
21  263:4  272:14
273:2, 7, 23  274:8
275:18, 23  276:5
287:13  292:18
296:4, 20  297:10
298:13, 22  299:10,
16, 18  300:11
324:22  325:4
326:9  343:3  344:5,
7, 13  345:17
346:23  351:13
354:2  359:1
361:23  362:18
368:11, 12, 13, 15
394:8  397:9, 11
398:8  401:18
408:8  409:19
**agreements**  48:23
57:14  242:3
243:14, 16  275:13
324:6  343:17
344:1, 3  367:17, 20,
23  368:4  370:18
371:1
**agrees**  35:6  401:22
**ahead**  67:1  111:23
112:8  147:2  175:8
217:12  235:7
249:4  337:19
360:4
**air**  254:9

**al**  1:2, 7  10:7, 13,
19  247:10, 11
317:8, 9  372:20
384:3
**AL.com**  87:2  219:2
**ALABAMA**  1:1
2:5  11:3, 5, 15, 18
13:22  49:12
170:21  248:12, 13,
18, 19, 22, 23  249:9,
10  267:3, 5  268:11,
19  281:13, 14
282:12, 13  289:18
296:5  304:7, 8
305:21, 22, 23
306:1  310:14, 15
311:13  312:5, 6
317:7  321:12
329:2, 11, 11, 17
330:5, 8, 13  332:10
333:5  337:13, 14
340:17  377:12
380:14  392:15
411:3, 13, 22
**alcohol**  347:11
**alert**  228:7
**allegation**  20:14
21:3  24:8  25:11
31:19  34:4  37:7
51:6  54:20  55:2
56:3  64:4  65:11
74:17, 19, 21  75:2,
3, 6  76:8  77:8, 9,
12, 19  78:11  79:2,
9, 18  80:1, 5  81:8,
14, 20, 23  82:4, 5
84:18  85:10, 15, 22
86:3  88:6  89:15
90:16  95:5  146:7
151:7  194:3, 8
210:7  221:17
222:2, 6, 12  223:2
224:13  345:3
348:12  349:13
358:20, 21  361:16
379:14
**allegations**  21:8
22:3, 7, 11, 17, 19
23:4, 9  27:20  30:6,
7, 14  32:4, 7, 12

35:1  37:4  57:11,
13  62:19  74:10
78:14, 16  82:9
85:21  86:7, 18, 22
87:5, 10  88:18
89:7  90:9  113:18
133:6  135:20
145:22  146:2
150:17  153:3, 22
209:1  218:22
219:16, 21  220:1
363:19  374:4, 8
375:19  376:6, 10,
23  377:8, 17
378:17  390:7
391:14
**allege**  87:3  152:9
208:22  377:22
**alleged**  21:23  22:4,
12  23:5, 10  27:20
36:22  37:1  48:10
52:2  56:14  77:2,
20  78:7  82:10
87:12  152:13
194:8  209:5
221:19  222:13
327:5  347:9
354:18  355:8
376:11
**allegedly**  74:22
136:1  226:9
**alleges**  76:20  77:6,
6  79:15  82:17
83:3  84:2, 14
85:10  86:16  347:9
356:11  377:22
378:1  388:22
391:21
**allocated**  314:22
**allocation**  187:1, 15
188:11
**allow**  93:2  151:10
380:3  401:22
**allowed**  100:13
295:3  351:14
389:9  401:19
**alluded**  235:5
360:23
**Also,**  396:23

**alteration**  185:11
**altering**  185:14
**alternative**  382:15
**amend**  303:13
**Amended**  4:20
9:10  16:8, 15, 18,
19  17:3, 6, 8, 20
37:10  56:15  80:15
90:2, 19  91:4
211:13, 14, 15
213:8  217:3
218:16  361:6
376:14, 20  377:7
387:15  400:17
**amendment**  313:6
**amount**  14:14
38:7, 21  40:2, 18
62:10  261:7
314:22  353:21
355:13, 15  403:15,
16
**amounts**  138:15
333:10, 11
**analysis**  207:4
**analyze**  393:10
**analyzing**  236:20
**ancillary**  313:4
**Angela**  375:17
**annex**  202:12
**annual**  51:18
110:20
**annuity**  42:22  43:1
**answer**  2:16  16:4
17:11  24:3  41:18
42:4, 11  46:3
47:22  50:15  51:3
52:18  56:7, 23
61:13  63:3  68:20,
21  70:3  71:8  76:2
77:22  86:10  100:5
104:13  124:18
142:5  150:19
151:12  157:5
176:22  182:17, 19,
21  186:12  226:16
234:16, 17  274:5
287:4  316:5, 8
318:6  324:13
331:12, 14  360:7
361:17  373:23

392:2  393:*11*
406:*8*
**answered**  32:*19*
41:*19*  91:*17*  153:*6,
7*  172:*13*  402:*23*
403:*3*  409:*18*
**answering**  89:*18*
116:*20*  172:*14*
315:*17*  400:*1*
407:*2*
**answers**  142:*2*
326:*5*  411:*7*
**anticipating**  238:*10*
**anybody**  14:*9*
125:*21*  139:*20*
140:*9, 11*  156:*11*
157:*3*  165:*15*
166:*10*  181:*9*
183:*4, 7*  251:*13, 17*
252:*4*
**anyway**  162:*1*
184:*8*  286:*17*
**anyways**  408:*7*
**anywise**  411:*11*
**apart**  84:*13*
123:*22*  152:*4*
**apologize**  159:*17*
162:*18, 20*  197:*17*
249:*6*  295:*11*
**apparent**  49:*20*
256:*8*
**apparently**  70:*7*
135:*22*  180:*2*
368:*22*  369:*9*
399:*4*
**appeal**  322:*8, 9, 12*
**appealed**  322:*10*
**appear**  70:*4*
111:*13*  163:*4*
181:*10*  212:*23*
213:*5, 8*  234:*3*
237:*13*  248:*13*
300:*10*  358:*23*
371:*18*
**appearance**  42:*9*
43:*14, 15, 18*
**appeared**  164:*16*
370:*13*  395:*20*
**appearing**  362:*21*

**appears**  147:*13*
154:*18*  156:*18*
157:*12*  181:*12*
211:*12*  258:*19*
259:*20*  275:*12, 13*
286:*2*  298:*21*
299:*7*  303:*3*  305:*3*
307:*18*  309:*16*
362:*18*  406:*2*
**applicability**  406:*23*
**applicable**  25:*3*
210:*8, 11*  342:*16,
17*  344:*6*
**applies**  247:*14*
393:*7*
**apply**  114:*6, 12*
319:*22*  345:*8, 23*
**appointed**  14:*18*
375:*2*  379:*19*
382:*16*  384:*11*
392:*15*
**appointment**  68:*2, 3*
**appoints**  67:*16*
**appreciate**  20:*1*
156:*12*  161:*7*
205:*5*
**appreciation**  295:*3*
**appreciative**
130:*22*  156:*16*
**approach**  130:*11*
**approaching**  257:*13*
**appropriate**  71:*1*
97:*19*  149:*15*
200:*3*  283:*9*
314:*12*  316:*15*
364:*20*  394:*18*
**appropriately**
265:*17*
**approval**  297:*3*
399:*15*  408:*14*
**approve**  316:*1, 3*
**approved**  222:*15*
296:*6*  298:*13*
299:*10*
**approves**  315:*1, 12,
13*
**approximately**
226:*5*
**April**  298:*23*  299:*1*
**ARANT**  10:*11*

**area**  49:*19*  285:*20*
406:*14*
**arguably**  353:*10*
**argument**  84:*16*
**Argumentative**
153:*8*
**arguments**  22:*20*
**arises**  405:*19*
**arising**  20:*18*  99:*8*
148:*2, 22*  149:*23*
208:*1*  245:*11*
**arose**  227:*7*
242:*23*  283:*2*
290:*10*  323:*19*
328:*13*
**arrangement**  92:*20*
93:*17*  398:*20*
**arrangements**  189:*9*
**arrestee**  405:*13*
**article**  87:*2*  219:*2*
**articulate**  208:*21*
**ASAP**  181:*19*
**asked**  2:*15, 20*
25:*10*  32:*5*  51:*3*
57:*1*  63:*14*  96:*23*
97:*20, 21*  111:*8*
120:*21*  148:*16*
151:*12*  153:*6, 7*
158:*21*  159:*5, 6*
172:*12*  176:*7*
181:*16*  200:*18*
202:*22*  205:*9*
206:*9, 19*  221:*13*
233:*18*  235:*23*
236:*5*  249:*5*  261:*6*
276:*4, 22*  309:*5*
313:*3*  325:*20*
327:*12*  331:*16*
339:*17*  390:*17*
391:*3, 4, 7*  393:*9*
398:*5*  399:*19*
400:*4*  409:*18*
**asking**  19:*21*
22:*22, 23*  32:*3*
46:*2*  68:*19*  70:*1*
72:*12, 13*  73:*6, 8, 9*
81:*20*  85:*18*  96:*12*
98:*16*  102:*19*
103:*17*  180:*11*
183:*6*  210:*21*

214:*20*  290:*1*
321:*20*  325:*15*
337:*20*  338:*8*
342:*20*  396:*2*
402:*10*  406:*7*
407:*2*
**asks**  54:*19*  72:*19*
176:*19*  210:*18*
214:*3*
**aspects**  203:*3*
313:*16, 16*
**assaulted**  150:*3*
226:*9*  229:*2*
**assert**  216:*14*
364:*18*  394:*17*
**asserted**  20:*14*
21:*11*  23:*16*  27:*15*
36:*19*  50:*11*
132:*21*  133:*2*
171:*23*  190:*6*
208:*6, 18*  209:*10*
217:*17*  228:*19*
341:*8*  388:*11*
390:*2, 8*  393:*17*
**assertions**  55:*7*
**assessing**  203:*9*
**assessor**  14:*6*
**assets**  48:*8*
**assigned**  179:*4*
265:*3*  386:*2*
**assist**  44:*12*  214:*20*
**associated**  45:*13*
116:*11, 14*  118:*14*
122:*18*  124:*10*
129:*12*  132:*17*
139:*20*  231:*1*
315:*14*  327:*3*
351:*6*  355:*13*
366:*14*
**Association**  204:*6*
**assume**  124:*12, 13*
184:*12*  224:*10*
228:*23*  278:*18*
282:*11*  320:*14*
**Assuming**  406:*11*
**Assurance**  157:*19*
158:*4, 10*  201:*21*
272:*22*  334:*6*
**Atlantic**  141:*15*

**Jeff Rich - Madison County  Representative**                  419

**attached** 87:2
146:*17, 20* 156:*18*
160:*21* 219:*3*
226:2 243:22
244:*4, 5, 8* 258:*21*
277:15 286:6
297:*10* 300:*3*
303:*16* 305:*12*
308:22 317:*20*
**attachment** 244:7
281:*1, 18*
**attachments** 286:6
**attained** 290:*6*
**attempting** 159:8
**attend** 141:*1*
203:*21*
**attended** 140:*21*
**attention** 96:*14*
187:8 196:6 228:6
406:*19*
**attorney** 13:2, *19*
14:*19* 43:7 53:*23*
61:*4* 72:22 131:22
132:*3, 5, 11, 13*
162:*19* 163:2
234:*14* 242:*14*
243:*10* 253:*13*
254:*12* 274:*16*
323:*11* 324:9
328:7 330:*4, 10*
333:*13* 335:*1*
379:*19* 408:*21*
**attorney-client**
71:*7, 21* 74:2
132:*8* 172:*8, 15*
182:*8* 262:*23*
274:*6*
**attorneys** 11:*19*
18:*6* 40:*3* 42:*13,*
*20* 115:*23* 116:5
117:*3, 5, 7* 267:*15*
324:9 367:4
380:*15*
**attorney's** 37:*23*
117:*6*
**Auburn** 13:*20*
**August** 6:*10* 7:4
9:*6* 156:*19* 277:*18*
278:*14* 302:*1*

309:*17* 374:*16*
**aunts** 269:*4*
**authored** 29:*12*
55:*15* 324:*16*
**authority** 11:*4*
104:*1* 184:*16*
267:*4* 378:*3*
**authorize** 97:*18*
**authorized** 329:*9,*
*16* 330:*7, 12*
**auto** 404:*5*
**autopsy** 348:*9, 19*
**available** 136:2
222:*14* 251:*8*
**Avenue** 10:*6, 12*
11:*2* 267:*2*
**aware** 22:7 23:*14*
26:*23* 27:*3* 36:*4*
44:*5* 53:*15* 54:*23*
59:*15* 61:*8* 66:*9*
73:6 74:*10, 18, 22*
75:*4, 11, 19, 22*
76:*6, 9, 19* 81:*19*
88:*6, 8, 17, 21*
89:*14* 92:*15, 18*
94:*7* 105:*11* 116:*7*
133:*1, 2* 143:*7*
144:*10, 13* 159:*23*
171:*22, 23* 183:*13*
184:*15, 18* 186:*4*
215:*2, 6, 16* 233:*5*
241:*19* 242:*1, 12*
243:*8, 17* 253:*1*
269:*17* 271:*20*
284:*6, 21* 290:*7, 11*
328:*1, 14, 22*
337:*21* 340:*13*
343:*8* 347:*21*
348:*22* 349:*20*
350:*6, 10* 354:*1*
355:*22* 357:*6*
370:*7* 380:*1* 381:*9*
385:*1, 7*

**< B >**
**back** 29:*22* 42:*11*
43:*12* 63:*23* 64:*1*
69:*9, 20* 80:*13*
94:*9, 23* 109:*23*
112:*6, 8* 113:*1*

126:*4, 6* 134:*21*
153:*18* 176:*4*
180:*9* 193:2
196:*19* 212:*11*
218:*13, 15* 221:*12*
232:*13, 22* 236:22
237:9 238:*18*
239:3 244:*12*
248:*6* 261:*4, 15*
280:*17* 281:*19*
282:*9* 290:*7* 297:*1*
298:*4* 334:*13*
335:*20* 338:*19*
361:*16* 362:*2, 6*
372:*10* 391:*18*
398:*9*
**background** 13:*17*
180:*13* 205:*12*
**bad** 45:*17* 54:22
65:*11*
**Baker** 351:*1*
354:*16*
**ballpark** 51:*19*
225:*17*
**Band-Aids** 197:*5*
**bar** 14:*15*
**Barbara** 122:*13*
131:*4* 140:*17*
141:*1* 168:*19*
169:*14* 170:*3*
173:*11* 176:*9, 16*
177:*20* 181:*16*
184:*19* 250:*9*
253:22 255:*20*
397:*14, 17* 398:*9*
399:*3*
**Barbara's** 174:*9*
**Baring** 248:*11*
**based** 20:*16* 21:*9*
27:*20* 31:*20* 36:*6,*
*23* 46:*23* 48:*10*
56:*23* 81:*13, 13, 18*
85:*11* 88:*16, 18*
89:*16* 95:*9* 100:*6,*
*9* 101:*2* 103:*3*
108:*17, 21* 112:*18*
113:*7, 12, 15, 17*
153:*16* 156:*2, 14*
202:*9* 208:*23*
224:*19* 244:*10*

282:*17* 289:*12*
332:2 334:*17, 17*
354:7 359:*17*
371:*20, 22* 397:*6*
**bases** 32:*16* 56:2
**bashed** 153:*23*
**basic** 216:*12*
**basically** 199:*11*
385:*18*
**basis** 14:*11* 20:*13*
24:7 25:*10* 26:22
32:*3* 33:*5, 12* 35:*1,*
*9* 36:*14* 54:*19*
57:*4* 58:7 64:*3*
65:*10* 90:*15* 91:*9*
93:*18* 130:*19*
145:*5* 236:*19*
250:*21* 262:*12, 13*
397:*20* 398:*22, 23*
399:*16*
**Bates** 15:*11* 155:*9*
157:*11* 166:*18, 19*
167:*2* 169:*13*
173:*9* 174:*13, 23*
175:*14, 17, 19*
178:*13* 187:*9*
192:*3* 197:*19*
229:*19* 230:*2*
234:*20* 235:*1, 22*
236:*8* 247:7 250:*6*
258:7 276:*17, 19*
278:*10* 279:*11*
280:*2, 4* 285:*18*
286:*10* 295:*12, 21*
296:*18* 298:*9*
299:*2, 12* 300:*9*
301:*1, 16* 303:*2, 18*
304:*23* 306:*16*
307:*16* 310:*22*
312:*2, 15* 317:*3*
338:*23* 341:*21*
342:7 360:*15*
372:*15*
**Batie** 355:*1*
**beating** 87:*1* 219:2
**becoming** 13:*18*
**began** 302:*1*
**beginning** 17:2
25:*16* 93:*11* 249:*6*
286:*16*

**begins** 237:5 396:23

**behalf** 12:3, 5 19:23  20:8, 9 28:12, 14, 19  30:23 36:18  117:17 138:15  157:18 159:18  163:3 188:5  192:22 219:23  226:14 253:9  267:23 323:11  352:17, 22, 22  366:17  386:10 407:4

**belabor** 173:4

**belief** 93:12  145:6 239:4  244:10

**believe** 16:14 18:23  31:5  33:18 34:18  38:18  41:23 43:20  46:21  47:9, 13, 16, 18  48:17 55:17  58:16  59:7 65:12  66:18, 21 75:13  92:12  94:18 102:9, 18  108:14 113:12  115:4, 5, 11 119:13  130:10 131:16  134:13 137:21  140:5 145:1  154:15, 19 167:18  169:23 177:19  181:23 183:10  191:2 201:10  205:23 209:20  215:15 216:21  221:3 224:15  226:7 235:12  237:18 244:6  245:14 251:22  252:18 255:23  256:3 257:2, 3  258:23 265:4  270:3 280:16  283:13, 16 297:9, 12  300:4 307:23  314:15 325:19, 23  326:16 327:7  332:20 336:10, 21  337:8

**begins** 339:17  344:9, 11 347:7  348:1, 11 355:10  358:17 365:8  366:23 367:14  368:9, 10 369:6, 18  374:12, 21  375:9  378:10 382:13  387:10 390:19  395:3, 13 399:6, 16  402:21

**believed** 177:20 340:14

**believes** 125:1 127:10  144:5

**bench** 196:18

**benefit** 153:17

**best** 16:4  24:3 32:20  51:14  96:9 121:8  174:18 269:17  403:9

**better** 41:19 111:14  130:7 166:21  324:21 356:5

**beyond** 61:21 105:21  151:16, 21 188:7  193:22 195:13  203:20 238:9  261:23 315:20  327:21 370:8  378:2  389:8 396:5  401:19 408:9  409:22

**Bielenberg** 283:8 286:19

**B-I-E-L-E-N-B-E-R-G** 286:20

**big** 106:11, 12 288:19

**biggest** 326:22

**bill** 315:19

**bills** 68:4, 6  70:14, 17  73:20  315:20, 22  383:3

**bind** 26:8, 10, 15 27:2

**binds** 26:17

**Birmingham** 10:19 30:22  268:20

**bit** 13:17  32:18 33:2  177:2  255:4

**bits** 84:15

**black** 280:8

**blacked-out** 285:20

**BLAKE** 1:2  10:22 272:16  277:9 279:15  285:23 296:5  299:19 306:18  307:9 316:14  375:17 378:17

**blank** 140:20, 22 301:11

**bled** 150:6

**bleeding** 228:4, 22

**block** 248:14, 17 301:8, 10  302:8 304:6  310:12

**bloodborne** 314:6

**blown** 256:20

**Blue** 92:19  122:15 140:6, 8, 13  168:20 173:15, 21  177:8 180:3, 4, 7, 20 181:5, 12, 16 251:23  252:5, 6, 13 253:23  397:2, 4, 15 398:10

**Blue's** 359:20

**Board** 411:13

**booked** 227:18

**booking** 405:11 406:12, 13, 14

**borne** 124:6

**bottom** 147:18 155:18, 20  167:6 174:13  197:12 232:2  233:5  247:8 248:16  250:3 258:8  280:9 281:12  302:8 311:4  321:3 392:12  405:2

**bought** 39:15

**BOULT** 10:11

**bowel** 348:14, 23

**box** 248:9

**boxes** 291:17, 17

292:4, 4  293:15, 21

**BRADLEY** 10:11

**brain** 77:4

**Brandon** 10:16 267:18  372:3, 23 389:7  400:7  402:6 408:8

**breadth** 190:8

**break** 37:16  54:23 63:18  112:1  176:6 206:19, 22  217:8 218:8  265:20

**breaking** 37:10

**brief** 268:14 343:14

**briefly** 220:19 280:18  350:4 373:22  375:19 404:23

**bring** 126:21 390:14

**brings** 15:17  85:8

**broad** 50:15  79:8

**broader** 192:12, 16 193:15

**broadest** 314:20

**Brooks** 10:23

**brothers** 269:4

**brought** 51:4 172:10  207:23 345:13

**Bryant** 87:1  219:2 225:10  226:4 227:13

**budget** 137:2 315:2, 8, 10, 13 316:2, 3

**buildings** 202:13

**built** 202:17

**bulk** 138:7, 10

**bullet** 347:8 348:13

**Burbach** 66:12 67:18

**Burback** 401:22

**burden** 124:5

**business** 283:23 285:6  329:11, 17 330:7, 13

**businesses** 113:11

**Jeff Rich - Madison County  Representative** 421

**Butler** 14:*18*
237:*3* 274:*16*
**buy** 48:*4*

**< C >**
**CAL4** 157:*11*
**call** 121:*9* 142:*4*
167:*19, 21* 168:*2, 6,
9, 11, 14, 18* 170:*5*
195:*4* 197:*4* 199:*9*
203:*22* 204:*13, 14*
258:*9*
**called** 141:*15*
184:*4* 204:*10*
228:*6*
**Callender** 286:*20*
287:*8*

**C-A-L-L-E-N-D-E-R**
286:*21*
**calling** 168:*20*
**calls** 169:*4* 182:*16*
**Calone's** 223:*4*
**Canuff** 402:*1*
**capacity** 14:*4* 29:*9*
60:*20* 270:*14*
278:*18* 293:*4, 9*
**captured** 188:*7*
**captures** 177:*5*
**care** 21:*4* 37:*6, 8*
80:*23* 81:*3, 10, 21*
82:*2, 8, 9* 87:*15, 20,
23* 96:*20* 106:*9*
123:*17* 124:*14, 23*
134:*11* 135:*17*
136:*4, 5, 11, 15, 17,
18, 19* 137:*4, 7*
150:*7* 151:*10*
153:*16* 194:*15, 17*
195:*9, 13, 17, 17, 18*
197:*13* 210:*8, 10,
11* 212:*18* 214:*2*
222:*8* 223:*13*
224:*6* 283:*2* 309:*1*
313:*4* 316:*16, 23*
318:*18* 319:*4*
325:*15, 16, 19*
327:*4, 6* 360:*21, 22*
374:*10, 18* 388:*17,*

*18* 391:*1* 394:*7*
406:*21*
**cared** 123:*19* 125:*8*
**caring** 130:*8*
**Carolyn** 391:*11*
**carried** 78:*3* 79:*10*
**carrier** 122:*21*
167:*8* 284:*23*
285:*3* 329:*4*
331:*19, 21, 22*
332:*9, 17* 365:*3*
**carriers** 233:*14*
303:*12*
**case** 11:*13* 30:*23*
36:*9, 13, 17* 37:*11*
38:*12* 39:*4* 40:*18,
19* 41:*9* 42:*21*
54:*8, 9, 16* 57:*21*
58:*5, 9* 59:*4* 88:*9*
94:*18* 96:*4* 99:*23*
100:*4, 14* 102:*5*
103:*16* 104:*7, 15,
19* 105:*6* 115:*1, 1,
7, 13* 117:*10, 12, 13*
118:*23* 131:*21, 23*
138:*13* 145:*21*
163:*5* 168:*16*
180:*19* 183:*20*
184:*11* 186:*20*
198:*2* 206:*1, 16*
211:*3, 5* 220:*15*
221:*4* 225:*10*
226:*22* 227:*2*
249:*11* 251:*18*
252:*1* 265:*2, 5*
268:*16* 271:*2*
292:*9* 317:*7, 9*
322:*6* 347:*5, 10*
356:*8* 357:*16*
359:*23* 366:*2*
372:*20* 374:*19*
375:*6, 9, 12* 376:*1,
1, 15* 378:*9* 380:*20*
381:*23* 382:*8, 12*
384:*1, 1, 3* 390:*11*
398:*18*
**cases** 15:*18* 16:*5*
18:*1, 2* 22:*3, 15, 19*
23:*3, 8* 33:*21*
36:*17* 38:*21* 39:*2,*

*11, 14* 41:*1, 2, 9, 13,
14, 17, 22* 42:*1, 3,
10* 44:*8* 45:*22*
47:*8, 12* 55:*11, 12*
57:*14, 16, 19* 63:*1*
88:*13* 92:*11, 14, 17*
94:*13, 19* 95:*9*
96:*19* 101:*23*
104:*2, 4* 113:*17, 20*
115:*12, 15, 17*
116:*2, 6, 8, 12*
117:*4, 9, 10* 133:*3,
5, 17, 19* 138:*18*
139:*16* 145:*19*
153:*4* 169:*23*
170:*1* 172:*4, 7*
180:*16* 181:*18*
182:*3* 207:*12*
222:*2* 230:*15*
231:*19* 233:*13*
250:*22* 322:*4, 5*
323:*3, 4* 345:*2*
352:*12, 15* 353:*9,
11, 18* 366:*11, 13*
367:*2, 5* 373:*5*
378:*6, 8* 380:*6*
382:*9* 387:*6* 388:*5*
390:*3* 391:*23*
393:*16, 19, 21*
396:*7* 404:*14, 15*
**categories** 342:*13*
**cause** 2:*19* 81:*4*
88:*1* 217:*17*
267:*13* 411:*12*
**caused** 142:*9* 229:*3*
**causes** 214:*14*
309:*3*
**caveat** 64:*5*
**cc'd** 169:*17* 279:*17*
**CCR** 411:*14*
**cell** 228:*3* 229:*2*
**Center** 161:*17*
196:*17* 311:*3, 9, 13*
312:*17*
**Central** 237:*23*
**certain** 49:*23*
144:*15* 168:*18*
363:*13* 390:*11*
393:*15*

**certainly** 42:*15*
95:*2, 7* 104:*9*
126:*19* 231:*17*
233:*5* 265:*7* 316:*9*
321:*6* 341:*18*
397:*1* 408:*2*
**certainty** 229:*15*
**Certificate** 8:*2, 4,
10, 12, 14, 16*
108:*11, 22* 111:*17*
160:*10, 21* 233:*6*
235:*14* 244:*5*
245:*4* 247:*2, 19*
273:*15* 280:*21*
281:*2* 282:*5, 9*
300:*20* 301:*17*
302:*18* 303:*5, 9, 17*
304:*1* 305:*5, 13, 20*
306:*5, 9, 19* 307:*11,
20* 308:*21* 309:*19,
21* 310:*6, 23* 311:*2,
23* 312:*14, 16*
328:*17* 358:*2, 8*
365:*2*
**certificated** 21:*1*
**certificates** 108:*3, 6,
12, 13, 17, 20* 109:*5*
143:*11* 231:*20*
232:*1* 330:*1*
332:*23* 333:*17*
335:*3, 9, 14, 22*
337:*3* 342:*14, 15*
356:*21, 23* 357:*19,
23* 365:*7, 10, 12*
371:*6, 14*
**Certified** 411:*14, 14*
**certify** 411:*6, 9, 13*
**chain** 5:*12, 14, 16,
18, 20, 22* 6:*2* 9:*12*
252:*22*
**chains** 174:*16*
252:*14*
**Chairman** 296:*10,
21* 299:*20*
**change** 59:*22* 97:*9*
187:*3* 234:*7*
275:*15* 288:*21*
330:*23*
**changed** 143:*4*
191:*6* 202:*9*

229:*18*  275:*11*
282:*8*, *10*  283:*8*
325:*10*  344:*8*
**changes** 202:2, *10*
274:*9*  275:*7*
323:*12*, *14*, *17*, *22*,
*22*  325:*7*
**characterization**
353:*8*  395:*16*
398:*16*
**characterize**
263:*19*  395:*10*
**characterized**
395:*11*, *12*, *19*
**charge** 99:2, *2*, *8*
403:*20*
**chart** 292:*22*  293:*1*
**check** 42:*23*  43:*6*
114:*21*  155:*14*
262:*7*  347:*20*
**checked** 270:*23*
**Checklist** 8:*22*
236:*7*  342:*11*, *18*,
*23*  343:*8*
**checks** 42:*14*, *19*
**chief** 86:*23*  219:*1*
**Children** 311:*4*, *14*
312:*17*
**chose** 353:*21*
**chosen** 315:*4*, *7*
**Christie** 381:*6*, *7*
**Christine** 354:*22*
**chronology** 147:*7*
**circle** 361:*16*
**circling** 54:*2*
**circumstance**
149:*11*
**circumstances**
57:*12*  150:*18*
151:*4*  191:*18*, *20*
**citizen** 226:*10*
**City** 162:*19*  202:*17*
**Civil** 1:2  2:*4*, *10*
13:*21*  153:*11*
303:*7*, *10*  304:*10*
**claim** 33:*13*  34:*8*,
*9*  35:*10*  46:*13*
57:*5*  58:*8*  66:*10*
69:*21*  72:*23*  76:*5*
88:*10*  89:*13*  91:*10*

95:4, *14*, *17*  96:2, *3*,
*6*, *7*  97:*14*, *19*
98:*13*  112:*13*
128:*14*  133:*18*
134:*1*, *5*, *18*, *19*
136:*7*, *8*  148:2, *22*
149:*23*  154:*1*
164:*15*, *19*  165:*22*
166:*3*  170:*18*, *20*,
*21*  171:*4*, *9*  207:*13*
208:*1*, *2*, *6*, *8*  209:*8*,
*12*, *19*  210:*3*
216:*15*  217:*20*
224:*16*  226:*8*, *18*
227:*5*, *7*  228:*9*, *18*
229:*4*, *5*  231:*15*
233:*3*  245:*11*
257:*4*, *7*, *8*  283:*1*
333:*10*, *11*  368:*23*
369:*1*, *2*  373:*10*
377:*13*  389:*2*, *5*
390:*8*  391:*6*, *21*
394:*9*  395:*23*
396:*5*, *6*
**claimant** 43:*7*, *7*
46:*15*  96:*4*
**claimants** 42:*7*, *12*,
*13*  170:*13*
**claiming** 71:*22*
**claims** 20:*14*  21:*1*,
*11*, *13*, *14*, *17*, *21*
23:*15*, *15*, *22*  26:*5*
27:*14*  30:*15*  34:*23*
36:*5*, *6*, *10*, *13*, *19*,
*22*, *23*  37:*22*  38:*1*,
*6*, *8*, *14*  45:*7*, *8*, *12*,
*16*  46:*11*, *13*  48:*6*,
*9*  50:*10*  52:*7*, *9*, *14*,
*20*, *21*  53:*17*  61:*11*
91:*19*  92:*1*  93:*14*
96:*1*, *5*  97:*3*  98:*20*,
*21*  99:*1*, *6*, *10*, *16*
101:*5*  111:*12*
112:*16*, *18*  113:*4*,
*16*  114:*17*  116:*19*
120:*3*  122:*18*
123:*23*  124:*3*, *4*, *5*,
*11*  125:*2*, *4*, *5*, *9*, *20*
126:*17*, *18*, *23*
127:*7*, *8*, *9*, *16*, *18*,

*18*, *23*  128:*8*, *10*
131:*7*, *16*  132:*21*
133:*2*  134:*3*, *14*, *15*
135:*2*, *13*, *15*
152:*17*  153:*10*, *11*,
*12*, *13*, *13*  161:*17*
169:*20*  171:*8*, *23*
172:*3*  190:*6*, *14*
191:*21*, *22*  207:*6*, *6*,
*20*  208:*10*, *17*
209:*9*  219:*13*
231:*12*  233:*15*, *17*,
*20*  234:*7*, *21*  235:*2*,
*3*  239:*10*  256:*10*
322:*15*  327:*3*
341:*8*, *9*  345:*13*, *23*
349:*15*  352:*14*
353:*19*  354:*5*
365:*20*  366:*19*
368:*16*  371:*23*
373:*7*, *9*  376:*8*
377:*11*, *12*, *14*
378:*18*, *21*  380:*10*
383:*13*  388:*3*, *8*, *11*,
*13*, *15*  390:*2*, *2*, *23*,
*23*  391:*9*, *10*
392:*16*  393:*17*, *18*
394:*6*  395:*19*, *20*
396:*6*, *8*  403:*13*, *14*,
*15*, *16*, *18*  404:*6*
**Clapp** 4:5  10:*16*
267:*18*, *18*  372:*22*,
*23*  376:*23*  382:*5*
389:*15*, *17*  400:*11*
401:*5*, *9*  402:*13*, *23*
407:*11*  409:*23*
**clarification** 18:*18*
70:*1*  73:*7*  398:*5*
402:*10*
**clarified** 180:*15*
**clarify** 17:*5*  40:*17*
43:*2*  59:*14*  188:*22*
243:*20*  331:*4*
**clarifying** 257:*20*
**class** 196:*13*  198:*2*
**clause** 184:*4*, *9*
193:*13*, *14*
**clean** 324:*13*
355:*21*

**cleaned** 355:*20*
**cleaning** 200:*3*, *3*
**cleanliness** 199:*20*
314:*3*
**clear** 66:*18*  138:*10*
149:*10*  177:*4*
180:*8*  193:*22*
227:*22*  257:*4*, *11*
268:*9*  279:*4*
287:*20*  327:*12*
330:*22*  333:*4*
334:*17*  361:*1*
**clearer** 42:*5*  50:*16*
**clearly** 79:*11*  82:*7*
83:*23*  85:*16*  86:*9*
171:*7*  290:*2*
**Clemon** 196:*18*, *19*,
*21*  317:*12*
**clerk** 318:*3*
**clerk's** 317:*16*
**client** 32:*4*  73:*14*
156:*1*  408:*12*
**clients** 156:*1*
163:*4*  258:*15*
262:*17*  287:*14*
**client's** 181:*23*
**Clinton** 10:*12*
**close** 196:*11*  234:*9*
**closed** 319:*23*
**closing** 161:*1*, *5*
**clued** 236:*8*
**coincide** 192:*20*
**collectively** 171:*13*
**collector** 14:*7*
**Collier** 354:*23*
**combination** 42:*21*
352:*16*
**come** 13:*9*  69:*20*
96:*3*  114:*14*
138:*12*  174:*3*
176:*22*  215:*21*
232:*13*, *22*  297:*1*
391:*18*  406:*15*
**comes** 266:*12*
348:*8*  406:*22*
410:*3*
**comfortable** 51:*20*
53:*1*, *10*  89:*18*
294:*3*, *9*  407:*2*, *7*

**coming** 221:*18* 238:*4* 241:*13* 245:*18* 325:*17*
**comma** 223:22
**comments** 86:*23* 218:*23*
**Commission** 14:*5, 16* 125:*18, 19* 198:*7* 257:22 268:22 275:*21* 276:*3, 7* 296:*7* 298:*14* 299:*11, 20* 314:*21* 315:*1, 5, 12, 16, 18* 316:*11* 320:9, *18, 20, 21, 23* 375:*18* 378:2 411:22
**Commission,** 341:22
**Commissioner** 3:*7* 329:*10* 411:*21*
**Commission's** 276:*1*
**committed** 134:*6, 7* 152:*5* 153:*5* 222:*19* 363:8
**common** 214:*19*
**communicate** 179:*19* 233:*23* 254:*13*
**communicated** 122:*13* 143:*11* 172:2 179:*5* 182:*4* 231:*14* 252:*4, 6* 384:*16*
**communicating** 99:9 240:2 288:*16* 292:20
**communication** 72:*5* 98:22 99:6 109:*23* 110:2 131:*3, 14, 17* 178:*1* 179:*6, 18* 182:*9* 183:*1* 230:*17, 19, 23* 241:20 243:*5* 250:*19* 252:*18* 253:*1, 5* 255:*19* 256:*4, 13* 269:*10, 18* 328:*4, 15, 21, 23* 381:*15, 18, 19* 382:2, *14* 385:22

**communications** 31:2 72:*19, 21* 73:*13* 131:*12, 20* 139:*14, 19* 163:*14* 178:9 182:*16* 230:*11* 252:*11* 274:*6* 328:*1* 369:9 381:*10* 382:*6, 20* 385:2, 8 386:*1, 4, 8*
**comp** 49:*21* 322:*4, 5*
**companies** 97:*14, 16* 113:*11* 125:*10* 168:22 187:22 331:*7* 403:*19*
**COMPANY** 1:*6* 11:*16* 12:*4* 19:*11* 31:*3, 8* 39:*18* 43:*1* 52:*6, 11* 98:*9* 104:*17* 123:*1* 127:*10* 130:*12, 15* 139:*15* 141:*15, 16, 17, 19, 23* 165:*1* 166:*5* 167:*17* 185:*12* 230:*14* 231:*21* 233:*19, 21* 234:22 246:*6, 10* 259:6 267:*19* 281:*10* 284:*17* 304:2 305:*17* 310:*10* 329:9 330:*12, 20* 331:*5, 6* 373:*1* 381:*11* 383:*12*
**company's** 31:*13* 122:*20, 22* 142:*3* 163:*16*
**comparable** 30:*11*
**compare** 154:*11*
**comparing** 244:22
**competitors** 289:*1*
**complained** 291:*23*
**Complaint** 4:*16, 18, 20* 9:*8, 10* 15:*19* 16:*8, 12, 14, 18, 19* 17:*3, 7, 9* 22:*21* 32:*11, 13* 33:*7* 37:*11* 54:*21* 56:*15* 63:*11* 71:2 74:*16, 18* 75:*4, 5* 76:*9, 10,*

