FILED
2018 Jan-12 PM 04:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **Madison County Sheriff Blake Dorning; *et al.*,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 5:15-cv-01997-HGD** |
| | ) | |
| **Evanston Insurance Company; Advanced Correctional Healthcare, Inc.; *et al.*,** | ) | |
| **Defendants.** | ) | |

**RULE 30(b)(6) SECOND NOTICE TO DEPOSE MADISON COUNTY AND RULE 30(b)(2) REQUEST FOR PRODUCTION**

PLEASE TAKE NOTICE that, pursuant to Federal Rules of Civil Procedure 30(b)(6), Defendant Evanston Insurance Company will depose by oral examination the designated corporate representative of Plaintiff Madison County at the time, date and place indicated before a court reporter or some other person authorized by law to take depositions. Such deposition will be taken for the purpose of discovery or for use as evidence at trial in this action, or for both purposes. This deposition will be videotaped and Defendant provides notice to Plaintiffs and any other parties to this action that the deposition may be used at the time of trial. Videotaping the deposition is necessary or desirable to aid the fact finder in their



understanding of the evidence and testimony presented in this deposition and for other reasons.

DEPOSITION OF: MADISON COUNTY

PLACE: MORRIS, KING & HODGE, PC
200 Pratt Avenue
Huntsville, AL 35801

DATE: June 13, 2017

TIME: 9:00 a.m. CT

Pursuant to Rule 30(b)(6), Madison County must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf on the matters set forth below; and it may set out the matters on which each person designated will testify. The persons designated must testify about information known or reasonably available to the organization.

**MATTERS FOR EXAMINATION**

1. The factual basis for your allegation that the claims asserted against you in the *Listau, Jefferson, Woods,* and *Foster* actions (as defined in your complaint) are based on "Malpractice or Professional Personal Injury sustained by a patient arising out of the conduct of Medical Services by [ACH, including any of its employees] … or Professional Healthcare Services by a person for whom ACH is legally responsible," as alleged in Doc. 28, ¶ 28.

2. The factual basis for your allegation that you "are affirmatively afforded coverage under the policy as [an] Additional Insured[]," as stated at Doc. 28, ¶ 31.

3. The factual basis for your allegation that Evanston defended and indemnified you "over the years" against "the same or substantially similar claims" as alleged in Doc. 28, ¶¶ 33, 49.

4. The factual basis for your allegation at Doc. 28, ¶ 41, that: "As it relates to Sheriff Dorning, Morrison and the County, the plaintiffs' claims in the *Listau, Jefferson, Woods,* and *Foster* actions are merely derivative of the alleged constitutional torts committed by ACH and its physicians and nurses. Stated differently, but for the alleged deliberate indifference to serious medical needs of ACH and its physicians and nurses, no supervisory liability or inadequate funding claim would exist."

5. The factual basis for your allegation at Doc. 28, ¶ 42, that: "Any damages sustained by plaintiffs in the *Listau*, *Jefferson*, *Woods*, and *Foster* actions are the sole result of the acts and/or omissions of ACH and its physicians and nurses. If [you] are found liable in the *Listau*, *Jefferson*, *Woods*, and/or *Foster* actions, it would be derivative, secondary, and passive as compared to the primary and active deliberate indifference or other acts and/or omissions by ACH and its

physicians and nurses related to the diagnosis and provision of medical care to *Listau*, *Jefferson*, *Woods*, and *Foster*."

6. The factual basis for your allegation at Doc. 28, ¶ 50, that: "Evanston ... wrongfully [denied] coverage" and "Evanston ... [acted] in bad faith."

7. The factual basis for your allegation at Doc. 28, ¶ 52, that: "Evanston has failed to provide ... a complete defense for [you] for the *Foster* action" or any other action.

8. The factual basis for your allegation at Doc. 28, ¶ 56, that: "Evanston denied, withdrew or failed to provide coverage for the County and Sheriff Dorning . . . ."

9. The factual basis for your allegation at Doc. 28, ¶ 57, that: "ACH's (and its physicians' and nurses') acts and/or omissions in performance of the Agreement (for which the County, Sheriff Dorning, and the Correctional Officers are allegedly liable) gave rise to the claims asserted by the plaintiffs in the *Listau, Jefferson, Woods,* and *Foster* actions."

10. The "Claim Expenses [incurred by you or on your behalf] associated with the investigation and defense of the claims asserted in the *Listau, Jefferson, Woods,* and *Foster* actions" as alleged at Doc. 28, ¶ 58.

11. The nature and amount of payments made directly by you or on your behalf for attorney's fees, court costs, Claim Expenses and other expenses

associated with your investigation and defense of the claims asserted in the *Listau, Jefferson, Woods*, and *Foster* actions. *See, e.g.*, Doc. 28, ¶ 58.

12. The factual and legal reasons why you settled the *Listau* and *Woods* actions.

13. Your communications with One Beacon or any other insurer regarding your defense for the claims asserted in the *Listau, Jefferson, Woods*, and *Foster* actions.

14. Your communications with One Beacon or any other insurer regarding attorney's fees, court costs, Claim Expenses, settlement proposals or payments, and other expenses associated with your defense of the *Listau, Jefferson, Woods*, and *Foster* actions.

15. Your communications with Essex Insurance Company, Evanston Insurance Company, or Markel Service, Incorporated related to the *Listau, Jefferson, Woods*, and *Foster* actions.

16. The nature, date, and patient associated with the "health services" referenced at Doc. 28, ¶ 63.

17. Each act or omission by ACH that you contend is alleged against you by the "plaintiffs in the *Listau*, *Jefferson*, *Woods*, and *Foster* actions," as asserted in Doc. 28, ¶ 64.

18. Each allegation in the "*Listau*, *Jefferson*, *Woods*, and *Foster* complaints ... that [you contend] triggered coverage for [you] under the Policy," as alleged at Doc. 28, ¶ 65.

19. The factual basis for your allegation at Doc. 28, ¶ 68 that: "Evanston has breached the contract because it failed to assume the defense of the referenced complaints and indemnify [you] and otherwise provide coverage under the Policy."

20. The factual basis for you allegation at Doc. 28, ¶ 69 that: "Evanston has improperly denied that some or all of the claims are covered by the policy and/or that it has any defense obligations and failed to pay the costs of defense in the referenced actions."

21. The factual basis for your allegation at Doc. 28, ¶ 73 that Evanston "will not provide and/or failed to provide a complete defense or indemnity for the County and Sheriff Dorning under the Policy in the *Listau*, *Jefferson*, *Woods*, and *Foster* actions."

**REQUEST FOR DOCUMENTS**

The Deponent is requested pursuant to Rule 30(b)(2) to produce the following documents and Electronically Stored Information (collectively "documents"):

1. All documents that you contend support your allegation at Doc. 28, ¶ 50, that: "Essex ... wrongfully [denied] coverage" and "Essex ... [acted] in bad faith."

2. All documents that refer to or reflect any "Claim Expenses [incurred by you or on your behalf] associated with the investigation and defense of the claims asserted in the *Listau*, *Jefferson*, *Woods*, and *Foster* actions" as alleged at Doc. 28, ¶ 58.

3. All documents that refer to or reflect any payments made directly by you for attorney's fees, court costs, Claim Expenses, settlement payments, and other expenses associated with your investigation and defense of the claims asserted in the *Listau*, *Jefferson*, *Woods*, and *Foster* actions.

4. All documents that refer to or reflect any payments made on your behalf for attorney's fees, court costs, Claim Expenses, settlement payments, and other expenses associated with your investigation and defense of the claims asserted in the *Listau*, *Jefferson*, *Woods*, and *Foster* actions.

