FILED
2018 Jan-12  PM 04:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

these defendants established a custom or policy that withdrawal would **always** be managed inside the jail or by getting the person released from jail, regardless of the severity of the symptoms. Defendants were aware of the risk of harm of such a policy but explicitly or implicitly agreed to this practice to avoid the huge cost associated with a hospitalization. *See* Medline Plus, online at www.nlm.nih.gov/medlineplus/ency/article/000766.htm (noting that a person experiencing DTs may need to be kept in a sedated state for a week or more).

126.   Dorning's public comments regarding the three lawsuits (*see* Exhibit 3) reflect a callous attitude toward inmates suffering from alcohol or drug withdrawal.

127.   In summary, the deliberately-indifferent policies and practices of Dorning, Morrison, Johnson, Williams, Robinson, and ACH in place at the Madison County Jail include, but are not limited to, the following:

a.   Not investigating serious known incidents of deliberate indifference by ACH and correctional personnel;

b.   Not evaluating or responding to inmate grievances regarding medical care;

c.   Placing inmates with serious medical conditions in medical watch when they obviously need, at a minimum, further testing and evaluation at a hospital;

22

d.   Training correctional officers to defer to ACH medical decisions even when it is obvious the inmate needs to immediately go to the hospital (i.e., severe abdominal pain and clear heart attack symptoms);

e.   Allowing inmates in medical watch to deteriorate over the course of hours and days without taking the inmate for evaluation and treatment at a hospital;

f.   Training correctional officers to defer to ACH decisions to allow inmates in medical watch to deteriorate over the course of hours and days without taking the person to a hospital for evaluation and treatment of the obvious deterioration;

g.   Relying on untrained correctional officers to monitor seriously ill inmates who are placed in medical watch;

h.   Not training correctional officers regarding what signs to look for and document while monitoring inmates under suicide or medical watch;

i.   Not monitoring the vital signs of inmates who are placed in medical watch;

j.   Not requiring correctional officers to document their observations of inmates being monitored for suicide or medical risk;

k.   Not monitoring the food and water intake of inmates known not to be eating or drinking or to be doing so only in limited amounts;

23

l.      Treating the responses of incoherent inmates as refusals to cooperate;

m.     Not treating an inmate's deterioration to the point they are no longer ambulatory as a condition requiring evaluation and treatment in a hospital;

n.      Not investigating, by testing or otherwise, the causes of significant deteriorations of inmate health or symptoms that obviously indicate potentially life-threatening conditions;

o.      Continuing failed treatment regimens even after they have proven ineffective (i.e., Jefferson's constipation);

p.      Denying inmates with serious pain appropriate pain medication, including narcotics;

q.      Delaying proper treatment of easily treatable conditions (i.e., abscessed teeth) until they become life-threatening;

r.      Not taking inmates suffering from serious complications related to detoxification from alcohol and drugs to the hospital; and

s.      Ignoring possible medical needs of inmates with mental health issues (or perceived mental health issues) that limit or prevent the inmate from communicating with correctional and medical personnel regarding their medical needs.

128.   Defendant ACH acted through one or more individuals who acted as

final policymakers for ACH, including defendants Johnson, Williams, and Robinson.

129.    All defendants acted jointly and in concert with each other. Each defendant had the duty and the opportunity to protect Jefferson, to obtain necessary medical treatment for Jefferson in a timely manner and/or to establish policies and procedures and implement training regarding such treatment, but each defendant failed and refused to perform such duty, thereby proximately causing Jefferson's pain and suffering and eventual death.

130.    All defendants, acting under color of state law, inflicted or caused to be inflicted cruel and unusual punishment upon Jefferson in violation of the Fourteenth Amendment to the United States Constitution. All defendants acted with deliberate indifference.

131.    All defendants acted with intent to violate Jefferson's constitutional rights or with reckless disregard for those rights, justifying punitive damages against the individual defendants and ACH.

132.    As a result of the conduct of defendants, Jefferson suffered physical and emotional injuries and then died.

**Count I - 42 U.S.C. § 1983 -
Deliberate Indifference to Serious Medical Needs**

133.    The individual defendants except Dorning, Morrison, and Johnson, acting under color of state law within the meaning prescribed by 42 U.S.C. § 1983,

were deliberately indifferent to Jefferson's serious medical needs as described above. These defendants, despite knowledge of a serious medical need, took no action or clearly inadequate action and did thereby deprive Jefferson of her rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983.

134.    Defendants Dorning, Morrison, Johnson, and Williams are supervisory officials for the jail and were responsible for development and implementation of policies and procedures for medical care at the jail and by action and inaction established the unconstitutional customs and policies described above.    These defendants did thereby deprive Jefferson of her rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983.

