Case 5:15-cv-01997-HNJ   Document 95-5   Filed 01/12/18   Page 1 of 29

FILED
2018 Jan-12 PM 04:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

Case 5:14-cv-01359-AKK   Document 36-1   Filed 10/29/14   Page 15 of 21

established to enable inmates to have scheduled visits to the health care provider. Educating the inmate to understand the seriousness of their conditions can create a more workable outcome for both the health care provider and the patient. Counseling and self-care instructions are given to these inmates to assist them while detained and upon their return to the community which is documented in the inmate's medical record.

**Q.    STAFFING PLANS:**   ACH will provide necessary and appropriate staffing in order to meet the terms of this contract and applicable consent orders. ACH agrees that minimum staffing levels as described below will be maintained at the Detention Facility at all times, regardless of staff vacation, training or illness. ACH represents and acknowledges that it may be required to increase staffing from these minimum stated levels in order to comply with this contract or applicable consent orders. However, ACH may request reasonable changes to the staffing plan. No changes to the staffing plan will be made without the written consent of the Sheriff. The Sheriff will not unreasonably withhold his consent so long as such changes, in the Sheriff's sole discretion, will maintain necessary and appropriate staffing to provide all required medical, psychiatric and dental care and satisfy any requirements contained in any applicable consent order. Requests for additional staffing due to changes in population, location, service requirements and/or to satisfy any applicable consent order will be negotiated between ACH, Sheriff and County prior to implementation of services. Additional staffing costs will be incremental to the current contract amount in effect at the time of service.

<u>WEEKLY STAFFING</u>:

(1) RN /LPN  Facility Administrator can be an RN or LPN as long as approved by the Chief of Corrections – 40 hours per week

(1) Administrative Support – 40 hours per week

(1) RN - 7:00 a.m. – 3:00 p.m. seven days per week

(5) LPNs - 7:00 a.m. – 3:00 p.m. Monday through Friday

(4) LPNs - 7:00 a.m. – 3:00 p.m. Saturday through Sunday

(1) Qualified Mental Health Professional - 7:00 a.m. – 3:00 p.m. Monday through Friday

(5) LPNs - 3:00 p.m. – 11:00 p.m. seven days per week

(4) LPNs - 11:00 p.m. – 7:00 a.m. seven days per week

(2) Medical Records Clerks 40 hours per week each

<u>ON-SITE DOCTOR HOURS</u>:

Medical Director (medical doctor) daily for as long as necessary on a schedule agreed to by the Sheriff.  The Medical Director or another covering physician with specific knowledge of the operation of the

Detention Facility is on call twenty-four hours a day, seven days a week, for emergency situations.

Psychiatrist one day per week (a week being defined as Sunday through Saturday), no less than four (4) hours per week.

Doctor specializing in obstetrics/gynecology every other week. Once a month, a certified registered nurse practitioner specializing in obstetrics/gynecology may visit the Detention Facility in lieu of the obstetrician/gynecologist.

Dentist one to two days per week totaling eight (8) hours per week.

ACH will provide services necessary to comply with all requirements contained herein.

**R.**     **BASE COMPENSATION**: The County (at the request of the Sheriff) will pay to ACH the annualized base price of **Two Million, Nine Hundred Seventy-Three Thousand, Six Hundred Forty-Seven and 24/100 Dollars ($2,973,647.24)** during the term of this Agreement, payable in monthly installments. Monthly installments during the initial term will be in the amount of **Two Hundred Forty-Seven Thousand, Eight Hundred Three and 92/100 Dollars ($247,803.92)** each month. In the event this Agreement should commence or terminate on a date other than the first or last day of any calendar month, compensation to ACH will be pro-rated accordingly for the shortened month.

Account reconciliation shall be completed for each fiscal quarter of the Agreement. Adjustments shall be made for variances in the average daily inmate population, non-covered pharmaceuticals purchased and other expenses such as equipment or services purchased by ACH (with prior approval of the County and the Sheriff on behalf of the County). Any contract amount in arrears will be settled through reconciliation and adjusted accordingly. Adjustments will be made to the first monthly invoice prepared after reconciliation between ACH and the County. Payment of the adjusted amount will be due upon receipt of said invoice.

**S.**     **INMATE POPULATION FLUCTUATION AND PER DIEM RATES**: The County, the Sheriff, and ACH agree that the annual base price is calculated based upon an average daily inmate population of up to **one thousand** (1,000) If the average daily inmate population exceeds **one thousand (1,000)** inmates over a period of one (1) month (each month), then the compensation payable to ACH by the County shall be increased by a per diem rate of **One and 00/100 Dollar** ($1.00) for each inmate over **one thousand (1,000).** The average daily inmate resident population shall be calculated pursuant to the daily count sheet generated at approximately midnight each day. The excess over an average of **one thousand (1,000),** if any, will be multiplied by the per diem rate and by the number of days in the period to arrive at the increase in compensation payable to ACH for that period. In all cases where adjustments become necessary, the invoice adjustment will be made on the invoice for a subsequent month's services. For example, if there is an average population for any given period of **one thousand thirty (1,030)** inmates, resulting in an excess of thirty (30) inmates, then ACH shall receive additional compensation of thirty (30) times the per diem rate times the number of days in that period. The

resulting amount will be an addition to the regular base fee and will be billed on a subsequent monthly invoice.

      **T.**    **COST SHARING/COST POOL**:  Out of the **Seven Hundred Forty-Three Thousand, Four Hundred Eleven and 81/100 Dollars ($743,411.81)** quarterly cost for healthcare services, a total amount of **Two Hundred Thousand Dollars ($200,000)** per quarter of this Agreement, is allocated to a "cost pool." ACH shall, at its own cost, arrange for healthcare services for any inmate who, in the opinion of the Medical Director (hereinafter meaning a licensed physician), requires such care. ACH's liability for costs associated with the healthcare services for inmates rendered <u>outside</u> the Jail and for prescription pharmaceuticals for inmates <u>either inside or outside</u> the Jail, will be limited each quarter of the term of this Agreement by this cost pool. If the costs of all care as described in this paragraph exceed the amount within any said quarter of **Two Hundred Thousand Dollars ($200,000)**, then ACH will review all costs and claims for payment to determine that such costs and claims are proper, pay for the additional costs and claims and submit invoices supporting the payments to the Sheriff along with an ACH invoice for one hundred percent (100%) of the cost in excess of **Two Hundred Thousand Dollars ($200,000)** for said quarter. Subject to the provisions contained herein, ACH shall be responsible for all costs associated with inmate healthcare for all incurred but not received costs during the term of this Agreement. ACH's responsibility to determine those costs and claims that are properly payable and for payment of such property payable costs and claims shall survive any termination of this Agreement and shall extend for such period until all such costs and claims have been resolved.

