FILED
2018 Jan-12  PM 04:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

Whitney called for medical assistance for Whitney because she was "shaking and sweating." Whitney told Nurse Hakes that strokes ran in her family. According to the jail incident report, Nurse Hakes assessed Whitney and "decided she needed to be taken to medical for medical observation."

54. The corresponding medical progress note stated that Whitney's blood pressure was 180/110, that Whitney was "slightly lethargic," and that she was "slurring words." Whitney for the first time was given Clonidine (typically given for methadone withdrawal), and she was moved to a medical cell for observation.

55. At approximately 10:00 p.m., Nurse Sheri Hakes performed a recheck on Whitney, whose blood pressure at that time was reported to be 162/112. Nurse Hakes finally placed a call to Dr. Williams.

55.1. Officers DeShields and Nobles were on-duty on April 21, 2014. Throughout the day, they saw Whitney shaking, sweating, and knew she was having strokes and that Whitney's condition was getting worse as the hours progressed. They also knew that Whitney needed to be sent to the hospital but that the Sheriff, Morrison, ACH, the Nurses, and Dr. Williams were not going to send her to the hospital. They did nothing to provide Whitney with any comfort, much less medical care. Instead, they harassed and ridiculed Whitney while she endured numerous strokes and seizures.

55.2. Officers Maloney, Patton, Spicer, Beasley, and Joyce Williams were on-duty on April 22, 2014.

56. At approximately 6:21 a.m. on April 22, 2014, Whitney was seen by Nurse Tanya Jones, at which time Whitney's blood pressure was 160/140. Her pulse rate was 94. Under the plan section, it is noted that Whitney was prescribed Atenolol and Clonidine. This report was reviewed and signed by Dr. Williams.

57. At this point, Whitney could no longer sign her name to forms. Nor could she use the phone to dial a number, and she could not remember her charge code. Because her situation was dire, another inmate used her own charge code and helped Whitney call her mother. Whitney's speech was so slurred that all they could understand was, "Mom I'm gonna die." Whitney's mother could hear in the background people saying "quit calling your mother." Upon information and belief, these comments were made by some of the Officers and/or Nurses.

57.1 Upon information and belief, these comments were made by Officers

Maloney, Patton, Spicer, Beasley, and/or Joyce Williams.

58. During commissary, the Officers left her to lay on the ground. An inmate friend called for them to please send a nurse to come help. One of the Nurses arrived and told Whitney to "get the fu** up." Then this Nurse began picking her up and dropping her while continuing to say "get the fu** up" over and over. Some of the Nurses and Officers had to later physically put Whitney in the shower as she had urinated all over herself.

58.1 Upon information and belief, these actions and comments were made by Officers Maloney, Patton, Spicer, Beasley, and/or Joyce Williams.

59. At approximately 11:15 p.m. on April 22, 2014, another inmate requested emergency assistance for Whitney. When Officers Spicer and Beasley arrived, they found Whitney in her bunk "twitching." Whitney told them she was "hurting all over" and her "muscles keep tensing." The two officers assisted Whitney into a wheelchair and took her to triage where Nurse Maria Sanchez assessed her. Whitney's blood pressure was still at 160/140, and her pulse rate had increased to 112. Whitney slid out of the wheelchair twice and had to be helped back up by Spicer, Beasley, and Sanchez. Nurse Sanchez contacted Nurse Demetrus Johnson, who informed her to take Whitney to Old Medical Cell #4 for "Medical Observation." Whitney was not handcuffed due to her "medical condition."

59.1. Throughout April 22, 2014, Officers Maloney, Patton, Spicer, Beasley, and Joyce Williams saw Whitney shaking, sweating, and knew she was having strokes and that Whitney's condition was getting worse as the hours progressed. They also knew that Whitney needed to be sent to the hospital but that the Sheriff, Morrison, ACH, the Nurses, and Dr. Williams were not going to send her to the hospital. They did nothing to provide Whitney with any comfort, much less medical care. Instead, they harassed and ridiculed Whitney while she endured numerous strokes and seizures.

60. It was obvious to all of the Officers and Nurses that Whitney's condition was even more desperate on April 23, 2014 than it had been the day before. Her need for medical care was even more obvious to a layperson. However, the Officers and Nurses still did nothing to provide Whitney with medical care.

60.1. Officers Joyce Williams, Anderson, and King were on-duty on April 23, 2014. It was obvious to them during the early morning hours of April 23, 2014 that Whitney's condition was even more desperate than it had been the day before. They

saw Whitney shaking, sweating, and knew she was having strokes and that Whitney's condition was getting worse as the hours progressed. They also knew that Whitney needed to be sent to the hospital but that the Sheriff, Morrison, ACH, the Nurses, and Dr. Williams were not going to send her to the hospital. They did nothing to provide Whitney with any comfort, much less medical care. Instead, they harassed and ridiculed Whitney while she endured numerous strokes and seizures.

61. According to a 7:40 a.m. 4/23/14 medical progress note, Nurse Emmanuel Mbi found Whitney "lying on the floor with her upper body under the bed," stating that she could "not get out." Whitney "was assisted out but kept crawling on her back going under the bed." Whitney heard Mbi say, "there is nothing I can do with her, take her to the fu**ing hospital."

62. At some time between 7:40 a.m. and 8:20 a.m., Dr. Williams and Nurse Tanya Jones went to Whitney's cell to assess her. Dr. Williams then ordered Whitney to be sent to Huntsville Hospital emergency room for treatment "due to signs of a stroke."

63. Even then, the jail incident report states that "Nurse Mbi informed [officers] that the transportation of [Whitney] to the emergency room was a non-emergency situation." The correctional officers "handcuffed and shackled [Whitney] and escorted [her] by wheelchair to the booking area and [she] was transported to the Huntsville Hospital Emergency Room."

63.1. Officer Anderson authored the incident report.

64. Upon arrival at Huntsville Hospital at 8:50 a.m., Whitney's blood pressure was 154/131 with a heart rate of 115. She looked like she had been beaten. She was blind and partially paralyzed.

64.1. On April 24, 2014, Officer Anderson made changes to the incident report.

65. Whitney was hospitalized for three weeks. She was subsequently diagnosed with PRES (Posterior Reversible Encephalopathy Syndrome); however, her condition is no longer "reversible." Although Whitney has since regained some use of her arms and legs, the repeated strokes and seizures over numerous days resulted in permanent neurological deficits and cortical blindness.

66. Whitney's eyes are perfect, but her brain can no longer interpret the images. Whitney can only appreciate light out of the top half of her eyes, but not to her right.

What she can "see" out of the top half, however, exceeds the standards for being legally blind. Moreover, what little Whitney can perceive will always be "upside down and inside out," meaning she has no depth perception and what she perceives to be to her right is really to her left, and vice versa.

66.1. Whitney cannot read, write, take care of her child or herself. Even simple household chores are difficult; some are impossible.

67. At the time of filing, Whitney is thirty-one years old.

CAUSES OF ACTION

Count 1: Section 1983 Deliberate Indifference to Medical Needs

68. This cause of action is brought against all Defendants pursuant to 42 U.S.C. § 1983. Whitney incorporates by reference all factual allegations in the preceding paragraphs.

69. Whitney suffered from a medical need that posed a substantial risk of serious harm. Whitney's condition was so obvious that even a lay person would easily recognize the necessity for attention and hospital treatment. Furthermore, even a lay person would have known that, if left unattended, Whitney's condition rendered her exposed to a substantial risk of serious injury, harm, and/or death.

70. Dr. Williams, the Nurses, Morrison, and the Officers all subjectively knew that Whitney suffered from a serious medical need and that she was unable to get medical attention for herself. They also subjectively knew that the failure to get treatment for Whitney's condition would result in serious injury, harm, and/or death. They were not only aware of facts from which these conclusions could be drawn, they in fact each subjectively drew such conclusions. Nevertheless, they disregarded the risk to Whitney, and in so doing they acted with more than gross negligence.

