FILED

2018 Jan-12  PM 04:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

with the requirements contained within this RFP and all documents referenced within the RFP), with monitoring results documented and reported on a quarterly basis to the Sheriff.   Provider must provide monthly statistical utilization reports of services provided, including all off-site services provided sorted by provider and by inmate.  The monthly statistical reports must at a minimum, include the following information:

*#8 CQI Statistical Form*

| ADMITTING INFORMATION |
| --- |
| Number of inmates admitted to the Madison County Detention Facility during the previous month. |

| INTAKE SCREENING |
| --- |
| Number of newly admitted inmates whose intake screening forms were not reviewed by a qualified healthcare professional within 24 hours of intake. |
| Out of the number of intake screening forms not reviewed by a qualified healthcare professional within 24 hours of intake (number listed above), number of these inmates who were released from the Madison County Detention Facility less than 24 hours from the time they were admitted to the Madison County Detention Facility. |
| Percent of intake screening forms reviewed within 24 hours of intake for inmates remaining in the Madison County Detention Facility more than 24 hours. |

| PHYSICALS AND TB TESTING |
| --- |
| Number of inmates who should have received their 14-day physicals, including TB tests, during the previous month.[1] |

| PHYSICALS |
| --- |
| Number of inmates who received their physicals within 14 days of their incarceration in the Madison County Detention Facility. |
| Number of inmates who did not receive physicals because they had a recent physical from previous incarceration. |
| Number of inmates who refused their physical. |

ACH001424

| |
|---|
| Number of inmates who received their physicals after 14 days but before 21 days of intake. |
| Percent of inmates who received their physicals within 21 days of intake, who had recent physicals, or who refused their physicals. |

**TB TESTING**

| |
|---|
| Number of inmates who received a mantoux test within 14 days of intake. |
| Number of inmates who refused a mantoux test. |
| Number of inmates who received a mantoux test after 14 days of intake. |
| Number of inmates who did not receive a mantoux test because of recent mantoux testing from previous incarceration in the Madison County Detention Facility or because the inmate reported a prior PPD. |
| Percent of inmates to be tested who received a mantoux test within 14 days of incarceration, who received a mantoux test after 14 days of intake, who had recently been tested, or who reported a prior PPD. |

**MANTOUX TEST READING**

| |
|---|
| Number of inmates who had their mantoux test read between 48 and 72 hours after it was implanted. |
| Number of mantoux tests that could not be read because the inmate had been released from jail. |
| Percent of mantoux tests read between 48 and 72 hours after implantation. |

**TB CHEST X-RAYS AND RESULTS**

| |
|---|
| Number of inmates who had a positive result to the mantoux test. |
| Number of inmates who received a chest x-ray within 96 hours of a positive mantoux test result. |
| Number of inmates who did not receive a chest x-ray because they had been released from jail. |
| Number of inmates who received chest x-rays who were started on INH therapy. |

DOCSHSV\157494\1\                                   12                                   ACH001425

| |
|---|
| Number of inmates who were diagnosed with active tuberculosis after receiving a chest x-ray. |
| Number of inmates diagnosed with active tuberculosis during previous month. |

*language*

On-site visits by the medical doctor, OB/GYN, psychiatrist, and dentist at the Madison County Detention Facility for the month should be listed by inmate, provider, time spent on-site, and location of visit. The nursing schedule for the month should also be provided.

*# 11 Staffing Grid*

The number of inmates who were identified as having certain chronic conditions during the previous month should be listed as follows:

Diabetes

a.    Number of insulin-dependent

b.    Number of non-insulin dependent

Hypertension

Seizures

Diagnosed Mental Illness

Asthma

HIV/AIDS

*# 10 Chronic Care Program*

N.    **MEDICAL EQUIPMENT AND SUPPLIES:**    Unless otherwise specifically stated within this RFP, Provider will be responsible for providing and paying for all equipment and supplies necessary for Provider's performance at the Detention Facility.

*Language*

O.    **FORMULARY:**  Provider must provide a pharmaceutical formulary in accordance with federal, state and local laws that meets the needs of the inmate population.  Medications shall be administered to inmates as prescribed.  Appropriately trained medical personnel will administer medications and the administration of each does will be documented.  Medications must be maintained under proper conditions and in a secure area.  All proposals must include an appropriate sample formulary and a pharmaceutical supply plan addressing Provider's quality and cost control measures to reduce the unnecessary, wasteful, or redundant ordering of or distribution (or repackaging and redistribution) of formulary items.

*Language*

*# 9 Pharmacy Formulary Quality Assurance*

ACH001426

P.    **MEDICAL WASTE:**  Provider will be responsible for the removal of all medical waste associated with the provision of healthcare at the Detention Facility.

Q.    **CHRONIC CARE CLINICS:**  Provider must establish a plan for the identification, treatment and monitoring of inmates with chronic illnesses and special healthcare needs.  Provider will be required to continue "chronic care clinics" for those persons identified with specified chronic illnesses and conditions (diabetes, hypertension, mental illness, HIV/AIDS, tuberculosis, asthma, seizures, etc.).

*Need chronic care program language.*    *#10 Chronic Care*

R.    **REFERENCES:**  All proposals must list by name, address, administrator, and inmate population all correctional institutions where proposer is providing healthcare and the length of time that each contract has been in effect.  This list will be used as a source of references for proposer.  All proposals must also list by name, address, administrator, and inmate population all correctional institutions where proposer has provided healthcare within the last two (2) years but where proposer is not currently providing services.  Proposer must also arrange, upon request, for members of any selection committee to tour a facility where proposer is currently providing services and interview Proposer's employees and contractors.

*#2 References  #11*

S.    **STAFFING PLANS:**  All proposals must contain a full and complete staffing plan and explain how healthcare for inmates at the Detention Facility will be delivered.  The staffing plan should be specific enough to allow the Sheriff to ascertain how many employee/contractor positions will be filled, where those positions will be located (Main, Courthouse, Annex), and how individual shifts will be staffed.  Although no representations are made regarding the efficiency of current staffing levels, current staffing levels are provided herein as reference in preparing proposals for continuing service:

*Language re: qud flowchart system*    *#12 Staffing*  *#5 Healthcare Delivery System*

<u>COURTHOUSE FACILITY WEEKLY STAFFING:</u>

(1)    RN    7:00 a.m. - 3:00 p.m. Monday through Friday

(1)    LPN    3:00 p.m. - 11:00 p.m. Monday through Friday

(1)    LPN    11:00 p.m. - 7:00 a.m. Monday through Friday

(1)    LPN    7:00 a.m. - 3:00 p.m. Saturday and Sunday

(1)    LPN    3:00 p.m. - 11:00 p.m. Saturday and Sunday

(1)    LPN    11:00 p.m. - 7:00 a.m. Saturday and Sunday

(1)    Medical Records clerk 20 hours per week    *(10 hrs)*

ACH001427

## MAIN FACILITY WEEKLY STAFFING:

(1)     RN     Facility Administrator

(1)     RN     12 hours per day, seven days per week *Supervisor*

(4)     LPNs   7:00 a.m. - 3:00 p.m. Monday through Friday

(2)     LPNs   3:00 p.m. - 11:00 p.m. Monday through Friday

(2)     LPNs   11:00 p.m. - 7:00 a.m. Monday through Friday

(2)     LPNs   7:00 a.m. - 7:00 p.m. Saturday and Sunday

(2)     LPNs   7:00 p.m. - 7:00 a.m. Saturday and Sunday

(1)     LPN    (booking) 1:00 p.m. - 9:00 p.m.
               OR 3:00 p.m. - 11:00 p.m. seven days per week

(1)     RN     (psych) 40 hours per week Monday through Friday

(2)     Medical Records clerks 40 hours per week each *(1)*

## ON-SITE DOCTOR HOURS:

*Language*

Medical Director (medical doctor) three days per week, no less than 10 hours per week. The Medical Director or another covering physician with specific knowledge of the operation of the Detention Facility is on call twenty-four hours a day, seven days a week, for emergency situations.

*#13-14 Physician Call Schedule & Procedure*

Psychiatrist one day per week, no less than 4 hours per week.

Doctor specializing in obstetrics/gynecology two times per month.

Dentist one to two days per week totaling 8 hours per week.

*120-180 days — Medical assessment Re-organize + reassign existing staff. Offer recommendation to enhance Medical efficiency & potentially return # to Sheriff.*

Provider is expected to provide services necessary to comply with all requirements contained herein, and current staffing levels are not provided as mandatory requirements of any proposal or for the purpose of setting a minimum or maximum amount of coverage or desired level of service. The Sheriff welcomes alternative staffing proposals, including but not limited to the use of social workers, additional or different doctor hours, and additional or different nursing hours, so long as Provider agrees to comply with any mandatory staffing levels set forth in the consent orders attached hereto and any other requirements set forth herein. Provider must include as part of the proposed staffing plan a nurse stationed in the booking area of the Main Facility twenty-four hours per day, seven days per week, to perform all intake screening of arrestees and inmates and to

DOCSHSV\157494\1\                    15                              ACH001428

complete all medical documentation associated with the booking of arrestees into the Main Facility or transfer of inmates between facilities.

T.   **PRICING:** All proposals must contain <u>a specific annualized price</u> for a base population of up to 800 inmates for all healthcare rendered under this contract. If Provider wishes, Provider may state one price for the initial year of the contract and another for subsequent years. Any other exceptions to the specific price shall be stated, such as per diem charge for an increase in average daily population above the base level.

