FILED
2018 Jan-12  PM 04:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

## Relief Sought

86.    As relief, plaintiff seeks the following:

a.    That plaintiff be awarded such compensatory damages as a jury shall determine from the evidence plaintiff is entitled to recover;

b.    That plaintiff be awarded against the individual defendants such punitive damages as a jury shall determine from the evidence plaintiff is entitled to recover;

c.    That plaintiff be awarded prejudgment and postjudgment interest at the highest rates allowed by law;

d.    That plaintiff be awarded the costs of this action, his reasonable attorney's fees, and his reasonable expert witness fees;

e.    That plaintiff be awarded appropriate declaratory and injunctive relief; and

f.    That plaintiff be awarded such other and further relief to which plaintiff is justly entitled.

**Dated: July 8, 2014.**

16

ACH001836

Respectfully submitted,

Henry F. Sherrod III (ASB-1200-D63H)
HENRY F. SHERROD III, P.C.
119 South Court Street (35630)
P. O. Box 606
Florence, Alabama 35631-0606
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

Attorney for Plaintiff

**Jury Demand**

Plaintiff requests a trial by jury.

Henry F. Sherrod III

17

ACH001837

RECEIVED
NOV 13 2000

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
NOV 8 2000

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

ENTERED Aux
NOV 9 2000

JIMMY MARSHALL, et al.,       )
                             )
        Plaintiffs,          )
                             )
                             )
JOE WHISANTE, et al.,        )     Case No. CV-78-C-5010-NE
                             )     Class Action
        Defendants          )
                             )

## CONSENT ORDER

### I. INTRODUCTION

1.   This *Consent Order* is submitted and entered into as a resolution of the issues raised by plaintiffs, all current and future inmates incarcerated at the Madison County Jail ("the jail") in pleadings filed on or after May 1, 2000, and in hearings before this Court, regarding medical care, housing conditions, security, and other practices at the jail.

2.   The defendants in this case are Madison County Sheriff Joe Whisante and the Commissioner of the Alabama Department of Corrections, who are sued in their official capacities. The plaintiff class and defendant Whisante are parties to this *Consent Order*. Unless otherwise specified, the term "defendant" refers to Sheriff Whisante and his successors as required by Rule 25 of the Federal Rules of Civil Procedure. Because the defendant is dependent upon Madison County for funding necessary to comply with many terms of this *Consent Order*, the Madison County Commission has been informed and notified of the terms of the *Consent*



DEFENDANT'S
EXHIBIT
49
Rich

ACH000088

*Order.* The defendant acknowledges that a new jail facility is needed to adequately house the number of inmates for which he is responsible and that housing inmates in the existing facilities is only an interim solution until a new jail is constructed. Although not a party to this *Consent Order*, Madison County has also recognized the need for a new jail facility and has taken steps toward a new jail, including the appropriation of funds to be expended toward construction of a new jail.

3.      The term "jail" unless otherwise specified includes the Main Jail located on the 9th and 10th floors of the Madison County Courthouse at 100 North Side Square, Huntsville, Alabama, and Annexes I, II, and III, located on Wheeler Avenue in Huntsville, Alabama, and any other facilities used to house Madison County inmates.

4.      The term "officer" refers to any member of the jail staff, exclusive of kitchen staff, who is charged with the duties of those persons commonly referred to as jailers, guards, detention officers, or correctional officers (this includes reserve officers).

5.      The term "qualified health care personnel" refers to a licensed practical nurse, registered nurse, nurse practitioner, physician's assistant, or medical doctor.

## II. SUBSTANTIVE PROVISIONS

### A.    Health Care

6.      The defendant shall provide and pay for all necessary medical care, mental health, and dental care as required by the United States Constitution in a timely manner. The defendant shall ensure that no inmate is told by any member of the correctional or medical staff at the jail that the inmate's family or friends must obtain constitutionally required medication, make appointments for constitutionally required medical care, or pay for constitutionally required

2

ACH000089

medical care. This does not prohibit use of a "co-pay" system designed to allow inmates to share the cost of medical care if inmates are financially capable. If the defendant adopts a co-pay system, he shall set out the provisions of such a system in writing and provide a copy to the Court and to plaintiffs' counsel before implementing such a system. Under no circumstances will inmates be denied constitutionally required medical care or have constitutionally required medical care delayed because they do not have funds to pay for it. If an inmate wishes to have an appointment with his or her own medical provider, defendant shall instruct the inmate to put this request in writing. Inmates will be allowed to see their personal or private physician at the inmate's own cost and subject to approval of the jail doctor.

      7.     A sufficient number of qualified health care personnel shall be employed at the Madison County Jail to ensure that inmates in the Jail have access at all times to constitutionally adequate medical care. A registered nurse shall be on duty at the jail no less than 40 hours per week. In addition, at least two other qualified health care personnel shall be on duty during the day shifts Monday through Friday and on evening shifts seven days a week. At least one qualified health care person shall be on duty during the night shift seven days a week and during the day shifts on Saturday and Sunday.

      8.     Each inmate shall receive, as timely as possible and as security dictates, an initial intake screening by a qualified health care practitioner or an appropriately trained staff member, who is not required to have been licensed to engage in medical care but who is trained in limited aspects of healthcare including health screening, upon the inmate's arrival at the jail or as soon thereafter as the inmate is capable of responding to health screening questions and before the inmate is placed in general population. This screening shall include, but shall not be limited to,

3

ACH000090

inquiry into any communicable diseases, including tuberculosis and sexually transmitted diseases, urgent chronic conditions, review and continuation of any medications, and timely referral for inmates in urgent need of physician review.  During intake screening, the intake personnel shall determine, if possible, whether the inmate is taking medication for a health condition and, if the inmate is on medication,  promptly make arrangements necessary to ensure continuity of treatment.

9.      All incoming inmates shall be screened for symptoms of tuberculosis infection immediately upon admission and, within 14 days, tested for tuberculosis as provided by guidelines of the State of Alabama Health Department.  The defendant shall immediately contact local health officials regarding any individual with a suspicion of contagious tuberculosis.  The inmate suspected of being contagious shall be isolated until direction from a health official can be obtained and followed.  Together with county health authorities, the defendant shall develop and implement a program for the identification, prevention, and treatment of tuberculosis among inmates.

10.     Inmates who appear at intake to be suffering from serious mental illness, including inmates indicating a suicidal threat by words or actions, shall be directed to the proper mental health authority at the first available time for diagnosis and appropriate treatment.

11.     Medical request forms shall be available to inmates at all times.  The defendant shall provide a means for inmates to submit their medical requests confidentially, such as by providing a locked drop box where inmates can leave their request forms.  The medical requests shall be reviewed by a registered nurse, physician's assistant, nurse practitioner, or licensed practical nurse every day according to appropriate written triage guidelines developed by the

4

ACH000091

medical director in accordance with standard medical practice. Under no circumstances will non-medical personnel have the authority to deny a request for medical, dental, or mental health care.

12.     Inmates shall have access to a regularly scheduled sick call. Physician sick call will be conducted by a physician at least three times per week. Daily sick call shall be conducted every day by a licensed practical nurse or a registered nurse in accordance with the directives developed by a qualified medical director and in compliance with the Administrative Code of the Alabama Board of Nursing.

13.     The defendant shall provide inmates constitutionally required dental care promptly for any serious dental problem. Such care or treatment will comply with the community standard of care for serious medical needs, and shall not be limited to extractions.

14.     Prescription medications shall only be distributed to inmates by qualified health care personnel or by appropriately trained jail staff under the supervision of qualified health care personnel. The defendant shall require the health care provider to develop and implement systems to provide medications in a timely manner and to track problems with the dispensing and administration of medications. Medication shall be administered at the prescribed time intervals or as soon as is possible thereafter, but in no event more than three hours thereafter. If prescribed medications are not provided because of an inmate's refusal or for any other reason, a written explanation for the medication not being provided shall be signed by the medical staff member administering the medication. All refusals of medication by inmates must be in-person and must be signed by the person administering the medication. The inmate shall be asked to sign an acknowledgment of his refusal. To the extent possible, the inmate shall be counseled concerning

5

ACH000092

the consequences of non-adherence to prescribed treatment. This counseling shall be documented. Glucometers and blood pressure sleeves shall be available and accessible to inmates as needed and as security allows.

15.     In the event of emergency room treatment, out-patient care, or treatment in a doctor's office, dentist's office, or hospital, the officer taking the inmate to the hospital, doctor or dentist shall request written instructions from the treating doctor or dentist. These written instructions, when available, shall be delivered by the officer to the health care personnel or left in a designated place to be retrieved and examined by the health care personnel.

16.     When health care is delivered in the facility, the defendant shall supply adequate space where inmates can be examined and treated confidentially and in private, subject to legitimate security concerns.

17.     The defendant shall provide pregnant inmates with prenatal care, including medical examinations, medically necessary diets, and counseling as prescribed by qualified health care personnel.

18.     The defendant shall provide and follow any diet (special meals, foods, and/or dietary supplements and vitamins) prescribed by a physician or dentist as part of the patient's treatment.

19.     Any inmate whom any officer or qualified health care personnel suspects poses a legitimate suicide threat shall be evaluated promptly by a qualified mental health care professional. 20.     The defendant shall maintain a suicide watch on all inmates diagnosed as or suspected of being suicidal. These inmates shall be checked every fifteen minutes by properly

6

ACH000093

trained officers, and these checks shall be documented.

21.    To prevent suicides and suicide attempts, the defendant shall ensure that cells housing inmates who are considered to constitute a serious suicide threat are equipped to deter or prevent access to items or materials that could be used by an inmate to commit suicide. To the extent possible, such cell or cells shall not contain any protrusions, accessible light fixtures, electrical outlets or other items by which an inmate may effectuate a suicide. Cells housing inmates considered to be at serious risk for committing suicide and cells housing inmates considered to be physically or mentally ill shall be equipped with bars or other sufficiently open spaces to allow easy visual observation of the inmate from outside the cell. Plexiglass or other transparent materials may be used over the bars if a solid door is needed on these cells for security purposes. No inmate considered to be at serious risk for committing suicide or physically or mentally ill shall be housed in a cell with a solid metal door.