*11, 17, 20* 77:*3, 3* 78:*15, 16, 20, 21, 23* 79:*15* 80:*15* 81:*17* 82:*6, 7, 17* 83:*3, 11, 21, 22, 23* 84:*2, 13, 14* 85:*10, 15, 20, 21, 23* 86:*3, 11, 16* 88:*7* 90:*2, 6, 20* 91:*5* 95:*17* 96:*12, 23* 97:22 98:*17* 99:*14, 17* 101:*8, 13, 15, 23* 113:*18* 142:*18* 146:*2, 3* 150:*17* 162:*10* 163:*3* 164:*23* 206:*11* 207:*18* 208:*12, 12, 15* 209:*2, 16, 17* 210:*16* 211:*13, 14, 15* 213:*1, 6, 9, 11* 216:*10, 19* 217:*3* 218:*16, 17* 220:*11* 221:*7* 223:*10* 226:2 227:*21* 256:*14* 333:*5, 16* 335:*5* 347:*5* 349:*13* 356:*7* 362:*4* 373:22, *22* 374:*3, 7, 11* 375:*16, 19* 376:*5, 11, 15, 20* 377:*7, 9, 18* 383:*23* 384:*5, 8* 387:*13, 15* 388:*3, 3, 22* 389:*5* 390:*13, 15, 20* 391:*21* 392:*3* 400:*13, 15, 18* 401:*7* 404:*11*
**complaints** 15:*18* 16:2, *5, 22* 17:*19, 20* 22:*7, 8, 11* 23:*18, 19, 23* 55:*9, 10* 57:*11* 60:*7, 15, 21* 61:*5, 6, 7, 9, 22* 62:*17, 20* 63:*5, 7* 76:*14* 78:*11* 91:*14* 124:22 135:*21, 21* 152:*9, 13* 153:*9, 22* 207:*11, 20* 208:22 219:22 223:*3* 335:2 378:*18, 20*

389:*13* 390:6 391:*10*
**complete** 175:*10, 18* 266:*4* 360:8 377:*10* 379:8
**completed** 405:*14* 406:*16*
**completely** 87:*4* 287:*5* 301:*10* 324:*16*
**completing** 405:*11*
**completion** 405:*14*
**compliance** 198:*6* 203:*13*
**complicated** 313:*1*
**complied** 27:*12*
**complies** 307:*1* 379:*1*
**comply** 320:*8, 15*
**component** 402:*16*
**comprehensive** 195:22 196:2 203:*6*
**comprehensively** 196:*8*
**computer-aided** 411:*8*
**concern** 148:*7* 158:*15* 293:*23* 325:*12, 17* 327:*6* 334:*20* 383:*9* 400:*6*
**concerned** 100:*12* 125:*3* 200:*1* 251:*7* 334:*5*
**concerning** 157:*17* 158:*7*
**concerns** 382:*10*
**conclude** 338:*3*
**conclusion** 26:*13* 115:*6* 126:*21* 364:*15, 16* 394:*13*
**concrete** 255:*7, 15*
**condition** 75:22 228:2
**conditional** 70:*20*
**conditions** 79:*18* 198:2 318:*18* 319:*5*

**conduct** 20:*19* 55:*12* 64:*12*, *16* 194:*4* 215:*9* 380:*14* 388:*14*
**conducted** 241:*13*
**conferences** 121:*13* 188:*9*
**Confidential** 5:*22* 175:*3* 225:*23*
**confidentiality** 141:*7* 226:*16*
**configuration** 202:*10*
**configured** 321:*1*
**confirm** 18:*14* 114:*21* 115:*5* 180:*11* 369:*11*, *22*
**confirmed** 26:*2*, *2* 107:*20* 216:*4*
**conflict** 35:*20* 380:*8*, *13* 381:*19* 382:*22* 384:*15*
**confused** 177:*3* 317:*22* 377:*8*
**confuses** 147:*8*
**confusion** 309:*3*
**conjunction** 14:*17* 198:*1* 213:*23*
**connected** 134:*16*
**Consent** 7:*8* 184:*5*, *8* 196:*9*, *11* 198:*14* 199:*18* 263:*22*, *23* 284:*5* 317:*5* 318:*21* 320:*9*, *11* 321:*8* 399:*9*, *17*
**consequently** 345:*6*
**consider** 35:*11* 70:*20* 114:*3* 133:*6*, *9* 256:*16* 403:*19*
**considered** 254:*23* 334:*16*
**considering** 81:*23*
**consist** 309:*15*
**consisted** 202:*13* 238:*14*
**consolidated** 202:*19* 319:*20*
**conspiracy** 89:*6* 153:*15* 209:*7* 221:*21*, *23*

**conspired** 37:*5* 153:*14*
**constipation** 348:*14*
**constitute** 252:*18*
**constitutional** 22:*4*, *12* 23:*5*, *10* 137:*3* 316:*15* 341:*9* 368:*16*
**constitutionally** 137:*6* 196:*5*, *22* 316:*19*, *22* 327:*4*, *5*
**constraints** 399:*22*
**consultant** 44:*12*, *15* 95:*18* 96:*12*, *16* 98:*9*
**consultation** 203:*1*
**consulted** 349:*22*
**consummated** 323:*16*
**contact** 140:*11* 141:*17* 161:*3*, *6* 167:*10* 229:*13* 230:*3*, *13* 232:*18* 233:*14* 269:*10*, *12*, *13* 283:*7* 288:*18* 330:*5*, *11* 351:*2* 379:*20*, *21*
**contacted** 269:*14*, *15* 339:*16*
**contacting** 231:*5*
**contacts** 145:*7*
**contain** 153:*10*
**contained** 56:*16* 63:*11* 87:*10* 88:*6* 89:*5* 142:*19* 190:*15*
**containment** 203:*11*
**contains** 34:*19* 85:*10*
**contended** 254:*19*
**contends** 26:*17* 30:*1* 38:*11* 92:*5*, *7*
**contention** 26:*7*, *11*, *23* 27:*1* 44:*6*
**contents** 320:*23*
**context** 81:*17* 89:*6* 321:*18* 336:*8* 388:*8*
**continuation** 65:*14* 267:*12*

**continue** 99:*9* 127:*20* 163:*13* 165:*2* 263:*6* 401:*23* 402:*2*
**continued** 111:*10* 162:*11* 286:*18* 397:*23*
**continues** 103:*2* 272:*1*
**continuing** 187:*14*, *18* 268:*9* 349:*15*
**continuos** 203:*10*
**continuous** 204:*17*
**continuum** 314:*16*
**contract** 15:*5* 25:*17*, *19* 89:*2* 95:*9* 107:*22* 110:*8*, *16* 111:*4*, *18*, *20* 126:*16* 135:*6* 145:*8* 181:*2* 187:*18* 188:*17*, *18*, *21*, *23* 189:*1*, *8* 200:*22* 222:*15*, *16* 239:*6* 243:*2* 245:*17* 257:*18* 270:*8*, *17* 288:*11* 289:*9* 290:*18* 293:*14* 297:*4* 302:*14* 304:*11* 310:*17* 311:*16* 312:*10* 313:*6*, *14* 314:*14* 315:*21* 323:*16*, *23* 327:*22* 328:*15*, *20* 330:*3* 332:*16*, *21* 333:*12* 334:*7*, *9* 336:*2*, *3*, *14*, *23* 337:*17*, *18* 342:*22* 343:*2*, *11* 350:*14* 357:*3*, *11*, *15* 358:*6* 363:*22* 365:*15*, *22* 368:*20* 369:*1*, *6* 370:*9* 371:*17*
**contracted** 124:*8*, *20* 135:*8* 313:*8* 314:*18* 340:*23*
**contractors** 82:*14* 348:*3*

**contracts** 49:*1* 110:*20*, *22* 111:*21* 323:*13* 370:*5*
**contractual** 27:*12* 48:*22* 236:*3* 354:*1*
**contractually** 228:*13* 315:*14*
**contradictory** 144:*13*
**contradicts** 144:*5*, *11*, *19*
**contribute** 81:*4* 88:*1* 394:*14*, *23* 395:*4*, *9*, *22*
**control** 101:*11* 199:*11* 291:*21*
**controlling** 314:*5*
**controversy** 290:*10* 328:*11* 329:*5* 384:*7*
**convenient** 84:*17*, *21*
**conveniently** 84:*16*
**convention** 147:*17*
**conversation** 118:*22* 119:*2*, *5* 120:*10* 255:*18* 287:*22*
**Conversations** 44:*11* 45:*12* 52:*4* 120:*22* 121:*18* 122:*4* 287:*23* 340:*18* 394:*19*
**converted** 202:*14*
**convey** 367:*15*
**conveyed** 255:*19*
**convince** 256:*9*
**cooks** 313:*22*
**Cooper** 182:*6*, *11* 253:*6* 256:*12* 396:*13*
**cooperate** 45:*3*
**coordinate** 380:*2*
**coordinated** 381:*13*
**Coordination** 197:*13*
**copay** 198:*21*
**co-pay** 325:*11*, *14*, *17*

**copayment** 198:*19*
**copied** 252:*13, 16*
**copies** 29:7 60:7,
*14* 62:4 63:2
108:*23* 109:*2, 18*
110:*5, 11, 17*
111:*10* 143:7
158:*19* 292:15
**copy** 18:*12* 89:*21*
90:*1, 21* 95:*21*
98:*1* 106:2, 20, 21
107:2, *3, 4* 108:2
111:*4, 9, 14* 121:9
156:*12* 158:*3*
159:*4, 7, 13, 21*
160:*3, 19* 166:*10*
183:*5, 8, 11* 229:*14*
230:*4* 235:*11, 23*
236:9 237:2 273:2
278:*17, 22* 280:*21*
297:*14, 20* 299:9
327:*11, 14* 342:*19,
21* 343:9 350:*12*
373:*21* 374:*16*
375:*15* 396:*11*
404:*20*
**copying** 174:*11*
**Corley** 66:*12*
67:*19* 401:*23*
**corner** 155:*18, 20*
281:*3*
**corporate** 59:7
231:*13*
**correct** 12:*18, 19*
13:*5, 6* 17:*15*
18:*17* 28:5, 6
51:*16* 75:*13* 87:8
105:*18, 19* 109:*6, 8*
110:8 111:22
123:*13* 135:*4*
136:*16* 138:*5, 8, 18,
19* 146:*18* 158:*16*
160:*11* 167:*4*
173:*12, 15* 187:*9,
10* 188:*12* 194:*15,
21* 197:*19* 203:*16*
209:*21* 212:6, *7, 9,
10* 216:*21* 219:*9,
10, 14* 220:*4, 8, 9,
16, 17* 224:*3* 225:*5,*

9 226:6, *10, 11*
227:2, *3, 5, 6, 10, 14,
15* 229:*8, 20*
231:*22, 23* 232:5
233:*2, 8, 9* 236:2
237:*3* 239:*18, 23*
240:*18, 19, 23*
241:6 244:*1, 2, 9*
245:7 246:2, *10, 17,
18, 22* 247:*4, 16, 17,
20* 248:*20* 250:*15*
257:*7, 9* 258:*13, 17,
23* 264:*1* 265:*10,
11, 13* 268:*11*
277:*10, 13* 278:*15,
20* 279:*15* 280:*11*
281:*4, 10* 284:*23*
286:*13* 294:*19, 20*
295:*16* 296:*1, 8, 13,
21* 297:*14* 298:*16*
299:*23* 300:*1, 23*
301:*3, 6, 7, 11, 12,
21* 303:*7, 19, 22*
304:*3, 12* 305:*14,
17, 22* 306:*11*
307:*2, 5* 308:*1*
310:*10, 11, 17, 18*
311:*4, 17* 312:*2, 7,
17* 314:*19* 318:*20*
319:*10* 320:*11, 12*
321:*4, 9* 323:*1*
332:*19, 20* 333:*2, 8*
336:*16* 337:*6, 11*
339:*8, 12* 342:*1, 9,
10, 14* 344:*18, 22*
345:*9, 10, 17*
346:*23* 349:*16*
350:9 352:*14*
353:6 360:*17*
365:7 370:6 375:*5*
377:5 385:*16*
387:6 388:*14*
389:6 394:*4* 397:*3*
398:*21* 411:*8*
**corrected** 246:*14*
**correction** 12:*13*
218:6 354:22
**CORRECTIONAL**
1:7 12:*1* 21:*19*
24:*14, 15* 25:*1*

34:*3* 55:*7, 13*
57:*16* 74:*12* 80:*3*
82:*21* 83:*6, 20*
84:*5, 20* 85:*13*
86:*2, 5, 7* 87:*7*
95:*4* 102:*1, 2*
106:*5, 14* 108:8
113:*23* 125:*1*
160:9 188:*20*
198:*7* 199:*1, 14*
200:*1, 9, 12* 201:*7*
203:*9, 16, 21* 204:*2,
5, 9* 210:*19* 211:*1,
9, 11, 16, 22* 213:*21*
215:*14* 219:*17*
227:*23* 228:*5, 23*
241:*12* 247:*4, 15*
248:*10* 265:9
267:*21* 296:6
300:*16* 301:2
305:6 306:*20*
307:*21* 309:*20*
310:8 314:*11*
325:*5, 20* 326:2
329:*21* 339:*4*
347:*19* 349:*6, 14,
17* 354:6 404:*20*
405:*3, 4* 409:*15*
**corrections** 203:*3*
**correctly** 27:*4*
77:9 105:*4* 135:*3*
148:*4* 157:*20*
167:*12, 23* 168:*10*
189:*15* 379:*16, 22*
387:*23*
**correspondence**
15:*3* 35:22 36:*16*
57:7 58:*9, 20* 70:8
109:*23* 121:*13*
242:*12* 328:9
356:*22* 357:*1*
373:*18* 374:*20*
385:*19* 387:*4*
**corresponding**
99:*16* 146:*11*
**cost** 37:7 38:*2, 19*
39:*5, 18* 41:*11, 13*
45:*5, 9* 92:*11, 13,
16* 115:*12* 123:*9,
12, 16, 18* 124:*10,*

15, 16 125:*11*
127:2 128:*12*
130:2 134:*9*
138:*16* 139:*1*
165:*1, 2* 174:*5*
176:*18* 177:*21*
178:*3* 181:7
183:*15* 184:*17*
185:9 186:*10*
187:*16* 203:*11*
221:*23, 23* 222:*18*
254:*1, 6* 255:*14*
315:*11* 397:2
398:*4, 13* 403:*5*
404:*7*
**costing** 41:*16*
**costs** 46:*19* 93:*4,
18* 115:9, *19*
116:*11* 122:*12, 18,
21* 129:*11, 11, 12*
136:2 138:*3, 8*
182:*14* 379:*12*
**counsel** 72:*20*
118:*17* 119:*7, 7, 8,
12* 168:*10* 169:*20*
170:*2, 6* 171:*4, 17,
20* 179:*8* 180:*22*
181:*6, 19* 182:*6*
205:*6* 274:*11*
278:*19* 323:*20*
324:*8* 333:*14, 15*
356:*20* 371:*5*
375:*3* 382:*16*
396:*14* 411:*11*
**count** 90:*3, 4, 5, 8*
207:*12, 18* 208:*12*
209:*17, 22* 212:*11,
12, 14* 213:*1, 4, 5, 8*
214:*15* 216:*9, 19*
217:*14, 21, 22*
218:*2, 5* 388:*20, 21,
21* 389:*1* 390:*12,
15* 391:*5, 12, 20*
392:*7*
**counting** 293:*20*
404:*13*
**counts** 377:*15, 20*
**COUNTY** 1:2
11:*15* 12:*14, 17*
13:*1, 2, 19* 14:*3, 4,*

5, 6, 6, 7, 15, 16, 19, 19  15:2, 6, 20  16:3, 8, 16  18:6, 19  20:1, 8, 9, 12, 15  21:6, 9, 12, 12, 15, 19, 22  22:4, 10, 17, 18  23:10, 16  24:16, 19, 19, 23, 23  25:8, 22, 23  26:4, 17  27:15, 19, 19  28:4, 5, 12, 14, 19, 21  29:1, 5, 9, 12  30:1, 13, 13, 15, 16, 20, 23  31:3, 14, 17  32:5, 16  33:4, 8  34:10, 15, 23  35:7, 7, 12, 21  36:1, 6, 18, 20, 23  37:5, 5, 13, 17, 19, 22  38:3, 6, 10, 11, 20, 21, 23  39:3, 6, 11, 13, 15, 17  40:1, 10  41:11, 16, 20  43:4, 6  44:1, 12, 14  45:15  47:7, 8, 12, 14, 15  48:4, 10, 16, 22  49:8, 10, 21, 22  50:11, 11, 13, 18, 20  51:1, 13  52:1, 15  53:15, 20, 21, 22  54:9, 14, 16  55:21  56:5, 11, 17, 20  57:3, 8, 17  58:6  60:8, 13  61:2, 15, 18, 23  62:2, 12, 17  63:9, 15  65:7  66:4, 11  67:10, 17, 18, 23  69:14, 23  70:5, 20  71:3, 10, 17  72:20, 23  73:10  76:23  77:16, 17, 20  78:4, 12, 18  79:2, 15  80:2, 21  81:9  82:1, 18  83:4, 4, 17  84:1, 10, 12  85:6, 9, 14  87:11, 13, 19  88:5, 10, 17, 21, 23  89:13, 16  90:9, 17  91:11, 20  92:1, 5, 7, 23  93:2, 7, 11, 20, 22  94:1, 6, 13  95:2, 7, 13, 19, 23  97:8, 9,

18  99:20  100:3, 19  101:17  102:3, 4  103:6, 14, 19  104:5  105:3, 6, 9, 13, 17, 22  106:3, 4, 5, 8, 10, 11, 20, 21  107:1, 6, 8  108:1, 8, 16, 18, 21  109:1, 4, 11, 18  110:11, 18, 19  111:5, 7  112:12  113:8, 16, 22  114:15, 19  115:3, 10, 18  116:8  117:21  118:4, 10, 13, 14  119:7, 11, 15, 19, 21, 22  120:1, 2, 22  123:17, 19  124:7, 8, 14, 20, 21  125:1, 3, 6, 8, 17, 19  126:1, 12, 13, 16, 19  127:1, 6, 10, 11, 15, 18  128:17  129:1, 3, 18, 20  130:3, 8, 17, 18  133:1, 4  134:4, 8, 16  135:5  136:1, 8, 10, 13, 23  137:5  138:10  139:5, 9, 14  140:1, 11  141:10, 11  142:6, 8, 14, 16  143:1, 6, 14, 19  144:5  145:1, 6, 13, 23  148:14, 14  149:2, 10, 14, 20, 21  150:4, 12  151:20  152:2, 19  153:14  154:2  155:9, 23  158:12, 15  159:1, 10, 19, 20  160:4, 19  161:9, 11  162:6  163:6  167:3  169:21  170:7  171:4, 17, 23  172:5  174:23  175:14, 17, 20  179:9, 15, 20  180:21  181:4, 6  183:14  184:15  185:7, 18, 20, 23  187:21  188:5, 14, 21  189:14, 20  190:3, 9, 10, 12

191:14, 16, 18  192:1, 23  193:7, 7, 18  194:6, 22  195:11  199:3  206:1  208:8, 16, 18  209:4, 10  212:8  213:10, 17  216:8  217:20  219:23  222:3, 3, 5, 7, 17, 19  223:1, 11  224:2, 4, 11, 12, 14, 17  226:9, 14, 19, 20  227:11  229:1, 5, 18, 19  231:16, 19  232:4  233:7, 10, 14  234:15, 17  235:10, 18  236:5  239:8, 12, 17, 17  240:5, 6, 9, 9  241:3, 4, 5, 7, 8, 21, 22  242:13, 14, 16  243:2, 9, 10, 11  245:4  246:8  247:3, 10, 11  248:12, 13, 17, 18, 22, 23  249:9, 10  251:7, 21  253:9, 14  254:12, 12, 17, 21  255:11, 13, 21  256:11, 21  257:14, 22  259:8, 10, 16, 23  262:1  263:2  265:8, 14  268:11, 22  270:2  271:5, 6, 6, 18  272:6, 15, 16  273:11, 16, 19  274:15, 16  275:20  276:1, 3, 7, 17  277:9  278:1, 19  281:13, 14  282:11, 12, 23  284:1, 4  285:5  288:5, 13, 17  289:16, 18, 22  293:5  294:6  296:5, 7  298:14  299:10, 20, 21, 22  300:11, 14, 22  301:16  302:9, 12, 16, 19  303:2, 14, 15, 18  304:6, 7, 8  305:21, 22, 23  306:1, 4, 9, 10, 18  307:9

309:17  310:14, 14  311:12  312:5, 6, 22  313:9, 10, 10, 13  314:18, 21, 23  315:1, 3, 3, 4, 5, 6, 7, 12, 16, 18  316:11, 14, 20  318:11  319:2  320:7, 9, 15, 18, 20, 21, 23  321:9, 12  322:2, 21  324:7, 9  325:1, 2  326:3, 9, 18, 21  327:10  328:7, 8, 18  329:2, 15  330:4, 10, 16  332:10  333:1, 5, 13, 14  335:1, 2, 10, 15, 16, 19, 23  336:8, 11, 21  337:1, 4, 8, 13, 14  338:11  339:6  340:17, 18, 23  341:22  342:8, 18  345:14, 20, 22  346:4, 8, 18, 20  347:20  350:9  351:17  352:23  353:6  354:6, 7, 11, 17  355:7, 18  356:16, 19  357:2, 4, 8, 8, 14, 19, 20  358:9, 13  359:2, 4  360:20  361:23  362:19  363:9, 12  364:5, 17  365:1, 6, 14  366:15, 17, 20  367:1, 3, 8, 18, 22  368:6, 14, 18  369:14, 20  370:5, 16, 22  371:4, 9  372:20  373:6  374:4, 9, 17  375:1, 3, 18  376:4, 6, 11  378:2, 6, 17  379:6  380:2, 3, 7, 7, 19, 23  382:11, 16  383:10, 16  384:2, 11, 14  385:10  386:3, 11  390:9  391:12  392:15  393:7, 13, 22  394:3, 15  395:1, 5, 17  396:7, 14

399:8, *10*  402:*1, 5*
403:*4*  404:*10, 23*
405:*2, 9*  407:*3, 15,
20, 21*  408:*21*
409:*3*
**County's**  18:*12*
19:*22*  20:*14*  23:*3*
24:*8*  25:*5, 11*  26:*7,
11*  31:*12*  32:*4*
33:*13*  35:*9*  38:*1*
41:*3, 7*  44:*6, 21*
45:*4, 7, 20*  46:*14,
18, 20*  47:*6, 20*
48:*10, 11*  50:*5*
51:*7*  54:*19*  55:*1*
64:*3*  65:*10*  75:*10*
77:*10*  78:*5*  88:*18*
90:*16*  94:*3*  96:*11,
15*  104:*20*  105:*22*
106:*1*  114:*20*
125:*11*  126:*20*
127:*23*  128:*3, 11*
129:*13, 17*  132:*16,
18, 21*  133:*12, 15,
22*  134:*2, 13, 17*
135:*1, 11*  138:*17*
141:*9*  152:*12, 16*
153:*2*  190:*1, 4*
192:*13, 15*  206:*16*
208:*22*  224:*22*
227:*23*  228:*9*
236:*17*  252:*9*
253:*13*  263:*13*
283:*23*  381:*1*
399:*17*  402:*15*
404:*5*
**couple**  39:*9*  175:*7*
207:*1*  209:*13*
221:*15*  235:*5*
407:*11*
**course**  13:*7*  14:*17*
65:*19*  66:*5*  104:*15*
109:*22*  131:*3*
147:*7*  191:*22*
199:*23*  227:*8*
250:*3*  261:*9*
**COURT**  1:*1*  2:*4*
11:*20*  12:*8*  40:*4, 8*
42:*2*  59:*9*  63:*12*
69:*12*  70:*11*  126:*5,*

7, *11*  196:*9*  223:*18*
263:*22*  267:*17*
268:*3*  284:*8*
316:*22*  317:*6*
319:*4*  378:*11*
383:*4*  401:*20*
411:*13, 14*
**courthouse**  14:*10*
202:*12*
**Courts**  282:*19*
284:*6*
**Court's**  321:*8*
325:*12*
**Couts**  2:*4*  11:*4*
267:*4*  411:*14*
**cover**  19:*20*  48:*9*
49:*16*  148:*7*  187:*4*
206:*12*  221:*15*
233:*3*  336:*5, 6*
365:*19*
**coverage**  15:*3, 4*
24:*9*  25:*3, 7, 12*
26:*4, 9, 19*  27:*10,
12, 14*  28:*1, 23*
29:*6*  30:*2, 5, 20*
31:*4, 6*  33:*6*  35:*2*
48:*6*  49:*6, 17*  50:*5,
10*  54:*22*  55:*3, 8,
14*  56:*3*  57:*5*  58:*8,
22*  60:*19*  64:*4*
65:*1, 5*  66:*2*  71:*10*
90:*17*  91:*10*  95:*23*
97:*2, 17, 23*  98:*18*
106:*15*  107:*16, 18,
20, 23*  110:*1*
111:*17, 19*  121:*10*
126:*15, 22*  127:*21*
128:*8*  130:*14*
143:*9, 10*  148:*3*
149:*1*  154:*4*
157:*16, 17*  158:*7,
10, 14, 23*  159:*10*
165:*7, 19, 21*
168:*15*  171:*19, 22*
172:*6*  180:*17, 18,
22*  181:*6, 18*
184:*13*  189:*5*
205:*16, 21*  206:*1, 8*
230:*22*  239:*9*
242:*18*  245:*12*

246:*11, 13*  247:*3,
13, 14*  249:*2*  251:*8*
259:*9*  260:*17*
261:*1, 3, 23*  285:*12*
287:*16*  303:*6, 10*
304:*11*  306:*4*
310:*16*  311:*16*
312:*10*  326:*15, 17,
20*  327:*20*  328:*3,
10*  329:*2*  331:*19,
22*  332:*1, 2, 3, 5, 6,
9, 13*  334:*19*
337:*16*  341:*8, 12*
360:*3*  362:*9, 20*
363:*9, 18*  364:*4, 19*
366:*1, 11, 12*
368:*21*  369:*7, 8, 19,
23*  371:*13, 23*
379:*13*  383:*5*
393:*7, 13*  394:*2, 17*
396:*4*
**coverages**  56:*17*
393:*15*
**covered**  50:*6*  64:*7,
9, 13, 18*  65:*13*
138:*11*  159:*16*
315:*21*  327:*2*
370:*12, 13*  393:*17,
18*  401:*17*  402:*7,
19*
**covering**  179:*15*
**covers**  47:*21*  48:*2*
50:*16, 17*
**CPR**  199:*7*
**Craig**  44:*17*  52:*4*
96:*16*  98:*16*
230:*11*  285:*8*
**creams**  197:*5*
**create**  201:*9*
380:*13*
**created**  25:*7*  88:*23*
**creating**  258:*14*
**cross**  201:*7*
**CSR**  11:*4*  267:*4*
**culmination**  177:*17*
**culminations**
177:*18*
**culpability**  74:*20*
**CUMMINGS**  10:*11*

**current**  33:*7*
91:*13*  148:*12*
158:*22*  188:*17, 23*
202:*16*  246:*5*
247:*2*  268:*21*
290:*8*  319:*1*
330:*21*
**currently**  181:*18*
189:*2*  262:*2*  265:*1*
321:*11, 22*  386:*13*
**CURRIE**  10:*17*
**customs**  76:*22*
77:*15, 23*
**cut**  114:*21*
**cute**  53:*6, 8*
**cutting**  221:*23*
**CV78-C-5010-NE**
317:*9*

**< D >**
**daily**  14:*10*  215:*18*
265:*15*
**damage**  38:*12*
41:*3*  355:*6*  359:*23*
**damaged**  38:*6*
358:*14*  359:*8, 13,
17*
**damages**  37:*11, 16*
41:*7*  354:*17, 21*
394:*3*  402:*17*
**date**  11:*11*  19:*8*
47:*18*  95:*15*  114:*8*
117:*23*  120:*11, 16*
144:*15*  155:*17, 19*
225:*11, 19*  258:*2*
260:*8*  267:*10*
286:*12*  294:*4*
297:*2, 3, 3, 6, 8*
307:*22*  310:*1*
317:*14, 16, 17*
330:*17*  384:*6, 8*
411:*14*
**dated**  178:*15*
277:*8*  278:*13*
279:*13*  280:*11*
281:*3*  285:*23*
294:*18*  295:*16*
296:*1*  299:*8, 23*
300:*21, 22*  301:*18*
303:*4, 21*  305:*4, 13*

**Jeff Rich - Madison County  Representative**                 428

306:*17*  307:*3, 18*
308:2  309:*16*
310:7  311:*1*  312:*1,
15*  339:2  360:*16*
372:*19*  373:*16*
374:*16*  386:*21*
396:*12*  400:*23*
**dates**  19:*1*  142:*23*
156:*3*  177:*3*  261:*4*
334:*12*
**David**  10:*4*  12:5
19:*5*  54:2  68:*12,
12*  73:9  154:*23*
156:*6*  238:*8, 17*
267:*23*  272:*23*
285:*18*  308:*22*
324:*12*  399:*18*
402:*1*
**Davis**  17:*6, 11, 18*
35:*5, 17*  36:*4, 9, 11*
41:*1*  65:*15*  66:8
91:*14, 22, 23*  92:*4,
9*  206:*12, 15*  207:5
231:*7, 19*  233:*13*
345:2  349:*19*
368:*5*  404:*16*
**Day**  10:*15, 16, 22*
41:*14*  97:*11, 12*
109:*4*  113:*13*
211:*21*  214:*1*
261:*13, 13, 18*
**day-to-day**  276:*3*
**deal**  49:*19*  125:*19*
127:*19*  163:8
178:*3*  200:8
205:*21*  325:*16*
**dealing**  99:*1*
211:*21*
**dealt**  58:*12*  62:9
**Dear**  277:*10*
**death**  81:*5*  88:2
150:7  219:*13*
220:*13*  228:8
229:*4*  348:*16*
404:*13*
**debate**  69:*3*
**debts**  315:*14*
**deceased**  213:*22*
**deceive**  370:*15, 21*

**December**  120:*14*
174:*12*  178:*15*
300:*13*  384:*22*
385:*15*
**decent**  176:*11*
**decide**  185:*16*
257:*15*
**decided**  112:*18*
**decision**  113:*3*
178:*23, 23*  183:*19*
184:*10*  263:2, *5, 9*
353:*22*  399:*11*
**declaratory**  379:*13*
**decree**  263:*22, 23*
317:*5*
**decrees**  196:*9, 12*
198:*14*  284:*5*
**deductible**  38:*22*
39:*3, 16, 17*  40:*1, 2,
11, 17*  41:*22*  43:*5*
114:*16, 20, 22*
115:*11, 13, 18*
125:*18*  126:*13*
236:*18*
**deductibles**  37:*20*
138:*13*  366:*15*
**deem**  211:*20*
**deemed**  50:*13*
149:*14, 15*  196:*21*
236:*4*
**defend**  30:*22*
31:*17*  39:*19*  57:*10*
59:*3*  70:*21*  93:*13,
21*  94:*4*  101:*18*
102:*4*  103:*6*
104:*19, 21*  105:*6, 8,
13, 17*  115:*12*
118:*13*  119:*15, 19,
21*  120:2  129:2, *5*
138:*20*  139:*23*
162:*6, 9*  163:*5*
185:*22*  186:*9*
224:*16*  257:*6*
364:*17*  366:*19*
375:*1*  379:*6, 20*
384:*11*  385:*10*
386:2  401:*23*
402:2  403:*16*
**defendant**  38:*4*
44:*7, 22*  45:*21*

46:8  76:8  80:*21*
87:*18*  133:*5*  211:*5*
212:*5, 9*  219:*7*
221:*4*  223:*11*
224:*4, 12*  320:*6*
387:*16, 21*  388:*5, 9*
**Defendants**  1:*8*
10:*9*  35:*14*  81:*6*
88:*3*  210:*9*  211:2,
12  212:*16*  220:*14*
352:*18, 19*  378:*7*
388:*10, 23*  389:*3, 6*
391:2, *6, 15*
**Defendant's**  4:*11,
13, 15, 17, 19, 21*
5:*1, 3, 5, 7, 9, 11, 13,
15, 17, 19, 21*  6:*1, 3,
5, 7, 9, 11, 13, 15, 17,
19, 21*  7:*1, 3, 5, 7, 9,
11, 13, 15, 17, 19, 21*
8:*1, 3, 5, 7, 9, 11, 13,
15, 17, 19, 21*  9:*1, 3,
5, 7, 9, 11, 13, 15, 17*
18:*9*  67:*3*  80:*17*
89:*22*  91:*1*  146:*8*
154:*8*  157:*9*  160:*5*
161:*14*  166:*13*
169:*6*  174:*20*
175:*11*  186:*16*
190:*23*  272:*10, 12*
276:*10, 16*  278:*5, 8*
279:*7, 21*  280:*1*
285:*14, 17*  286:*7*
294:*12*  295:*8, 10,
18, 21*  296:*15, 17*
298:*5, 8, 18*  299:*3,
5, 13*  300:*6, 7, 17*
301:*13*  302:*21, 23*
304:*21*  306:*13*
307:*13*  308:*7, 14*
310:*3, 19, 21*
311:*19, 21*  312:*11,
13*  317:*1*  338:*20*
341:*14, 17*  342:*4, 5*
360:*10, 12*  372:*11*
373:*12, 15*  374:*13,
15*  375:*13, 15*
376:*17*  384:*18*
386:*18, 20*  396:*9*

400:*19, 22*  404:*17,
19*
**defended**  33:*4, 18*
34:*10, 15*  94:*1*
104:*11, 16*  105:2
124:*5*  169:*20*
228:*10*  380:*11, 19*
384:*13*
**defending**  36:*17*
39:*1*  67:*23*  104:*15*
105:*21*  116:*11*
118:*3, 9*  143:*13*
145:*13*  179:*12*
**defense**  29:*4*  35:*6,
13, 15, 19*  36:*3*
37:*21, 23*  38:*5, 14,
19*  39:*5, 10, 14, 22*
40:*6, 8*  41:*8, 12, 17*
42:*3*  43:*13*  46:*18*
47:*6, 7*  57:*9, 19, 22*
58:*5, 23*  59:2
64:*21*  65:*3, 17, 20*
66:*11, 17*  67:*11, 18*
70:*5, 23*  71:*5, 18*
72:*1, 2, 15*  73:*1, 11,
15, 15, 15, 20, 20*
74:7  91:*15, 19*
92:*2, 6, 8, 11, 13, 16*
93:*4, 7, 17*  94:*14,
16*  95:*8*  99:*20*
100:*3, 8, 12, 19*
101:*2, 6*  102:*11*
103:*13, 19*  104:*6*
115:*8, 19*  116:*1, 10,
11, 19*  117:*21*
118:*16, 17, 23*
119:*6, 7, 8*  120:*23*
121:*1*  122:*5, 12, 18,
21*  123:*9, 12, 15, 18*
124:*10, 15, 16*
125:*11*  127:2
128:*12*  129:*11*
130:2  132:*18, 18*
134:*3*  138:*3, 16*
139:*2, 15*  154:*4*
164:*15*  168:*10, 16*
169:*19*  170:*2, 6*
171:*3, 17, 20, 22*
174:*4, 6*  176:*11, 18*
177:*21*  178:*3*

179:4, 8  181:7
182:14  183:15
184:17  186:5, 10
187:1, 15  188:11
189:6  208:9, 17
209:9  216:14
227:12  229:6
252:2  254:1, 6
255:14  260:14
261:11  321:13
323:2  331:23
364:8  367:8  373:6
375:11  376:3
379:11, 12  380:2
381:13, 14  382:8
383:1, 21  384:10
385:5, 13  393:20
394:15, 21, 22
395:1, 4, 6, 9, 14, 22
397:2, 19  398:4, 13
**defenses** 92:21
364:19  394:18
**define** 197:22
269:1  388:6
**definition** 28:6
**definitive** 165:4
**definitively** 197:22
**degree** 13:21
132:6  199:18
240:12, 13
**delay** 162:8, 12
163:1
**deliberate** 37:1
76:7, 21  80:23
81:11  82:21  83:6,
14, 19  84:5  85:3,
12  86:1, 5  87:20
124:3  135:22
223:13  374:5, 7
376:7  377:1
**deliberately** 77:14
84:3, 19
**delirium** 347:10
**deliver** 161:7
**delivery** 203:4
**demand** 69:17, 20
121:9  139:8
268:15, 23  321:13
322:1  323:1