5. All documents that refer to or reflect any communication between you and One Beacon or any other insurer regarding your defense for the claims asserted in the *Listau*, *Jefferson*, *Woods*, and *Foster* actions.

6. All documents that refer to or reflect any communication between you and One Beacon or any other insurer regarding your coverage for the claims asserted in the *Listau*, *Jefferson*, *Woods*, and *Foster* actions.

7. All documents that refer to or reflect any communication between you and One Beacon or any other insurer regarding attorney's fees, court costs, Claim Expenses, settlement proposals or payments, and other expenses associated with your defense of the claims asserted in the *Listau*, *Jefferson*, *Woods*, and *Foster* actions.

8. All documents that refer to or reflect any communication between you and Essex Insurance Company, Evanston Insurance Company, or Markel Service, Incorporated.

RESPECTFULLY SUBMITTED,

Date: May 4, 2017

*/s/ F. Lane Finch, Jr.*
F. Lane Finch, Jr. (ASB-0027-I58F)
Brandon J. Clapp (ASB-3990-D82W)
Brian C. Richardson
(ASB-5241-H14U)
*Attorneys For Evanston Insurance Co.*

**OF COUNSEL**:
**Swift, Currie, McGhee & Hiers, LLP**
2 North 20th Street, Suite 1405
Birmingham, AL 35203
Telephone: (205) 314-2401
Facsimile: (205) 244-1373
Lane.finch@swiftcurrie.com
Brandon.clapp@swiftcurrie.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2017, the foregoing was served by electronic mail and/or U.S. Mail, postage prepaid and properly addressed to the following attorneys of record:

David J. Hodge
Joseph D. Aiello
MORRIS, KING, & HODGE, PC
200 Pratt Avenue NE
Huntsville, AL 35801
dhodge@mkhlawyers.com
jaiello@mkhlawyers.com

J. Jeffrey Rich
MADISON COUNTY, ALABAMA
100 Northside Square, 7th Floor
Huntsville, AL 35801
rich@madisoncountyal.gov
***Attorneys for Plaintiffs***

H. Harold Stephens
Harold D. Mooty, III
Amanda James Turnage
Bradley Arant Boult Cummings, LLP
200 Clinton Avenue West, Suite 900
Huntsville, AL 35801
hstephens@bradley.com
hmooty@bradley.com
aturnage@bradley.com
***Attorneys for Advanced Correctional Healthcare***

*/s/ F. Lane Finch, Jr.*
Of Counsel



F. Lane Finch, Jr.
lane.finch@swiftcurrie.com
Direct: 205.314.2403

The Peachtree | 1355 Peachtree Street, NE | Suite 300 | Atlanta, GA 30309
REPLY TO: 2 North 20th Street | Suite 1405 | Birmingham, AL 35203
www.swiftcurrie.com

February 23, 2017

CERTIFIED MAIL – RETURN RECEIPT REQUESTED
Madison County, Alabama
c/o Jeff Rich
County Attorney
Madison County Commission
100 Northside Square, Suite 700
Huntsville, AL 35801-4820

CERTIFIED MAIL – RETURN RECEIPT REQUESTED
Blake Dorning
Madison County Sheriff
c/o Jeff Rich
County Attorney
Madison County Commission
100 Northside Square, Suite 700
Huntsville, AL 35801-4820

Re: *Whitney Elizabeth Foster vs. Advanced Correctional Healthcare, Inc., et al.*
Insured: Advanced Correctional Healthcare, Inc.
Date of Loss: On or about April 21, 2014
Claim No.: MM271209
Policy No.: MM825711
Policy Period: 08/01/2015 to 08/01/2016

Dear Mr. Rich and Mr. Dorning:

I was retained to review coverage by Markel Service, Incorporated, as the claim service manager for Evanston Insurance Company ("Evanston Insurance").[1] Evanston Insurance provided Locum Tenens and Contract Staffing Professional Liability Insurance for Advanced Correctional Healthcare, Inc.

---

[1] As of June 30, 2016, Essex Insurance Company merged into Evanston Insurance. As a result, Evanston Insurance has assumed all risks and liabilities of Essex Insurance.



I reviewed whether there is coverage for Madison County, Alabama and/or Madison County Sheriff Blake Dorning in connection with the personal injury complaint filed by Whitney Elizabeth Foster in the United States District Court for the Northern District of Alabama (Civil Action No.: 5:16-CV-00521-MHH) (the "Claim").

As discussed below, Evanston Insurance will defend Madison County and Sheriff Dorning against the Claim under a reservation of rights. More specifically, Evanston Insurance reserves the right to withdraw its defense and to not indemnify Madison County or Sheriff Dorning for any settlement or judgment based on non-covered claims. Evanston Insurance also reserves the right to assert that any coverage under the Evanston Insurance Policy is excess over other insurance. Evanston Insurance will provide the defense of Madison County through John Burbach and Frank Corley of Sirote & Permutt, P.C. Evanston Insurance will provide the defense of Sheriff Dorning through David Canupp and George Royer of Lanier Ford Shaver & Payne P.C.

THE POLICY

Evanston Insurance issued Locum Tenens and Contract Staffing Professional Liability Insurance, policy number MM-825711, to Advanced Correctional Healthcare, Inc. and Arthur Williams, M.D. (the "Named Insured")[2] on a claims made basis for the period of August 1, 2015, to August 1, 2016. The retroactive date is August 1, 2002. The limit for Coverage A. Individual Professional Liability is: $1,000,000 for each Claim; $3,000,000 aggregate. The limit for Coverage B. Organization Liability is: $1,000,000 for each Claim; $3,000,000 aggregate. The single patient limit for Coverage A., Coverage B. or both Coverage A. and B. combined is $1,000,000. The Coverage Part Aggregate is $15,000,000. The deductible is $100,000.

THE CLAIM

The Claim alleges Foster was a detainee at the Madison County Jail. At the time she was admitted to the jail, she was being treated with methadone; while in jail she suffered from methadone withdrawal. She allegedly did not receive proper medical treatment and suffered injury before she was eventually taken to the hospital.

Count 1 of the Complaint alleges Section 1983 Deliberate Indifference to Medical Needs against all defendants:

> 69. Whitney suffered from a medical need that posed a substantial risk of serious harm. Whitney's condition was so obvious that even a lay person would easily recognize the necessity

[2] Arthur M. Williams, M.D. is a Named Insured for Coverage A. Advanced Correctional Healthcare, Inc. is the Named Insured for Coverage B.

for attention and hospital treatment. Furthermore, even a lay person would have known that, if left unattended, Whitney's condition rendered her exposed to a substantial risk of serious injury, harm, and/or death.

70. Dr. Williams, the Nurses, *Morrison, and the Officers all subjectively knew that Whitney suffered from a serious medical need [that] .... would result in serious injury .... Nevertheless, they disregarded the risk* to Whitney, and in so doing they acted with more than gross negligence.

71. *Whitney's serious medical needs were ignored, in part, because of the deliberately indifferent customs or policies of Madison County, Dorning, Morrison,* ACH, and Dr. Williams *to the serious medical needs of prisoners in the Madison County Jail. The actions of the Officers*, the Nurses, and Dr. Williams *themselves indicate systemic breaches of fundamental standards of correctional management* and correctional health care. Their actions are also themselves indicative of inadequate policies and practices and inadequate training and supervision. *Madison County, Dorning, Morrison*, ACH, and Dr. Williams *subjectively knew that the failure to get treatment for the serious medical needs and conditions of detainees and jailees would result in serious injury ... [and] .... they disregarded the risk to the detainees/jailees at the Madison County Jail*, including Whitney, and in so doing they acted with more than gross negligence.