135.    Defendant Madison County intentionally refused to adequately fund medical care as described above with deliberate indifference to the serious medical needs of inmates such as Jefferson,  had a policy of not adequately funding inmate medical care, and did thereby contribute to cause Jefferson's suffering and eventual death and the individual defendants' denial of necessary medical treatment for Jefferson's serious medical needs.

136.    Defendant Dorning is also liable for the acts of ACH and its policymakers, including Johnson, Williams, and Robinson, as Dorning delegated his

final policymaking authority to ACH.

137.   As a result of the conduct of defendants, Jefferson was caused to suffer physical and emotional injuries and damages and died.

### Count II - Negligence / Wantonness

138.   The individual ACH defendants and unknown ACH employees involved with Jefferson's care owed a duty to Jefferson to meet the standard of care applicable to inmates and/or to make sure those under their supervision were trained adequately regarding the proper care of such inmates and that adequate policies and procedures regarding the proper care of such inmates were in place.  This standard of care required, among other things, proper treatment of Jefferson's constipation, narcotic pain medication to ease Jefferson's suffering, appropriate monitoring of Jefferson's deteriorating condition, testing to determine if Jefferson's bowel was obstructed, and referral of Jefferson for evaluation and treatment outside of the jail.  These defendants negligently and/or wantonly violated this standard of care or caused it to be violated with the foreseeable result that Jefferson suffered unnecessary pain and suffering and died.

139.  Because ACH personnel were acting within the scope of their employment, defendant ACH is liable for their negligence and/or wantonness.

### Other Matters

27

140.   All conditions precedent to the bringing of this suit have occurred.

**Relief Sought**

141.   As relief, plaintiff seeks the following:

    a.   That plaintiff be awarded such compensatory damages as a jury shall determine from the evidence plaintiff is entitled to recover;

    b.   That plaintiff be awarded against the individual defendants such punitive damages as a jury shall determine from the evidence plaintiff is entitled to recover;

    c.   That plaintiff be awarded prejudgment and postjudgment interest at the highest rates allowed by law;

    d.   That plaintiff be awarded the costs of this action, his reasonable attorney's fees, and his reasonable expert witness fees;

    e.   That plaintiff be awarded appropriate declaratory and injunctive relief; and

    f.   That plaintiff be awarded such other and further relief to which plaintiff is justly entitled.

Respectfully submitted,


s/ Henry F. Sherrod III
Henry F. Sherrod III (ASB-1200-D63H)
HENRY F. SHERROD III, P.C.
119 South Court Street (35630)
P. O. Box 606
Florence, Alabama 35631-0606
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

Jerry D. Roberson (ASB-8283-O71J)
P.O. Box 657
Haleyville, Alabama 35565
Phone: 205-485-1020
Fax: 205-485-2660
Email: jerry@jdrlaw.org

Attorneys for Plaintiff

## Jury Demand

Plaintiff requests a trial by jury.

s/ Henry F. Sherrod III
Henry F. Sherrod III

FILED

2014 Oct-29  PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

## HEALTHCARE SERVICES AGREEMENT AT
## THE MADISON COUNTY DETENTION FACILITY

**THIS AGREEMENT** between Madison County, Alabama (hereinafter referred to as "County"), Blake Dorning in his official capacity as Madison County Sheriff (hereinafter referred to as "Sheriff"), and Advanced Correctional Healthcare, Inc. (hereinafter referred to as "ACH"), is entered into as of the 1st day of May, 2012. Services under this Agreement shall commence on May 1, 2012, and shall continue through April 30, 2013, unless otherwise terminated as provided herein.

### WITNESSETH:

**WHEREAS,** the Sheriff desires to provide for health care to inmates housed in the Madison County Detention Facility (hereinafter referred to as "Detention Facility" or "Jail") in accordance with applicable law; and,

**WHEREAS,** ACH is in the business of providing correctional health care services and desires to provide such services for the Sheriff under the terms and conditions hereof; and,

**WHEREAS,** the Sheriff desires to enter into this Agreement with ACH to promote this objective; and,

**WHEREAS,** the County, upon the recommendation of the Sheriff, consents to and desires to enter into this Agreement with ACH to the extent necessary for ACH to secure payment for the services provided hereunder.

**NOW THEREFORE,** in consideration of the covenants and promises hereinafter made, the parties hereto agree as follows:

1.      **GENERAL SCOPE**: ACH will develop, manage and staff a comprehensive healthcare services system at the Madison County Detention Facility in Huntsville, Alabama, to provide all inmates within the Detention Facility with necessary healthcare.

2.      **TERM**: This healthcare services contract with ACH will be for a term beginning **May 1, 2012** and ending **April 30, 2013,** unless otherwise terminated as provided herein.