      **U.**    **CONTRACT TERMINATION**:    This contract may be cancelled "without cause" by any party upon ninety (90) days' written notice. It is understood and agreed that this Agreement shall be subject to annual appropriations by Madison County for the operation of the Detention Facility. Notwithstanding any provisions herein to the contrary, if funds are not appropriated for this Agreement, then upon exhaustion of such funding, Madison County and the Sheriff shall be entitled to immediately terminate this Agreement without penalty or liability. Recognizing that such termination may entail costs for ACH, Madison County and the Sheriff will act in good faith and make every effort to give ACH notice of any potential funding or appropriation issues. If this Agreement is terminated due to lack of funding, ACH shall be paid for services rendered up to the time of termination. This contract may be terminated "for cause" upon ten (10) days' written notice. In the event that this Agreement is terminated for cause, ACH shall be compensated for work completed by ACH up to the termination date set forth in the written termination notice.

      **7.**    **OBJECTIVES**:    ACH will meet, exceed and otherwise comply with the following stated objectives:

      **A.**    To deliver unimpeded, necessary healthcare services (including medical, dental and mental health services) to inmates (as set forth herein and as dictated by law) that can be audited against established standards.

      **B.**    To operate the healthcare program in a humane manner with respect to the inmate's right to basic healthcare services.

**C.** To operate the healthcare program at full staffing and use only licensed, certified and professionally trained personnel.

**D.** To implement a written healthcare plan with clear objectives, policies, and procedures.

**E.** To maintain an open and cooperative relationship with the Sheriff's administration and staff.

**F.** To maintain complete and accurate records of care and to collect, analyze and report health statistics on a regular basis.

**G.** To operate the healthcare program in a cost-effective manner with full reporting and accountability to the Sheriff and Madison County.

**8.    MISCELLANEOUS:**

**A.    INDEPENDENT CONTRACTOR STATUS:** The parties acknowledge that ACH is an independent contractor engaged to provide medical care to inmates at the Jail Facilities under the direction of ACH management. Nothing in this Agreement is intended nor shall be construed to create an agency relationship, an employer/employee relationship, or a joint venture relationship between the parties. The employees or agents of ACH are not now nor shall they be deemed to be employees of Madison County or the Sheriff. Likewise, the employees of the Sheriff and/or Madison County are not now nor shall they be deemed to be employees of ACH. ACH assumes all financial responsibility for the employees of ACH, such as wages, withholding taxes, social security taxes and other taxes which may be related to the services to be provided under this Agreement.

**B.    ASSIGNMENT AND SUBCONTRACTING:** ACH shall not assign this Agreement to any other person or entity without the express written consent of the Sheriff and the County. Any such assignment or subcontract shall include the obligations contained in this Agreement. Any assignment or subcontract shall not relieve ACH of its independent obligation to provide the services and be bound by the requirements of this Agreement. In order to discharge the obligations hereunder, ACH may engage certain healthcare professionals as independent contractors rather than employees. As the relationship between ACH and these healthcare professionals will be that of independent contractor, ACH will not be considered or deemed to be engaged in the practice of medicine or other professions practiced by these professionals. ACH will exercise control over the manner or means by which these independent contractors perform their medical duties. This control will be exercised reasonably consistent with independent medical judgment these independent contractors are required to exercise. ACH shall exercise administrative supervision over such professionals necessary to insure strict fulfillment of the obligations contained in this Agreement. All terms and conditions of this Agreement shall be included in all such subcontracts. For each agent and subcontractor, including all medical professionals, physicians and nurses performing duties as agents or independent contractors of ACH under this Agreement, ACH shall provide the Sheriff proof that, for each such professional, there is in effect during the period that person is engaged in the performance of this Agreement, a professional liability or medical malpractice insurance policy

in an amount or amounts of One Million Dollars ($1,000,000) coverage per occurrence and Three Million Dollars ($3,000,000) annual aggregate coverage.

        **C.**    **NOTICE:**   Unless otherwise provided herein, all notices or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally in hand or sent by certified mail, return receipt requested, postage prepaid, and addressed to the appropriate party(s) at the following address or to any other person at any other address as may be designated in writing by the parties. All notices to the Madison County Sheriff and to Madison County shall be addressed to:

> County:     Madison County Commission
>                 100 North Side Square
>                 Huntsville, Alabama 35801-4820

> Sheriff:     Sheriff Blake Dorning
>                 Madison County Sheriff's Department
>                 100 North Side Square
>                 Huntsville, Alabama 35801-4820

All notices to ACH shall be addressed to:

> Norman R. Johnson, M.D.
> Advanced Correctional Healthcare, Inc.
> 3922 West Baring Trace
> Peoria, Illinois 61615-2500

Notices shall be effective upon receipt.

        **D.**    **GOVERNING LAW**: This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed according to, the laws of the State of Alabama, except as specifically noted.

        **E.**    **ENTIRE AGREEMENT**:   This Agreement constitutes the entire agreement of the parties and is intended as a complete and exclusive statement of the promises, representations, negotiations, discussions and agreements that have been made in connection with the subject matter hereof. No modifications or amendment to this Agreement shall be binding upon the parties unless the same is in writing and signed by the respective parties hereto. All prior negotiations, agreements and understandings with respect to the subject matter of this Agreement are superseded hereby.

        **F.**    **AMENDMENT**:   This Agreement may be amended or revised only in writing and signed by all parties.

        **G.**    **WAIVER OF BREACH**: The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

**H.     OTHER CONTRACTS AND THIRD-PARTY BENEFICIARIES:**
The parties acknowledge that ACH is neither bound by nor aware of any other existing contracts to which the County or the Sheriff are parties and which relate to the providing of medical care to inmates at the Jail. The parties agree that they have not entered into this Agreement for the benefit of any third person or persons, and it is their express intention that the Agreement is intended to be for their respective benefit only and not for the benefit of others who might otherwise be deemed to constitute third-party beneficiaries hereof, specifically including but not limited to arrestees or inmates in the custody of the Sheriff.

**I.      SEVERABILITY:** In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

**J.      LIAISON:** The Madison County Sheriff shall serve as the liaison with ACH.

**K.     COOPERATION:** On and after the date of this agreement, each party shall, at the request of the other, make, execute and deliver or obtain and deliver all instruments and documents and shall do or cause to be done all such other things which either party may reasonably require to effectuate the provisions and intentions of this agreement.