71. Whitney's serious medical needs were ignored, in part, because of the deliberately indifferent customs or policies of Madison County, Dorning, Morrison, ACH, and Dr. Williams to the serious medical needs of prisoners in the Madison County Jail. The actions of the Officers, the Nurses, and Dr. Williams themselves indicate systemic breaches of fundamental standards of correctional management and correctional health care. Their actions are also themselves indicative of inadequate policies and practices and inadequate training and supervision. Madison County, Dorning, Morrison, ACH, and Dr. Williams subjectively knew that the failure to get

-16-

treatment for the serious medical needs and conditions of detainees and jailees would result in serious injury, harm, and/or death. They were not only aware of facts from which these conclusions could be drawn, they in fact each subjectively drew such conclusions. Nevertheless, they disregarded the risk to the detainees/jailees at the Madison County Jail, including Whitney, and in so doing they acted with more than gross negligence.

72. As a direct and proximate result of the combining and concurring unconstitutional conduct of all of Defendants, Whitney was not timely and appropriately tested, diagnosed or treated for high blood pressure, her condition deteriorated due to the lack of timely and appropriate treatment, and she suffered PRES Syndrome, which resulted in permanent neurological deficits and cortical blindness. As a result, Whitney is essentially permanently and totally disabled.

73. As a further direct and proximate result of the combining and concurring negligent conduct of Defendants, Whitney has been caused to lose wages and benefits, and she has also been caused to lose future earning capacity. Whitney has also been caused to suffer great physical pain and suffering in the past, and she will also suffer such great physical pain and suffering in the future. Whitney has been caused to undergo serious and painful medical care and treatment and to incur expense in the past, and Whitney will also be caused to undergo such serious and painful medical care and treatment and incur such expenses in the future. Whitney has suffered great mental anguish, annoyance, and embarrassment in the past, and she will suffer more mental anguish, annoyance, and embarrassment in the future. Whitney has been permanently injured and permanently disfigured and will remain in this state and dependent on other persons for the rest of her life. She has suffered permanent damage and will always suffer from a reduced quality of life.

74. To be clear, Madison County is only sued under this count for its deliberate indifference to the constitutional rights of detainees/jailees at the Madison County Jail by its policy of funding as described above.

75. All Defendants acted with malice and/or with reckless disregard for Whitney's constitutional rights and her health and safety.

WHEREFORE, PREMISES CONSIDERED, Whitney respectfully requests this Honorable Court (1) to enter judgment against Defendants, (2) to award Whitney compensatory damages from Defendants in an amount determined by the jury, (3) to award Whitney punitive damages from Defendants (except Madison County) in an amount determined by the jury, (4) to award Whitney attorneys' fees and expert

witness fees from Defendants, (5) to award Whitney court costs and interest from Defendants, and (6) to award Whitney other relief as the Court deems just and proper.

Count 2: Section 1983 Conspiracy to Violate Civil Rights

76. This cause of action is brought against Madison County, Dorning, Morrison by and through Morrison, ACH, and Dr. Williams pursuant to 42 U.S.C. § 1983. Whitney incorporates by reference all factual allegations in the preceding paragraphs.

77. A conspiracy existed between Madison County, Dorning, Morrison, ACH, Dr. Williams, and others that resulted in the actual denial of Whitney's constitutional right to medical care for her serious medical needs. These Defendants and others reached an understanding to deny detainees and jailees in the Madison County Jail of such rights as set forth above.

78. As a direct and proximate result of this conspiracy to violate the civil rights of the detainees/jailees at the Madison County Jail, Whitney was injured and damaged as stated above.

WHEREFORE, PREMISES CONSIDERED, Whitney respectfully requests this Honorable Court (1) to enter judgment against Madison County, Dorning, Morrison by and through Morrison, ACH, and Dr. Williams, (2) to award Whitney compensatory damages from these Defendants in an amount determined by the jury, (3) to award Whitney punitive damages from these Defendants (except Madison County) in an amount determined by the jury, (4) to award Whitney attorneys' fees and expert witness fees from these Defendants, (5) to award Whitney court costs and interest from these Defendants, and (6) to award Whitney other relief from these Defendants as the Court deems just and proper.

Count 3: Negligent Medical Malpractice

79. This cause of action is asserted against ACH, Dr. Williams, and the Nurses pursuant to the Alabama common law tort of negligence as modified by the Alabama Medical Liability Acts, Ala. Code §§ 6-5-480, et seq. ("AMLA"). Whitney incorporates by reference all factual allegations in the preceding paragraphs.

80. ACH, its supervisors, and its employees (including Dr. Williams and the Nurses) had a duty to follow the standard of reasonable care, skill, and diligence in their care and treatment of Whitney that is used by similarly situated health care providers in the same general line of practice.

81. ACH, its supervisors, and its employees (including Dr. Williams and the Nurses) negligently breached that duty by: (a) failing to timely diagnose and treat Whitney's high blood pressure; (b) ordering insufficient medical care for Whitney; (c) ordering inappropriate medical treatment for Whitney; (d) failing to timely and appropriately have Whitney tested, diagnosed and treated, at a hospital or other appropriate facility or otherwise, for dangerously elevated blood pressure; (e) failing to diagnose and properly treat Whitney's methadone withdrawal; (f) failing to transport Whitney to a hospital when her symptoms clearly showed she was experiencing a medical emergency; (g) failing to diagnose and/or treat Whitney for the warning signs of a stroke, (h) failing to diagnose and/or treat Whitney for the warning signs of a stroke; and (i) failing to have a care plan in place and failing to change that care plan with each change of medical status.

82. As a direct and proximate result of the combining and concurring negligent malpractice of ACH, its supervisors, and its employees, including Dr. Williams and the Nurses (and the combining and concurring wrongful conduct of the other Defendants), Whitney was injured and damaged as stated above.

83. Defendant ACH is vicariously liable for the negligent conduct of its supervisors, and its employees (including Dr. Williams and the Nurses) under the doctrines of respondeat superior, apparent agency, nondelegable duties, and other doctrines.

WHEREFORE, PREMISES CONSIDERED, Whitney respectfully requests this Honorable Court (1) to enter judgment against ACH, Dr. Williams, and the Nurses, (2) to award Whitney compensatory damages from these Defendants in an amount determined by the jury, (3) to award Whitney court costs and interest from these Defendants, and (4) to award Whitney other relief from these Defendants as the Court deems just and proper.

Count 4: Negligent Correctional Care

84. This cause of action is asserted against Madison County and the Officers pursuant to the Alabama common law tort of negligence as modified by statutes of the Alabama Legislature. Whitney incorporates by reference all factual allegations in the preceding paragraphs.

85. Madison County negligently funded the Madison County Jail for the reasons stated above.

-19-

86. The Officers negligently, carelessly, and/or unskillfully assessed Whitney. They knew or should have known that Whitney needed medical attention. However, they negligently (a) monitored Whitney, (b) ignored Whitney's medical needs, (c) placed too much reliance on ACH and its supervisors and employees, and/or (d) delayed and denied Whitney treatment.

87. The Officers did not "act in compliance with law" under the meaning of Ala. Code § 14-6-1 because they not only violated the U.S. Constitution (as stated above), they also violated Ala. Code § 14-6-19 by failing to provide Whitney with medical care for her serious medical needs. The Officers also did not "act in compliance with law" under Ala. Code § 14-6-1 because they acted beyond their authority by failing to follow nondiscretionary orders, rules, regulations, statutes, checklists, and/or policies of the State of Alabama, of Madison County, and/or of the Madison County Sheriff. For these same reasons, the Officers are not entitled to State-agent immunity.

88. As a direct and proximate result of the combining and concurring negligent correctional care of Madison County and the Officers (and the combining and concurring wrongful conduct of the other Defendants), Whitney was injured and damaged as stated above.

WHEREFORE, PREMISES CONSIDERED, Whitney respectfully requests this Honorable Court (1) to enter judgment against Madison County and the Officers, (2) to award Whitney compensatory damages from these Defendants in an amount determined by the jury, (3) to award Whitney court costs and interest from these Defendants, and (4) to award Whitney other relief from these Defendants as the Court deems just and proper.

Count 5: Wantonness

89. This cause of action is asserted against all Defendants (except Dorning and Morrison) pursuant to the Alabama common law tort of wantonness as modified by statutes of the Alabama Legislature. Whitney incorporates by reference all factual allegations in the preceding paragraphs.

90. By consciously doing and/or not doing the acts set-forth above, Defendants subjectively knew that injury would likely or probably result to Whitney or someone in a substantially similar position. Their conduct was wanton, reckless, and oppressive.

91. As a direct and proximate result of the combining and concurring wanton

conduct of Defendants, Whitney was injured and damaged as stated above.