*[handwritten left margin: Exception Cmp. Program - proposal includes cost sharing]*

*[handwritten right margin: Cost Proposal Options 800 9@]*

U.   **ALTERNATIVE PRICING:** The price must be stated for multiple alternative formats. A price must be provided which includes all costs of the program as outlined in this Request for Proposal and the proposal, and a second price must be provided which excludes the cost of all prescription-type pharmacy items. Additionally, all proposals must, in addition to the pricing requirements set forth above, contain pricing for a base population of up to 900 inmates for all healthcare rendered under this contract. The Sheriff will consider all other alternative pricing options provided by proposers.

*[handwritten left margin: Exceptions: cannot provide program w/o pharmaceuticals Due to our cont., pharm ability to secure @ costs below other sources. cost factors incl - purchase, returns + cost home usage.]*

*[handwritten right margin: refer to Pricing - Proposal Options]*

V.   **COST SHARING:** The Sheriff and Madison County will consider sharing responsibility for the costs of healthcare in certain specific areas in order to assist Provider in predicting its costs and potential liabilities. All proposals must specifically state these limits of responsibility so proposed, and how Madison County would share in these costs after the cost limits have been reached.

*[handwritten left margin: language explaining capped liability program]*

*[handwritten right margin: #13 pkg. Cost Sharing Procedure]*

W.   **CONTRACT TERMINATION:** The contract between Provider, Madison County, and the Sheriff may be cancelled "without cause" by any party upon 120 days written notice. The contract may be cancelled "with cause" upon 30 days written notice, but a right-to-cure period will be provided.

X.   **DRAFT CONTRACT:** Provider shall submit a draft contract with the proposal setting forth specific contract terms.

*[handwritten left margin: need contract]*

9.   **OBJECTIVES:** Each response will be evaluated as to its achievement and compliance with the following stated objectives:

A.   To deliver unimpeded, necessary healthcare services (including medical, dental and mental health services) to inmates (as set forth herein and as dictated by law) that can be audited against established standards.

*[handwritten left margin: Need Language]*

B.   To operate the healthcare program in a humane manner with respect to the inmate's right to basic healthcare services.

ACH001429

C.     To operate the healthcare program at full staffing and use only licensed, certified and professionally trained personnel.

D.     To implement a written healthcare plan with clear objectives, policies, and procedures.

E.     To maintain an open and cooperative relationship with the Sheriff's administration and staff.

F.     To maintain complete and accurate records of care and to collect, analyze and report health statistics on a regular basis.

G.     To operate the healthcare program in a cost-effective manner with full reporting and accountability to the Sheriff and Madison County.

10.     **SELECTION PROCESS:** One or more of the proposers may be invited to make oral presentations to the Sheriff or Madison County Commissioners, or to answer questions. Final award will be made to the proposer who meets the above-stated selection qualifications and is judged best able to provide a healthcare services system at the Detention Facility.

ACH001430



**ADVANCED**
CORRECTIONAL ✚ HEALTHCARE

August 3, 2006

Sheriff Blake Dorning
Madison County Sheriff's Department
100 Northside Square
Huntsville, Alabama 35801

Dear Sheriff Dorning:

I am sorry I did not get a chance to meet with you during my recent visit to Huntsville on July 24th and 25th, 2006. I came to Huntsville to review the status of the project after the first nineteen days of operation and to ensure that our new program of policies and procedures were beginning to take effect. I met with Nurse Administrator Charlotte Turner from 4:00 p.m. until 9:30 p.m. on the 24th and from 8:30 a.m. until 5:00 p.m. on the 25th. During that time we had an opportunity to review all aspects of the operation.

Dr. Arthur Williams appears to be functioning adequately however there are some areas that I felt needed to be addressed. For example, I have discussed various prescribing patterns with him as well as his need to see absolutely all patients and sign all charts every day when he comes in; he should be on-site five days a week. I introduced a new system of patient encounter forms to improve his level of documentation over what he previously has been doing. He appeared to understand the system and I think he will be able to implement it without difficulty. The main issue that continues to be a problem is his desire to occasionally leave the facility before he has addressed all the problems and seen all the patients. The contract calls for a total of twenty (20) hours per week, certainly this is more than adequate and he is being compensated for this. I have advised him that he must stay until all patients are seen every day. I do not think that 20 hours is necessary to accomplish this and I believe that 2-3 hours a day should be more than enough for this level of project. I will continue to work with him and to use Charlotte to monitor the actual number of hours he is in the facility. His overall medical skills and knowledge appear quite good and I don't think that will be an issue once he learns the specific prescribing patterns necessary for a good correctional physician.



DEFENDANT'S
EXHIBIT
21
Rich
PENGAD 800-631-6989

809 W. Detweiller Dr. Suite 806
P.O. Box 10260 Peoria, IL 61612-0260
Ph: (309) 692-8100    Fax: (309) 692-8106

I met with the site psychiatrist, Dr. Anakwenze, who has worked at the facility through at least two vendors; he worked with Southern Health Partners and Health Assurance. After reviewing his prescribing patterns under Health Assurance it was clear to me that he is prescribing medications based upon what patients want versus what the true mental health needs appear to be. I discussed this with him at length and instructed him in various techniques to try to cut down on unnecessary and abused medications such as Seroquel. At the time of Southern Health Partners there was no Seroquel being used at all. When Health Assurance came in they did not give any recommendations or advice so Dr. Anakwenze was led to believe that he could do whatever he felt like or whatever the inmate asked for. Consequently, at the time we began the project there were 22 prescriptions for Seroquel, a highly abused drug, in your facility. At the time of dictation of this letter, Charlotte has advised me that following my in-service and training session with Dr. Anakwenze he has been able to reduce the use of medications down to three and probably will reduce them one or two more, until the level has been reduced to an appropriate amount. I will continue to monitor his behavior and to be sure that things are going OK.

On the night of the 24th Charlotte and I interviewed another psychiatrist, Dr. Wicks, so that we would be prepared in case Dr. Anakwenze does not work out. Dr. Wicks was to return to the facility and meet with Major Weaver and Charlotte for a "walk through". At the time of this dictation I am not certain whether that has happened. We will continue to review all of the physicians however to be sure that they are functioning adequately.

I spoke to Dr. Green, our OB/Gynecologist, by telephone and he appears quite enthusiastic to assist us in the project. He will review all of our policies, procedures and proctols and sign off on them. This will ensure that the policies, procedures and protocols being used in the facility are approved by the specialist recommending them. This will add another level of protection to you personally should a lawsuit hit the facility.

I also met with Dr. Woods, our dentist; he appears to be handling all of the cases without difficulty. I discussed his policy and procedure and the need for him to sign-off on the dental policies to ensure that the dental care of these patients is being handled in an appropriate way, consistent with good correctional policy. He appears to understand this and seems quite enthusiastic to continue our relationship.

During my visit I held a lengthy in-service with the nursing staff to bring them up to speed with appropriate nurse documentation, nurse sick call and referral patterns.

ACH001245

As you will recall we had a major problem with the way jail medical records were being handled. For example, single pieces of paper would come in, be reviewed by they physicians, put in pile, and then placed in a box in no particular pattern. At the time we started the project, we found approximately 50 boxes of papers that needed to be filed. Later we found an additional 20 boxes of medical records that needed to be filed; all of this was months in arrears. We immediately implemented a new program for medical records and in the last 19 days all of the records generated since we have started the project are filed appropriately and, in fact, we now have enough extra time from our medical records staff that we are able to begin to file some of the back-log. At the time of this dictation, Charlotte tells me that we have emptied out two of the fifty boxes of past medical records. So we are making headway but it will probably take at least another three months to get all of the boxes filed and up-to-date.

We have now had an opportunity to review the skills of each particular nursing staff member and to determine the work loads for the facility. At the time of my review on the 25th of July Charlotte felt that we have 1.5 FTE's of medical records more than we need and 4.2 FTE's of nursing more than was necessary to run the project. At the time of this dictation, we have been notified that 100-150 additional inmates will be housed at the Madison County Jail requiring increased nursing staff. Based upon that I believe we can absorb these new patients without hiring any new people. We can simply reassign our existing staff members who do not have enough work. Charlotte will be drawing up a new staffing matrix which will be approved by Kathy Webster, and when completed, I will send you a copy of it for your approval.

Nursing sick calls are not going quite as well as I would like. I think they could be improved with more aggressive nursing care following the written protocols and having the doctor sign off. I think this would continue to lower the work load for the physicians and continue to deliver a higher and faster level of care to the inmate patient. We will continue to train and monitor our staff going forward.

I met with Major Weaver during my visit and gave him a complete update on the program. At that time I gave him an early example of the Incurred, But Not Received (IBNR) report that will be coming to you. I assume he has given this to you and you have had a chance to review it. If there are any changes that you would like, please let me know. As the months go by you will notice that this report gets longer and longer. There are almost always be some expenses that go back three, four, or even six months into the past. The Incurred, But Not Received, means that we believe there is a bill hanging out there but it hasn't been sent to us yet.

ACH001246

I have finished verbal negotiations, by phone, with Mr. David Federicks, CFO of Huntsville Hospital. He has consented to a 50% discount on the usual and customary fees and in addition has allowed us to contract with his reference laboratory for any blood work or laboratory studies that we may need. I called Julian Butler and Jeff Rich to discuss the new numbers with them and at this time have not heard back but I believe that these numbers will be satisfactory.