22.    The defendant will cause to be developed and implemented written policies and procedures regarding the handling of inmates suspected of being under the influence of alcohol or drugs or undergoing withdrawal. If an inmate experiences severe, life-threatening intoxication, overdose or withdrawal symptoms, the inmate shall be personally evaluated by a physician or registered nurse who shall issue instructions for care and observation of the inmate, or shall be transferred to a hospital or other appropriate facility for detoxification under medical supervision.

23.    Severely intoxicated persons will be checked for responsiveness every fifteen (15) minutes, and all intoxicated inmates will be specially supervised by jail staff by television monitor or in person. All inmates intoxicated upon admission to the jail will be kept segregated

7

from other inmates in the jail until fully detoxified, to the fullest extent that the physical design of the jail allows.

24.     The defendant shall cause to be developed and implemented written policies and procedures concerning provision of health care at the Madison County Jail, and shall provide a copy of these policies and procedures to plaintiffs' counsel and the Court by November 1, 2000. These policies shall include, but not be limited to, the following areas:

a.     Intake screening and management

b.     Physical examination within fourteen (14) days of booking

c.     Access to routine and acute medical care, including hospitalization, surgical care, consultation, and referrals

    i. Follow-up of diagnostic testing and referral providers' treatment decisions

    ii. Medical request tracking and resolution

d.     Medication administration, management, and tracking

e.     Pain control (including list of approved pain medication)

f.     Emergency care and services

g.     Medical observation unit equipment and procedures

h.     Health record maintenance, documentation, and transfer

i.     Communicable disease control and environmental health and sanitation

j.     Prenatal care

k.     Staffing, including job descriptions, credentialing, and scopes of practice

l.     Initial and ongoing training of medical and correctional staff

m.     Quality management, including performance measurement, practice guidelines, and third party audits

n.     Mental health and suicide screening and treatment

o.     Dental screening and treatment, including but not limited to extractions

p.     Medical diets

25.     If deemed necessary by the Court, the Court may appoint a medical doctor with

8

ACH000095

experience in correctional health care to perform a third party audit of the health care provided at the jail. This doctor will report to the parties and to the Court with regard to the status of medical care for inmates at the Madison County Jail. The parties shall submit the name(s) of proposed medical doctor(s) to the Court upon the Court's request. The defendant shall be responsible for any reasonable costs, as determined by the Court, for any services rendered.

**B.      Security**

26.      Officers shall patrol all areas of the jail and shall inspect each area at least once each hour. The defendant shall ensure that in the Main Jail, there is at least one officer per shift on each floor assigned to observe the living areas from the catwalks and to check on individuals in single cells throughout the entire shift. There shall be at least one officer patrolling the floor in Annex II and III and two officers patrolling the floor on each side of Annex I at all times.

27.      Defendant shall install and maintain videocameras in at least two of the single cells, and shall place inmates who require constant monitoring in those cells. Defendant shall maintain the existing video surveillance system in the drunk tank. Defendant shall install and maintain a rotating surveillance camera on each side of Annex I. Defendant shall place an emergency call button in each of the ten large cells in the Main Jail. These call buttons shall be connected to an intercom so that inmates can reach security staff immediately in the event of an emergency.

28.      Defendant shall make provisions for safe housing and treatment of suicidal, intoxicated, mentally ill, and other inmates presenting special needs or risks. To the extent possible, persons under eighteen (18) years of age will be separated from other inmates.

29.      The status of all inmates held in single cells will be reviewed by the shift

9

commander every seven (7) days.  All cases where an individual is held in a single cell longer than thirty (30) days will be referred to the defendant or his designee for review.   Individuals held in single cells shall have access to clean clothing, drinkable water, personal hygiene items, and a functioning toilet, and shall be provided an opportunity to shower at least three times per week.

30.   Chemical munitions shall not be used to punish inmates.  Chemical munitions shall not be used except as a last resort to prevent an inmate from causing bodily harm or physical injury to themselves or to another, or to escape, and only when there is no other reasonable alternative.  In no event shall chemicals be used on an inmate while that inmate is secured in a single-person cell.  All staff shall be trained in the proper use of chemical munitions.  Every use of force, including chemical munitions, shall be documented following each such incident.  This report shall be completed immediately following the use of force when possible and if it is not possible to complete the report immediately, before the end of the officer's shift.  The shift supervisor and the chief correctional officer shall review all uses of force and shall determine if the force was necessary.  The shift supervisor and/or chief correctional officer shall counsel and discipline appropriately any officer who is determined to have used force excessively or improperly.  These actions shall be documented and reviewed by the defendant.  All chemical munitions shall be issued by the defendant.

31.   The defendant shall cause to be developed and implemented written policies and procedures which specify acts prohibited within the facility and penalties that may be imposed for various degrees of violations, and shall include these policies and procedures in the inmate handbook.  Disciplinary reports will be prepared when rule violations occur and the inmate faces

10

the possibility of punishment.

32.     To ensure the security of the jail, the safety of the inmates, and inmates' access to staff, health care services, and exercise, the jail shall be staffed with a constitutionally sufficient number of officers.  Sufficient staff shall be hired and trained such that the required staffing levels can be maintained even during periods of staff illness and vacation.

33.     The number of funded staff positions at the jail shall be as follows:

a.      10 detention officers, not including the Chief Correctional Officer, at the Main Jail on all shifts;

b.      16 detention officers, not including the Chief Correctional Officer, in the Annexes during the first shift;

c.      14 detention officers, not including the Chief Correctional Officer, in the Annexes during the second shift; and

d.      15 detention officers, not including the Chief Correctional Officer, in the Annexes during the third shift.

If the jail reduces the number of available staff members below this level or any position remains vacant for over thirty (30) days, the defendant shall report any such reduction or vacancy to the Court.  Under no circumstances shall there be less than the following staff on duty:

a.      Two officers on the 10th floor of the Main Jail;

b.      Four officers on the 9th floor of the Main Jail during the first shift, Monday through Friday, and three officers on the 9th floor of the Main Jail on all other shifts, with one of these officers assigned to booking on each

11

ACH000098

shift;

c.    Two officers in Annex II;

d.    Five officers in Annex I; and

e.    One officer in Annex III so long as it is used exclusively to house work release inmates or misdemeanants.  If Annex III is used to house inmates who are not on work release or misdemeanants, there shall be two officers for all shifts.

If the defendant is not able to meet the foregoing minimum staffing requirements, the defendant shall make immediate report to plaintiffs' counsel setting out the location where staffing fell below the minimum level, the reasons for it, and the defendant's plan to restore staffing to the required levels specified at the beginning of this paragraph.  Plaintiffs may seek relief from the Court if staffing remains at or below the minimum level for an unreasonable period of time, the reasonableness of such time and the adequacy of staffing to be determined by the Court.

34.   Within 60 days of entry of this order or within 90 days of hire, whichever is later, all detention officers in supervisory positions (e.g. sergeants and lieutenants) shall have attended the 80-hour Jail Management Training course conducted by the Alabama Department of Corrections at the Alabama Corrections Academy, if available, and if not available, as soon as possible thereafter.  The defendant shall send at least two officers to the 80-hour Jail Training course conducted by the Alabama Department of Corrections at the Alabama Corrections Academy each time the course is offered until all officers have completed the course.  In determining who shall attend, the defendant shall prioritize inexperienced staff and staff with supervisory responsibilities.  In addition, the defendant shall provide to each new officer 24 hours of formal

12

training.  Thereafter, all trained members of the jail staff shall receive at least 12 hours per year of formal training on a continuing basis.  All such training shall be documented in the personnel file of each staff member and reported to the Court in the periodic reports provided for in paragraph 51.

35.    Training shall, at a minimum, include:  training in all substantive areas covered by this *Consent Order*, including, but not limited to: completion of the medical screening form; recognition, during medical intake screening, of symptoms or conditions listed on the medical screening form which indicate that the inmate being screened requires medical attention; methods or procedures for obtaining medical care for inmates; suicide detection and prevention; mental health and drug- or alcohol-related emergencies; security procedures; first aid and cardiopulmonary resuscitation; classification of inmates; disciplining of inmates; supervision of inmates; use of force; use of chemical agents; inmate rules and regulations; rights and responsibilities of inmates; fire and emergency procedures; and key controls.

**C.    Fire Safety**

36.    The defendant will cause to be drafted written policies and procedures regarding fire safety in case of fire and comply, to the extent possible in the jail facilities as currently configured with no structural modification required, with all standards, regulations, orders, and reports issued by the Alabama Fire Marshal.  The policies and procedures will establish a fire protection plan, identify the location of fire fighting equipment, describe fire prevention methods, post a plan for evacuations during fire emergencies, and provide for at least annual training of staff in all facilities and notification of inmates of emergency evacuation procedures.  The

13

ACH000100

policies and procedures shall be reviewed by qualified local or state fire marshals.

37.    The fire protection plan will include a provision for the monthly monitoring and maintenance of fire control equipment, including exit signs and extinguishers.

**D.    Housing of Inmates**

38.    The population of the Main Jail, on the 9th and 10th floors of the Madison County Courthouse, shall not exceed 200 persons. The population of Annex II shall not exceed 100 persons. The population of Annex IIB shall not exceed 16 persons. The population of each side of Annex I shall not exceed 82 persons. The population of Annex III shall not exceed 106 persons so long as it is used exclusively to handle work release inmates or misdemeanants. If Annex III is used to house inmates who are not in work release or misdemeanants, the number of persons housed in it shall not exceed 50. The defendant shall further reduce the number of inmates housed in the annexes by 75 by October 1, 2001. The number of beds in each annex shall be limited to the population levels specified herein. If the jail experiences an emergency or a sudden, unanticipated increase in prisoners and the defendant is not able to make other immediate provision for housing, defendant may exceed these population limits for not more than two (2) days.

39.    In no event shall an inmate sleep upon a mattress placed on the floor of any jail facility for more than two consecutive nights. In no event shall any inmate sleep upon a mattress on the floor within 10 feet of a toilet, shower, or urinal in any jail facility. The defendant shall document by date, name of the inmate and location all instances when inmates sleep on the floor and report each such instance to the Court in the reports provided for in paragraph 51.