367:11  383:19
394:10
**demanded** 261:10
**demands** 29:3
227:12
**denial** 56:3  57:4
58:7  64:4  65:5
81:6  88:3  332:4
360:2
**denied** 54:21  55:2
**denies** 85:9, 14
**denoting** 247:2
**dental** 195:17, 18
**deny** 37:6  84:1
89:4  153:16
221:21, 22  379:14
**denying** 78:10, 15,
18  279:5  305:9
**department** 14:8
84:11  114:21
204:8, 10, 16  205:2
247:4  269:16
270:13  315:10
330:5, 11  342:8
343:1, 7  352:9
373:7  375:4
377:23  378:5
**Departments** 315:2
**depend** 75:16, 18,
19, 22  150:16, 23
151:1, 13
**dependent** 320:7,
14, 17, 20
**depending** 97:14
**depo** 266:7
**depose** 401:19
**deposed** 251:23
252:7  338:10, 11
389:8
**DEPOSITION**
1:14  2:2, 17, 21
3:2, 6  11:13, 17
12:14  15:1  16:6
17:21  18:7, 13, 19
19:18  20:21  30:8
54:18  68:15  90:12
112:9  186:15
252:8  266:2, 21
267:13  306:23
319:8  327:9

343:15  347:3
359:20  369:13
399:19  402:7
410:3  411:6
**depositions** 2:11
13:5
**deputies** 86:18, 22
149:22  152:2
218:23  226:9
**deputy** 86:23
148:1, 22  150:2, 19,
22  219:1  245:10
322:14
**derivative** 21:13
75:6  208:22
**describe** 91:13
178:8  203:22
222:9  228:22
311:7  350:20
386:6
**described** 28:1
80:23  81:10  87:20
131:3  134:15
136:8  200:18
212:13  213:13
223:13  224:6
248:19  292:4
302:7  323:3
**describes** 209:20
348:22  388:21
**describing** 130:7
324:22
**description** 135:9
176:12  190:6, 15,
17  197:7, 20
198:12  301:8
302:9  304:5  365:5
403:9
**designated** 12:16
**designed** 48:9
201:18  202:6
**designee** 220:13
**despite** 35:18, 21
366:21  398:23
**detail** 17:2  389:13
396:1  398:2  399:1,
2  402:20
**details** 195:12
321:7

**detainee** 75:12
150:13  151:7
195:5
**detainees** 78:13
136:16  194:15, 18
387:17, 18
**detention** 15:6
21:6  24:21  26:6
82:12  85:6  191:14
195:23  196:16
198:9  201:19
202:6  203:4, 14
211:7  269:20
272:15  300:11
311:9  405:11, 15,
20  407:21
**deter** 325:15
**determination**
94:10  104:2
151:18  190:8
223:4  360:1
**determine** 19:16
224:8  319:15
330:11  379:13
403:19  406:18
**determined** 236:23
332:2  359:6
366:10
**determines** 331:23
**detriment** 369:21
**develop** 79:16
**developed** 78:2, 8,
12  150:21  201:2
**developing** 78:8
**development** 195:19
**D-home** 311:10
312:20, 22  313:5
**diagnostic** 197:14
**dialogue** 100:16
187:14, 18
**died** 229:4  388:16
**Dielenberg** 287:2, 7
303:3
**dietary** 313:21
**differ** 76:16
**difference** 46:6
240:21  249:8, 13
251:1, 5, 6  273:21
308:22  338:5

**different** 18:22
39:*23* 49:*18* 53:*14*
65:6, *9* 97:*12, 16*
108:*14* 147:22
154:*16* 155:*17*
184:7 203:*23*
225:2 302:*11*
323:20 331:7
344:2 400:*16*
409:*10*
**differently** 234:*5*
**difficult** 45:*15*
77:2 110:*4* 292:*14*
331:*11* 389:8, *20*
409:*14, 21*
**difficulties** 350:*21*
**difficulty** 292:22
351:*4, 9*
**digressing** 20:2
**diligence** 334:*21*
**diligently** 177:*12*
**direct** 38:*23* 96:*13*
201:4 215:*8*
**directed** 68:6 70:*4,
14* 77:*19* 84:*23*
102:22 189:*7*
265:*17* 356:*5*
**direction** 61:*10*
103:*1, 1* 116:*21, 22*
200:*12* 369:*17*
**directions** 61:*16*
**directly** 40:*3*
41:*16* 42:7 60:22
61:*17, 19* 98:*23*
101:*16, 20* 103:*11*
140:2 170:*13*
231:8, *9* 233:*14, 18,
23* 234:*21* 351:*10*
382:*14* 383:*11*
**director** 203:2
311:*13*
**disability** 293:6
**disagree** 74:*4*
172:*19* 189:*21*
221:*19* 293:*18*
335:*12* 391:*19, 22*
395:6
**disagreeing** 398:*11*
**disclose** 225:22

274:6
**disclosed** 51:*5*
**discover** 109:*10, 11*
**discovery** 51:*5*
72:6
**discreet** 117:22
**discreetly** 119:*1*
236:*21*
**discrete** 223:*1*
**discrimination**
194:*9* 345:*4*
**discuss** 132:*20*
168:*15* 173:*5*
179:*3* 184:*20*
185:*2, 5* 258:*10*
286:*18* 375:*20*
386:*23* 396:*16*
**discussed** 55:*3*
73:2 119:*4* 127:*7,
15* 128:*17* 158:*14*
168:*5, 8, 14* 187:*3*
242:*19, 22* 271:*17*
282:*14* 291:*5, 7*
**discusses** 178:*18*
**discussing** 132:*16*
161:*4* 171:*5, 7*
186:*23*
**discussion** 29:*19*
60:*18* 69:7 70:*16*
71:*4* 72:2, *14* 73:*5,
10* 89:6 92:*18*
116:*5* 117:2, *20, 22*
120:*5* 122:*14*
126:*10* 128:*5*
134:22 137:22
139:*12* 154:*6*
157:8 169:*1, 1*
171:*13* 175:*10*
177:7 178:*7*
182:*10* 183:*3*
206:*23* 234:*19*
239:*10* 241:*15*
245:*16* 249:*15*
254:*18* 268:*14*
272:*1, 2* 283:*20*
284:*11* 285:*7*
287:*19* 327:*18, 21*
338:*14, 17* 373:*4*
386:*17* 389:*21*

397:*13, 14* 398:*9*
403:*11, 13*
**discussions** 45:*3*
71:*16* 74:6 115:22
116:*12, 16* 118:*1, 8*
130:6 131:2, *5, 6*
167:*15* 170:*3*
172:*11* 177:*19*
179:2 181:*13, 14*
182:*5* 187:*23*
188:5, *6* 241:*11*
256:*5* 285:*5* 287:*1,
11, 12* 293:*3* 324:2
367:6 380:*5*
397:*23*
**diseases** 314:6
**dismiss** 206:*17*
378:*12*
**dismissed** 36:*5*
352:20 375:6
378:7
**disorganized** 292:5,
7, *8*
**dispute** 78:22
207:*16* 219:*23*
242:*23* 262:*11, 12,
13* 287:*20* 293:*17*
308:6 328:*13*
330:*17* 332:*14*
335:*11, 21* 345:8
393:*1*
**disputes** 205:*16, 22*
**disregarded** 74:*15*
75:*1*
**dissatisfaction**
289:*13*
**distinct** 27:22
**distinction** 52:*19*
156:2 194:*17*
195:*16* 232:*10*
359:8 360:2
**distinguish** 208:*3*
223:8
**DISTRICT** 1:*1, 1*
268:*19* 317:6, *7, 12*
**DIVISION** 1:2
**doctor** 183:*18*
184:*10* 228:7
**document** 14:*9*
17:*3* 24:2, *2* 31:*23*

32:*1, 21* 90:*18*
147:6 156:*5*
168:*23* 191:*12*
192:9 237:*4*
272:*11* 274:*10, 12,
18* 276:*14, 23*
277:2, *3, 6* 279:*11*
280:*1* 286:*10*
294:*16* 298:*10*
301:*10* 305:*1*
306:7 307:*17*
317:*4* 318:*1* 326:*1,
4* 339:*1* 342:*8*
343:*11* 360:*14*
372:*14, 16* 375:22
387:9 407:8, *19*
409:*12, 13*
**documents** 14:*20*
15:7, *13* 19:6, *8*
33:2 138:22 156:2
182:*12* 244:*10*
280:*5* 284:*21*
297:*1* 309:*10*
318:9 334:*14*
335:7 359:*18*
381:9 386:6
**doing** 32:2 45:6
95:2 166:*1* 177:*15*
185:9 223:20
229:*16* 284:*1*
288:*14* 290:22
334:22 371:*20, 21*
**dollar** 46:*14, 17*
333:*10, 11*
**dollars** 125:7, *12*
**dollar-wise** 51:*19*
**dormitory** 202:*14,
15*
**DORNING** 1:2
10:22 56:*21* 82:*18*
83:*15* 84:*23* 86:*17,
21* 87:*4* 113:22
158:*16* 159:*1*
160:*10* 212:5, *19*
217:23 218:*21*
219:8, *12* 220:4, *13,
15* 221:2, *2* 230:7
241:*21* 242:*13*
243:9 246:7, *21*
257:5, *8* 272:*16*

277:9   278:15
279:15   285:23
286:4   295:16
296:5, 11, 20
299:19   306:18
307:9   316:14, 18
321:13   327:13
364:18   371:4
374:18   375:17
378:17   379:7
393:13   394:2, 15
395:2   402:3
404:10
**Dorning's**  86:23
212:23   219:1
**double**  155:14
**double-check**  157:6
**doubt**  164:6
284:11   287:18
295:1   304:16
**Dr**  157:13   158:19,
21   159:13, 21
163:14   207:14
208:7   217:18
221:9   245:22
246:2   269:23
270:4, 6   278:14
279:14   280:10, 20
281:19   282:4
283:6   284:12
285:22   286:13, 18
288:3, 10, 15
290:16, 20   292:21
293:12   294:2, 7, 18
295:15   296:1, 12
297:11, 15, 16
299:8, 19   325:8
327:18   333:16
339:20   340:12, 19
373:21
**draft**  273:23   274:2
340:2   406:1
**drafted**  79:10
196:7   213:11
324:8, 15   326:7
**drafter**  210:16
**drafting**  275:7
325:22
**drafts**  276:8   409:7
**draw**  195:16

**drawn**  140:20, 22
193:8
**drill**  255:4
**drilled**  238:23
**DTs**  347:16
**due**  114:22   334:21
347:11
**dues**  350:1
**duly**  11:6   267:6
411:13
**duplicative**  187:6
**duration**  24:14
25:18
**duty**  93:13, 21
105:8, 12   136:11,
13, 23   185:22
186:9   210:10
212:18   316:15
361:21   387:17, 22
405:19

**< E >**
**earlier**  18:20
34:19   49:8   57:21
64:13   70:13   79:7
91:16   100:11
131:4   147:17
161:4   163:20
206:22   215:11
222:11   240:18
302:7   318:7   325:8
354:13   361:1
**early**  60:18   62:10
206:9   230:18, 21
232:13   261:19
288:11   334:1
**easily**  292:16
**Eastern**  237:22
**educating**  202:1
**EEOC**  99:2, 2, 8
**effect**  51:6   93:1,
19   126:17   127:7, 8,
15, 16, 17   142:17
219:13   319:8
320:2   336:3   349:1
**efficient**  351:5, 15
**efficiently**  351:19
**effort**  102:3
110:11, 15   127:3

178:21   283:3, 22,
23   287:12   355:13
**efforts**  118:4
126:20   129:17
135:1   162:4   178:9
380:1
**eight**  335:9
**either**  35:16   42:12
48:21   51:13, 19
53:21   69:3   97:10
121:12   128:3
135:1, 22   154:4
177:15   178:6
187:2   225:14
237:22   242:6
254:14   275:4
301:19   315:4, 6
324:23   326:17
331:8   335:1   337:8
338:6   353:1
355:16   376:20
380:21   403:17
**elected**  392:15
**electronic**  292:13
350:7   352:4
**electronically**
350:11
**element**  38:11
41:11
**elements**  38:17
**elicited**  2:16
**Elizabeth**  170:14
**Elliott**  15:21
117:13, 17   118:23
119:12, 15, 20, 22
372:20   382:12
387:5   391:16, 23
392:9   404:11, 14
**Elliott's**  387:14
**E-mail**  4:22   5:2,
12, 14, 16, 18, 20, 22
6:2   9:12   15:2
121:12   131:14
146:16, 19   147:3,
13, 22   148:9, 10
156:10   167:6, 14
168:3   169:11, 13
170:12   172:13
173:9, 9, 18   174:9,
16   177:1   178:14

179:23   181:15, 22
186:19   237:1, 5, 10,
10, 12, 14   238:7, 7,
12, 13, 16   239:14,
20, 22   240:11
241:16   243:22
244:1, 21   245:6, 9
250:9, 10   252:14,
22   253:12, 19
254:4, 16   258:6, 8,
18   285:1   328:9
381:5, 17, 22, 23
382:3
**e-mails**  15:10
120:13   132:11, 15,
20   147:7, 17   167:4
169:8   171:10
176:8, 22   177:18
178:8   186:22
188:8   238:16, 19
252:17, 17   253:21
272:2   333:23
384:20, 22   385:4,
12, 19   397:7
**employ**  366:19
**employed**  228:1
229:1
**employee**  14:3
44:16   84:12   132:2
140:3   194:9
210:23   214:22
228:8, 17   327:19
340:19
**employees**  20:20
21:10, 23   25:23
56:18, 21   82:13
84:11, 11   141:22
148:15   189:14, 20
190:3, 12   191:18
194:1, 5, 7, 12
207:14   208:7
210:4, 6, 9   212:17
215:7   221:10
239:18   240:6
254:22, 23   259:8,
11, 17, 23   270:7, 10
283:1   289:17
326:22   336:9
345:14, 16, 21
346:5, 9, 21   348:3

354:8  356:2  364:6
367:1  392:16
**employment**  194:9
215:3  322:2  345:3
**enclosed**  247:1
280:21  286:4
303:6, 8
**enclosing**  296:3
298:12  299:9
309:18
**encompassed**
206:10  214:9
252:23
**encompasses**  84:23
85:16
**encountered**  288:17
**encouraged**  129:16
**ended**  389:10
**endorsement**  142:7,
12, 14, 15, 17  143:2
144:6  163:23
164:3, 12  165:10,
16  251:2, 18, 19
337:22  361:2, 3
**enforcement**  87:7
219:17  392:17
393:6
**engage**  100:13
**engaged**  59:3
178:23  256:12
**engineering**  13:21
**ensure**  201:22
**enter**  48:22  93:3,
6, 18  153:15
317:14
**entered**  34:2
36:12  174:3  198:1
243:14  317:5, 10
318:3, 4, 8, 22
319:18  324:6
368:15  401:18
**entire**  104:11
147:2  313:11
341:19
**entirely**  177:4
**entirety**  157:3
164:9
**entities**  49:2  50:2,
6, 19  282:7, 7, 13
315:3

**entitled**  30:1
135:12, 17  216:20
248:9, 14  321:4
341:21  391:13
**entity**  19:12  114:3
122:16  170:22
236:5  253:14
282:19  371:10
**entry**  317:16
**equalization**  203:11
**equates**  222:11
**equivalent**  223:5
**escort**  263:10
**especially**  223:3
**essence**  176:17
241:13
**essentially**  192:19
**Essex**  24:16  25:2
30:3, 4, 5  31:5, 16
33:4, 8, 18  34:23
35:6, 11, 18  38:15
55:12  59:3, 15, 19
60:3, 6, 9, 14, 17, 22
61:18, 23  62:1, 6,
18  63:10, 13  64:21
65:22  66:1, 3
91:10  93:13  95:11
108:4  111:8, 11
116:10  120:23
121:2  122:5, 15
126:22  127:1
128:11  137:13
138:3  140:3, 12
142:19  143:3, 4, 8
145:2  154:4
162:13  163:5, 9
172:1  173:14, 20
176:17  177:9, 15
179:4, 18  230:13
231:21  234:21
235:3  251:5, 19
252:5, 12, 19  253:2
256:19  260:17
281:9  304:2
305:16  310:9
328:2  329:1
330:12, 19, 23
331:6  337:22
338:7  359:22
360:3  364:2, 4, 16

365:23  366:10, 11,
13, 14, 16, 19, 23
367:7, 13, 20  368:8,
13  371:20, 22
373:5  374:23
376:3  379:5, 12, 18
381:11  382:10, 14
383:7, 11  384:2, 10,
16  394:1, 14, 23
395:4  396:3  397:3,
20  398:14
**Essex's**  64:12, 16,
22  120:6  143:12
145:12  182:2
**establish**  89:12
387:19
**establishing**  33:6
**Estate**  117:18
**estimate**  51:15
53:2
**et**  1:2, 7  317:8, 8
372:20  384:3
**evaluate**  113:12
181:1
**evaluating**  132:16
**EVANSTON**  1:6
11:15  12:4  24:17
25:2  26:8, 17  27:2
46:19  54:9, 21, 22
55:2  56:22  59:13,
15, 17, 18  60:2, 6, 9,
14, 18, 22  61:2, 3, 4,
19, 23  62:1, 6, 18
63:13  65:11, 16, 21
66:1, 3, 10  67:17
68:7  69:17, 19, 20
70:14  71:18  72:23
73:12  90:16  91:10
92:1, 6, 7, 10, 12, 15
93:4  101:13, 16, 17,
20  102:4  105:12,
20  106:2  107:10,
11  108:2, 4  111:8
121:1, 2  122:5, 12,
16  124:15  135:1
139:17, 20, 22
140:3, 12  142:8
169:9  174:13
250:7  252:12, 20
267:19  331:5

373:1, 5  374:23
376:3  383:16
385:5, 10, 13
401:22
**Evanston's**  47:7
71:6  91:18  107:5
120:6  402:16
**evasive**  334:13
**event**  95:10  260:9
268:16  280:9
283:1  297:9
301:20  381:20
**events**  227:20
**eventual**  81:5  88:2
**eventually**  157:17
**everyone's**  191:3
**evidence**  2:18
44:10  65:4, 7
330:19  331:5
334:23  358:13
359:17  368:17
369:3  370:3, 14, 20
**evidence-based**
161:8
**evidenced**  356:21
411:14
**evidencing**  273:15
**evolved**  261:9
**exact**  23:1  47:17
139:10  147:20
159:10  260:8
261:18  283:17
297:20  308:20
343:23  392:5
399:18
**exactly**  95:11
156:22  232:23
287:9  406:4
**Examination**  4:3, 4,
5  12:12  18:16
74:9  112:7  176:5
205:7  218:14
266:4  268:7
372:22  402:21
405:18
**examine**  350:13
405:16  406:15
**examined**  350:16
**examiner**  167:21

**Jeff Rich - Madison County  Representative**                    433

example 40:4
49:10 69:16 96:4
99:1 228:3 265:12
334:4
examples 209:14
exceeded 115:13, 19
excess 49:23 66:2
142:20 143:3, 9, 16,
17, 21, 23 144:7, 16,
17 145:4 165:11
166:1 173:23
250:13 251:2, 14,
16, 18 252:10, 16
253:3 315:20
322:1 328:3 329:3
excessive 154:1
257:5, 9 322:15
394:8
exchange 102:8
169:11
exchanged 101:3, 7
exclusively 134:18
excuse 98:15
executed 298:12, 21
executive 52:12
exhausted 145:18
Exhibit 4:11, 13, 15,
17, 19, 21 5:1, 3, 5,
7, 9, 11, 13, 15, 17,
19, 21 6:1, 3, 5, 7, 9,
11, 13, 15, 17, 19, 21
7:1, 3, 5, 7, 9, 11, 13,
15, 17, 19, 21 8:1, 3,
5, 7, 9, 11, 13, 15, 17,
19, 21 9:1, 3, 5, 7, 9,
11, 13, 15, 17 18:9,
11 67:2, 3, 5 71:19
80:14, 17 87:2
89:22 90:1, 13
91:1, 3, 5 146:8, 11
154:8, 10, 11, 11, 12,
13 155:9, 18, 20
157:9, 11 160:5, 8,
8 161:14, 18
166:13, 16, 18, 19
167:2 169:6, 10
174:20, 23 175:14,
16, 19 177:5, 5
178:13 184:23
186:16, 18 187:8

190:23 191:11
193:2, 16, 17
209:16 216:18
218:16 219:3
221:7 232:12, 15
236:22, 23 239:15
243:6 244:6
245:21, 23 246:19,
20 249:17, 18, 23
250:5 257:10, 12
258:7 272:10, 12
273:5 274:1
275:12 276:10, 13,
16, 19 277:7 278:5,
9, 13 279:7, 10, 13,
21 280:1, 10, 17, 19
285:14, 17, 22
286:7, 10 294:12,
15 295:8, 11, 18, 21
296:15, 18 297:11
298:5, 8, 18, 20
299:3, 6, 7, 12, 13,
15, 16 300:2, 3, 6, 7,
17, 19 301:13, 15
302:21 303:1
304:14, 19, 20, 21
306:7, 13, 15, 22
307:2, 4, 7, 13, 16,
23, 23 308:4, 7, 10,
14, 16 309:9, 12
310:3, 5, 19, 22
311:19, 22 312:11,
13 317:1, 3 318:12,
13 338:20, 22
341:14, 17, 20
342:4, 5 343:13, 17
344:15 347:2, 7
356:9, 10 360:10,
12 363:2 364:13
365:23 372:11, 15
373:12, 15 374:13,
16 375:13 376:17
378:15, 22 384:18
385:12 386:18, 20
392:10 396:9
400:14, 19, 20
401:2, 4, 5, 8, 14
404:17, 20
exhibits 90:20
117:15 175:11

176:7 187:2
242:21 244:21
252:23 397:7
exist 111:17, 20
215:15 221:22
271:7, 15, 16
383:16
existed 107:21
145:3, 3 221:21
369:9, 20, 23
383:22 409:5
existence 55:8
183:9 269:18
existing 65:14
96:2, 5, 7
exists 137:21
332:1, 3 370:8
expand 62:16
expect 32:12
98:14 99:12, 18
167:21 192:1
257:6 260:7
261:18 279:1
313:11
expectation 261:21
expected 106:10
124:9 147:19
191:16 270:14
313:13, 18, 23
314:10
expecting 106:14
244:22 245:3
expend 222:14
expenditures
349:18
expense 38:10
341:2 349:21
355:18
expenses 39:10
40:6, 7 41:8 54:7
59:1 69:18, 20
116:14 188:11
349:15 366:14
369:14
experience 103:19
104:5
expert 52:12
338:10
expiration 289:8

expire 257:14
expired 257:21
Expires 411:21, 22
explain 181:22
185:4 361:15
363:7
explained 52:1
124:17 351:3
398:2
explains 337:22
explore 181:9
exploring 32:8
exposure 112:19
113:7, 10, 13, 15, 19
130:12 133:2
403:15
express 122:10, 19
148:6 202:1
363:22
expressly 86:6
368:5
extend 299:16
326:21
extended 326:18
extent 23:12 61:20
72:19 74:17 77:4
182:15 191:21
208:5 211:22
215:14 271:7
273:20 335:18
338:2 401:17
eye 281:18
eyes 156:15

< F >
facilitate 284:3
287:13
facilities 198:10
202:18 247:15
319:23
facility 15:6 21:6
24:20, 21 26:6
30:15, 17 31:16
34:1 82:13 85:7
191:14 196:1, 16
201:19 202:7, 10,
11, 16, 19 203:5
211:7 215:19
227:19 228:16

269:*20*  272:*15*
300:*12*  407:*22*
**facility's** 203:*14*
**fact** 28:*3, 8*  45:*14*
47:*11*  67:*22*  78:*15,
23*  79:*1*  86:*16*
128:*16, 23*  129:*4, 5,
6, 15*  143:*23*  152:*8*
159:*7*  161:*11*
168:*2*  171:*9*
224:*23*  244:*4*
284:*13*  332:*2*
333:*13*  339:*10*
346:*17*  356:*16, 18*
357:*15*  363:*14*
365:*16*  368:*23*
371:*18*  383:*4*
386:*1*
**factor** 46:*11*  137:*8*
**factors** 52:*5, 10*
75:*17*  151:*16*
403:*18*
**facts** 32:*23*  44:*5*
55:*1, 9*  57:*2*  60:*11*
63:*5, 10, 15*  76:*4*
129:*7*  132:*17*
145:*10*  229:*7*
368:*18*  369:*4*
**factual** 20:*13*  24:*7*
25:*10*  26:*22*  32:*3,
7, 16*  33:*12*  35:*1, 9*
54:*19*  55:*20*  56:*2*
57:*12*  58:*6, 7*
62:*19*  64:*3*  65:*10*
90:*15*  91:*9*  112:*11*
380:*12*
**Factually** 78:*18*
**failed** 79:*15*  80:*2*
87:*4*  88:*11*  92:*2, 6,
8*  219:*12, 15*  222:*7*
224:*2*  228:*17*
378:*3*  387:*21*
**failure** 65:*2*  85:*23*
136:*9*  218:*19*
222:*12*  271:*21*
354:*18*  355:*2, 8*
**fair** 14:*13*  32:*21*
62:*10*  87:*9*  176:*13*
184:*12*  197:*7*
211:*17*  222:*23*

257:*1, 2*  265:*19*
275:*4*  297:*22*
324:*5*  331:*10, 14*
338:*13*  340:*4*
**fairly** 189:*4*
198:*11*  409:*1*
**fairness** 32:*9*
**faith** 54:*22*  65:*11*
**fall** 49:*7*  61:*12*
73:*16*  109:*17*
137:*11*  187:*23*
190:*6*
**false** 340:*10, 14*
357:*6*  362:*7*
365:*11*
**familiar** 13:*4*
22:*16, 22*  23:*2, 7*
183:*17*  354:*11, 14*
373:*10*  404:*4*
**familiarity** 269:*21*
**family** 322:*18*
**far** 38:*9*  140:*1*
188:*9*  220:*6*
236:*14*  237:*23*
251:*6*  313:*21*
314:*7*  341:*4, 5, 6,
11*  349:*10*  385:*19*
406:*23*
**fashion** 320:*1*
392:*5*
**fast** 223:*18*  400:*12*
**fault** 75:*15*  351:*11*
**favor** 126:*20*
**February** 4:*14*
67:*6*  102:*12*  103:*4*
400:*23*
**Federal** 2:*3, 9*
52:*17*  196:*9*
263:*22*  284:*6*
327:*3*  383:*4*  389:*9*
401:*20*
**feel** 161:*2, 6*
182:*20*
**fees** 37:*23*  115:*23*
116:*6, 14*  117:*4, 5,
6, 7*  163:*7*
**fell** 190:*14*
**felt** 130:*18*  169:*22*
185:*4*  254:*20*

**Fields** 354:*23*
**fight** 362:*13*
**figure** 128:*22*
129:*3*  200:*13*
**file** 98:*6, 11, 15, 15*
99:*12, 18*  130:*9, 19*
163:*8*  164:*23*
238:*6, 15*  244:*11,
14, 16*  322:*19*
379:*12*
**filed** 15:*19*  16:*3, 8*
17:*10*  18:*1*  24:*18*
32:*11, 13*  33:*16*
55:*14*  60:*21*  63:*1*
98:*10*  99:*8, 11, 17*
101:*9*  109:*16*
116:*8*  117:*11, 13,
18*  119:*16*  138:*2*
142:*18*  163:*3, 17*
229:*5*  256:*13*
265:*4*  293:*17*
319:*3*  322:*12*
347:*5*  356:*8*
378:*19*  383:*19, 23*
384:*6*  390:*20*
404:*10, 14, 15*
**files** 122:*8*  271:*3*
404:*13*
**filing** 3:*6*  127:*12*
170:*18*  231:*6, 17*
233:*12*  384:*8*
404:*11*
**filings** 22:*15*  231:*8*
**fill** 207:*2*
**filled** 297:*3*
**final** 36:*12*  183:*14*
263:*14, 19*  326:*4*
**finalize** 180:*18*
**finally** 260:*12*
392:*11*
**finance** 114:*20*
**financial** 137:*12,
16, 18*  153:*16*
**Finch** 4:*3*  10:*15*
12:*3, 3, 10, 12*  17:*8,
13*  19:*5*  31:*22*
32:*23*  40:*21*  54:*1*
56:*12*  68:*12, 14, 19*
69:*2, 10*  70:*9*
71:*22*  72:*7, 12, 21*

73:*8, 19*  74:*3, 9*
77:*1*  80:*7*  83:*1*
102:*16*  111:*23*
112:*7*  126:*5, 11*
128:*15*  144:*20*
147:*10, 16*  153:*7*
154:*23*  155:*13*
165:*18*  166:*21*
172:*10, 16, 20*
173:*2, 4*  175:*2*
176:*5*  184:*3, 6*
190:*21*  192:*5*
201:*14*  205:*10*
221:*13*  231:*2*
242:*21*  256:*23*
266:*9*  360:*17*
364:*2*  374:*17*
386:*22*  395:*12*
402:*8*
**Finch:** 17:*16*
29:*23*  33:*3*  64:*1*
80:*14*  139:*13*
147:*21*  173:*8*
191:*10*
**Finch's** 225:*1*
230:*10*  236:*12*
255:*6*  261:*1*
366:*22*
**find** 53:*13*  61:*17*
63:*8*  74:*5*  155:*1*
156:*8*  157:*4*  183:*2*
204:*7*  242:*9*  247:*1*
261:*12*  293:*1*
**finding** 228:*21*
**fine** 12:*10*  40:*21*
53:*7*  147:*16*  195:*7*
266:*9, 10*  268:*6*
324:*19*  400:*21*
**finish** 136:*20*  372:*5*
**finished** 186:*22*
375:*21*
**firing** 284:*16*
**firm** 30:*22*  33:*19*
57:*23*  59:*2*  67:*11,
22*  71:*9*  253:*6*
256:*12*  274:*14*
275:*5*  324:*10*
380:*22*
**first** 11:*6*  29:*8*
45:*19*  50:*23*  51:*12*

80:*15*  90:*1*  93:*9*
109:*17*  110:*7*
116:*4*  117:2, *8, 10,*
*12*  118:*22*  119:*2, 4,*
*14, 17*  120:*9*
146:*22*  153:*9*
157:*13*  191:*3, 4*
211:*13, 14, 15*
212:*13*  213:*8*
217:*3, 16*  218:*16*
223:*9*  224:*1*  258:*7*
260:*11*  267:*6*
277:*7, 22*  280:*3*
290:*18*  295:*2*
303:*8*  306:*6, 22*
320:*5*  327:*9*
333:*14, 20*  340:*22*
344:*20*  347:*8*
354:*21*  356:*12*
362:*6*  364:*15*
377:*9*  387:*3, 4*
389:*13*  394:*13*
401:*3*

**fiscal**  315:*2, 9*

**five**  17:*18*  41:*1, 9*
42:*10*  43:*15, 22*
44:*8, 23*  52:*15, 16*
60:*7, 15*  61:*5, 6*
111:*2, 3*  115:*16*
138:*4*  139:*16*
145:*19*  152:*8, 13*
226:*13*

**fives**  138:*18*

**flight**  156:*20, 20*
238:*4*

**flip**  249:*21*  405:*8*

**flooding**  322:*7*

**floors**  202:*12*
314:*8*

**focus**  286:*17*
356:*12*

**folks**  178:*10*
179:*18, 19*  195:*1, 2*
196:*4*

**follow**  149:*5*
208:*16*  211:*8*
221:*16*  234:*12*
331:*3*

**followed**  101:*21, 22*
107:*9, 10*  111:*5*
144:*2*

**following**  51:*9*
75:*20*  160:*18*
161:*12*  205:*8*
241:*12*  361:*7*
380:*4*  381:*12*
411:*14*

**follows**  11:*8*  267:*8*

**followup**  159:*12,*
*20*  408:*10*

**follow-up**  266:*5*
373:*2*  389:*12*

**font**  156:*15*

**food**  313:*22*

**force**  154:*1*  257:*6,*
*9*  314:*12, 15, 16*
322:*15*  341:*2*
394:*9*

**Ford**  402:*2*

**foregoing**  411:*6, 8*

**foresee**  210:*17*

**form**  2:*19*  41:*5*
79:*5*  83:*8*  86:*19*
110:*13*  135:*14*
141:*12*  145:*9*
152:*6*  192:*18*
207:*15*  224:*18*
241:*1*  247:*21, 23*
248:*2, 5, 22*  249:*3*
256:*23*  316:*17*
319:*12*  320:*1*
324:*11*  336:*17*
341:*11*  355:*4*
363:*10*  367:*10*
381:*17*  382:*3*
392:*4*  398:*15*
405:*13, 15*  406:*16,*
*17*  408:*17*

**formal**  92:*22*
178:*6*  180:*18*
199:*6*  254:*20*

**formalities**  2:*9*

**format**  295:*12*
352:*2*

**forth**  109:*23*  261:*5*
395:*16*  398:*9*
402:*4*

**forth,**  301:*9*

**forthcoming**  183:*3*
255:*1*

**forward**  45:*14*
92:*22*  95:*22*  96:*12,*
*23*  98:*17*  99:*3, 5*
102:*2*  112:*19*
113:*20*  118:*16*
125:*20*  127:*19*
143:*5*  144:*15*
162:*10*  178:*11*
233:*19, 21*  239:*11*
256:*12*  257:*17*
287:*14*  367:*6*

**forwarded**  252:*17*
297:*20*  328:*16*
373:*21*

**forwarding**  155:*23*

**Foster**  4:*18*  15:*22*
16:*11*  17:*1*  20:*16*
21:*2*  33:*15*  35:*5,*
*16*  37:*18*  65:*16*
66:*8, 10*  67:*7, 23*
74:*11, 13, 16*  76:*5,*
*10, 19*  90:*2, 6*
91:*14, 22, 23*  92:*4,*
*9*  98:*8, 14*  100:*14*
101:*13, 15, 18, 21*
102:*5, 15*  170:*8, 9,*
*14, 17*  171:*1, 5*
206:*12*  207:*5*
216:*19*  217:*3*
231:*7, 18*  233:*13*
345:*2*  349:*19*
390:*13, 15, 19, 22*
400:*13, 15, 17*
404:*16*

**found**  23:*8*  88:*17,*
*22*  411:*14*

**four**  15:*18*  16:*20,*
*22*  21:*8*  33:*6, 21*
35:*3*  38:*8*  40:*23*
93:*22*  94:*2, 5, 13,*
*19*  111:*2, 3*  120:*3*
133:*3, 5*  138:*4*
202:*13*  266:*8*
408:*9*  409:*19, 20*

**four-hour**  407:*10*
409:*22*

**fourth**  280:*19*

**Frank**  66:*12*  67:*19*
173:*3*  401:*22*

**frankly**  330:*22*

**fraud**  356:*11*
363:*8*  368:*23*
369:*2*  370:*4*

**free**  161:*2, 6*
376:*21*  390:*10*

**freestanding**  136:*7*

**Frequently**  205:*18*
288:*13*  408:*23*
409:*1*

**Friday**  277:*18*

**front**  56:*13*  66:*15*
89:*10*  142:*12*
144:*21, 22*  196:*17*
207:*1*  238:*22*
244:*6, 23*  294:*23*
332:*15*  391:*17*
400:*22*

**full**  12:*20*  156:*9,*
*12*  325:*1*  379:*8*
387:*12*  388:*19*

**full-time**  14:*3*

**fully**  43:*3, 9*
298:*12, 21*  331:*12*
359:*20*  377:*19*

**function**  156:*13*
215:*18*  265:*15*

**fund**  30:*16*  80:*22*
81:*10*  82:*1*  87:*19*
88:*11*  136:*9, 11, 14*
137:*1, 5*  186:*5*
209:*5, 7*  222:*4, 8,*
*12*  223:*2, 12*  224:*2,*
*5*  315:*8*

**funded**  43:*3, 9, 10*
376:*12*  377:*23*

**funding**  81:*3*
87:*14, 23*  89:*1*
133:*18*  134:*1, 5, 14,*
*18*  137:*2, 10*  139:*2*
209:*12*  222:*20, 20*
224:*15*  276:*2*
315:*7*  320:*7, 15, 17*
374:*9*  377:*2*  378:*4*
407:*22*

**further**  3:*5*  65:*4*
96:*13*  181:*15*
255:*4*  256:*5*

388:*19*  398:2, *5*
411:9, *13*
**future**  128:*4*
129:22  234:7
255:16  319:*1*

**< G >**
**game**  53:2
**gaps**  261:*14*
**gash**  150:6, *13*
151:8
**Genatone**  231:*11*
323:*19*
**general**  14:*13*
45:*11*  114:*18*
170:16  197:*20*
205:*13*  218:*20*
232:9  233:2
234:15  245:16
247:12  249:*1*
284:22  285:2
287:*11*  301:5
302:5, *14*  304:*3, 9*
306:*3*  310:*15*
311:*15*  312:9
316:2  329:*8, 16*
330:6  331:*21*
337:*15*  341:2
389:*1*  391:5  404:6
**generally**  49:*9*
126:*18*  127:9
219:*11*  241:2
246:*11*  261:*19*
268:20  282:*18*
312:23  346:*19*
347:*1*  373:*11*
388:22  403:*6, 10*
**generate**  326:*4*
**generically**  261:*17*
**Genitone**  324:2
**geographically**
162:*20*
**George**  169:*17, 18,*
*19*  171:*3, 16, 18, 21*
172:5  402:*1*
**George's**  170:6
**getting**  43:*12*
110:5  116:*17*
129:9, *12*  156:*13*
179:6  285:6