72. As a direct and proximate result of the combining and concurring unconstitutional conduct of all of Defendants, Whitney was not timely and appropriately tested, diagnosed or treated .... As a result, Whitney is essentially permanently and totally disabled.

....

74. *To be clear, Madison County is only sued under this count for its deliberate indifference to the constitutional rights of detainees/jailees at the Madison County Jail by its policy of funding as described above.*

> 75. All Defendants acted with malice and/or with reckless disregard for Whitney's constitutional rights and her health and safety.

Emphasis added.

Count 2 alleges Section 1983 Conspiracy to Violate Civil Rights against Madison County, Dorning, Morrison, ACH, and Dr. Williams:

> 76. *This cause of action is brought against Madison County, Dorning, Morrison*, ACH, and Dr. Williams ***pursuant to 42 U.S.C. § 1983***. Whitney incorporates by reference all factual allegations in the preceding paragraphs.
>
> 77. *A conspiracy existed between Madison County, Dorning, Morrison, ACH, Dr. Williams, and others that resulted in the actual denial of Whitney's constitutional right to medical care* for her serious medical needs. These Defendants and others reached an understanding to deny detainees and jailees in the Madison County Jail of such rights as set forth above.
>
> 78. As a direct and proximate result of this conspiracy to violate the civil rights of the detainees/jailees at the Madison County Jail, Whitney was injured and damaged as stated above.

Emphasis added.

Count 3 alleges Negligent Medical Malpractice only against ACH, Dr. Williams and ACH nurses. There are no allegations in this cause of action against Madison County or Sheriff Dorning. *See* Complaint, ¶¶ 79-83.

Count 4 alleges Negligent Correctional Care against Madison County and its correctional officers. That cause of action generally alleges:

> 85. *Madison County negligently funded the Madison County Jail* for the reasons stated above.
>
> 86. *The Officers ... negligently (a) monitored Whitney, (b) ignored Whitney's medical needs, (c) placed too much reliance on ACH and its supervisors and employees, and/or (d) delayed and denied Whitney treatment.*

> 87. *The Officers did not "act in compliance with law"* ... because they not only violated the U.S. Constitution (as stated above), they also violated Ala. Code § 14-6-19 ***by failing to provide Whitney with medical care for her serious medical needs [and] because they acted beyond their authority by failing to follow nondiscretionary orders, rules, regulations, statutes, checklists, and/or policies of the State of Alabama, of Madison County, and/or of the Madison County Sheriff*** ....
>
> 88. ***As a direct and proximate result of the combining and concurring negligent correctional care of Madison County and the Officers*** (and the combining and concurring wrongful conduct of the other Defendants), ***Whitney was injured and damaged as stated above.***

Emphasis added.

Count 5 is a general wantonness count against all defendants based on "all factual allegations in the preceding paragraphs." Compl., ¶ 89. ACH is allegedly responsible for the acts of its personnel, but there is no allegation of vicarious liability against Madison County or Sheriff Dorning.

The final cause of action, Count 6, alleges Civil Conspiracy asserting Madison County, Dorning, Morrison, ACH, and Dr. Williams conspired to deny Foster her constitutional right to medical care. Compl., ¶ 94.

Specific to Madison County, Sheriff Dorning, and jail administrator Steve Morrison, the Claim alleges:

> 9. Defendant Blake Dorning was the Madison County Sheriff at all relevant times. As the sheriff, he is responsible for management of the Madison County Jail. He has a nondelegable statutory duty under Alabama law to attend to the medical needs of detainees and jailees in the Madison County Jail. He is sued in his individual capacity only.
>
> 10. Defendant Steve Morrison served as the Jail Administrator of the Madison County Jail at all relevant times. Dorning delegated his statutory duties regarding medical care of inmates to Morrison. Morrison is sued in his individual capacity only.
>
> 11. Defendants Cassie Maloney, Joyce Williams, Benzilla Anderson, Mildred Patton, Sheree King, Charity Beasley, Shelby Spicer, Felicia

DeShields, and Emily Nobles (hereafter the "Officers") were correctional officers under the employment of Sheriff Dorning. All their actions in monitoring and caring for Whitney were done within the course and scope of their employment with Dorning and under the supervision of Dorning and Morrison. The Officers are only sued in their individual capacity.

....

18. In whole or in part because of the [ACH] agreement, Dorning, Morrison, and Madison County have failed and refused to address known systemic deficiencies regarding medical care at the Madison County Jail. Madison County conspired with Dorning and Morrison to cooperate with ACH and Dr. Williams in controlling costs. Dorning, Morrison and Madison County were aware of ACH's business model, and were aware ACH put cost control over inmate health and safety, yet they retained ACH as the contractor (initially and via express and implied contract renewals) because it saved money. Dorning, Morrison, and the County knew that ACH implemented cost control measures through less staffing, hiring substandard medical personnel willing to put costs over inmate health and safety, denying inmates medications, and delaying or denying medically necessary referrals to outside providers.

19. Madison County, Dorning, Morrison, ACH, Dr. Williams, and others established deliberately-indifferent customs or policies concerning medical care of detainees and jailees. Specifically, they had an explicit or implicit agreement, plan, and policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills. This plan included a policy of delaying or denying necessary medical treatment by outside providers. With deliberate indifference to the serious medical needs of inmates, Madison County, Dorning, Morrison, ACH, and Dr. Williams (a) failed to develop and implement adequate policies and procedures for the handling of detainees and jailees with serious health conditions; (b) failed to develop and implement adequate policies and procedures for the training of correctional officers and medical staff to respond to the serious medical needs of detainees and jailees. Moreover, correctional officers were trained to defer to ACH regarding medical matters and to not to contact outside emergency personnel even if there is a medical emergency. Correctional officers who have contacted outside emergency personnel directly have been disciplined.

20. As part and parcel of their plan and policy outlined above, ACH, Dr. Williams, Dorning, Morrison, and Madison County developed a policy and practice regarding treatment of inmates withdrawing from alcohol and drugs. These Defendants were aware that severe withdrawal symptoms could only be safely treated in a hospital. However, they established a custom or policy that withdrawal would always be managed inside the jail or by getting the person released from jail, regardless of the severity of the symptoms. Defendants were aware of the risk of harm of such a policy but explicitly or implicitly agreed to this practice to avoid the costs associated with hospitalization.

....

25. Correctional officers involved in all three of these cases deferred to ACH personnel because they were trained by Dorning and Morrison to do so and/or it was the established custom to do so ....

26. Dorning and Morrison made it clear to correctional officers that inmate healthcare costs were a problem at the jail, that one trip to the hospital could potentially blow the county's healthcare budget, and that they needed to cooperate with ACH to control costs ....

27. Pursuant to longstanding practice, jail healthcare is treated as solely within the discretion of ACH personnel. Pursuant to longstanding practice, all inmate grievances related to medical care are directed to ACH, which ignores them. These Defendants are well aware that ACH provided substandard and frequently inhumane medical care. However, none of these grievances are investigated by Dorning, Morrison, or Madison County. Correctional officers are well aware of this custom of indifference. This policy further encouraged correctional officers to "punt" to ACH and do nothing to help detainees/jailees with serious medical needs.

28. Consistent with the policy of deferring to ACH, neither Dorning nor Morrison nor anyone else at Madison County took any steps to investigate the circumstances of the three deaths stated above ....

29. However, upon information and belief, Dorning, Morrison, and

Madison County have never requested ACH to make changes or improve the care of inmates ....