3.      **SCOPE OF SERVICES**: ACH shall be the sole supplier of healthcare services (including pharmacy) and coordinator of the healthcare delivery system at the Detention Facility, including coordination and payment for all care rendered to inmates by healthcare providers outside the Detention Facility. ACH is responsible for all health care for all inmates at the Detention Facility. The term "health care" (or "medical care" as sometimes referred to herein) includes, but is not limited to, services customarily provided by a general practitioner, psychiatric and psychological care, obstetrics/gynecological care, dental care, pharmaceuticals, including prescriptions, medications and prescribed over-the-counter medications; on-site laboratory testing to include finger-stick blood sugar, urine dipstick for pregnancy and/or infection, and tuberculosis skin tests; and disposable medical supplies intended for one-time use; and medical waste removal necessary for performance at the Detention Facility. All medical

Case 5:14-cv-01399-CLS   Document 36-1   Filed 10/29/14   Page 23 of 21

care provided by ACH shall be rendered by professionals licensed to practice in the State of Alabama. A nurse practitioner may be used in the physician schedule only as approved by the Sheriff.

**4.     FACILITY**: The Detention Facility is operated by the Sheriff and consists of the one consolidated facility located at 815 Wheeler Avenue.

**5.     INMATE POPULATION**: The Detention Facility houses both male and female pretrial detainees, sentenced inmates with sentences of generally less than one year, and work-release inmates. The Detention Facility houses both misdemeanants and felons. ACH will provide necessary healthcare to all residents of the Detention Facility, including those inmates considered to be "work-release inmates" while the work-release inmates are housed within the Detention Facility. This contract is based upon a **1,000** inmate daily population.

**6.     MINIMUM QUALIFICATIONS AND REQUIREMENTS**:     The Sheriff requires and ACH represents and warrants that it will meet certain minimum requirements. At a minimum, ACH will strictly comply with the following:

**A.     ORGANIZATION**: ACH will have an on-site manager/coordinator with jail healthcare experience to serve as a liaison between ACH, the Sheriff, and representatives of the Sheriff or the Madison County Commission.

**B.     INSURANCE**:     ACH covenants to furnish, and it is understood and agreed that ACH shall procure at its own expense, and maintain in force throughout the entire term of this Agreement, including any renewal terms, General Liability, Professional Liability, and Medical Malpractice Insurance providing coverage for claims including professional liability, negligence, and claims asserted pursuant to 42 U.S.C. § 1983 in the amount of One Million Dollars ($1,000,000) per occurrence, and Three Million Dollars ($3,000,000) aggregate, insuring all claims that may arise out of the course and scope of this Agreement. Madison County and the Sheriff shall be additional named insureds on the aforesaid policies of insurance. As between insurance coverage provided by other sources to the above named entities and individuals and ACH's insurance coverage, ACH's insurance coverage shall be primary. ACH shall furnish the Sheriff and Madison County with original certificates of its insurance policy obtained in compliance with this Section. The Madison County Administrator shall be furnished with a copy of said policy. Such certificate shall be furnished on or before the commencement of ACH's operations pursuant to this Agreement. ACH shall require its insurance carrier to notify, in writing, the Madison County Administrator and the Sheriff of any changes, endorsements, amendments or cancellations of such insurance policies at least ten (10) days prior to the effective date of such change. ACH's insurance policies shall be written by an insurance company or companies authorized by the Commissioner of Insurance of the State of Alabama to do business in the State of Alabama. ACH herein agrees and covenants to pay on demand any deductible amount or self insured risk required by said insurance company and/or any insurance policy of Madison County which may be utilized by any person, company or other entity on any claim made against Madison County, or the Sheriff (or those persons or entities associated with them) as a result of any service from or related to this Agreement. Should ACH's insurance provider withdraw coverage or become insolvent, all claims, litigation costs, attorney fees and any judgment or settlement money will be paid by ACH.

**C.    INDEMNIFICATION**:   ACH agrees to indemnify and save harmless Madison County, and the Sheriff, and their respective supervisors, agents, officers, employees, and officials from and against any and all liability, loss, damages, interest, judgments and liens growing out of any and all costs and expenses (including, but not limited to, reasonable attorney fees and disbursements) arising out of or incurred in connection with any and all claims, demands, suits, actions or proceedings, which may be brought against Madison County, the Sheriff, respective supervisors, agents, officers, employees, and officials by reason of, or as the result of (1) acts or omissions of ACH, its agents, servants, or employees related in any way to or while in the performance of this Agreement; (2) any allegations of an act or omission, conduct or misconduct, of ACH, its agents, servants or employees not included in the paragraph above and for which the County, the Sheriff, or their agents, servants, or employees are alleged to be liable; and (3) any allegation of employment discrimination by an ACH employee.