**L.      TIME OF ESSENCE:** Time is and shall be of the essence of this agreement.

**M.     AUTHORITY:** The parties signing this agreement hereby state that they have the authority to bind the entity on whose behalf they are signing. The Sheriff's signature hereto is not intended to bind him in his individual capacity, and his signature hereto is merely intended to convey his consent to and desire for the County to enter into this Agreement with ACH to provide the services herein.

**N.     BINDING EFFECT:** This agreement shall be binding upon the parties hereto, their heirs, administrators, executors, successors and assigns.

**9.      CUMULATIVE POWERS:** Except as expressly limited by the terms of this agreement, all rights, power and privileges conferred hereunder shall be cumulative and not restrictive of those provided at law or in equity.

**IN WITNESS WHEREOF,** the parties have executed this Agreement in their official capacities with legal authority to do so.

SHERIFF, MADISON COUNTY

Blake Dorning
Date: June 4, 2012

MADISON COUNTY COMMISSION

Mike Gillespie, Chairman
Date: June 4, 2012

ATTEST:

Howard Baites
County Administrator
Date: June 4, 2012

ADVANCED CORRECTIONAL HEALTHCARE, INC.

By: _____ Neil Leuthold
Its: President / Comptroller
Date: June 26, 2012

http://www.wsfa.com/story/25284108/healthcare-plan-for-inmates-could.

FILED
2014 Oct-29  PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Healthcare plan for inmates could save jail money

*Posted: Apr 18, 2014 12:44 PM CST Updated: May 16, 2014 12:44 PM CST* HUNTSVILLE, AL (WAFF) -
Administrators with the Madison County Jail could save hundreds of thousands of dollars spent providing health care for inmates by taking advantage of provisions in the Patient Protection and Affordable Care Act, officials said.

On Thursday, the jail's administrator Chief Deputy Steve Morrison met with Norman Johnson, CEO of the jail's healthcare provider, Advanced Correctional Healthcare, to discuss strategies to seek state or federal coverage for some of the facility's medical expenses.

"The Madison County Jail I think is way ahead of the curve because they're well aware of this," said Johnson.

"People don't realize that Social Security, Medicaid, Medicare is cut off once you are incarcerated," said Morrison.

Morrison said medical expenses for the jail's detainees awaiting hearings and trials become the jail's responsibility, a responsibility that can be costly as the jail takes in older, unhealthier criminal suspects.

"If you come to this jail, you will be healthier when you leave this jail than if you go to your own doctor or if you're living out on the streets," said Johnson. "While we are not a health spa, clearly people are healthier after they come to the jail."

"They come in here, there's a variety of illnesses that they have to treat from diabetes to hepatitis to HIV," said Morrison. "Some of those require huge monthly costs for pharmaceutical medications. Some we have to take off-site to the hospital which is usually a catastrophic amount of money."

The jail has a medical budget of $3 million and a staff of five doctors and 38 nurses to care for inmates, Morrison said, but sometimes inmates must be admitted to expensive outside hospitals for treatment. Morrison explained that the jail has a reserve of $800,000 for

10/24/2014 6:31 PM

outside care but that those funds can be quickly depleted with just a few catastrophic cases

"We had an inmate that had some type of illness from all the psychotropic drugs that he'd been taking throughout his lifetime. He was in a coma for a long time and it was almost $300,000 for him. Now when you get just one of those out of a thousand inmates that can really cripple your budget," said Morrison said.

Johnson said Advance Correctional Healthcare and the jail were exploring approaches to have some Medicare or Medicaid coverage for at least a share of outside medical expenses. "I will be working with him to see if we can get a navigator into the jail to assist in the signup of these people," he said. "If that happens, a portion of their hospitalizations will be covered by the public aid system." Johnson said it was unclear whether such a navigator could be a jail staffer or would have to be hired from outside.

Part of the challenge, Morrison said, was keeping up with changing provisions and applications of relevant portions of the Affordable Care Act. Ideally, Morrison said, the jail could eventually have all inmates registered for Medicare or Medicaid sponsored health care coverage as soon as they were booked in, a process he acknowledged would be daunting. "The registration process is really intense," he said. "So it's going to take 20 to 30 minutes per inmate as they come through here and we run like 29,000 through each year."

Morrison said any steps to line up navigators and register inmates were still likely several months away but that any cost benefits from such an initiative could materialize quickly. "Once this thing's in place, it's almost immediate," he said. "We could see savings probably the first year."

Johnson said Madison County's jail was rare among the hundreds of jails Advanced Correctional serves in its aggressive pursuit of such savings. "They're very up on all the latest changes," he said. "And I think that they will probably benefit from the use of navigators and getting people into the insurance program probably more aggressively than other jails that we're presently working with."

"Constitutionally we're supposed to provide medical care," Morrison said. "It doesn't say we have to pay for it."

*Copyright 2014 WAFF[1]. All rights reserved.*

1. http://www.waff.com/

10/24/2014 6:31 PM

http://www.al.com/news/huntsville/index.ssf/2014/10/madison...

FILED
2014 Oct-29  PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Madison County Sheriff Blake Dorning: Running metro jail is like managing mental hospital

By Paul Huggins | phuggins@al.com [1] The Huntsville Times Email the author | Follow on Twitter[2] on October 22, 2014 at 6:29 PM, updated October 22, 2014 at 6:41 PM

HUNTSVILLE, Alabama - Madison County Metro Jail has essentially become a replacement mental hospital, and managing the incarcerated people -- the bulk of whom have drug and alcohol-related health problems -- is an enormous challenge, Sheriff Blake Dorning said.

The 12-year sheriff seeking a fourth term in next month's election, made his statement after AL.com reported the families of three recent prisoners who died in the metro jail filed lawsuits against the county[3], the sheriff and the contracted medical service provider for the jail, Advanced Correctional Healthcare.

Meanwhile, while Madison County Commission Chairman Dale Strong maintained that the commission has no culpability for what occurs at the jail, he re-iterated an idea to get people charged with non-violent, petty crimes out of the jail quicker and become less of a liability.

Dorning couldn't comment specifically about those three cases because they are pending investigations. When asked if he had concerns about the Madison County's liability for jail-related lawsuits, he assured tax payers that the corrections staff and ACH are "doing the best they can" but also painted a harsh description of the challenges jailers and medical staff face.

"County Jail is the most difficult corrections setting that one could be in," he said. "You know why we don't have all the mental hospitals we used to have. Because they're in jail now."

At the front of the challenge is that 95 percent of incarcerated people in the jail are affected by some type of narcotic drug, both illegal and prescription or alcohol, he said. It was these drugs that caused them to become "bad people" that commit crimes, and they are still under the influence of those drugs when then are booked, he said. People in that condition aren't reliable to give information on their health status, he added.