92. Defendant ACH is vicariously liable for the wanton conduct of its supervisors, and its employees (including the above-stated nurses and Dr. Williams) under the doctrines of respondeat superior, apparent agency, nondelegable duty and other doctrines.

WHEREFORE, PREMISES CONSIDERED, Whitney respectfully requests this Honorable Court: (1) to enter judgment against these Defendants, (2) to award her compensatory damages in an amount to be determined by a jury; (3) to award her punitive damages to punish these Defendants for their wrongful conduct and to deter these Defendants and others from committing the same or similar wrongful conduct, (4) to award her court costs and interest as allowed by law, and (5) to award her all other relief as the Court deems just and proper.

Count 6: Civil Conspiracy

93. This cause of action is asserted against all Madison County, ACH, and Dr. Williams pursuant to the Alabama common law tort of conspiracy as modified by statutes of the Alabama Legislature. Whitney incorporates by reference all factual allegations in the preceding paragraphs.

94. A conspiracy existed between Madison County, ACH, Dr. Williams, and others that resulted in the actual denial of Whitney's constitutional right to medical care for her serious medical needs. These Defendants and others reached an understanding to deny detainees and jailees in the Madison County Jail of such rights as set forth above.

95. As a direct and proximate result of this conspiracy to violate Whitney's civil rights, Whitney was injured and damaged as stated above.

WHEREFORE, PREMISES CONSIDERED, Whitney respectfully requests this Honorable Court (1) to enter judgment against Madison County, ACH, and Dr. Williams, (2) to award her compensatory damages against Madison County, ACH, and Dr. Williams in an amount to be determined by a jury, (3) to award her punitive damages against ACH, and Dr. Williams in an amount to be determined by a jury to punish them for their wrongful conduct and to deter them and others from committing the same or similar wrongful conduct, (4) to award her court costs and interest as allowed by law, and (5) to award her all other relief as the Court deems just and proper.

Jury Demand

96. Whitney requests a trial by struck jury on all issues of fact, including the amount of damages.

Respectfully submitted by
the Attorneys for Whitney Elizabeth Foster

/s/ Richard Riley
David Marsh, Rip Andrews, Richard Riley, Hank Sherrod

| | |
|---|---|
| MARSH, RICKARD & BRYAN P.C. | HENRY F. SHERROD III P.C. |
| 800 Shades Creek Pkwy.; Ste. 600D | 119 South Court Street |
| Birmingham, Alabama 35209 | Post Office Box 606 |
| Ph: (205)879-1981 | Florence, Alabama 35631-0606 |
| Fx: (205)879-1986 | Ph: (256)710-7983 |
| Em: rriley@mrblaw.com | Fx: (877)684-0802 |
| | Em: hank@alcivilrights.com |

Certificate of Filing and Service

On June 8, 2017, I electronically filed the foregoing using the CM/ECF System, which will electronically serve true and exact electronic copies on the persons stated below at the stated email addresses:

Christie J. Strange Esq. (cjs@phm-law.com)
David J. Canupp Esq. (djc@lfsp.com)
George W. Royer Jr. Esq. (gwr@lanierford.com)
Horace Cecil Ireland III Esq. (ireland@phm-law.com)
John P. Burbach Esq. (jburbach@sirote.com)
L. Franklin Corley IV Esq. (fcorley@sirote.com)
H. Harold Stephens Esq. (hstephens@babc.com)
Harold D. Mooty III Esq. (hmooty@babc.com)
T. Kelly May Esq. (kmay@huielaw.com)
Hugh Cannon Lawley Esq. (cannon@huielaw.com)
Jennifer H. Reid Esq. (jreid@huielaw.com)
Hank Sherrod Esq. (hank@alcivilrights.com)

/s/ Richard Riley
Richard Riley

FILED
2016 May-02  PM 03:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MADISON COUNTY SHERIFF BLAKE DORNING; MADISON COUNTY, ALABAMA; STEVE MORRISON; CHRISTINE COLLIER; VANESSA FIELDS; NICK WALLACE; ROSLYN GUYTON; RANDY HOOPER; and PAMELA BATIE;** | ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | **Civil Action No. 5:15-cv-01997-HGD** |
| **v.** | ) ) | |
| **ESSEX INSURANCE COMPANY; ADVANCED CORRECTIONAL HEATHCARE, INC.; and FICTITIOUS DEFENDANTS 1-10,** | ) ) ) ) ) | |
| **Defendants.** | ) ) ) | |

## SECOND AMENDED COMPLAINT

Plaintiffs Madison County Sheriff Blake Dorning ("Sheriff Dorning"), Madison County, Alabama (the "County"), Steve Morrison ("Morrison"), Christine Collier ("Collier"), Vanessa Fields ("Fields"), Nick Wallace ("Wallace"), Roslyn Guyton ("Guyton"), Randy Hooper ("Hooper"), and Pamela Batie ("Batie" and, together with Morrison, Collier, Fields, Wallace, Guyton, and Hooper the "Correctional Officers") file this Second Amended Complaint against Defendants



Essex Insurance Company ("Essex"), Advanced Correctional Healthcare, Inc. ("ACH"), and Fictitious Defendants 1-10 (together with Essex and ACH, "Defendants").

**PARTIES**

1.    Sheriff Dorning is an individual over nineteen years of age and a resident of Madison County, Alabama.  Sheriff Dorning is, and has been since 1983, the Sheriff for the County, a constitutionally established officer of the state of Alabama.  Ala. Const. of 1901, art. V, § 112 ("The executive department shall consist of ... a sheriff for each county.").

2.    The County is an Alabama public corporation with its principle place of business located at 100 Northside Square, Huntsville, Alabama 35801.

3.    Morris is an individual over nineteen years of age and a resident of Madison County, Alabama.  Morrison is, and has been since October 11, 2010, employed by Sheriff Dorning as the Jail Administrator for the Madison County Detention Facility (the "Detention Facility").

4.    Collier is an individual over nineteen years of age and a resident of Madison County, Alabama.  Collier is, and has been since January 5, 2009, employed by Sheriff Dorning as a correctional officer at the Detention Facility.

2

5.      Fields is an individual over nineteen years of age and a resident of Madison County, Alabama.   Fields is, and has been since March 3, 2008, employed by Sheriff Dorning as a correctional officer at the Detention Facility.

6.      Wallace is an individual over nineteen years of age and a resident of Madison County, Alabama.   Wallace is, and has been since July 25, 2005, employed by Sheriff Dorning as a correctional officer at the Detention Facility.

7.      Guyton is an individual over nineteen years of age and a resident of Madison County, Alabama.   Guyton is, and has been since July 25, 2011, employed by Sheriff Dorning as a correctional officer at the Detention Facility.

8.      Hooper is an individual over nineteen years of age and a resident of Madison County, Alabama.  Hooper is, and has been since June 7, 1999, employed by Sheriff Dorning as a correctional officer at the Detention Facility.

9.      Batie is an individual over nineteen years of age and a resident of Madison County, Alabama.  Batie is, and has been at all times material to this Complaint, employed by Sheriff Dorning as a correctional officer at the Detention Facility.

10.      Essex is a Delaware corporation with its principle place of business located at 1209 Orange Street, Wilmington, Delaware 19801.   Essex is not qualified to do business with the Alabama Secretary of State, and it is not authorized to transact insurance business with the Alabama Department of

3

Insurance.   Essex is an insurer of losses, liability, and damages and issues insurance policies to persons and/or business and governmental entities located or doing business in Alabama.

11.    ACH is an Illinois corporation with its principle place of business located at 3922 West Baring Trace, Peoria, Illinois 61615.  ACH is a physician-owned correctional healthcare company.