During my meeting with Mr. Butler and Mr. Rich I reviewed all of the updates and new policies, procedures and protocols and the results of these over the nineteen days since the beginning of the project. I believe they were satisfied with the progress to date.

In closing, we have had a very interesting first nineteen days - tremendous strides have been made. The huge problem in medical records has been corrected and we are in the process now of going back and catching up with all of the records that were not filed. Charlotte has advised me that she has run across many violations of the consent decree prior to when we started. She is going to prepair a report for us so that you will be able to see exactly those items that were in arrears, for example, Chronic Clinic, medical records, and what is presently being done to get us into compliance. Our physician staff appears to be adequate at this time; however they will need continued training and reassurance to ensure that they are operating at the level that you require. Overall, I am pleased but we have a long way to go.

Again thank you for allowing us to participate in this project. If you have any questions or concerns please contact me at any time.

Respectfully,

Norman R. Johnson, M.D.
President & CEO

Pc:     Jeff Rich
        Julian Butler
        Major Weaver
        Charlotte Turner, Nurse Administrator
        Kathy Webster, Medical Liaison Officer

ACH001247



**ADVANCED**
CORRECTIONAL✚HEALTHCARE

September 12, 2006

Sheriff Blake Dorning
Madison County Sheriff's Department
100 Northside Square, Room 206
Huntsville, Alabama 25801

Dear Sheriff Dorning:

It was good to see you during my recent trip to Huntsville on Friday, September 8, 2006. During my visit I had an opportunity to meet with Kathy Webster and Attorney Jeff Rich. Ms. Webster stated things were going very well and overall she felt the project was progressing nicely. I reviewed the type of reports she is receiving and noted she is not getting the pre and post staffing reports. I spoke to Charlotte Turner concerning this and all reports will now be sent to Kathy. She will sign-off on them to ensure that she is, not only receiving them, but agrees with our present staffing plans.

Nurse Turner has completed a long list of possible consent decree violations by the prior company. These have been reported to Jeff Rich and a complete list is in his possession. All of these violations have now been corrected and at the time of this dictation there are no areas of violation of the consent decree.

As you will recall, the medical records were in some degree of chaos. This has markedly improved and there are only four boxes of alphabetized records to be filed; one box is still rough and has not been alphabetized. There are still about 2,000 medical administration record sheets to be filed. This is a massive improvement from the prior situation in which we had 50 boxes of records that had not been appropriately filed.

During my visit I had an opportunity to review the documentation of all physicians and nurses. There are still areas in need of improvement and I performed in-services with Dr. Williams, as well as with the nurses. We will continue to monitor this closely to ensure medical records are appropriately documented.



DEFENDANT'S
EXHIBIT
22
Rich

809 W. Detweiller Dr. Suite 806
P.O. Box 10260 Peoria, Il. 61612-0260
Ph: (309) 692-8100    Fax: (309) 692-8106

A Continuing Quality Improvement (CQI) meeting has been set for 3:00 p.m. on Wednesday, October 18th, at the Huntsville Jail. At that meeting we will plan to have nursing staff, all doctors, Jeff Rich, Kathy Webster, Major Weaver, and you if time permits. The meeting should take about 1-1 ½ hours.

The policies and procedures have been completed and at the present time are in Jeff Rich's office. He is going to need a little more time to review them before finally approving them from a legal standpoint. We will await his advice.

The co-pays at the jail need to be raised and Jeff Rich is working on this. I sent a letter to him stating that, in my opinion, higher co-pays would certainly help to cut down on the workload as well as improve your cash flow.

Enclosed I have sent a copy of the Certificate of Liability Insurance which means the Madison County Jail Alabama and the Madison Sheriff's office has additional insurance. I showed this to Jeff Rich and he pointed out that these two entities are not legal entities and the names will need to be changed. I will contact our insurance agent, Rob Bielenberg, and see to it these are changed to an appropriate additional insured. It is important to note Mr. Rich still does not believe that the wording in the document is adequate. He understands we were led to believe we were going to get the exact wording he requested, and then at the last minute the company refused to do so. Jeff is now investigating other ways to handle this. For example, he is checking to see if we could somehow piggy-back onto the jail's insurance and be covered in that fashion. I believe he understands we have done everything we can at this point, including firing our prior insurance company and hiring a new one, and still have not been able to solve this problem.

With the jail population soon exceeding 1,000 we will have to look at the entire staffing program and additional employees may need to be hired. So far, we are doing fine and do not require any further staffing. We still have a couple of staff members that are weak but we will continue to work with them. If we cannot correct this problem we may need to remove them and replace them with more qualified staff. I am assured by Charlotte our salary base is very solid and should not be an impediment in hiring good, qualified employees.

ACH001237

In closing, things are going very well and again thank you for allowing us to assist you in this very important project. Please call me immediately if there are any issues or problems, or if I can assist you in any way.

Respectfully,

Norman R. Johnson, M.D.
CEO Advanced Correctional Healthcare

Enclosure:

05/15/2006  14:25   5056937565   CALLENDER CO   PAGE  02/02

# ACORD™  CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 09/05/2006

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|

CALLENDER & CO.
1615 CANDLETREE DR
PEORIA, IL  61614

| INSURED | INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|---|
| Advanced Correctional Healthcare<br>P.O. Box 10260<br>Peoria, IL  61612-0260 | INSURER A: WESTFIELD INS. CO. | |
| | INSURER B: NEW HAMPHIRE INS. CO. | |
| | INSURER C: ESSEX INS. CO. | |
| | INSURER D: | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS MADE  X OCCUR | CWP3409591 | 08/01/2006 | 08/01/2007 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>☐ POLICY ☐ PRO-JECT ☐ LOC | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| A | | **AUTOMOBILE LIABILITY**<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS<br>X SCHEDULED AUTOS<br>X HIRED AUTOS<br>X NON-OWNED AUTOS | CWP3409591 | 08/01/2006 | 08/01/2007 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY**<br>☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN  EA ACC<br>AUTO ONLY:  AGG | $<br>$ |
| A | | **EXCESS/UMBRELLA LIABILITY**<br>X OCCUR  ☐ CLAIMS MADE<br><br>☐ DEDUCTIBLE<br>☐ RETENTION  $ | CWP3409591 | 08/01/2006 | 08/01/2007 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | AGGREGATE | $ 1,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| B | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | WC3551445 | 08/01/2006 | 08/01/2007 | X WC STATU-TORY LIMITS  OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| C | | **OTHER**<br>MEDICAL PROFESSIONAL LIABILITY | GPD5304AZ | 08/21/2006 | 08/21/2007 | $1,000,000 EACH CLAIM<br>$3,000,000 AGGREGATE LIMIT | |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS**

Madison County Jail, AL and the Madison County Sheriff's Office, AL are included as additional insured under the General Liability and Professional Liability coverage if required by contract in writing.  Coverage applies to operations in correctional facilities.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Madison County Jail<br>100 Northside Square<br>Huntsville, AL 35801 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __10__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br>AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)                                      © ACORD CORPORATION 1988

Received Time Sep. 19.   1:23PM

ACH001239



# CALLENDER & CO.

1615 CANDLETREE DRIVE/PEORIA, ILLINOIS 61614/309-693-1313/FAX 309-693-7969

August 29, 2006

Norman Johnson, MD
Advanced Correctional Healthcare
P.O. Box 10260
Peoria, IL  61612-0260

Dear Dr. Johnson:

RE: Madison County - add'l insured issue

As you know we have been working to accommodate some specific wording regarding the additional insured request from Madison County, AL.  Listing additional insured's under a General Liability policy is fairly routine and can be accomplished without too much resistance on the part of the carrier, but that is not the case when it comes to Medical Professional Liability.  Professional carriers typically will not list additional insured's and when, or if, they do, want to avoid extremely broad definitions  of who will be included in the coverage extension.

The wording in the contract reads as follows: *Madison County, its officers, agents and employees, and the Sheriff and all agents and employees of the Sheriff.*  A Medical Professional Liability policy only provides coverage for medical malpractice, committed by medical professionals, and coverage extended via an additional insured endorsement would only cover the additional insured for acts committed by ACH. It would not cover the additional insured for acts of their employees, agents, etc. Since their employees are, in most cases, not medical professionals the carrier does not want to create the possibility some liberal interpretation that an act committed by an employee, agent, etc of the additional insured is grounds for coverage. Again, the additional insured listed is only covered for their vicarious liability resulting from the acts of ACH.

The new carrier, Essex Insurance Co., has agreed to accommodate the additional insured request by listing as the additional insured's 1) Madison County Jail, AL and 2) The Madison County Sheriff's Office, but will not list the words *its officers, agents and employees.*  I have to believe Madison County's intent is to try and make sure they are protected under ACH's coverage in the event ACH, through it's actions, brings them into a claim situation. This should accomplish that and at the same time not expose the carrier to being drawn into a claim that was, in fact, caused by one of the additional insured's.  I would assume the County and Sheriff, rightfully so, cover themselves against claims deriving from their own activities.

We have searched the marketplace and cannot find a carrier willing to include the  exact wording referred to above but I am in hopes the new carrier's additional insured approach will be understood and acceptable to Madison County.  Thank you.

Sincerely,
Callender & Co.