14

ACH000101

40.     The defendant shall make all necessary efforts to locate available beds in other correctional facilities, including the Huntsville City Jail, to house Madison County inmates when the population of the Madison County Jail is above or approaches the total specified in paragraph 38.

41.     The defendant shall request that the Madison County Commission maintain and monitor the jail's ventilation, heating, and cooling systems so as to provide adequate air circulation and temperatures in all jail facilities, and shall notify the Court of any failure by the Commission to do so.  The defendant shall have an independent third party evaluate air quality indicators every six months for a period of two years.

42.     Upon arrival at the Madison County Jail, each inmate shall receive a document illustrating and explaining exercises that can be conducted within the inmate's cell. Unless prevented from doing so by a security emergency or weather conditions, the defendant shall give inmates housed in Annex I and II access to the outdoor exercise yards at least forty-five minutes per day at least five days per week at a time no earlier than 7 a.m.  Defendant shall give inmates housed in the Main Jail access to a hallway for exercise at least forty-five minutes per day at least two (2) days each week.  Defendant shall provide sufficient security by television monitor or direct supervision.

43.     Defendant shall continue to provide personal hygiene items to all inmates.  Such items shall include soap, a toothbrush, toothpaste, sanitary items for women, a towel, a blanket, and linens for their beds.

44.     All eating and drinking utensils and serving utensils shall be gathered and sanitized in the kitchen after every meal.  In no event shall any utensils be washed in the

15

ACH000102

bathroom sinks or in the janitor's closet of any jail facility.

45.    Food shall be served at least twenty (20) feet away from the door to the toilets, urinals, sinks, and showers in the Annex facilities.

46.    In the event of a flood or sewer leak, inmates shall be provided a sanitary place to eat and sleep, and shall in no event be forced to eat or sleep in a flooded cell.

47.    Defendant shall continue to provide regular pest control services and shall respond promptly to any infestation of insects or vermin in any of the jail facilities.

48.    This *Consent Order* does not modify any previous Order entered in this case involving the Commissioner of the Department of Corrections, specifically the Order entered by this Court on August 6, 1981 requiring the removal of sentenced State prisoners from the Madison County Jail within thirty (30) days of the date on which the Department of Corrections receives notice from the Clerk of the Circuit Court for Madison County, Alabama.

**E.    Jail Manual**

49.    Defendant shall cause to be completed and published a revised policies and procedures manual for the jail.  This manual shall set forth in detail the jail's operations and all substantive areas covered in this *Consent Order*, including, but not limited to: routine and emergency medical, dental, and mental health care procedures for inmates, security procedures, surveillance and key control procedures; booking and intake procedure; special housing procedures, inmate rules and regulations; fire safety policy; fire and emergency procedures; training requirements for staff; sanitation and maintenance policies; exercise and recreation policy; food service procedures; policies and procedures relating to inmate provisions, such as

16

ACH000103

clothing, bedding, laundry, hygiene items, and the commissary; and policies regarding suicidal, mentally ill, intoxicated, and pregnant inmates. Defendant shall provide plaintiffs' counsel and the Court with a copy of the manual, on or before December 15, 2000.

**F.      Inmate Handbook**

50.      No later than December 15, 2000, defendant shall reduce the rules and regulations of the Madison County Jail to writing and place these rules and regulations in an inmate handbook to be distributed to all inmates upon their request. A document containing a summary of the major jail rules and regulations and an explanation of access to medical care will be given to each inmate upon arrival at the Madison County Jail. This summary will inform the inmate of the existence and availability upon request of a complete copy of the inmate handbook. In addition to informing inmates about the rules and regulations of the jail, the handbook shall also set forth the policies and procedures of the jail, including, at a minimum, disciplinary procedures and the procedures for securing routine and emergency medical/dental/mental health care. The handbook shall also state that the jail is being operated pursuant to a *Consent Order* and shall indicate that copies of the *Consent Order* are available upon request. The defendants shall keep a sufficient number of copies of the Inmate Handbook and this *Consent Order* at the Jail so that copies can be provided to inmates upon request. Defendant shall provide plaintiffs' counsel and the Court with a copy of the handbook and the summary to be given to all inmates upon admission, on or before December 15, 2000.

### III. IMPLEMENTATION

17

51.    Defendant shall make reports to the Court on his compliance with each section of this *Consent Order* on January 1, 2001, April 1, 2001, July 1, 2001, October 1, 2001, April 1, 2002, and October 1, 2002.  These reports shall include improvements made to the jail and the progress of new jail facilities; a list of the dates on which any inmate slept on the floor, the number of inmates who slept on the floor, the names of those inmates, and the daily roster showing the population of each living area on dates when inmates slept on the floor; documentation of all uses of chemical munitions; the daily count for any day on which the population exceeded the capacity; the staffing levels for any day on which the staffing fell below the levels set out in ¶ 33; the names of all staff and the training received by each staff member; actions taken, if any, by the County Commission with regard to building a new jail; the number of sentenced inmates transported to a state facility each month; and the number of inmates who remained in the jail for over thirty days after the State of Alabama received the transcript of the inmates' sentence from the Circuit Court Clerk for the 23rd Judicial District of the State of Alabama.

52.    Defendant shall, upon request with reasonable notice,  provide plaintiffs' counsel with access to all documents and records relating to the implementation of this order, except for medical records which shall be provided only if the request for such records is accompanied by a release signed by the inmate.  With defendant's approval or as by court order, plaintiffs' experts shall have access to the jail facility as necessary to address issues affected by this *Consent Order*.

53.    The Court shall have discretion at any time to appoint a qualified, neutral individual with sufficient expertise to evaluate the defendant's compliance with part or all of this *Consent Order* and report to the Court with the imposition of reasonable cost to be determined by

18

ACH000105

## VI. CONCLUSION

56.     If defendant fails to comply with the substantive terms and conditions of this *Consent Order*, plaintiffs' counsel may apply to the Court for a finding of contempt or other appropriate relief.  Prior to approaching the Court for such relief, plaintiffs' counsel will bring any deficiencies to the attention of the defendant and will make reasonable attempts to resolve the issues informally.

57.     The parties agree and stipulate, and the Court hereby independently finds, that the prospective relief in its totality set forth in this *Consent Order* is narrowly drawn, extends no further than necessary to correct the violations of plaintiffs' federal rights set forth in their *Complaint* and *Motion For an Order to Show Cause*, and is the least intrusive means necessary to correct these violations.  The parties agree and stipulate, and the Court hereby independently finds, that this *Consent Order* will not have an adverse impact on public safety or the operation of a criminal justice system.  Accordingly, the parties agree and stipulate, and the Court hereby independently finds, that this *Consent Order* complies in all respects with the provisions of 18 U.S.C. § 3626(a).

58.     The parties stipulate that plaintiffs are entitled to reasonable attorneys' fees and costs in regard to plaintiffs' claims pursuant to 42 U.S.C. § 1988, subject to the limitations contained in the Prison Litigation Reform Act.

59.     Subsequent to an agreement or order for attorney's fees and costs in this action to date, plaintiffs will only seek fees and costs that are directly and reasonably incurred in enforcing the relief ordered for the violation of plaintiffs' rights under this *Consent Order*.

60.     Any party may seek modification of any part of this *Consent Order* for good

20

ACH000107

cause shown. Defendants shall continue to implement in a timely manner all parts of this *Agreement* pending decision of the Court on any motion for modification.

21

ACH000108

Submitted, approved, and consented to by:

Tamara H. Serwer
Marion Chartoff
Tammy Sun
Stephen B. Bright
Southern Center for Human Rights
83 Poplar Street, N.W.
Atlanta, GA 30303-2122

*Attorneys for Plaintiffs*

Julian D. Butler
Sirote & Permutt, P.C.
305 Church Street, Suite 800
Huntsville, AL 35802

*Attorney for Defendant Joe Whisante*

Upon consideration and review, and upon conducting a fairness hearing on November 8, 2000, I hereby find the provisions of this *Consent Order* to be fair and reasonable to the plaintiff class.

SO ORDERED this ____8th____ day of ___November___ 2000.

HON. U.W. CLEMON
UNITED STATES DISTRICT COURT

ENTERED
NOV 9  2000

22

ACH000109

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

MAR 2 1 2001

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| JIMMY MARSHALL, et al., | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| JOE WHISANTE, et al., | ) |
| | ) |
| Defendants | ) |

Case No. CV 78-C-5010-NE

**ENTERED**

MAR 26 2001

## CONSENT ORDER ON PLAINTIFFS' MOTION
## FOR APPOINTMENT OF A MEDICAL MONITOR

On or about February 1, 2001, plaintiffs filed a Motion for Appointment of a Medical

Monitor with the Court, along with affidavits, medical records, and a report regarding the

performance of NaphCare, Inc., as a subcontractor at the Jefferson County Jail in Birmingham,

Alabama, supporting their assertions. The Court thereafter set a hearing for February 21, 2001,

to determine the merits of the plaintiffs' pending Motion. On February 21, 2001, Sheriff Whisante

filed a response along with affidavits from Dr. George Lyrene, Medical Director for NaphCare,

Inc., Chief Correctional Officer Captain P. D. Guthrie, as well as other Madison County Sheriff's

Department employees, supporting his assertions. Prior to the hearing on February 21, 2001, the

plaintiffs and Sheriff Whisante reached an agreement in regard to the concerns described in

plaintiffs' Motion. Counsel for the plaintiffs and Sheriff Whisante subsequently reported to the

Court that an agreement had been reached between both parties and the terms of that agreement

ACH000110

Case 5:15-cv-01997-HNJ   Document 95-11   Filed 01/12/18   Page 25 of 52

were announced to the Court. The terms of that agreement are set forth herein and all parties are ordered to comply with these terms.[1]

1.  By April 30, 2001, defendant shall cause to be conducted, by consultants of his choice (at least one of whom is a medical doctor), a comprehensive audit of the quality of medical, mental health, and dental care (hereinafter "healthcare") provided to inmates at the Madison County Jail.[2] Defendant shall inform plaintiffs' counsel of the date upon which the audit is scheduled to occur.

2.  Defendant shall provide plaintiffs' counsel the following documents by March 31, 2001:

> A.  The curriculum vitae of the consultant(s) the defendant has chosen to audit the healthcare provided at the Madison County Jail;
>
> B.  Any instructions given by Sheriff Whisante, NaphCare, Inc., or Madison County to the consultant(s) with respect to the scope and methodology of the audit.