292:22  293:*8*
321:6  351:*3*
**Gillespie**  296:*11, 21*
**Give**  13:*17*  24:2
31:9  47:*17*  175:8
183:*18*  190:*19*
195:*12*  198:*11*
234:6  334:4  406:7
409:9
**given**  55:20  89:*21*
155:6  176:*21*
200:2  260:*18*
318:*1*  369:*16*
383:*3*  390:*13*
407:*1*  411:9
**giving**  53:*1*  180:*13*
227:*21*  290:*17*
**glad**  24:*3*  31:*10*
162:22
**go**  29:*16*  52:5
54:*3*  64:6  67:*1*
69:*4*  70:*18*  80:7
94:23  105:*20*
111:*23*  112:8
113:*1*  114:8
127:*12*  147:2
175:8, *21*  205:*11*
207:*10*  210:*19*
217:*12*  235:7
238:*19*  248:6, *6*
256:*12*  290:7
334:*13*  347:*3*
367:6  389:*13, 23*
393:*10*  400:*12*
401:*18*
**goal**  164:*14*
165:*20*  214:*1*
**goes**  87:*3*  261:22
280:5  379:*18*
402:*3*
**going**  29:*18*  32:*10*
40:22  45:*14*  46:*14*
55:22  63:20  64:*1*
66:*17*  68:8, *14*
69:6  70:22  72:20
78:*21*  80:*10*  92:22
100:*13*  125:*20*
127:*19*  129:2
143:5  144:*14*
168:*20*  175:7, *23*

176:*10*  180:8, *13*
182:*18*  184:*11, 16,*
*20*  193:2  196:*19*
205:8  214:7  218:*9*
223:*17*  225:*15*
230:*19*  251:*20*
256:9, *21*  257:*12,*
*14, 16, 17, 18*
263:*15*  265:22
266:*1*  286:*17*
298:*1*  304:*17*
322:9  338:*15*
353:*15*  358:*1*
359:6  364:*8*  367:6
372:*1, 4, 7*  387:*15*
389:*11*  396:*19*
399:6, *21*  401:*16*
404:*12*
**going-forward**
250:*21*
**good**  15:*17*  63:*17*
173:*11*  200:8
241:*14*  269:5
309:*14*  325:*16*
**goodness**  199:*10*
**gosh**  131:6  380:*21*
**gotten**  143:7  236:*9*
**government**  409:*3*
**governmental**
170:22
**gracious**  199:*10*
**graduated**  13:*20, 22*
**grandparents**  269:*3*
**granted**  115:8
**Great**  74:8  157:*4*
**ground**  55:*19*
**group**  104:*12*
204:9, *13, 15*
392:*21*
**guess**  41:*16*  69:*21*
189:*4*  224:8  234:*9,*
*9*  273:*1*  344:6
360:*20*
**guys**  289:2
**Guyton**  355:*1*

**< H >**
**habit**  169:*3*
**hair**  42:*16, 17*
**hairs**  39:*20*

**Hale**  339:*3, 22*
363:*1*
**halfway**  396:*23*
**Hammonds**  33:*17,*
*21*  34:*4, 11, 14*
58:2  64:*14, 19*
145:*15, 21*  146:2
373:9  374:*19*
380:*20*
**hand**  64:7  156:*16*
**handing**  373:*14*
**handle**  173:6
205:*15*  283:*19*
**handling**  79:*17*
**handwritten**  277:2
405:*23*
**Hank**  207:22
**happen**  54:*15*
255:16  383:22
**happened**  206:6
222:9  256:*15*
**happily**  368:2
**happy**  23:*20*  76:*17*
77:5  127:*3*  183:9
238:*19*  284:8
400:2
**hard**  292:*15*
297:*13*
**harm**  229:*3*
**Harold**  10:*10*
11:*23*  58:*15*
156:*18*  184:*1*
266:*3*  267:*20*
321:*18*  389:*12*
408:*11*
**Harold's**  266:6
400:8  408:*10*
**Harper**  381:*4*
**head**  51:22  54:6
150:6, *14*  151:8
153:23  334:*4*
**Health**  6:6  31:*15*
34:*1*  79:*18*  157:*18*
158:*4, 10*  201:*20*
204:*19*  225:6
241:9  272:*17, 18,*
*22*  273:*14*  288:*23*
291:*19*  298:*12*
299:9

**HEALTHCARE**
1:7  7:12, 16, 20, 22
12:2  15:5  16:17
21:18  24:20, 22
25:18, 21  26:5
27:13, 16, 17, 23
28:2  30:14  31:15
34:1  61:12  75:9,
18  78:2, 13  79:11
82:12  85:5, 8  89:1,
8, 9  106:17, 22
123:20  124:1, 4
148:2, 23  150:1, 10
152:18, 20  153:19
160:9  161:9
187:19  188:15
190:7, 15  191:13
195:2, 23  196:3, 15,
16, 22  197:11
198:7, 9  199:13, 23
200:9, 10  201:16,
23  203:4, 10, 18
208:1  209:5
210:18  213:21
214:3, 6, 17, 19
215:10  216:7
222:4, 18  224:3
227:4, 8  228:14, 16
241:15  243:13
245:11  247:4
248:10  258:10
263:3, 11  267:21
269:19  270:1, 18
272:5, 14, 19  274:8,
21  277:23  288:19,
22  289:7, 21
291:12  296:4, 6
298:22  299:17
300:10, 16  301:3
305:6  306:20
307:21  309:20
310:9  313:9, 17
314:19, 23  315:11
316:4, 20  321:4, 9
323:4, 8, 12  324:6
326:8, 13  339:4, 7
340:12  343:3, 17
345:22  346:11, 22
350:8  351:18
374:10  376:12

404:15, 21, 22
405:3, 5  406:18
408:15  409:15
**hear**  256:18
**heard**  183:22
**hearing**  411:9
**hearings**  319:3
**Heathcare**  6:4
**heels**  196:11
245:18
**help**  32:1  58:15
129:19  192:22
362:2
**helpful**  340:11
**hereto**  2:13
**Herr**  44:17, 20
47:5  48:21  52:4
95:20  96:16  97:18
98:16  230:11, 13
285:8  403:23
**H-E-R-R**  44:19
285:8
**hesitancy**  208:10
**hesitant**  191:9
214:18  344:10
355:11
**hesitate**  95:3
210:14
**hey**  179:19
**HIERS**  10:17
**high**  161:7
**higher**  180:9
**hindsight**  234:4
**HIPAA**  203:12
**hire**  180:22  181:6
**hired**  30:22  57:10
104:10  139:22
162:12, 13
**hiring**  284:17
**history**  13:4  45:7,
8, 17  52:7  53:16,
19  97:8  114:23
125:20  127:18
128:11  404:6
**hit**  111:16
**Hodge**  10:4, 5
11:2, 18  12:5, 5
17:5, 10, 15  19:9
32:19  41:5  63:17
66:18  68:8, 13, 17,

22  71:7, 20  72:4, 9,
18  73:4, 13, 22
74:8  79:5  82:23
83:8  86:13, 19
102:14  110:13
135:14  145:9
152:6  153:6, 8
155:4, 10  157:5
170:11  172:8, 12,
19, 22  173:3  175:6
182:8, 15, 23
192:18  201:12
202:20  207:15
224:18  227:16
238:2  241:1
247:21  248:1
251:4  266:1  267:2,
23, 23  268:5, 17
308:17, 23  316:17
321:17  324:11, 15,
18  336:17  355:4
363:10  367:10
376:22  377:3
389:7, 16, 19
398:15  400:6
401:1, 16  402:6, 19
403:2  407:9  408:8,
17  409:18
**hodgepodge**  156:21
**Hodges**  102:19
**hold**  51:15  150:12
174:14
**holder**  302:19
306:5  311:2
312:16
**holding**  66:15
89:15
**homeowners**  404:5
**honest**  359:19
**honestly**  81:21
225:14  260:8
285:19
**honesty**  256:6, 7
**Hooper**  355:1
**hope**  59:16  176:14
373:2
**hopefully**  52:21
129:19  214:2
406:21
**Horatio**  322:16, 18

**host**  52:10  125:8
151:3, 16  152:1
271:17
**hour**  266:5
**hours**  266:3, 8
408:9  409:19, 20
**housed**  75:23  76:1
202:11  348:1
**housing**  202:15
318:18  319:5
**Howard**  229:19
**Huntsville**  10:7, 13
11:3, 18  14:1
202:17  267:3
288:3
**hypothetical**  76:3
137:9  151:17
224:20  228:20
**hypothetically**
224:11  228:23

**< I >**
**I,**  283:6
**idea**  234:20  238:3
262:5  270:13
277:3
**identification**  18:10
67:4  80:18  89:23
91:2  146:9  154:9
157:10  160:6
161:15  166:14
169:7  174:21
175:12  186:17
191:1  272:13
276:11, 13  278:6, 8
279:8, 22  285:15
286:8  294:13
295:9, 19  296:16
298:6, 8, 19  299:4,
14  300:8, 18
301:14  302:22
304:22  306:14
307:14  308:8
310:4, 20  311:20
312:12  317:2
338:21  341:15, 20
342:6  360:13
372:12  373:13
374:14  375:14
376:18  384:19

386:*19*  396:*10*
404:*18*
**identified**  30:*8*
145:*11*  200:*17*
208:*14*  212:*20*
214:*15*  284:*22*
285:*2*  293:*15*
311:*3*  314:*14*
323:*1*  325:*9*
335:*16*  336:*7*
357:*2*  372:*14*
**identifies**  232:*4, 7*
**identify**  11:*19*
215:*17*  233:*6*
267:*16*  272:*10*
275:*3*  276:*14, 22*
277:*1, 6*  294:*16*
298:*9, 20*  299:*5, 15*
300:*5, 19*  301:*15*
302:*23*  305:*1*
306:*15*  307:*17*
309:*5, 8, 10*  310:*5,
21*  311:*21*  317:*4*
336:*20, 22, 23*
339:*1*  360:*14*
372:*16*
**identifying**  231:*21*
365:*2*
**ignore**  75:*13*
182:*21*
**ignored**  76:*21*
77:*14*  260:*15*
**Illinois**  230:*21*
248:*11*
**illustrates**  155:*3*
**immediate**  406:*19*
**immediately**
118:*14*  272:*19, 21*
326:*14*  363:*3*
405:*17*
**impact**  45:*13*  46:*7,
14, 20*  47:*5, 11*
51:*7*  151:*5*  172:*3,
3, 6*  224:*21*  225:*3*
251:*20*  403:*13*
404:*2*
**impacted**  38:*3*
44:*7, 22*  45:*20*
402:*16*
**impacting**  130:*2*

**impacts**  45:*9*
251:*8*  404:*6*
**impatient**  163:*2*
**impede**  325:*18*
**implement**  79:*16*
387:*20*
**implementation**
195:*19*
**implemented**  78:*3*
79:*10*  150:*21*
408:*22*
**implying**  128:*23*
**important**  68:*11*
106:*16, 19*  107:*1, 7*
169:*22*  292:*12*
**imposed**  316:*21*
**improperly**  348:*15*
**improvement**
203:*11*
**inability**  289:*15*
**inaccurate**  237:*19*
**inadequate**  89:*1*
133:*17, 23*  327:*4, 5*
374:*9*  377:*1*
**inadequately**
376:*12*
**inadvertently**
155:*12*
**inappropriate**  16:*1*
69:*1*
**incarcerated**  21:*5*
151:*4*  319:*1*
**incentive**  89:*2*
137:*13, 16*
**incentivize**  136:*3*
222:*13*  223:*6*
**incentivized**  134:*10*
**incidents**  82:*20*
83:*5, 19*  84:*4*  85:*3,
12*  218:*20*
**include**  17:*17*
37:*12*  41:*1*  60:*10*
61:*3, 19*  83:*17*
86:*6*  90:*22*  98:*16*
113:*21*  145:*12*
174:*16*  204:*18*
303:*14*  313:*15*
314:*15*  336:*19*
378:*21*

**included**  60:*10*
69:*16*  74:*18*  75:*3*
106:*17*  108:*19*
110:*16*  122:*8*
143:*2*  170:*2*  201:*1*
208:*2*  238:*16*
247:*11*  248:*5*
249:*1*  281:*15*
302:*13*  304:*8*
306:*2*  311:*14*
328:*19*  334:*1, 1*
337:*14*  341:*12*
342:*12, 18*  357:*13*
367:*23*
**includes**  137:*2*
220:*21*  303:*6, 9*
315:*11*  316:*3*
**including**  28:*5*
40:*8*  136:*15*  156:*8*
194:*5*  201:*17*
203:*5*  213:*22*
225:*2*  274:*15*
284:*16*  294:*7*
379:*9*
**inconsistent**  253:*21*
**incorporate**  377:*21*
**incorporated**  196:*9*
325:*3*
**incorporates**
208:*13*  377:*17*
**incorrect**  237:*19*
311:*8*
**increased**  51:*12, 17*
**increases**  51:*18, 22*
52:*3*
**incur**  349:*15*
**incurred**  37:*23*
38:*10, 20*  59:*1*
349:*14, 22*  354:*18*
355:*1, 7*
**incurring**  116:*14*
**indemnification**
29:*3*  38:*13, 14*
93:*7*  111:*12*
121:*11*  123:*21*
124:*21*  126:*15, 23*
135:*18*  152:*22*
154:*3*  164:*15*
177:*22*  189:*6*
192:*7, 12, 17*

193:*13, 14*  208:*17*
209:*9*  252:*2*  254:*2*
260:*14*  261:*11*
326:*8*  343:*19*
344:*2*  345:*7*  346:*8*
383:*6, 21*  384:*23*
393:*21*  394:*10*
397:*19*
**indemnifications**
345:*12*
**indemnified**  228:*10*
**indemnify**  31:*17*
93:*13*  113:*8*  162:*6,
10*  193:*7, 18*
224:*17*  257:*7*
346:*4, 19*
**indemnifying**  118:*3*
143:*13*  145:*13*
**indemnity**  135:*6, 8,
12*  138:*4*  141:*11*
174:*1, 6*  176:*18*
178:*4*  187:*2, 16*
188:*1*  208:*9*
216:*14*  227:*12*
229:*6*  253:*13*
304:*3*  321:*14*
323:*2*
**independent**  19:*15*
21:*22*  23:*9, 21*
60:*20*  77:*10, 20*
79:*2, 19*  89:*13*
122:*6*  133:*10*
136:*7, 11*  153:*21*
231:*3*  259:*10*
279:*2*  280:*14*
282:*16*  291:*2*
**independently**
294:*22*  304:*15*
305:*8*  308:*5*
**indexing**  291:*19*
**indicate**  296:*10*
346:*3*  364:*7*
405:*23*
**indicated**  330:*2*
336:*11*  349:*8, 9*
**indicates**  89:*15*
295:*3*  296:*3*  303:*5*
318:*16*  320:*5*
367:*18*

**indicating** 15:*11*
241:*22* 294:*3, 7*
329:*1*
**indication** 111:*16*
217:*19, 22* 218:*2, 5*
376:2
**indifference** 37:*1*
76:7 81:*1, 11* 82:2,
*21* 83:6, *19* 84:5
85:*3, 12* 86:*1, 5*
87:*21* 124:*3*
135:22 223:*14*
374:*5, 7* 376:7
377:*1*
**indifferent** 76:22
77:*15* 83:15 84:*3,
19*
**individual** 81:*5, 19*
88:2 119:*8* 167:*10*
204:*16* 210:8
211:2, *5, 11, 16, 19*
212:*16* 218:6
350:23 352:*19*
354:*12, 22*
**individually** 159:*16*
207:*10* 349:*17*
**individuals** 118:*1*
**industry** 262:2
**ineffectively** 348:*15*
**infectious** 314:6
**influence** 101:*10*
**info** 167:*10*
**inform** 119:*20*
120:*1*
**information** 48:*20*
55:21 56:5 60:9
61:*17, 21* 62:*18*
63:9, *14* 68:23
72:*16* 101:*3, 7*
102:8 108:*16, 19,
21* 116:*17* 154:*12,
13, 20* 157:16
158:*5, 7, 9* 174:*18*
198:*19* 325:2
371:*12* 379:*20, 21*
**informed** 119:*18*
320:*10, 22* 331:8
**infrequently**
205:*18, 19*

**in-house** 203:22
333:*15*
**initial** 35:23 61:22
245:*15* 269:*10*
335:*21*
**initially** 16:*10*
261:*10* 386:2
**initiated** 196:*13*
**injury** 20:*17* 74:*14*
**inmate** 30:*12*
33:*17* 75:*12, 23, 23*
81:*3* 87:*14, 23*
89:*1* 150:*3, 6*
151:*1* 196:*20*
198:2 203:*10, 17*
204:*18* 210:*19, 21*
214:6 227:*16, 20*
228:*3, 21* 229:*3, 3,
4* 325:*15*
**inmates** 21:*4* 37:6
79:*17* 81:2, *12*
82:*3, 11* 87:22
136:*15* 161:9
194:*17, 18* 195:*4, 9*
196:*15* 197:*12*
210:*8, 12* 211:*21*
214:2 223:*15*
263:*12* 269:*20*
270:*15* 316:*16, 20,
23* 319:*1* 351:*6, 7*
388:*16* 406:*15*
**input** 325:*10, 20*
326:2
**inquire** 330:*6*
**inquiring** 328:*9*
**inquiry** 330:*16*
**inserted** 297:*7*
**in-service** 203:*8, 15,
19*
**insinuating** 219:*20*
**insolvent** 330:*20*
331:*6, 9*
**instance** 149:*21*
**instances** 349:*4*
350:*19* 356:*11*
**instruct** 71:*8*
**instruction** 200:*11*
314:*4*
**INSURANCE** 1:*6*
8:*2, 4, 10, 12, 14, 16*

11:*15* 12:*4* 24:*17*
25:*4, 20* 26:*8, 15,
18* 27:*2, 11, 18*
28:*3, 13, 17, 22*
29:*13* 31:*3, 7, 13*
37:*21* 38:*2, 13*
39:*15, 18* 41:*20*
44:*11, 13* 45:*5, 10,
16* 46:*10, 15* 48:2,
*4* 51:*8, 8* 52:*6, 11,
12* 54:*9* 56:*12*
57:*9* 59:*15* 65:*23*
70:*15* 95:*18* 96:*11,
15* 97:*12, 13, 16*
98:*9, 9* 104:*17, 23*
105:*7* 106:*7, 15*
107:*18* 108:*3, 7, 17,
20, 22* 109:*1, 5, 12,
19* 110:*12* 111:*11,
11* 113:*11* 123:*21,
22* 124:*21* 125:*6,
10* 127:*10, 20*
129:*14* 130:*12, 14*
135:*7, 9, 12, 18*
139:*15* 141:*16*
142:*20, 21, 21*
143:*3, 11, 21, 22*
144:*6, 7, 8, 21*
145:*2, 7* 148:*3, 7,
23* 149:*13, 17, 21*
152:*22* 157:*15, 15,
22* 158:*2, 4, 14, 19,
23* 159:*9, 14, 22*
160:*10, 21* 163:*16*
165:*1, 11, 12, 13*
167:*8, 16* 168:*22*
169:*19* 173:*21*
185:*8, 12, 19, 21*
187:*21* 188:*1*
192:*11, 16* 205:*15,
21, 21* 224:*22*
225:*3, 6* 229:*14*
230:*4, 13, 20, 21*
231:*1, 21, 21* 232:*2*
233:*6, 19, 21* 234:*2,
21* 235:*11* 236:*9*
239:*5* 241:*16*
242:*5, 18* 244:*5*
245:*4, 12, 20* 246:*6,
10, 11* 247:*2, 19*

250:*11* 259:*6, 9*
260:*4, 10* 267:*19*
271:*12, 22, 23*
273:*6, 9, 15* 280:*22*
281:*3, 10* 282:*5, 10,
22* 283:*7* 284:*2, 17,
23* 285:*11* 286:*21*
287:*2, 8, 16* 289:*15,
20* 290:*5* 291:*4*
294:*4, 10* 300:*21*
301:*17* 303:*18*
304:*2, 2* 305:*6, 13,
17, 20* 306:*20*
307:*11, 20* 308:*21*
309:*19, 22* 310:*7, 9*
311:*1* 312:*1, 14*
326:*7, 15, 17, 20, 23*
327:*1, 1, 7, 14, 19*
328:*10, 17* 329:*1, 9,
10, 22* 330:*1, 2, 5,
11, 12, 20* 331:*5, 6*
332:*9* 333:*6, 17*
334:*6* 335:*4, 9, 15,
23* 336:*7, 9* 337:*3*
341:*4, 7, 12* 342:*14,
15, 19, 21* 356:*22*
357:*1, 2, 10, 12, 13,
20, 23* 358:*3, 8, 22*
361:*22* 362:*9, 20*
363:*4, 8, 13, 15, 16,
18, 21* 364:*3, 17*
365:*2, 3, 4, 4, 7, 10,
12, 14, 18, 19, 21*
366:*23* 370:*8, 11*
371:*6, 13, 14, 16*
373:*1* 379:*6, 19*
381:*11* 383:*1, 12*
384:*3, 10, 23*
392:*13, 21* 393:*21*
394:*10, 14, 23*
395:*14* 403:*5, 6, 8,
19, 21* 404:*4, 7, 8*
**insurance-related**
240:*18*
**insure** 27:*19* 259:*7*
403:*20*
**insured** 24:*10*
25:*7, 13* 26:*18*
28:*4, 23* 30:*2*
33:*14* 35:*2* 47:*15*

49:21 52:8 114:4
122:23 123:1
142:7, 9, 17 143:23
148:13 164:3
165:13, 21 185:13
233:11 239:16
240:3, 5, 21, 22
241:17, 17, 18
242:7, 9 247:12, 20
248:4, 9, 14, 20
249:1 260:3, 9
262:1 273:17, 20,
22 281:6, 15 283:9
285:10, 11 289:19
290:12, 13 301:3
302:13 303:13
305:19 306:10
310:9, 15 311:12
335:21, 22 337:15,
21, 23 338:1, 4, 5, 6
359:9, 9 361:2, 6, 8,
13, 14
**insured.'** 361:9
**insureds** 26:1
31:14 35:12 36:2
48:15, 18, 23 56:18,
22 66:5 93:8
113:19, 21 118:13
138:16 142:22
144:9 159:2 232:5,
7 233:8 240:10
241:6, 23 242:10,
17 243:3, 12 246:8,
16, 17 249:12, 12
273:12 275:11, 13
290:2 304:9 306:2
311:14 312:6, 8
328:19 335:17, 20
336:4, 12, 15 337:5,
11 356:13, 18
357:5, 9, 14, 21
358:4, 7, 10, 15, 16
399:8, 16
**insurer** 30:21
54:11 61:11 95:8
99:4, 5 102:2
107:19 108:9, 17,
19 118:6 124:6
125:2 129:10, 21
149:3 150:5 162:5,

11 163:7 192:1
206:4 226:19
234:1 256:10
260:13 281:9
301:5 302:3 304:1,
3 305:16 310:10
334:18 352:17
353:5 369:10
370:1 383:20
399:5
**insurers** 95:22
97:1, 7, 9, 19, 22
98:17 108:14
129:15
**insures** 392:14
**insuring** 383:7, 8
**intake** 405:9, 13
**intelligently** 186:12
**intend** 119:21
120:2 150:12
190:10 213:12
**intended** 111:17,
20 117:1 190:9
192:16, 19 210:16
328:6 367:14
368:12
**intending** 19:23
**intent** 152:20
**intention** 173:22
189:12, 18, 22
190:1, 4 250:12
259:14, 21
**intentional** 46:4
**intentionally** 80:22
81:9 82:1 87:19
223:12 224:5
370:15, 21
**interacted** 349:8
**interaction** 200:8
215:13
**interest** 137:18, 20,
23 236:13, 16, 17
346:13 372:4
380:8, 13 396:18
**interested** 253:7
411:11
**interpretation**
378:20
**interrelate** 153:18

**interrelated** 85:5
209:11
**interrupt** 136:21
217:11
**interrupted** 360:5
**interruption** 343:14
**intertwined** 85:4
134:16 135:16, 19
208:20
**interval** 199:13
**intervening** 261:14
**introductory** 203:8,
15, 20
**investigate** 83:5
86:1, 17, 21 87:5
218:20, 22 219:12,
15
**investigating** 82:20
83:18 84:4 85:2,
11 283:18
**investigation** 86:4
220:12
**investigations** 84:20
**invited** 262:18
**invoice** 114:19
115:2, 6, 9, 14, 15,
18
**invoices** 39:1
**invoking** 185:19, 21
**involve** 89:7 99:10
331:2, 2 345:3
**involved** 14:10
30:6 41:12 42:2,
22 57:20 96:7
98:20, 22 112:16
115:22 171:18
187:22 188:4
210:9 212:17
231:11 274:11
275:6, 16, 21
287:15
**involvement** 57:9,
18 58:4 78:5
151:15 178:22
179:17 325:13
343:4, 4 380:6
407:5 409:7, 13
**involves** 406:13

**involving** 139:23
288:10 380:7
392:16 409:3
**Ireland** 139:21
162:17, 18, 22
163:4 167:7, 15
177:16 179:3
375:2, 10 379:19
380:3, 6, 17 381:11
382:7, 11 384:11,
13, 15
**Ireland's** 30:21
57:22 58:20
**isolation** 89:12
**issue** 69:17 94:7
99:22 106:11, 12
120:19, 20 126:3
164:17 172:6
173:6 176:10
177:13 178:4
184:16 188:11
189:7 230:22
242:19 252:11
260:3, 4, 10 261:12
262:7 286:19
326:22 328:22
333:9, 12 359:14
398:1 408:5
**issued** 18:2 28:18,
22 29:13 48:16
50:23 51:12 59:16
108:4 180:19
**issues** 15:4 73:7
102:19 106:16
125:23 126:2
132:17 148:11
164:11, 18, 22
165:5, 6, 15, 18
168:15, 21 171:19,
22 189:5 199:17
204:19 228:15
258:15 288:21
289:4 292:11
313:21 318:17, 23
323:21 331:1
346:10 380:13
382:21 383:2, 15,
22 384:15 385:1
398:6

**item** 36:*20* 37:*9*
56:*6* 90:*12* 112:*10*
165:*9, 10* 194:*10*
316:*3*
**items** 25:*13* 64:2
342:*12*
**its** 20:*19* 21:*10, 23*
22:*4, 12* 23:*4, 10*
27:20 30:*21* 31:20
35:*1* 36:7 37:2, *15,*
*20* 38:22 39:*17*
51:7 52:*11* 56:20
57:*4, 7, 8* 58:7
64:*3* 69:*17, 19*
75:*11* 78:*13* 80:2
82:*3, 13* 84:2
88:*11* 95:*8* 100:*3*
102:*2* 104:*12*
105:*3, 14, 21* 106:*3,*
*4* 112:*14* 113:*19,*
*21* 114:*3* 118:*10,*
*13* 119:*19* 122:*11*
124:*6* 125:*2, 5*
127:*10* 129:*14, 21*
133:2, *16, 22*
134:*19* 135:7, *13,*
*15* 138:*16* 145:7
149:*3, 22* 150:*5*
152:2, *2, 3* 157:*3*
162:*5* 164:*9*
165:*21* 169:*21*
180:22 181:*10*
185:*23* 192:*1*
193:*23* 194:*1, 1, 4,*
*4, 5, 11* 215:7
226:*19* 231:20
237:*13* 242:*18*
256:*10* 257:*21*
260:*13* 299:*11*
320:*3* 330:*23*
336:*9* 341:*1*
345:*15, 21* 363:*12*
367:*4* 370:*1, 4, 11*
371:*13* 378:*2*
383:*8, 20* 392:*15*
393:22 399:*8, 16*

**< J >**
**Jagady** 92:*19*
140:*12* 173:*15, 20*

177:*8* 251:*23*
253:*23* 359:*20*
397:*15* 398:*10*
**jail** 16:*17* 21:*18*
27:*16, 23* 75:*9, 18*
77:*17* 78:*6, 20*
82:*11, 19* 83:*17*
88:*11* 106:*9* 124:*1,*
*3, 23* 133:*13*
135:*17* 136:*9, 12,*
*14* 137:*1* 148:*3, 23*
151:*5, 8* 152:*19*
153:*19* 188:*16*
194:22 195:*1, 3*
196:*10* 197:*12*
199:*15, 22* 200:*6*
201:2 202:*12, 15*
211:*6* 212:*2, 3, 4*
213:*4, 16, 17* 222:*5*
223:2 224:*3, 15*
234:*8* 245:*12, 16*
262:*10* 263:*11*
265:*14, 16* 270:*2,*
*12, 15* 272:*6*
274:22 278:*1*
281:*13* 282:*11, 19*
288:*6, 18, 23*
289:22 291:*16*
293:*8, 14* 302:*9, 19*
304:*7* 306:*5, 18*
307:*9* 309:*17*
312:*20* 313:*10, 12,*
*16, 19* 314:*1, 3, 23*
315:*15* 316:*4, 16,*
*20* 318:*11, 19*
319:*2, 2, 6, 10, 15,*
*19* 320:*19* 321:*9,*
*17* 322:*15* 323:*5, 6,*
*9* 325:*13* 340:*13*
345:22 346:*11*
347:*20* 349:*5*
350:*9, 23* 351:*6, 19*
354:*11* 374:*10*
376:*12* 388:*17*
394:*7* 404:*15*
406:*13, 14, 22*
407:*6* 408:*16*
409:*2, 5*
**jailer** 74:*11* 83:*4*
84:*18* 148:*1, 21*

150:2, *14* 151:*9, 9,*
*13, 20* 152:2
245:*10*
**jailers** 84:*9* 149:22
314:*11*
**Jails** 404:22
**janitorial** 314:*1*
**January** 8:*18* 9:*14*
258:*12* 300:*12*
339:*3* 362:*23*
386:*21* 392:*12*
**Jean** 220:*13*
**JEFF** 1:*14* 2:2
11:*5, 13* 40:*16*
156:*10* 173:*12*
174:*11* 234:*13, 14*
267:*5, 13* 282:*6*
360:*21* 411:*6*
**Jefferson** 4:*16*
15:*21* 16:*11, 23*
20:*15* 21:2 33:*14*
37:*18* 66:*7* 79:*14*
80:*16* 81:*2, 12*
87:*12, 22* 88:*9*
92:*9* 206:*12* 207:*5*
209:*16, 17* 210:*10*
211:*2, 5, 16* 212:*6,*
*9, 18* 213:*1, 6, 8*
214:*17* 216:*10*
218:*15* 221:*4, 7*
223:*10, 15, 22*
226:*2* 231:*7, 18*
233:*13* 339:*6*
345:2 348:*13, 20*
349:*19* 352:*12*
353:*4* 366:*8* 367:*5,*
*17* 368:*5* 387:*5*
391:*11, 20* 404:*14*
**Jefferson's** 81:*4, 7*
88:*1, 4* 210:*10*
212:*17*
**Jeffery** 12:*21*
**J-E-F-F-E-R-Y**
12:*21*
**Jeff's** 389:*8*
**Jessica** 178:*14*
181:*15* 182:*4*
187:*12* 193:*3*
243:*1, 4* 254:*4*

323:*15*
**Jessica's** 179:*23*
**Jimmy** 317:*8*
**job** 95:2 166:*21*
216:*1* 356:*4*
**Joe** 317:*8*
**John** 12:*21* 66:*12*
67:*18* 401:22
**Johnson** 58:*10*
83:*16* 85:*1* 157:*13*
158:*19, 21* 159:*13,*
*21* 163:*14* 245:22
246:2 269:*23*
270:*4, 6* 278:*14*
279:*14* 280:*10, 20*
282:*4* 284:*12*
285:22 286:*13, 18*
288:*3, 10, 15*
290:*16, 20* 292:*21*
293:*12* 294:*2, 7, 18*
295:*15* 296:*1, 12*
297:*11, 15* 299:*9,*
*19* 325:*8* 327:*18*
333:*16* 339:*17, 20*
340:*12, 19* 369:*12*
372:*19* 373:*16, 21*
**Johnson's** 281:*19*
283:*6* 297:*16*
**jointly** 388:*4, 6, 7*
399:*12*
**Jones** 229:*23*
230:*1* 234:*20*
235:*1, 22* 236:*8*
**Jr** 10:*15*
**judge** 14:7 36:*5*
49:*10* 72:*8* 74:*5*
88:*8, 17, 22* 196:*18,*
*19, 21* 222:*11*
223:*2* 265:*1, 5*
317:*12* 318:*4*
**Judge's** 88:*12, 15,*
*16* 89:*3, 15, 19*
**judgment** 115:*8*
254:*8* 322:*8*
378:*13* 379:*15*
403:*17*
**Julian** 14:*18* 237:2
274:*15*
**July** 5:*6, 8, 10*
6:22 7:2, *6, 14* 8:*8*

9:*4*  117:*18*  142:*18*
160:*8*  191:*12*
229:*9, 12*  230:2
241:*10, 19*  242:*14*
243:*8*  246:20
277:*8*  295:*16*
305:*5*  306:*17*
307:*3, 18*  308:2
326:*14*  335:*8*
337:2  340:22
341:*6*  356:*21*
364:*23*  371:7
372:*19*  373:*16*
**jump**  205:*10*
249:*4, 17*  337:*19*
360:*4*
**June**  1:*15*  6:20
11:*1, 11*  229:*10, 12*
230:*3*  232:*17*
237:*1*  241:*10, 20*
242:*14, 15*  267:*1,
11*  288:2  290:*15*
291:*7, 9*  294:*2, 8,
18*  295:*5*  298:*14*
341:*1, 7*  365:*1*
371:*7*  411:*14*
**jury**  268:*15*  375:*8*
**justification**  252:*1*
**justify**  196:*20*
**juvenile**  311:*6, 8*

**< K >**
**Kallon**  222:*11*
265:*5*
**keep**  43:*21*  45:*4*
98:*1*  130:*12*
281:*18*  284:*8*
354:*19*  355:*2, 8*
386:*11*
**kept**  53:*20, 21*
98:*4*  190:*18*  352:*5*
354:*15, 16*  386:*15*
**Kevin**  229:*23*
**kin**  411:*11*
**kind**  93:*16*  112:*23*
177:*12*  207:*3*
226:*15*  258:*5*
262:*6*  360:*9*
389:*11*  396:*5*
399:*7*  400:*9*

**KING**  10:*5*  11:*2,
18*  267:2
**kitchen**  313:*19*
**knew**  74:*12*  108:*9*
133:*4*  179:*16*
228:*1*  233:*10*
377:*7*  384:*15*
**know**  13:*4, 12, 14,
15*  16:*7*  20:2  31:*9*
32:*17*  41:*18*  42:*17,
19*  46:*4*  49:*9*
50:*15*  51:*2, 21*
53:*8, 9*  59:*21, 22*
60:*16*  61:*5*  62:*9,
14, 22*  65:*3*  66:*22*
72:*1, 16*  73:*2, 10*
76:2  77:*23*  86:*9*
91:*12, 18*  97:*6*
103:*15*  106:*4*
109:*9*  113:*11*
117:*16*  122:2
128:*13, 15*  132:*23*
141:*13, 19, 22*
142:*2, 4, 23*  143:*18*
144:*20*  147:*6*
148:*12*  153:*12*
156:*1, 7*  158:*5, 8*
159:*15*  160:*16*
161:*13*  166:*8*
167:*21*  168:*19*
170:*20*  173:*1*
181:*14*  183:*1*
184:*1*  186:*7*  188:*6,
8*  194:*23*  199:*5*
200:*16, 17*  204:*12,
20, 23*  206:*23*
207:*17, 19*  208:*11,
20*  210:*5, 17, 22*
211:*21*  213:*9, 20*
215:*22*  216:2
217:*4*  219:*22*
221:*22*  222:*22*
223:*8, 19*  224:*19,
20*  225:*6, 14*  230:*9*
233:*16*  235:*9*
237:*16, 20*  238:*1, 3,
5*  240:*20*  250:*16,
23*  251:*7, 13*  254:*9*
256:*6, 7*  262:*3*
263:*18*  268:*20*

271:*16*  274:*4*
277:*5, 21*  278:*3*
285:*19*  288:*1*
291:*10*  292:*12*
293:*19, 22*  297:*8*
302:2  304:*18*
308:*23*  316:*5, 8*
317:*18*  318:*8*
323:*18, 21*  327:*9*
329:*8*  330:*21*
331:*1*  334:*3*
336:*19*  338:*12*
340:*1*  341:*4, 5, 6,
11*  342:*17*  347:*14,
16*  348:*16*  350:2
351:*9*  353:*12*
355:*5*  365:*9*
369:*16*  371:*3, 11*
372:*2, 3*  374:*1*
375:*20*  378:*12*
384:*7*  385:*20, 21*
386:*3, 23*  389:*16*
393:*3*  396:*16*
397:*5*  398:*22*
404:*12*  405:*21*
406:*10, 12*  408:*4*
**knowing**  108:*23*
109:*3*
**knowledge**  29:*14*
48:*14*  60:*14, 23*
61:*1*  62:*3*  63:*16*
70:*2, 17*  77:*4*
107:*5*  111:*7*  114:*2*
140:*10*  160:*23*
178:*5*  182:*1*  216:*3*
230:*1, 6*  231:*13*
235:*21*  236:*1*
269:*17*  322:*10*
327:*11, 13, 16*
328:*8*  329:*14*
330:*15*  332:*8*
340:*16*  349:*11*
366:*16*  382:*4*
398:*6, 8*  407:*6*
**known**  58:*11*
82:*20*  83:*5, 19*
84:*4*  85:*2, 11*
107:*11*  233:*16*
270:*17*