30. In summary, the deliberately-indifferent policies and practices of ... Dorning, Morrison, and Madison County in place at the Madison County Jail include, but are not limited to, the following:

a. Not investigating serious known incidents of deliberate indifference by ACH and correctional personnel.

b. Not evaluating or responding to inmate grievances regarding medical care.

c. Placing inmates with serious medical conditions in medical watch when they obviously need, at a minimum, further testing and evaluation at a hospital.

d. Training correctional officers to defer to ACH medical decisions even when it is obvious the inmate needs to immediately go to the hospital.

e. Allowing inmates in medical watch to deteriorate over the course of hours and days without taking the inmate for evaluation and treatment at a hospital.

f. Training correctional officers to defer to ACH decisions to allow inmates in medical watch to deteriorate over the course of hours and days without taking the person to a hospital for evaluation and treatment of the obvious deterioration.

g. Relying on untrained correctional officers to monitor seriously ill inmates who are placed in medical watch.

h. Not training correctional officers regarding what signs to look for and document while monitoring inmates under suicide or medical watch.

I. Not monitoring the vital signs of inmates who are placed in medical watch.

j. Not requiring correctional officers to document their

observations of inmates being monitored for suicide or medical risk.

k. Treating the responses of incoherent inmates as refusals to cooperate.

m. Not treating an inmate's deterioration to the point they are no longer ambulatory as a condition requiring evaluation and treatment in a hospital.

n. Not investigating, by testing or otherwise, the causes of significant deteriorations of inmate health or symptoms that obviously indicate potentially life-threatening conditions.

o. Continuing failed treatment regimens even after they have proven ineffective.

p. Denying inmates with serious pain appropriate pain medication, including narcotics.

q. Not taking inmates suffering from serious complications related to detoxification from alcohol and drugs to the hospital.

....

35. Whitney should have been considered a "high risk inmate" ....

36. Dorning, Morrison, ACH, Dr. Williams, the Nurses, and the Officers all knew this ....

....

47. ...[T]he Officers all knew that Whitney was suffering from methadone withdrawal. The ... Officers kept telling her she was faking even though she was slurring her speech, biting her tongue, and had limited control of her body. The ... Officers also told Whitney to tell her mom to "quit calling here or you're going to have some problems."

....

> 50. The Officers were correctional officers that were charged with the responsibility of monitoring, observing, and caring for Whitney on April 21, 22, and 23, 2014. Because of her soaring blood pressure had been left virtually untreated for days, Whitney began to have severe strokes and seizures that were very obvious early on April 21, 2014 and escalated in severity thereafter.
>
> 51. It was obvious to all of the Officers ... that Whitney's condition was desperate on April 21, 2014 and continuing to get worse as the hours progressed. Her need for medical care ... was such that it would have been obvious even to a layperson that she needed to be sent to a hospital. However, the Officers ... did nothing to provide Whitney with any comfort, much less medical care. Instead, Whitney was harassed and ridiculed by the Officers ... while she endured numerous strokes and seizures.
>
> 52. By the evening, ... [t]he Officers ... just watched Whitney deteriorate.
>
> ....
>
> 58. During commissary, the Officers left her to lay on the ground .... Some of the ... Officers had to later physically put Whitney in the shower as she had urinated all over herself.
>
> ....
>
> 60. It was obvious to all of the Officers ... that Whitney's condition was even more desperate .... Her need for medical care was even more obvious to a layperson. However, the Officers ... still did nothing to provide Whitney with medical care.

<u>PERTINENT POLICY TERMS</u>

I did not set forth the entire policy here and you should read the entire Policy. I call your attention to the following pertinent provisions of the Policy:

INSURING AGREEMENT

A. Professional Liability and Claims Made Clause: The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a

result of Claims first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section Claims A., Claim Reporting Provision:

1. under Coverage A. Individual Professional Liability: because of Malpractice or Professional Personal Injury, sustained by a patient and committed by the Coverage A. Insured, or by any person for whose Malpractice or Professional Personal Injury the Coverage A. Insured is legally responsible, except as a member, stockholder or partner of an association, corporation, partnership or limited liability company, arising out of the conduct of the Insured's Medical Services;
2. under Coverage B. Organization Liability: because of Malpractice or Professional Personal Injury, sustained by a patient and committed by any person for whom the Coverage B. Named Insured is legally responsible, arising out of the conduct of the Insured's Professional Healthcare Services;

provided:

a. under Coverage A. Individual Professional Liability: that such Malpractice or Professional Personal Injury happens during the Policy Period or on or after the applicable Retroactive Date stated in the Declarations and before the end of the Policy Period; and

b. under Coverage B. Organization Liability: that such Professional Healthcare Services or Professional Personal Injury happens during the Policy Period or on or after the applicable Retroactive Date stated in the Declarations and before the end of the Policy Period; and

c. prior to the effective date of this policy the Coverage A. and Coverage B. Insureds had no knowledge of such Malpractice, Professional Healthcare Services or Professional Personal Injury or any fact, circumstance, situation or incident which may lead a reasonable person in that Insured's position to conclude that a Claim was likely.

DEFINITIONS

....

G. Malpractice means an act, error or omission in Medical Services rendered or that should have been rendered.

H. Medical Services means services, including but not limited to Telemedicine Services, provided in the medical care or treatment of any patient, but only where such care or treatment is within the scope of the Healthcare Provider's license, certificate or other qualification to practice Medical Services.

....

J. Professional Personal Injury means:

1. any bodily injury, mental injury, sickness, disease, emotional distress or mental anguish, including death resulting therefrom of any patient, arising out of Malpractice;

....

....

L. Professional Healthcare Services means:

1. Medical Services; and
2. Placement Services.

....

THE EXCLUSIONS

This insurance does not apply to:

A. any Malpractice, Professional Healthcare Services or Professional Personal Injury committed in violation of any law or ordinance;

B. any Claim based upon or arising out of any dishonest, fraudulent, criminal, malicious, knowingly, wrongful, deliberate, or intentional acts, errors or omissions committed by or at the direction of the Insured;

....

I. any Claim based upon or arising out of the liability of others assumed by the Insured under any contract or agreement, unless such liability would have attached to the Insured even in the absence of such contract or agreement;

....

T. any Claim based upon or arising out of:

1. the failure to maintain medical records in their original condition;

2. creating, altering, amending or modifying medical records;
3. improperly disposing of medical records;
4. the failure to maintain the privacy and security of medical records or private personal information;

MELT 0001 07 11, pages 1-5.

Endorsement No. 3 adds additional insured coverage:

ADDITIONAL INSURED ENDORSEMENT- PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

LOCUM TENENS AND CONTRACT STAFFING PROFESSIONAL LIABILITY INSURANCE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. Section The Insured is amended by the addition of the following:

   Whenever used in this Policy, the unqualified word Insured shall also mean Additional Insured.

2. Additional Insured means, whenever used in this endorsement, the following:

   State, Municipal Department of Corrections, Office of the Sheriff, or other Officials to whom the Coverage B. Named Insured is obligated by valid written contract to provide coverage as an additional insured to such person or organization but only as respects liability in rendering Professional Services caused by the negligence of the Named Insured and only for coverage not otherwise excluded in the policy.

3. Coverage provided to any Additional Insured as defined herein shall apply solely with respect to any Claim or Claim Expenses arising from Professional Services rendered by the Named Insured specified in Item 1. of the Declarations.

4. Where no coverage shall apply herein for the Coverage A or Coverage B Named Insured, no coverage or defense shall be afforded to the above Additional Insured.

5. Section Defense, Settlements and Claim Expenses is amended by the addition of the following: (sic)

6. The Additional Insured and the Coverage B Named Insured shall be represented by the same lawyer unless such mutual representation is prohibited by law or by any applicable professional code of conduct.

The above citations to the Policy are not intended to change or modify the terms of the Policy, all of which are applicable to the Claim.