Madison County and the Sheriff agree to indemnify and save harmless ACH from and against any and all liability, loss, damages, interest, judgments and liens growing out of any and all costs and expenses (including, but not limited to, reasonable attorney fees and disbursements) arising out of or incurred in connection with any and all claims, demands, suits, actions or proceedings, which may be brought against ACH by reason of, or as the result of (1) acts or omissions of Madison County, the Sheriff, or their respective supervisors, agents, officers, employees, and officials related in any way to or while in the performance of this Agreement; (2) any allegations of an act or omission, conduct or misconduct, of Madison County, the Sheriff, or their respective supervisors, agents, officers, employees, and officials not included in the paragraph above and for which ACH is alleged to be liable; and (3) any allegation of employment discrimination by Madison County, the Sheriff, or their respective supervisors, agents, officers, employees, and officials.

**D.    NCCHC STANDARDS**:   Healthcare services must be provided in substantial compliance with the current Jail Health Standards published by the National Commission on Correctional Healthcare (NCCHC). ACH may, but is not required to, seek accreditation from NCCHC.

**E.    INMATE CARE STANDARDS**:   ACH represents and warrants that services provided at the Detention Facility will at all times be in compliance with all aspects of the November 8, 2000, March 26, 2001, and November 26, 2001, Orders entered in the case of Marshall v. Dorning, In the United States District Court for the Northern District of Alabama, CV-78-C-5010-NE. In the event that any provision varies from those requirements contained within the consent orders, then the requirements within the consent orders will control. Furthermore, ACH represents and warrants that such services shall at all times be in compliance with the following requirements:

Inmates in the detention facility shall have access at all times to constitutionally adequate healthcare. To this end, ACH must provide 24-hour/7 days per week nursing coverage to address in a timely manner the health care needs of any inmate. In addition, all 14-day physical exams must be performed by nurses or higher level practitioners appropriately trained in physical assessment. Licensed practical nurses must be supervised by a registered nurse, nurse practitioner, physician's assistant, or physician as required by the Alabama Board of Nursing.

The medical director shall review and approve each physical assessment performed on any inmate.

On an annual basis, the medical director, in conjunction with the treating psychiatrist (with regard to psychiatric illness) and obstetrician/gynecologist (with regard to obstetrical and gynecological issues), shall review and update triage protocols and nursing protocols to ensure that they are in accordance with the community standard of care specific to each medical condition, and train all nurses on the proper use of these protocols. The triage protocols developed by the medical director shall indicate whether a condition requires routine (within four weeks), urgent (within two days), or emergency (immediate) referral to a physician. There shall be sufficient physician hours each week to ensure that inmates are seen by a physician at the appropriate interval as determined by the triage protocol.

The medical director shall review the referral decisions by nurses to physicians on a weekly basis to ensure that individuals whose serious medical, dental, and mental health conditions require treatment are being referred in an appropriate and timely way consistent with the standard of care. This shall include referral of individuals newly admitted to the detention facility who suffer from acute or chronic illnesses. If the medical director determines that referrals are not appropriate and timely, he or she shall take immediate steps to counsel and train the nurses in proper referral practices.

An obstetrician/gynecologist shall be available at the detention facility at least every other week (this does not allow the physician to manipulate the required days here) to provide adequate prenatal care to pregnant women and to treat women with gynecological problems. No more than once a month, a certified registered nurse practitioner specializing in obstetrics/gynecology may visit the detention facility in place of the obstetrician/gynecologist. If, according to the triage protocols developed by the medical director and obstetrician/gynecologist, a female prisoner requires treatment prior to the next visit by the obstetrician/gynecologist, she shall receive such treatment at the appropriate interval.

ACH shall ensure that a psychiatrist is at the detention facility a sufficient amount of time each week to provide timely and adequate treatment for inmates with serious mental illness, in accordance with the triage protocols established by the medical director and psychiatrist.

      **F.**    **OFF-SITE SERVICES**: ACH will identify the need for inmate care to be rendered outside the Detention Facility and to schedule, coordinate, and pay for all non-emergency, emergency, and specialized healthcare rendered to inmates inside and outside the Detention Facility. ACH will identify the need for inpatient hospitalization of inmates and to schedule, coordinate, and pay for any inpatient hospitalization for such inmate. ACH is responsible for all institutional charges, physician charges and any and all additional charges for health care, including but not limited to ambulance charges up to an agreed upon limit described elsewhere herein. ACH will review every invoice submitted to it for payment of off-site services to confirm that such services were actually provided to the inmate while he was in the custody of the Sheriff. When off-site care, including hospital care, is required for approved medical reasons, ACH shall arrange for said care and be financial responsible for cost of ambulance transportation, if medically indicated, and the cost of all approved medical and dental care,

Case 5:14-cv-01399-AKK   Document 36-1   Filed 10/29/14   Page 5 of 21

diagnostic testing and supplies provided off-site while the Patient is a Detention Facility inmate, subject to the financial liability limit noted in Section T. ACH shall arrange all off-site treatment and care in accordance with the Sheriff's policies and procedures.