"A lot of questions (we ask) when inmates are brought in, they must tell the truth, Dorning said. "If they have psychological issues, they may not have the capacity to tell you there's something wrong with them. And we're booking in hundreds of these a week."

The next difficult stage occurs after they can't get feed their drug habit while incarcerated, and they begin the painful process of detoxification, Dorning said. "A lot of detoxification goes on."

When they come out of detox, the realization of their situation hits them, such as the family crisis they caused, being abandoned by family and losing jobs; and this is when the depression and similar emotional problems take hold, the sheriff said.

"You realize you're losing everything and you're surrounded by people with the same emotions," Dorning said.

As for the three cases of deaths at the jail listed in the federal lawsuits, the sheriff said anytime there's an injury or a death at the jail, they evaluate how to make things better.

"I'm sure ACH will evaluate how they do things," he said.

Related:  14 years later Madison County Jail still under federal court order to provide medical care

Chairman Strong said he has been in discussions with Dorning about the lawsuits, but has not heard any recommendations for changes.

The commission's sole responsibility is to fund the jail, and it has no oversight for day-to-day operations, Strong said. While he understands the legal ramifications of the lawsuits and the need to protect county taxpayers, "if there is a need to change or to modify (jail operations), that recommendation would come from the sheriff."

10/24/2014 1:43 PM

Strong has previously touted a plan to purchase 400 mobile monitoring devices that would be attached to arrested individuals. This ensures they don't leave the county. It could be an effective way to significantly reduce the cost of operating the jail and make it more manageable, he said.

The Madison County Metro Jail is one of the largest in the state, housing 984 persons daily, sheriff's records show. In 2013, it incarcerated 16,242 people booked into the jail.

1. http://connect.al.com/staff/paulhuggins/posts.html

2. https://twitter.com/PaulDHuggins

3. http://www.al.com/news/index.ssf/2014/10/gangrene_and_broken_bones_kill.html

FILED
2014 Oct-29  PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# FBI investigating Madison County deputies in 'revenge beatdown' of Tennessee mechanic



Robert Bryant, a mechanic from Kelso, Tenn., was paid $625,000 to drop his suit alleging he was beaten and falsely arrested by Madison County deputies. "I didn't need the money before they beat me down." (Challen Stephens / cstephens@al.com)

By Challen Stephens | cstephens@al.com [1] AL.com Email the author | Follow on Twitter[2] on August 22, 2014 at 1:24 PM, updated August 22, 2014 at 4:48 PM

**HUNSTVILLE, Alabama**[3] -- The Madison County Sheriff's Department is waiting to see if deputies are indicted by the U.S. Department of Justice before determining discipline in the 2012 "revenge beatdown" of Robert Bryant.

Robert Bryant was paid $625,000 to drop his **lawsuit** [4]against Sheriff Blake Dorning and eight Madison County deputies. But the case is not closed.

The FBI today confirmed it is investigating possible criminal civil rights abuses in the 2012 arrest of Bryant.

10/24/2014 1:49 PM

"We do have an investigation ongoing," said FBI spokesman Paul Daymond in Birmingham this morning. "The results of that investigation will be turned over to the Department of Justice Civil Rights Division for their review."

Bryant, a mechanic from Tennessee, talked this week about agreeing to accept $625,000 [5]on July 30 to drop the suit alleging deputies stalked him, stopped him, beat him and falsely arrested him in revenge for a barroom scuffle.

Bryant on Wednesday said: "I feel good about it. But I don't feel good about the criminals still running free." He said he won't feel safe until certain deputies are put behind bars. He said he avoids Alabama, but doesn't feel safe at his home in Kelso, Tenn.

Sheriff Blake Dorning issued a statement the day after the large settlement, saying the county insurance company chose to settle the case to avoid a costly legal battle. The three-paragraph statement denied any wrongdoing or responsibility by deputies named in the lawsuit.

"I was kind of appalled that in light of all things that happened he would continue to stand by these officers and suggest $625,000 was for lawyers' fees," said Hank Sherrod, Bryant's attorney, during an interview on Wednesday at his office in Florence.



Crime scene photo of Robert Bryant at Huntsville Hospital following arrest on Aug. 22, 2012. (Photo by Madison County Sheriff's Department)

Sherrod said that Sheriff Blake Dorning has not disciplined his deputies for their role in the case.

"Right now he is leading his deputies to believe they can conduct a revenge beating and the insurance will cover it," said Sherrod.

But Chief Deputy David Jernigan, a former FBI officer hired to the number two spot in the Madison County Sheriff's Department, said on Thursday that the sheriff's department is waiting on the U.S. Department of Justice and the FBI.

"There is a current federal criminal civil rights investigation into this matter," said Jernigan on Thursday. He said if the FBI investigation yields evidence indicating a crime, the Department of Justice would convene a grand jury. "We welcome the independent review of this."

He said federal findings could lead to suspension without pay or other discipline.

"Until indictments come down, we're not going to do anything," said Jernigan.

Sherrod this week said the lawyers representing Sheriff Blake Dorning and his eight deputies had called and "begged" to settle to avoid a public trial. Sherrod said no. Then they called and "begged" some more, he said. Sherrod said Madison County paid out $625,000 without taking a single deposition in order to avoid a public trial.

And they agreed to all of his conditions, including no confidentiality agreement.

"This very statement by the sheriff was the one reason we were hesitant to settle," said Sherrod. "Basically, the sheriff whitewashed this."

## Started in a pool hall

**Bryant says**[6] he and Deputy Justin Watson had a run-in at a pool hall in Hazel Green in the summer of 2012. The lawsuit alleged that Bryant said something about a woman accompanying Watson, who was off duty and in plain clothes at the time. The suit alleged Watson grabbed Bryant from behind, Bryant spun around and hit Watson, and then they both fell to the floor in a brief scuffle.

Later in August of 2012, leaving the same pool hall, Bryant was pulled over for an illegal lane change at a dimly lit area near the Tennessee line. In one police account, he growled and leapt from his truck to attack Watson. In another police report, Bryant attacked Watson during a field sobriety test.

But Bryant says Watson wasn't the one who pulled him over. His lawsuit says he was stopped by Deputy Jake Church. Bryant alleges he awoke in handcuffs to being kicked and pummeled by a number of deputies.

The Madison County Sheriff's Department and the county attorney have declined past invitations to allow the deputies to share their version of events.

Bryant was charged with a felony for assaulting an officer. He was not intoxicated and there were no traffic citations. Madison County dropped all charges against Bryant more than a year later in November of 2013, just days after Bryant's benefactor turned up dead.