12.    Fictitious Defendants 1-10, whether singular or plural, are those persons, enterprises, and/or entities (and their parents, subsidiaries, predecessors, successors, heirs, partners, members, shareholders, employees, agents and other persons acting for, in concert with, or on their behalf) that: (1) breached any contract, obligation, or duty to Sheriff Dorning, the County, and/or the Correctional Officers (collectively, "Plaintiffs"); (2) participated, benefitted from, and/or otherwise were directly or indirectly involved in the acts and/or omissions alleged below or in the Listau, Jefferson,  Woods and Foster actions (as defined below); (3) owe any duty to defend, indemnify, and/or hold harmless any Plaintiff as a result of the filing of, or acts and/or omissions alleged in, the Listau, Jefferson, Woods and Foster actions; or (4) are or may be liable for any acts and/or omissions taken by Plaintiffs or for which Plaintiffs may be liable in the Listau, Jefferson, Woods and Foster actions.  The true names and legal identities of Fictitious Defendants 1-10 are unknown to Plaintiffs at this time, but they will be added by

4

amendment, individually and jointly, when ascertained.  Fictitious Defendants 1-10 are liable to Plaintiffs, as set forth in more detail below.  Fictitious Defendants 1-10 must be joined as parties in this action because, without them, complete relief cannot be afforded among those already parties.   Alternatively, Fictitious Defendants 1-10 may be joined in this action because the relief sought by Plaintiffs against Defendants is joint, several, or alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences, and common questions of law or fact will arise in this action.

13.    Defendants, and each of them, acted individually or as the agent, servant, employee, partner, or co-venturer of one another or were otherwise engaged in a joint enterprise.  Alternatively, Defendants, and each of them, acted through their agents, servants, employees, partners, and/or co-venturers and are liable to Plaintiffs under *respondeat superior* and/or agency theories, or are otherwise vicariously liable.  Each and every allegation asserted against Essex and/or ACH in paragraphs 15 through 117 below is asserted against Fictitious Defendants 1-10.

## JURISDICTION AND VENUE

14.    This case has been removed from the Circuit Court of Madison County, Alabama upon Defendants' allegations that this is an action between citizens of different states and that the amount in controversy exceeds seventy five

thousand dollars ($75,000) thereby conferring jurisdiction upon this Court pursuant to 28 USC § 1332. Plaintiffs admit and reassert these jurisdictional allegations and consent to this Court's jurisdiction.

15.    This case was removed to this venue based upon Defendants' allegations that this district and division of this Court is proper for removal of cases from the Circuit Court of Madison County, Alabama, where this action was originally filed.  Plaintiffs admit and reassert these venue allegations and consent to this venue.  Plaintiffs further allege that venue is proper in this district and division of this Court because: (1) Essex and ACH do business or have done business directly or through an agent (including, for example, Southern Cross Underwriters, Inc. and Dr. Arthur Williams, respectively) in Madison County, Alabama; and (2) a substantial part of the acts and/or omissions giving rise to this and the <u>Listau</u>, <u>Jefferson</u>, <u>Woods</u> and <u>Foster</u> actions occurred in and were directed at one or more residents of Madison County, Alabama.

16.    This Court possesses personal jurisdiction over each Defendant because: (1) that Defendant transacted, and continues to transact, business within Alabama; (2) the causes of action asserted in this action arose from, or are connected with, purposeful acts or omissions committed by that Defendant, in whole or in part, in or directed toward a resident of Alabama; and (3) that Defendant has continuous and systematic contacts with Alabama by engaging in

6

numerous activities that have had an effect in Alabama.[1]   Accordingly, each

Defendant is amenable to suit in Alabama.

### FACTS COMMON TO ALL CLAIMS AND RELIEF

. THE AGREEMENT

17.     The County, Sheriff Dorning, and ACH entered into the "Healthcare

Services Agreement at the [Detention Facility]" (the "Agreement") effective May

1, 2012, with extensions of the term through December 31, 2014.[2]

18.     The general scope of the Agreement is clear:   "ACH will develop,

manage and staff a comprehensive healthcare services system at the [Detention

Facility] in Huntsville, Alabama, to provide all inmates within the Detention

Facility with necessary healthcare."   (Agreement at ¶ 1).   That is, ACH agreed to

be the "*sole supplier* of healthcare services ... and *coordinator* of the healthcare

delivery system at the Detention Facility."   (Agreement at ¶ 3 (emphasis added);

---

[1] Essex has availed itself, and continues to avail itself, of Alabama courts, including, for example, the U.S. District Court for the Northern District of Alabama: case nos. 4:97-cv-2548; 2:98-cv-289; 4:09-cv-323; 2:11-cv-3782; 2:11-cv-4153; 2:14-cv-2138; 2:14-cv-2152; and 4:14-cv-02153; the Circuit Court for Dallas County, Alabama: case nos. 2013-cv-9 and 2013-cv-900008; the Circuit Court for Jefferson County, Alabama: case nos. 2014-cv-903548; 2011-cv-900478; 2009-cv-900534; and 2007-cv-657; the Circuit Court for Marengo County, Alabama: case no. 2010-cv-900022; the Circuit Court for Marion County, Alabama: case nos. 2010-cv-92 and 2009-cv-900016; the Circuit Court for Montgomery County, Alabama: case no. 2012-cv-901255; the Circuit Court for St. Clair County, Alabama: case no: 2009-cv-900069; and the Circuit Court for Walker County, Alabama: case no: 2008-cv-900116.

[2] Although the term of the Agreement expired on December 31, 2014, ACH continued to be the sole supplier of healthcare services and coordinator of the healthcare delivery system at the Detention Facility until June 22, 2015.  ACH refused to sign an extension of the Agreement in December 2014 or thereafter because, among other things, ACH wanted to avoid prior obligation to make the County and Sheriff Dorning additional named insureds on ACH's insurance policies.  (See Agreement at ¶ 6.B.).

see also id. ("ACH is *responsible for all health care for all inmates* at the Detention Facility.") (emphasis added)).[3]

19.    As the sole supplier and coordinator of all healthcare services, ACH clearly and unambiguously represented that "[i]nmates in the detention facility *shall have access* at all times to *constitutionally adequate healthcare*." (Id. at ¶ 6.E.) (emphasis added).   Understandably, Sheriff Dorning needed assurances that ACH could and would provide inmates constitutionally adequate healthcare, so he "require[d] and ACH represent[ed] and warrant[ed] that it [would] meet certain minimum requirements," including "strictly comply" with requirements related to insurance, indemnity, healthcare standards, reporting, and policy and procedure compliance. (Id. at ¶ 6).

20.    Aside from representing and warranting its strict compliance with minimum qualifications and requirements, ACH agreed and represented that it would "meet, exceed and otherwise comply with" a number of stated objectives, including:

> • To deliver unimpeded, necessary healthcare services (including medical, dental, and mental health services) to inmates (as set forth in the Agreement and as dictated by law) that can be audited against established standards;

---

[3] "Health care" or "medical care" is broadly defined under the Agreement. (See Agreement at ¶ 3).

- To operate the healthcare program in a humane manner with respect to the inmate's right to basic healthcare services;

- To operate the healthcare program at full staffing and use only licensed, certified, and professionally trained personnel;

- To implement a written healthcare plan with clear objectives, policies, and procedures; and

- To maintain an open and cooperative relationship with the Sheriff's administration and staff.

(Agreement at ¶ 7).

21.     To protect the County, Sheriff Dorning, and his employees (including the Correctional Officers) from a failure by ACH to "strictly comply" with the minimum qualifications and requirements or to "meet, exceed and otherwise comply with" the numerous stated objectives, ACH agreed to and represented that it would procure insurance for and indemnify them.

22.     ACH's insurance obligation is clear: "ACH *shall procure* at its expense, *and maintain* it for throughout the entire term of this Agreement, including any renewal terms, General Liability, Professional Liability, and Medical Malpractice insurance providing coverage for claims *including professional liability, negligence, and claims asserted pursuant to 42 U.S.C. § 1983* ..., insuring *all claims* that may *arise out of the course and scope of this Agreement*." (Agreement at ¶ 6.B.) (emphasis added).  Simply, ACH agreed to obtain (and represented that it had in force) insurance covering "all claims" that might "arise

9

out of the course and scope of th[e] Agreement," including claims for professional liability, negligence, and constitutional torts. (Id.) ACH also agreed and represented that "[the] County and [Sheriff Dorning] shall be additional *named insureds* on the aforesaid policies of insurance." (Id.) (emphasis added).

23.    Aside from affording broad insurance coverage, ACH agreed and represented that its insurance would be "primary," and, if ACH's insurer withdrew or denied coverage, "all claims, litigation costs, attorney fees and any judgment or settlement money will be paid by ACH." (Id.) Under paragraph 6.B. of the Agreement, ACH becomes the insurer and assumes liability for injuries and/or damages for which the County and Sheriff Dorning are responsible if Essex withdraws or denies coverage.