Rob Bielenberg, CPCU

RB:ls

---

*LARRY K. BIELEMA • ROBERT D. BIELENBERG, CPCU • JEFFREY A. PETEFISH, CIC • GORDON S. PETERS • FREDERICK S. PETERS*

 INSURANCE SINCE 1861

ACH001240



September 14, 2006

Jeff Rich
305 Church Street
Suite 800
Huntsville, Alabama 35801

Dear Mr. Rich:

Thank you for meeting with me in your office on September 8, 2006. Enclosed you will find a copy of the letter that I am sending Sheriff Dorning concerning my evaluation of the jail medical project.

During our meeting we discussed the insurance situation and you noted the prior company had eventually been able to get 8th Amendment insurance through a company called Landmark American Insurance Company. I have contacted our insurance agent, Rob Bielenberg, (309) 693-1313, and discussed your desire to continue our pursuing the wording that you require; I also mentioned the Landmark American Insurance Company. He said this was an old insurance company we had used in the past and we did not continue our insurance with them because of the high cost. I believe we had gone to GenStar Insurance Company at that time. He was unaware that they provided a pure 8th Amendment insurance, but I have asked him to contact them and then to discuss this with you. I gave him your telephone number and expect he will have called you by the time this letter arrives.

Enclosed also you will find a list of medications and an official med package that we recommend you send to any pharmacies you would like to have a competing bid. We then will compile the numbers we are given with the existing company, IHS, and give you the results. A decision can be made then on whether to stay with the existing company or, to alter the contract if necessary, to go with a local pharmacy.



We appreciate your willingness to work with us on this insurance issue and I will keep you informed of any changes as they develop with the Madison Jail project.

Respectfully

Norman R. Johnson, M.D.
CEO Advanced Correctional Healthcare

Enclosures:

ACH001229

| For Price Comparison | | | |
|---|---|---|---|
| MEDICATION | QTY | PRICE | |
| ABILIFY 30 MGS | 30 | | |
| ACETAMINOPHEN 500MG TABLET | 120 | | |
| ACETOMINIPHEN / COD GRAIN 1/2 | 30 | | |
| ACYCLOVIR 400 MGS | 30 | | |
| ACYCLOVIR 400 MGS | 60 | | |
| ACYCLOVIR 800 MGS | 60 | | |
| ALBUTEROL 90 MCG INHALER | 17 | | |
| ALBUTEROL 90MCG INHALER | 45 | | |
| ALLOPURINOL 100 MG TABLET | 90 | | |
| AMITRIPTYLINE 100MG TAB | 30 | | |
| AMITRIPTYLINE 150MG TAB | 30 | | |
| AMITRIPTYLINE 25MG TAB | 30 | | |
| AMITRIPTYLINE 50MG TAB | 30 | | |
| AMITRIPTYLINE 50MG TAB | 60 | | |
| AMITRYPTYLINE 75MG TAB | 30 | | |
| AMOX/CLAV 875MG TAB | 14 | | |
| AMOXICILLIN 250 MG CAPSULE | 30 | | |
| AMOXICILLIN 500MG CAPSULE | 20 | | |
| ASPIRIN 325MG TABLET | 30 | | |
| ASPIRIN 81MG TABLET | 30 | | |
| ATENOLOL 100MG TABLET | 30 | | |
| ATENOLOL 25MG TABLET | 30 | | |
| ATENOLOL 50 MGS | 30 | | |
| ATENOLOL 50MG TABLET | 30 | | |
| AZATHIOPINE 50 MGS | 60 | | |
| BENZTROPINE 0.5MG TABLET | 60 | | |
| BENZTROPINE MES 1MG TABLET | 60 | | |
| BUPROPION 100 mg | 70 | | |
| CALC ANTAC ASSORT TABS | 150 | | |
| CAPTORIL 25MG TABLET | 30 | | |
| CARBAMIDE PEROXIDE 6.5% | 15 | | |
| CEPHALEXIN 500MG CAPSULE | 20 | | |
| CHLORPHENIRAMINE 4MG TAB | 30 | | |
| CHLORPROMAZINE 100MG TABLET | 30 | | |
| CHLORPROMAZINE 200MG TABLET | 60 | | |
| CHLORPROMAZINE 25MG TABLET | 60 | | |
| CHLORPROMAZINE 50MG  TABLET | 60 | | |
| CIMETIDINE 300MG TABLET | 30 | | |
| CIMETIDINE 400MG TABLET | 60 | | |
| CLINDAMYCIN 150MG CAPS | 14 | | PG 1 |

ACH001230

 Price Comparison for Medications

Page 2

| | | | |
|---|---|---|---|
| CLONAZEPAM 1MG TABLET | 60 | | |
| CLONAZEPAM 2MG TABLET | 60 | | |
| CLONIDINE HCL 0.1MG TABLET | 30 | | |
| CLONIDINE HCL 0.1MG TABLET | 60 | | |
| CLONIDINE HCL 0.2MG TABLET | 60 | | |
| CLOTRIMAZOLE 1% CREAM | 15 | | |
| COMBIVENT INHALER | 15 | | |
| COMBIVIR 150 MGS | 60 | | |
| DEPAKOTE 250MG TABLET | 60 | | |
| DEPAKOTE 500 MGS | 60 | | |
| DEPAKOTE ER 500MG TABLET | 50 | | |
| DESONIDE 0.05% | 60 | | |
| DIAZAPAM 2 MG | 60 | | |
| DIPHENHYDRAMINE 25MG CAPS | 60 | | |
| DIPHENHYDRAMINE 50MG CAPS | 60 | | |
| DOCUSATE SOD 100MG CAPSULE | 20 | | |
| DOXEPIN 50MG CAPSILE | 60 | | |
| DOXEPIN 75MG CAPSULE | 30 | | |
| DOXYCYCLINE 100MG CAPSULE | 14 | | |
| DOXYCYCLINE 100MG CAPSULE | 20 | | |
| ENALAPRIL 10MG TABLET | 30 | | |
| ENALAPRIL 5 MG | 30 | | |
| ENALAPRIL 5MG TABLET | 30 | | |
| EPIPEN AUTO INJEC | 1 | | |
| ERY-TAB 500MG TABLET EC | 28 | | |
| ERYTHROMYCIN ST 500MG TAB | 14 | | |
| FLUCONAZOLE 150MG TABLET | 1 | | |
| FLUOXETINE 10MG CAPSULE | 30 | | |
| FLUOXETINE 20MG CAPSULE | 30 | | |
| FUROSEMIDE 20MG TABLET | 30 | | |
| FUROSEMIDE 40MG TABLET | 60 | | |
| FUROSEMIDE 80MG TABLET | 30 | | |
| GABAPENTIN 300 MGS | 60 | | |
| GENTAMYCIN OPTH DROP | 30 | | |
| GEODON 20 MGS | 30 | | |
| GEODON 40 MGS | 60 | | |
| GEODON 60 MGS | 30 | | |
| GEODON 80 MGS | 30 | | |
| GLIPIZIDE 10MG TABLET | 60 | | |
| GLIPIZIDE 5 MG TABLET | 60 | | |
| GLIPIZIDE ER 10 MG TABLET | 60 | | |
| HALOPERIDOL 2MG TABLET | 60 | | PG 2 |

ACH001231

| | | | |
|---|---|---|---|
| HALOPERIDOL 5MG TABLET | 60 | | |
| HCTZ 25MG TABLET | 30 | | |
| HCTZ 50MG TABLET | 30 | | |
| HUMULIN 70/30 | 10 | | |
| HUMULIN R | 10 | | |
| HYDROCORTISONE 1% CREAM | 30 | | |
| HYDROCORTISONE 2.5% CREAM | 30 | | |
| HYDROXYZINE PAM 50MG CAP | 60 | | |
| IBUPROFEN 200MG TABLET | 120 | | |
| IBUPROFEN 400MG TABLET | 30 | | |
| IBUPROFEN 600MG TABLET | 30 | | |
| IBUPROFEN 800MG TABLET | 30 | | |
| ISONIAZID 300MG TABLET | 30 | | |
| ISOSORBIDE MN 30MG TAB SA | 30 | | |
| KLOR-CON M10 10MEQ TAB | 30 | | |
| KLOR-CON M20 20MEQ TAB | 60 | | |
| LEVAQUIN 250MG TABLET | 30 | | |
| LEVAQUIN 500MG TABLET | 14 | | |
| LEVOTHROID 125MCG TABLET | 30 | | |
| LEVOTHROID 150MCG TABLET | 30 | | |
| LEVOTHROID 175MCG TABLET | 30 | | |
| LEVOTHROID 25MCG TABLET | 30 | | |
| LEVOTHROID 75MCG TABLET | 30 | | |
| LEXAPRO 20 MGS | 30 | | |
| LIPITOR 10 MGS       * | 30 | | |
| LIPITOR 20 MGS       * | 30 | | |
| LIPITOR 40 MGS       * | 30 | | |
| LISINOPRIL 10MG TABLET | 30 | | |
| LISINOPRIL 20 MGS | 30 | | |
| LISINOPRIL 20 MGS | 60 | | |
| LISINOPRIL 20MG TABLET | 30 | | |
| LITHIUM CARB 300MG CAP | 60 | | |
| LITHIUM CARB 300MG CAP | 90 | | |
| LOPERMIDE 2 MG | 60 | | |
| LOVASTATIN 20MG TABLET | 30 | | |
| LOVENOX    (30mg) | 7 | | |
| METAMUCIL SF ORNG PACKET | 30 | | |
| METFORMIN 500MG TABLET | 120 | | |
| METFORMIN 500MG TABLET | 60 | | |
| METFORMIN HCL 1000MG TABLET | 60 | | |
| METRONIDAZOLE 500MG TABLET | 14 | | |
| MICONAZOLE NIT 2% CREAM | 60 | | PG3 |