3.  Defendant shall instruct his consultant(s) to present any findings, conclusions, observations, recommendations, and the methodology used to come to those findings,

---

[1] Sheriff Whisante's agreement to comply with the terms set forth herein in no way implies any wrongdoing or liability for any deficiencies in health care alleged in Plaintiffs' Motion for Appointment of Medical Monitor, nor does this agreement imply that Sheriff Whisante is or was in violation of the *Consent Order* entered on November 9, 2000.

[2] By consenting to this order, the plaintiffs in no way mean to imply that they accept defendant's consultants as neutral, independent, or objective monitors of the defendant's compliance with the November 9, 2000, *Consent Order*. Plaintiffs do not waive any right to renew their motion for the court to appoint an independent third-party auditor with experience in correctional healthcare, pursuant to ¶ 25 of the *Consent Order*.

2

ACH000111

conclusions, observations, and recommendations, in the form of a written report. Defendant shall file this report with the Court and provide it to plaintiffs' counsel within a reasonable time after receipt of the report.

    4.       Defendant shall make his healthcare consultant(s) available for deposition by plaintiffs' counsel. Any such deposition will be designated as confidential and its use will be limited to this litigation.

    5.       Plaintiffs, at their own and sole expense, may conduct an independent audit of the healthcare provided to inmates at the Madison County Jail. Defendant shall allow plaintiffs' healthcare expert(s) to conduct a comprehensive audit of the jail's provision of healthcare. This shall include chart reviews of randomly selected medical charts and reasonable access to other documents as deemed necessary by plaintiffs' expert(s). This shall also include reasonable access to healthcare staff and inmate-patients. The parties will schedule such an audit at a time mutually agreeable to the parties.

    6.       Plaintiffs shall file the report of their expert(s) with the Court and provide it to counsel for the defendants within a reasonable time after receipt of the report. Plaintiffs shall make any such expert(s) available for deposition by counsel for the defendant.

    7.       Beginning April 10, 2001,[3] and continuing thereafter until the reporting requirements of the Consent Order entered in this case expire or are otherwise terminated or ended, defendant shall provide plaintiffs' counsel with a written report containing the following information on a monthly basis:

        A.       The names of all newly admitted inmates during the previous month.

---

    [3] The report for April 10, 2001, shall reflect information from the month of March 2001.

3

ACH000112

  i.  The number of inmates from (A) who were identified at intake screening as having symptoms of active TB.

  ii.  The total number of inmates from (A) who were diagnosed with active tuberculosis.

B.  The number of newly admitted inmates from (A) whose health screening forms were not reviewed by a qualified healthcare professional within 24 hours of Intake.

C.  The number of inmates who should have received their 14-day physicals, including TB tests, during the previous month.

  i.  Of the inmates in (C), the number of inmates who actually did receive their physicals within 14 days after their incarceration in the Madison County Jail.

  ii.  Of the inmates in (C), the number who received their 14-day physicals after 14 days but before 21 days after intake.

  iii.  Of the inmates in (C), the number who actually had a Mantoux skin test implanted within 14 days of intake.

    a.  Of the inmates in (iii), the number of inmates who had their skin test read between 48 and 72 hours after it was implanted. Note the number of inmates whose tests could not be read because they had been released from jail.

    b.  The number of inmates from (a) who tested positive.

4

ACH000113

c. The number of inmates from (b) who received a chest x-ray within 96 hours of the positive skin test result. Note the number of inmates who could not receive a chest x-ray because they had been released from jail.

d. The number of inmates from (c) who were started on INH therapy.

e. The number of inmates from (c) who were diagnosed with active TB.

D. The physician sick call schedule for the previous month, including the name of each physician who worked, the actual days he or she was present at the jail, the actual number of hours he or she spent in the Main Jail on each of these days, and the actual number of hours he or she spent at the Annex on each of these days. Defendant shall provide this information with regard to on-site visits by the OB/GYN, psychiatrist, and dentist, as well.

E. The nursing schedule for the previous month, including the name of each nurse who worked, whether he or she is an LPN or an RN, the days and hours he or she actually worked, and where he or she actually worked.

F. Of the inmates actually confined in the Madison County Jail on the 15th day of each month, the number of inmates who have been identified as having the following chronic conditions:

i. Diabetes (# of insulin-dependent/# of non insulin-dependent)

ii. Hypertension

5

ACH000114

  iii.  Seizure disorders

  iv.  Diagnosed mental illness

  v.  Asthma

  vi.  HIV/AIDS

8.  By March 31, 2001, defendant shall file with the Court and provide plaintiffs' counsel a copy of the revised written policies and procedures for provision of healthcare at the Madison County Jail, as required by ¶ 24 of the *Consent Order*.

**Submitted, approved, and consented to by:**

*Tamara H. Server*

Tamara H. Server, Esq.
Stephen B. Bright, Esq.
Marion Chartoff, Esq.
Southern Center for Human Rights
83 Poplar Street, N.W.
Atlanta, GA 30303-2122
Telephone: (404) 688-1202
Facsimile: (404) 688-9440

*Attorneys for Plaintiffs*

*Julian D. Butler*

Julian D. Butler, Esq.
J. Jeffery Rich, Esq.
Sirote & Permutt, P.C.
305 Church Street, Suite 800
Huntsville, AL 35802
Telephone: (256) 536-1711
Facsimile: (256) 518-3681

*Attorneys for Defendant Joe Whisante*

6

ACH000115

SO ORDERED this ___20th___ day of ___March___, 2001.

HONORABLE U.W. CLEMON
UNITED STATES DISTRICT COURT

7

ACH000116

decisions by qualified health care personnel, and the follow-up of diagnostic tests administered to class members, as required by ¶ 24 of the Consent Order.

To purge himself of contempt, within ten (10) days of the date of this Order, Sheriff Whisante shall provide to the Court clearly convincing evidence of his compliance with the physician sick call provision of the Consent Order. Within thirty (30) days of this Order, Sheriff Whisante shall provide to the Court clearly convincing evidence of his compliance with ¶¶ 9, 24 of the Consent Order.

As a sanction for his contempt, Sheriff Whisante shall pay to class counsel a reasonable attorney's fee for services rendered in the contempt proceedings, together with all reasonable costs associated therewith including without limitation the expert witness fees and expenses.

The Court shall conduct a hearing in February 2002 to determine the extent to which Sheriff Whisante has purged himself of the civil contempt adjudicated by this Order.

Done this 26th day of November, 2001.

                                        _____
                                        Chief United States District Judge
                                        U.W. Clemon

Case 5:15-cv-01997-HNJ  Document 95-11  Filed 01/12/18  Page 32 of 52

J. JEFFERY RICH
ATTORNEY AT LAW
(256) 518-3657
jrich@slrote.com

SIROTE
——— & ———
PERMUTT
A PROFESSIONAL CORPORATION

May 12, 2009

Norman R. Johnson, M.D.
Advanced Correctional Healthcare, Inc.
P. O. Box 10260
Peoria, Illinois 61612-0260



MAY 18 2009

**Re:** Healthcare Services Agreement at the Madison County Detention Facility

Dear Dr. Johnson:

Enclosed you will find the original Healthcare Services Agreement between Madison County, Alabama, Blake Dorning and Advanced Correctional Healthcare, Inc. (the "Agreement") that was approved by the Madison County Commission at its meeting on May 4, 2009. The Agreement has been signed by Sheriff Dorning and Commissioner Gillespie. Please sign the Agreement where appropriate and return the original Agreement to me. If you have any questions, please do not hesitate to contact me.

Sincerely,

J. Jeffery Rich
FOR THE FIRM

JJR/cbe
Enclosure
c:     Sheriff Blake Dorning (via Hand Delivery, w/Enclosure)
       Chief Deputy Chris Stephens (via Hand Delivery, w/Enclosure)
       Lieutenant Bill Hancock (via Hand Delivery, w/Enclosure)
       Sherry Jones (via Hand Delivery, w/Enclosure)
       Judy Teague (via Hand Delivery, w/Enclosure)
       Kathy Webster (via Hand Delivery, w/Enclosure)

DOCSHSV\188083\1\

LAW OFFICES AND MEDIATION CENTERS
305 CHURCH STREET, SUITE 800   HUNTSVILLE, ALABAMA 35801
POST OFFICE BOX 18248   HUNTSVILLE, ALABAMA 35804-8248
TELEPHONE | 256.536.1711      FAX | 256.518.3681     URL | http://www.slrote.com
Birmingham   |   Huntsville   |   Mobile




DEFENDANT'S
EXHIBIT
50
R.ch

ACH000280

## HEALTHCARE SERVICES AGREEMENT AT
## THE MADISON COUNTY DETENTION FACILITY

**THIS AGREEMENT** between Madison County, Alabama (hereinafter referred to as "County"), Blake Dorning in his official capacity as Madison County Sheriff (hereinafter referred to as "Sheriff"), and Advanced Correctional Healthcare, Inc. (hereinafter referred to as "ACH"), is entered into as of the 6th day of July, 2006. Services under this Agreement shall commence on July 8, 2006, and shall continue through September 30, 2007, unless otherwise terminated as provided herein. **This agreement is amended effective May 1, 2009, for the period May 1, 2009 through April 30, 2012.**

### WITNESSETH:

**WHEREAS,** the Sheriff desires to provide for health care to inmates housed in the Madison County Detention Facility (hereinafter referred to as "Detention Facility" or "Jail") in accordance with applicable law; and,

**WHEREAS,** ACH is in the business of providing correctional health care services and desires to provide such services for the Sheriff under the terms and conditions hereof; and,

**WHEREAS,** the Sheriff desires to enter into this Agreement with ACH to promote this objective; and,

**WHEREAS,** the County, upon the recommendation of the Sheriff, consents to and desires to enter into this Agreement with ACH to the extent necessary for ACH to secure payment for the services provided hereunder.

**NOW THEREFORE,** in consideration of the covenants and promises hereinafter made, the parties hereto agree as follows:

1.      **GENERAL SCOPE:** ACH will develop, manage and staff a comprehensive healthcare services system at the Madison County Detention Facility in Huntsville, Alabama, to provide all inmates within the Detention Facility with necessary healthcare.