**knows**  147:*15*
371:*11*

**< L >**
**labeled**  301:*1*
303:2  312:*15*
**labelled**  175:*3*
**lack**  21:*3*  130:*7*
324:*21*
**laid**  164:*3*  197:*17*
**land**  258:*6*
**Lane**  10:*15*  12:*3*
17:*5*  68:*9*  156:*7*
201:*12*  266:*4*
360:*16*  366:*21*
374:*17*  386:*21*
389:*10, 12*  395:*12*
402:*8*
**language**  24:*12, 21*
34:*20*  49:*3, 3*  55:*6,
8*  56:*4, 8, 10, 14, 15*
88:*14*  93:*15*  100:*7*
101:2  107:*20*
142:*13, 15*  143:*1,
16*  144:*4, 10, 13, 15,
18, 19*  149:*5*  189:*1,
3*  191:*5*  193:*21*
206:*20*  233:*5*
247:*8*  248:*3*  251:*2*
262:*21*  310:*12*
311:*12*  312:*4*
325:*7, 21*  333:*23*
338:2  344:*2, 8*
363:*22*  388:2
**languishing**  179:*1*
**Lanier**  44:*16*
96:*17*  99:*3, 11, 13*
230:*12*  233:*20*
402:2  403:*23*
**large**  2:*6*  196:*12*
348:*23*  411:*4, 22*
**larger**  327:*6*
**largest**  226:*12, 18*
**Larry**  381:*4*
**Lastly**  257:*10*
**late**  261:*19*
**Law**  13:*23*  23:*22*
30:22  59:2  87:*6*
132:*6*  170:*21, 21*
208:2  219:*17*

240:*12, 13, 14*
253:6  274:*14*
324:*9*  378:*21*
380:22  392:*16*
393:6  396:*4*
399:*19*  400:*4*
**lawsuit**  15:5  16:2
30:*11, 12, 19*  32:12
33:*16*  35:5, 5
36:10  62:12  65:*15,*
*16*  69:23  71:*13*
99:7, *11*  109:*14, 16,*
*22*  116:*13*  127:*13*
130:*9, 19*  131:*18*
134:*4*  137:*13*
138:2  139:6, 6
143:9  162:7  163:9
170:*19*  171:*1, 9*
193:8  212:6, 9
220:6  321:*23*
322:*19*  333:*12*
340:20  359:7, *10,*
*15*  382:*19*  383:*5,*
*15*  388:*11*  395:20
**lawsuits**  16:*15*
21:*16*  24:*18*  29:*4*
30:5, 7, 9  35:*13*
36:3  39:*19*  43:*11*
55:*14*  58:23  59:2
64:*20, 23*  65:*4, 15*
96:9  111:*15*
116:*15*  118:*20*
119:*10*  132:*19*
139:23  143:*14*
145:*14, 15*  152:*17*
168:*12*  179:*13*
206:*10*  207:*4*
221:20  231:6
293:6  321:*11, 16,*
*20*  352:*18*  363:20
364:6  365:*20*
369:22  370:*12*
382:20  383:*18, 20*
404:*9*
**lawyer**  25:2  29:9
35:*20*  60:*17*  62:*11*
69:22  102:22
155:22  162:*12, 14,*
*15*  163:*16*  170:*17*
206:5  231:*10*

252:9  271:5  293:*4,*
9, 20  297:*13*
334:*20*  338:*11*
349:*23, 23*  398:3
**lawyers**  36:*16*
39:*1, 14*  42:1  57:9,
*19*  58:5  70:*19*
72:2  73:*21*  104:*10,*
*11, 16, 18*  118:*19*
171:22  274:*13, 21*
275:8  326:*4*
366:*19*  380:*17*
382:*21, 23*  383:*10*
**lawyer's**  242:*20*
**lay**  195:*12*
**lead**  338:3
**leadership**  199:*14*
**leading**  112:*17*
348:*16*
**lead-up**  109:22
**leave**  84:*21*  216:*1*
**leaving**  14:*12*
**led**  283:*16*
**ledger**  386:*11*
**Lee**  205:*23*  381:2
**left**  11:22  176:*15*
254:8  288:22
291:*16*  311:*4*
325:*1*  386:*16*
**left-hand**  155:*18, 20*
**legal**  26:*13*  59:*23*
72:*13*  112:*11*
132:*17*  190:8
216:*12*  282:7, *13*
293:*15*  338:8
356:20  371:*4*
**legally**  137:*21*
316:*13*
**lengthy**  76:*11, 15*
187:22
**L-E-O-T-H-O-L-D**
58:*15*
**Lets's**  124:*13*
**Letter**  4:*14*  5:*4, 6,*
8, *10*  6:*10, 12, 14,*
*16, 18, 20, 22*  7:2, *4,*
*6, 10, 14, 18*  8:6, 8,
*18*  9:2, *4, 6, 14, 16*
25:*1*  29:*11*  31:5, 8
34:*13, 18*  35:*19*

36:*1*  66:*15, 19*
67:*1, 6, 9, 16, 21*
68:9  69:*14*  70:*1, 6,*
8  71:6  73:6  95:*18*
96:*11*  97:*20, 21*
98:2, *16*  99:*13, 19*
101:20  102:*12, 15,*
*19, 20*  103:*4, 16*
121:*10*  157:*12*
158:*18*  159:5, *12,*
*21*  160:*12, 14, 18,*
*22*  161:*12, 16*
162:*3, 8, 12*  163:*12,*
*18, 23*  164:*8, 20*
165:5, 7, *10, 19, 22*
166:*4*  180:*18*
181:*21*  182:2
187:*11*  188:*10, 13,*
*14*  193:3  231:2
233:*17*  242:*20*
245:22  246:*1, 20*
258:22  259:2, *4*
261:*1, 23*  262:*15*
263:3, *13, 17, 21*
277:8  278:*13, 18,*
*23*  279:*13, 18, 19*
280:*10, 13*  281:*19,*
*21*  282:*18*  283:6
285:22  286:*3, 4, 11,*
*16*  287:*3*  294:*17,*
*21*  295:*15, 23*
297:*11, 20*  298:*11,*
*15*  299:*7*  300:*3*
303:*3*  305:*3, 7, 12*
306:*8, 17*  307:*3, 18*
309:*16*  325:8
334:*8*  339:2, *5, 11,*
*14, 21, 23*  340:*1, 2,*
*5, 7, 8, 10*  360:*16,*
*23*  363:*1, 2*  364:*1,*
*7, 10*  366:22
372:*18*  373:*15, 20*
374:*16, 23*  378:*23*
380:*4*  381:*12*
382:*17*  385:*3, 9*
386:*21, 22*  389:22
390:*18*  392:*12*
394:*13, 21*  395:*18*
396:*1, 11, 15*
400:*23*  402:*9*

**letters**  15:*4*  29:5
35:*4, 8*  65:*1*  98:*8*
182:*12*  230:*18*
261:*3*  336:5, 6
365:*13*  367:*11*
370:*9*
**Leuthold**  58:*13, 18,*
*19*  59:6  161:*3*
163:*15*  246:*21*
298:*12, 16*  305:*4*
306:*19*  307:*3, 19*
309:*18*
**L-E-U-T-H-O-L-D**
59:*10*
**Leuthold's**  306:*8*
**level**  137:*3*  193:22
210:20  222:*18*
294:*4, 9*
**liability**  39:22
49:*14*  50:*4, 10*
52:9  77:*10*  133:*10,*
*16, 23*  134:2  137:7
142:*9*  208:*23*
232:8, 9  233:2
247:*12, 13*  249:2, 2
280:*21*  281:2
284:*9*  300:*21*
301:*17*  302:*14*
303:*17*  304:*10, 10,*
*11*  305:*13*  306:*3, 3*
310:*7, 16, 16, 23*
311:*15, 16, 23*
312:9, *9, 14*  327:2
330:*1*  332:*23*
337:*16, 16*  341:2, *3*
363:*4*  377:*13*
392:*17*  403:*15*
404:*5, 6*
**liable**  87:*13*
151:20  152:*3*
194:*8*
**license**  14:*9*
**licensed**  411:*13*
**life**  115:*1*  200:*21*
**light**  70:*6*  186:*7*
223:*3*
**liked**  325:*9*
**likelihood**  160:*16*
164:*10*  270:*21*
274:*3*  296:22

**limit** 37:7  45:7
86:4  118:7  125:3
130:12  136:1, 2
358:8  389:9
409:22
**limitation** 71:23
104:9  333:10
**limitations** 100:2, 6,
9, 18, 22  101:1
103:13, 19  104:6, 9,
18
**limited** 41:9  67:10
73:1  78:5  83:18
85:15  151:16
203:5  224:19
266:7  379:9
389:11  400:9
408:10
**limits** 49:23
145:17  273:16
332:17  333:2, 6
362:12, 14  365:5
401:19
**line** 23:1, 1  151:2
211:9, 20  217:7
245:2, 3  277:16
313:22  316:3
334:14
**link** 179:18
**list** 64:2  207:2
**Listau** 15:20
16:11, 23  20:15
21:2  33:14  36:20
37:17  66:7  92:8
95:14  96:22  98:15,
15  99:12, 18, 23
100:4, 20  103:7, 14,
20  104:7  112:12
113:4  114:10
117:18  119:12
138:21  142:18
206:11  207:5
231:7, 18  233:13
345:2  347:10, 21
348:1, 10  349:19
352:12  353:4
366:1  367:5, 17
368:5  404:15
**listed** 18:16  48:15,
18  64:11  212:15

281:9  305:16, 19
342:13
**lists** 301:5  343:19
379:21
**litigate** 205:15
**litigated** 206:1
207:21
**litigation** 14:13, 14
15:12, 14, 15  17:4
26:3, 12  46:9  50:9
52:17  57:10  66:6
71:11  98:8  121:20
122:1, 9  196:13
205:13, 14  251:21
322:3, 13
**litigations** 15:16
**little** 13:17  24:5
32:18  33:2  162:1
177:2  255:4
312:23
**live** 268:19
**LLC** 157:19  158:4
201:21  272:22
**locate** 156:11
191:4  293:1
**located** 141:20
271:1
**locating** 350:22
351:4, 10
**location** 19:2, 3
150:23  301:9
**locations** 319:20
**log** 155:1, 6
**logical** 282:17
355:19
**logically** 208:16
301:23
**logistical** 383:2
**long** 47:14  129:20
185:18, 20  229:20
331:17  384:7
**longer** 177:1  219:4
**long-time** 14:18
**look** 23:20  24:3
46:12  47:17  80:14
83:1  84:23  86:11
89:11, 21  90:3, 5,
20  91:4  94:23
112:10  147:8
150:4  155:17, 19

156:17  170:12
175:9  176:7, 22
177:4  180:1  183:9
186:21  187:20
189:10  191:10
193:3  209:13, 17
212:11  216:18
218:15, 17  220:10,
18  232:3, 6, 12
235:8  236:22
239:3  244:17, 18
245:21  246:19, 19
247:6  248:8
249:16  250:5
259:13  273:8
277:16  280:17
281:1, 19  283:5
284:13  295:2
296:19  303:16
304:5  306:6
307:15  320:4
321:2  339:10
343:12, 12, 18
344:12  349:12
350:4  356:7
360:10, 19, 22
361:5  362:23
364:14  368:1
376:21  390:10
392:12  393:10
396:23  405:9
**looked** 22:2  95:7
223:6  238:11, 18
244:12  302:6, 10,
12  336:14  343:22
364:1  385:3
392:21
**Looking** 37:9
141:14  149:3
201:13  207:18
211:17  217:4
219:5  220:1  221:6
237:15, 16  248:17
250:8  252:22
259:3  274:1
276:16  282:9
293:21  317:23
344:17  345:11
362:6  374:3  377:6
384:5  387:12

388:19  392:3, 11
393:5  394:12
396:22  401:11
405:1
**looks** 147:11
191:4  400:16
**loss** 53:16, 19
128:11
**lot** 39:23  75:17
106:5, 13  151:19
152:9  164:21
207:22  225:1
284:6  293:10
304:17  321:21, 23
389:17  403:10, 13
**lots** 46:16, 16
**loud** 80:20
**low** 45:5
**luck** 177:14  179:6

**< M >**
**MADISON** 1:2
11:14  12:14, 16
14:3, 5, 6, 6, 7, 15,
16, 19  15:2, 6, 20
16:3, 8, 16  18:6, 12,
19  19:21  20:1, 8, 9,
11, 13, 15  21:5, 9,
11, 12, 22  22:3, 10,
17, 18  23:2, 9, 16
24:7, 16, 19, 19, 23,
23  25:5, 8, 11, 22,
23  26:3  27:15, 19,
19  28:4, 5, 12, 14,
19, 21  29:1, 12
30:1, 12, 13, 15, 16,
20, 23  31:2, 13
32:3, 5, 16  33:4, 7,
13  34:10, 15, 23
35:6, 7, 9, 12  36:6,
20, 23  37:4, 5, 13,
17, 19, 22  38:1, 3, 6,
10, 11, 20, 21, 23
39:5, 11, 13, 14
40:1, 10  41:2, 6
43:4  44:1, 6  45:19
48:16  49:8, 10
52:15  53:15  54:9,
14, 16, 19  60:8, 13
61:1, 15, 18, 22

62:2, *17*  63:9, *15*
65:7, *10*  66:*11*
67:*10, 18, 23*  71:*3,
10, 17*  72:22  73:*10*
75:*10*  76:22  77:*9,
15, 17, 20*  78:*12, 18*
79:2, *15*  80:*1, 21*
81:9, *23*  82:*18*
83:*3, 4, 17*  84:*1, 10,
12*  85:6, *9, 14*
87:*11, 12, 18*  88:*5,
10, 17, 21*  90:*9*
91:*20*  92:*1, 5*
93:22  94:*1, 3, 12*
97:*8*  100:*3, 19*
101:*17*  102:*3, 4*
103:6, *14, 18*  104:*5,
20*  105:*3, 9, 13, 17,
22, 22*  106:*1, 3, 3, 5,
19*  108:*7, 16, 18, 21*
109:*1, 4, 11, 18*
110:*10, 19*  111:*5, 7*
112:*12*  113:*7, 16,
21*  114:*15, 19, 20*
115:2, *17*  116:*8*
117:*21*  118:*4, 9, 13,
14*  119:*15, 19*
120:22  123:*17, 19*
126:*1, 12*  127:6, *14,
18, 23*  128:*3, 11, 17*
129:*1, 3*  130:*3, 8*
133:*1, 12, 15, 22*
134:23  135:*5, 11*
136:*1, 8, 10, 13, 23*
137:*5*  138:*17*
139:*5, 9, 14*  140:*11*
141:*9, 10, 11*  142:*6,
8, 14, 16*  143:*1, 6*
144:*5*  145:*23*
148:*14, 14*  149:*20,
21*  150:*12*  151:*20*
152:2, *19*  153:2, *14*
154:2  155:*9*
158:*15*  159:*1, 19,
20*  160:*19*  161:*11*
167:2  170:*7*  171:*4,
17*  172:*5*  174:*23*
175:*14, 17, 19*
179:*9, 14, 19*
180:*21*  181:*4, 5*

183:*14*  184:*15*
185:*7, 18, 20, 22*
187:*21*  188:*5*
190:*1, 4*  191:*14, 16*
192:*1, 13, 15*  193:*7,
7, 18*  195:*11*  208:*8*
212:*8*  213:*10, 17*
216:*8*  217:*20*
222:*3, 3, 4, 7*  223:*1,
11*  224:2, *4, 11, 11,
14, 17*  226:*9, 19, 20*
227:*11, 22*  228:*8*
229:*1, 5*  231:*19*
232:*4*  233:*10*
234:*15*  235:*17*
236:*4*  239:*16, 17*
240:*5, 6, 9, 9*  241:*3,
4, 7, 7, 21*  242:*13*
243:*9, 11*  246:*7*
247:*3, 10, 11*
248:*12, 13, 17, 18,
22, 23*  249:*9, 10*
251:*7, 21*  253:*14*
254:*12, 17*  255:*11*
256:*21*  257:*14*
262:*1*  265:*8*
268:*10, 22*  270:*2*
271:*5, 5, 6*  272:*6,
15, 16*  274:*15*
275:*20*  276:*17*
277:*9*  278:*1, 19*
281:*13, 13*  282:*11,
12*  283:*23*  288:*5,
13, 17*  289:*18, 22*
296:*5, 7*  298:*13*
299:*10*  300:*11, 22*
301:*16*  302:*9, 12,
16, 19*  303:*2, 14, 15,
18*  304:*6, 7, 8*
305:*20, 21, 23*
306:*1, 4, 9, 10, 18*
307:*9*  309:*17*
310:*13, 14*  311:*12*
312:*5, 5*  313:*10, 10,
13*  314:*18, 23*
316:*10, 14, 20*
318:*11*  319:*2*
320:*7, 9*  321:*9, 12*
326:*9*  328:*8*  329:*2,
15*  330:*16*  332:*10*

333:*4, 14*  335:*2, 10,
15, 16*  336:*21*
337:*8, 13, 14*
340:*16, 17, 23*
341:*21*  342:*8*
345:*13, 20, 22*
346:*4*  347:*19*
350:*9*  352:*23*
353:*6*  354:*10*
355:*7*  361:*23*
362:*18*  363:*9, 12*
364:*5, 17*  365:*1, 6*
366:*15, 17, 20*
367:*3, 8, 18*  368:*6,
14*  371:*4, 9*  372:*20*
373:*6*  375:*3, 17*
378:*2*  379:*6*  380:*2,
3, 7, 7, 19*  382:*11,
16*  383:*16*  384:*2,
11, 14*  385:*10*
386:*3, 11*  391:*12*
392:*14*  393:*13, 22*
394:*3, 15*  395:*1, 5,
17*  396:*14*  399:*8,
17*  402:*1, 5, 15*
404:*10, 23*  405:*2, 8*
407:*3, 15, 20, 21*
**main**  195:*14*
**maintain**  127:*20*
242:*4*  341:*2*  350:*7*
352:*1*  354:*19*
355:*3, 8*
**maintained**  350:*11,
12*
**maintaining**  362:*8*
**maintains**  49:*23*
**majority**  198:*18*
**making**  75:*21*
121:*22*  122:*3, 7*
178:*21*  196:*4*
239:*11*  243:*18*
276:*9*  393:*6*
**malpractice**  20:*17*
21:*9, 21, 23*  23:*15,
22, 22*  34:*8*  77:*11,
21*  78:*9*  80:*4*
81:*14, 15, 18*  89:*16*
90:*4, 8*  124:*2*
134:*6, 19*  135:*23*
146:*13, 17*  148:*8*

151:*21, 22*  152:*4,
15*  153:*5, 10*
156:*19*  183:*18, 23*
184:*9, 13*  207:*13,
20*  208:*2, 23*  209:*2,
6, 11*  216:*20, 22*
217:*15*  227:*1*
232:*16*  233:*3*
239:*7*  243:*23*
244:*13*  285:*3*
327:*1*  341:*3*  390:*2,
16, 23*  391:*9*
395:*20, 23*  396:*5*
**management**
203:*12, 12*  292:*13*
**managing**  45:*6*
**mandated**  316:*19*
365:*21*
**manner**  30:*18*
104:*21*  387:*19*
**Manual**  9:*18*
201:*5, 9*  202:*5, 9*
404:*21*  408:*12*
409:*16*
**March**  9:*16*  243:*2*
257:*12*  258:*19, 20*
259:*4*  260:*6, 19*
263:*7*  396:*12*
**mark**  67:*1*  91:*3*
378:*14*  407:*10*
**marked**  18:*9*  67:*3*
80:*17*  89:22  91:*1*
146:*8*  154:*8*  157:*9*
160:*5*  161:*14, 17*
166:*13, 15*  169:*6, 9*
174:*20*  175:*12*
186:*16*  190:*23*
191:*11*  272:*9, 12*
276:*10, 12*  278:*5, 8*
279:*7, 10, 21, 23*
285:*14, 16*  286:*7, 9*
294:*12, 15*  295:*8,
18, 21*  296:*15*
298:*5, 8, 18*  299:*3,
13*  300:*6, 7, 17*
301:*13*  302:*21*
304:*21*  306:*13*
307:*13*  308:*7, 9, 14*
310:*3, 19*  311:*19*
312:*11*  317:*1*

338:20 341:14, 16 342:4, 5 360:12 372:11 373:12, 14 374:13, 15 375:13 376:16, 17 384:18, 20, 21 385:12 386:18 396:9, 11 397:7 400:19 404:17, 19

**Markel** 122:15 140:4, 12 161:16 162:13 163:5, 9 181:1 252:19 383:12 396:3 397:21

**marketing** 241:14

**marking** 146:10 160:7 174:22 175:13, 16, 18 307:15 375:15 386:20

**Marshall** 206:1 317:8

**materialize** 255:8

**materials** 238:6, 15

**Matt** 62:10, 13 110:4 396:12

**matter** 11:14 15:21, 21, 22, 22 24:10 33:22 34:11, 17 35:17 36:5, 11 74:11 80:16 100:20 101:18 103:18, 21 119:12, 15, 20, 22 158:14 170:8 184:20 185:2 226:4 227:13 287:12 334:19 379:7 393:19

**matters** 18:15 19:20 84:8 92:1 171:14 274:14 322:23 347:4

**Matthew** 396:13

**maximum** 41:3 138:18

**Maynard** 182:6, 11 253:5 256:12 396:13

**McConnel** 169:15 397:17

**McConnell** 122:13 131:4 140:17 141:1 168:19 170:4 173:11 176:9 177:20 180:8, 17 181:13, 16 184:19 250:9 253:23 255:20 256:4 397:15 398:10 399:3

**McConnell's** 176:16

**McGHEE** 10:17

**mean** 46:5 50:14 52:20 62:21, 21 71:12 72:10 82:5 104:8, 10 111:19 127:8 135:19, 20 139:21 143:15 148:20 154:17 183:9 196:2 208:12 217:11 222:6 225:6 248:21 251:4 256:6 288:20 302:10 315:5 321:20 324:16 328:11 331:20 338:7 340:9 342:19 345:19 354:15 361:9, 13 371:8 389:7 393:8 399:2

**meaning** 181:4 206:20

**means** 166:8 196:4 214:13 224:9 302:20 331:19 335:22 338:1 388:11 411:7

**meant** 70:23 121:14 137:19 259:12 395:8 403:12

**mechanics** 40:13 402:10

**mediation** 101:4, 14 102:8 104:3

112:20, 21 131:8 141:7 368:13

**mediations** 112:17 140:21 141:2 353:13 366:17 367:4, 14

**medical** 20:19 21:4, 13, 14 37:2, 6, 8 74:13, 23 75:12, 14 76:1, 7, 20 77:13, 16 80:22 81:1, 3, 6, 7, 10, 12, 15 82:3, 3, 8, 9 87:14, 20, 21, 23 88:3, 4 90:3 106:9 124:23 134:7, 8, 10, 11, 14 135:17 136:4, 5, 11, 15, 17, 17, 19 137:4, 6 150:7 151:10, 22 152:4, 14 153:4, 10, 16 183:17, 23 184:9, 13 194:15, 16 195:9, 13, 17 196:5 197:4, 13 203:14 207:12 216:20, 22 217:15 222:8 223:12, 14 224:5 227:1 228:2 233:3 283:2 291:11, 15, 17, 23 292:8, 15 293:16, 22 313:4 315:19, 20, 22 316:16, 23 318:18 319:4 325:15, 19 327:4, 5 341:3 348:1, 3 350:6, 7, 10, 11, 14, 16, 22 351:5, 20, 22 352:4 354:11, 19 355:3, 8, 14, 17 374:10 377:12 387:18 388:16, 18 391:1 394:7 405:16, 17

**medically** 347:14

**medicine** 197:1

**meet** 18:5 210:11 316:21

**meeting** 245:15 270:3, 5 288:4 290:16 291:5 294:2, 8 299:11 372:2

**meetings** 199:11, 17 201:20 269:22 270:10, 20 271:18 276:8 288:9 316:10

**members** 268:21 270:6 275:5, 20 276:7

**memory** 31:11 121:8 209:15

**mentioned** 15:19 16:21 45:19 58:22 140:15 179:2 205:13 216:9 219:7 224:21 236:11 244:20 286:22 376:2 377:13

**mere** 47:11 355:12

**merely** 114:19

**merged** 59:17

**merger** 59:22

**merits** 375:7

**mess** 288:19

**met** 199:13 262:17 270:12

**metal** 202:13

**methodology** 200:3

**middle** 157:13

**Mike** 339:3, 22 363:1

**military** 269:7

**Miller** 300:15

**million** 53:3, 6 139:1, 10 332:18, 18

**mind** 46:6 208:3 331:22 392:23 399:21 400:1

**mine** 13:15 155:15

**minimal** 343:4

**minute** 63:3 67:12 80:8 118:8 134:22 175:22 180:1 184:12 186:21

195:*12*  216:*23*
232:*3*
**minutes**  347:*21*
400:*10*
**misconduct**  194:*4*
**misinformed**  194:*21*
**misrepresentation**
357:*17*
**misrepresentations**
370:*15, 21*
**misrepresented**
368:*18*  369:*4*
**missing**  70:*7*
**misspelled**  59:*11*
**misstate**  59:*17*
**mix**  390:*14*
**modifications**
319:*16*
**modified**  250:*20*
**modifying**  173:*21*
250:*11*
**Monday**  167:*20*
168:*6, 14*  169:*1*
174:*12*
**monetary**  125:*5*
**money**  46:*17*  48:*7*
106:*6, 6, 13*  125:*16*
136:*2, 3*  165:*1*
222:*14*  223:*7*
314:*22*  352:*13, 16,
16, 21*  353:*10, 17*
375:*8, 12*  403:*16,
17*
**monitor**  165:*3*
**monitoring**  348:*5*
**month**  385:*17*
**months**  65:*19*
261:*10*
**Moore**  9:*8, 10*
30:*11*  31:*19*  34:*16*
58:*1, 3*  64:*14, 19*
145:*15*  163:*19*
164:*19*  375:*16, 17*
376:*1*  378:*9, 19*
380:*20*
**mopping**  314:*7, 8*
**morning**  55:*4*
167:*20*  168:*6, 14*
173:*12*  402:*22*

**MORRIS**  10:*5*
11:*2, 18*  267:*2*
**Morrison**  74:*11, 21*
82:*19*  83:*16*  84:*9*
85:*1*  113:*22*  211:*4,
6, 22, 23*  213:*3, 12,
16, 22*  214:*4, 11, 22*
215:*4, 20, 23*  216:*5*
218:*3*  221:*3, 3*
309:*18*
**Morrison's**  74:*20*
215:*9, 17*
**motion**  206:*16*
378:*12, 13*
**motions**  22:*14*
62:*23*  63:*1*  101:*8*
**mouthful**  112:*23*
**move**  177:*13*
178:*11*  187:*5*
239:*11*  402:*13*
**moved**  118:*16*
164:*17*
**moving**  112:*19*
113:*20*  287:*13*
346:*13*  358:*19*
**multiple**  29:*5*  45:*3,
11*  118:*1*  202:*18*
318:*8*  319:*19*
329:*23*  356:*19*
371:*6*  380:*9, 17*
**mutual**  153:*16*
**myriad**  48:*2*  49:*6*
79:*7*

**< N >**
**name**  11:*23*  12:*20*
44:*17, 18*  58:*11*
59:*5, 22*  131:*7, 9,
10*  140:*20, 22*
184:*7*  206:*3*
211:*16, 19*  212:*23*
213:*5, 7*  214:*14, 15*
216:*9*  220:*5*  221:*1,
2*  273:*16*  323:*19*
330:*23*  336:*21, 22*
351:*1*  358:*6*
372:*23*  380:*22*
411:*14*
**named**  33:*17*
35:*14*  38:*4*  44:*7,

22*  45:*20*  46:*7*
49:*8*  119:*9*  133:*4*
211:*2, 4, 11*  212:*5,
8*  213:*4*  217:*14*
220:*7, 10, 14, 15*
240:*10, 21*  241:*18,
23*  242:*7, 8, 10, 17*
243:*3, 12*  246:*17*
248:*2, 9*  249:*12*
260:*3, 9*  273:*11, 20,
21*  275:*12*  281:*6*
285:*11*  289:*19*
290:*2, 12*  300:*15*
328:*18*  335:*17, 19,
22, 23, 23*  336:*4, 11,
12*  337:*5*  338:*4*
354:*12*  356:*13*
357:*1, 5, 14*  358:*7,
7, 16*  359:*9*
**names**  206:*7*
211:*23*  212:*14*
248:*4*  282:*7, 10*
302:*16*  306:*9*
328:*19*
**naming**  28:*4*
245:*4*  358:*5*
**narrower**  53:*4*
**narrowly**  395:*19*
**National**  52:*8*
198:*7, 8*  204:*5*
225:*2*
**nationally**  52:*10*
**nationwide**  262:*10*
**Naturally**  250:*4*
**nature**  20:*4*  42:*22*
200:*4*  270:*16*
290:*13*  293:*21*
314:*7*  350:*2*
**NCCHC**  203:*13*
**NE**  10:*6*
**Neaves-Davis**  311:*3,
13*  312:*17*
**necessarily**  75:*16*
84:*8*  110:*21*
148:*18*  169:*5*
255:*7*  275:*22*
297:*19*  353:*7*
409:*8*
**necessary**  81:*6*
88:*3*  104:*17*

127:*12*  129:*15*
137:*3*  149:*14*
173:*6*  178:*10*
245:*20*  289:*16*
315:*11*  320:*8*
351:*16*  368:*10*
387:*18*
**need**  29:*16*  74:*14,
23*  75:*12, 14*  114:*8*
146:*4*  147:*23*
148:*21*  150:*11*
172:*21*  179:*21*
188:*22*  189:*8*
217:*7*  240:*10*
241:*22*  245:*9*
266:*5*  273:*8*  282:*8,
10*  378:*14*  405:*16*
406:*22*
**needed**  70:*17*
146:*5*  149:*19*
159:*11*  239:*12, 13*
261:*5*  270:*16*
284:*10*  399:*17*
407:*23*
**needs**  37:*2*  76:*7,
20*  77:*13, 16*  81:*1,
7, 12*  82:*3*  87:*21*
88:*4*  129:*20*
136:*18*  148:*13*
223:*14*  239:*16*
240:*5*  241:*17*
266:*3*  315:*8*
**negligence**  34:*5*
79:*3*  124:*2*  134:*7*
135:*23*  142:*10*
193:*9, 20, 23*
209:*19, 23*  216:*20*
377:*11*  388:*22*
389:*2, 5*  390:*1, 8,
23*  391:*5, 9, 13, 21*
**negligent**  90:*3, 8*
189:*13, 19*  190:*2,
11*  191:*17*  216:*22*
259:*7, 16, 23*
390:*16*
**negotiate**  192:*22*
**negotiating**  99:*15,
16*  149:*7*
**negotiation**  275:*23*

negotiations 25:17
263:16, 20  275:17
353:14, 15
Neil 58:10  161:3
163:14  246:21
298:11  305:4
306:19  307:3, 19
309:18
neither 21:14
235:21  260:2
411:9
never 29:12  58:11
66:19  92:22  94:9
106:2  107:8, 8, 10
109:11  111:5, 8, 16
178:5  181:8  182:1
183:22, 23  189:11
233:22  255:9
259:14  290:8
293:1  361:22
399:2  402:11
new 51:4  242:3
258:1  284:17
303:5, 9  355:17
Nick 354:23
Nikki 117:18
Nilsoon 237:2
Nilsson 146:12
147:23  238:12
239:15  240:2, 8
245:8
Nilsson's 147:14
156:10  243:21
244:21
nine 260:2
Nods 54:6
non 368:3
noncontributory
142:20  143:21
144:1, 7  165:12
166:1
non-renew 128:8
Norm 58:10
339:17  369:12
373:16
normal 95:16
104:14
normally 49:19
97:6  147:11  297:2
356:3

Norman 269:23
278:14  279:14
280:10  285:22
294:18  299:8
327:18  372:18
North 10:18
268:20
NORTHEASTERN
1:2
NORTHERN 1:1
268:19  317:7
Nos 279:11
Notary 2:5  11:4
267:4
note 156:4  166:17
219:19  276:15
278:9  279:10
303:12  387:4
noted 175:2
notes 121:17, 21, 22
122:3, 7  169:3
270:19  271:1, 7, 13
277:2  283:12
405:23
notice 3:6  4:12
15:1  18:12, 19
19:7  20:22  30:19
54:18  75:21  90:12
94:23  95:4, 6, 10,
14  96:6, 11  112:9
117:19  118:15
147:18  170:18, 20
322:21  358:10
noticed 109:18
150:14  151:9
notification 234:2
notified 320:10
notify 97:19
November 8:6
285:23  303:4
317:11, 15, 17
318:4, 5  385:17
Number 20:23
24:11  36:20  37:9
46:11  53:13, 17
69:15  70:21
112:10, 11  125:4
139:10  155:2
157:11  163:23
164:13  165:4, 11,

17  169:13  192:3
194:10  226:7
231:20  247:7
263:8  270:15
280:4  285:18
288:8, 9  295:12
333:22, 23  344:15
353:14, 14  365:4
383:2  392:14, 22
393:9  403:14
406:20  409:2
411:14
numbered 15:11
155:9  167:2
173:10  174:23
175:14, 19  178:13
197:19  250:6
258:8  278:10
280:2  296:18
300:9  303:18
304:23  306:16
338:23  344:21
372:15
nurse 228:7
nurses 37:3, 15
208:7  217:18
221:10  406:13, 18
nutshell 198:12

< O >
OB-GYN 197:15
object 32:19  41:5
68:8  71:7  72:20
79:5  83:8  86:19
110:13  135:14
141:12  145:9
152:6  172:8  182:8,
15  192:18  207:15
224:18  241:1
247:21  256:23
316:17  324:11
336:17  355:4
363:10  384:9
398:15  401:16
408:17
objected 123:11, 14
233:23  381:14
objection 71:20
73:3  123:8  247:22

248:1  324:14, 18
367:10
objections 2:14, 19,
22  19:9
obligated 228:13
315:14
obligation 125:6
316:19  347:20
370:11
obligations 19:16
79:12  120:7
177:22  181:2
188:1  198:15, 17
200:6  356:4
observes 405:15
obstruction 348:14
obtain 27:18  28:3
51:8  107:17  109:2,
20  110:11  259:9
327:14  329:23
357:12  387:18
403:5  404:7
obtained 29:7
329:22  330:2
371:18, 19
obtaining 58:22
327:11  351:10
obvious 195:14
obviously 263:10
occasion 351:4
occasions 363:23
occur 209:3
occurred 97:15
114:8  135:23
200:17, 21  209:3
261:16  324:23
333:21  386:4
occurrence 214:19
332:18
October 5:4  6:16,
18  9:2  109:16
232:19  246:1
286:12  360:16
364:12  366:22
378:23  383:14
384:4  385:3, 9, 14
odd 174:11
offer 92:2, 23
93:19  181:5, 8, 10
395:5, 9, 13, 16, 21

397:*12, 18*  401:*21*
402:*5*
**offered**  2:*18*  73:*12*
92:*10, 12*  199:*19,*
*20*  385:*5, 13*
394:*21, 22*
**offering**  20:*3*
71:*18*  92:*15*
**office**  53:*22*  58:*21*
95:*16*  98:*5*  281:*14*
282:*12, 20*  288:*4*
290:*16*  295:*5*
297:*1*  380:*17*
**officer**  59:*8*
153:*23*  210:*19*
211:*9, 23*  214:*4, 6*
227:*23*  228:*5, 14*
229:*1*  405:*11, 15,*
*20*
**officers**  74:*12*  80:*3*
82:*22*  86:*2, 6*  87:*7,*
*7*  113:*23*  119:*9*
199:*8, 8*  203:*9, 16,*
*21*  204:*1, 2, 9, 11*
211:*1, 11, 17, 20*
214:*20*  215:*13*
219:*17, 18*  265:*9*
270:*11*  282:*23*
314:*11*  322:*14*
346:*10*  347:*19*
348:*4*  349:*6, 8, 14,*
*17, 21*  354:*6, 22*
407:*23*
**offices**  11:*1*  218:*6*
267:*1*
**official**  49:*11, 12*
50:*12, 13*
**officials**  49:*5, 7*
50:*12*  58:*21*  294:*6*
295:*4*  300:*14*
392:*16*
**oh**  130:*14*  131:*6*
199:*9*  239:*1*
**ointments**  197:*5*
**Okay**  17:*12*  20:*4*
51:*10*  54:*5*  55:*23*
59:*19*  90:*7, 14*
116:*23*  117:*14*
136:*22*  176:*6*
193:*5*  195:*5*  217:*6*