LIMITATIONS ON COVERAGE

The Additional Insured coverage potentially available to Madison County and Sheriff Dorning is limited by the terms of the Policy. The Additional Insured Endorsement adds a Municipal Department of Corrections and the Office of the Sheriff as additional insurers subject to the following:

1. There is coverage "but only as respects liability in rendering Professional Services caused by the negligence of the Named Insured and only for coverage not otherwise excluded in the policy."

2. Coverage is limited "to any Claim or Claim Expenses arising from Professional Services rendered by the Named Insured ...."

3. If there is no coverage for the Named Insured, then there is no coverage for or defense obligation to the above Additional Insured.

Endorsement No. 3.

In addition, the exclusions listed in the prior section may apply to some or all of the allegations in the Claim.

NON-COVERED CLAIMS

The Claim alleges numerous acts or omissions by Madison County and/or Sheriff Dorning for which there is no coverage. The following illustrates that point.

The material elements supporting a Section 1983 claim against a municipality are: (1) that the plaintiff's constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). Here the complaint alleges that a county breached its duty to fund medical treatment in a jail resulting in harm to the decedent. That is not a claim arising from Professional Services rendered by the Named Insured.

The Claim states "To be clear, Madison County is only sued under this count [Count 1: Section 1983 Deliberate Indifference to Medical Needs] for its deliberate indifference to the constitutional rights of detainees/jailees at the Madison County Jail by its policy of funding ...." Compl., ¶ 74. Count 4 alleges: "Madison County negligently funded the Madison County Jail for the reasons stated above." *Id.*, ¶ 85. These are not claims arising from Professional Services rendered by the Named Insured.

The complaint also contains allegations that the contractual cap on outside medical costs and other terms of the ACH contract encouraged the denial of outside medical referral. This is not a claim arising from Professional Services rendered by the Named Insured. Similarly, the allegations that Sheriff Dorning was on notice that inmates were being denied adequate medical treatment and failed to take action do not arise from Professional Services rendered by the Named Insured. Further, the allegations of delegation of policymaking authority do not constitute a claim arising from Professional Services rendered by the Named Insured.

The Claim further alleges liability based on acts of various defendants which acts do not meet the definition of "Professional Services." Further, said liability is not allegedly arise from Professional Services rendered by the Named Insured. *See, e.g.*, Compl., ¶¶ 19 (delay/denial of certain medical treatment, training of correctional officers, and discipline of correctional officers), 20 (development of policies and practices relating to treatment of inmates withdrawing from alcohol and drugs), 22 (encouraging correctional officers to ignore deficient medical care), 23 (policies and customs harmful to the health of detainees and jailees), 24 (inmate death caused by failure of correctional personnel to provide basic medical care), 27 (failure to investigate grievances relating to medical care), 28 (failure to investigate inmate deaths), and 30 (various other acts not constituting "Professional Services").

<u>EVANSTON INSURANCE'S COVERAGE IS EXCESS</u>

Any coverage for Madison County or Sheriff Dorning is excess over any other insurance afforded to them by virtue of the Other Insurance clause, read together with Endorsement 3 and Section The Insured. Section D states:

D. OTHER INSURANCE

> This insurance shall be in excess of the applicable Deductible stated in the Declarations and any other valid and collectible insurance available to the Insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limits of Liability provided in this policy.

MELT 2200 07 11, page 1.

<u>DEFENSE UNDER RESERVATION OF RIGHTS</u>

The Claim asserts potentially covered and non-covered claims. Alabama law holds that when a complaint alleges both covered and non-covered claims, the insurer must "at least defend the allegations covered by the policy." *State Farm Fire and Cas. Co. v. Lacks*, 840 F. Supp. 2d 1292, 1296 (M.D. Ala. 2012), citations omitted. *See also Nationwide Mut. Fire Ins. Co. v. D.R. Horton*, 2016 U.S. Dist. LEXIS 139043 (S.D. Ala. Oct. 6, 2016). There is no reported decision interpreting Alabama law to require an insurer to defend against or indemnify for non-covered claims.

To the extent the Claim alleges the liability of Madison County or Sheriff Dorning arises from Professional Services rendered by the Named Insured, there may be coverage.

However, there are allegations against Madison County and Sheriff Dorning that do not arise from the ACH's Professional Services. There is no duty to defend against those allegations and there would be no duty to indemnify Madison County or Sheriff Dorning for liability arising from such claims.

Evanston Insurance agrees to allow John Burbach and Frank Corley of Sirote & Permutt, P.C. to continue to defend Madison County and David Canupp and George Royer of Lanier Ford Shaver & Payne P.C. to continue to defend Sheriff Dorning in this matter at this time subject to a full and complete reservation of any and all rights, including but not limited to the right to withdraw from providing the defense, the right to seek reimbursement of defense costs paid by Evanston Insurance, the right to file a declaratory relief action to determine coverage, and the right to deny any obligation to pay any judgment or settlement. Evanston Insurance also reserves the right to approve the Claim Expenses,[3] including attorney's fees, and to only pay its *pro-rata* share of said expenses and/or to seek equitable contribution from any other carrier owing a defense to Madison County or Sheriff Dorning to the extent such other carrier does not pay its *pro-rata* share of Claim Expenses.

---

[3] See MELT 0001 0711, p. 2, for definition of "Claim Expenses."

While a defense is being provided to Madison County and Sheriff Dorning in this matter pursuant to the terms of the Policy, it is to be expressly understood that Evanston Insurance is responsible only according to the terms, limits, and conditions of its Policy.

NON-WAIVER

The defense provided to Madison County and Sheriff Dorning is under a reservation of rights because there are non-covered claims asserted in the Claim, there are potential policy defenses, and the Policy is or may be excess of other insurance.

Evanston Insurance does not waive or forfeit any rights that it holds. There may be other circumstances and facts that may preclude coverage. There may be other applicable policy provisions, conditions, terms and exclusions that preclude coverage. Neither this letter, nor Evanston Insurance's defense of Madison County and Sheriff Dorning under a reservation of rights, nor any other action taken by Evanston Insurance should be construed as a waiver of any rights held by Evanston Insurance under any policy of insurance or otherwise. Evanston Insurance expressly reserves all rights.

RIGHT TO REIMBURSEMENT

Evanston Insurance specifically reserves its right to reimbursement of defense costs allocable to non-covered claims to the extent allowed by applicable by law.

POLICY LIMITS

The damages outlined in the Claim are not specific and therefore represent a potential for an exposure in excess of the $1,000,000 per claim limit in the Policy. If Madison County or Sheriff Dorning has other insurance available, it or he should immediately notify those insurance companies of the Claim. If there is no additional insurance, and should a judgment be rendered in excess of the policy limits, then Madison County and Sheriff Dorning would be responsible for the excess judgment. In the event that none of the damages are covered, then Madison County and Sheriff Dorning could be responsible for the entirety of the judgment. For those reasons, we recommend that you seek the advice of independent counsel.

CONCLUSION

Evanston Insurance will defend Madison County and Sheriff Dorning but it reserves the right to assert at a later time any and all coverage defenses that are appropriate.

The Policy does not afford coverage for certain acts or omissions of Madison County and Sheriff Dorning as discussed above and as stated in the Policy. Evanston Insurance will not indemnify Madison County and Sheriff Dorning as to non-covered claims. Madison County and

Sheriff Dorning must act on its or his own behalf to protect its or his interests as to all non-covered claims.

Evanston Insurance may file a declaratory judgment action to determine its duties and obligations under the Policy or may intervene into the above-referenced lawsuit for the purpose of resolving what insurance coverage obligations Evanston Insurance has, if any.

The foregoing may not be all of the coverage defenses available and Evanston Insurance reserves its right to assert possible additional coverage defenses as it become appropriate.