### G.   SPECIFIC OBLIGATIONS:

1.   ACH will identify the need, schedule and coordinate:

All physician services, supporting diagnostic examinations, follow up for health problems identified by screening or laboratory tests, non-emergency and emergency medical care rendered to inmates inside and outside the Detention Facility;

Inpatient hospitalization or offsite specialty service for any inmate at the Detention Facility;

Providing a responsible physician who will conduct sick call daily and provide an on call physician or a designee seven days per week, twenty four hours per day for emergency situations;

Psychiatric, psychological and counseling services for any inmates inside the Detention Facility;

Providing a total pharmaceutical system for the Detention Facility;

Providing a medical detoxification program for drug and/or alcohol addicted inmates;

Providing all equipment with the exception of capital outlay equipment. ACH shall provide at its own expense supplies necessary for ACH's performance at the Detention Facility;

Providing all medical supplies;

Providing consultation services to the Sheriff and Director of Corrections on any and all aspects of the health care delivery system at the Detention Facility, including but not limited to, a comprehensive strategic plan; site specific policies, procedures and protocol; peer review; introductory in-service training for correctional officers with regard to accessing inmate healthcare services; continuous quality improvement; cost containment; utilization management and risk management programs; HIPAA and NCCHC compliance programs specific to the Detention Facility's medical operations;

Providing a centralized billing system for health care providers;

Providing a customized Electronic Medical Records (EMR) System to assist in the risk management of all inmate medical and mental health issues.

Administering emergency medical care to any employee or visitor at the Detention Facility who requires such care.

Administering, within twenty-four hours of arrival and prior to being placed in a general population cell outside of the booking area, for all new inmates at the Detention Facility, an initial medical, oral and psychological screening. A standard form to record findings of the initial screening and evaluation will be utilized. The form is placed in the patient's medical file. At a minimum, initial screenings will include:

- Documentation of current illnesses and health problems, including medications taken, and special health requirements.

- Behavior observations, including state of consciousness, mental status, and whether the inmate is under the influence of drugs or alcohol.

- Notation of body deformities, trauma markings, bruises, ease of movement, etc.

- Conditions of skin including infestations.

- Referral of the inmate for special housing, emergency health services, or additional medical specialties will be made as needed.

Administering a full health assessment, including a comprehensive physical and psychological evaluation on any inmate confined at Detention Facility within fourteen days of arrival at the facility. This examination will conform to national medical standards, and be performed by a qualified medical professional. At a minimum, the comprehensive evaluation will include:

- Review of the receiving screening results by the Medical Director or the responsible physician

- Collection of additional data to complete the medical, dental and psychological histories

- Review of immunization history and update scheduled as needed Laboratory and/or diagnostic tests (as determined

by the responsible physician to detect diseases, the assessment will include:

a)    TB testing
b)    Sexually transmitted diseases testing including HIV
c)    Full blood work up
d)    Dental examination
e)    Vision examination
f)    Recording of height, weight, blood pressure and temperature
g)    Other tests and examinations as appropriate
h)    Medical (including gynecological assessments of females) with appropriate comments
i)    Review of the results of the medical examination and tests, and identification of problems by physician
j)    Obstetrical follow-up.

Administering a psychological screening to include at a minimum an interview conducted by the appropriate staff in which inquiries into the items listed below are made: History of psychiatric hospitalization and outpatient treatment; Family history; Current psychotropic medications; suicidal ideation and suicidal behavior; Drug usage; Alcohol usage; History of sex offenses; History of outwardly violent behavior; History of victimization or abuse; Special education placement; History of cerebral trauma and seizures; Emotional response to detainment.

ACH shall perform the collection of physical evidence (hair, blood, saliva) for the purpose of DNA testing on-site with signed consent from the inmate in accordance with applicable NCCHC guidelines. Court ordered collection of physical evidence shall be referred to the appropriate emergency room. ACH shall not be financially responsible for any costs associated with the collection or testing of physical evidence, including but not limited to any associated medical and/or laboratory fees, added personnel and court costs and the costs of DNA collection.

ACH shall perform body cavity searches on-site with signed consent from the inmate in accordance with applicable NCCHC guidelines. Court ordered body cavity searches shall be referred to the appropriate emergency room. ACH shall not be financially responsible for any costs associated with a body cavity search, including but not limited to any associated medical and/or laboratory fees, added personnel and court costs.

Case 5:14-cv-01399-AKK   Document 36-1   Filed 10/29/14   Page 9 of 21

ACH shall provide health education materials to the Sheriff for inmate education.