## Unsolved murder

Bryant on Wednesday said he plans to use a portion of the settlement as a reward for information in the unsolved murder of Jason Klonowsk[7]i.

"I didn't need the money before they beat me down," said Bryant, later adding: "I lost a friend who helped me put the lawyers together."

Klonowski, who had long ago started a courier company, secured lawyers for Bryant, printed up "Support Robert Bryant" t-shirts and yard signs, built a stage on his property, held a rally and publicly promised to see deputies placed in prison. Klonowski was found shot in the head in his front yard in early November 2013, one month after the rally.

Bryant and Klonowski's neighbor say a death threat was tacked to the stage warning Klonowski not to hold the rally. The Alabama Bureau of Investigation took over the homicide investigation in November, and the FBI last winter confirmed [8]they were assisting.

Bryant and Sherrod recounted going for mediation in Madison County. Sherrod drove to Tennessee to pick up Bryant, who refuses to drive alone in Alabama. Bryant left his truck at a gas station on the Tennessee side of the state line.

When they returned, two Madison County deputies were waiting near his truck in Tennessee. "It's probably a coincidence, maybe not," said Sherrod.

"I hate it for the people of Madison County," said Bryant. "I would not feel safe there."

1. http://connect.al.com/staff/cstephens/posts.html

2. https://twitter.com/ChallenStephens

3. http://www.al.com/huntsville

4. http://blog.al.com/wire/2014/03/sheriff_blake_dorning_and_eigh.html

http://www.al.com/news/index.ssf/2014/08/fbi_investigating_madison_c.

5. http://www.al.com/news/index.ssf/2014/07/madison_county_sheriff_settles.html

6. http://blog.al.com/wire/2014/01/claims_of_revenge_beatdown_by.html

7. http://blog.al.com/wire/2014/02/three_months_later_klonowski_k.html

8. http://blog.al.com/breaking/2014/02/fbi_investigating_shooting_of.html

10/24/2014 1:49 PM

**FILED**
2017 Jun-08  PM 03:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE NORTHERN DISTRICT OF ALABAMA COUNTY, ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| Whitney Elizabeth FOSTER | ) |
| | ) Jury Trial Demanded |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| ADVANCED CORRECTIONAL HEALTHCARE INC. | ) Case No.: 5:16-cv-521 |
| Dr. Arthur WILLIAMS; Emmanuel MBI; Tanya JONES; | ) |
| Sherri HAKES; Maria SANCHEZ; Demetrus JOHNSON; | ) The Honorable Madeline |
| Denetris HUDGINS; Mary JONES; Michelle KIRK; | ) Hughes Haikala, presiding |
| C. ASHLEY; D. SMITH; | ) |
| | ) |
| MADISON COUNTY; Blake DORNING; | ) |
| Jerry MORRISON, as the personal representative of | ) |
| Estate of Steve Morrison, deceased | ) |
| Cassie MALONEY; Sheree KING; Joyce WILLIAMS; | ) |
| Benzilla ANDERSON; Mildred PATTON | ) |
| Charity BEASLEY; Shelby SPICER; | ) |
| Felicia DESHIELDS; Emily NOBLES | ) |
| | ) |
| Defendants | ) |

### FIRST AMENDED COMPLAINT

Comes now the Plaintiff, Whitney Elizabeth Foster, who alleges the following facts, asserts the following causes of action, and claims the following damages.

### Parties, Jurisdiction, and Venue

1. Whitney is over the age of nineteen years, and she is a resident citizen of Madison County, Alabama.

2. Defendant ACH is a foreign corporation that is incorporated under the laws of the State of Illinois and has its principal place of business in the State of Illinois. ACH is authorized to do business in the State of Alabama by the Alabama Secretary of State.



-1-

3. ACH is a correctional healthcare company. It does substantial business in the State of Alabama. Specifically, ACH is under contract with various Alabama governments to provide medical care and treatment to detainees, jailees, and prisoners. By and through such contracts and undertakings in the State of Alabama, ACH has purposefully directed its activities towards the State of Alabama, and it has derived substantial profits from the State of Alabama.

4. ACH's registered agent for service is the C.T. Corporation System, which can be served at 2 North Jackson Street, Suite 605, in Montgomery, Alabama 36104.

5. Defendant Dr. Arthur Williams is a physician who undertook to provide medical care to Whitney at the Madison County Jail. He violated the applicable standard of care by failing to possess and exercise that level of reasonable care, skill and diligence in his treatment of Whitney that similarly situated physicians in the same general line of practice would have used.

6. Defendants Emmanuel Mbi, Tanya Jones, Sherri Hakes, Maria Sanchez, Demetrus Johnson, Denetris Hudgins, Mary Jones, Michelle Kirk, C. Ashley, and D. Smith (hereafter the "Nurses") were all registered or licensed practical nurses who undertook to provide medical care to Whitney while she was at the Madison County Jail. They violated the applicable standard of care by failing to possess and exercise that level of reasonable care, skill and diligence in their treatment of Whitney that similarly situated registered or licensed practical nurses in the same general line of practice would have used.

7. Dr. Williams and the Nurses were all employed by ACH during the events made the basis of this suit. All of their actions in relation to Whitney as further set forth herein were done within the course and scope of their employment with ACH.

8. Defendant Madison County is an Alabama public corporation. It can be served by and through Dale W. Strong, the Chairperson of the Madison County Commission, at 100 Northside Square, Courthouse 700, in Huntsville, Alabama 35801. Whitney filed/served a verified notice of claim on the Chairperson of the Madison County Commission on March 10, 2015.

9. Defendant Blake Dorning was the Madison County Sheriff at all relevant times. As the sheriff, he is responsible for management of the Madison County Jail. He has a nondelegable statutory duty under Alabama law to attend to the medical needs of detainees and jailees in the Madison County Jail. He is sued in his individual capacity only.

10. Defendant Steve Morrison served as the Jail Administrator of the Madison County Jail at all relevant times. Dorning delegated his statutory duties regarding medical care of inmates to Morrison. Morrison is sued in his individual capacity only.

10.1. Defendant Steve Morrison died on October 30, 2016. The Probate Court of Madison County, Alabama, has appointed Jerry Morrison as the administrator of the Estate of Steve Morrison (Case No. 64926). On December 14, 2016, Jerry Morrison (in his capacity as personal representative) was substituted as a party defendant in place of Steve Morrison. (D.50) Whitney filed a verified statement of claim with the Probate Court on December 22, 2016.