24.    Separate from – but consistent with – ACH's insurance obligation in the Agreement, ACH agreed to and represented that it would,

> indemnify and save harmless [the County, Sheriff Dorning], and their respective supervisors, agents, officers, employees and officials from and against *any and all* liability loss, damages, interest, judgments and liens growing out of any and all costs and expenses (including, but not limited to, reasonable attorney fees and disbursements) *arising out of or incurred in connection with any and all* claims, demands, suits, actions or proceedings, which may be brought [against them] *by reason of, or as the result of* (1) acts or omissions of ACH, its agents, servants, or employees *related in any way to or while in the performance of this Agreement*; [and] (2) any allegations of an act or omission, conduct or misconduct, of ACH, its agents,

10

> servants or employees *not included in the paragraph*
> *above and for which the County, [Sheriff Dorning], or*
> *their agents, servants, or employees are alleged to be*
> *liable*.

(Agreement at ¶ 6.C.) (emphasis added).

25.     ACH must indemnify and hold harmless the County, Sheriff Dorning,

and his employees (including the Correctional Officers) from claims and losses

brought about because of: (1) acts and/or omissions of ACH and its agents and

employees related to or while performing under the Agreement, and (2) acts and/or

omissions of ACH and its agents and employees for which the County, Sheriff

Dorning, and his agents and employees (including the Correctional Officers) are

allegedly liable. (Id.)

### THE ESSEX INSURANCE POLICY

26.     Essex issued a claims-made insurance policy (no. MM-823662) for

"Locum Tenens and Contract Staffing Professional Liability Insurance" with a

Policy[4] period from August 1, 2013 to August 1, 2014 (the "Policy" or the "Essex

Policy").

27.     The Named Insureds for Coverage A, entitled "Individual

Professional Liability Coverage," are "Employed and Contracted Physicians and

Allied Healthcare professionals providing Medical Services through the Coverage

---

[4] Except as defined in this Complaint, the capitalized words and phrases have the same meaning ascribed
to them in the Policy.

B Named Insured." (Pol. at Declarations). The Named Insured for Coverage B, entitled "Organizational Liability Coverage," is ACH. (Id.) *Neither the County nor Sheriff Dorning is identified as a Named Insured under the Policy.*

28. Generally, Essex is obligated under the Policy to pay Damages and Claim Expenses[5] for Claims because of Malpractice[6] or Professional Personal Injury[7] sustained by a patient arising out of the conduct of Medical Services[8] by a Coverage A Insured (or a person for whose Malpractice or Professional Personal Injury the Coverage A Insured is legally responsible) or Professional Healthcare Services by a person for whom ACH is legally responsible.[9] (Pol. at Insuring Agreement, ¶ A).

29. To avoid Claim Expenses from reducing the Each Claim Limits of Liability (but not the Aggregate Limits of Liability), Essex issued the "Claim Expenses in Addition to the Each Claim Limit of Liability" endorsement. (Pol. at

---

[5] Claim Expenses are generally defined as "reasonable and necessary amounts incurred by the Company or by the Insured with the prior written consent of the Company in defense of that portion of any Claim for which coverage is afforded under this policy, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds." (Pol. at Section Definitions C.).

[6] Malpractice is defined as "an act, error or omission in Medical Services rendered or that should have been rendered." (Pol. at Section Definitions G.).

[7] Professional Personal Injury is defined as "any bodily injury, mental injury, sickness, disease, emotional distress or mental anguish, including death resulting therefrom of any patient, arising out of Malpractice;" and "any allegation of a civil rights violation ..., provided that such allegation is the result of any patient receiving Medical Services." (Pol. at Section Definitions J; Amd. Endorsement – Civil Rights Violation).

[8] Medical Services is defined as "services ... provided in the medical care or treatment of any patient, but only where such care or treatment is within the scope of the Healthcare Provider's license, certificate or other qualification to practice Medical Services." (Pol. at Section Definitions H.).

[9] Professional Healthcare Services is defined as "Medical Services" and "Placement Services." (Pol. at Section Definitions L.).

Claim Expenses in Addition). As a result, the Policy is not a diminishing limits insurance policy.

30. To expand the scope of coverage under the Policy, Essex issued the "Amendatory Endorsement – Civil Rights Violation" endorsement (the "Civil Rights Endorsement"). The Civil Rights Endorsement states, in pertinent part:

> 1. Section Definitions H. is amended by the addition of the following:
>
>> 4. an allegation of a civil rights violation pursuant to the Civil Rights Act of 1871 (42 U.S.C. § 1983 *et seq.* [sic]) and amendments thereto, provided that such allegation is the result of any patient receiving Medical Services.
>
> \*\*\*\*\*
>
> 3. Section The Exclusions F. is deleted and replaced with the following:
>
>> F. any Claim based upon or arising out of any unlawful discrimination by any Insured; provided, however, this exclusion shall not apply to any civil rights violation alleged pursuant to the Civil Rights Act of 1871 (42 U.S.C. § 1983 *et seq.* [sic]) and amendments thereto, provided that such civil rights violation arises out of Medical Services for which the Insured is legally liable.

(Pol. at Civil Rights Endorsement).[10]

---

[10] Although paragraph 1 of the Civil Rights Endorsement purports to amend "Section Definitions H." by supplementing the definition of "H. Medical Services" with a new subparagraph "4," "Section Definitions H." defining "Medical Services" does not have subparagraphs 1 through 3. Instead, it appears Essex intended to amend "Section Definitions J.," which defines "Professional Personal Injury" and contains subparagraphs 1 through 3.

31.     The County and Sheriff Dorning are affirmatively afforded coverage under the Policy as Additional Insureds.  (Pol. at Endorsement No. 6).

32.     The "Additional Insured Endorsement – Professional Liability" (Endorsement No. 6) states, in pertinent part:

>       1.     Section The Insured is amended by the addition of the following:
>
>> Whenever used in this Policy, the unqualified word Insured shall also mean Additional Insured.
>
>       2.     Additional Insured means, whenever used in this endorsement, the following:
>
>> State, Municipal Department of Corrections, Office of the Sheriff, or other Officials to whom the Coverage B. Named Insured is obligated by a valid written contract to provide coverage as an additional insured to such person or organization but only as respects liability in rendering Professional Services caused by the negligence of the Named Insured and only for coverage not otherwise excluded in the policy.
>
>       3.     Coverage provided to any Additional Insured as defined herein shall apply solely with respect to any Claim or Claim Expenses arising from Professional Services rendered by the Named Insured specified in Item 1. of the Declarations.
>
>       4.     Where no coverage shall apply herein for the Coverage A or Coverage B Named Insured, no coverage or defense shall be afforded to the above Additional Insured.

                              *****

14

> 7. This insurance shall be excess and non-contributory insurance over any other insurance afforded to the Additional Insured.

(Id.)

33. Notwithstanding the language of the Policy and the Additional Insured Endorsement, Essex provided a defense and indemnity to the County, Sheriff Dorning, and his employees for claims arising under federal and state law concerning the evaluation and treatment of inmates at the Detention Facility, including, but not limited to, the same or similar claims asserted in the in the Listau, Jefferson, Woods and Foster actions (as defined below). That is, Essex treated the County and Sheriff Dorning as Named Insureds (along with ACH) over the years by defending and indemnifying the County and Sheriff Dorning from the same or substantially similar claims to those asserted in the Listau, Jefferson, Woods and Foster actions.

## THE LISTAU, JEFFERSON, WOODS AND FOSTER ACTIONS[11]

34.     On July 8, 2014, Robert Elliot, as the personal representative of the estate of Nikki Listau ("Listau"), commenced a civil action (no. 5:14-cv-1309 in the U.S. District Court for the Northern District of Alabama) against ACH, two ACH physicians (including Dr. Williams), four ACH nurses, the County, Sheriff Dorning, and the Correctional Officers (the "Listau action").

35.     On October 14, 2014, Carolyn Jefferson, as the personal representative of the estate of Tanisha Jefferson ("Jefferson"), commenced a civil action (case no. 5:14-cv-1959 in the U.S. District Court for the Northern District of Alabama) against ACH, two ACH physicians (including Dr. Williams), five ACH nurses, the County, Sheriff Dorning, and Morrison (the "Jefferson action").