ACH001232



Price Comparison for Medications                               Page 4

| | | | |
|---|---|---|---|
| MILK OF MAG SUSP | 480 | | |
| MYTAB GAS 80MG CHEW TAB | 30 | | |
| NAPROXEN 375MG TABLET | 14 | | |
| NAPROXEN 500MG TABLET | 60 | | |
| NAPROXEN SOD 220MG TABLET | 60 | | |
| NAPROXEN SOD 550MG TABLET | 30 | | |
| NEO/POLY/HC OTIC SOLUTION | 10 | | |
| NITROQUICK 0.4MG 4X25 TAB | 25 | | |
| NOVOLIN 70/30 100UNIT/ML VL | 20 | | |
| NOVOLIN N 100UNIT/ML VIAL | 20 | | |
| NOVOLIN R | 10 | | |
| ORAJEL REG STR TOOTHACHE | 10 | | |
| PAROXETINE 20MG TABLET      * | 30 | | |
| PAROXETINE 20MG TABLET      * | 60 | | |
| PAROXETINE 40MG TABLET | 30 | | |
| PAXIL CR 25 MG | 30 | | |
| PENICILLIN VK 500MG TABLET | 28 | | |
| PHENOBARBITAL 64.8 MG | 60 | | |
| PHENYTOIN 100MG CAPS | 90 | | |
| PINK BISMUTH LIQ | 237 | | |
| POTASIUM 10 MEQ | 30 | | |
| PREDNISONE 10MG TABLET | 30 | | |
| PRENATAL PLUS TABLET | 30 | | |
| PREVACID 15MG CAPSULE | 30 | | |
| PRILOSEC OTC 20MG TABLET | 60 | | |
| PROBENECID/COLCHICINE TABS | 14 | | |
| PROMETHAZINE 25 MGS | 30 | | |
| PROPRANOLOL 10MG TABLET | 20 | | |
| PROPRANOLOL 40MG TABLET | 60 | | |
| QVAR INHALER 40 MCG | 1 | | |
| RANITIDINE 150MG TABLET | 60 | | |
| REYATAZ 150 MG | 60 | | |
| RISPERDAL 2 MG      * | 60 | | |
| RISPERDAL 4 MG | 60 | | |
| RISPERDAL 4MG TABLET | 30 | | |
| SEROQUEL 100MG TABLET      * | 60 | | |
| SEROQUEL 200MG TABLET      * | 60 | | |
| SEROQUEL 300 MGS | 60 | | |
| SEROQUEL 50 MGS      * | 30 | | |
| SPIRONOLACTONE 100MG TAB | 20 | | |
| SPIRONOLACTONE 25MG TABLET | 30 | | |
| SUCRALFATE 1GM TABLET | 60 | | PG 4 |

ACH001233

| | | | |
|---|---|---|---|
| SULFATRIM DS TABLET | 60 | | |
| SUSTIVA 600 MGS | 30 | | |
| TETRACYCLINE 250MG CAPS | 60 | | |
| TRAZODONE 100MG TABELT | 60 | | |
| TRAZODONE 100MG TABELT | 30 | | |
| TRIAMCINOLONE .0.1% CREAM | 30 | | |
| TRILEPTAL 300MG TABLET | 30 | | |
| TRILEPTAL 600MG TABLET | 30 | | |
| TRIPLE ANTIBIOTIC OINTMENT | 30 | | |
| TUBERSOL PPD 10 TEST | 1 | | |
| TUBERSOL PPD 50 TEST | 1 | | |
| VALPROIC ACID 250MG CAPSULE | 60 | | |
| VALPROIC ACID 250MG CAPSULE | 120 | | |
| VERAPAMIL 240 MGS | 30 | | |
| VITAMIN B-1 100MG TABLET | 30 | | |
| VITAMIN B-6 TABLET | 30 | | |
| WARFARIN SOD 10MG TABLET | 30 | | |
| WARFARIN SOD 2.5MG TABLET | 30 | | |
| WARFARIN SOD 5MG TABLET | 60 | | |
| WARFARIN SOD 5MG TABLET | 30 | | |
| WARFARIN SOD 6MG TABLET | 30 | | |
| WARFARIN SOD 7.5MG TABLET | 30 | | |
| WELBUTRIN XL 150 MGS | 30 | | |
| WELBUTRIN XL 300 MGS | 30 | | |
| ZITHROMAX 250MG TABLET | 4 | | |
| ZOCOR 10 MGS | 30 | | |
| ZOCOR 20 MGS | 30 | | |
| ZOLOFT 100 MGS | 30 | | |
| ZOLOFT 50 MGS        * | 60 | | |
| ZYPREXA 10MG TABLET | 30 | | |
| ZYPREXA 10MG TABLET | 60 | | |
| ZYPREXA 20MG TABLET | 30 | | |
| ZYPREXA 20MG TABLET | 60 | | |
| **Totals** | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | PG 5 |

ACH001234

In addition to the bid, please acknowledge the following are included in your pharmacy program:

- Blister-packed medications
- Accepts returns on all blister-packs with an initial value of $2.95 or more and up to 90 days of expiration date and credits at 100% of remaining value
- Program includes medication cart for the facility
- Program includes fax machine for the medical unit
- Free delivery to the facility

Please sign and return with your bid. Thank you.

_____          _____
(NAME & TITLE)                              (DATE)



**ADVANCED**
CORRECTIONAL⊕HEALTHCARE

October 23, 2006

Mr. Jeff Rich
Madison County Sheriff's Dept.
100 Northside Square
Huntsville, AL 35801

Dear Mr. Rich,

Thank you for your letter of October 16, 2006. We have continued to discuss this issue
with Robert Bielenberg from Callendar Insurance and as you had mentioned, he has been
talking to you about this. I have faxed a copy of your letter to Mr. Bielenberg and he will
write a letter to you concerning the present status of his search and where we are on all of
these issues. He clearly understands that I view this is in our best interest for the
company as well as for Madison County to get these issues resolved as quickly as
possible.

I am sorry you were unable to attend the continuing quality improvement meeting at the
county jail on October 18, 2006. Enclosed you will find the minutes of that meeting.
Since everyone advised me they had never had a CQI meeting in the past, I started by
explaining exactly what a Continuing Quality Improvement meeting consists of and how
it is to be conducted. We followed that by the reading of the action items on the strategic
plan and then review of the statistics. The most important things that came out of the
statistics was that the physician is still seeing about twice the number of patients that he
should be given the size of the facility. This continues to be a training issue with the
nurses. The nurses are seeing about the number of nursing sick calls I would have
estimated. The balance of the statistics appeared relatively within normal limits with the
exception of the number of people on psychotropic drugs. This number of about 100%
higher than other facilities of similar make up. We believe this is because there is a lack
of acute psychiatric care hospital bed capacity in the area. Also, we may be counting a
number of sleeping medications which should be reduced. Charlotte will continue to
work with our psychiatrist over these issues.

As we reviewed, the action items from the CQI meeting, the one action item that is
probably the most important to focus on from your standpoint is the Policies and
Procedures. Please advise me if you have any changes that you would like to make. It is
my understanding after these had been reviewed by Nurse Administrator Charlotte
Turner and Kathy Webster, that these are the policies under which we are presently
operating.

**DEFENDANT'S
EXHIBIT**
25
Rich

During the meeting we had an opportunity to discuss prescribing practices and policy. The psychiatrist continues to use medications simply because they have been used by a patient before, not because they are indicated by any particular disease process. Again, I advised him that this is not a standard of care and that medications need to be prescribed specifically for very specific disease processes. Once again, he seemed to understand. Time will tell whether or not he will be able to follow through.

At the end of the meeting, we reviewed the financial status of the project and overall considering the multiple very severe cases that we had, including two cardiac arrests and what amounted to almost double billing for the first months medications, we came out quite well. I am enclosing the review of the total medication expense from March 2006 through September 2006. Included in that is a bar graph which dramatically shows that when we came onsite in the month of July, that was the absolute peak of expense. The costs began to drop precipitously following that. At this time, we are sitting in the $18,000.00 per month range, I suspect with our increased census going to over 1000 patients that we will probably level out at around $20,000.00 per month. Included also, you will find an "incurred but not received" (IBNR) report, which shows that our best guess at this moment is that we have $9,176.00 outstanding that we probably will receive at some time in bills. In addition, our review of bills received and paid (updated through 10/24/06 indicates that we have received $162,866.70. Of that, $24,604.96 could be transferred back to the inmate for payment either because they had their own insurance from Public Aid or some other form of insurance. Of the balance, $138,261.74 we were able to obtain discounts of $60,241.58 so that out of the total $162,866.70 we have paid $78,020.16 to date. This brings the total of pharmacy, total bills paid and incurred but not received to $156,887.88. Of which we have actually paid $147,711.88 and we await the IBNR numbers as they come in. Since the first quarter was an abbreviated quarter, and was actually short about a week, the quarterly number of $150,000 is prorated to $138,000.00. Final reports will come from our Accounting Department but any financial adjustment will need to be made only on real dollars and will not include the "incurred but not received" since we do not know what this will be.