2.      **TERM:** This healthcare services contract with ACH will be for a term beginning **May 1, 2009** and ending **April 30, 2012,** unless otherwise terminated as provided herein.

3.      **SCOPE OF SERVICES:** ACH shall be the sole supplier of healthcare services (including pharmacy) and coordinator of the healthcare delivery system at the Detention Facility, including coordination and payment for all care rendered to inmates by healthcare providers outside the Detention Facility. ACH is responsible for all health care for all inmates at the Detention Facility. The term "health care" (or "medical care" as sometimes referred to herein) includes, but is not limited to, services customarily provided by a general practitioner, psychiatric and psychological care, obstetrics/gynecological care, dental care, pharmaceuticals, including prescriptions, medications and prescribed over-the-counter medications; on-site laboratory testing to include finger-stick blood sugar, urine dipstick for pregnancy and/or infection, and tuberculosis skin tests; and disposable medical supplies intended for one-time use;

DOCSHSV\187827\2\



DEFENDANT'S
EXHIBIT

ACH000239

and medical waste removal necessary for performance at the Detention Facility. All medical care provided by ACH shall be rendered by professionals licensed to practice in the State of Alabama. A nurse practitioner may be used in the physician schedule only as approved by the Sheriff.

4.    **FACILITY:**  The Detention Facility is operated by the Sheriff. As of May 1, 2009, the Detention Facility consists of the following facilities: (1) the facility located at 815 Wheeler Avenue (commonly known as and referred to herein as the "Main Facility"), (2) the 9th and 10th floors of the Madison County Courthouse (commonly known as and referred to herein as the "Courthouse Facility"), and (3) the facility located at 700 Wheeler Avenue (commonly known as and referred to herein as the "Annex Facility"). These three facilities comprising the Madison County Detention Facility are sometimes collectively referred to herein as the "Jail" or the "Detention Facility".

5.    **INMATE POPULATION:**  The Detention Facility houses both male and female pretrial detainees, sentenced inmates with sentences of generally less than one year, and work-release inmates. The Detention Facility houses both misdemeanants and felons. ACH will provide necessary healthcare to all residents of the Detention Facility, including those inmates considered to be "work-release inmates" while the work-release inmates are housed within the Detention Facility. This contract is based upon a 1,000 inmate daily population.

6.    **MINIMUM QUALIFICATIONS AND REQUIREMENTS:**  The Sheriff requires and ACH represents and warrants that it will meet certain minimum requirements. At a minimum, ACH will strictly comply with the following:

A.    **ORGANIZATION:**  ACH will have an on-site manager/coordinator with jail healthcare experience to serve as a liaison between ACH, the Sheriff, and representatives of the Sheriff or the Madison County Commission.

B.    **INSURANCE:**  ACH covenants to furnish, and it is understood and agreed that ACH shall procure at its own expense, and maintain in force throughout the entire term of this Agreement, including any renewal terms, General Liability, Professional Liability, and Medical Malpractice Insurance providing coverage for claims including professional liability, negligence, and claims asserted pursuant to 42 U.S.C. § 1983 in the amount of One Million Dollars ($1,000,000) per occurrence, and Three Million Dollars ($3,000,000) aggregate, insuring all claims that may arise out of the course and scope of this Agreement. Madison County and the Sheriff shall be additional named insureds on the aforesaid policies of insurance. As between insurance coverage provided by other sources to the above named entities and individuals and ACH's insurance coverage, ACH's insurance coverage shall be primary. ACH shall furnish the Sheriff and Madison County with original certificates of its insurance policy obtained in compliance with this Section. The Madison County Administrator shall be furnished with a copy of said policy. Such certificate shall be furnished on or before the commencement of ACH's operations pursuant to this Agreement. ACH shall require its insurance carrier to notify, in writing, the Madison County Administrator and the Sheriff of any changes, endorsements, amendments or cancellations of such insurance policies at least ten (10) days prior to the effective date of such change. ACH's insurance policies shall be written by an insurance company or companies authorized by the Commissioner of Insurance of the State of Alabama to

ACH000240

do business in the State of Alabama. ACH herein agrees and covenants to pay on demand any deductible amount or self insured risk required by said insurance company and/or any insurance policy of Madison County which may be utilized by any person, company or other entity on any claim made against Madison County, or the Sheriff (or those persons or entities associated with them) as a result of any service from or related to this Agreement. Should ACH's insurance provider withdraw coverage or become insolvent, all claims, litigation costs, attorney fees and any judgment or settlement money will be paid by ACH.

C.   **INDEMNIFICATION:**   ACH agrees to indemnify and save harmless Madison County, and the Sheriff, and their respective supervisors, agents, officers, employees, and officials from and against any and all liability, loss, damages, interest, judgments and liens growing out of any and all costs and expenses (including, but not limited to, reasonable attorney fees and disbursements) arising out of or incurred in connection with any and all claims, demands, suits, actions or proceedings, which may be brought against Madison County, the Sheriff, respective supervisors, agents, officers, employees, and officials by reason of, or as the result of (1) acts or omissions of ACH, its agents, servants, or employees related in any way to or while in the performance of this Agreement; (2) any allegations of an act or omission, conduct or misconduct, of ACH, its agents, servants or employees not included in the paragraph above and for which the County, the Sheriff, or their agents, servants, or employees are alleged to be liable; and (3) any allegation of employment discrimination by an ACH employee.

Madison County and the Sheriff agree to indemnify and save harmless ACH from and against any and all liability, loss, damages, interest, judgments and liens growing out of any and all costs and expenses (including, but not limited to, reasonable attorney fees and disbursements) arising out of or incurred in connection with any and all claims, demands, suits, actions or proceedings, which may be brought against ACH by reason of, or as the result of (1) acts or omissions of Madison County, the Sheriff, or their respective supervisors, agents, officers, employees, and officials related in any way to or while in the performance of this Agreement; (2) any allegations of an act or omission, conduct or misconduct, of Madison County, the Sheriff, or their respective supervisors, agents, officers, employees, and officials not included in the paragraph above and for which ACH is alleged to be liable; and (3) any allegation of employment discrimination by Madison County, the Sheriff, or their respective supervisors, agents, officers, employees, and officials.

D.   **NCCHC STANDARDS:**   Healthcare services must be provided in substantial compliance with the current Jail Health Standards published by the National Commission on Correctional Healthcare (NCCHC). ACH may, but is not required to, seek accreditation from NCCHC.

E.   **INMATE CARE STANDARDS:**   ACH represents and warrants that services provided at the Detention Facility will at all times be in compliance with all aspects of the November 8, 2000, March 26, 2001, and November 26, 2001, Orders entered in the case of Marshall v. Dorning, In the United States District Court for the Northern District of Alabama, CV-78-C-5010-NE. In the event that any provision varies from those requirements contained within the consent orders, then the requirements within the consent orders will control. Furthermore, ACH represents and warrants that such services shall at all times be in compliance with the following requirements:

ACH000241

Inmates in the detention facility shall have access at all times to constitutionally adequate healthcare. To this end, ACH must provide 24-hour/7 days per week nursing coverage at the Courthouse Facility and the Main Facility, provided that the Main Facility has a sufficient number of nurses to address in a timely manner the health care needs of any inmates held at the annex buildings. In addition, all 14-day physical exams must be performed by nurses or higher level practitioners appropriately trained in physical assessment. Licensed practical nurses must be supervised by a registered nurse, nurse practitioner, physician's assistant, or physician as required by the Alabama Board of Nursing. The medical director shall review and approve each physical assessment performed on any inmate.

On an annual basis, the medical director, in conjunction with the treating psychiatrist (with regard to psychiatric illness) and obstetrician/gynecologist (with regard to obstetrical and gynecological issues), shall review and update triage protocols and nursing protocols to ensure that they are in accordance with the community standard of care specific to each medical condition, and train all nurses on the proper use of these protocols. The triage protocols developed by the medical director shall indicate whether a condition requires routine (within four weeks), urgent (within two days), or emergency (immediate) referral to a physician. There shall be sufficient physician hours each week to ensure that inmates are seen by a physician at the appropriate interval as determined by the triage protocol.

The medical director shall review the referral decisions by nurses to physicians on a weekly basis to ensure that individuals whose serious medical, dental, and mental health conditions require treatment are being referred in an appropriate and timely way consistent with the standard of care. This shall include referral of individuals newly admitted to the detention facility who suffer from acute or chronic illnesses. If the medical director determines that referrals are not appropriate and timely, he or she shall take immediate steps to counsel and train the nurses in proper referral practices.

An obstetrician/gynecologist shall be available at the detention facility at least twice each month to provide adequate prenatal care to pregnant women and to treat women with gynecological problems. No more than once a month, a certified registered nurse practitioner specializing in obstetrics/gynecology may visit the detention facility in place of the obstetrician/gynecologist. If, according to the triage protocols developed by the medical director and obstetrician/gynecologist, a female prisoner requires treatment prior to the next visit by the obstetrician/gynecologist, she shall receive such treatment at the appropriate interval.

ACH shall ensure that a psychiatrist is at the detention facility a sufficient amount of time each week to provide timely and adequate treatment for inmates with serious mental illness, in accordance with the triage protocols established by the medical director and psychiatrist.

F.    **OFF-SITE SERVICES:** ACH will identify the need for inmate care to be rendered outside the Detention Facility and to schedule, coordinate, and pay for all non-emergency, emergency, and specialized healthcare rendered to inmates inside and outside the Detention Facility. ACH will identify the need for inpatient hospitalization of inmates and to schedule, coordinate, and pay for any inpatient hospitalization for such inmate. ACH is responsible for all institutional charges, physician charges and any and all additional charges for

DOCSHSV\18782712\1                                    4

health care, including but not limited to ambulance charges up to an agreed upon limit described elsewhere herein. ACH will review every invoice submitted to it for payment of off-site services to confirm that such services were actually provided to the inmate while he was in the custody of the Sheriff. When off-site care, including hospital care, is required for approved medical reasons, ACH shall arrange for said care and be financial responsible for cost of ambulance transportation, if medically indicated, and the cost of all approved medical and dental care, diagnostic testing and supplies provided off-site while the Patient is a Detention Facility inmate, subject to the financial liability limit noted in Section T. ACH shall arrange all off-site treatment and care in accordance with the Sheriff's policies and procedures.