253:*8*  282:*2*  283:*5*
309:*14*  313:*2*
318:*14*  343:*21*
344:*17*  361:*19*
374:*2*  378:*22*
379:*3*  389:*19*
393:*4*  397:*16*
399:*23*  401:*5, 15*
**old**  55:*19*
**older**  269:*3*
**omission**  193:*23*
194:*3*
**omissions**  27:*21*
37:*14*  48:*11*
145:*23*  189:*13, 20*
190:*2, 12, 13*
191:*18*  194:*11*
259:*7, 16, 23*
345:*15*  346:*6, 20*
354:*8*
**once**  99:*11*  175:*8*
180:*17*  256:*14*
258:*5*  285:*18*
324:*23*
**OneBeacon**  37:*20*
39:*4, 6*  40:*9, 11*
42:*3, 7*  43:*3, 9*
44:*2*  45:*14*  46:*19*
47:*15, 20*  48:*5, 16,*
*21*  49:*13*  50:*21, 23*
51:*11*  52:*22*  53:*17*
54:*7, 14*  68:*5*
70:*19*  92:*11, 13, 16,*
*19*  93:*3, 21*  94:*1, 4,*
*8, 10, 13, 20*  95:*3,*
*10, 14*  96:*10*  97:*4*
99:*7, 19, 22*  100:*2,*
*7, 18*  101:*10*  103:*6,*
*10, 12, 20*  104:*1, 7,*
*10, 11, 20*  105:*2, 8,*
*16, 18*  112:*15, 15,*
*16*  113:*19*  114:*2,*
*15, 18*  115:*2, 13, 17,*
*23*  116:*5, 7, 13, 17,*
*18, 18*  117:*3, 20*
118:*2, 8, 12, 22*
119:*2, 6, 18, 20*
120:*1, 6, 23*  121:*12,*
*14*  122:*4, 10, 14*
123:*7, 11, 14*

124:*14*  125:*13, 16,*
*21, 23*  126:*8, 12, 19*
127:*3, 4, 7, 15, 22*
128:*7, 17*  129:*1, 5,*
*10, 14, 16, 21, 23*
130:*3, 5, 6, 21*
132:*2*  134:*21, 22,*
*23*  137:*12, 23*
138:*7, 14*  139:*1, 5,*
*8, 17*  140:*16*
141:*14*  142:*4*
145:*18*  167:*9, 17,*
*20*  168:*3, 6, 9*
169:*21*  170:*4, 23*
177:*7*  183:*13*
184:*14*  185:*15, 22*
186:*3, 5, 8*  236:*12*
250:*10*  253:*15*
254:*13*  256:*19*
290:*2*  352:*12, 16,*
*23*  353:*5, 8, 10, 18,*
*19, 22*  354:*2*
366:*13*  392:*13, 21*
393:*12, 18, 20*
397:*3, 20*  398:*14,*
*19*  399:*5, 15, 17*
**OneBeacon's**  47:*6*
50:*1*  93:*5, 8*  113:*3*
118:*2, 9, 10*  123:*1*
181:*2*  353:*3*  354:*4*
**ones**  16:*9*  187:*7*
207:*2*  275:*6*
**one's**  228:*6*
**ongoing**  129:*13*
200:*5*  263:*16, 20*
293:*23*
**open**  96:*2*
**operate**  213:*23*
262:*10*  312:*19*
313:*18*  378:*1*
**operated**  30:*17*
196:*10*  202:*17*
319:*19*
**operates**  312:*22*
**operating**  237:*22*
**operation**  30:*16*
78:*19*  136:*14*
137:*1*  201:*2, 19*
265:*16*  301:*9*
313:*5, 11*  315:*15*

318:*10*  319:*14*
320:*3, 19*  325:*13*
378:*4*  409:*1*
**operations**  133:*13*
203:*14*  247:*14*
276:*3*  304:*6*  319:*9*
**opinion**  20:*3*
104:*21*  189:*7*
192:*13*  196:*6*
206:*2*  332:*4*  338:*9*
**opinions**  55:*14*
205:*20*
**opportunity**  161:*7*
387:*17*
**opposed**  43:*3*
130:*13*  254:*13, 17*
290:*12*  358:*15*
408:*5*
**Order**  7:*8*  36:*12*
63:*12*  73:*23*  88:*15,*
*16*  89:*4, 5, 10, 19*
197:*21*  206:*15, 20,*
*21*  222:*10*  223:*4*
249:*20*  280:*6*
317:*19, 20*  318:*4, 5,*
*7, 17, 21*  319:*8, 16,*
*18*  320:*9, 11, 15, 22,*
*23*  321:*8*  408:*7*
**orderly**  201:*22*
351:*14*  352:*2*
**orders**  18:*1*  23:*7*
36:*9*  62:*16*  88:*12*
198:*1*  318:*10, 14*
319:*14, 17, 21*
**organization**  198:*8*
293:*22*
**organized**  292:*17*
351:*5*
**organizing**  355:*14*
**original**  70:*18*
123:*20*  347:*3*
**originally**  309:*2*
**ought**  344:*5*
**outbreak**  199:*21*
**outcome**  139:*6*
151:*6*  359:*6*
**outline**  181:*17*
198:*14, 16*
**outlining**  182:*2*
**outlook**  290:*20*

**out-of-pocket** 41:*3,
7* 349:*18, 21*
**outside** 62:*21* 76:2
136:*4* 185:*10*
197:*13* 231:*10, 13*
274:*11* 290:*6*
321:*17* 323:*20*
324:*8* 333:*14*
**overarching** 400:*6*
**overlap** 97:*10*
**overlooked** 175:*4*
186:*20*
**oversight** 197:*17*
**owe** 93:*21* 212:*18*
**owed** 93:*13*
120:*23* 121:*1*
210:*10*
**owner** 185:*7*

**< P >**
**p.m** 174:*12* 218:*12*
**P-2013-04** 342:*1, 9*
**package** 341:*13*
**PAGE** 4:*2, 10*
17:*2* 67:*17* 80:*19*
83:*1* 86:*11, 14*
90:*4, 6* 149:*18*
163:22 165:*10*
169:*13, 14* 173:*9,
10* 178:*13* 184:*23*
192:*6, 8* 197:*8, 9,
18* 198:*3, 4* 201:*16*
203:*1* 232:2 247:*6,
8* 248:*8, 16* 249:*17*
250:*6* 255:*3* 258:*7*
273:*9* 277:*7* 280:*3,
9, 19, 19* 281:*12*
282:*1* 285:*19*
296:*19* 303:*16, 17*
306:*6* 308:*10, 20*
309:*6, 21* 317:*14,
23* 320:*5* 321:*2, 3*
331:*15, 17* 339:*11*
347:*7* 349:*12*
350:*5* 360:*19, 23*
361:*11* 364:*15*
379:*2, 4* 387:*3, 12*
390:*18* 392:*11*
394:*12* 396:*20, 22*
401:*12, 14* 405:*1, 2*

**pages** 18:*16* 77:6
86:*12* 164:*3*
198:*13, 16* 294:*17*
308:*10, 16* 309:*9,
14*
**paid** 21:*19* 38:*7,
21, 23* 39:*3, 4, 13,
16, 17, 18* 40:*9, 18*
41:*23* 42:*7* 43:*1*
44:*12* 46:*19, 19*
52:*9* 54:*7* 78:*4*
104:*16* 106:*5, 6*
116:*1, 18* 117:*5*
123:*17* 124:*15, 16*
125:*9, 17* 128:*11*
138:*7, 14, 15, 16, 20*
163:*7* 183:*15*
185:*8* 223:*7*
226:*19* 315:*23, 23*
352:*13, 17, 21*
353:*1, 8, 10, 16, 18,
18* 369:*15* 375:*10*
379:*12*
**Pamela** 355:*1*
**paper** 78:*17, 17*
148:*19* 350:*12*
**paperwork** 236:*6*
**paragraph** 16:*10*
54:*20* 80:*20* 83:*2,
13* 84:22 86:*13, 14,
20* 87:*4, 10, 16, 18*
90:*19* 91:*6* 157:*14*
158:*13* 180:*2, 7*
187:*20* 189:*11*
191:*23* 192:*8*
193:*4, 21* 194:*6, 10*
197:*7, 18* 198:*3, 4,
5* 201:*15* 208:*14*
210:*2* 212:*14*
218:*17, 18* 219:*4, 6,
8, 11* 220:*3, 7, 10,
11, 19* 221:*12, 15*
222:*7* 223:*9* 224:*1*
259:*3, 14* 260:*1*
273:*9* 280:*20*
282:*1* 284:*14*
318:*16* 321:*5*
343:*18, 23* 344:*17,
20, 21* 345:*7, 11*
346:*2, 14, 17, 18*

347:*6, 8* 348:*13*
349:*12* 350:*5*
356:*7, 10* 358:*19*
361:*5* 362:*4* 363:2
377:*3, 16* 378:*1*
387:*13, 14* 388:*20,
20* 390:*17* 392:*13*
394:*13* 396:*19, 20,
22*
**paragraphs** 220:*20*
221:*7* 224:*7*
377:*18, 21*
**parameters** 185:*10*
245:*17*
**paraphrase** 345:*18*
**paraphrasing** 36:*21*
**parcel** 359:*10*
**pardon** 205:*10*
**parents** 269:*3*
**parse** 83:*11*
**part** 19:*7* 34:*23*
48:*13* 49:*15* 50:*1*
52:*8* 76:*21* 77:*14*
78:*8* 81:*8* 102:*18*
104:*3* 106:*1, 6*
110:*3* 148:*2, 22*
149:*23* 150:*8*
159:*3* 165:*16*
172:22 187:*14, 17*
196:*12* 200:*5*
202:*9, 21* 222:*15*
239:*6* 245:*11*
251:*23* 252:*1*
260:*1, 17* 266:*12*
271:*21* 277:*20*
292:*17* 315:*9*
320:*16, 19* 343:*10*
351:*21* 359:*10, 11,
14* 367:*20* 387:*16*
405:*12* 406:*16*
**participate** 38:*5*
41:*17* 45:*21* 46:*8*
201:*20*
**participated** 353:*13*
**particular** 54:*8*
81:*18* 98:*12*
117:*23* 165:*16*
168:*12* 201:*4*
207:*3* 234:*3* 274:*8*
275:*1, 10* 277:*6*

301:*10* 318:*5*
324:*1* 408:*5*
409:*11*
**particularly** 214:*17*
**particulars** 222:*9*
**parties** 2:*8, 13* 3:*1*
21:*16* 49:*1* 153:*17*
170:7 206:7
212:*13, 15* 217:*14*
220:*6* 241:*10*
243:*15* 275:*9*
352:*18* 353:*14*
380:*10, 11* 381:*21*
411:*11*
**partner** 396:*4*
399:*20* 400:*4*
401:2
**Partners** 272:*17, 18*
273:*14* 289:*1*
291:*20*
**partner's** 380:22
**parts** 46:*3* 288:*11,
12*
**party** 216:*13, 16*
220:7
**pass** 167:*10*
**patent** 14:*14, 15*
205:*13*
**pathogens** 314:*6*
**patient** 20:*18*
351:*13*
**pause** 214:*14*
**pay** 37:*20* 40:*1, 10*
41:*16, 21* 66:*17*
70:23 117:*6*
125:*13, 15, 18*
126:*8, 9, 13, 14*
127:2 129:*10*
135:2 174:*5*
176:*10* 180:*21*
181:*5* 184:*17*
185:*16* 353:*15, 21*
355:*21* 379:*14*
403:*17*
**paying** 41:*11*
73:*16* 106:*13*
113:*15* 114:*15*
123:*8, 11, 15* 130:*1*
174:*4* 356:*1*

payment 42:*1*
43:*4* 186:*10* 226:*5,*
*12* 315:*13, 19*
355:*22* 356:*1*
375:*8, 12*
payments 39:*12*
353:*3, 5*
pays 44:*14*
PBA 349:*23* 350:*1*
PC 67:*19*
peer 203:*7*
pendency 131:*15*
pending 36:*11*
65:*15* 133:*21*
168:*12* 170:*9*
171:*2, 8, 14* 179:*13*
196:*14, 14* 321:*12,*
*22* 322:*3, 6, 11*
383:*4* 384:*7*
people 42:*2*
156:*14* 178:*19*
182:*23* 194:*22*
213:*13* 275:*4*
371:*10*
Peoria 248:*11*
perceived 291:*14*
percent 123:*8, 12,*
*15* 124:*15, 16*
127:*2* 174:*4, 6*
248:*21* 254:*1, 2, 6*
percentage-wise
51:*19*
perfectly 173:*3*
perform 387:*22*
405:*18*
performance 194:*2,*
*13* 345:*17* 346:*22*
performed 207:*3*
period 97:*15*
143:*3* 144:*11*
243:*15* 288:*11*
298:*22, 23* 299:*18*
300:*12* 307:*11*
335:*6* 385:*22*
409:*6*
periods 25:*19*
97:*10* 144:*12, 14*
302:*1*

Permutt 14:*1, 2*
66:*13* 67:*19* 275:*5*
324:*10, 23* 401:*23*
person 59:*5* 81:*14*
98:*20, 21* 99:*1, 7,*
*10* 107:*22* 114:*3*
131:*7* 140:*15, 16,*
*18* 141:*5* 156:*9*
213:*18* 219:*7*
228:*22* 231:*6, 8, 13*
234:*14* 235:*16*
351:*2, 2* 352:*6*
354:*10* 405:*10, 16*
personal 20:*3, 17*
62:*3* 269:*22*
349:*11, 20* 407:*6*
personally 229:*13*
230:*12* 253:*8*
270:*19* 274:*10*
275:*16* 350:*13, 16*
352:*3*
personnel 75:*11*
82:*18* 83:*7, 20*
84:*2, 6, 10, 20*
85:*13* 86:*8* 134:*19*
199:*3* 204:*3*
407:*16* 408:*3*
persons 204:*21*
perspective 31:*12*
192:*15* 196:*17*
200:*7* 239:*9*
263:*14* 353:*20*
pertaining 2:*10*
pertinent 250:*22*
Peter 231:*10*
323:*19*
pharmaceutical
197:*14*
phone 121:*18*
122:*3* 139:*20*
140:*6* 141:*6* 169:*4*
255:*18*
phones 142:*3*
phrase 210:*17*
242:*6* 275:*11*
physical 319:*19*
physically 150:*3*
229:*2*
physician 351:*23*

physicians 37:*2, 15*
351:*18*
picked 261:*15*
picture 175:*10*
piece 68:*23* 70:*7*
136:*5* 157:*1*
244:*19, 20*
pieces 84:*15*
piled 291:*18*
place 83:*17* 93:*9,*
*10* 100:*18, 22*
107:*17* 129:*18*
130:*9* 134:*9* 136:*6*
137:*11* 149:*7*
150:*20* 189:*8*
232:*18, 20* 236:*7*
239:*7* 242:*4*
255:*15* 258:*3*
263:*23* 282:*22*
287:*17* 290:*4*
292:*14* 319:*17*
334:*7, 10, 20* 341:*7*
360:*2* 363:*14, 15,*
*17* 365:*16* 368:*22*
369:*7* 406:*10, 21*
placed 95:*10*
129:*19* 157:*18*
229:*22* 383:*19*
plaintiff 87:*12*
88:*9, 22* 322:*9*
Plaintiffs 1:*4* 10:*3*
12:*6* 37:*12* 268:*1*
318:*23* 390:*3*
plaintiff's 134:*5*
163:*1*
plan 202:*5* 203:*6*
play 174:*3* 233:*1*
playing 53:*2*
pleaded 88:*22*
pleading 63:*12*
pleadings 15:*15*
17:*23* 22:*14, 21, 22*
36:*8* 55:*10* 57:*13*
61:*4, 9, 21* 62:*4, 7,*
*15, 16, 22, 23, 23*
63:*6, 8* 101:*8*
319:*2*
please 11:*19, 21*
12:*20* 69:*11* 70:*9*
99:*3* 147:*3* 148:*12*

161:*2, 6* 187:*4*
217:*8* 233:*23*
247:*1* 258:*21*
267:*15, 17* 272:*11*
303:*12*
pled 88:*10* 208:*11*
392:*4, 5*
plus 198:*13* 222:*20*
pocket 138:*12, 17*
point 15:*8, 17*
20:*10* 29:*8, 10*
32:*8, 22* 56:*13*
63:*18* 91:*20* 102:*7*
103:*12* 114:*23*
144:*23* 145:*4*
146:*15* 149:*5*
163:*9* 168:*19*
170:*10* 171:*8*
177:*19* 178:*12*
179:*12* 181:*23*
186:*14* 187:*4*
188:*14* 195:*14*
199:*22* 201:*13*
202:*11* 208:*4*
213:*23* 229:*19*
250:*18* 254:*18*
256:*1, 2, 8, 14*
257:*20* 271:*9*
274:*19* 282:*21*
284:*16* 289:*6*
313:*7* 319:*23*
332:*3* 348:*8, 11*
358:*11* 372:*2*
390:*14* 404:*23*
pointed 282:*6*
402:*8*
pointing 68:*10*
Policies 9:*18* 25:*4*
26:*1* 28:*9, 11, 13,*
*18, 22* 29:*2, 7, 10,*
*13* 39:*22, 22* 48:*2,*
*16, 19* 59:*16, 19, 21*
75:*20* 76:*22* 77:*15,*
*23* 78:*1, 6, 7, 12, 19*
79:*8, 9, 16* 83:*15*
109:*1, 2, 12, 19*
110:*1, 6, 12, 18*
143:*7* 144:*21*
150:*20* 151:*14*
158:*20* 160:*20*

181:*3*  183:*18*
184:*9*  195:*20, 21,*
*22*  201:*1, 17*  202:*3*
203:*7*  232:*23*
233:*12*  261:*6, 8*
290:*3, 3*  387:*19*
405:*3*  407:*14*
408:*11, 15, 20, 23*
409:*4, 9, 9, 16*
**policy**  24:*9, 12*
25:*12*  26:*5, 15*
31:*18*  35:*3*  37:*20*
39:*5, 15, 17*  41:*20,*
*21*  47:*21*  48:*1*
49:*2, 13, 14, 23*
50:*2, 7, 14, 15, 19,*
*21, 23*  51:*12, 23*
52:*6, 11*  55:*6*  56:*4,*
*8, 9, 13, 16, 19, 22*
60:*1, 5*  81:*2*  87:*14,*
*22*  88:*23*  93:*15, 15*
97:*10*  100:*7, 10*
101:*3*  103:*10*
104:*12, 23*  105:*4, 7,*
*10, 14, 18, 21*  106:*3,*
*4, 7, 20, 22*  107:*5*
108:*2, 4*  109:*7*
111:*4, 9, 14*  118:*3*
141:*14*  142:*8*
143:*17, 20*  144:*4,*
*10, 11, 12, 13, 14*
145:*17, 18*  146:*13,*
*17*  148:*8*  153:*13*
156:*19*  158:*4, 9*
159:*2, 4, 7, 14, 22*
160:*4*  166:*6, 9, 11*
169:*21*  173:*21, 22,*
*23*  183:*13*  184:*14*
185:*8, 9, 10, 11, 14*
186:*1, 4, 6, 9, 13*
201:*5, 9*  202:*5, 8*
223:*15*  229:*14*
230:*4*  232:*5, 8, 9,*
*16*  235:*11, 17*
236:*1, 9*  239:*7*
243:*12, 23*  244:*13*
246:*8*  250:*12, 13,*
*13, 19, 20*  251:*3, 19*
252:*3*  273:*16, 20*
289:*20*  290:*3, 5, 8,*

*9, 13*  302:*1*  325:*11,*
*14*  327:*12, 14*
328:*3*  332:*17, 19*
333:*2, 2, 6*  335:*20*
337:*22, 23*  342:*19,*
*21*  343:*9, 10*
357:*10*  360:*3*
361:*8, 12*  362:*12,*
*13*  365:*3, 4, 5*
392:*14, 21*  393:*5,*
*12, 18, 22*  394:*1*
395:*14*  404:*21*
405:*22*  406:*1, 9*
407:*1, 5*  408:*6*
**politically**  194:*21*
311:*8*
**pollution**  206:*8*
**pool**  134:*9*
**poorly-worded**
137:*17*
**portion**  2:*17*  81:*16*
125:*14*  126:*8*
223:*9*  224:*1*  286:*3*
321:*7*  336:*6*
352:*22*  353:*17*
**portions**  43:*10*
277:*1*
**position**  12:*23*
25:*5*  31:*7, 13*
45:*15*  57:*15*  64:*22*
65:*21*  66:*2*  75:*10*
91:*18*  93:*5, 12*
94:*3, 6*  105:*23*
106:*2*  116:*9*
118:*10*  122:*11, 20,*
*22*  123:*4, 6*  132:*16*
133:*12, 15, 22*
134:*13, 17*  135:*11*
141:*9*  143:*8, 19*
145:*3*  152:*12, 16*
153:*2*  181:*22*
188:*15, 22*  212:*1*
227:*23*  228:*9*
354:*4*  359:*22*
370:*10*  396:*3*
**positions**  22:*9*  66:*7*
**positive**  58:*17*
129:*17*  130:*6*
273:*3*  290:*20*

**possession**  231:*20*
**possibility**  122:*17*
**possible**  45:*5, 7*
140:*6*  228:*18*
236:*13*
**possibly**  19:*2*
103:*9*  228:*11*
232:*10*
**potential**  26:*23*
45:*13*  47:*5*  79:*3,*
*19*  80:*4*  133:*16, 23*
134:*2*  224:*21*
258:*15*  380:*8*
**PowerPoint**  290:*23*
**practical**  103:*18*
**practice**  14:*12, 13*
95:*16*  101:*22*
205:*14*  218:*21*
270:*22*  386:*16*
405:*21*
**practiced**  14:*1*
240:*14*
**practices**  77:*23*
83:*15*  228:*15*
318:*19*  319:*6*
**practicing**  13:*18*
**Pratt**  10:*6*  11:*2*
267:*2*
**preceded**  238:*20*
**preceding**  326:*14*
377:*18*
**precise**  146:*6*
**precursor**  170:*21*
**preexisting**  308:*18*
**premature**  359:*13*
**premise**  395:*6*
**premium**  50:*22*
51:*11*
**premiums**  45:*9, 13*
52:*3*  128:*3*  225:*3,*
*7*
**preparation**  16:*6*
19:*18*  109:*14*
**prepare**  14:*21*
17:*20*  18:*2, 6*
95:*17*
**prepared**  51:*3*
336:*20*
**prescription**  197:*1*

**Present**  10:*21*
315:*8*  350:*21*
359:*16*  366:*5, 8*
**presentation**
290:*23, 23*  295:*4*
**presented**  276:*5*
315:*19*
**presently**  128:*3*
**preserve**  368:*10*
**president**  246:*21*
**pressure**  284:*7*
**presume**  35:*11*
63:*2*  105:*5*  154:*14,*
*17*  174:*10*  185:*12*
280:*4*  300:*3*
375:*10*  384:*16*
**presumed**  318:*1*
**pretend**  68:*22*
**pretending**  68:*18*
**pretrail**  195:*5*
**pretrial**  194:*18*
**pretty**  14:*8, 9*
108:*15*  205:*11*
**previous**  18:*19*
55:*12*  57:*7, 10*
66:*6*  124:*18*
143:*14*  149:*12*
242:*2*  245:*19*
271:*20*  274:*14*
299:*17*  369:*22*
370:*12*  397:*7*
399:*19*
**previously**  26:*20*
55:*14*  62:*11*  151:*2*
160:*1*  208:*14*
247:*9*  272:*3*
310:*13*  314:*4*
370:*23*  384:*21*
402:*14*
**price**  51:*8*  222:*16*
**prices**  52:*6, 11*
**primarily**  392:*20*
**primary**  66:*2*  95:*8*
143:*5*  144:*16*
145:*2*  250:*20*
251:*17*  252:*11, 16*
253:*3*  260:*3, 10*
327:*20, 23*  328:*10*
**principal**  216:*13*

**prior** 13:*18* 14:*12* 29:*11* 30:*9* 33:*11* 64:*12, 14, 16* 157:*18* 167:*14* 170:*18* 196:*9* 258:*3* 270:*17* 272:*6, 19, 21* 273:*6* 284:*16, 21* 289:*7, 8, 8* 291:*12* 292:*1, 10, 23* 319:*7* 329:*5* 330:*17* 351:*20* 352:*20* 355:*14* 359:*4* 367:*13* 390:*19*

**prisoners** 77:*16*

**private** 14:*12* 205:*14* 226:*10* 349:*23* 386:*16*

**privilege** 71:*8, 21* 73:*17, 18* 74:*2* 132:*9, 14* 155:*1, 6* 172:*9, 15* 263:*1*

**privileged** 72:*5, 10, 22* 154:*20* 172:*17* 182:*16, 18, 20*

**pro** 69:*18* 146:*3*

**probably** 19:*1, 2* 98:*23* 117:*8, 10* 137:*17* 146:*3, 5* 170:*23* 172:*23* 173:*2* 225:*15, 18* 250:*1* 255:*17* 269:*5* 297:*6* 311:*7* 321:*23* 354:*16* 359:*5, 13, 14*

**probate** 14:*7* 49:*10*

**problem** 148:*13* 245:*18* 284:*18* 291:*11, 14*

**problems** 30:*14* 350:*22*

**Procedure** 2:*4, 10* 202:*5* 404:*21* 405:*12*

**Procedures** 9:*18* 79:*17* 201:*1, 17* 202:*3* 203:*7* 228:*15* 387:*20* 407:*14* 408:*12, 15* 409:*5, 10, 16*

**proceeds** 322:*1* 353:*1*

**process** 104:*3* 271:*19* 405:*12* 406:*12, 17*

**processed** 405:*10*

**processing** 324:*21*

**procure** 46:*15* 271:*22* 289:*15* 341:*1*

**procured** 25:*20* 357:*2* 365:*16*

**procuring** 44:*13* 45:*16* 362:*8*

**produce** 32:*5*

**produced** 15:*12, 14* 19:*8* 34:*19* 50:*9* 73:*19* 121:*19, 21, 23* 122:*9* 131:*21, 23* 138:*23* 238:*8, 17* 271:*1, 4* 273:*3* 381:*23* 382:*4, 9* 385:*19* 404:*22* 406:*4, 6* 409:*17*

**product** 131:*23* 132:*11, 13, 19* 271:*10*

**production** 273:*2*

**professional** 20:*17* 31:*21* 34:*5* 79:*3, 19* 142:*10* 232:*8* 247:*13* 249:*2* 304:*10* 306:*3* 310:*16* 311:*15* 312:*9* 337:*16* 341:*3* 343:*2* 380:*14*

**professionals** 405:*5*

**profusely** 228:*4*

**programs** 203:*12, 13*

**promise** 221:*14* 343:*21*

**pronounce** 58:*10, 12*

**pronounced** 58:*18, 19*

**proper** 378:*3*

**properly** 377:*23*

378:*1*

**property** 49:*16, 17*

**Proposal** 8:*22* 124:*9, 12, 13* 176:*17* 177:*21* 178:*6* 180:*23* 181:*7* 182:*7, 13* 183:*3, 4, 6, 10* 185:*1, 3, 6* 254:*5, 7, 20* 255:*7* 256:*2, 15* 277:*13, 16, 23* 341:*23* 342:*9, 13* 398:*13*

**proposals** 277:*17* 341:*23*

**proposed** 173:*17* 178:*12* 186:*23* 188:*18* 221:*22* 253:*12, 15, 17, 23* 254:*14* 323:*14, 17* 397:*4, 5*

**proposes** 174:*1, 4*

**proposing** 397:*2*

**proposition** 391:*19*

**proprietor** 157:*18*

**prosecution** 38:*12*

**prospects** 382:*7*

**protect** 48:*7* 95:*2* 106:*7* 125:*7* 254:*21* 282:*22* 387:*17*

**protection** 289:*16*

**protective** 73:*23*

**protocol** 203:*7*

**prove** 127:*13*

**provide** 28:*23* 33:*5, 12* 35:*6, 9* 48:*6* 60:*8* 61:*10* 65:*2, 17, 20* 66:*11* 67:*17* 71:*5* 73:*12* 92:*6, 8* 93:*16* 95:*8, 23* 97:*2, 17, 21, 22* 98:*18* 110:*17* 111:*9* 126:*22* 134:*10* 136:*3* 137:*3, 6, 9* 148:*3* 149:*1, 4, 13, 21* 150:*5, 7* 151:*10* 152:*21* 158:*3, 21* 160:*3* 165:*21*

194:*14, 16* 195:*2, 10* 196:*23* 197:*3, 10* 199:*3* 201:*15, 16* 202:*4* 204:*1* 222:*18* 236:*4* 239:*9* 245:*12, 19* 261:*23* 262:*19* 265:*7* 268:*17* 270:*1, 17* 273:*14* 313:*3, 9* 314:*19* 316:*15, 19* 329:*2* 339:*18* 351:*13* 361:*21* 363:*3, 18* 364:*8* 366:*11* 368:*21* 378:*3* 382:*15* 383:*20, 21* 393:*20* 394:*2* 395:*14* 405:*13* 406:*18, 21* 407:*22, 23* 408:*1*

**provided** 27:*12* 30:*5* 35:*19* 49:*5* 57:*22* 60:*17* 61:*18* 62:*2, 5* 64:*21* 65:*23* 82:*10* 95:*6* 103:*20* 104:*6* 106:*2, 3* 108:*7, 13* 111:*5, 11* 121:*9, 11* 157:*16* 158:*6, 8, 9* 170:*19* 195:*15, 18, 18* 196:*15, 21* 198:*6* 199:*7* 200:*11* 203:*19* 204:*3, 8* 222:*19* 224:*14* 235:*10, 14, 17* 236:*3* 238:*5, 15* 260:*16, 17* 276:*4* 283:*2* 294:*10* 314:*4* 329:*23* 331:*23* 332:*23* 333:*7, 18* 335:*10, 15* 337:*4* 340:*3* 356:*18* 357:*18* 364:*4* 365:*1, 6* 366:*12, 23* 371:*7* 373:*5* 376:*3* 398:*7* 399:*1, 3*

**provider** 40:*3* 49:*18* 134:*7, 8, 10* 148:*12* 149:*12, 12*

159:*9*  188:*16*
197:*11*  198:*15*
210:*18*  245:*19*
257:*18*  269:*19*
271:*21*  272:*5, 19*
289:*7, 22*  290:*6*
291:*12, 15, 22*
292:*1, 10, 23*
326:*13*  339:*8*
340:*12*  353:*2*
355:*17*
**providers** 97:*13*
204:*5*  241:*15*
274:*21*  288:*22*
351:*18*
**provides** 50:*10*
345:*12*  393:*12, 15*
**providing** 35:*13*
36:*3*  40:*4*  50:*4*
62:*3*  95:*19, 21*
103:*13*  118:*17*
203:*1*  214:*3, 16*
252:2  274:*22*
289:*14*  313:*22*
341:*8*  345:*21*
350:*8*  364:*3*  366:*1*
371:*14, 22*  377:*9*
379:*10*
**provision** 21:*3, 4,*
*17*  27:*23*  33:*23*
35:*3*  75:*8, 17*  82:*8,*
*12*  85:*5*  89:*2, 8*
124:*23*  135:*16*
142:*19*  144:*23*
152:*18*  153:*18*
160:2  190:*9*
192:*17*  226:*16*
273:*6, 10*  325:*18*
345:*12, 23*  346:*11*
362:*22*  368:*4*
398:*4*
**provisions** 2:*3*
185:*11*  186:*1*
201:6  215:*11*
319:*21*  326:*8*
**Public** 2:*5*  11:*5*
49:*2, 4, 7*  50:*2, 6,*
*19*  86:*23*  218:*23*
267:*5*
**publicized** 226:*1*

**published** 205:*20*
206:2
**pull** 304:*19*  306:*22*
343:*16*  344:*5*
347:2  378:*22*
**purchase** 39:*6*
**purchased** 105:*7*
**Purchasing** 342:*8*
343:*1, 7*
**purport** 28:*23*
**purported** 143:2,
*15*  221:*21*
**purports** 160:*12*
243:6
**purpose** 114:*4*
202:*1*  318:*17*
**purposes** 36:2
38:2  49:*11, 12*
50:*14*  96:*18*
213:*14*  223:*5*
249:*10*  337:*23*
341:*20*
**pursuant** 2:*3*
70:*18*  71:*18*  85:*7*
89:*8*  104:*12, 22*
105:*3, 9, 13, 17*
126:*16*  151:*14*
375:*1*  393:*22*
**push** 94:*9*
**put** 30:*18*  45:*15*
84:*15*  94:*22*  95:*3,*
*14*  96:*5, 10*  100:*2*
110:*19*  130:*20*
242:*4*  261:*15*
272:2  284:6
313:*22*  319:*16*
325:*17*
**puts** 77:*4*
**putting** 75:*21*
191:*8*  294:*22*
358:*9*  400:*21*

**< Q >**
**qualified** 41:*14*
**quality** 161:*8*
199:*11*  203:*10*
**quarterly** 199:*12*
**quarters** 290:*18*
**question** 2:*15*  13:*8,*
*9*  15:*23*  16:*4*  20:*6*

21:*20*  23:*13*  25:*9*
27:*4, 5*  29:*16*
33:*10*  39:2  41:*19*
42:*4, 12*  43:*12*
49:*20*  50:*16*  56:*8,*
*23*  60:*12*  61:*1, 13,*
*14*  63:*4*  65:*22*
67:*14*  69:*11, 12*
70:*10, 11, 13*  72:*15*
77:*18*  91:*7*  100:*6*
103:2, *2*  104:*14*
105:*1*  107:*13, 15*
108:*15*  116:*20, 21*
117:*1*  121:*3*  127:*5*
137:*15, 18*  144:*3*
147:*22*  150:*19*
151:*11, 23*  152:*23*
157:*5*  161:*23*
170:*16*  172:*13, 14*
176:*20, 23*  183:*16*
186:*7, 13*  226:*17*
234:*14, 15, 16*
238:*11*  239:*5*
243:*7*  249:*5*
251:*17*  252:*15*
254:*11*  255:*3*
265:*16*  276:*21*
286:*17*  287:*4, 6*
290:*14*  315:*17*
316:*8*  318:*7*
324:*13*  326:*6*
331:*12, 16*  338:*13*
354:*21*  355:*10*
356:*5*  358:*17*
359:*4*  360:6
362:*12, 16*  370:*19*
371:*9*  384:*9*
392:*22*  393:*10*
395:*7*  399:*18*
403:*1*  406:*8*  410:*1*
**questioning** 118:*7*
151:*3*  217:*7*  309:2
**questions** 2:*20*
24:*1*  31:*23*  39:*9*
66:*14, 16*  68:*10, 19,*
*20*  69:*15*  70:*3, 22*
74:6  89:*19*  91:*16*
96:*13*  101:*14*
102:*10, 17*  103:*5*
145:*12*  161:2, *6, 12*

164:*11*  173:*6*
205:*9*  206:*10, 19*
217:*12*  221:*13*
225:*1*  230:*10*
236:*12*  250:2, *7*
255:6  266:*5, 6*
337:*20*  372:*3*
373:2, *23*  396:2
400:*1, 3*  401:*10*
407:*12*  408:*11*
411:*7*
**quick** 217:*7, 13*
344:*12*  360:*4*
**quickly** 205:*11*
206:*18, 22*  351:*19*
373:*3*
**Quinn** 381:2
**quit** 249:*20*
**quite** 81:*21*  155:2
177:*11*  201:*3*
330:*22*  359:*19*
**quiz** 54:*4*
**quote** 22:*23*  85:*20*
182:2  233:*7, 8*
237:*5, 6*  239:*15, 18*
240:2, *3, 21, 22, 22,*
*23*  241:*23, 23*
242:*17, 17*  243:*11,*
*12, 22, 23*  245:*9, 13*
246:*7, 9, 16, 16, 17*
247:*10, 15, 19, 20*
248:*19, 20*  250:*11,*
*13*  290:*12*  337:*5, 5,*
*10, 11*  356:*17, 18*
358:*22*  361:2*1, 21*
362:*16, 17*  395:*21*
402:*15*
**quoted** 388:*3*
**quotes** 239:*20*
**quoting** 83:*14*
85:*19*

**< R >**
**radar** 111:*13*
**raise** 121:6  125:*23*
126:2  164:*11*
165:*15, 18*
**raised** 32:*15*  72:*14*
94:*8*  120:*18, 20*

121:*3*  237:*17*
260:*4, 10*  318:*23*
**raising**  72:*23*
**Randolph**  30:*11*
34:*16*  375:*16*
**Randy**  355:*1*
**range**  53:*10*  115:*11*
**rata**  69:*18*
**rating**  38:*1*  44:*6,*
*21*  45:*20*  46:*7, 20*
47:*6*  127:*23*
224:*22*  402:*15, 17*
403:*8, 8*  404:*2*
**ratings**  51:*7*
**rationale**  114:*6, 12*
**reached**  115:*20*
255:*10, 11*  256:*20*
**read**  31:*10*  67:*13*
69:*12*  70:*9, 11*
74:*16*  75:*5*  76:*17*
77:*3, 5, 8, 12*  80:*19*
88:*12, 15*  89:*20*
126:*4, 6*  147:*2*
148:*4, 16, 17, 18*
157:*20*  164:*2, 7, 9*
166:*23*  167:*12, 23*
173:*18*  176:*15, 16*
181:*15*  186:*13*
189:*15*  190:*20*
197:*23*  210:*1*
212:*12, 22*  216:*23*
217:*15*  218:*18*
223:*9*  224:*8, 14*
239:*21*  244:*21*
252:*8*  259:*19*
282:*18*  287:*3*
346:*12*  357:*22*
358:*2*  371:*5, 8, 11,*
*11*  375:*18*  379:*16,*
*22*  387:*16, 23*
396:*1*
**reading**  3:*2*  20:*21*
83:*10*  87:*9*  164:*6*
184:*22*  286:*2*
379:*5*  388:*2*
**ready**  374:*1*
375:*20*  386:*23*
396:*16*