If you believe that our understanding of the facts is in error or the Policy is being misapplied in reaching our conclusion, please let us know promptly so that we can address such issues. If you have any additional information concerning the Claim, the please forward this information to us as soon as possible so that consideration can be given to it.

I suggest that defense be tendered under any other potentially applicable insurance policy. Please let us know whether another insurance company is defending Madison County and Sheriff Dorning under a reservation of rights or any other limitation. Please send us a copy of any other insurance policy that provides coverage or potential coverage for the Claim.

If you have any questions or comments concerning the insurance coverage available to Madison County and Sheriff Dorning under the Policy, please do not hesitate to contact the undersigned at (205) 314-2403.

Sincerely,

SWIFT, CURRIE, McGHEE & HIERS, LLP

Lane

F. Lane Finch, Jr.

Copies Via Email and First Class Mail:

David Hodge
Morris, King & Hodge, PC
200 Pratt Avenue
Huntsville, AL 35801
dhodge@mkhlawyers.com

Jagady Blue via Email
Markel - Manager
jblue@markelcorp.com

FILED
2014 Oct-29 PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| CAROLYN JEFFERSON, as the personal representative of the Estate of Tanisha Jefferson, | ) | |
| Plaintiff | ) | |
| v. | ) | CASE NO. 5:14-cv-01959-AKK |
| MADISON COUNTY, ALABAMA; et al., | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Carolyn Jefferson complains of defendants, stating as follows:

### Nature of the Action

1. This is a civil action brought by Carolyn Jefferson, whose decedent, Tanisha Jefferson, was denied certain constitutional rights by defendants while incarcerated in the Madison County Jail. Specifically, defendants were deliberately indifferent to Tanisha Jefferson's serious medical needs in violation of her rights as a pretrial detainee under the Fourteenth Amendment to the United States Constitution. Plaintiff also brings state law claims against the health care defendants.

### Jurisdiction and Venue

2. This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. The Court has jurisdiction of this matter pursuant



to 28 U.S.C. §§ 1331 and 1343(a)(3).

3. This judicial district is an appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the suit happened in this judicial district.

**Parties**

4. Carolyn Jefferson is of legal age and a citizen and resident of the state of Alabama. She resides in Madison County, Alabama.

5. Defendant Madison County, Alabama is an Alabama county. It is responsible for funding the Madison County Jail, including medical care at the jail. It contracted with defendant Advanced Correctional Healthcare, Inc. to provide medical services at the Madison County Jail.

6. Defendant Blake Dorning was the Madison County Sheriff at all relevant times. As the sheriff, among other things, he is responsible for management of the Madison County Jail. Defendant has a statutory duty under Alabama law to attend to the medical needs of inmates in the Madison County Jail. He is sued in his individual capacity only.

7. Defendant Steve Morrison served as the jail administrator of the Madison County Jail at all relevant times. He is sued in his individual capacity only.

8. Defendant Advanced Correctional Healthcare, Inc. (ACH) is a private

for-profit corporation that is under a contractual obligation to provide medical care for inmates in the Madison County Jail.

9. Defendant Norman R. Johnson , M.D. is a physician who serves as the CEO of ACH. He is sued in his individual capacity only.

10. Defendant Arthur M. Williams, M.D. is a physician who was employed by ACH to provide physician medical services and to be the director of the medical program for inmates at the Madison County Jail.

11. Defendant Mary Ann Jones is a Licensed Practical Nurse employed by ACH to provide nursing services at the Madison County Jail at all relevant times. She is sued in her individual capacity only

12. Defendant Darlyn Florence is a Registered Nurse Practitioner who was employed by ACH to provide nursing and medical services for inmates at the Madison County Jail at all relevant times.

13. Defendant Douglass Smith is a Licensed Practical Nurse who was employed by ACH to provide nursing services for inmates at the Madison County Jail at all relevant times.

14. Defendant Tammy Mason is a Licensed Practical Nurse who was employed by ACH to provide nursing services for inmates at the Madison County Jail at all relevant times.

15. Defendant Michelle Kirk is a Licensed Practical Nurse who was

employed by ACH to provide nursing services for inmates at the Madison County Jail at all relevant times.

**Facts**

16. Tanisha Jefferson was arrested at her home on October 14, 2013 and booked into the Madison County Jail.

17. On October 31, 2013, Jefferson died as a result of complications related to a bowel obstruction most likely caused by an extended period of constipation (at least 13 days on the date of her death).

18. Jefferson died as a result of defendants' failure to refer her to a hospital for evaluation and treatment.

19. Because of Jefferson's extended period of constipation, her severe abdominal pain, and other "alarm" symptoms (see below), by October 29, 2013, all of the individual ACH defendants were aware that Jefferson may have a bowel obstruction, which is a life-threatening condition.

20. Each of the individual ACH defendants worked in the medical department at the Madison County Jail, were aware of Jefferson's condition on or after October 29, 2013, and the risk to her life, yet took no action.

21. Throughout Jefferson's incarceration she made numerous complaints of stomach pain and the inability to have a bowel movement.

22. Beginning on October 19, 2013, Jefferson complained of rectal and abdominal pain.

23. Jefferson made numerous requests to see the doctor (defendant Williams) and filed at least one medical grievance, on October 25, 2014, complaining that she had been sick for 10-11 days.

24. In an October 28, 2014, request to see the doctor, she made clear she feared for her life, stating that if something happened to her it was on jail and medical personnel.

25. When Jefferson finally saw Williams on October 29, 2013, he misrepresented her condition in his note, among other things, completely omitting Jefferson's "alarm" symptoms, including her severe and worsening abdominal pain, lack of appetite (for days), rectal pain, and vomiting.

26. According to readily-available and reliable online medical information, including the information attached as Exhibits 1-3, even one such "alarm" symptom required further evaluation, including diagnostic testing at a minimum, and could not be safely addressed by a repeat laxative prescription.

27. Jefferson's symptoms on October 29, 2013, clearly indicated a potentially life-threatening problem, such as a bowel obstruction. Nevertheless, Williams just prescribed laxatives and sent Jefferson back to her cell. He did not even do a rectal exam, which is a standard diagnostic tool for such issues.

28. By October 29, 2013, at the latest, the individual defendants except Dorning and Morrison were aware that Jefferson had not had a bowel movement in at least 13 days, that she was having stomach pain so bad she told fellow inmates and jail staff (Williams, the nurses, and correctional officers) she thought she would explode, that she was so weak and in pain she could hardly walk.

29. From at least October 29, 2013, until her death on October 31, 2013, it was obvious to all that came in contact with Jefferson that her condition was serious and that she needed to go to a hospital for evaluation and treatment.

30. On October 30, 2013, Jefferson took another turn for the worse. She started sweating and started having difficulty breathing. ACH personnel, including Williams, were informed of Jefferson's condition, yet did nothing.

31. Jefferson saw an unidentified ACH nurse in the early morning hours on October 31, 2013, reported her deteriorating condition, but was sent back to her cell.

32. By the morning of October 31, 2013, Jefferson was disoriented. ACH personnel, including at least defendants Williams, Jones, Mason, Smith, and Florence, were informed regarding Jefferson's early morning visit to the nurse and Jefferson's further deterioration since then. Nevertheless, Jefferson was not taken to the hospital. At approximately 8:40 p.m. on October 31, 2013, Jefferson passed out in her cell, complaining of even more extreme abdominal pain. Even then Jefferson was not sent to the hospital. Instead, she was taken by wheelchair to the medical department for

observation. An ambulance was not called until Jefferson became nonresponsive around 9:09 p.m. By that time, it was too late.