ACH shall review at scheduled quality assurance meetings the healthcare reports with the Sheriff and/or his designee concerning the overall operation of the healthcare services program and the general health of the inmates at the Detention Facility.

ACH representatives shall meet, in accordance with a schedule agreed to by the Sheriff and ACH, with the Sheriff and/or his designee concerning procedures within the Detention Facility and any proposed changes in health related procedures or other matters which either party deems necessary.

ACH will not be responsible for the following: elective care, infant care and certain other enumerated expenses as provided herein. ACH shall not provide elective medical care to inmates. Elective medical care shall be defined as care which, if not provided, would not, in the opinion of ACH's medical director (licensed physician employed by ACH), cause the inmate's health to deteriorate or cause harm to the inmate's well-being. Decisions concerning elective medical care shall be consistent with the applicable American Medical Association ("AMA") standards. ACH shall not be financially responsible for the cost of medical care provided to infants born to Detention Facility inmates. ACH will provide and be financially responsible for prenatal care, testing and hospital care related to pregnancy and delivery as medically indicated for Detention Facility inmates, subject to the financial liability limit noted in Section T, but newborn/infant care is not within the scope of this Agreement. ACH will not be responsible for any other expenses, including, but not limited to, dentures and dental restoration, optical care, eyeglasses and optical supplies, prosthetics and prosthetic supplies.

2. Duties and Obligations of the Sheriff:

The Sheriff shall maintain responsibility for the physical security of the Detention Facility and the continuing security of the inmates. ACH and the Sheriff agree that adequate security services are necessary for the safety of the agents, employees and subcontractors of ACH as well as of the security of inmates and the Sheriff's staff consistent with a correctional setting. The Sheriff will provide security sufficient to enable ACH and its personnel to safely provide healthcare services described in this Agreement. The Sheriff and Madison County shall not be liable for loss of or damage to equipment and supplies of ACH, its agents, employees or subcontractors unless such loss or damage was caused by the

sole negligence of the Sheriff's employees. The Sheriff shall provide use of existing office furniture, including but not limited to, filing cabinets, desks and chairs and all necessary utilities currently in place at the existing healthcare facilities located in the Detention Facility. Upon termination of this Agreement, ACH shall return to Madison County and to the Sheriff possession and control of all County-owned medical and/or office equipment. At such time, the office's furniture shall be in good working order with allowances made for reasonable wear and tear.

The Sheriff shall provide, as needed, information pertaining to inmates that ACH and the Sheriff mutually identify as reasonable and necessary for ACH to adequately perform its obligations to the Sheriff.

**H.     INMATE CO-PAYMENT**: The Sheriff has a policy of charging inmates a $5.00 co-payment fee for certain pharmaceuticals and a $10.00 co-payment fee for certain services the on-site healthcare provider provides to inmates. No inmates are denied healthcare or necessary pharmaceuticals based on their ability or lack thereof to pay the co-payment fee. ACH will complete appropriate documentation and provide the same to the Sheriff or his designee to ensure that co-payment charges are deducted from appropriate inmate jail accounts.

**I.     SATISFACTION   WITH   HEALTHCARE   PERSONNEL**:   In recognition of the sensitive nature of the provision of medical services in the Detention Facility, ACH will remove any employee or contractor from the Detention Facility in the event the Sheriff becomes dissatisfied with any healthcare personnel provided by ACH and provides written notice regarding the same. ACH will be required to conduct appropriate background checks and submit appropriate documentation to the Sheriff regarding each employee or contractor providing services herein. The Sheriff will also have the option of performing an independent background check of all employees and contractors, and ACH shall obtain any necessary waivers or consents to allow the Sheriff to conduct certain background checks. The Sheriff's option to perform an independent background check in no way absolves ACH from its obligations hereunder. All persons rendering services on behalf of ACH shall be licensed, certified, or registered, as appropriate, in their respective areas of expertise as required by applicable Alabama law, and appropriate supervision shall be provided as required by applicable Alabama law.

**J.     TRANSPORTATION AND MOVEMENT OF INMATES**: Non-emergency transportation of inmates will be performed by appropriate members of the Sheriff's staff. Emergency transportation of inmates will be performed by appropriate emergency response personnel summoned by ACH.