11. Defendants Cassie Maloney, Joyce Williams, Benzilla Anderson, Mildred Patton, Sheree King, Charity Beasley, Shelby Spicer, Felicia DeShields, and Emily Nobles (hereafter the "Officers") were correctional officers under the employment of Sheriff Dorning. All their actions in monitoring and caring for Whitney were done within the course and scope of their employment with Dorning and under the supervision of Dorning and Morrison. The Officers are only sued in their individual capacity.

12. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) over Count 1 and 2, which assert personal injury claims against the Defendants pursuant to 42 U.S.C. § 1983. This Court has supplemental federal jurisdiction pursuant to 28 U.S.C. § 1367(a) over Counts 3 thru 6, which assert personal injury claims against the Defendants under Alabama law.

13. Venue is proper in this division and district pursuant to 28 U.S.C. § 1391(b)(1),(c)(2),(d) because ACH resides in this division and district under the meaning of this statue. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this division and district.

<u>Statement of Facts</u>

14. Long before the events made the basis of Whitney's injury, ACH undertook to provide medical care to the detainees and jailees at the Madison County Jail by and through a written contract with Madison County and Dorning as Madison County Sheriff. The contract stated that "[i]nmates in the detention facility shall have access at all times to constitutionally adequate healthcare."

15. The contract required ACH to "develop, manage and staff a comprehensive

-3-

healthcare services system at the [Detention Facility] in Huntsville," "to provide all inmates within the Detention Facility with necessary healthcare," to be "responsible for all health care for all inmates at the Detention Facility," and to be the "sole supplier of healthcare services ... and coordinator of the healthcare delivery system at the Detention Facility."

16. The contract also required ACH to deliver unimpeded and necessary healthcare services (including medical, dental, and mental health services) to inmates that can be audited against established standards; to operate the healthcare program in a humane manner with respect to the inmate's right to basic healthcare services; to operate the healthcare program at full staffing and use only licensed, certified, and professionally trained personnel; to implement a written healthcare plan with clear objectives, policies, and procedures; and to maintain an open and cooperative relationship with the Sheriff's administration and staff.

17. ACH has had the Madison County Jail contract since before 2010. ACH underbid other competitors to get the contract. ACH got the contract by touting its ability to control the expenses Madison County would incur for outside medical care in hospitals. ACH, Madison County, and Dorning negotiated a $200,000 per quarter cap on outside medical care. If outside medical care costs exceeded $200,000 in a quarter, Madison County would be responsible. If ACH beats the cap, ACH gets to keep the difference between actual outside costs and the cap as profit. The $200,000 per quarter number was designed by Madison County and Dorning to give ACH a financial incentive to control outside medical costs, which in turn has led ACH to delay and deny referrals to outside providers. ACH's business model, reflected in the agreement, succeeds by underbidding the competition and implementing severe cost control measures, the necessary result of which is unnecessary inmate suffering.

17.1. In addition and in the alternative to the allegations in paragraph 17, to the extent that the contract was amended weeks prior to Whitney's incarceration to contains a provision that any unused amount should be returned to the County, the $200,000 per quarter cap that was in place for the four years prior to Whitney's incarceration continued to play a role in depriving detainees with medical care. The Sheriff, the County, ACH, Dr. Williams, and Morrison all knew that four years of entrenched custom and practice simply does change overnight, especially when this alleged contract change was only a small part of the overall momentum to deprive detainees with necessary outside medical care. The Sheriff, the County, ACH, Dr. Williams, and Morrison did nothing to notify nurses and jailers of this change. Nor did they do anything to change the other aspects their other deliberately indifferent policies and customs as set forth herein. Instead, the Sheriff, the County, ACH, Dr.

-4-

Williams, and Morrison acted with deliberate indifference by allowing the other aspects of their deliberately indifferent policies to continue.

17.2. Furthermore, the Sheriff, the County, ACH, Dr. Williams, and Morrison only made this alleged contract change because it had been sued numerous times (see paragraphs 24-25, infra) and the $200,000 contract provision was an easy way for inmates affected by their deliberate indifference to establish that the policies were deliberately indifferent. The Sheriff, the County, ACH, Dr. Williams, and Morrison only made the contract change to remove this glaring evidence of their deliberate indifference, but they changed nothing else. In other words, they left in place all of the other aspects of their deliberately indifferent policies as set forth herein that are more difficult to detect and prove. This conscious decision to keep their deliberately indifferent policies in place and only remove the most visible indicia of their wrongful conduct is, in and of itself, strong evidence of their on-going deliberate indifference to the serious medical needs of inmates.

18. Irrespective of the agreement, Dorning, Morrison, and Madison County have failed and refused to address known systemic deficiencies regarding medical care at the Madison County Jail. Madison County conspired with Dorning and Morrison to cooperate with ACH and Dr. Williams in controlling costs. Dorning, Morrison and Madison County were aware of ACH's business model, and were aware ACH put cost control over inmate health and safety, yet they retained ACH as the contractor (initially and via express and implied contract renewals) because it saved money. Dorning, Morrison, and the County knew that ACH implemented cost control measures through less staffing, hiring substandard medical personnel willing to put costs over inmate health and safety, denying inmates medications, and delaying or denying medically necessary referrals to outside providers.

19. Madison County, Dorning, Morrison, ACH, Dr. Williams, and others established deliberately-indifferent customs or policies concerning medical care of detainees and jailees. Specifically, they had a explicit or implicit agreement, plan, and policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills. This plan included a policy of delaying or denying necessary medical treatment by outside providers. With deliberate indifference to the serious medical needs of inmates, Madison County, Dorning, Morrison, ACH, and Dr. Williams (a) failed to develop and implement adequate policies and procedures for the handling of detainees and jailees with serious health conditions; (b) failed to develop and implement adequate policies and procedures for the training of correctional officers and medical staff to respond to the serious medical needs of detainees and jailees. Moreover, correctional officers were trained to defer to ACH regarding medical

-5-

matters and to not to contact outside emergency personnel even if there is a medical emergency. Correctional officers who have contacted outside emergency personnel directly have been disciplined.

20. As part and parcel of their plan and policy outlined above, ACH, Dr. Williams, Dorning, Morrison, and Madison County developed a policy and practice regarding treatment of inmates withdrawing from alcohol and drugs. These Defendants were aware that severe withdrawal symptoms could only be safely treated in a hospital. However, they established a custom or policy that withdrawal would always be managed inside the jail or by getting the person released from jail, regardless of the severity of the symptoms. Defendants were aware of the risk of harm of such a policy but explicitly or implicitly agreed to this practice to avoid the costs associated with hospitalization.