36.     On October 14, 2014, Tanyatta Woods, as the personal representative of the estate of Deundrez Woods ("Woods"), commenced a civil action (case no. 5:14-cv-1964 in the U.S. District Court for the Northern District of Alabama) against ACH, two ACH physicians (including Dr. Williams), five ACH nurses, the County, Sheriff Dorning, and Morrison (the "Woods action").

37.     On March 30, 2016, Whitney Elizabeth Foster ("Foster") commenced a civil action (case no. 5:16-cv-00521-HGD in the U.S. District Court for the

---

[11] Plaintiffs deny all claims and allegations asserted against them in the Listau, Jefferson, Woods and Foster actions. The allegations in paragraphs 35 through 43 (and elsewhere in this Complaint) exist to provide the Court with the nature and character of the claims and allegations made by the plaintiffs in the four actions. Nothing in this Complaint shall constitute or be construed as a waiver of any defense in the Listau, Jefferson, Woods and Foster actions.

Northern District of Alabama) against ACH, ACH physicians Dr. Williams, ten ACH nurses, the County, Sheriff Dorning Morrison, and nine correctional officers (the "Foster action").

38.    The operative pleading in the Listau, Jefferson, Woods and Foster actions asserts, fundamentally, the same claims and seeks the same relief. Specifically, the plaintiffs in the Listau, Jefferson, Woods and Foster actions contend Listau, Jefferson, Woods and Foster were pretrial detainees in the Detention Facility with "serious medical needs" that were ignored or improperly treated:

- Listau allegedly had advanced delirium tremens due to alcohol withdrawal that caused seizures and falls (resulting in "severe blunt force injuries"), leading to her death (Listau Second Amd. Compl. at ¶¶ 24-25).

- Jefferson allegedly had a bowel obstruction from constipation that was improperly and ineffectively treated, leading to her death (Jefferson First Amd. Compl. at ¶¶ 17, 35); and

- Woods allegedly had a gangrenous right foot that went untreated and caused a blood clot to form, leading to his death (Woods First Amd. Compl. at ¶¶ 21-22).

- Foster allegedly had high blood pressure due to methadone withdrawal that went untreated and caused strokes, seizures, partial paralysis, blindness and PRES (Foster Compl. at ¶¶ 39-65).

39.    The plaintiffs in the <u>Listau</u>, <u>Jefferson</u>, <u>Woods</u> and <u>Foster</u> actions contend that ACH and its physicians and nurses were negligent and/or wanton in their evaluation and treatment of Listau, Jefferson, Woods and Foster, including failing to comply with the standard of care, failing to adequately train, and failing to implement adequate policies and procedures.  (Listau Second Amd. Compl. at Ct. II; Jefferson First Amd. Compl. at Ct. II; Woods First Amd. Compl. at Ct. II; Foster Compl. at Ct. 4).

40.    Additionally, the plaintiffs in the <u>Listau</u>, <u>Jefferson</u>, <u>Woods</u> and <u>Foster</u> actions contend ACH and its physicians and nurses were so substandard in their evaluation and treatment of Listau, Jefferson, Woods and Foster that they were deliberately indifferent to their serious medical needs.  (Listau First Amd. Compl. at ¶ 163; Jefferson First Amd. Compl. at ¶ 133; Woods First Amd. Compl. at ¶ 149; Foster Comp. at ¶ 71).

41.    The plaintiffs in the <u>Listau</u>, <u>Jefferson</u>, <u>Woods</u> and <u>Foster</u> actions seek to impose supervisory liability on Janice Robinson (an ACH nurse),[12] two ACH physicians (including Dr. Williams),[13] Morrison, and/or Sheriff Dorning.  (Listau Second Amd. Compl. at ¶ 164; Jefferson First Amd. Compl. at ¶ 134; Woods First Amd. Compl. at ¶ 150; Foster Compl. at ¶ 71).  They also seek to impose liability on the County for its alleged failure to adequately fund medical care at the

---

[12] Robinson is only a defendant in the <u>Listau</u> action.

[13] Only one ACH physician (Dr. Williams) is named as a defendant in the <u>Foster</u> action.

Detention Facility.  (Listau Second Amd. Compl. at ¶ 165; Jefferson First Amd. Compl. at ¶ 135; Woods First Amd. Compl. at ¶ 151; Foster Compl. at ¶¶ 74, 85). As it relates to Sheriff Dorning, Morrison, and the County, the plaintiffs' claims in the <u>Listau</u>, <u>Jefferson</u>, <u>Woods</u> and <u>Foster</u> actions are merely derivative of the alleged constitutional torts committed by ACH and its physicians and nurses. Stated differently, but for the alleged deliberate indifference to serious medical needs of ACH and its physicians and nurses, no supervisory liability or inadequate funding claim would exist.

42.    Any damages sustained by plaintiffs in the <u>Listau</u>, <u>Jefferson</u>, <u>Woods</u> and <u>Foster</u> actions are the sole result of the acts and/or omissions of ACH and its physicians and nurses.  If the County, Sheriff Dorning, and/or the Correctional Officers are found liable in the <u>Listau</u>, <u>Jefferson</u>, <u>Woods</u> and/or <u>Foster</u> actions, it would be derivative, secondary, and passive as compared to the primary and active deliberate indifference or other acts and/or omissions by ACH and its physicians and nurses related to the diagnosis and provision of medical care to Listau, Jefferson, Woods and Foster.

**ESSEX'S INSURANCE COVERAGE LETTER**

43.    Alabama law imposes a broad duty on an insurer to defend its insured under an insurance policy, which is "more extensive" than the duty to indemnify.

An insurer has the burden to prove the applicability of an exclusion if that insurer seeks to avoid its duty to defend and/or indemnify based on the exclusion.

44.     On January 15, 2015, counsel for Essex sent a letter to counsel for the County, Sheriff Dorning, and the Correctional Officers.  In the January 15, 2015 letter, Essex denied coverage under the Policy for the claims asserted against the Correctional Officers in the <u>Listau</u>, <u>Jefferson</u>, and <u>Woods</u> actions.  (Ltr. at 9).

45.     Although Essex does not expressly deny coverage of any specific claim asserted by a plaintiff in the <u>Listau</u>, <u>Jefferson</u>, or <u>Woods</u> action, it does state, in pertinent part:

- "The allegations regarding overarching policies and procedures regarding medical care and treatment provided at the Madison County Jail that do not relate to actual medical care and treatment provided to the inmates *are not covered* under the Essex Policy" (Ltr. at 8) (emphasis added);

- "Sheriff Dorning and Madison County are only Additional Insureds covered by the Essex Policy for liability resulting from the 'negligence' of ACH and its employees in rendering 'Professional Services.' They *are not otherwise covered* by the Essex Policy" (Ltr. at 8) (emphasis added); and

- "The Essex Policy provides coverage for Sheriff Dorning and Madison County as Additional Insureds <u>only</u> with respect to liability Sheriff Dorning and Madison County may have resulting from the negligence of ACH and its employees in providing medical care or treatment to inmates and/or staffing/hiring decisions.  The Essex Policy *does not provide any coverage* to Sheriff Dorning

20

for damages relating to their independent actions"
(Ltr. at 9) (emphasis added).

46.    Essex also notes that the Policy is supposed to be "excess and non-contributory insurance over any other insurance afforded to the Additional Insured." (Ltr. at 7).

47.    Essex concludes its January 15, 2015 letter by stating:

> Essex ... will *contribute* to the defense of [the] County and Sheriff Dorning as stated above, but it reserves the right to assert at a later time any and all coverage defenses that are appropriate. The Policy does not afford coverage for certain acts and omissions of [the] County and Sheriff Dorning as stated in the Policy. Essex ... will not indemnify [the] County and Sheriff Dorning as to non-covered claims."

(Ltr. at 11) (emphasis added).

48.    Essex is incorrect about insurance coverage for the County and Sheriff Dorning under the Policy.[14]   More appropriately, Essex's analysis of the nature and extent of insurance coverage under the Policy lacks legal or factual support.   It probably would have been beneficial for Essex to keep in mind the well-settled rule in Alabama that "[t]he insured's conduct *rather than the allegedly injured person's allegations* determine whether the insurer has a duty to indemnify." Tanner v. State Farm Fire & Cas. Co., 874 So. 2d 1058, 1066 (Ala. 2003)

---

[14] For example, nowhere in the January 15, 2015 letter does Essex acknowledge the Civil Rights Endorsement. In quoting the "Applicable Terms of Policy," Essex ignores the effect of the Civil Rights Endorsement on the definition of Professional Personal Injury and cites inapplicable Exclusions A., B. and I. (Ltr. at 5-6). This gross oversight or calculated omission eviscerates the entire analysis in the January 15, 2015 letter.