During the meeting, I announced that we are looking at another discounted healthcare provider system that we can use at Huntsville. This will help us to get discounts on all of the physicians as well as some of the laboratories and other providers. I have enclosed a copy of that network, called "Healthchoice of Alabama". I will keep you updated on that progress.

In the last month, it has been necessary to remove a couple of our nurses, both for cause. We are in the process of replacing them at this time. There is an LPN that will work out very well in the mental health nursing position. We have discussed this with the administrative staff at the jail and they seem very satisfied with this person. Since we really cannot wait for a final opinion and correction of the contract, we are moving forward with the permission of the administrative staff at the jail to ensure that this position stays filled until a final change in the contract can be made.

ACH001225

Enclosed also you will find a new staffing matrix requested by nurse administrator, Charlotte Turner and approved by Kathy Webster and Major Weaver which will include the following changes:

#1   Moving 20 hours of medical records from the Courthouse to the Annex.
#2   Moving 2.1 FTE's of RN from the main facility to the Annex.
#3   Hiring 832 hours of additional LPN to support the staffing in the main facility.

Because this calls for expanded staffing above our existing contract, pursuant to the increase in census in the jail, we would ask for $19,311.00 increase in the contract to handle the increased hours.

Again, thank you for your support.  If you have any questions, please feel free to contact me at any time.

Respectfully,

Norman R. Johnson, M.D.
CEO
Advanced Correctional Healthcare

NRJ/ll
enc

ACH001226



**ADVANCED**
CORRECTIONAL+HEALTHCARE

June 8, 2007

Jeff Rich, Attorney
305 Church Street
Suite 800
Huntsville, Alabama 35801

Dear Mr. Rich:

Thank you for allowing me to make my brief presentation to you and the officials in your office on June 4, 2007. As you will recall we discussed a number of possible changes to the contract which would start with the renewal of the contract in October 2007. I have enclosed a draft of the revised contract for your review.

### Additions:

- Increase the average daily census from 900 to 1,000. Increases contract $36,500.00.
- Increase the $150,000 off-site pool, which includes medications, to $165,000. This will continue under review until we have negotiated a more favorable rate with the hospital.
- Annual 2 ½% increase on the base rate for the contract. Increase of $61,162.00
- Reduce the per diem rate from $1.50 to $1.00
- Change the contract to a five (5) year contract and reduce the maximum percent of increase from 5% down to 3%.

### Deletions:

- Remove the verbiage concerning 20 hours of doctor time per week. This would allow for the doctor to be available five days a week for as long as needed.
- Remove the obligation to purchase durable equipment and reduce the contract $12,000.
- Reduce staffing schedule by a ½ FTE billing clerk; reduces the contract $5200 per year.
- All durable equipment is the property and responsibility of the sheriff.
- Reduce the per diem rate from $1.50 to $1.00
- Change the contract to a five (5) year contract and reduce the percent of increase from 5% down to 3%.



DEFENDANT'S
EXHIBIT
26
Rich

4625 N. University Street • Peoria, IL 61614-5828
P.O. Box 10260 • Peoria, IL 61612-0260
Ph: (309) 692-8100    Fax: (309) 692-8106

At the end of our meeting a few action items were noted.

1.  Renegotiate our 50% discount with the hospital to receive a more favorable rate. This is to be started by Mr. Gillespie, Sheriff Blake and Julian from your office. They will contact the hospital administration to update them on the proposed changes and that we believe a more positive rate would be appropriate. Upon their notification that the ground work has been laid, I will get my team involved with negotiating a more favorable rate.

2.  Complete the final details of the contract prior to contract renewal on October 1, 2007.

3.  Offer a five (5) year contract that retains the sheriff's 90 day cancellation for no cause and reduces the annual 5% increase down to 3%.

4.  Break down the off-site costs between those clients that are specifically related to the sheriff and those that are related to the sheriff's contract with the city. Charlotte Turner will be responsible for this.

Overall, this was an extremely productive meeting. I feel good about the status of the project and about our plans for moving forward. Again thank you for allowing me to make this brief presentation and I look forward to continuing to work with you.

Respectfully,

Norman R. Johnson, M.D.
CEO Advanced Correctional Healthcare

Enclosure:

ACH000934


**CORRECTIONAL✛HEALTHCARE**

July 7, 2009

Sheriff Blake Dorning
Madison County Sheriff's Department
100 Northside Square
Huntsville, Alabama 35801

Dear Sheriff Dorning:

It was good to see you at the Fort Lauderdale National Sheriffs' Association meeting. I
am glad to hear that things continue to go well with the health care program at your
facility.

The program has been very stable for quite a while now. I had some concerns after we
lost our psychiatrist but we have located another psychiatrist who is working out well
and seems to be a good fit for the facility. Overall, things remain quite. There are no
active medical lawsuits at this time which is always good. And since we have started
the project there have been no successful lawsuits.

Again, thank you for allowing us to assist you in this very important project and I look
forward to seeing you at our next meeting.

Respectfully,

Norman R. Johnson, M.D., CEO
Advanced Correctional Healthcare
309-648-3056





**ADVANCED**
CORRECTIONAL✚HEALTHCARE

July 27, 2009

Mr. Jeff Rich
Sirote & Permutt, PC
305 Church Street
Huntsville, AL 35801

**RE: Advanced Correctional Healthcare Certificate of Insurance for Correctional Healthcare**

Dear Mr. Rich,

Please find attached the current certificate of insurance denoting additional insured coverage
at the Madison County Detention Facility for correctional healthcare. This certificate names
Madison County and the Sheriff of Madison County as additional insured and identifies the
levels of coverage carried by Advanced Correctional Healthcare for the County, ACH physicians
and nurse employees while providing services to the inmates of your facility. The coverage
period for this insurance is extended until August 1, 2010. Please review this information and
file a copy for your records. If there are any questions, please feel free to contact me. We
appreciate the opportunity to deliver a higher standard of evidence-based, quality, affordable
healthcare to the inmates of the county.

Respectfully,

Neil Leuthold
President
Advanced Correctional Healthcare

Enclosures:

3922 W. Baring Trace • Peoria, IL 61615-2500



DEFENDANT'S
EXHIBIT
28
Rich

ACH000383

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 07/24/2009

| PRODUCER | |
|---|---|
| CALLENDER & CO. 1615 CANDLETREE DR PEORIA, IL  61614 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

| INSURED | INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|---|
| Advanced Correctional Healthcare P.O. Box 10260 Peoria, IL  61612-0260 | INSURER A: WESTFIELD INS. CO. | |
| | INSURER B: NATIONAL UNION (AIG) | |
| | INSURER C: ESSEX INS. CO. | |
| | INSURER D: | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | GENERAL LIABILITY X COMMERCIAL GENERAL LIABILITY  CLAIMS MADE X OCCUR | CWP3409591 | 08/01/2009 | 08/01/2010 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY  PRO-JECT  LOC | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| A | | AUTOMOBILE LIABILITY  ANY AUTO  ALL OWNED AUTOS X SCHEDULED AUTOS X HIRED AUTOS X NON-OWNED AUTOS | CWP3409591 | 08/01/2009 | 08/01/2010 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY  ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN  EA ACC AUTO ONLY:  AGG | $ |
| A | | EXCESS/UMBRELLA LIABILITY X OCCUR  CLAIMS MADE | CWP3409591 | 08/01/2009 | 08/01/2010 | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | AGGREGATE | $ 10,000,000 |
| | | DEDUCTIBLE  RETENTION  $ | | | | | $ |
| | | | | | | | $ |
| B | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | WC9594879 | 08/01/2009 | 08/01/2010 | X WC STATU- OTH- TORY LIMITS  ER | |
| | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| C | | OTHER MEDICAL PROFESSIONAL LIAB., incl CIVIL RIGHTS | MM-817251 | 08/01/2009 | 08/01/2010 | $1,000,000/$3,000,000 | |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS**

Madison County, AL and the Sheriff of Madison County, AL are included as additional Insured under the General Liability and Professional Liability coverage.  Coverage applies to ACH operations in correctional facilities only.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Madison County Jail 100 Northside Square Huntsville, AL 35801 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __10__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)                                                      © ACORD CORPORATION 1988

ACH000384



**ADVANCED**
Correctional Healthcare

------------------------------------------------ A Higher Standard. Delivered.

August 1, 2011

Madison County Jail
Chief Deputy Jail Admin. Steve Morrison
100 Northside Square
Huntsville, AL 35801

RE: Advanced Correctional Healthcare Certificate of Insurance for Correctional Healthcare

Dear Administrator Morrison,

Please find enclosed the current certificate of insurance denoting coverage at the
Madison County Sheriff's Department for correctional healthcare. This certificate identifies
the levels of coverage carried by Advanced Correctional Healthcare for the ACH
physicians and nurse employees while providing services to the inmates of your facility.
The coverage period for this insurance is extended until August 1, 2012. Please review this
information and file a copy for your records.

If there are any questions, please feel free to contact me. We appreciate the opportunity
to deliver a higher standard of evidence-based, quality, affordable healthcare to the
inmates of the county.

Respectfully,

Neil Leuthold
President
Advanced Correctional Healthcare
309-692-8100 (office)
309-453-4711 (cell)
nleuthold@advancedch.com

Encl.