G.   **SPECIFIC OBLIGATIONS:**

1.   ACH will identify the need, schedule and coordinate:

All physician services, supporting diagnostic examinations, follow up for health problems identified by screening or laboratory tests, non-emergency and emergency medical care rendered to inmates inside and outside the Detention Facility;

Inpatient hospitalization or offsite specialty service for any inmate at the Detention Facility;

Providing a responsible physician who will conduct sick call five (5) days per week and provide an on call physician or a designee seven days per week, twenty four hours per day for emergency situations;

Psychiatric, psychological and counseling services for any inmates inside the Detention Facility;

Providing a total pharmaceutical system for the Detention Facility;

Providing a medical detoxification program for drug and/or alcohol addicted inmates;

Providing all equipment with the exception of capital outlay equipment. ACH shall provide at its own expense supplies necessary for ACH's performance at the Detention Facility;

Providing all medical supplies;

Providing consultation services to the Sheriff and Director of Corrections on any and all aspects of the health care delivery system at the Detention Facility, including but not limited to, a comprehensive strategic plan; site specific policies, procedures and protocol; peer review; introductory in-service training for correctional officers with regard to accessing inmate healthcare services; continuous quality improvement; cost containment;

DOCSHSV\1878270\   5

ACH000243

utilization management and risk management programs; HIPAA and NCCHC compliance programs specific to the Detention Facility's medical operations;

Providing a centralized billing system for health care providers;

Administering emergency medical care to any employee or visitor at the Detention Facility who requires such care.

Administering, within twenty-four hours of arrival and prior to being placed in a general population cell outside of the booking area, for all new inmates at the Detention Facility, an initial medical, oral and psychological screening. A standard form to record findings of the initial screening and evaluation will be utilized. The form is placed in the patient's medical file. At a minimum, initial screenings will include:

- Documentation of current illnesses and health problems, including medications taken, and special health requirements.

- Behavior observations, including state of consciousness, mental status, and whether the inmate is under the influence of drugs or alcohol.

- Notation of body deformities, trauma markings, bruises, ease of movement, etc.

- Conditions of skin including infestations.

- Referral of the inmate for special housing, emergency health services, or additional medical specialties will be made as needed.

Administering a full health assessment, including a comprehensive physical and psychological evaluation on any inmate confined at Detention Facility within fourteen days of arrival at the facility. This examination will conform to national medical standards, and be performed by a qualified medical professional. At a minimum, the comprehensive evaluation will include:

- Review of the receiving screening results by the Medical Director or the responsible physician

- Collection of additional data to complete the medical, dental and psychological histories

ACH000244

- Review of immunization history and update scheduled as needed Laboratory and/or diagnostic tests (as determined by the responsible physician to detect diseases, the assessment will include:

a) TB testing
b) Sexually transmitted diseases testing including HIV
c) Full blood work up
d) Dental examination
e) Vision examination
f) Recording of height, weight, blood pressure and temperature
g) Other tests and examinations as appropriate
h) Medical (including gynecological assessments of females) with appropriate comments
i) Review of the results of the medical examination and tests, and identification of problems by physician
j) Obstetrical follow-up.

Administering a psychological screening to include at a minimum an interview conducted by the appropriate staff in which inquiries into the items listed below are made: History of psychiatric hospitalization and outpatient treatment; Family history; Current psychotropic medications; suicidal ideation and suicidal behavior; Drug usage; Alcohol usage; History of sex offenses; History of outwardly violent behavior; History of victimization or abuse; Special education placement; History of cerebral trauma and seizures; Emotional response to detainment.

ACH shall perform the collection of physical evidence (hair, blood, saliva) for the purpose of DNA testing on-site with signed consent from the inmate in accordance with applicable NCCHC guidelines. Court ordered collection of physical evidence shall be referred to the appropriate emergency room. ACH shall not be financially responsible for any costs associated with the collection or testing of physical evidence, including but not limited to any associated medical and/or laboratory fees, added personnel and court costs and the costs of DNA collection.

ACH shall perform body cavity searches on-site with signed consent from the inmate in accordance with applicable NCCHC guidelines. Court ordered body cavity searches shall be referred to the appropriate emergency room. ACH shall not be financially responsible for any costs associated with a body cavity search, including but not limited to any associated medical and/or laboratory fees, added personnel and court costs.

ACH000245

ACH shall provide health education materials to the Sheriff for inmate education.

ACH shall review at scheduled quality assurance meetings the healthcare reports with the Sheriff and/or his designee concerning the overall operation of the healthcare services program and the general health of the inmates at the Detention Facility.

ACH representatives shall meet, in accordance with a schedule agreed to by the Sheriff and ACH, with the Sheriff and/or his designee concerning procedures within the Detention Facility and any proposed changes in health related procedures or other matters which either party deems necessary.

ACH will not be responsible for the following: elective care, infant care and certain other enumerated expenses as provided herein. ACH shall not provide elective medical care to inmates. Elective medical care shall be defined as care which, if not provided, would not, in the opinion of ACH's medical director (licensed physician employed by ACH), cause the inmate's health to deteriorate or cause harm to the inmate's well-being. Decisions concerning elective medical care shall be consistent with the applicable American Medical Association ("AMA") standards. ACH shall not be financially responsible for the cost of medical care provided to infants born to Detention Facility inmates. ACH will provide and be financially responsible for prenatal care, testing and hospital care related to pregnancy and delivery as medically indicated for Detention Facility inmates, subject to the financial liability limit noted in Section T, but newborn/infant care is not within the scope of this Agreement. ACH will not be responsible for any other expenses, including, but not limited to, dentures and dental restoration, optical care, eyeglasses and optical supplies, prosthetics and prosthetic supplies.

2.  Duties and Obligations of the Sheriff:

The Sheriff shall maintain responsibility for the physical security of the Detention Facility and the continuing security of the inmates. ACH and the Sheriff agree that adequate security services are necessary for the safety of the agents, employees and subcontractors of ACH as well as of the security of inmates and the Sheriff's staff consistent with a correctional setting. The Sheriff will provide security sufficient to enable ACH and its personnel to safely provide healthcare services described in this Agreement. The Sheriff and Madison County shall not be liable for loss of or damage to equipment and supplies of ACH, its agents, employees or subcontractors unless such loss or damage was caused by the

8

ACH000246

sole negligence of the Sheriff's employees. The Sheriff shall provide use of existing office furniture, including but not limited to, filing cabinets, desks and chairs and all necessary utilities currently in place at the existing healthcare facilities located in the Detention Facility. Upon termination of this Agreement, ACH shall return to Madison County and to the Sheriff possession and control of all County-owned medical and/or office equipment. At such time, the office's furniture shall be in good working order with allowances made for reasonable wear and tear.

The Sheriff shall provide, as needed, information pertaining to inmates that ACH and the Sheriff mutually identify as reasonable and necessary for ACH to adequately perform its obligations to the Sheriff.

**H.    INMATE CO-PAYMENT:** The Sheriff has a policy of charging inmates a $5.00 co-payment fee for certain pharmaceuticals and a $10.00 co-payment fee for certain services the on-site healthcare provider provides to inmates. No inmates are denied healthcare or necessary pharmaceuticals based on their ability or lack thereof to pay the co-payment fee. ACH will complete appropriate documentation and provide the same to the Sheriff or his designee to ensure that co-payment charges are deducted from appropriate inmate jail accounts.

**I.    SATISFACTION WITH HEALTHCARE PERSONNEL:** In recognition of the sensitive nature of the provision of medical services in the Detention Facility, ACH will remove any employee or contractor from the Detention Facility in the event the Sheriff becomes dissatisfied with any healthcare personnel provided by ACH and provides written notice regarding the same. ACH will be required to conduct appropriate background checks and submit appropriate documentation to the Sheriff regarding each employee or contractor providing services herein. The Sheriff will also have the option of performing an independent background check of all employees and contractors, and ACH shall obtain any necessary waivers or consents to allow the Sheriff to conduct certain background checks. The Sheriff's option to perform an independent background check in no way absolves ACH from its obligations hereunder. All persons rendering services on behalf of ACH shall be licensed, certified, or registered, as appropriate, in their respective areas of expertise as required by applicable Alabama law, and appropriate supervision shall be provided as required by applicable Alabama law.

**J.    TRANSPORTATION AND MOVEMENT OF INMATES:** Non-emergency transportation of inmates will be performed by appropriate members of the Sheriff's staff. Emergency transportation of inmates will be performed by appropriate emergency response personnel summoned by ACH.

**K.    INMATE MEDICAL RECORDS:** ACH will establish policies and procedures addressing the medical record format and documentation requirements. ACH will ensure that medical record formats are maintained in a standardized format in accordance with prevailing medical regulations. A medical record will be established for each inmate who receives care beyond the initial intake screening. ACH will maintain a comprehensive health care

DOCSHSV\187827\2\                                    9

ACH000247

record that at a minimum will include the following: Complete receiving; Health assessment data forms; Master problem list; All findings diagnoses treatments, and dispositions; Prescribed medication and their administration; Reports of laboratory, x-ray and diagnostic studies; Signature and title of each documenter; Consent and refusal forms when applicable; Release of information forms when applicable; Place, date and time of health encounter; Discharge summary of hospitalizations; Mental Health Program. Medical records of inmates shall be kept separate from the inmates' confinement records. A complete original of the applicable medical records shall be available to accompany each inmate who is transferred from the Detention Facility to another location for off-site services or to another institution. Medical records shall be confidential, subject to applicable law regarding confidentiality of such records. ACH shall comply with Alabama and federal laws and the Sheriff's policies with regard to access by inmates and jail staff to medical records. No information contained in the medical records of an inmate shall be released by ACH except as provided by the Sheriff's policy, by a Court order or otherwise in accordance with applicable laws. At expiration of the contract, all medical records shall be delivered to and remain the property of the Sheriff However, the Sheriff shall provide ACH with reasonable on-going access to all medical records even after the expiration of this Agreement for the purpose of defending litigation. Inmate medical records shall at all times be the property of the Madison County Sheriff ACH shall make available to the Sheriff, unless otherwise specifically prohibited, at the Sheriff's request, all records, documents and other papers relating to the direct delivery of healthcare services to Detention Facility inmates hereunder. During the period of this Agreement, and for a reasonable time thereafter, the Sheriff will provide ACH, at ACH's request, the Sheriff's record relating to the provision of healthcare services to inmates as may be reasonably requested by ACH in connection with an investigation of, or defense of, any claim by a third party related to ACH's conduct. Consistent with the applicable state and federal laws and the foregoing provisions, the Sheriff will make available to ACH such records as are maintained by the Sheriff as ACH may reasonably request. Any such information provided by the Sheriff to ACH that the Sheriff considers confidential shall be kept confidential by ACH and shall not, except as may be required by law, be distributed to any third party without prior written approval by the Sheriff. Notwithstanding any provision of this Agreement to the contrary, the Sheriff's internal affairs investigation records shall not be required to be provided to ACH or any other person except as may be required by law.