**real**  145:*5*  188:*14*
217:*13*  344:*12*
360:*4*
**reality**  69:*1, 3*
**really**  55:*18*  58:*11*
94:*17*  118:*21*
122:*2*  174:*16*
187:*17*  189:*7*
198:*14*  201:*12*
209:*14*  219:*5*
225:*12, 20*  237:*21*
256:*1, 15*  286:*16*
321:*19*  338:*8, 12*
340:*11*  341:*19*
343:*1, 3*  368:*23*
389:*20*  400:*7*
407:*1*
**reason**  13:*8*  19:*22*
46:*2*  52:*2, 2*  72:*9*
79:*6*  94:*9*  107:*21*
111:*13*  123:*20*
124:*19*  131:*19*
154:*15, 19*  161:*21*
164:*6*  207:*16*
210:*14*  234:*4*
237:*18*  255:*10*
260:*18*  279:*1*
280:*16*  284:*10*
287:*17*  293:*17*
294:*23*  304:*16*
308:*6*  335:*11*
371:*3*  374:*21*
387:*10*  393:*1*
**reasonable**  32:*14*
130:*19*
**reasons**  30:*1*
112:*12*  125:*9*
260:*15*
**recall**  15:*8*  33:*3,*
*11, 17*  34:*7, 12*
45:*23*  60:*20*  62:*7*
88:*13*  100:*1*  110:*4*
111:*1*  115:*4*
117:*19, 22*  119:*1,*
*14*  120:*11, 16*
146:*1*  158:*1*
161:*18, 20*  162:*2*
163:*12*  164:*14*
165:*8, 20*  168:*5, 10,*
*13*  169:*2, 11*

187:*11*  206:*3, 5*
225:*11*  231:*5*
235:*18*  256:*7*
258:*1*  262:*16, 20*
263:*4, 20*  269:*9, 14*
271:*8, 11, 15*  273:*4,*
*5*  275:*10*  276:*6*
280:*13*  283:*19, 21*
287:*1, 7, 10, 18, 22*
288:*2, 7, 15, 20*
289:*4*  290:*15, 19,*
*22*  291:*4*  292:*9, 11,*
*20*  294:*1, 6, 21*
304:*14*  305:*7*
307:*10*  308:*4*
309:*1, 2*  313:*21*
324:*1*  327:*17*
334:*11*  335:*5*
344:*1*  347:*22, 23*
349:*1, 4, 7*  362:*21*
367:*12*  368:*3*
374:*19*  382:*18*
387:*8*
**receipt**  28:*18*
29:*11*  160:*18*
380:*4*  381:*12*
385:*9*
**receive**  28:*11, 17*
31:*3*  95:*17*  109:*7*
183:*4*  196:*5*
278:*22*  280:*16*
295:*1*  374:*22*
**received**  28:*13*
29:*12*  102:*12*
109:*5, 12*  121:*16*
164:*8*  171:*11*
182:*13*  183:*6, 11*
239:*13*  279:*5, 18*
304:*16*  305:*10*
308:*6*
**receiving**  53:*16*
67:*5*  117:*19*
161:*18, 20*  162:*3*
167:*14*  171:*12*
187:*11*  278:*17*
279:*3*  280:*13*
294:*21*  304:*14*
305:*7*  308:*4*
374:*19*  382:*17*
387:*8*

**Recess**  63:*21*
80:*11*  112:*4*  176:*2*
218:*11*  265:*23*
298:*2*  372:*8*
**recitation**  176:*16*
184:*13*
**recites**  180:*2*  361:*1*
**recognized**  282:*19*
**recognizing**  13:*3*
228:*14*
**recollection**  51:*23*
94:*22*  96:*10, 21*
121:*7, 22*  122:*3, 7*
138:*23*  140:*7*
162:*4*  164:*5*  168:*7,*
*17*  188:*19*  201:*5*
229:*16*  231:*3*
233:*1*  235:*19*
237:*7*  244:*4, 9*
268:*15*  269:*16*
279:*2*  280:*15*
282:*17*  291:*3, 6*
339:*16*  348:*6, 7*
373:*17*
**recommend**  339:*7,*
*11*
**recommendation**
289:*13*  339:*5, 19*
**recommendations**
276:*9*
**reconvene**  266:*2*
**reconvening**  266:*6*
**record**  11:*11, 20*
29:*16, 18, 19, 22*
59:*14*  63:*20, 23*
69:*4, 6, 7, 9*  80:*7,*
*10, 13*  112:*3, 6*
126:*10*  139:*12*
147:*3, 5*  154:*6*
155:*8*  156:*5*  157:*7,*
*8*  166:*18*  175:*22*
176:*1, 4*  182:*10*
217:*2*  218:*10, 13*
219:*19*  249:*14, 15*
265:*22*  267:*16*
268:*9*  276:*15, 23*
278:*9*  294:*16*
298:*1, 4*  338:*14, 16,*
*17, 19*  351:*13*

372:7, 10  378:11
382:5  386:17
**recordkeeping**
199:19  351:22
**records**  47:17
291:12, 15, 17, 23
292:8, 13, 16  293:7,
8, 16, 23  350:6, 7,
10, 12, 14, 17, 22
351:3, 5, 10, 15, 20
352:2, 4, 10  354:12,
19  355:3, 9, 14
**recovery**  54:15
**redacted**  73:22
154:11, 20  155:11
**redactions**  155:2
157:6
**redirect**  400:8
**Reeves**  62:10
110:4  396:12, 13
398:12
**refer**  50:18  210:22
230:19  407:18
**reference**  54:20
97:4  220:22  221:8
253:11  260:8
271:12  273:18
328:3  336:23
351:20  358:21
359:3  377:17
399:13  400:22
**referenced**  15:10
16:10  17:1  33:7,
22  34:18  64:2
160:20  180:1
191:19, 20  198:3
222:10  226:1
231:2  233:4
242:20  253:18
328:20  336:1
385:23
**references**  16:9, 13,
15  90:18  171:1, 11
189:5  199:10
208:13  210:3, 6
221:1, 2  273:9
277:12  286:4
306:4  341:23
389:22

**referencing**  56:11
157:23  192:6
358:6
**referred**  195:8
403:7
**referring**  30:4
57:18  64:15  78:1
87:16  96:16  158:6
188:7  190:18
259:6  261:2  262:9
282:5  283:6
284:15  334:8
384:2  390:12
399:14  402:18
**refers**  50:20  90:23
163:23  220:3
232:15  237:7
390:18  407:15
**refine**  52:21
**reflect**  128:10
148:18  386:7
**reflected**  86:22
102:18  218:23
**reflects**  237:4
**refusal**  218:19
**refuse**  93:2
**refused**  80:22  81:9
82:1  86:17, 21
87:5, 19  95:11
151:9  218:21
223:12  224:5
387:22
**regard**  17:6  66:7
70:5  92:20, 23
99:13  110:1
116:13, 14  118:2
157:15  158:22
163:15  171:12
172:2  189:5
199:17  200:10
203:9, 17  206:16
216:14  227:13
230:14  246:5
251:2, 20  252:10
275:17  285:11
288:13  289:21
310:13  315:5
319:9  320:3
332:10  333:6, 17
335:3  345:7

346:14  347:4
349:3, 18  350:6
352:11  354:14
357:8  362:8, 19
363:8  365:5  366:1,
7  367:17  368:7
370:11, 17, 23
382:12
**regarding**  30:13
35:22  47:11  60:19
62:19  63:10, 14
71:4  72:16  73:11,
14  82:9  87:1
99:20  101:4  102:8
115:23  117:3
118:9, 23  120:6, 23
121:17  122:4, 4
137:23  139:5, 15
145:22  146:12
158:10  164:12
165:19  176:10
182:13, 13  187:23
202:2  219:1
231:15  255:15
305:5  306:19
307:20  309:19
312:4  319:4  339:3
372:19  382:7
383:5, 15  384:23
385:4, 12  386:1
387:20  394:20
399:1
**regardless**  232:23
395:15  400:10
**regards**  76:16
374:18
**regular**  199:12
**regularly**  45:3
**reimburse**  165:2
**reimbursed**  44:2
69:19  163:6
366:13, 15
**reimbursement**
58:23  379:11
**reinvent**  327:8
**reject**  384:10
394:20
**rejected**  254:14
395:17  402:5, 9
**rejecting**  253:15

**relate**  57:15  65:13
80:3  101:5  152:19
153:18  163:18
186:22  188:10
323:4, 6, 8  394:6
395:22
**related**  15:4, 15
16:2, 17  21:2, 17,
20  24:20  26:5
27:16, 16  31:6, 15
33:23  35:4  37:21,
23  41:7  43:8  52:5
55:9  57:3  69:15
70:8  75:8, 17  76:4
78:9  79:11  82:8
86:7  91:21  93:6
96:2, 7  123:23
124:2, 4, 22  135:13,
15  151:4  152:18
168:11  194:1, 12
195:22  196:15
199:17  201:6
227:4  228:15
231:15  257:5
273:6  313:4, 17
318:10, 18  319:14,
22  321:23  322:6,
13, 14  345:16
371:13  398:3
400:8
**relates**  82:11
134:5  186:14
321:8  340:19
356:13  387:5
389:6
**relating**  54:8  67:6
391:1  394:3
**relation**  98:12
**relationship**  24:15
112:14  129:13
130:2, 4  188:22
199:5  263:6  334:2
363:12
**relative**  165:6
**relatively**  76:11, 15
196:11  205:19
**relatives**  268:18
269:1
**relay**  182:12

relevant 76:3
151:17  162:20
172:17  191:5
229:14  230:4
235:11  409:6
relied 352:5  369:20
relief 379:13
relish 196:19
rely 329:20
remain 36:10, 10
remains 36:11
196:14
remember 23:21
31:12  32:12  49:3
64:20  67:5  100:14,
16  101:19  110:3
117:9  123:5  131:6,
8  146:6, 11  149:8
199:21  206:7
225:13  239:1
260:21, 22  261:4, 5,
8, 18  269:22
279:18  325:6
326:19  378:11
390:5
reminder 268:8
remove 328:2
removed 144:18
rendered 79:20
rendering 31:20
34:5  142:10
renew 257:23
263:3, 6, 15
renewed 160:2
328:17
renews 156:19
rental 197:15
repayment 139:9
repeat 33:9  55:23
221:14
repeated 35:21
repeatedly 107:16
357:12, 15, 18, 22
368:21
repetitive 64:19
rephrase 41:6
65:7  159:17, 19
243:7
replow 55:18

report 150:14
231:8  233:15, 20
234:21  235:2
348:9, 19  382:23
383:11
reported 52:22
53:17  231:9
233:17  291:20
Reporter 2:5
11:21  12:8  59:9
69:13  70:12  126:7,
11  223:18  267:17
268:3  411:14
reporter: 126:5
reporters 40:5, 8
42:2
reporting 170:3
198:22  411:13
reports 53:16, 20
349:7, 9
represent 12:1
14:4  35:21  184:2
267:21  341:18
376:19  378:15
380:3  381:21
representation
16:20  357:7
representations
24:13  25:6, 14, 15
26:8, 14, 16, 20
27:1, 8  35:18  57:3,
7  329:21  334:17
362:7  363:11
369:19
representative
12:16  19:12, 12, 22
32:6  61:2  213:10
230:20  268:10
271:4  338:12
representatives
201:21  270:4, 7, 13
288:5, 16  293:13
381:1
represented 14:15
25:20  107:16
340:10  365:13
369:8  371:16
380:23  392:6
representing 62:11
69:22  71:9  226:20

274:21  275:8
380:9  381:10
382:11  383:10
represents 411:8
request 19:6  44:1
54:1  102:1  149:20
159:3  160:19
202:2  229:14
230:3, 12  236:4
243:18  260:14
268:17, 21  273:1
277:12, 15  341:22
352:8  382:6  398:1,
23
requested 62:2
69:12  70:11  74:1
118:16  239:5
241:4, 8  283:17
292:23  296:12
382:3  405:17
requesting 162:9
242:15  243:10
262:20  297:21
requests 293:6
require 48:23
195:10  201:8
332:21
required 2:9
25:21, 22  27:18
28:1  37:19  41:21
61:11  94:4, 10
104:21  105:16, 20
106:23  109:19
123:21  135:9
193:12, 18  195:1
196:23  197:3, 9, 23
198:21  199:2
201:20  202:3, 23
222:21  239:6
243:2  271:22
284:2  302:14
304:11  310:17
311:16  312:10
313:15  332:16
333:11  334:7
336:3  337:17
342:22  343:9, 10
357:4, 12  358:7
363:4, 21  365:15

371:17  400:3
406:19
requirement 192:7,
11, 12, 16  235:13
236:3  254:3
273:19  346:8
348:5  397:19
requirements 27:13
198:23  200:15
325:3  383:6, 7, 8
requires 194:14, 16
198:5  242:4
requiring 273:11
Re-read 69:10
research 19:16
262:6
researchable 352:2
reservation 34:11,
13, 16, 20  35:15
65:17  99:22
103:15  174:2
181:1  339:12
364:9  367:22
375:2  379:8
380:12  385:11
389:22  402:4
reserve 2:14
reserved 69:17, 19
reserves 112:15
166:5  364:18
394:16
reserving 367:19
resident 194:19
resolution 35:22
177:14  179:22
318:22
resolve 112:20
318:17  352:13
resolved 46:13
226:4  352:15
366:4, 8
respect 17:14, 16,
18  19:1, 6  22:11
24:18  25:3, 17
26:3, 9, 18  27:9
31:4  32:6  33:14
35:16  36:13  38:19
39:10  40:23  41:2
43:21  44:21  45:4
49:4, 13  52:9

54:*14*  55:*7, 13, 21*
56:*16*  58:*22*  64:*22*
65:*22*  66:*3, 9, 16*
70:*17*  71:*10, 12*
75:*20*  78:*2, 6, 19*
84:*3, 19*  91:*19*
92:*21*  93:*22*  94:*2,
4*  96:*8, 22*  99:*23*
100:*3*  102:*11*
118:*5, 5*  121:*14*
122:*11, 14, 20*
129:*20*  149:*18*
150:*22*  164:*19*
172:*17*  198:*17*
214:*5, 16*  215:*12,
12, 18*  238:*6*
260:*16*  265:*15*
268:*13*  269:*19*
270:*20*  275:*22*
314:*2, 5*  316:*22*
320:*18*  323:*20*
325:*12*  326:*23*
327:*7*  328:*12, 22*
337:*8*  380:*10*
382:*21, 22*  407:*20*
409:*1, 2*
**respective**  181:*3*
188:*1*  346:*21*
**respectively**  2:*13*
**respects**  234:*13*
**respond**  102:*23, 23*
293:*5, 5, 6*
**responded**  22:*20*
30:*19*  167:*19*
181:*20*  258:*20*
260:*15*  402:*12*
**responding**  162:*8*
238:*13*
**response**  35:*23*
66:*20*  68:*9, 23*
70:*2*  71:*1*  99:*19*
119:*17*  121:*15*
145:*11*  146:*21*
147:*3*  162:*2*  163:*2,
3, 8*  164:*22, 23*
171:*11, 12*  174:*8*
225:*1*  230:*9*
236:*11*  237:*13*
260:*13*  261:*11*

262:*15*  382:*18*
406:*8*
**responses**  101:*7*
255:*6*
**responsibilities**
200:*6*  314:*14*
**responsibility**
94:*11*  100:*9*  125:*2*
126:*21*  129:*18*
130:*9, 20*  163:*10*
166:*2*  216:*4*  254:*7*
351:*11*  352:*1*
**responsible**  116:*10*
127:*11*  133:*13*
150:*11, 13*  153:*20*
168:*21*  189:*13, 19*
190:*2, 5, 11*  191:*17*
192:*2*  204:*16, 21*
256:*11*  259:*15, 22*
270:*10*  275:*1*
315:*6*  351:*12*
388:*17*
**responsive**  19:*8*
255:*2*
**rest**  81:*17*  125:*15*
130:*20*  245:*5*
280:*5*
**rested**  348:*6*
**result**  37:*14*  74:*14*
209:*6*  269:*20*
271:*21*  345:*15*
360:*1*  411:*12*
**resulted**  88:*23*
206:*2*
**Resumed**  74:*9*
112:*7*  176:*5*
218:*14*  268:*7*
**re-swear**  267:*17*
**retain**  118:*18*
**retained**  119:*6, 14*
**retaining**  118:*16*
**retention**  70:*19*
**retrieval**  351:*15*
**retrieve**  156:*9*
210:*19, 21*
**retrieving**  350:*22*
355:*14*
**retroactive**  250:*21*
**return**  296:*12*

**returned**  258:*12*
**returning**  258:*16*
**revenge**  87:*1*  219:*1*
**review**  14:*20, 23*
15:*18*  16:*5*  17:*19,
23*  28:*21*  146:*23*
147:*1*  180:*23*
181:*6, 21*  203:*7*
206:*21*  237:*6*
261:*5*  290:*7*
319:*13*  386:*22*
396:*15*  408:*22, 23*
**reviewed**  15:*1, 2, 3,
5, 7, 13*  22:*6, 14*
23:*18*  28:*8*  29:*2,
10*  36:*8*  186:*6, 8*
201:*3*  206:*18*
271:*3*  274:*18, 20*
333:*22*  359:*18*
406:*17*
**reviewing**  276:*8*
375:*21*  376:*5*
378:*11*  409:*7*
**revised**  262:*18, 21*
274:*18, 20*  340:*2*
**revising**  274:*12*
**revisions**  274:*7*
275:*2*  276:*9*
339:*23*
**RFP**  6:*8*  8:*20*
277:*12*  341:*19*
**Rice**  322:*16, 18*
**RICH**  1:*14*  2:*2*
11:*5, 13*  12:*15, 21*
112:*8*  174:*12*
176:*6*  205:*5*
221:*17*  234:*13, 14*
267:*5, 13, 17*  268:*8*
276:*19*  282:*6*
285:*21*  360:*21*
372:*13, 23*  382:*6*
411:*6*
**R-I-C-H**  12:*22*
**Rich's**  147:*13*
**right**  13:*10, 11, 13*
32:*2*  45:*22*  56:*1*
67:*20*  69:*17, 19*
75:*2*  82:*22*  86:*15*
91:*6, 13*  107:*14*
108:*5, 10*  109:*5*

112:*15*  113:*9*
115:*16*  117:*12*
121:*4*  151:*21*
161:*4*  162:*21*
164:*9*  183:*14*
185:*15*  191:*15*
198:*17*  209:*18*
217:*9*  225:*4, 8*
227:*17*  230:*22*
236:*18*  240:*3*
245:*6, 13*  246:*9, 12*
249:*22*  257:*19*
258:*12, 16, 22*
269:*6*  277:*7*
278:*12*  279:*5, 12*
281:*22*  282:*3*
287:*6*  295:*14, 22*
302:*17*  311:*11*
316:*11*  329:*6*
342:*17*  344:*14*
347:*8, 17*  360:*22*
364:*18*  367:*22*
373:*7*  375:*4, 8*
378:*7, 19*  379:*10,
11, 12, 14*  380:*20*
381:*1*  383:*14, 17*
384:*4*  387:*2*  388:*5,
9, 23*  390:*4*  393:*14*
394:*16*  397:*4, 9, 22*
398:*14, 20*  402:*13*
403:*23*  405:*20*
407:*16*  408:*3*
409:*7*
**right-hand**  281:*3*
**rights**  34:*11, 13, 16,
21*  35:*16*  65:*18*
99:*23*  103:*16*
153:*11*  166:*5*
174:*2*  303:*7, 10*
304:*11*  364:*9*
367:*19*  368:*7, 11*
375:*2*  379:*9*
380:*12*  385:*11*
389:*22*  402:*4*
**Riley**  162:*16, 19*
**Riley's**  33:*18*
**rise**  190:*14*  227:*21*
**risk**  74:*15*  75:*2*
113:*15, 18*  137:*7*
203:*12*

risks 45:6  112:*18*
113:*7, 10*  284:*9*
road  236:*20*
Rob  283:*7*
Robert  87:*1*
117:*17*  219:2
286:*19*  287:*1, 7*
303:*3*  372:*19*
Robin  351:*1*
354:*16*
Robinson  83:*16*
85:*1*
role  19:*17*  118:2, *9,
11, 12*  119:*19*
169:*18*  170:6
171:*3, 16*  179:*8, 11*
215:*18*  276:2
313:*20*  314:2
407:*20*
Rosalyn  354:*23*
roughly  110:*7*
round  389:*14*
route  54:*4*
routine  95:*16*
104:*14*
Royer  169:*17*
172:6  402:*1*
Royer's  169:*18*
171:*3, 16*
Rule  12:*17*
ruled  88:*9*
Rules  2:*3, 9*
380:*14*  389:*9*
run  129:*20*  234:*10*
runs  156:*12*

**< S >**
safe  30:*17*  378:*4*
safeguards  406:*21*
sake  191:*3*  314:*8*
sales  14:*8*  322:*1*
sat  343:*21*
saving  221:*23*
saw  228:*3*  230:*17*
290:*8*  307:*10*
saying  29:*5*  39:*8*
68:*17*  69:2  74:*3*
85:*17*  130:*14*
134:*23*  147:*12*
214:*12*  256:*18*

258:*21*  259:*18*
282:*11*  363:*16*
says  67:*21*  76:*18,
18*  81:*8*  83:*14*
84:*14*  86:*20*  106:*4*
146:*16, 19*  157:*3,
14*  158:6  159:*5*
161:*1, 1, 5*  165:*11*
166:*7*  167:*8*
170:*13*  173:*14*
180:*7, 20*  181:*16*
184:*19*  185:*1*
186:*4*  187:*21*
188:*13, 13*  189:*11*
193:*6*  194:*11*
203:*15*  219:*12*
224:*2, 4*  235:*8, 17*
239:*15, 19, 20*
240:*4, 7, 11*  242:*9*
243:*22*  244:*22*
246:*11*  247:*1, 14*
248:*22*  258:*9*
259:*2, 5, 14*  260:*2*
262:*2, 9*  273:*13*
277:*17, 20*  281:*14,
20*  282:*4*  283:*6, 16,
18*  284:*14*  286:*18*
302:*12, 18*  303:*8,
11*  304:6  305:*23*
306:*8*  311:*18*
318:*21*  337:*13*
361:*6, 12*  362:*7*
363:*3*  364:*16*
365:*23*  379:*4*
387:*7, 13*  389:*1*
394:*14*  395:*4*
398:*12*  399:*14*
401:*12*  405:*3, 10*
scan  373:*22*
scanned  396:*1*
schedule  258:*9*
scheduled  167:*20*
168:*14*
scheme  37:*7*
School  13:*23*
scope  27:*9*  66:*16*
67:*10*  70:*22*  71:*4,
17, 23*  72:*3, 14, 15,
17*  73:*1, 11, 14*
78:*5*  100:*12, 16, 19,*

23  101:*6*  102:*11*
152:*20*  191:*22*
197:*6, 16, 21*
198:*12*  204:*23*
227:*8*  400:*2*
screen  111:*14*
405:*10, 13*
screening  406:*16,
17*
se  146:*3*
searched  156:*6*
Second  4:*20*  16:*7,
18*  17:2  37:*10*
91:*4*  93:*10*  174:*14*
187:*20*  211:*13*
247:6  250:*5, 8, 10*
277:*16*  280:*18, 19,
19*  282:*3*  303:*17*
306:*7*  309:*21*
339:*10*  346:*17*
356:*12, 12*  379:*5*
387:*12, 14*
secondly  407:*6*
Section  7:*20*  233:*3*
321:*3*  341:*9*  361:*6*
405:*10*
secure  30:*18*
security  313:*16*
318:*19*  319:*5*
407:*21*  408:*1*
security,  407:*13*
see  32:*1*  53:*13*
54:2  80:*5*  87:2
113:*1*  120:*14*
163:*22*  165:*9, 14*
166:*4*  169:*15*
178:*16*  179:*21*
180:*5*  188:2
193:*10*  210:2
213:2  219:2
236:*19*  238:*11*
244:*12*  250:*14*
255:*7*  258:*21*
270:*23*  272:2
273:*8, 18*  277:*19*
280:*8, 22*  281:*7, 16*
283:*8, 10, 13*
284:*19*  290:*8*
295:*5, 13*  317:*13*
344:*12*  347:*11*

356:*14*  361:*3, 10*
362:*5, 9*  363:*5*
364:*21*  376:*6, 10*
405:*6*
seeing  273:*4*  349:*7*
seek  229:*6*  379:*11*
seeking  38:*13*
138:*3*  154:*3*  208:*9,
17*  274:*5*
seen  17:*8*  22:*3, 9*
39:*22*  93:*16*  107:*4*
206:*15, 21*  232:*23*
273:*1*  289:*20*
310:*13*  328:*23*
338:*1, 2*  342:*20*
348:*9, 19*  359:*18*
397:*6*
select  180:*22*
selected  270:*1*
self-insured  49:*22*
semblance  249:*20*
send  60:*14*  61:2,
*15*  62:*18*  63:*10*
68:6  70:*14*  97:*21*
99:2  110:*5*  111:*10*
115:*6, 17*  159:*6*
233:*17*  262:*20*
328:*8*  339:*22*
sending  59:*13*
60:*6, 21*  61:*9*  62:*7*
68:*4*  101:*23*
373:*17*
sense  34:*20*
112:*19*  170:*5*
253:*21*  254:*17*
314:*20*  316:*6, 7*
322:*11*  325:*22*
327:*1*  356:*1*
386:*16*  390:*7, 22*
sent  61:*21, 22*
62:*13*  63:*16*  115:*2,
14, 15*  121:*10, 15*
160:*9*  174:*12*
177:2  188:*19*
232:*13*  237:*1*
243:*17*  245:*22*
258:*11, 18*  297:*15*
339:*21, 23*  367:*12,
13*

**Jeff Rich - Madison County  Representative**                    460

**sentence**  81:*16*
85:*16*  89:*3, 4, 11*
90:*23*  146:*22*
148:*20*  180:*4, 14*
181:*10*  189:*10*
193:*6*  210:*22*
217:*16*  224:*13*
239:*14*  240:*4*
245:*23*  246:*4*
250:*8, 10*  259:*13*
273:*13*  282:*3*
284:*14*  295:*2*
303:*8, 11*  306:*7*
320:*4*  358:*1*
364:*16*  366:*21*
379:*5*  395:*3*  397:*1*
399:*13*
**sentences**  83:*10*
195:*6*
**separate**  27:*22*
84:*13*  123:*22*
152:*3*
**separated**  98:*8*
**separately**  76:*8*
344:*21*
**September**  6:*12, 14*
279:*14*  280:*11*
281:*4*
**sequence**  117:*9*
148:*15, 19*  163:*13*
174:*11*  250:*1*
259:*1*  304:*18*
406:*2*
**sequencing**  149:*9*
**series**  167:*3*  169:*8*
186:*22*  270:*9*
318:*10*  384:*22*
385:*11*
**serious**  37:*1*  74:*13,*
*14, 23*  75:*11, 14*
77:*13, 16*  79:*18*
81:*1, 7, 11*  82:*2, 20*
83:*5, 18*  84:*4*  85:*2,*
*11*  86:*17, 21*  87:*5,*
*21*  88:*4*  111:*15*
170:*1*  179:*20*
218:*20, 22*  219:*15*
223:*14*  228:*1*
**seriously**  169:*23*
334:*16*

**servants**  194:*1, 5, 7,*
*12*  345:*16*
**serve**  269:*6*
**served**  322:*20*
**serves**  169:*19*
**Service**  161:*17*
201:*23*  350:*8*
**Services**  6:*4, 6*
7:*12, 16, 20, 22*
20:*19*  24:*22*  25:*18,*
*21*  27:*13, 17*  28:*2*
31:*16, 21*  34:*1, 6*
40:*5, 8*  61:*12*
79:*12, 20*  85:*6, 8*
89:*9*  106:*18, 22*
123:*20*  124:*1*
142:*11*  149:*4*
150:*8, 10*  152:*18,*
*20*  187:*19*  190:*7,*
*16*  191:*13*  195:*2,*
*15, 23*  196:*3*  197:*6,*
*13, 14, 14, 15, 15, 16,*
*21*  198:*5, 13, 17*
203:*2, 10, 18*
215:*10*  216:*7*
227:*8*  241:*9*
243:*14*  258:*10*
263:*3*  270:*2, 18*
272:*6, 15*  274:*8, 22*
277:*23*  289:*14, 21*
296:*4*  298:*13, 22*
299:*9, 17*  300:*10*
313:*4, 7, 9*  314:*1,*
*17, 19, 23*  323:*4, 9,*
*12*  324:*6*  326:*9*
339:*12*  343:*2, 3, 17*
345:*22*  346:*22*
376:*13*  404:*22*
**session**  306:*23*
**sessions**  199:*6*
**set**  98:*12*  175:*18*
176:*8*  192:*8*
200:*14*  222:*16*
377:*19*  395:*16*
402:*3*
**sets**  198:*8*
**setting**  343:*1*
**settle**  38:*7*  104:*2,*
*3*  112:*16*  113:*3*
115:*12*  183:*20*

184:*5, 9*  353:*3, 9,*
*10, 18, 19*  366:*18*
368:*15*  375:*12*
393:*21*  403:*17*
**settled**  38:*8*  46:*13,*
*16*  112:*12*  113:*17*
133:*20*  184:*11*
225:*10*  375:*10*
**settlement**  37:*21*
38:*5*  41:*8*  43:*8*
57:*14*  101:*5*
112:*17*  115:*20*
129:*11*  138:*15*
185:*17*  254:*8*
352:*11, 21*  367:*7,*
*16, 20*  368:*4, 11, 12,*
*15*  379:*15*
**settlements**  42:*6*
43:*3, 9, 11*  55:*11*
114:*4, 7*  139:*2*
**seven**  32:*13*  335:*9*
**severally**  388:*4*
**severely**  388:*6, 7*
**severity**  46:*12*
125:*4*  403:*14*
**share**  33:*1*  69:*18*
92:*10, 13, 16*  93:*3*
119:*11*  160:*14*
181:*7*
**sharing**  92:*21*
93:*17*  122:*11, 21*
125:*11*  187:*1, 15*
**Shaver**  402:*2*
**sheets**  293:*16*
**Shelley**  146:*12*
147:*1, 22*  237:*2, 5*
**SHERIFF**  1:*2*
14:*5*  16:*16*  21:*12,*
*15*  24:*20, 23*  25:*23*
26:*4*  27:*15*  30:*13,*
*21*  31:*1, 14, 18*
35:*7, 12*  36:*2, 18*
50:*12*  56:*18, 21*
57:*8*  62:*12*  66:*4*
69:*23*  70:*6*  82:*18*
83:*4*  84:*9, 11, 18*
86:*17, 20*  91:*20*
93:*1, 8*  113:*22*
116:*9*  119:*8, 11*
124:*9*  130:*8*  140:*1*

143:*14*  145:*1, 14*
148:*14*  149:*2, 11,*
*14*  150:*4*  152:*3*
153:*15*  154:*3*
155:*22*  158:*12, 16,*
*23*  159:*10*  160:*9,*
*14, 19*  162:*6*  172:*1*
179:*20*  185:*19, 21,*
*23*  188:*16*  194:*7*
202:*4, 18*  203:*2, 23*
204:*21*  208:*9, 19*
212:*5, 19, 23*
217:*23*  219:*8, 12*
220:*4, 15*  221:*1, 2*
222:*17*  227:*11*
228:*1*  229:*1*  230:*6*
231:*16*  232:*4*
233:*7*  235:*15*
239:*13, 17*  240:*6, 9*
241:*4, 5, 8, 20, 22*
242:*13, 16*  243:*3, 9,*
*11*  246:*7, 21*
247:*10*  248:*13, 18,*
*23*  249:*9*  254:*22*
255:*14, 21*  257:*5, 8,*
*15, 15*  263:*5*
265:*18*  269:*17*
270:*12*  271:*6, 19*
272:*16*  273:*11, 17,*
*19*  274:*15*  275:*16*
277:*9*  278:*15, 19*
279:*15*  282:*23*
284:*1, 4, 5*  285:*5,*
*23*  286:*3*  289:*17,*
*19*  292:*12*  293:*4,*
*10*  294:*7*  295:*16*
296:*11, 20*  297:*7*
299:*19*  300:*14*
303:*14*  304:*8*
305:*21*  306:*1, 9, 18*
307:*9*  310:*14*
312:*5, 19*  313:*8*
314:*18*  316:*2, 13,*
*18*  319:*9*  320:*6, 14,*
*16*  321:*13*  322:*14,*
*21*  324:*7*  326:*3, 10,*
*18, 21*  327:*13*
328:*18*  329:*3*
332:*11*  333:*1*
334:*2*  335:*11, 16,*

17, 19  336:1, 8, 12, 22  337:1, 4, 9, 14  339:6  340:17, 23  345:14, 20  346:5, 9, 18, 21  351:17  352:23  353:6  354:5, 7  355:6, 11, 16, 18  356:6, 17, 20  357:1, 4, 7, 13, 19, 21  358:9, 14  359:1, 5  360:21  362:1, 19  363:1, 9, 13  364:5, 17  365:2, 6, 14  366:18, 20  367:1, 3, 9, 19, 23  368:6, 14, 19  369:20  370:6, 16, 22  371:4, 10  374:5, 9, 17  376:7  379:7  380:8, 20  382:17  383:10  384:12, 14  390:9  393:8, 8, 13  394:2, 9, 15  395:1, 5  396:6, 15  399:8, 10  402:3  404:10  407:23

**Sheriffs**  322:14

**sheriff's**  78:1  84:10  93:12  118:4  132:18  137:2  145:6  163:7  201:22  204:8, 10, 15  205:1  239:9  247:3  254:22  269:15  270:12  276:2  281:14  282:12, 20  289:13  315:10, 15  352:9, 9  357:8  369:14  373:6  375:3  377:22  378:4  403:4

**Sherrod**  207:22

**Sherry**  300:15

**shortly**  263:2, 7

**show**  18:11  32:21  53:16  146:10  154:10  160:7, 13  161:16  166:15  169:8  174:17

193:17  272:9  276:12  278:7  279:9, 23  285:16  286:9  294:14  295:10, 20  296:17  298:7  304:19  308:9  335:7  336:13, 15, 18  338:22  341:16  342:3  372:14  378:15  407:19

**showed**  231:2  281:20  282:4  308:20  325:8

**showing**  108:4  186:18

**shown**  154:13  276:18  278:17  279:17  317:14

**shows**  160:8  301:2  310:8

**sic**  33:19

**side**  191:8, 8, 9  344:10, 10  353:15

**sidetracked**  361:18

**sign**  188:20  189:1  296:12  339:21  340:5  408:19

**signature**  257:23  258:11  296:23  297:2, 16, 17, 21  317:17

**signatures**  299:22

**signed**  110:17  241:9  242:2  258:3  270:8  296:11, 20  297:7  299:19  300:14  305:4  313:14  340:7  342:23  357:11, 15  363:22  365:22  368:20  369:6

**significance**  59:23

**significant**  158:15  162:8  163:1  225:20  289:5

**signing**  3:2  188:21  258:15  270:17  370:5, 17, 23

**silly**  53:2  162:1

**similar**  30:6  302:6

**similarities**  33:20

**simple**  108:15  222:2

**simply**  96:5  103:2  137:9  147:23  148:21  156:13  166:2  223:1  245:9  285:3  291:18  319:21

**single**  115:14  293:15  343:22

**singular**  81:16

**sir**  32:9  82:16  83:9  166:7, 12  356:10  395:11

**Sirote**  13:23  14:2, 17  66:12  67:11, 19, 22  70:13, 19  71:4, 9, 17  73:2, 11  74:7  100:13  102:21  275:5  324:10, 23  326:1, 12  401:23

**Sirote's**  73:1  102:11

**sisters**  269:4

**sit**  213:9  250:23  271:11  331:4

**Site**  203:6  241:12

**sitting**  214:11

**situation**  134:9  210:18  292:3  381:20

**situations**  382:22

**six**  32:13  63:4

**size**  156:15  202:14

**slide**  290:22

**small**  348:23

**Smith**  44:16  96:17  99:3, 10, 13  230:11  233:20  403:23

**sole**  37:14

**solely**  36:7  153:4  237:15  325:4  389:6

**solve**  284:18

**somebody**  147:15  153:23  179:17

214:5  252:19  263:10  355:20

**somebody's**  111:13

**someone's**  405:22

**sorry**  33:9  40:16, 20  59:12  67:12  76:13  86:10, 14  91:7  92:3  116:23  123:10  131:8  136:20  140:20, 23  146:23  184:23  219:4  220:21, 23  242:15  246:13  249:17  276:21  281:22  284:5  285:17  292:6  298:23  306:21  317:11, 18, 21, 22  318:2  324:12  360:5  362:2  364:11, 14  381:8