33. By October 29, 2013, all of the individual defendants except for Dorning and Morrison were aware of Jefferson's condition yet failed to act appropriately. Jefferson was obviously suffering from a serious problem of a potentially life-threatening nature.

34. Due to her extended period of constipation, severe abdominal pain, and other "alarm" symptoms, Jefferson's need for evaluation and treatment in a hospital was such that it would have been obvious even to a layperson.

35. Despite Jefferson's condition, Jefferson received no effective treatment; defendants just watched Jefferson's condition deteriorate until she died.

36. As a direct and proximate result of the failure and refusal of the individual defendants except Dorning, Morrison, and Johnson to refer Jefferson for evaluation and treatment in a hospital, Jefferson suffered pain and suffering and eventually died.

37. All defendants were jointly and severally the proximate cause of Jefferson's pain and suffering and eventual death.

38. Moreover, pursuant to a policy and practice of Madison County, Dorning, ACH, Johnson, and Williams prohibiting narcotic pain medication for inmates, Jefferson's severe pain during the days before she died was completely

ignored. Pursuant to this policy and practice Jefferson received no effective medication for her pain.

39. The actions of jail and ACH personnel indicate systemic breaches of fundamental standards of correctional management and correctional health care.

40. These breaches are indicative of inadequate policies and practices and inadequate training and supervision.

41. The treatment of Jefferson falls far below the standard of correctional health care.

42. Because Jefferson was not appropriately treated, she experienced unnecessary pain and suffering and eventually died.

43. All of the individual defendants identified above acted with malice and/or with reckless disregard for Jefferson's constitutional rights.

Listau's serious medical needs were ignored because of the customs or policies of defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH of deliberate indifference to the serious medical needs of prisoners in the Madison County Jail.

44. With deliberate indifference to the serious medical needs of inmates, defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH failed to develop and implement adequate policies and procedures for the handling of inmates with serious health conditions and failed to adequately train correctional officers and medical staff, with the foreseeable result that inmates such as Listau would not

receive appropriate treatment.

45. More generally, defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH have established deliberately-indifferent customs or policies concerning inmate medical care, including but not limited to a custom or policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills.

46. Defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to avoid having to pay for medical care for the inmate. This plan included a custom or policy of delaying or denying necessary medical treatment by outside providers. Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates.

47. Defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH were on notice that the above-described customs or policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and suffering due to delay and denial of necessary medical care. Defendants had such knowledge from prisoner complaints, communications from correctional officers, from their own observations, from common sense, from other deaths, from other lawsuits, and in other ways.

48. During 2013 at least three inmates died as a result of the failure of ACH

and correctional personnel at the Madison County Jail to provide inmates with medical care, and the undersigned has filed suit on behalf of each of the families.

49. Listau died in March. The circumstances of her death are described in detail in the second amended complaint. A motion for leave to file the second amended complaint was filed in that case today, October 29, 2014. The case number is 5:14-CV-1309-CLS.

50. Listau died from broken bones she suffered as a result of one or more falls caused by delirium tremens-related seizures. Listau was suffering from advanced DTs when she arrived at the jail and clearly needed to go to the hospital, as severe DTs is a life-threatening condition that needs to be treated as a medical emergency. *See* Medline Plus, online at www.nlm.nih.gov/medlineplus/ency/article/000766.htm. Even though Listau was identified as suffering from severe DTs shortly after she arrived in the jail, she was not taken to the hospital. She was placed in a medical watch cell. She deteriorated rapidly over the course of 24-plus hours in the jail. Listau's deterioration was observed by correctional and ACH personnel. No action was taken to help Listau until she was found non-responsive. By then it was too late.

51. Deundrez Woods died in August. The circumstances of his death are described in detail in the first amended complaint filed in that case today, October 29, 2014. The case number is No. 5:14-cv-01964-IPJ.

52. Woods experienced a severe and sudden change in mental functioning in late July 2013, was moved into a medical watch cell on August 6, 2013, and continued to deteriorate from August 6 until he was found non-responsive on August 19, 2013. Woods was suffering from the effects of a gangrenous right foot. His mental status change was due to that infection, and he ultimately died from a blood clot that originated in his gangrenous foot. By at least August 15, when Woods was taken by wheelchair to court, Woods was incoherent and not ambulatory. From August 15 until he was found non-responsive on August 19, while being checked every 15 minutes by correctional officers, Woods went from incoherent and non-ambulatory to barely responsive to dead. During this period, Woods did not eat or drink, did not have his vital signs checked, and was not seen even a single time by ACH personnel.

53. Tanisha Jefferson died in October.

54. All three inmates died even though they had been seen by ACH personnel.

55. All three inmates died when ACH personnel refused to send them to the hospital.

56. In all three cases, correctional officers deferred to ACH medical personnel even though it was obvious ACH was doing nothing for the inmate.

57. In all three cases, correctional officers deferred to ACH medical

personnel even though it would have been obvious to a layperson that the inmate needed to be sent to a hospital for evaluation and treatment.

58. Correctional officers deferred to ACH personnel because they were trained to do so.

59. Correctional officers did not defer to ACH in ignorance, however.

60. ACH had been the contractor at the Madison County Jail since before 2010.

61. It was well known to Madison County correctional officers that ACH had a practice of delaying or denying referrals of inmates for outside medical care.

62. Correctional officers were aware that ACH was making medical care decisions regarding inmates that put cost control over inmate health and safety.

63. Dorning and Morrison made it clear to correctional officers that inmate healthcare costs were a problem at the jail, that one trip to the hospital could potentially blow the county's healthcare budget, and that they needed to cooperate with ACH to control costs.

64. These concerns with inmate healthcare costs have been reported in the media. Thus, an April 2014 AL.com article, for which Morrison and ACH CEO Norman Johnson were interviewed, does not mention the three 2013 deaths or improving inmate healthcare but rather discusses the budget problems created by catastrophic cases that can "really cripple your budget," in the words of Morrison, and

the "aggressive pursuit" of cost savings by Morrison. A copy of the article is attached as Exhibit 2.

65. Consistent with this deferral-to-ACH policy, neither Dorning nor Morrison took any steps to investigate the circumstances of the three deaths.

66. This has been a longstanding practice of Dorning and, since he was hired in October 2010, Morrison.

67. Morrison was hired to cut costs at the jail.

68. The failure and refusal to investigate serious incidents is a more general practice of Dorning, who has refused to investigate serious allegations against his deputies, as reflected by the public comments of Dorning's chief deputy regarding the revenge beating of Robert Bryant. *See* AL.com article attached as Exhibit 4.

69. Dorning has completely failed and refused to investigate serious allegations against those he supervises, whether as law enforcement officers or correctional officers.

70. The uninvestigated 2013 deaths followed on the heals of at least three deaths in the preceding two-and-a-half years.

71. In August 2010, Julie Jean died under circumstances similar to those in the 2013 deaths, particularly Woods' death. Like Woods, Jean, during her final days, was in medical watch, was checked by correctional officers every 15 minutes, did not eat or drink in substantial amounts, did not have her vital signs monitored, was

completely out of touch with reality, and deteriorated over the course of days until she became non-responsive. She died as a result of lithium toxicity.

72. There was no investigation of the death of Jean by Dorning or his designee.

73. In December 2011, Emanuel Patterson died from lithium toxicity under nearly identical circumstances to those in the Jean case. Patterson was in medical watch, was checked by correctional officers every 15 minutes, did not eat or drink in substantial amounts, did not have his vital signs monitored, was completely out of touch with reality, and deteriorated over the course of days until he became non-responsive.