**K.     INMATE MEDICAL RECORDS**: ACH will establish policies and procedures addressing the medical record format and documentation requirements utilizing the Electronic Medical Records System. ACH will ensure that medical record formats are maintained in a standardized format in accordance with prevailing medical regulations. A medical record will be established for each inmate who receives care beyond the initial intake

DOCSHSV\207688\3\                                      9

screening. ACH will maintain a comprehensive health care record that at a minimum will include the following: Complete receiving; Health assessment data forms; Master problem list; All findings diagnoses treatments, and dispositions; Prescribed medication and their administration; Reports of laboratory, x-ray and diagnostic studies; Signature and title of each documenter; Consent and refusal forms when applicable; Release of information forms when applicable; Place, date and time of health encounter; Discharge summary of hospitalizations; Mental Health Program. Medical records of inmates shall be kept separate from the inmates' confinement records. A complete original of the applicable medical records shall be available to accompany each inmate who is transferred from the Detention Facility to another location for off-site services or to another institution. Medical records shall be confidential, subject to applicable law regarding confidentiality of such records. ACH shall comply with Alabama and federal laws and the Sheriff's policies with regard to access by inmates and jail staff to medical records. No information contained in the medical records of an inmate shall be released by ACH except as provided by the Sheriff's policy, by a Court order or otherwise in accordance with applicable laws. At expiration of the contract, all medical records shall be delivered to and remain the property of the Sheriff. However, the Sheriff shall provide ACH with reasonable on-going access to all medical records even after the expiration of this Agreement for the purpose of defending litigation. Inmate medical records shall at all times be the property of the Madison. County Sheriff and ACH shall make available to the Sheriff, unless otherwise specifically prohibited, at the Sheriff's request, all records, documents and other papers relating to the direct delivery of healthcare services to Detention Facility inmates hereunder. During the period of this Agreement, and for a reasonable time thereafter, the Sheriff will provide ACH, at ACH's request, the Sheriff's record relating to the provision of healthcare services to inmates as may be reasonably requested by ACH in connection with an investigation of, or defense of, any claim by a third party related to ACH's conduct. Consistent with the applicable state and federal laws and the foregoing provisions, the Sheriff will make available to ACH such records as are maintained by the Sheriff as ACH may reasonably request. Any such information provided by the Sheriff to ACH that the Sheriff considers confidential shall be kept confidential by ACH and shall not, except as may be required by law, be distributed to any third party without prior written approval by the Sheriff. Notwithstanding any provision of this Agreement to the contrary, the Sheriff's internal affairs investigation records shall not be required to be provided to ACH or any other person except as may be required by law.

      **L.**   **REPORTING REQUIREMENTS**: ACH must notify the Sheriff's staff of any inmate believed to have any medical or mental health condition posing a potential threat to inmate or officer wellbeing (such as inmates suspected of having tuberculosis or other communicable diseases or conditions), provide general medical information regarding these medical conditions and provide protocol to be taken when housing, transporting, and interacting with inmates suspected of having these diseases or conditions. ACH must provide a comprehensive internal quality improvement program, which includes conducting an on-going evaluation of compliance with its policies and procedures (in compliance with the requirements contained within relevant consent orders and this contract), with monitoring results documented and reported on a quarterly basis to the Sheriff. ACH must provide monthly statistical utilization reports of services provided, including all off-site services provided sorted by provider and by inmate. ACH must provide monthly staffing reports describing all staffing for the previous month by name, position, location and number of hours. The monthly statistical reports must, at a minimum, include the following information:

Case 5:14-cv-01959-CLS   Document 36-1   Filed 10/29/14   Page 12 of 21

| |
|---|
| **ADMITTING INFORMATION** |
| Number of inmates admitted to the Madison County Detention Facility during the previous month. |
| **INTAKE SCREENING** |
| Number of newly admitted inmates whose intake screening forms were not reviewed by a qualified healthcare professional within 24 hours of intake. |
| Out of the number of intake screening forms not reviewed by a qualified healthcare professional within 24 hours of intake (number listed above), number of these inmates who were released from the Madison County Detention Facility less than 24 hours from the time they were admitted to the Madison County Detention Facility. |
| Percent of intake screening forms reviewed within 24 hours of intake for inmates remaining in the Madison County Detention Facility more than 24 hours. |
| **PHYSICALS AND TB TESTING** |
| Number of inmates who should have received their 14-day physicals, including TB tests, during the previous month. |
| **PHYSICALS** |
| Number of inmates who received their physicals within 14 days of their incarceration in the Madison County Detention Facility. |
| Number of inmates who did not receive physicals because they had a recent physical from previous incarceration. |
| Number of inmates who refused their physical. |
| Number of inmates who received their physicals after 14 days but before 21 days of intake. |
| Percent of inmates who received their physicals within 21 days of intake, who had recent physicals, or who refused their physicals. |
| **TB TESTING** |
| Number of inmates who received a mantoux test within 14 days of intake. |
| Number of inmates who refused a mantoux test. |
| Number of inmates who received a mantoux test after 14 days of intake. |
| Number of inmates who did not receive a mantoux test because of recent mantoux testing from previous incarceration in the Madison County Detention Facility or because the inmate reported a prior PPD. |
| Percent of inmates to be tested who received a mantoux test within 14 days of incarceration, who received a mantoux test after 14 days of intake, who had recently been tested, or who reported a prior PPD. |