21. Moreover, the agreement required ACH to provide substantial insurance coverage, to name Madison County and Dorning as additional insureds, and to indemnify Madison County and Dorning, and their agents and employees in connection with any claim related to healthcare services. Under the contract, as long as correctional officers let ACH medical personnel make medical decisions, correctional officers are indemnified by ACH's insurance carrier.

22. Because of this agreement, the correctional officers at the Madison County Jail subjectively believe that they cannot be responsible for deficient medical care by ACH personnel, and they were regularly told this by Dorning, Morrison, and other Jail supervisors. Thus, the contract and policies stated above encouraged correctional officers to defer to ACH personnel.

23. These Defendants knew their policies and customs created a substantial risk of serious harm to detainees and jailees and that it would result in the infliction of unnecessary pain and suffering on detainees and jailees. These Defendants were on notice that their plan was harmful to the health of detainees and jailees. These Defendants had such knowledge from prisoner complaints, communications from correctional officers, from their own observations, from common sense, from other deaths, from other lawsuits, and in other ways.

24. During 2013, at least three inmates (Nikki Listau, Tanisha Jefferson, and Deundrez Woods) died as a result of the failure of ACH and correctional personnel at the Madison County Jail to provide inmates with basic medical care. The circumstances of these deaths are described in full the amended complaints filed in Section 1983 lawsuits filed against these Defendants. (See Elliott v. Madison Cnty.,

-6-

et al, Case No. 5:14-cv-1309 (D.53)(Smith); Jefferson v. Madison Cnty., et al, Case No. 5:14-cv-1959 (D.8)(Kallon); Woods v. Madison Cnty., et al, Case No. 5:14-cv-1964 (D.8)(Bowdre)). The facts of those amended complaints are incorporated by reference as if fully set forth herein. All three inmates died even though they had been seen by ACH personnel. All three inmates died when ACH and Madison County Jail personnel refused to send them to the hospital. In all three cases, correctional officers deferred to ACH medical personnel even though (1) it was obvious to a layperson that the inmate needed to be sent to a hospital for evaluation and treatment and (2) it was obvious to the correctional officers that ACH was doing nothing for the detainee/jailee. In November 2015, Doring, Morrison, Madison County, and others filed an action that is pending in this Honorable Court to require ACH's liability insurers to defend and indemnify them for their wrongful conduct in the three lawsuits filed. (See Dorning, et al. v. Essex Ins., et al., Case No. 5:15-cv-1997 (Davis). Upon information and belief, however, they have done nothing to change their policies that are deliberately indifferent to the constitutional rights of detainees/jailees.

25. Correctional officers involved in all thee of these cases deferred to ACH personnel because they were trained by Dorning and Morrison to do so and/or it was the established custom to do so. Nevertheless, it was well known to Madison County Jail correctional officers that ACH had a practice of delaying or denying referrals of inmates for outside medical care. Correctional officers were aware that ACH was making medical care decisions regarding inmates that put cost control over inmate health and safety. Correctional officers had this knowledge from the incidents described above, from other similar incidents that occurred over the years, from their daily observations regarding how ACH personnel treated inmates, and in other ways.

26. Dorning and Morrison made it clear to correctional officers that inmate healthcare costs were a problem at the jail, that one trip to the hospital could potentially blow the county's healthcare budget, and that they needed to cooperate with ACH to control costs. These concerns with inmate healthcare costs have been reported in the media. In an April 18, 2014 article (which was published after the three deaths described above, but before Whitney suffered her permanent injuries), Morrison quoted as discussing the budget for medical care. Morrison was quoted as stating that because even one "catastrophic" case can "really cripple your budget" that Dorning and Madison County were undertaking an "aggressive pursuit" of cost savings.

27. Pursuant to longstanding practice, jail healthcare is treated as solely within the discretion of ACH personnel. Pursuant to longstanding practice, all inmate grievances related to medical care are directed to ACH, which ignores them. These

Defendants are well aware that ACH provided substandard and frequently inhumane medical care. However, none of these grievances are investigated by Dorning, Morrison, or Madison County. Correctional officers are well aware of this custom of indifference. This policy further encouraged correctional officers to "punt" to ACH and do nothing to help detainees/jailees with serious medical needs.

28. Consistent with the policy of deferring to ACH, neither Dorning nor Morrison nor anyone else at Madison County took any steps to investigate the circumstances of the three deaths stated above. This has been a longstanding practice of Dorning, Morrison, and Madison County. In 2010, 2011, and 2012, Julie Jean, Emanuel Patterson, and Frederick Foster died under circumstances similar to those in the 2013 deaths, particularly Woods's death. Like Woods, they were on medical watch, were checked by correctional officers every fifteen minutes, did not eat or drink in substantial amounts, did not have her vital signs monitored, was completely out of touch with reality, and deteriorated over the course of days until they became non-responsive. There was no investigation of the death of Jean, Patterson, or Foster by Dorning, Morrison, or Madison County. Even after the obvious systemic problems that led to at least six deaths and permanent blindness injury suffered by Whitney -- over the course of just over four years -- Dorning stated in an October 2014 interview with the media that believes the responsibility for the deaths and for making changes lies solely with ACH: "I'm sure ACH will evaluate how they do things."

29. However, upon information and belief, Dorning, Morrison, and Madison County have never requested ACH to make changes or improve the care of inmates. Furthermore, they know from years of experience with ACH, and from ACH's failure to respond to the deaths themselves and to other incidents, that ACH will conduct no evaluation and institute no training or other changes.

30. In summary, the deliberately-indifferent policies and practices of ACH, Dr. Williams, Dorning, Morrison, and Madison County in place at the Madison County Jail include, but are not limited to, the following:

a. Not investigating serious known incidents of deliberate indifference by ACH and correctional personnel.

b. Not evaluating or responding to inmate grievances regarding medical care.

c. Placing inmates with serious medical conditions in medical watch when they obviously need, at a minimum, further testing and evaluation at a hospital.

d. Training correctional officers to defer to ACH medical decisions even when it is obvious the inmate needs to immediately go to the hospital.

e. Allowing inmates in medical watch to deteriorate over the course of hours and days without taking the inmate for evaluation and treatment at a hospital.

f. Training correctional officers to defer to ACH decisions to allow inmates in medical watch to deteriorate over the course of hours and days without taking the person to a hospital for evaluation and treatment of the obvious deterioration.

g. Relying on untrained correctional officers to monitor seriously ill inmates who are placed in medical watch.

h. Not training correctional officers regarding what signs to look for and document while monitoring inmates under suicide or medical watch.

i. Not monitoring the vital signs of inmates who are placed in medical watch.

j. Not requiring correctional officers to document their observations of inmates being monitored for suicide or medical risk.

k. Treating the responses of incoherent inmates as refusals to cooperate.

m. Not treating an inmate's deterioration to the point they are no longer ambulatory as a condition requiring evaluation and treatment in a hospital.

n. Not investigating, by testing or otherwise, the causes of significant deteriorations of inmate health or symptoms that obviously indicate potentially life-threatening conditions.

o. Continuing failed treatment regimens even after they have proven ineffective.

p. Denying inmates with serious pain appropriate pain medication, including narcotics.

q. Not taking inmates suffering from serious complications related to detoxification from alcohol and drugs to the hospital.