(emphasis added). Again, the duty to *defend* is *"more extensive"* than the duty to *indemnify*.

49.   Essex is attempting to avoid coverage for the County and Sheriff Dorning under its Policy simply because they might have insurance coverage under another insurance policy. Essex has never taken that position in the past. In fact, in prior civil actions, Essex uniformly provided insurance coverage under ACH's insurance policy for the County, Sheriff Dorning, and his employees concerning the same types of claims asserted in the <u>Listau</u>, <u>Jefferson</u>, <u>Woods</u> and <u>Foster</u> actions. More recently (after filing of the <u>Listau</u>, <u>Jefferson</u>, and <u>Woods</u> actions), Essex afforded insurance coverage under ACH's insurance policy for the County, Sheriff Dorning, and his employees concerning the same types of claims asserted in the <u>Listau</u>, <u>Jefferson</u>, <u>Woods</u> and <u>Foster</u> actions.

50.   Even assuming the County and Sheriff Dorning are only Additional Insureds, Essex does not have the right to wrongfully deny coverage or act in bad faith. Moreover, if insurance coverage does not exist for the County and Sheriff Dorning, then it does not exist for ACH and its physicians and nurses. As such, Essex's coverage decision reflected in the January 15, 2015 letter strips ACH and its physicians and nurses of coverage for constitutional torts in the <u>Listau</u>, <u>Jefferson</u> and <u>Woods</u> actions, notwithstanding ACH's payment of $737,451 to Essex, which included a premium for the Civil Rights Endorsement.

22

51.     On March 4, 2015, Plaintiffs sent a letter to Essex asking it to reconsider its coverage opinion and clarify what, if anything, it contends is a covered Claim under the Policy, but Essex did not substantively respond to Plaintiffs' reasonable request.

52.     On April 8, 2016, Plaintiffs sent a letter to ACH demanding it comply with, among other things, its indemnity provisions in the Agreement with regard to the claims asserted in the <u>Foster</u> action and to provide notice to the insurer referenced in the Agreement.  ACH has failed or refused to acknowledge and agree to comply with its obligations under the Agreement, including its insurance, defense, and indemnity obligations, or to cure its breach of the Agreement.   To date, Essex has failed to provide indemnity or a complete defense for the County and Sheriff Dorning for the <u>Foster</u> action.

## ACH's Obligations in Light of January 15, 2015 Letter

53.     The Agreement obligated ACH to procure and maintain in force insurance covering claims for professional liability, negligence, and constitutional torts, "insuring all claims that may arise out of the course and scope of th[e] Agreement." (<u>Id.</u>)  Both the County and Sheriff Dorning were supposed to be additional *named insureds*, with insurance coverage for medical malpractice / professional liability, negligence, and constitutional torts arising from the scope of

or performance under the Agreement. Also, "ACH's insurance coverage [was supposed to be] primary." (<u>Id.</u>)

54.     Although ACH attempted to obtain an insurance policy covering claims for professional liability, negligence, and constitutional torts, Essex contends some or all of the claims asserted by the plaintiffs in the <u>Listau</u>, <u>Jefferson</u>, and <u>Woods</u> actions against the County and Sheriff Dorning are not covered by the Policy. Essex, therefore, decided that it will not defend or indemnify for "non-covered claims" and informed the County and Sheriff Dorning it may seek "reimbursement of defense costs." (Ltr. at 10-11). And, Essex has not even *contributed* to the defense of the County or Sheriff Dorning in the <u>Listau</u>, <u>Jefferson</u>, and <u>Woods</u> actions, as previously represented.

55.     Essex's decision is costly for ACH. Essex's coverage decision puts ACH in breach of its obligation to procure insurance, affording the County and Sheriff Dorning "primary" insurance coverage as Named Insureds for claims like those asserted in the <u>Listau</u>, <u>Jefferson</u>, <u>Woods</u> and <u>Foster</u> actions.

56.     Because Essex denied, withdrew or failed to provide coverage for the County and Sheriff Dorning, "all claims, litigation costs, attorney fees and any judgment or settlement money [must] be paid by ACH" for the County and Sheriff Dorning associated with the <u>Listau</u>, <u>Jefferson</u>, <u>Woods</u> and <u>Foster</u> actions. (Agreement at ¶ 6.B.). Also, because the County, Sheriff Dorning, and the

24

Correctional Officers purportedly are not covered under the Policy for all claims asserted against them in the Listau, Jefferson, Woods and Foster actions, then ACH breached its obligation to procure adequate insurance for them.

57.     Aside from the insurance coverage dispute and ACH's failure to procure adequate, primary insurance for the County and Sheriff Dorning, ACH is obligated to indemnify and hold harmless the County, Sheriff Dorning, and Correctional Officers (among others) under the Agreement. From the face of the pleadings (and based on the information known to-date),[15] it is clear that ACH's (and its physicians' and nurses') acts and/or omissions in performance of the Agreement (for which the County, Sheriff Dorning, and the Correctional Officers are allegedly liable) gave rise to the claims asserted by the plaintiffs in the Listau, Jefferson, Woods and Foster actions. The County, Sheriff Dorning, and the Correctional Officers are, therefore, entitled to indemnification from ACH under the Agreement.

58.     The County, Sheriff Dorning, and the Correctional Officers have incurred, and will continue to incur, Claim Expenses associated with the investigation and defense of the claims asserted in the Listau, Jefferson, Woods and Foster actions. The County, Sheriff Dorning, and the Correctional Officers

---

[15] Under Alabama law, when determining liability under an indemnity provision, a court may look beyond the complaint in the underlying action to the underlying facts shown by admissible evidence. Holcim (US), Inc. v. Ohio Cas. Ins. Co., 38 So. 3d 722, 730 (Ala. 2009).

have incurred, and will continue to incur, Claim Expenses associated with the enforcement of their rights under the Policy and Agreement.[16]

59.    On March 4, 2015, Plaintiffs sent a letter to ACH demanding it comply with, among other things, its insurance, defense, and indemnity provisions in the Agreement in light of the Essex coverage letter, including pay "all claims, litigation costs, attorney fees and any judgment or settlement money" in the Listau, Jefferson, and Woods actions that they have incurred or will incur in the future. ACH failed or refused to acknowledge and agree to comply with its obligations under the Agreement, including its insurance, defense, and indemnity obligations, or to cure its breach of the Agreement.

60.    Because "ACH neither cured its breach of the Agreement nor complied with the County's and Sheriff Dorning's reasonable demands" and "ACH refused to execute another Agreement to continue its business relationship with the County and Sheriff Dorning," the County and Sheriff Dorning terminated ACH's services effective June 22, 2015. In the April 22, 2015 letter terminating ACH's services, the County and Sheriff Dorning asked ACH to cooperate to ensure a smooth and orderly transition. They also asked ACH to transfer documents and information, including, for example, medical and mental health

---

[16] Under Alabama law, "[w]here a party is contractually entitled to be held harmless, that party is entitled to its costs and attorneys' fees incurred to enforce the contractual indemnity provision." Parker Towing Co., Inc. v. Triangle Aggregates, Inc., 143 So. 3d 159, 170 n. 12 (Ala. 2013) (quoting 41 Am. Jur. 2d Indemnity § 30 (2005)).

records, charts, laboratory results, reports, notes, and other documents (physical and electronically stored) in its possession or control, concerning ACH's work at the Detention Facility and with inmates / patients.

61. During its work with the County and Sheriff Dorning, including the transition leading up to ACH's departure from the Detention Facility, ACH failed to maintain inmate / patient records as required under the Agreement or in conformance with generally accepted standards. Indeed, the medical records kept and maintained by ACH at the Detention Facility were in "shambles" at the time of ACH's departure from the Detention Facility.

**COUNT I**
**BREACH OF CONTRACT**
**(ESSEX)**

62. Plaintiffs reallege and reassert the preceding factual allegations as if fully set forth in this Count I of the Complaint.

63. Actions were brought against Sheriff Dorning, the County, and/or the Correctional Officers based upon health services provided in the County Jail in the Listau, Jefferson, Woods and Foster actions.