NEL/edb



DEFENDANT'S
EXHIBIT

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 7/29/2011 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| CALLENDER & CO.<br>1615 CANDLETREE DR<br>PEORIA, IL  61614 | PHONE (A/C, No, Ext): 309 693-1313 | FAX (A/C, No): 309 693-7969 |
| | E-MAIL ADDRESS: | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A: WESTFIELD INS. CO. | |
| INSURED  Advanced Correctional Healthcare<br>3922 Baring Trace<br>Peoria, IL  61615 | INSURER B: CHARTIS INC | |
| | INSURER C: ESSEX INS. CO. | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

## COVERAGES                CERTIFICATE NUMBER:                REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY<br>☒ COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS-MADE ☒ OCCUR | ☒ | | CWP3409591 | 08/01/2011 | 08/01/2012 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| A | AUTOMOBILE LIABILITY<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS ☒ SCHEDULED AUTOS<br>☒ HIRED AUTOS ☒ NON-OWNED AUTOS | | | CWP3409591 | 08/01/2011 | 08/01/2012 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | ☒ UMBRELLA LIAB ☒ OCCUR<br>☐ EXCESS LIAB ☐ CLAIMS-MADE | | | CWP3409591 | 08/01/2011 | 08/01/2012 | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | | AGGREGATE | $ 10,000,000 |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | WC1646222 | 08/01/2011 | 08/01/2012 | ☒ WC STATU-TORY LIMITS / OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| C | MEDICAL PROFESSIONAL<br>LIAB incl CIVIL RIGHTS | | | MM-820821 | 08/01/2011 | 08/01/2012 | $1mil/$3mil | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

Madison County, AL and the Sheriff of Madison County, AL are included as additional insured under the General Liability and Professional Liability coverage.  Coverage applies to ACH operations in correctional facilities only.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Madison County Jail<br>100 Northside Square<br>Huntsville, AL 35801 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2010 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2010/05)          The ACORD name and logo are registered marks of ACORD

ACH001144



## MADISON COUNTY COMMISSION

JEFF RICH
*County Attorney*

July 9, 2014

### VIA ELECTRONIC MAIL - drj@advancedch.com
### READ RECEIPT REQUESTED

Norman R. Johnson, M.D.
Advanced Correctional Healthcare, Inc.
3922 West Baring Trace
Peoria, Illinois 61615-2500

**Re:**   **Robert Elliott, as the Personal Representative of the Estate of Nikki Listau v.
Madison County, Alabama, et al.; In the United States District Court for the
Northern District of Alabama; Case Number 5:14-cv-01309-CLS; File #2013-182**

Dear Dr. Johnson:

Please find attached a copy of a Complaint filed in the above-referenced matter. Nikki Listau
was an inmate in the Madison County Detention Facility and was admitted to Huntsville Hospital
during her incarceration, where she later died.

Please consider this letter notice of Madison County, Alabama's and Sheriff Blake Dorning's
demands for indemnification pursuant to the Healthcare Services Agreement for the Madison
County Detention Facility entered into between Madison County, Alabama, Blake Dorning and
Advanced Correctional Healthcare, Inc. In addition, I request that you provide notice to the
insurer referenced in the Agreement. Sheriff Dorning and Madison County should be additional
insureds of the insurer and demand defense and indemnification under the Policy.

Sincerely,

Jeff Rich
County Attorney

JJR/cbe
Attachment



DEFENDANT'S
EXHIBIT
31
Rish

100 Northside Square Suite 700 · Huntsville, Alabama 35801-4820
Telephone:  256.519.2061 · Facsimile - 256.519.2059 · Email – jrich@madisoncountyal.gov

ACH001819

c:   Sheriff Blake Dorning (via Electronic Mail, w/Attachment)
     Honorable Dale W. Strong (via Electronic Mail, w/Attachment)
     Honorable Roger Jones (via Electronic Mail, w/Attachment)
     Honorable Steve Haraway (via Electronic Mail, w/Attachment)
     Honorable Eddie Sisk (via Electronic Mail, w/Attachment)
     Honorable Phil Vandiver (via Electronic Mail, w/Attachment)
     Honorable Phil Riddick (via Electronic Mail, w/Attachment)
     Honorable Bob Harrison (via Electronic Mail, w/Attachment)
     Kevin Jones (via Electronic Mail, w/Attachment)

ACH001820

FILED
2014 Jul-08  PM 01:1(
U.S. DISTRICT COURT
N.D. OF ALABAM/

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ROBERT ELLIOTT, as the personal representative of the Estate of Nikki Listau, | ) ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | CASE NO. |
| MADISON COUNTY, ALABAMA; ADVANCED CORRECTIONAL HEALTHCARE, INC.; BLAKE DORNING; STEVE MORRISON; ARTHUR M. WILLIAMS, M.D.; PAMELA BATIE; _____ POTHIER; CHRISTINE COLLIER; VANESSA FIELDS; NICK WALLACE; _____ GUYTON; RANDY HOOPER; MICHELLE KIRK; DEONDRA MONTGOMERY; TANYA JONES; and TINA ADAMS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff Robert Elliott complains of defendants, stating as follows:

### Nature of the Action

1.    This is a civil action brought by Elliott, whose decedent, Nikki Listau,

ACH001821

was denied certain constitutional rights by defendants while incarcerated in the Madison County Jail. Specifically, defendants were deliberately indifferent to Listau's serious medical needs in violation of Listau's rights as a pretrial detainee under the Fourteenth Amendment to the United States Constitution. Plaintiff also brings state law claims against the health care defendants.

### Jurisdiction and Venue

2.      This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and Title II of the Americans with Disabilities Act. The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

3.      This judicial district is an appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the suit happened in this judicial district.

### Parties

4.      Robert Elliott is of legal age and a citizen and resident of the state of Alabama. He resides in Madison County, Alabama.

5.      Defendant Madison County, Alabama is an Alabama county. It is responsible for funding the Madison County Jail, including medical care at the jail. It contracted with defendant Advanced Correctional Healthcare, Inc. to provide

2

ACH001822

medical services at the Madison County Jail.

6.  Defendant Advanced Correctional Healthcare, Inc. (ACH) is a private for-profit corporation that is under a contractual obligation to provide medical care for inmates in the Madison County Jail.

7.  Defendant Arthur M. Williams, M.D. is a physician who was employed by ACH to provide physician medical services and to be the director of the medical program for inmates at the Madison County Jail.

8.  Defendant Blake Dorning was the Madison County Sheriff at all relevant times.  As the sheriff, among other things, he is responsible for management of the Madison County Jail.  Defendant has a statutory duty under Alabama law to attend to the medical needs of inmates in the Madison County Jail.  He is sued in his individual capacity only.

9.  Defendant Steve Morrison served as the jail administrator of the Madison County Jail at all relevant times.  He is sued in his individual capacity only.

10.  Defendant Pamela Batie was a correction officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

11.  Defendant _____ Pothier was a correction officer at the Madison County Jail at all relevant times.  She/he is sued in her individual capacity only.

12.  Defendant Christine Collier was a correction officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

3

ACH001823

13.    Defendant Vanessa Fields was a correction officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

14.    Defendant Nick Wallace was a correction officer at the Madison County Jail at all relevant times.  He is sued in his individual capacity only.

15.    Defendant ____ Guyton was a correction officer at the Madison County Jail at all relevant times.  She/he is sued in her individual capacity only.

16.    Defendant Randy Hooper was a correction officer at the Madison County Jail at all relevant times.  He is sued in his individual capacity only.

17.    Defendant Michelle Kirk is a Licensed Practical Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

18.    Defendant Deondra Montgomery is a Registered Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

19.    Defendant Tanya Jones is a Licensed Practical Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

20.    Defendant Tina Adams is a Licensed Practical Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

4

ACH001824

**Facts**

21.   Nikki Listau was arrested at her home on March 10, 2013, at approximately 10:45 a.m.

22.   According to the autopsy, Listau suffered severe blunt force injuries, including a broken left femur and multiple rib fractures and died as a result of these injuries.

23.   It is not entirely clear at this time when Listau suffered these injuries.

24.   She could have suffered them before her arrest, during her arrest, or at the jail.

25.   Listau may have suffered these injuries as a result of falling off of her bunk while in a medical watch cell at the jail.

26.   Listau may have suffered these injuries as a result of seizures related to delirium tremens.

27.   In any event, according to the autopsy report, Listau died as a result of these injuries.

28.   According to hospital records, when Listau was booked into the jail, she was not ambulatory and required a wheelchair.

29.   Jail records show Listau was not even able to dress herself when she was admitted into the jail.

ACH001825

30.     Either due to other health problems or due to blunt force injuries (alone or in combination with other health problems), Listau was in severe medical distress when she was admitted to the jail on March 10, 2013.

31.     At the time Listau was admitted into the jail, Listau was suffering from alcohol withdrawal, also referred to as delirium tremens (DTs).

32.     According to jail records, on March 11, 2013, at 11:19 a.m., approximately 24 hours after she was arrested, Listau was found unresponsive in her cell.  She never recovered and was pronounced dead at the hospital on March 12, 2014.

33.     Before she was found unresponsive, ACH and jail personnel had numerous opportunities to save Listau's life by sending her to the hospital.

34.     Between booking on March 10 and shortly before 11:19 a.m. on March 11, 2013, all of the individual defendants except for Dorning were aware of Listau's condition yet failed to act.

35.     Listau was obviously weak and suffering from serious health problems of a potentially life-threatening nature.

36.     At the time of her admission to the jail, due to her severe blunt force injuries and/or other health problems, including DTs, Listau was in desperate need of medical care.

37.     At a minimum, Listau was suffering from DTs at the time of her

6

ACH001826

admission to the jail.