   L.   **REPORTING REQUIREMENTS:** ACH must notify the Sheriff's staff of any inmate believed to have any medical or mental health condition posing a potential threat to inmate or officer wellbeing (such as inmates suspected of having tuberculosis or other communicable diseases or conditions), provide general medical information regarding these medical conditions and provide protocol to be taken when housing, transporting, and interacting with inmates suspected of having these diseases or conditions. ACH must provide a comprehensive internal quality improvement program, which includes conducting an on-going evaluation of compliance with its policies and procedures (in compliance with the requirements contained within relevant consent orders and this contract), with monitoring results documented and reported on a quarterly basis to the Sheriff. ACH must provide monthly statistical utilization reports of services provided, including all off-site services provided sorted by provider and by inmate. ACH must provide monthly staffing reports describing all staffing for the previous month by name, position, location and number of hours. The monthly statistical reports must, at a minimum, include the following information:

ACH000248

| ADMITTING INFORMATION |
|---|
| Number of inmates admitted to the Madison County Detention Facility during the previous month. |

| INTAKE SCREENING |
|---|
| Number of newly admitted inmates whose intake screening forms were not reviewed by a qualified healthcare professional within 24 hours of intake. |
| Out of the number of intake screening forms not reviewed by a qualified healthcare professional within 24 hours of intake (number listed above), number of these inmates who were released from the Madison County Detention Facility less than 24 hours from the time they were admitted to the Madison County Detention Facility. |
| Percent of intake screening forms reviewed within 24 hours of intake for inmates remaining in the Madison County Detention Facility more than 24 hours. |

| PHYSICALS AND TB TESTING |
|---|
| Number of inmates who should have received their 14-day physicals, including TB tests, during the previous month. |

| PHYSICALS |
|---|
| Number of inmates who received their physicals within 14 days of their incarceration in the Madison County Detention Facility. |
| Number of inmates who did not receive physicals because they had a recent physical from previous incarceration. |
| Number of inmates who refused their physical. |
| Number of inmates who received their physicals after 14 days but before 21 days of intake. |
| Percent of inmates who received their physicals within 21 days of intake, who had recent physicals, or who refused their physicals. |

| TB TESTING |
|---|
| Number of inmates who received a mantoux test within 14 days of intake. |
| Number of inmates who refused a mantoux test. |
| Number of inmates who received a mantoux test after 14 days of intake. |
| Number of inmates who did not receive a mantoux test because of recent mantoux testing from previous incarceration in the Madison County Detention Facility or because the inmate reported a prior PPD. |
| Percent of inmates to be tested who received a mantoux test within 14 days of incarceration, who received a mantoux test after 14 days of intake, who had recently been tested, or who reported a prior PPD. |

ACH000249

| MANTOUX TEST READING |
| --- |
| Number of inmates who had their mantoux test read between 48 and 72 hours after it was implanted. |
| Number of mantoux tests that could not be read because the inmate had been released from jail. |
| Percent of mantoux tests read between 48 and 72 hours after implantation. |
| **TB CHEST X-RAYS AND RESULTS** |
| Number of inmates who had a positive result to the mantoux test. |
| Number of inmates who received a chest x-ray within 96 hours of a positive mantoux test result. |
| Number of inmates who did not receive a chest x-ray because they had been released from jail. |
| Number of inmates who received chest x-rays who were started on INH therapy. |
| Number of inmates who were diagnosed with active tuberculosis after receiving a chest x-ray. |
| Number of inmates diagnosed with active tuberculosis during previous month. |

On-site visits by the medical doctor, OB/GYN, psychiatrist, and dentist at the Madison County Detention Facility for the month should be listed by inmate, provider, time spent on-site, and location of visit. The nursing schedule for the month should also be provided.

The number of inmates who were identified as having certain chronic conditions during the previous month should be listed as follows:

- Diabetes
  - Number of insulin-dependent
  - Number of non-insulin dependent
- Hypertension
- Seizures
- Diagnosed Mental Illness
- Asthma
- HIV/AIDS

**M.    MEDICAL EQUIPMENT AND SUPPLIES:**  ACH will be responsible for providing and paying for all equipment and supplies necessary for ACH's performance at the Detention Facility.

**N.    PHARMACEUTICALS:**  ACH must provide a pharmaceutical supply in accordance with federal, state and local laws that meets the needs of the inmate population. Medications shall be administered to inmates as prescribed. Appropriately trained medical

ACH000250

personnel will administer medications and the administration of each dose will be documented. Medications must be maintained under proper conditions and in a secure area. ACH will ensure that appropriate quality and cost control measures are in place to reduce the unnecessary, wasteful, or redundant ordering of or distribution of formulary items.

ACH will comply with all applicable state, federal regulations, and ACA standards regarding prescribing, dispensing, administering, and procuring pharmaceuticals. Procedures will define timely procurement, dispensing, distribution, accounting, and disposal of pharmaceuticals. Records will be maintained to ensure adequate control of and accountability for all medications. Inmates will not prepare, dispense, or administer medication except for self-medication programs approved the Sheriff and ACH.

Drug storage and medication will not contain any outdated, discontinued, or recalled medications. All medications will be stored under proper conditions of sanitation, temperature, light, moisture, ventilation, segregation, and security. Antiseptics, other medications for external use, and disinfectants will be stored separately from internal and injectable medications. An adequate and proper supply of antidotes and other emergency medications, and related information will be readily available to health care staff. Prescription medications are administered or delivered to the inmate only upon the order of a physician, dentist, or other legally authorized individual. ACH will determine the prescriptive practices for the facilities. Medications are prescribed only when clinically indicated and will be documented by a form approved by the Medical Director of ACH. ACH will work with pharmaceutical companies to assure the lowest possible pharmaceutical cost.

Medications are only dispensed by licensed individuals; each prescription is labeled in accordance with applicable regulations with the following information: date, pharmacy prescription number, patient name, name of the drug, strength, amount dispensed, directions to the patient for use, prescriber name, and other pertinent information. Health personnel who have been trained and/or licensed can only pass medications. Administration of medications or their refusal is recorded on the inmate's log. Inmates on abusable medications are observed to ensure that the medications are taken and not hoarded.

O.    **MEDICAL WASTE:**   ACH will be responsible for the removal of all medical waste associated with the provision of healthcare at the Detention Facility.

P.    **CHRONIC CARE CLINICS:**   ACH must establish a plan for the identification, treatment and monitoring of inmates with chronic illnesses and special healthcare needs. ACH will be required to continue "chronic care clinics" for those persons identified with specified chronic illnesses and conditions (diabetes, hypertension; mental illness, HIV/AIDS, tuberculosis, asthma, seizures, etc.). ACH has defined a chronic health problem as an illness which is either ongoing or recurring. To provide an effective and efficient health care delivery system for chronic ill patients, ACH identifies the number of inmates with specific chronic conditions, and individual treatment plans are developed or reviewed for each of these inmates which includes: instructions regarding medications; special therapies; exercise; diet; the type and frequency of laboratory; other diagnostic testing; frequencies of follow up for reevaluation of the inmate's condition; and adjustment of the treatment plan as needed. Chronic clinics are established to enable inmates to have scheduled visits to the health care provider. Educating the

ACH000251

7.    **OBJECTIVES:**    ACH will meet, exceed and otherwise comply with the following stated objectives:

A.    To deliver unimpeded, necessary healthcare services (including medical, dental and mental health services) to inmates (as set forth herein and as dictated by law) that can be audited against established standards.

B.    To operate the healthcare program in a humane manner with respect to the inmate's right to basic healthcare services.

C.    To operate the healthcare program at full staffing and use only licensed, certified and professionally trained personnel.

D.    To implement a written healthcare plan with clear objectives, policies, and procedures.

E.    To maintain an open and cooperative relationship with the Sheriff's administration and staff.

F.    To maintain complete and accurate records of care and to collect, analyze and report health statistics on a regular basis.

G.    To operate the healthcare program in a cost-effective manner with full reporting and accountability to the Sheriff and Madison County.

8.    **MISCELLANEOUS:**

A.    **INDEPENDENT CONTRACTOR STATUS:** The parties acknowledge that ACH is an independent contractor engaged to provide medical care to inmates at the Jail Facilities under the direction of ACH management. Nothing in this Agreement is intended nor shall be construed to create an agency relationship, an employer/employee relationship, or a joint venture relationship between the parties. The employees or agents of ACH are not now nor shall they be deemed to be employees of Madison County or the Sheriff. Likewise, the employees of the Sheriff and/or Madison County are not now nor shall they be deemed to be employees of ACH. ACH assumes all financial responsibility for the employees of ACH, such as wages, withholding taxes, social security taxes and other taxes which may be related to the services to be provided under this Agreement.