**sort**  36:21  37:9  40:22  46:4  69:21  153:15  176:8  177:1, 5  180:12  199:6  221:16  223:22  263:14  362:5  395:6

**sorting**  291:19

**sorts**  146:4

**sound**  45:22  110:8  161:23  176:11  353:9

**source**  276:2  277:4

**sources**  320:17

**Southern**  272:17, 18  273:14  288:23  291:19

**speak**  11:6  13:8  267:6

**speaks**  85:2  147:6

**Specialty**  141:16

**specific**  16:13  26:3  28:15  32:10, 21  45:23  56:10, 14  61:14  104:8  120:11, 16  121:7  128:5  129:23  140:7  146:1  163:12  164:5

168:7  203:6, 13
209:14  263:20
287:10, 18  288:7
291:6  292:11
334:12  335:5
348:7  367:21
377:16  388:4, 9, 14
390:6  409:9
**specifically**  15:8
16:6  21:7, 20  34:7
44:20  45:1, 2
57:17, 20  88:13
95:13  97:5  103:12
111:8  114:10
123:6  159:6, 13
160:17  161:20
200:16  201:18
202:6, 23  271:15
347:23  402:7, 17
**specifics**  47:1
126:18  168:18
283:21  287:22
290:15, 19
**speculate**  355:11
**speculation**  355:12
**spell**  44:18  131:10
**spelled**  150:9
**spend**  104:19
125:7  136:3  223:7
**spent**  41:14
222:14  320:18
355:16
**split**  39:20  93:17
122:17  124:10, 14
174:1  176:18
177:21, 22  178:3
185:9  253:12, 16,
17  254:1, 2, 6
255:14  397:2, 8, 10,
18  398:4, 13  399:7
**splits**  254:15
**splitting**  42:15, 18
187:1
**spoke**  173:14, 20
**spoken**  157:14
**spring**  153:4
**stack**  238:19
**staff**  114:18
199:13, 14, 23
200:2, 9, 9, 11, 12

201:7, 22  204:1
213:21, 22  214:20
288:12  355:16, 17
356:6  405:16, 17
**staffed**  348:2
377:23
**stages**  60:18
**stand**  149:3
246:13  289:5
**standalone**  222:2
223:1
**standard**  161:8
210:7, 11  262:3
**standards**  198:9
199:21  316:21
**standing**  73:3
134:12  150:3, 18
216:13  229:7
257:9
**standpoint**  125:5,
20  343:6  351:16
383:1
**staph**  199:22
**stapled**  318:9
**Star**  284:22  285:2
301:6  302:5  304:3
329:8, 16  330:6
**start**  11:22  158:13
205:8  286:15
347:6
**started**  114:9
269:18  285:4
369:5  396:2
**starting**  12:13
192:8  258:6  274:9
388:20  397:1
**starts**  90:4, 6
173:11  180:4
223:22  377:15, 16
396:20
**State**  2:5  11:5
12:20  23:22  49:11
50:12  91:14  123:3,
7, 10  147:23
170:21  197:22
208:2  258:14
261:22  267:5
291:23  329:10, 11,
17  330:7, 13

339:11  378:21
411:3, 21
**stated**  66:3, 10
79:7  82:6  83:23
102:20  142:19
191:23  242:11
243:23  339:13
357:20  370:17
394:16  395:2
**statement**  222:23
262:3  320:13
347:15  348:17
370:8  393:2
398:12
**statements**  57:6
340:8
**STATES**  1:1
37:11  143:20
144:6  166:4  167:7
174:2  247:9
250:11  280:20
317:6, 12  368:6
387:15
**stating**  123:6
259:20
**status**  49:1  56:17
158:22, 23  246:5, 7
262:1  330:22
357:9
**statute**  234:10
**statutorily**  315:7
**statutory**  136:13, 23
**stenotype**  411:7
**step**  127:12
**STEPHEN**  59:9
**Stephens**  4:4
10:10  11:23  12:1,
11  17:12  40:16, 20
58:17  111:2
141:12  147:5, 12,
19  155:8  156:4, 22
166:17, 23  175:21
184:1, 5  191:2
192:3  205:7  218:8,
14  227:17  247:22
249:14  266:10
267:20, 20  268:6, 7
272:23  308:19
309:4  321:19
324:12, 17, 19

372:1, 21  381:2, 4,
6  392:9  401:4, 7
402:20
**Stephens:**  58:14
184:3  190:21
249:16  309:8
372:13
**steps**  109:2  329:15,
20
**Steve**  84:9  113:22
211:4, 6, 22, 23
213:12, 15, 22
214:4, 10, 22  215:3,
8, 17, 20, 23  216:5
221:3  309:17
**stick**  76:5  118:22
119:3
**stipulate**  3:1
**stipulated**  3:5
**stipulations**  12:9
268:4
**Stone**  131:5, 11, 15,
20  132:1, 2, 3
140:17  141:4
**Stop**  223:17, 17, 17
266:1  337:20
372:1, 4
**stopping**  63:18
**straightforward**
117:2
**Strange**  381:6, 7
**strategic**  203:6
**straw**  263:14, 19
**Street**  10:18
**strictly**  152:4
207:23
**strike**  103:11
237:10  354:20
**structure**  231:14
**stuff**  141:7  146:4, 5
**style**  202:15
**subitems**  64:11
**Subject**  19:9
52:16  64:23  65:17
68:2, 3  72:6  73:23
79:8  235:6  379:8
**subjectively**  74:12
**Submission**  8:22
**submit**  254:19

**submitted** 170:*18*
277:*23* 318:*22*
383:*3*
**subparagraph** 83:2
**subpart** 345:*8, 11*
346:*3, 15* 362:6
**subparts** 344:22
362:5
**subpoenas** 293:5
**subrogation** 137:*20,
23* 236:*13, 15, 17*
**subsequent** 96:*3*
99:7 173:*8* 210:2
274:7 319:*14, 17*
334:*18*
**subsequently** 391:7
**substance** 178:*11*
256:*1*
**substantial** 198:6
**substantive** 260:*12*
**substantively** 344:*1*
**substitute** 308:*13*
**substituted** 308:*15*
**sued** 16:*16* 47:*12*
106:*8* 128:*17*
129:*1, 4, 9, 12*
141:*9* 148:*1, 22*
149:22 224:*12*
245:*10* 345:20
346:*5, 10, 19*
**suffered** 74:*13, 22,
23* 150:6, *13* 151:*8*
**suffering** 81:5 88:2
**sufficient** 158:*11*
239:*8*
**sufficiently** 88:*10*
**suggested** 35:*20*
323:22 325:7
**suggesting** 219:*20*
**suit** 31:*4, 6, 15, 20*
33:*21* 84:*16*
117:*20* 172:*18*
**Suite** 10:*12, 18*
**suits** 16:*9* 33:*4, 6,
11* 44:*23* 52:*16*
**sum** 40:*22*
**summaries** 99:*14*
**summary** 83:*14*
87:*9* 115:*8* 322:*8*

378:*13*
**summed** 387:*14*
**summer** 301:*20*
**sun-setted** 320:2
**supervise** 215:*8*
**supervises** 87:*6*
219:*16*
**supervision** 210:*13,
15, 20* 213:*14, 17*
214:*9, 13, 18*
**supervisory** 204:*3*
216:*4*
**supplies** 197:*4*
200:*4*
**support** 44:*5* 55:*1*
65:*10*
**supported** 126:*20*
134:*23*
**supposed** 251:*19*
327:*23* 329:*23*
408:*10*
**supposedly** 251:*3*
286:*5*
**suppress** 371:*12*
**suppression** 370:*4*
**sure** 13:*14* 20:*5*
22:*18* 28:*15* 39:*7*
42:*4, 13* 43:*1* 53:*9,
13* 56:*7* 64:*8, 10*
67:*15* 75:*21* 80:6
90:*23* 95:*1, 1*
100:*5, 6* 104:*13*
115:*21* 116:*19, 20*
119:*16* 123:*23*
132:7 137:*14*
144:*2, 22* 148:*1, 21*
149:*6, 17* 155:*15*
165:*3* 168:*4* 170:*1*
171:*15* 174:*5*
175:*4* 177:*9*
185:*13* 191:*5*
192:*14, 21* 196:*4*
201:*14* 210:*12*
239:*11* 245:*10*
249:*13* 252:*19*
265:*3, 6* 272:*23*
284:*9* 287:*4, 16*
290:*1* 301:*19*
302:*19* 315:*17*
324:*3* 326:*5*

327:*12* 334:*21*
344:*4* 359:*4*
361:*17* 392:*4, 18,
23* 393:*6, 11* 395:*8*
399:*9* 406:*9* 407:*3*
**surprised** 369:*13*
**surrounded** 239:*4*
**surrounding** 57:*13*
238:*7, 16*
**suspect** 168:*9*
324:*20*
**sustained** 20:*18*
37:*12, 17*
**swear** 11:*21*
**SWIFT** 10:*17*
**sworn** 11:6 12:*7*
267:6 268:2
**system** 195:*23*
196:*3* 201:*16*
203:*4* 292:*13*
351:*13, 22* 352:*8*

**< T >**
**table** 178:*10, 20*
256:*16*
**tailored** 201:*18*
**take** 31:8 63:*18*
67:*12* 72:*7* 74:*4*
91:*3* 102:*23* 103:*1*
109:*1* 111:*23*
172:*20* 181:*5*
186:*21* 210:*1*
212:*22* 216:*23*
217:*7, 9* 218:*8*
228:*20* 265:*19, 20*
270:*19* 297:*13*
313:*11, 23* 315:22
329:*15* 343:*12, 18*
346:*12* 356:*3*
403:*11*
**taken** 2:*2* 11:*17*
22:*10* 57:*16* 63:*21*
65:*18, 22* 66:*7*
70:*5* 80:*11* 81:*16*
82:*7* 89:*12* 112:*4*
143:*8* 163:*11*
176:*2* 218:*11*
265:*23* 292:*1*
298:*2* 329:*20*
358:*5* 369:*22*

370:*10* 372:*8*
396:*3* 403:*16, 17*
411:*6*
**takes** 145:*2* 367:*8*
**talk** 16:*21* 156:*14*
167:*9, 17* 168:*20*
178:*10* 272:*3*
363:*20*
**talked** 45:*8* 57:*21*
63:*7, 7* 126:*12, 17*
139:*21* 140:*5*
156:*6* 188:*8*
215:*11* 252:*9, 15*
287:*21* 324:*3*
327:*9* 350:*4* 360:*9*
380:*16* 399:*11*
**talking** 16:*23* 58:*1,
3* 59:*18, 19, 20*
60:*1, 2, 4* 64:*3, 13*
102:*14* 111:*21*
128:*20* 151:*21*
163:*19* 185:*1*
195:*11* 205:*12*
220:*2* 247:*9*
252:*14* 253:*8*
254:*10* 256:*1*
286:*22* 287:*7, 15*
356:*9* 364:*10*
365:*18* 403:*7*
**tape-recorded**
340:*18*
**tasers** 265:*13*
**task** 386:*12*
**tax** 14:*6, 7, 8* 322:*1*
**taxpayers** 38:*3*
45:*10* 48:*7, 7*
125:*7, 12*
**tazed** 349:*5, 9*
**technically** 84:*7*
**telephone** 121:*13*
188:*9*
**tell** 16:*13* 22:*23*
31:*10* 44:*20* 45:*1*
52:*13, 23* 55:*22*
73:*4* 95:*13* 104:*8*
116:*4* 119:*3*
127:*22* 128:*2*
165:*20* 172:*5*
213:*18* 214:*10*
215:*20, 23* 226:*15*

228:*12*  238:*20, 21*
240:*8*  245:*8*
253:*14*  255:*17, 18*
260:*7*  269:*9*
275:*14*  321:*16*
329:*19*  331:*18*
368:*1*  406:*3*
409:*12*
**telling**  51:*20*
107:*23*  173:*17*
207:*17*  214:*10*
369:*5*  395:*13*
**tells**  67:*16*
**tender**  71:*1*  91:*15,*
*17*  101:*15*
**tendered**  93:*20*
94:*13, 15, 19, 20*
101:*12*
**Tennent**  205:*23*
**tenure**  235:*22, 23*
**term**  75:*13*  188:*17*
194:*22*  214:*9*
241:*16*  246:*15, 17*
247:*18*  299:*17*
332:*12*  337:*7, 10*
365:*4*  407:*13*
**termed**  66:*1*
**terminate**  97:*11*
263:*10*
**terminated**  242:*3*
289:*8, 11, 12*
350:*15, 20*
**terminating**  271:*20*
**termination**  258:*2*
**terminology**  187:*19*
**terms**  31:*18*
104:*12, 22*  105:*3, 9,*
*14, 17, 21*  149:*8*
164:*12*  195:*12*
257:*22*  263:*14*
275:*17, 23*  288:*19*
302:*7*  320:*8, 10*
327:*21*  336:*2*
361:*20*  362:*12*
402:*4*
**test**  201:*14*  209:*15*
**testified**  11:*8*
19:*11*  26:*21*  109:*8*
160:*1*  267:*8*
293:*13*  314:*4*

369:*12*  370:*23*
402:*14*
**testify**  12:*17*  18:*3,*
*15*  20:*7, 11*  32:*6*
68:*15, 16*  268:*10*
**testifying**  19:*17*
159:*18*  407:*4*
**testimony**  14:*21*
19:*21, 23*  20:*8*
100:*15*  213:*15, 20*
244:*3*  251:*22*
359:*21, 21*  377:*6*
411:*9*
**text**  156:*9*
**Thad**  10:*23*
**Thank**  161:*10*
**Thanks**  167:*11*
**theme**  387:*13*
**theory**  69:*21*
134:*6*  228:*12*
**therefor**  81:*4*
**thereof**  2:*17*
**thereto**  411:*7*
**thing**  46:*5, 9*
64:*17*  147:*20*
241:*3*  332:*5*  399:*4*
**things**  45:*6*  48:*3*
64:*6*  87:*13*  130:*13*
137:*10*  149:*15*
152:*9*  200:*4, 10*
221:*15*  225:*2*
261:*14, 15*  263:*8*
270:*15*  284:*7*
290:*21*  291:*7*
293:*21*  297:*14*
314:*7*  325:*9, 11*
346:*13*  393:*9*
405:*1*  409:*2, 10*
**think**  15:*13, 23*
16:*1, 10*  26:*10, 13,*
*14*  27:*6*  29:*6*
30:*10*  31:*11, 22*
32:*9*  33:*5, 12, 16*
39:*4*  40:*7*  42:*21*
47:*22*  50:*8*  51:*14*
55:*5*  56:*8, 20*  58:*6*
61:*20*  63:*13*  66:*14*
68:*4*  73:*5, 13*  74:*1*
76:*10*  84:*8*  86:*12*
90:*19*  101:*20, 21*

105:*12*  107:*19*
108:*12*  110:*4, 9*
114:*11*  117:*15*
123:*14*  129:*7, 8*
130:*21*  131:*22*
132:*5, 11*  138:*10,*
*22*  141:*5*  144:*14,*
*19*  146:*2*  150:*8*
151:*11*  155:*3, 5*
156:*13*  157:*6*
159:*8*  161:*21*
163:*14*  170:*9, 11,*
*17*  171:*7, 10*
172:*16, 23*  177:*1, 5,*
*23*  178:*7, 21*  179:*5,*
*16*  184:*2*  187:*6*
191:*7*  195:*7*
196:*17*  197:*6, 23*
198:*11*  199:*6, 7*
203:*22*  206:*2, 8, 14,*
*18, 21*  207:*19*
208:*11, 19*  219:*11*
222:*11*  224:*23*
225:*23*  226:*1, 3*
227:*19*  232:*7, 9, 11,*
*16, 20*  233:*1*
234:*11*  235:*9, 14*
236:*23*  238:*8, 20*
242:*8*  243:*21*
249:*23*  251:*10*
253:*20*  254:*16*
255:*1, 2, 19*  256:*18*
257:*10*  258:*5*
269:*5*  271:*9*  280:*7*
285:*3*  287:*6*
289:*23*  292:*17*
301:*20*  309:*4, 5, 6*
313:*20*  314:*3, 13*
319:*18*  322:*9*
323:*15*  324:*4*
325:*10*  326:*22*
331:*14, 15*  332:*14*
335:*18*  339:*22*
344:*7*  349:*9*
351:*21*  352:*19*
358:*5*  359:*9*  360:*7*
362:*14*  367:*21*
368:*2*  375:*9*
380:*22*  381:*15, 22*
382:*1*  384:*20*

391:*3, 4, 7*  392:*9*
395:*23*  396:*3*
397:*14, 17*  400:*13*
401:*4*  403:*2*
406:*20*
**thinks**  57:*4*  58:*6*
**third**  140:*16, 17*
180:*2, 3*  193:*6*
259:*3*  363:*2*
**third-party**  204:*4*
**this,**  318:*11*
**thought**  32:*16*
128:*19*  155:*5*
177:*8*  184:*6*
200:*18*  219:*5*
223:*19, 23*  237:*21*
301:*23*  360:*6*
369:*15*
**thoughts**  174:*7, 8*
176:*19, 21*  177:*6*
**threats**  128:*7*
**three**  37:*22*  38:*7*
133:*19*  180:*16*
181:*18*  182:*3*
202:*13*  226:*13*
266:*3*  290:*18*
336:*14*  344:*21*
352:*13*
**tied**  134:*18*  209:*11*
**time**  2:*16, 21*
11:*12*  13:*8*  14:*2,*
*17, 19*  29:*8, 8, 10*
43:*21*  44:*3*  48:*21,*
*22*  95:*15*  97:*15*
101:*12*  102:*12*
109:*17*  110:*5*
116:*4*  117:*23*
119:*6*  120:*9, 12, 17*
143:*4*  145:*4*
146:*15*  148:*8*
149:*6*  158:*2*  159:*7*
160:*1*  168:*12*
170:*10*  171:*2, 8*
176:*21*  177:*8, 11*
179:*1*  186:*14*
199:*12*  201:*3*
202:*11*  204:*3, 4*
205:*5*  210:*1*
212:*22*  215:*21*
216:*1*  227:*20*

229:*8, 12, 19, 20*
230:2   231:*17*
233:*12*   234:*8*
237:*15, 23*   243:*15*
250:*19*   256:*8*
257:*13*   260:*11*
261:*7, 10*   267:*11*
268:*13*   269:*6*
271:*9*   274:*19, 23, 23*   277:22   283:22
285:*4*   288:*7, 9, 9, 23*   289:21   299:*18*
300:*12*   307:*11*
320:*21*   325:*1*
328:*16*   334:*15*
335:6   340:*4, 7, 14*
342:22   346:*12*
350:*17, 17*   351:*7*
355:*13, 15*   359:16
364:*19*   372:*4*
379:7   383:*17*
385:22   386:*12*
389:9   394:*17*
396:*14, 18*   399:22
400:*5*   401:*3*   407:*1*
408:*13*   409:*6*
**timed**   237:*12*
**timeframe**   120:*14*
225:*17*   244:*14*
260:20   261:*20*
263:7   269:*11*
272:*4*
**timely**   387:*19*
**times**   96:*1*   97:*8*
111:*3*   141:*6*
207:*23*   231:*11*
235:6   237:*18*
270:8   296:*23*
343:*4*   356:*19*
380:*18*   409:*20*
**timesheet**   386:*15*
**timestamps**   147:*9*
**timing**   257:*11*
261:*8*
**title**   212:*1, 3*
**titled**   209:22
**today**   14:*21*   17:*21*
18:*3, 7*   85:*8*   93:*11*
109:*15*   127:*19*
163:20   206:22

213:*10*   214:*11*
249:7   250:*23*
271:*11*   282:*18*
294:*23*   321:*1*
331:*4*
**Today's**   11:*11*
267:*10*
**told**   49:*9*   56:*5*
57:2   119:*1*   180:*3*
205:*4*   222:*17*
240:*17*   251:*11, 14,
17*   271:*14*   370:*1*
398:*17*
**top**   51:*21*   154:*12*
169:*14*   173:*10*
197:*12*   248:*8*
250:6   291:*18*
334:*4*   341:*21*
379:*4*
**topic**   45:*19*   51:*4*
54:*18*   63:*4*   114:*14*
117:7   121:*1, 18*
122:*5*   130:*1*   186:*9,
23*   187:*15*   253:*3*
271:*23*   272:*1*
385:*4, 13*
**topics**   178:7
271:*17*
**tort**   341:*9*
**total**   40:*18*   139:*1*
266:7
**totally**   394:*6, 7*
**touch**   55:*19*   402:*20*
**touched**   55:5
**tour**   245:*16*
**toured**   270:*11*
**Trace**   248:*11*
**track**   237:9
**traffic**   238:7
**trail**   237:*10*
**train**   80:2   228:*14,
17*   265:*12*   314:*10*
**trained**   150:*20*
210:*13, 15*
**training**   199:*2, 6, 7,
19, 20*   200:*2, 11, 14*
201:*6, 7*   202:*2, 20,
23*   203:*8, 16, 19, 20*
204:*1, 2, 4, 8, 10, 17,
18, 22*   205:*1*

215:*12*   265:*8*
314:*5, 13, 16*
387:*20*
**transcribed**   411:7
**TRANSCRIPT**
1:*14*   252:*8*   411:*9*
**transcription**   411:*8*
**transition**   201:22
202:*4, 7*   288:*21*
292:*9*
**transitioned**   202:*15*
**transportation**
198:*22*
**Travelers**   290:*3*
**trays**   313:22
**treated**   348:*15*
**treatment**   81:7
88:*4*   387:*18, 21*
**tremens**   347:*11*
**trends**   52:*8*   225:2
**Trey**   30:*21*   33:*18*
57:22   58:20
139:*21*   162:*16, 17,
18, 18, 22*   163:*4*
167:*6, 15*   177:*15*
179:*3*   375:*2, 10*
379:*19*   380:*2, 6, 16*
381:*11, 13, 16, 19*
382:7   384:*11, 13,
15*   386:*1*
**Trey's**   179:*8*
**trial**   2:*18*
**tried**   156:*8*   261:*12*
326:6   352:*3*
**triggered**   152:*14*
**trouble**   59:*6*
**true**   79:*4, 6*   81:*21,
22*   82:*15, 16*   83:*7,
9*   86:*18*   88:*19*
110:*14*   145:*5, 21*
219:22   220:*18, 20*
221:*10*   222:*5*
226:23   313:*12*
346:*14*   347:*15*
348:*17*   357:*21*
358:*16, 18*   366:2
390:22   391:*8, 16*
411:*8*
**truth**   11:*6, 7, 7*
267:*6, 7, 7*

**try**   64:*18*   67:*13*
113:*1*   126:*21*
127:*13, 19*   129:*17*
130:*9, 19*   136:*20*
174:*18*   175:*9*
176:*21*   178:*9*
244:*19, 20*   282:*21*
287:*13*
**trying**   39:*20, 21*
45:*4*   53:*3, 6, 9*
54:*4*   61:*16*   63:*8*
64:*5*   72:*10*   77:*2*
83:*10*   95:*1*   118:*21*
119:*3*   125:*3*
128:*21*   129:*3*
130:*11*   156:*8*
163:*15*   171:*15*
177:*13*   178:*19, 23*
179:*3*   183:*2*
194:*20*   196:*20*
200:*13*   239:*11*
242:*9*   249:*19*
255:*8*   256:*17*
275:*3*   284:*2, 8, 8*
287:*16*   331:*11*
334:*5, 12, 21*
340:*11*   389:*20*
400:*12*   409:*14, 21*
**Tulane**   396:*15*
**Turn**   80:*19*   187:*8*
189:*23*   193:*16*
205:6   221:*12*
379:2   387:*3*
**two**   46:*3*   65:*15*
91:*23*   92:*4*   97:*13,
16*   125:*10, 18*
156:*2, 21*   171:*12*
202:*12*   223:*8*
234:*12*   253:*20*
282:6   308:*10, 16*
309:*6, 9*   331:*7*
343:*13*   356:*11*
358:*23*   362:*5*
378:*18*   409:*10*
**two-foot**   293:*15*
**type**   73:*15*   190:*5*
195:*21*   239:*5*
291:*1*   314:*17*
**typed**   336:*20*

**types**  190:*13*
**typical**  97:*21*
**typically**  98:*11*
184:*8*
**typing**  325:*23*

**< U >**
**Uh-huh**  169:*16*
170:*15*
**Uh-uh**  79:*23*
**ultimate**  100:*8*
101:*4*  104:*1*  151:*5*
183:*19*  184:*10, 16*
254:*7*
**ultimately**  26:*14*
29:*7*  30:*18*  104:*18*
109:*13*  162:*23*
163:*4*  256:*13*
260:*16*  276:*1*
292:*19*  353:*16*
375:*6*  378:*7*
**umbrella**  40:*6*
49:*7*  73:*17*
**unanswered**  70:*21*
**unartfully**  331:*16*
**uncles**  269:*4*
**underlying**  16:*5, 22*
17:*18*  21:*8, 13, 14,*
*16*  22:*2, 6, 8, 10, 19*
23:*3, 8, 14*  29:*4*
30:*7*  32:*11*  37:*13*
38:*20*  39:*11*  42:*10*
43:*13, 16, 22*  44:*8,*
*23*  47:*8, 12*  55:*9,*
*10, 11, 12*  57:*11, 19*
60:*7, 11, 15, 21*
61:*6*  62:*17, 20*
63:*4, 5, 6, 10, 15*
76:*14*  92:*5*  96:*9,*
*18*  114:*7*  115:*17*
116:*1, 6, 15*  117:*4*
120:*3*  131:*16*
132:*19*  133:*3, 5, 17,*
*19*  135:*21*  138:*4*
139:*16*  152:*8, 13,*
*17*  153:*4, 22*
168:*11*  172:*4*
179:*13*  196:*12*
207:*4, 12*  219:*21*
221:*20*  222:*1*

230:*14*  235:*2*
347:*9*  363:*20*
364:*6*  365:*20, 20*
366:*11, 12*  367:*2*
368:*16*  382:*8, 19*
388:*5*  390:*3, 5*
393:*16, 19*
**undersigned**  11:*3*
267:*3*
**understand**  12:*15*
13:*7, 10*  20:*5*
23:*12*  24:*17*  25:*9*
27:*4, 6*  36:*11*
39:*21*  46:*10*  53:*11*
60:*12*  72:*18*  81:*15*
87:*11*  102:*21*
103:*3*  105:*1, 4*
116:*21*  135:*2*
137:*14*  144:*23*
151:*23*  171:*16*
183:*16*  221:*18*
229:*11*  251:*16*
253:*20*  254:*3*
259:*8, 12, 17*
289:*23*  315:*10*
331:*13, 18, 20*
332:*12*  333:*3, 7*
345:*19*  358:*17*
359:*20, 22*  371:*9*
389:*15*  398:*17*
399:*4*  400:*7, 11*
403:*6, 18*
**understanding**
28:*7*  36:*15*  39:*7*
47:*19, 20*  48:*12*
50:*5*  113:*6, 14*
139:*23*  189:*12*
225:*21*  249:*7*
250:*18*  251:*15*
255:*5*  259:*15, 22*
266:*3*  319:*7*
389:*10*  403:*22*
404:*1, 3*
**understood**  67:*10*
118:*12*  119:*19*
140:*2*  180:*8*
233:*10*  239:*12*
253:*22*  254:*4*
287:*17*  397:*8, 18*

399:*5, 10*
**undertook**  292:*18*
**underwriter**  46:*11*
**underwritten**
141:*15*
**Unfortunately**  72:*4*
156:*10*
**unintelligently**
186:*12*
**unit**  76:*1*  348:*2*
**UNITED**  1:*1*
317:*6, 11*
**universe**  206:*13*
**University**  13:*21, 22*
**unknown**  210:*9*
212:*17*
**unqualified**  361:*8,*
*13*
**unquote**  402:*15*
**unrecorded**  292:*4*
**unrelated**  322:*15*
346:*10*  394:*6, 7*
**unremarkable**
348:*23*
**unusual**  350:*3*
**upcoming**  315:*9*
**update**  158:*22*
246:*5*  290:*17*
**upper**  281:*3*
**ups**  180:*9*
**upside**  258:*6*
**USC**  341:*9*
**use**  138:*9*  202:*6*
228:*2*  241:*16*
246:*15*  248:*3*
265:*13*  314:*12*
337:*7, 10*  374:*6*
400:*5*
**Usual**  12:*8*  268:*3*
**utilized**  405:*4*

**< V >**
**vague**  124:*9, 13*
254:*18*
**Vanessa**  354:*23*
**variations**  176:*8*
**variety**  332:*15*
**various**  25:*19*
44:*13*  50:*11*  101:*7*
108:*6, 12, 20*

118:*19, 19*  132:*17*
172:*3*  178:*8*  199:*5*
200:*10*  231:*11, 12*
270:*7*  288:*4*
336:*19*  342:*12*
**vehicles**  301:*9*
**Vendor**  277:*10*
**verbatim**  239:*21*
400:*4*
**verdict**  174:*3*
**verify**  329:*15*
**versa**  214:*21*
**version**  407:*15*
**versions**  174:*15*
**versus**  11:*15*  46:*8*
47:*7*  54:*9*  251:*16*
252:*10*  253:*3*
285:*10*  317:*8*
372:*20*  384:*2*
391:*11*
**vicariously**  141:*10*
**vice**  214:*21*
**Vicki**  2:*4*  11:*4*
267:*4*  411:*14*
**Videographer**
10:*23*  11:*10*  29:*15,*
*17, 20, 21*  63:*19, 22*
69:*5, 8*  80:*9, 12*
112:*2, 5*  154:*7*
175:*23*  176:*3*
218:*9, 12*  265:*21*
266:*11*  267:*10*
297:*23*  298:*3*
338:*15, 18*  372:*6, 9*
410:*2*
**view**  50:*9*  130:*7*
177:*12*  297:*13*
326:*1*
**viewed**  124:*22*
165:*22*  325:*14*
**views**  132:*21*
**violating**  226:*15*
262:*23*
**violations**  22:*5, 13*
23:*5, 11*
**violative**  401:*18*
**visit**  241:*12*
**voice**  333:*15*
382:*10*
**voluntary**  353:*4*

**Jeff Rich - Madison County  Representative**                          **467**

**vote** 276:4 314:21 315:18, 22 316:1, 10
**voted** 257:22 297:4, 5
**vs** 375:17

< W >
**wait** 115:5
**waiting** 257:23
**waive** 73:18 172:14
**waived** 2:11, 22 3:3, 7
**waiver** 368:3
**waives** 74:1
**waiving** 368:7
**Wallace** 354:23
**want** 18:14 23:19 24:1 31:23 32:20 39:9 42:18 55:18 64:7 73:17 118:7 122:2 157:7 162:21 167:8, 9 173:4, 18 181:20 185:12 201:13 204:7 205:11 217:9 221:14 225:22 228:22 232:6 234:12 236:14 238:18 257:3 258:9 263:1 308:17 327:8 334:13 347:3 356:11 361:16 368:1 372:14 390:11, 14 404:23
**wanted** 67:12 130:18 149:17 167:17 170:1 223:21 254:19 287:14 325:10 339:21 353:19 362:11 389:23 399:9
**wantonness** 209:20, 23 377:12 388:23 389:2, 5 390:1 391:5, 13
**wants** 68:20 129:18

**way** 45:18 53:8, 14 130:7 143:20 147:10 154:21 168:13, 23 179:21 194:2, 12 219:20 237:11 244:10 248:7 251:12 288:1 293:19 324:21 338:6 340:20 345:16 351:5 358:14 392:5 395:12 406:7
**ways** 39:23 151:19 152:1 283:19
**weather** 330:12
**weeds** 211:20
**week** 180:10 350:18
**weigh** 180:23
**welcome** 174:6 176:19
**welcoming** 33:1
**Well** 20:7 25:10 41:10 42:17 43:11 46:10 47:23 60:3, 23 63:3 66:21 71:22 73:8 77:8 84:7, 17 94:12 100:11 101:12 103:10 105:2 106:1 109:4, 10 113:10 116:23 120:18 126:3, 4 127:14 128:21 130:14 132:5 133:19 144:17 153:9 155:16, 21 156:17, 22 161:5 164:21 170:12, 23 172:10, 20 181:1, 12 182:11, 20 183:17 184:7 188:5 194:20 195:16 197:20 198:16 200:13 229:9 234:9 237:17 238:10 243:1 248:6 251:13 252:13

253:18 271:20 274:23 278:18 284:6 286:2 293:2 297:12 302:18 308:19 318:21 321:19 326:3 330:21 336:13 337:12 342:21 348:3 353:12 356:1 359:23 365:23 384:7 390:12 392:1, 20 397:13 401:6
**went** 13:23 42:19, 20, 20 91:15 151:2 181:21 228:3 229:2 265:8 389:12 401:2, 6, 9
**we're** 11:12 29:17 59:20 60:1, 2, 4 63:20, 23 69:5 70:7 109:14 112:5 156:5 206:11 217:4 235:6 249:11 252:22 255:3 256:21 263:15
**West** 10:12
**we've** 17:6 45:8 55:3, 5 58:12 63:7, 7 65:13 128:19 138:11 188:8 191:11 252:14
**whatsoever** 221:9
**wheel** 327:8
**whichever** 168:11
**Whisante** 317:8
**Whitney** 74:13 170:13, 17
**Whitney's** 77:13
**wholly** 346:10
**widely** 225:23
**wife** 268:18
**willful** 370:4
**willfully** 368:18, 20 369:4
**Williams** 83:16 85:1 207:14 208:7 217:18 221:9

**willing** 89:9 127:12 339:18 392:2
**willingness** 328:2
**winding** 249:22 358:20
**wise** 400:5
**wisely** 125:8
**withdraw** 331:19, 21 332:1 379:10
**withdrawal** 332:5 347:11
**withdrawing** 91:12
**withdrawn** 332:9, 13 400:20
**withdrew** 90:16 91:10
**witness** 2:15, 16, 20 3:3 11:21 12:7 29:20 40:19 58:14 59:11 154:7 156:17 191:7 227:18 268:2 307:1 377:5 379:1 381:3, 5, 7 401:19 403:3 411:9
**witnessed** 296:23
**witnessing** 349:10
**wondered** 238:2
**wondering** 39:23 200:19
**Woods** 15:21 16:11, 23 20:16 21:2 33:15 37:18 66:8 92:9 113:4 206:11 207:4 231:7, 18 233:12 345:1 349:3, 19 352:12 353:4 366:7 367:5, 18 387:5 391:23 392:3
**word** 91:13 114:11 137:19 138:10 208:19 214:13, 18 324:20 358:22 361:8, 13, 22 362:16, 17, 21 403:12
**worded** 49:4 86:6

**Freedom Court Reporting, Inc**                          **877-373-3660**

**wording**  45:*23*
69:*16*  83:*21, 22*
84:*14*  237:*16*
283:*13, 17*  303:*13*
336:*19*  337:*12*
371:*5*

**words**  78:*17, 20, 22*
83:*11*  148:*19*
156:*23*  157:*1*
209:*1*  240:*1*  337:*5*
358:*3*  374:6

**work**  13:*4, 16, 23*
39:22  130:*11*
131:22  132:*11, 13,
19*  159:*8*  214:*12*
215:*21*  233:22
240:*18*  271:*9*
351:*16*  402:*11*

**worked**  92:*21*
261:*13*  274:*14*
383:2

**workers**  49:*21*
322:*4, 5*

**working**  40:*13*
177:*10*  386:*10*

**works**  238:*3*
252:*20*

**world**  104:*11*
147:7

**worry**  130:*15*

**wound**  228:*4*

**write**  43:6  339:*14,
18*

**writing**  47:*4, 10*
131:*13*  181:*17*
182:*3*  216:*5*  243:*9,
17*  302:*15*  304:*12*
310:*17*  311:*17*
312:*10*  337:*17, 18*
356:*19*

**written**  25:2  34:*13*
74:6  103:*4*  131:*17*
173:6  178:6
188:*17*  201:*17*
202:*4*  215:2, *6, 15,
16*  253:*1*  286:*3*
336:*5, 7*  381:*18*
382:2  385:*21*
390:*19*  395:*18*

**wrong**  137:*19*

**wrongful**  56:*3*
57:*4*  58:7  64:*4*
65:*5*  145:22  229:*4*
259:*10*

**wrongfully**  54:*21*
55:2

**wrote**  29:*5*  65:2
66:*19*  68:9  69:*23*
73:6  96:22  148:*5*
189:*16*  286:*5*
340:*1*


**< Y >**

**y'all**  17:*17*  19:7
138:2  268:22
290:*17*

**yeah**  239:*1*  318:*14*
353:7

**year**  18:*21*  51:22
315:2, *9*  371:*15*
384:*3*

**years**  32:*14*  52:*15*
189:*3*  202:*8*
207:22  226:*14, 20*
240:*15*  260:2
269:2  274:*4, 17*
293:*11*  323:*18*

**Young**  178:*14*
182:*4*  187:*12*
188:*23*  193:*3*
206:*5*  243:*1, 4*
258:*9, 20*  259:2
261:22  262:*20*
323:*15*

**Young's**  181:*15*
254:*4*