74. There was no investigation of the death of Patterson by Dorning or Morrison.

75. Frederick Foster died in a restraint chair in a medical watch cell in May 2012. Like Jean and Patterson (and Woods), Foster was out of touch with reality, did not eat or drink in substantial amounts, did not have his vital signs monitored, and deteriorated over the course of several days as correctional officers and ACH personnel watched. No action was taken until he became non-responsive.

76. There was no investigation of the death of Foster by Dorning or Morrison.

77. Of course, others have suffered and been lucky enough to survive.

78. As a result of publicity regarding the 2013 death lawsuits, the undersigned has received information regarding other incidents involving deliberate indifference to medical needs under ACH, including a woman who could have died from an abscessed tooth that was ignored for two months and more than one inmate who was not taken to the hospital for many hours despite obvious heart attack symptoms.

79. Medical care at the jail is and has been a regular subject of inmate grievances.

80. While not all inmate grievances have merit, pursuant to longstanding practice, grievances related to medical care are not investigated by Madison County correctional personnel or ACH.

81. Pursuant to longstanding practice, all grievances regarding jail medical care are turned over to ACH and are not reviewed by Dorning or Morrison or any other correctional officer or correctional supervisor.

82. ACH does not respond to inmate grievances. It simply ignores them.

83. Pursuant to longstanding practice, jail healthcare is treated as solely within the discretion of ACH personnel.

84. Dorning, Morrison, Johnson, Williams, Robinson, and ACH have failed and refused to evaluate the quality of inmate medical care and address the obvious systemic problems that led to at least 6 deaths over the course of just over three years

(August 2010 to October 2013).

85. Even after the 2013 death lawsuits, Dorning's comments to the media (*see* AL.com article attached as Exhibit 3) make clear Dorning believes the responsibility for the deaths and for making changes lies with ACH. "I'm sure ACH will evaluate how they do things," Dorning told the reporter.

86. Dorning's claim that he believes ACH will reevaluate in light of the lawsuits is not credible.

87. Dorning knows from years of experience with ACH, and from ACH's failure to respond to the deaths themselves and to other incidents, that ACH will conduct no evaluation and institute no training or other changes.

88. Dorning and Morrison know that they never requested ACH to make changes or improve the care of inmates.

89. Dorning and Morrison have never even requested that ACH report to them regarding the quality of the care provided inmates.

90. The sole basis used by Dorning and Morrison to evaluate ACH is cost control.

91. Consistent with Dorning's and Morrison's laser focus on costs and lack of concern about the quality of inmate healthcare provided by ACH, in the April 2014 AL.com article referenced above (Exhibit 2), Morrison does not mention the 6 inmates who died while being overseen by ACH personnel since 2010, only the one

inmate, Patterson, who "crippled" the budget with over $300,000 in charges because he was in a coma for an extended period.

92. The deferral of correctional officers to ACH decisions to delay and deny necessary medical care in the name of cost control is not only a matter of longstanding practice, it is also a matter of contract.

93. Deferral by correctional officers to ACH deliberate indifference is caused by both the letter of the contract and the structure of the contractual relationship.

94. ACH has had the Madison County contract since before 2010.

95. ACH underbid other competitors to get the contract.

96. ACH got the contract by touting its ability to control the expenses Madison County would incur for outside medical care like that needed by Listau, Woods, and Jefferson.

97. ACH, Madison County, and Dorning negotiated a $200,000 per quarter cap on outside medical care.

98. If outside medical care costs exceeded $200,000 in a quarter, Madison County would be responsible.

99. Based on historical healthcare expenditure numbers for the Madison County Jail and reasonable predictions based on data for the inmate population at the jail, the $200,000 per quarter number was designed to give ACH a financial incentive

to control outside medical costs, which in turn has led ACH to delay and deny referrals to outside providers.

100. Under the contract, if ACH beats the cap, ACH gets to keep the difference between actual outside costs and the cap as profit.

101. As Morrison, to whom Dorning has delegated responsibility for managing the jail, has stated publically, hospitalizations can quickly deplete the quarterly budget (*see* Exhibit 3).

102. Pursuant to this agreement, correctional officers are trained to defer to ACH regarding medical matters regardless of the severity of the inmate's conditon.

103. Correctional officers are trained not to contact emergency personnel even if there is a medical emergency; instead, they are trained to contact ACH nurses on duty.

104. Correctional officers who have contacted emergency personnel directly have been disciplined.

105. Moreover, the agreement requires ACH to provide substantial insurance coverage, to name the county and the sheriff as additional insureds, and to indemnify the sheriff, the county, and their agents and employees in connection with any claim related to healthcare services.

106. Under the contract, as long as correctional officers let ACH medical personnel make medical decisions, correctional officers are indemnified by ACH's

insurance carrier.

107. Thus, the contract encourages correctional officers to defer to ACH personnel.

108. Correctional officers have claimed or are expected to claim they cannot be responsible for deficient medical care by ACH personnel.

109. Dorning, Morrison, and the correctional officers they supervised, however, were well aware that ACH provided substandard and frequently inhumane medical care.

110. Correctional officers had this knowledge from the incidents described above, from other similar incidents over the years, from their daily observations regarding how ACH personnel treated inmates, and in other ways.

111. Defendant Williams has been the Madison County Jail physician for many years, worked under prior contractors, and was known to provide substandard care to inmates.

112. Defendant Robinson as well has been at the Madison County Jail for years and was known to be deliberately indifferent to inmate medical needs.

113. In whole or in part because of the agreement, particularly its indemnification provision, Dorning and Morrison have failed and refused to address known systemic deficiencies regarding medical care at the Madison County Jail.

114. Under the agreement, for Madison County to avoid liability for excess

medical care expenses, it was necessary for defendants Dorning and Morrison and the correctional officers they managed to cooperate with ACH in controlling costs.

115. Defendants Madison County and ACH and all individual defendants were aware the cost control measures implemented at the Madison County Jail by ACH resulted in the denial of constitutionally-required medical care for inmates with serious medical needs.

116. ACH's business model, reflected in the agreement, succeeds by underbidding the competition and implementing severe cost control measures, the necessary result of which is unnecessary inmate suffering and liability claims (dealt with through liability insurance).

117. Defendants Dorning and Madison County were aware of ACH's business model, were aware ACH put cost control over inmate health and safety, yet retained ACH as the contractor (initially and via contract renewals) because it saved the county money.

118. Madison County and Dorning rejected other contractors because they believed ACH saved them money.

119. Thus, Madison County caused or contributed to the above-described customs or policies by not providing adequate funds for inmate medical care.

120. The primary areas in which ACH implemented cost control measures were staffing, medications, and referrals to outside providers.

121. In order to control costs, defendant ACH, with the knowledge and consent of defendants Dorning and Morrison, staffed the Madison County Jail inadequately, hired sub-standard medical personnel willing to put costs over inmate health and safety, denied inmates medications, and delayed or denied medically-necessary referrals to outside providers, including necessary medical treatment like that denied Listau, Woods, and Jefferson.

122. Alabama law vests final policymaking authority for inmate medical care in Dorning, as the representative of Madison County.

123. Defendant Dorning, in turn, via the agreement with ACH and longstanding practice, has delegated final policymaking authority regarding inmate medical care to ACH, and, therefore, he is liable for ACH decisions.

124. While the agreement gives Dorning and Madison County the authority to hold ACH accountable regarding the costs of inmate healthcare, it provides no mechanism for reporting and accountability regarding the quality of inmate healthcare, and neither Dorning nor Madison County have made any effort to hold ACH accountable for how it handles inmate healthcare.

125. Directly applicable to the death of Listau, defendants Dorning, Morrison, Williams, Robinson developed a policy and practice regarding treatment of inmates withdrawing from alcohol and drugs. While defendants were aware that severe withdrawal symptoms, including DTs, could only be safely treated in the hospital,