| **MANTOUX TEST READING** |
|---|
| Number of inmates who had their mantoux test read between 48 and 72 hours after it was implanted. |
| Number of mantoux tests that could not be read because the inmate had been released from jail. |
| Percent of mantoux tests read between 48 and 72 hours after implantation. |
| **TB CHEST X-RAYS AND RESULTS** |
| Number of inmates who had a positive result to the mantoux test. |
| Number of inmates who received a chest x-ray within 96 hours of a positive mantoux test result. |
| Number of inmates who did not receive a chest x-ray because they had been released from jail. |
| Number of inmates who received chest x-rays who were started on INH therapy. |
| Number of inmates who were diagnosed with active tuberculosis after receiving a chest x-ray. |
| Number of inmates diagnosed with active tuberculosis during previous month. |

On-site visits by the medical doctor, OB/GYN, psychiatrist, and dentist at the Madison County Detention Facility for the month should be listed by inmate, provider, time spent on-site, and location of visit. The nursing schedule for the month should also be provided.

The number of inmates who were identified as having certain chronic conditions during the previous month should be listed as follows:

- Diabetes
  - Number of insulin-dependent
  - Number of non-insulin dependent
- Hypertension
- Seizures
- Diagnosed Mental Illness
- Asthma
- HIV/AIDS

**M.    MEDICAL EQUIPMENT AND SUPPLIES**: ACH will be responsible for providing and paying for all equipment and supplies necessary for ACH's performance at the Detention Facility, including, but not limited to, batteries, thermometers, blood pressure cuffs, oxygen, etc.

**N.    PHARMACEUTICALS**: ACH must provide a pharmaceutical supply in accordance with federal, state and local laws that meets the needs of the inmate population.

Case 5:14-cv-01359-AKK   Document 36-1   Filed 10/29/14   Page 13 of 21

Medications shall be administered to inmates as prescribed. Appropriately trained medical personnel will administer medications and the administration of each dose will be documented. Medications must be maintained under proper conditions and in a secure area. ACH will ensure that appropriate quality and cost control measures are in place to reduce the unnecessary, wasteful, or redundant ordering of or distribution of formulary items.

ACH will comply with all applicable state, federal regulations, and ACA standards regarding prescribing, dispensing, administering, and procuring pharmaceuticals. Procedures will define timely procurement, dispensing, distribution, accounting, and disposal of pharmaceuticals. Records will be maintained to ensure adequate control of and accountability for all medications. Inmates will not prepare, dispense, or administer medication except for self-medication programs approved the Sheriff and ACH.

Drug storage and medication will not contain any outdated, discontinued, or recalled medications. All medications will be stored under proper conditions of sanitation, temperature, light, moisture, ventilation, segregation, and security. Antiseptics, other medications for external use, and disinfectants will be stored separately from internal and injectable medications. An adequate and proper supply of antidotes and other emergency medications, and related information will be readily available to health care staff. Prescription medications are administered or delivered to the inmate only upon the order of a physician, dentist, or other legally authorized individual. ACH will determine the prescriptive practices for the facilities. Medications are prescribed only when clinically indicated and will be documented by a form approved by the Medical Director of ACH. ACH will work with pharmaceutical companies to assure the lowest possible pharmaceutical cost.

Medications are only dispensed by licensed individuals; each prescription is labeled in accordance with applicable regulations with the following information: date, pharmacy prescription number, patient name, name of the drug, strength, amount dispensed, directions to the patient for use, prescriber name, and other pertinent information. Health personnel who have been trained and/or licensed can only pass medications. Administration of medications or their refusal is recorded on the inmate's log. Inmates on abusable medications are observed to ensure that the medications are taken and not hoarded.

     **O.**    **MEDICAL WASTE**: ACH will be responsible for the removal of all medical waste associated with the provision of healthcare at the Detention Facility.

     **P.**    **CHRONIC CARE CLINICS**: ACH must establish a plan for the identification, treatment and monitoring of inmates with chronic illnesses and special healthcare needs. ACH will be required to continue "chronic care clinics" for those persons identified with specified chronic illnesses and conditions (diabetes, hypertension, mental illness, HIV/AIDS, tuberculosis, asthma, seizures, etc.). ACH has defined a chronic health problem as an illness which is either ongoing or recurring. To provide an effective and efficient health care delivery system for chronic ill patients, ACH identifies the number of inmates with specific chronic conditions, and individual treatment plans are developed or reviewed for each of these inmates which includes: instructions regarding medications; special therapies; exercise; diet; the type and frequency of laboratory; other diagnostic testing; frequencies of follow up for reevaluation of the inmate's condition; and adjustment of the treatment plan as needed. Chronic clinics are