31. Whitney was twenty-eight when she was arrested on April 4, 2014, during a routine traffic stop on an outstanding warrant from 2008 for possession of drug

paraphernalia.

32. At the time of her arrest, Whitney had been living with her parents and had been drug free for months. She recently had a child, and she was attending a methadone clinic and taking prescription Xanax. She was taking adequate and responsible steps to distance herself from her past drug abuse.

33. Whitney was taken to the Madison County Jail and booked on April 4, 2014 at 7:34 p.m. Four and a half hours later, at 12:08 a.m. on April 5, 2014, Nurse "C. Ashley" noted in Ashley's jail medical record after interviewing Whitney that she was currently being treated at the "Methadone Clinic" in Huntsville and that she was taking 80mg of methadone in treatment daily.

34. Under the "Other" section of this report, Nurse Ashley noted that Whitney brought "no meds brought in," and that someone needed to "verify" Whitney's meds "@ methadone clinic." However, there is no indication in any of Whitney's medical records that any of the Defendants or anyone else verified this information from the methadone clinic. It is also noted on this report under the "Withdrawal History" section of the report that Whitney had told Nurse Ashley that she previously experienced methadone withdrawal symptoms.

35. Whitney should have been considered a "high risk inmate" because she was taking 80 mg of methadone daily up to the time of her incarceration. An 80 mg daily dose is a high dose that would have been administered under the supervision of a methadone clinic.

36. Dorning, Morrison, ACH, Dr. Williams, the Nurses, and the Officers all knew this. They also all knew that methadone withdrawal can cause a person to have elevated blood pressure, which can cause serious life-threatening conditions, including strokes and seizures.

37. Drug and alcohol withdrawal is a frequent illness suffered by detainees in jails. Dorning, Morrison, ACH, Dr. Williams, the Nurses, and the Officers knew the signs and symptoms of drug and alcohol withdrawal from training and past experiences, they knew the condition was potentially life-threatening, and they knew that such persons should be treated reasonably and responsibly to avoid a medical emergency.

38. Within a week of Whitney's incarceration she began to show visible signs of being weak and suffering from methadone withdrawal. Her visible symptoms

escalated in severity each day. Although Defendants knew Whitney was 100% dependent on them for methadone, blood pressure medicine, and other medical care -- and that she could not get these things on her own -- they did nothing to help her.

39. Beginning on April 5, 2014, Whitney began experiencing elevated blood pressure noted on the vitals record as 150/110.

40. On April 6, 2014, Whitney began experiencing stomach cramps and increased anxiety. She was placed on vistaril and dicyclomine. In a later note for that visit, it is noted this was "protocol for withdrawal patients." Whitney's blood pressure at that time was 144/98.

41. According to the vitals report, Whitney's blood pressure continued to be recorded as elevated on numerous occasions.

42. Whitney knew the symptoms of high blood pressure because some of her family members suffered from it. Within one week of being incarcerated in the Madison County Jail, she began experiencing symptoms of high blood pressure. She began complaining to the correctional officers and the medical staff and asked to be seen by a doctor.

42.1. Every time her blood pressure was taken while she was incarcerated, the nurses would take multiple readings, making her take deep breaths until they got the lowest possible reading. They only wrote the lowest readings down. There were a multitude of readings in the 200s that never got written down.

43. Whitney's family also began calling the Madison County Jail as they could tell something was wrong because her speech was slurring during calls home. The family continued to call back and tried to find out information about Whitney's situation, but got nowhere.

44. The Nurses did not call a doctor. Instead, they turned the air conditioning to 55 degrees, only issued her a plastic sheet, and kept her from buying sweat pants/sweat shirt in the commissary. Whitney had to fill water bottles with hot tap water and place them under her arms and to her sides to keep warm.

45. On the April 16, 2014, medical progress note prepared by Nurse M. Jones, Whitney's blood pressure was reported as 150/100.

46. On April 17, 2014, Whitney completed a sick call request form,

complaining of a migraine since the beginning of her incarceration.

47. By this time, Dr. Williams, the Nurses, and the Officers all knew that Whitney was suffering from methadone withdrawal. The Nurses and Officers kept telling her she was faking even though she was slurring her speech, biting her tongue, and had limited control of her body. The Nurses and Officers also told Whitney to tell her mom to "quit calling here or you're going to have some problems."

48. On April 18, 2014, because Whitney complained so much, she was finally seen in the clinic. On the medical progress note prepared by Denetris Hudgins, Whitney's blood pressure was listed as 150/110. The plan was to treat her with ibuprofen and to place her on blood pressure list for three days "to watch." This plan was reviewed and signed by Dr. Arthur Williams. Dr. Williams told Whitney that her blood pressure was "elevated but not as bad as the nurse said it was yesterday."

49. According to the vitals record, Whitney's blood pressure on April 19, 2014, was reported as 130/90. Although she was supposed to be on a three day watch list, there is no blood pressure entry for April 20, 2014.

50. The Officers were correctional officers that were charged with the responsibility of monitoring, observing, and caring for Whitney on April 21, 22, and 23, 2014. Because of her soaring blood pressure had been left virtually untreated for days, Whitney began to have severe strokes and seizures that were very obvious early on April 21, 2014 and escalated in severity thereafter.

51. It was obvious to all of the Officers and Nurses that Whitney's condition was desperate on April 21, 2014 and continuing to get worse as the hours progressed. Her need for medical care throughout the days of April 21, 22, and 23, 2014 was such that it would have been obvious even to a layperson that she needed to be sent to a hospital. However, the Officers and Nurses did nothing to provide Whitney with any comfort, much less medical care. Instead, Whitney was harassed and ridiculed by the Officers and Nurses while she endured numerous strokes and seizures.

52. By the evening of April 21, 2014, Whitney's condition had become well known at the Madison County Jail. By personal observation or otherwise, numerous persons at the Jail, including the Officers and Nurses, were aware of Whitney's severe and deteriorating condition. The Officers and Nurses just watched Whitney deteriorate.

53. At approximately 7:57 p.m. on April 21, 2014, an inmate in the cell with