64. The plaintiffs in the Listau, Jefferson, Woods and Foster actions contend that former inmates Listau, Jefferson, Woods and Foster were ignored or received improper medical treatment, and as a direct and proximate result of the improper medical treatment, they suffered serious injuries and/or death.

65.    The Listau, Jefferson, Woods and Foster complaints included allegations that triggered coverage for Plaintiffs, its insureds, under the Policy.

66.    Essex was contractually obligated to insure Plaintiffs pursuant to the Essex Policy.

67.    Plaintiffs notified Essex of the claims set forth in the Listau, Jefferson, Woods and Foster complaints and made a demand for coverage.

68.    Essex has breached the contract because it failed to assume the defense of the referenced complaints and indemnify Plaintiffs and otherwise provide coverage under the Policy.

69.    Essex has improperly denied that some or all of the claims are covered by the policy and/or that it has any defense obligations and failed to pay the costs of defense in the referenced actions.

70.    As a result of Essex's breach of contract, Plaintiffs have incurred and will continue to incur substantial attorneys' fees, court costs, Claim Expenses and other expenses in defending the Listau, Jefferson, Woods and Foster actions, without any participation by Essex and in the bringing of this action.

**COUNT II**
**BAD FAITH**
**(ESSEX)**

71.    Plaintiffs reallege and reassert the preceding factual allegations as if fully set forth in this Count II of the Complaint.

72.     Essex had, and continues to have, a duty to defend and indemnify the County and Sheriff Dorning.  In fact, in civil actions before and after the Listau, Jefferson, Woods and Foster actions, ACH uniformly provided insurance coverage under ACH's insurance policy for the County, Sheriff Dorning, and his employees concerning the same types of claims asserted in the Listau, Jefferson, Woods and Foster actions.

73.     Essex is defending ACH and its physicians and nurses under the Policy in the Listau, Jefferson, Woods and Foster actions, but it will not provide and/or failed to provide a complete defense or indemnity for the County and Sheriff Dorning under the Policy in the Listau, Jefferson, Woods and Foster actions.

74.     Essex has, in bad faith, intentionally, and without any reasonably legitimate, debatable, or arguable reason, failed or refused to completely defend and/or indemnify the County and Sheriff Dorning from all claims asserted against them in the Listau, Jefferson, Woods and Foster actions.

75.     Essex has made that refusal or failure with actual knowledge or in reckless disregard of the lack of any legitimate, debatable, or arguable reason for its failure to defend or indemnify the County and Sheriff Dorning from all claims asserted against them in the Listau, Jefferson, Woods and Foster actions.

76.     Alternatively, Essex has, in bad faith, intentionally and/or recklessly failed to determine whether or not there exists a legitimate or arguable reason to refuse a defense to the County and Sheriff Dorning by its failure to properly investigate, evaluate and honor the claims.

77.     As a result of Essex's refusal or failure to defend the County and Sheriff Dorning in the Listau, Jefferson, Woods and Foster actions, the County and Sheriff Dorning have suffered economic loss, including being compelled to "act on [their] own behalf to protect [their] interest." (Ltr. at 11).

78.     Additionally, as a direct and proximate result of Essex's failure or refusal to defend and indemnify the County and Sheriff Dorning in the Listau, Jefferson, Woods and Foster actions, the County and Sheriff Dorning have been, and will continue to be, damaged by, among other things, incurring considerable expense in the preparation of the defense of the Listau, Jefferson, Woods and Foster actions, including, but not limited to, filing fees, witness fees, witness mileage, expert fees, court reporter services, attorneys' fees and other litigation fees and expenses.

**COUNT III**
**BREACH OF CONTRACT**
**(ACH)**

79.     Plaintiffs reallege and reassert the preceding factual allegations as if fully set forth in this Count III of the Complaint.

80.    The County and Sheriff Dorning entered into a valid and binding contract (the Agreement) with ACH which was supported by adequate consideration.

81.    In the Agreement, ACH agreed and represented that it would, among other things: (1) keep and appropriately maintain medical records; (2) procure and maintain in force general liability, professional liability, and medical malpractice insurance covering claims for professional liability, negligence, and constitutional torts, "insuring all claims that may arise out of the course and scope of th[e] Agreement;" (3) add the County and Sheriff Dorning "as additional [N]amed [I]nsureds" on the Policy; (4) ensure the Policy is primary to "insurance coverage provided by other sources;" and (5) if Essex withdrew or denied coverage under the Policy, pay "all claims, litigation costs, attorney fees and any judgment or settlement money." (Agreement at ¶¶ 6.B., K.).

82.    ACH breached the Agreement with the County and Sheriff Dorning by, among other things: (1) failing to keep and appropriately maintain medical records; (2) failing to fulfill its duties and obligations to the County and Sheriff Dorning; (3) failing to deal in good faith, fairly, and honestly with the County and Sheriff Dorning; (4) failing to honor or otherwise comply with its promises and obligations to the County, Sheriff Dorning, and the Correctional Officers; and (5) otherwise committing the acts and/or omissions described in this Complaint.

83.    The County and Sheriff Dorning fully performed their obligations under the Agreement, and any condition precedent has been satisfied.

84.    As a direct and proximate result of ACH's breach of its contractual obligations, the County and Sheriff Dorning have been, and will continue to be, damaged by, among other things, incurring considerable expense to fix the medical records and in the preparation of the defense of the Listau, Jefferson, Woods and Foster actions, including, but not limited to, filing fees, witness fees, witness mileage, expert fees, court reporter services, attorneys' fees and other litigation fees and expenses.

### COUNT IV
### INDEMNIFICATION
### (ACH)

85.    Plaintiffs reallege and reassert the preceding factual allegations as if fully set forth in this Count IV of the Complaint.

86.    Notwithstanding any contractual right to a defense and indemnification (and as an alternative or additional theory of recovery), Plaintiffs are entitled, at common law and/or equitably, to a defense and indemnification from ACH in the Listau, Jefferson, Woods and Foster actions.

87.    ACH was hired to provide quality medical care to inmates at the Detention Facility, which necessarily included an obligation to properly hire and train ACH's physicians and nurses, to properly staff the Detention Facility with

32

capable physicians and nurses, and to implement policies, procedures, and quality control mechanisms to ensure the medical care it provide inmates at the Detention Facility conformed with the standard of care, consent orders, and constitutional mandates. By accepting the job (and the obligations that come with this job) at the Detention Facility, ACH undertook a duty to indemnify Plaintiffs for claims made and relief sought associated with inadequate medical care of inmates at the Detention Facility.

88.    As between Plaintiffs and ACH, it is just and fair that ACH should bear total responsibility for the acts and/or omissions alleged in the Listau, Jefferson, Woods and Foster actions, rather than leave the responsibility on Plaintiffs.

89.    ACH has been, and will continue to be, unjustly enriched at the expense of Plaintiffs through Plaintiffs' defense of themselves in the Listau, Jefferson, Woods and Foster actions and to the extent Plaintiffs discharge any liability in the Listau, Jefferson, Woods and Foster actions.

90.    ACH has wrongfully failed or refused to defend and indemnify Plaintiffs. Plaintiffs have been, and will continue to be, damaged by, among other things, incurring considerable expense in the preparation of the defense of the Listau, Jefferson, Woods and Foster actions, including, but not limited to, filing

fees, witness fees, witness mileage, expert fees, court reporter services, attorneys' fees and other litigation fees and expenses.

**COUNT V**
**FRAUD**
**(ACH)**

91.    Plaintiffs reallege and reassert the preceding factual allegations as if fully set forth in this Count V of the Complaint.

92.    ACH falsely represented to the County and Sheriff Dorning in the Agreement, and continued to falsely represent to them (including in subsequent communications and in extensions or renewal terms of the Agreement), the following material facts:

- ACH procured and maintained adequate, primary insurance covering all claims that might arise out of the course and scope of ACH's work, including claims for professional liability, negligence, and constitutional torts; and

- the County and Sheriff Dorning were, and would continue to be, additional *named insureds* on ACH's insurance policies.

93.    The County and Sheriff Dorning reasonably and foreseeably relied on ACH's misrepresentations by, among other things, entering into and continuing a business relationship with ACH and allowing ACH and its physicians, nurses, and other employees to provide medical care to inmates at the Detention Facility.

34