38.     From prior jail admissions, Listau was known to be an alcoholic with a history of seizures during withdrawal.

39.     As a result of DTs and possibly other health issues, Listau was so weak she could not walk without assistance at the time of her admission to the jail.

40.     At the time of Listau's admission to the jail, due to DTs and possibly other health problems, Listau's need for medical care was such that it would have been obvious even to a layperson.

41.     Within a few hours of her arrest, on March 10, 2013, at approximately 2:00 p.m., Listau was placed in a medical watch cell on the instruction of ACH nurse Kirk. Listau was taken there by defendant Pothier, who observed Listau's condition and reported it to Batie, who in turn informed Morrison.

42.     In addition to defendant Kirk, ACH nurse defendants Montgomery, Jones, and Adams and jail physician Williams were also aware of Listau's condition on March 10.

43.     On the morning of March 11, 2013, at approximately 8:42 a.m., defendant Collier observed Listau naked on the floor of her cell, rambling incoherently, though at least responsive.  Defendant Collier canceled Listau's scheduled court appearance that morning (to be done by video) and reported Listau's condition to defendant Fields and defendant Batie, who in turn informed ACH

7

ACH001827

personnel and Morrison.

44.    By 9:00 a.m. on March 11, Listau's terrible condition had become well known at the jail. By personal observation or otherwise, numerous persons at the jail were aware of Listau's terrible condition, including all of the individual defendants except Dorning.

45.    Later on the morning of March 11, 2013, at approximately 9:40 a.m., defendants Wallace, Hooper, and Guyton found Listau on the floor mostly non-responsive, picked her up and put her on the bed, and reported Listau's condition to Batie, who in turn reported Listau's condition to defendant Batie, who in turn informed ACH personnel and Morrison.

46.    Between 2:00 p.m. on March 10, 2013, and shortly before 11:19 a.m. on March 11, 2013, Listau's severe (and deteriorating) condition was observed by or known to numerous correction officials, including all of the individual defendants except Dorning.

47.    Despite Listau's condition, Listau received no treatment; defendants just watched Listau deteriorate and eventually die.

48.    By 11:19 a.m. on March 11, 2013, Listau was completely unresponsive and was found so. She eventually died.

49.    As a direct and proximate result of the failure and refusal of the individual defendants except Dorning to secure emergency medical treatment for

8

ACH001828

Listau, Listau suffered pain and suffering and eventually died.

50.     All defendants were jointly and severally the proximate cause of Listau's pain and suffering and eventual death.

51.     The actions of jail and ACH personnel indicate systemic breaches of fundamental standards of correctional management and correctional health care.

52.     These breaches are indicative of inadequate policies and practices and inadequate training and supervision.

53.     The treatment of Listau falls far below the standard of correctional health care.

54.     Because Listau was not appropriately treated, she experienced unnecessary pain and suffering and eventually died.

55.     All of the individual defendants identified above acted with malice and/or with reckless disregard for Listau's constitutional rights.

56.     Listau's serious medical needs were ignored because of the customs or policies of defendants Madison County, Dorning, Morrison, Williams, and ACH of deliberate indifference to the serious medical needs of prisoners in the Madison County Jail.

57.     With deliberate indifference to the serious medical needs of inmates, defendants Madison County, Dorning, Morrison, Williams, and ACH failed to develop and implement adequate policies and procedures for the handling of inmates

ACH001829

with serious health conditions and failed to adequately train jail jailers and medical staff, with the foreseeable result that inmates such as Listau would not receive appropriate treatment.

58.     More generally, defendants Madison County, Dorning, Morrison, Williams, and ACH have established deliberately-indifferent customs or policies concerning inmate medical care, including but not limited to a custom or policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills.

59.     Defendants Madison County, Dorning, Morrison, Williams, and ACH were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to avoid having to pay for medical care for the inmate.  This plan included a custom or policy of delaying or denying necessary medical treatment by outside providers.  Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates.

60.     Defendants Madison County, Dorning, Morrison, Williams, and ACH were on notice that the above-described customs or policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and suffering due to delay and denial of necessary medical care. Defendants had such knowledge from prisoner complaints, communications from jailers, from their own observations, from common sense, from other lawsuits, and

10

ACH001830

in other ways.

61.     During 2013 at least 2 other inmates died while in the Madison County Jail under similar circumstances, Deundrez Woods (date of death August 21, 2013) and Tanisha Jefferson (date of death October 31, 2013).

62.     To a large extent, these constitutionally-deficient policies and practices regarding inmate medical care were created and implemented by the agreement between Madison County, Dorning, and ACH.

63.     The agreement, among other things, requires ACH to provide substantial insurance coverage, to name the county and the sheriff as additional insureds, and to indemnify the sheriff, the county, and their agents and employees in connection with any claim related to health care services.

64.     In whole or in part because of the agreement, Madison County, Dorning, and Morrison have failed and refused to address known systemic deficiencies regarding medical care at the Madison County Jail.

65.     Under the agreement, for Madison County to avoid liability for excess medical care expenses, it was necessary for defendants Dorning and Morrison and the jailers they managed to cooperate with ACH in controlling costs.

66.     Defendants Madison County and ACH and all individual defendants were aware the cost control measures implemented at the Madison County Jail by ACH resulted in the denial of constitutionally-required medical care for inmates with

11

ACH001831

serious medical needs such as Listau.

67.    ACH's business model, implemented in the agreement, succeeds by underbidding the competition and implementing severe cost control measures, the necessary result of which is unnecessary inmate suffering and liability claims (dealt with through liability insurance).

68.    The primary areas in which cost control measures were implemented were staffing, medications, and referrals to outside providers.

69.    In order to control costs, defendant ACH, with the knowledge and consent of defendants Madison County, Dorning, and Morrison, staffed the Madison County Jail inadequately, hired sub-standard medical personnel willing to put costs over inmate health and safety, denied inmates medications, and delayed or denied medically-necessary referrals to outside providers, including necessary medical treatment like that denied Listau.

70.    Alabama law vests final policymaking authority for inmate medical care in Dorning, as the representative of Madison County.

71.    Defendants Madison County and Dorning, in turn, via the agreement with ACH, have delegated final policymaking authority regarding inmate medical care to ACH, and, therefore, they are liable for ACH decisions.

72.    Defendant ACH acted through one or more individuals who acted as final policymakers for ACH, including defendant Williams.

ACH001832

73.     Defendant Madison County caused or contributed to the above-described customs or policies by not providing adequate funds for medical treatment for the prisoners in its custody, by continuing to retain ACH despite knowledge of ACH's policies and practices, and in other ways.

74.     All defendants acted jointly and in concert with each other. Each defendant had the duty and the opportunity to protect Listau, to obtain necessary medical treatment for Listau in a timely manner and/or to establish policies and procedures and implement training regarding such treatment, but each defendant failed and refused to perform such duty, thereby proximately causing Listau's pain and suffering and eventual death.

75.     All defendants, acting under color of state law, inflicted or caused to be inflicted cruel and unusual punishment upon Listau in violation of the Fourteenth Amendment to the United States Constitution. All defendants acted with deliberate indifference.

76.     All defendants acted with intent to violate Listau's constitutional rights or with reckless disregard for those rights, justifying punitive damages against the individual defendants and ACH.

77.     As a result of the conduct of defendants, Listau suffered physical and emotional injuries and then died.

13

ACH001833

## Count I - 42 U.S.C. § 1983 -
### Deliberate Indifference to Serious Medical Needs

78.     The individual defendants except Dorning, acting under color of state law within the meaning prescribed by 42 U.S.C. § 1983, were deliberately indifferent to Listau's serious medical needs as described above.  These defendants, despite knowledge of a serious medical need, took no action or clearly inadequate action and did thereby deprive Listau of her rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983.

79.     Defendants Dorning, Morrison, and Williams are supervisory officials for the jail and were responsible for development and implementation of policies and procedures for medical care at the jail and by action and inaction established the unconstitutional customs and policies described above.  These defendants did thereby deprive Listau of his rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983.

80.     Defendant Madison County intentionally refused to adequately fund medical care as described above with deliberate indifference to the serious medical needs of inmates such as Listau, had a policy of not adequately funding inmate medical care, and did thereby contribute to cause Listau's injuries and the individual defendants' denial of necessary medical treatment for Listau's serious medical need.

81.     Defendants Madison County and Dorning are also liable for the acts of

14

ACH001834

ACH and its policymakers, including Williams, as Madison County and Dorning delegated their final policymaking authority to them.

82.     As a result of the conduct of defendants, Listau was caused to suffer physical and emotional injuries and damages and died.

### Count II - Negligence / Wantonness

83.     The individual ACH defendants and unknown ACH employees involved with Listau's care owed a duty to Listau to meet the standard of care applicable to inmates and/or to make sure those under their supervision were trained adequately regarding the proper care of such inmates and that adequate policies and procedures regarding the proper care of such inmates were in place.  This standard of care required, among other things, appropriate monitoring of Listau's deteriorating condition and referral of Listau for emergency medical treatment outside of the jail. These defendants negligently and/or wantonly violated this standard of care or caused it to be violated with the foreseeable result that Listau suffered unnecessary pain and suffering and died.

84.     Because ACH personnel were acting within the scope of their employment, defendant ACH is liable for their negligence and/or wantonness.

### Other Matters

85.     All conditions precedent to the bringing of this suit have occurred.

15

ACH001835