B.    **ASSIGNMENT AND SUBCONTRACTING:** ACH shall not assign this Agreement to any other person or entity without the express written consent of the Sheriff and the County. Any such assignment or subcontract shall include the obligations contained in this Agreement. Any assignment or subcontract shall not relieve ACH of its independent obligation to provide the services and be bound by the requirements of this Agreement. In order to discharge the obligations hereunder, ACH may engage certain healthcare professionals as independent contractors rather than employees. As the relationship between ACH and these healthcare professionals will be that of independent contractor, ACH will not be considered or deemed to be engaged in the practice of medicine or other professions practiced by these professionals. ACH will exercise control over the manner or means by which these independent

ACH000255

contractors perform their medical duties. This control will be exercised reasonably consistent with independent medical judgment these independent contractors are required to exercise. ACH shall exercise administrative supervision over such professionals necessary to insure strict fulfillment of the obligations contained in this Agreement. All terms and conditions of this Agreement shall be included in all such subcontracts. For each agent and subcontractor, including all medical professionals, physicians and nurses performing duties as agents or independent contractors of ACH under this Agreement, ACH shall provide the Sheriff proof that, for each such professional, there is in effect during the period that person is engaged in the performance of this Agreement, a professional liability or medical malpractice insurance policy in an amount or amounts of One Million Dollars ($1,000,000) coverage per occurrence and Three Million Dollars ($3,000,000) annual aggregate coverage.

      **C.**   **NOTICE:**   Unless otherwise provided herein, all notices or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally in hand or sent by certified mail, return receipt requested, postage prepaid, and addressed to the appropriate party(s) at the following address or to any other person at any other address as may be designated in writing by the parties. All notices to the Madison County Sheriff and to Madison County shall be addressed to:

| | |
|---|---|
| County: | Madison County Commission |
| | 100 North Side Square |
| | Huntsville, Alabama 35801-4820 |
| | |
| Sheriff: | Sheriff Blake Dorning |
| | Madison County Sheriff's Department |
| | 100 North Side Square |
| | Huntsville, Alabama 35801-4820 |

All notices to ACH shall be addressed to:

      Norman R. Johnson, M.D.
      Advanced Correctional Healthcare, Inc.
      3922 West Baring Trace
      Peoria, Illinois 61615-2500

Notices shall be effective upon receipt.

      **D.**   **GOVERNING LAW:** This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed according to, the laws of the State of Alabama, except as specifically noted.

      **E.**   **ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement of the parties and is intended as a complete and exclusive statement of the promises, representations, negotiations, discussions and agreements that have been made in connection with the subject matter hereof. No modifications or amendment to this Agreement shall be binding upon the parties unless the same is in writing and signed by the respective parties hereto.

DOCSHSV\1878270\1                   18

ACH000256

All prior negotiations, agreements and understandings with respect to the subject matter of this Agreement are superseded hereby.

      **F.**     **AMENDMENT:** This Agreement may be amended or revised only in writing and signed by all parties.

      **G.**     **WAIVER OF BREACH:** The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

      **H.**     **OTHER CONTRACTS AND THIRD-PARTY BENEFICIARIES:** The parties acknowledge that ACH is neither bound by nor aware of any other existing contracts to which the County or the Sheriff are parties and which relate to the providing of medical care to inmates at the Jail. The parties agree that they have not entered into this Agreement for the benefit of any third person or persons, and it is their express intention that the Agreement is intended to be for their respective benefit only and not for the benefit of others who might otherwise be deemed to constitute third-party beneficiaries hereof, specifically including but not limited to arrestees or inmates in the custody of the Sheriff.

      **I.**     **SEVERABILITY:** In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

      **J.**     **LIAISON:** The Madison County Sheriff shall serve as the liaison with ACH.

      **K.**     **COOPERATION:** On and after the date of this agreement, each party shall, at the request of the other, make, execute and deliver or obtain and deliver all instruments and documents and shall do or cause to be done all such other things which either party may reasonably require to effectuate the provisions and intentions of this agreement.

      **L.**     **TIME OF ESSENCE:** Time is and shall be of the essence of this agreement.

      **M.**     **AUTHORITY:** The parties signing this agreement hereby state that they have the authority to bind the entity on whose behalf they are signing. The Sheriff's signature hereto is not intended to bind him in his individual capacity, and his signature hereto is merely intended to convey his consent to and desire for the County to enter into this Agreement with ACH to provide the services herein.

      **N.**     **BINDING EFFECT:** This agreement shall be binding upon the parties hereto, their heirs, administrators, executors, successors and assigns.

      **9.**     **CUMULATIVE POWERS:** Except as expressly limited by the terms of this agreement, all rights, power and privileges conferred hereunder shall be cumulative and not restrictive of those provided at law or in equity.

ACH000257

**IN WITNESS WHEREOF,** the parties have executed this Agreement in their official capacities with legal authority to do so.

SHERIFF, MADISON COUNTY

_____
Blake Dorning
Date: May 4, 2009

MADISON COUNTY COMMISSION

_____
Mike Gillespie, Chairman
Date: May 4, 2009

ATTEST:

_____
Howard Baites
County Administrator
Date: May 4, 2009

ADVANCED CORRECTIONAL HEALTHCARE, INC.

By: _____
Its: CEO
Date: May 29th, 2009

DOCSHSV\187827\2\                    20

ACH000258

## HEALTHCARE SERVICES AGREEMENT AT
## THE MADISON COUNTY DETENTION FACILITY

THIS AGREEMENT between Madison County, Alabama (hereinafter referred to as "County"), Blake Dorning in his official capacity as Madison County Sheriff (hereinafter referred to as "Sheriff"), and Advanced Correctional Healthcare, Inc. (hereinafter referred to as "ACH"), is entered into as of the 1st day of May, 2012. Services under this Agreement shall commence on May 1, 2012, and shall continue through April 30, 2013, unless otherwise terminated as provided herein.

### WITNESSETH:

WHEREAS, the Sheriff desires to provide for health care to inmates housed in the Madison County Detention Facility (hereinafter referred to as "Detention Facility" or "Jail") in accordance with applicable law; and,

WHEREAS, ACH is in the business of providing correctional health care services and desires to provide such services for the Sheriff under the terms and conditions hereof; and,

WHEREAS, the Sheriff desires to enter into this Agreement with ACH to promote this objective; and,

WHEREAS, the County, upon the recommendation of the Sheriff, consents to and desires to enter into this Agreement with ACH to the extent necessary for ACH to secure payment for the services provided hereunder.

NOW THEREFORE, in consideration of the covenants and promises hereinafter made, the parties hereto agree as follows:

1.     GENERAL SCOPE:  ACH will develop, manage and staff a comprehensive healthcare services system at the Madison County Detention Facility in Huntsville, Alabama, to provide all inmates within the Detention Facility with necessary healthcare.

2.     TERM:  This healthcare services contract with ACH will be for a term beginning May 1, 2012 and ending April 30, 2013, unless otherwise terminated as provided herein.

3.     SCOPE OF SERVICES:  ACH shall be the sole supplier of healthcare services (including pharmacy) and coordinator of the healthcare delivery system at the Detention Facility, including coordination and payment for all care rendered to inmates by healthcare providers outside the Detention Facility. ACH is responsible for all health care for all inmates at the Detention Facility. The term "health care" (or "medical care" as sometimes referred to herein) includes, but is not limited to, services customarily provided by a general practitioner, psychiatric and psychological care, obstetrics/gynecological care, dental care, pharmaceuticals, including prescriptions, medications and prescribed over-the-counter medications; on-site laboratory testing to include finger-stick blood sugar, urine dipstick for pregnancy and/or infection, and tuberculosis skin tests; and disposable medical supplies intended for one-time use; and medical waste removal necessary for performance at the Detention Facility.  All medical

DOCSHSV\207688\3\



ACH000260

care provided by ACH shall be rendered by professionals licensed to practice in the State of Alabama. A nurse practitioner may be used in the physician schedule only as approved by the Sheriff.

    **4.**    **FACILITY:**  The Detention Facility is operated by the Sheriff and consists of the one consolidated facility located at 815 Wheeler Avenue.

    **5.**    **INMATE POPULATION:**  The Detention Facility houses both male and female pretrial detainees, sentenced inmates with sentences of generally less than one year, and work-release inmates. The Detention Facility houses both misdemeanants and felons. ACH will provide necessary healthcare to all residents of the Detention Facility, including those inmates considered to be "work-release inmates" while the work-release inmates are housed within the Detention Facility. This contract is based upon a **1,000** inmate daily population.

    **6.**    **MINIMUM QUALIFICATIONS AND REQUIREMENTS:**  The Sheriff requires and ACH represents and warrants that it will meet certain minimum requirements. At a minimum, ACH will strictly comply with the following:

    **A.**    **ORGANIZATION:**  ACH will have an on-site manager/coordinator with jail healthcare experience to serve as a liaison between ACH, the Sheriff, and representatives of the Sheriff or the Madison County Commission.

    **B.**    **INSURANCE:**  ACH covenants to furnish, and it is understood and agreed that ACH shall procure at its own expense, and maintain in force throughout the entire term of this Agreement, including any renewal terms, General Liability, Professional Liability, and Medical Malpractice Insurance providing coverage for claims including professional liability, negligence, and claims asserted pursuant to 42 U.S.C. § 1983 in the amount of One Million Dollars ($1,000,000) per occurrence, and Three Million Dollars ($3,000,000) aggregate, insuring all claims that may arise out of the course and scope of this Agreement. Madison County and the Sheriff shall be additional named insureds on the aforesaid policies of insurance. As between insurance coverage provided by other sources to the above named entities and individuals and ACH's insurance coverage, ACH's insurance coverage shall be primary. ACH shall furnish the Sheriff and Madison County with original certificates of its insurance policy obtained in compliance with this Section. The Madison County Administrator shall be furnished with a copy of said policy. Such certificate shall be furnished on or before the commencement of ACH's operations pursuant to this Agreement. ACH shall require its insurance carrier to notify, in writing, the Madison County Administrator and the Sheriff of any changes, endorsements, amendments or cancellations of such insurance policies at least ten (10) days prior to the effective date of such change. ACH's insurance policies shall be written by an insurance company or companies authorized by the Commissioner of Insurance of the State of Alabama to do business in the State of Alabama. ACH herein agrees and covenants to pay on demand any deductible amount or self insured risk required by said insurance company and/or any insurance policy of Madison County which may be utilized by any person, company or other entity on any claim made against Madison County, or the Sheriff (or those persons or entities associated with them) as a result of any service from or related to this Agreement. Should ACH's insurance provider withdraw coverage or become insolvent, all claims, litigation costs, attorney fees and any judgment or settlement money will be paid by ACH.

ACH000261