Madison County
Blake Dorning
January 15, 2015
Page 8

- Madison County caused or contributed to these cost savings customs and policies by not providing adequate funds for inmate medical care. *E.g.*, Elliott Second Am. Compl. at ¶ 149.

- Sheriff Dorning and Madison County made no effort to hold ACH accountable for how it handles inmate health care. *E.g.*, Elliott Second Am. Compl. at ¶ 154.

- Madison County intentionally refused to adequately fund medical care with deliberate indifference to the serious medical needs of inmates; had a policy of not adequately funding inmate medical care; and thereby contributed to cause inmate suffering and eventual death and defendants' denial of medical treatment for the inmates' serious medical needs. *E.g.*, Elliott Second Am. Compl. at ¶ 165.

The allegations regarding overarching policies and procedures regarding medical care and treatment provided at the Madison County Jail that do not relate to actual medical care and treatment provided to the inmates are not covered under the Essex Policy. For example, the allegation that the defendants failed and refused to evaluate the quality of inmate medical care and address the obvious systemic problems that led to at least six deaths over the course of just three years. *E.g.*, Elliott Second Am. Compl. at ¶ 114.

Sheriff Dorning and Madison County are only Additional Insureds covered by the Essex Policy for liability resulting from the "negligence" of ACH and its employees in rendering "Professional Services." They are not otherwise covered by the Essex policy.

An insurer is only required to defend claims that are subject to coverage under the insurer's policy. See *Tapscott vs. Allstate Ins. Co.*, 526 So.2d 570 (Ala. 1988); *Blackburn vs. Fidelity and Deposit Co. of Maryland*, 667 So.2d 661 (Ala. 1995).1 Although as a practical matter, an insurer may defend the entire action because it is difficult to only defend some of the claims, the Alabama Supreme Court has not held an insurer has a duty to defend non-covered claims. See also, *State Farm Fire & Cas. Co. v. Lacks*, 840 F. Supp. 2d 1292, 1296 (M.D. Ala. 2012) (insurer has no duty to defend or indemnify as to non-covered claims).

We reviewed One Beacon Insurance Group policy number 791-00-05-33-0001 insuring Madison County, Alabama, and its elected or appointed officials and employees for claims involving law enforcement liability. The One Beacon Policy provides coverage to Sheriff Dorning and Madison County for damages resulting from a

**Essex 000034**

Madison County
Blake Dorning
January 15, 2015
Page 9

"law enforcement wrongful act" only if the "law enforcement wrongful act" was first committed by an insured in the course and scope of their "law enforcement activities ...." (One Beacon Policy, SECTION I COVERAGES ¶ A 1. and 3.)

The Essex Policy provides coverage for Sheriff Dorning and Madison County as Additional Insureds only with respect to liability Sheriff Dorning and Madison County may have resulting from the negligence of ACH and its employees in providing medical care or treatment to the inmates and/or staffing/hiring decisions. The Essex Policy does not provide any coverage to Sheriff Dorning or Madison County for damages relating to their independent actions.

As is apparent, the One Beacon Policy provides coverage to Sheriff Dorning and Madison County for their wrongful acts. The Essex Policy provides no coverage for Sheriff Dorning and Madison County for their wrongful acts.

Because One Beacon's policy appears to cover direct actions by Sheriff Dorning and Madison County and the Essex Policy only covers Sheriff Dorning's and Madison County's liability based upon the acts of ACH and its employees, Essex and One Beacon agreed to each pay 50% of your defense costs with the understanding that Essex retains the right to approve hourly rates. Madison County and Sheriff Dorning will be defended by David Canupp in these three lawsuits. If Sheriff Dorning and Madison County object to this arrangement, please let Essex know as soon as possible.

While Essex Insurance is paying a percentage of Madison County's and Sheriff Dorning's defense costs, it is to be expressly understood that Essex Insurance is responsible only according to the terms, limits, and conditions of its Policy.

## NO COVERAGE FOR OTHER MADISON COUNTY EMPLOYEES

Steve Morrison, Administrator of the Madison County Jail is a defendant in all three lawsuits. Pamela Batie, Jessica Pothier, Christine Collier, Vanessa Fields, Nick Wallace, Roslyn Guiton and Randy Hooper, correctional officers at the Madison County Jail, are named as defendants in the *Elliott* case. These individual defendants have not tendered their defense to Essex Insurance. Nevertheless, please be advised that these individually named defendants and employees of Madison County Jail are not covered under the Essex policy.

Essex 000035

### NON-WAIVER

The defense provided to Madison County and Sheriff Dorning is under a reservation of rights because there are non-covered claims asserted in the Claims and because there are potential policy defenses.

Essex Insurance does not waive or forfeit any rights that it holds. There may be other circumstances and facts that may preclude coverage. There may be other applicable policy provisions, conditions, terms and exclusions that preclude coverage. Neither this letter, nor Essex Insurance's participation in the defense of Madison County and Sheriff Dorning under a reservation of rights, nor any other action taken by Essex Insurance should be construed as a waiver of any rights held by Essex Insurance under any policy of insurance or otherwise. Essex Insurance expressly reserves all rights.

### RIGHT TO REIMBURSEMENT/INDEMNITY

Essex Insurance specifically reserves its right to reimbursement of defense costs allocable to non-covered claims to the extent allowed by applicable by law.

Furthermore, we note that ACH has a right to indemnity from Madison County and Sheriff for all claims brought against ACH as the result of acts or omissions of Madison County or the Sheriff pursuant to the Healthcare Services Agreement at the Madison County Detention Facility.

### POLICY LIMITS

The damages outlined in the Claims are not specific and therefore represent a potential for an exposure in excess of the $1,000,000 per claim limit or the aggregate limits in the Policy. If Madison County or Sheriff Dorning has other insurance available, it or he should immediately notify those insurance companies of the Claims. If there is no additional insurance, and should a judgment be rendered in excess of the policy limits, then Madison County and Sheriff Dorning would be responsible for the excess judgment. In the event that none of the damages are covered, then Madison County and Sheriff Dorning could be responsible for the entirety of the judgment. For those reasons, we recommend that you seek the advice of independent counsel.

Madison County
Blake Dorning
January 15, 2015
Page 11

### CONCLUSION

Essex Insurance will contribute to the defense of Madison County and Sheriff Dorning as stated above, but it reserves the right to assert at a later time any and all coverage defenses that are appropriate.

The Policy does not afford coverage for certain acts or omissions of Madison County and Sheriff Dorning as stated in the Policy. Essex Insurance will not indemnify Madison County and Sheriff Dorning as to non-covered claims. Madison County and Sheriff Dorning must act on its own behalf to protect its interests as to all non-covered claims.

Essex Insurance may file a declaratory judgment action to determine its duties and obligations under the Policy or may intervene into the above-referenced lawsuit for the propose of resolving what insurance coverage obligations Essex Insurance has, if any.

The foregoing may not be all of the coverage defenses available and Essex Insurance reserves its right to assert possible additional coverage defenses as it become appropriate.

If you believe that our understanding of the facts is in error or the Policy is being misapplied in reaching our conclusion, please let us know promptly so that we can address such issues. If you have any additional information concerning the Claims, please forward this information to us as soon as possible so that consideration can be given to it.

If you have any questions or comments concerning the insurance coverage available to Madison County and Sheriff Dorning under the Policy, please do not hesitate to contact the undersigned at (205) 502-0197.

Sincerely,

F. Lane Finch, Jr.

Madison County
Blake Dorning
January 15, 2015
<u>Page 12</u>

cc:   Barbara McConnell
      Examiner
      OneBeacon Government Risks
      188 Inverness Drive W., Ste 600
      Englewood, CO 80112

      Jagady Blue
      Senior Claims Examiner
      Markel

876739.2

**Essex 000038**



**MAYNARD COOPER & GALE PC**
ATTORNEYS AT LAW

Matthew B. Reeves
DIRECT 256.562.1155
EMAIL mreeves@maynardcooper.com

March 4, 2015

**VIA CERTIFIED MAIL AND E-MAIL**

F. Lane Finch, Jr.
Hand Arendall, LLC
2001 Park Place North
Suite 1200
Birmingham, AL 35203

    Re:    **Insurance Coverage**

Dear Mr. Finch,

    As you know, I represent Madison County, Alabama (the "County"), Madison County Sheriff Blake Dorning ("Sheriff Dorning"), and his employees concerning insurance and indemnity claims arising from civil actions filed by Tanyatta Woods, as personal representative of the estate of Deundrez Woods ("Woods"); Carolyn Jefferson, as personal representative of the estate of Tanisha Jefferson ("Jefferson"); and Robert Elliott, as personal representative of the estate of Nikki Listau ("Listau").

    After reviewing the applicable insurance policy (no. MM-823662, the "Policy") and your coverage letters, it is clear that the position taken by Essex Insurance Company ("EIC") and its claims service manager, Markel Service, Inc. ("Markel" and, together with EIC, "Essex"), concerning insurance coverage (or lack of insurance coverage) is factually and legally unsupported.[1] Essex's coverage analysis did not consider the "Amendatory Endorsement – Civil Rights Violation" and it appears Essex ignored the well-settled rule in Alabama that "[t]he insured's conduct *rather than the allegedly injured person's allegations* determine whether the insurer has a duty to indemnify." Tanner v. State Farm Fire & Cas. Co., 874 So. 2d 1058, 1066 (Ala. 2003) (emphasis added). Moreover, Essex's position puts its Named Insured – Advanced Correctional Healthcare, Inc. ("ACH") – in an unenviable position, exposing ACH to substantial claims and expenses it probably understood were covered under the Policy.

    Even a cursory review of the operative pleadings reveals that the plaintiffs' claims against the County, Sheriff Dorning, and his employees in the Woods, Jefferson, and Listau actions are merely derivative of the alleged negligence and constitutional torts committed by ACH and its physicians and nurses. Without the alleged inadequate medical care by ACH and its physicians and nurses, no claim exists against the "supervisory officials" or the County. See

---

[1] Notably, ACH's coverage decision as to the County and Sheriff Dorning failed to explain what claims (as opposed to "allegations") and relief are actually covered by the Policy, understanding that only a single claim is asserted against the County (inadequate funding) and Sheriff Dorning (supervisory liability) by each plaintiff in the Woods, Jefferson, and Listau actions.



DEFENDANT'S EXHIBIT 83 Rich

...LATIN STREET  P.O. BOX 18668 (35804-8668)  HUNTSVILLE, ALABAMA 35801-4936  256.551.0171  FAX 256.512.0119

WWW.MAYNARDCOOPER.COM

Evanston 001665

March 4, 2015
Page 2

Hicks v. Moore, 422 F.3d 1246, 1252-53 (11th Cir. 2005) ("Because we conclude that Plaintiff's constitutional rights were not violated ..., Plaintiff cannot maintain a § 1983 action for supervisory liability...."); Rooney v. Watson, 101 F.3d 1378, 1381-82 (11th Cir. 1996) ("[O]ur finding that the Rooneys did not suffer any constitutional deprivation makes it unnecessary to consider Volusia County's policy or custom."). That is, supervisory and municipal liability are contingent on the existence of an underlying constitutional violation. But for the inadequate medical care, none of the "supervisory officials" or the County could be liable to the plaintiffs in the Woods, Jefferson, and Listau actions.

Essex has failed to investigate and appropriately consider insurance coverage under the Policy for the County and Sheriff Dorning as it relates to the derivative claims asserted against them in the Woods, Jefferson, and Listau actions. The County and Sheriff Dorning, therefore, encourage Essex to immediately reconsider its coverage decision. Indeed, Essex's duty of good faith and fair dealing require it to revisit insurance coverage for the County and Sheriff Dorning under the Policy.

Also, it appears we need to clear up a misunderstanding. The January 15, 2015 letter to the County and Sheriff Dorning states: "Essex and One Beacon agreed to each pay 50% of your defense costs with the understanding that Essex retains the right to approve hourly rates." (Jan. 15, 2015 Ltr. at 9). This is simply incorrect. Perhaps, Jagady Blue, Markel's Senior Claims Examiner, misunderstood Barbara McConnell's position. Certainly, Mr. Blue proposed a 50/50 split of defenses costs between Essex and One Beacon; however, One Beacon did not agree to that arrangement. It could not do so without approval of its insureds, and neither Sheriff Dorning nor the County agreed or will agree to that arrangement. Instead, if Essex wants to split the defense costs, then it needs to make arrangements with ACH. To be sure, if the County, Sheriff Dorning, and his employees are not covered under the Policy for the claims asserted against them in the Woods, Jefferson and Listau actions, then ACH breached its obligation to procure adequate, primary insurance and, regardless of that failing, ACH is responsible for the defense costs under the insurance provision in section 6.B. and the indemnity provision in section 6.C. of the Healthcare Services Agreement.

Because discovery is about to begin in the Woods case (and it is likely imminent in the Jefferson and Listau cases too), these insurance issues need to be resolved as soon as possible. From past experience with plaintiffs' counsel, the defense costs associated with the Woods, Jefferson, and Listau cases will be substantial. Aside from the urgency of resolving these issues because of the existing and impending defense costs, it is also appropriate so that if an opportunity to settle one or more of these cases is presented, then the parties can explore such an opportunity (relying on Essex and ACH to fund the settlement). I look forward to hearing from Essex before March 9, 2015 on this important matter.


MAYNARD COOPER
& GALE PC
ATTORNEYS AT LAW

**Evanston 001666**

March 4, 2015
Page 3

Sincerely,

Matthew B. Reeves

MR:bb

cc: Norman R. Johnson, M.D.
J. Jeffery Rich, Madison County Attorney

THE ABOVE IS NOT AN EXHAUSTIVE STATEMENT OF ALL RELEVANT FACTS AND LAW. NOTHING IN THIS LETTER SHALL CONSTITUTE OR BE CONSTRUED AS A WAIVER OF ANY BREACH OF OR DEFAULT UNDER THE AGREEMENT OR WAIVER OF ANY RIGHT WHICH THE COUNTY, SHERIFF DORNING, OR HIS EMPLOYEES MAY HAVE AT LAW OR IN EQUITY, INCLUDING, WITHOUT LIMITATION, ANY RIGHT UNDER THE AGREEMENT OR ESSEX INSURANCE POLICY. ANY FAILURE OR DELAY ON THE PART OF THE COUNTY, SHERIFF DORNING, AND/OR HIS EMPLOYEES TO EXERCISE ANY RIGHT, REMEDY, POWER OR PRIVILEGE UNDER THE AGREEMENT, THE ESSEX INSURANCE POLICY, OR PROVIDED BY STATUTE, AT LAW, IN EQUITY, OR OTHERWISE SHALL NOT IMPAIR OR OPERATE AS A WAIVER OF ANY SUCH RIGHT, REMEDY, POWER OR PRIVILEGE OR BE CONSTRUED AS A WAIVER OF ANY BREACH OR DEFAULT OR AS AN ACQUIESCENCE THEREIN. THE COUNTY, SHERIFF DORNING, AND HIS EMPLOYEES EXPRESSLY RESERVE ALL OF THEIR LEGAL AND EQUITABLE RIGHTS AND REMEDIES, INCLUDING, BUT NOT LIMITED TO, THE RIGHT TO SEEK INJUNCTIVE RELIEF AND RECOVER MONETARY DAMAGES.



MAYNARD COOPER
& GALE PC
ATTORNEYS AT LAW

Evanston 001667

# Advanced Correctional Healthcare

## Policy and Procedure Manual
## For
## Health Services
## In
## Jails

## Madison County Detention Center
## Main Jail, Annex, Courthouse
## Huntsville, Alabama

Revised: November 2007



DEFENDANT'S EXHIBIT 85 Rich

MADISON COUNTY (ACH) 0381

# INTRODUCTION

Administrative and operational policies are utilized to ensure uniformity and consistency in the day-to-day Advanced Correctional Healthcare operations. Policies are intended to provide direction to personnel in their application of professional/technical skills in the correctional setting.

All Advanced Correctional Healthcare staff must support existing policies. The existing policies may need to be added to, deleted from, or modified based on each particular institution's needs

The policy may be modified, upon request, in cases where a professional (physician or nurse) identifies that a policy works to the disadvantage of the institution (or an individual).

The professional may also request a change in policy based on new information or particular circumstances.

Exceptions for existing policies may be made only by the Health Services Administrator. However, a written report should be forwarded to the corporate office noting the following:
1. Policy name;
2. Exception made;
3. Reason for making the exception.

The policies will be reviewed and amended as needed on an annual basis; however, suggestions may be submitted at any time.

Advanced Correctional Healthcare policies are to be utilized by Advanced Correctional Healthcare professionals only. No part of this manual may be reproduced in any form by any means without written permission from the corporate office.

MADISON COUNTY (ACH) 0382

## Table of Contents/Exposure Categories

Classification of procedures/tasks according to Exposure Categories I, II and III as outlined in the Joint Advisory Notice issued by the Departments of Labor and Health and Human Services entitled Protection Against Occupational Exposure to Hepatitis B Virus (HBV) and Human Immunodeficiency Virus (HIV), Federal Register/Vole. 52, No. 210/October 30, 1987.

Category I -   Tasks that involve exposure to blood, body fluids, or tissues.

Category II -  Tasks that involve no exposure to blood, body fluids or tissues, but employment may require performing unplanned Category I tasks.

Category III - Tasks that involve no exposure to blood, body fluids or tissues, and Category I tasks are not a condition of employment.

| POLICY | PAGE # | I | II | III |
|---|---|---|---|---|
| **SECTION A.** **GOVERNANCE AND ADMINISTRATION** | | | | |
| 101 RESPONSIBLE HEALTH PARTY | 1 | | | X |
| 102 MEDICAL AUTONOMY | 2 | | | X |
| 103 ADMINISTRATIVE MEETINGS AND REPORTS | 5 | | | X |
| 104 POLICIES AND PROCEDURES | 6 | | | X |
| 105 COMPREHENSIVE QUALITY IMPROVEMENT PROGRAM | 7 | | | X |
| 106 EMERGENCY PLAN | 8 | | | X |
| 107 COMMUNICATION ON SPECIAL NEEDS PATIENTS | 9 | | | X |
| 108 PRIVACY OF CARE | 11 | | | X |
| 109 NOTIFICATION IN EMERGENCIES | 12 | | | X |
| 110 PROCEDURE IN EVENT OF INMATE DEATH | 13 | X | | |
| 111 GRIEVANCE MECHANISHM | 14 | | | X |
| **SECTION B.** **SAFE ENVIRONMENT** | | | | |
| 112 INFECTION CONTROL PROGRAM | 16 | X | | |
| 113 ENVIRONMENTAL HEALTH & SAFETY | 17 | | X | |

| POLICY | PAGE # | I | II | III |
|---|---|---|---|---|
| 114 KITCHEN SANITATION & FOOD HANDLERS | 18 | | X | |
| 115 ECTOPARASITE CONTROL | 19 | | X | |
| 116 FIRST AID KITS | 20 | | X | |
| **SECTION C.** **PERSONNEL AND TRAINING** | | | | |
| 117 CREDENTIALING | 21 | | | X |
| 118 CONTINUING EDUCATION FOR QUALIFIED HEALTH SERVICES PERSONNEL | 22 | | | X |
| 119 TRAINING FOR CORRECTIONAL OFFICERS | 23 | | X | |
| 120 MEDICATION ADMINISTRATION TRAINING | 24 | X | | |
| 121 INMATE WORKERS | 26 | | | X |
| 122 JOB DESCRIPTIONS | 27 | | | X |
| 123 STAFFING LEVELS | 28 | | | |
| 124 CORRECTIONAL HEALTH COORDINATOR | 31 | | | |
| 125 ORIENTATION AND TRAINING FOR HEALTH SERVICES STAFF | 32 | | | |
| **SECTION D.** **HEALTHCARE SUPPORT SERVICES** | | | | |
| 126 PHARMACEUTICALS | 33 | | | |
| 127 CLINIC SPACE, EQUIPMENT AND SUPPLIES | 34 | | | X |
| 128 DIAGNOSTIC SERVICES | 35 | X | | |
| 129 HOSPITAL AND SPECIALIZED AMBULATORY CARE | 36 | X | | |
| **SECTION E.** **INMATE CARE AND TREATMENT** | | | | |
| 130 RECEIVING SCREENING | 37 | X | | |
| 131 INFORMATION ON HEALTH SERVICES | 40 | X | | |
| 132 ORAL SCREENING | 41 | X | | |
| 133 HEALTH ASSESSMENT | 42 | X | | |
| 136 EMERGENCY SERVICES | 43 | X | | |
| 137 WRITTEN AND VERBAL CLINICIAN'S ORDERS | 44 | | | X |
| 138 PATIENT TRANSPORT | 45 | | X | |
| 139 DENTAL TREATMENT | 46 | X | | |
| 140 MENTAL HEALTH EVALUATIONS | 47 | X | | |

| POLICY | PAGE # | I | II | III |
|---|---|---|---|---|
| 141 ASSESSMENT PROTOCOLS | 48 | | | X |
| 142 CONTINUITY OF CARE | 49 | X | | |
| 143 HEALTH EVALUATIONS OF INMATES IN SINGLE PERSON CELLS | 50 | | X | |
| **SECTION F. HEALTH PROMOTION AND DISEASE PREVENTION** | | | | |
| 144 HEALTH PROMOTION AND DISEASE PREVENTION | 51 | | | X |
| 145 DIET | 52 | | | X |
| **SECTION G. SPECIAL NEEDS AND SERVICES** | | | | |
| 146 SPECIAL NEEDS HOUSING | 53 | X | | |
| 147 SUICIDE PREVENTION | 54 | X | | |
| 148 INTOXICATION AND WITHDRAWAL | 55 | | X | |
| 149 PRENATAL CARE | 57 | | X | |
| 150 INMATES WITH ALCOHOL OR OTHER DRUG PROBLEMS | 58 | | | X |
| 151 SEXUAL ASSUALT | 59 | X | | |
| 152 PREGNANCY COUNSELING | 60 | | | X |
| 153 ORTHOSES, PROTHESES, AND OTHER AIDS TO IMPAIRMENT | 61 | | X | |
| **SECTION H. HEALTH RECORDS** | | | | |
| 154 HEALTH RECORD FORMAT AND CONTENTS | 62 | | | X |
| 155 CONFIDENTIALITY OF HEALTH RECORDS | 64 | | | X |
| 156 SHARING OF HEALTH INFORMATION | 65 | | | X |
| 157 AVAILABILITY AND USE OF HEALTH RECORDS | 66 | | | X |
| 158 TRANSFER OF HEALTH RECORDS | 67 | | | X |
| 159 RETENTION OF HEALTH RECORDS | 68 | | | X |

MADISON COUNTY (ACH) 0385

| POLICY | PAGE # | I | II | III |
|---|---|---|---|---|
| **SECTION I.** **MEDICAL/LEGAL ISSUES** | | | | |
| 160 MEDICAL RESTRAINTS & THERAPEUTIC SECLUSION | 69 | | | X |
| 161 FORCED PSYCHOTROPIC MEDICATION | 70 | | | X |
| 162 FORENSIC INFORMATION | 71 | | | X |
| 163 INFORMED CONSENT | 72 | | | |
| 164 RIGHT TO REFUSE TREATMENT | 73 | | | X |
| 165 MEDICAL RESEARCH | 74 | | | X |
| 166 VOLUNTEERS, STUDENTS, INTERNS | 75 | | | X |

RECEIVING SCREENING
POLICY 130

**POLICY:**

Prior to being placed in a cell, Advanced Correctional Healthcare's policy requires that medical personnel give all inmates a receiving screening.

**PROCEDURE:**

No arrestee requiring medical services beyond what can be provided within the facility shall be accepted into the facility until the arrestee has been treated at the local hospital and medically cleared by the hospital for commitment into the jail.

Medical staff will immediately assess any arrestee presenting to the jail with a potential injury. Where injuries require treatment beyond what is available in the facility, the nurse will refer the inmate to the local emergency room and request a medical clearance. The medical staff will make this determination before the inmate is accepted into the jail.

**INTAKE SCREENING OF PERSONS PROCESSED:**

The detention officer completing the booking process, as part of the admissions procedure, will provide the arrestee with an Intake Screen form to be completed. If, during the completion of the form, the detention officer observes the need for medical staff to examine the person, the medical staff will be immediately requested to perform an examination. If the medical staff determines a persons should receive medical treatment before the booking process continues, medical staff shall direct the shift supervisor to inform the arresting and/or transporting officer to transport the person to the Huntsville Hospital Emergency Room for treatment if such treatment is not possible in thee main jail. Upon completion of treatment, if at the emergency room, the treating physician shall, in writing, provide medical clearance for the person to be returned to the jail for the completion of the booking process and shall include any orders pertaining to the further treatment and/or medications to be given.

More specifically, any person exhibiting nay of the following behavior or characteristics will be denied admission to the Madison County Jail until evaluated by jail medical staff and/or emergency room staff:
1. Persons who are unconscious;
2. Persons who are having or who have recently had convulsions;
3. Persons with any significant external bleeding;
4. Persons with any obvious fractures;
5. Persons with signs of head, neck or spinal injuries;

37.

6. Persons with any type of serious injury;
7. Persons who cannot walk under their own power;
8. Persons who display symptoms of internal bleeding;
9. Persons with abdominal bleeding;
10. Pregnant women in labor;
11. Pregnant women with any other serious problem(s);
12. Persons with extremely intoxicated or incapacitated behavior;
13. Persons with breathing difficulties;
14. Persons exhibiting apparent hallucinations; *and*
15. Persons with other serious medical indications.

The screening process will include inquiry into any communicable diseases, including tuberculosis and sexually transmitted diseases, urgent chronic conditions, review and continuation of any medications. During intake screening, detention officers shall determine, if possible, whether the inmate is taking medication for a health condition and if the inmate is taking medication, promptly make arrangements with jail medical staff for continuation of treatment.

1. Inmates who appear at intake to be suffering from serious mental illness, including inmates indicating a suicidal threat by words or action will be immediately referred to the medical staff.
2. Any inmate, at intake, suspected of having tuberculosis *(TB)*, will be isolated from the jail population pending medical findings.
3. Any inmate who answered yes to the following questions on the Intake Screening form will be escorted to the nurse's unit immediately for medical evaluation:
    a. Do you have a cough that won't clear up?
    b. Do you have a fever that won't go away?
    c. Do you have heavy sweating at night for no reason when it is not hot?
    d. Have you lost more than 10 pounds of weight during the last 6 months?

*need to spell out once*

The inmate is questioned regarding his/her tuberculosis history. If there is no history of a past positive PPD or past INH therapy, then a PPD is given to the inmate within fourteen (14) days. If there is a TB history then the inmate is scheduled for a CXR. The PPD must be read within 48/72 hours. If the PPD is positive, the inmate is placed in a single person cell until a CXR is obtained and the results received. The CXR should be obtained within 96 hours. *48 or 72?*

Any inmate suspected of having active TB will be isolated with a medical face mask until the public health department is consulted and the appropriate can be arranged. The Jail Compliance Officer shall be immediately notified in the event an inmate is suspected of having active TB.

38.

If an inmate is released prior to his/her test being read, the inmate should be advised to follow-up with the local health department, if it is known he/she is being released prior to PPD reading. If an inmate refuses the TB skin test, he/she shall be isolated for his protection and the protection of other inmates, as TB is an airborne infectious disease. It shall be explained and documented to the inmate the importance of TB skin testing. The inmate should also sign a Refusal of Treatment form. If the inmate has no symptoms of TB and CXR is clear, he may return to the general population.

A medical file will be started on each inmate entering the facility.

Reference: NCCHC J-E-02
Effective Date: November 2007

39.

MADISON COUNTY (ACH) 0457

INTOXICATION AND WITHDRAWAL
POLICY 148

**PURPOSE:**

To provide guidelines for the nursing assessment of detainees who appear to be exhibiting acute symptoms of alcohol/drug (barbiturate/narcotic/benzodiazepine) withdrawal.

**POLICY:**

*reference p-ye #*

All detainees shall be evaluated through the receiving screening process (Policy 130) for their use of or dependence on drugs or alcohol.

**PROCEDURE:**

Detainees reporting the use of alcohol, opioids, stimulants, sedatives, hypnotic drugs, or other substances shall be evaluated for their degree of reliance on and potential for withdrawal from these substances and possible intoxification (overdose).

Detoxification will be carried out only under medical supervision and initiated by the medical staff with physician overview on an individual care basis. When it is determined that an inmate has a dependency on alcohol/drugs that may cause withdrawal symptoms, the inmate is monitored at least once per shift by the medical staff and observations are noted on the Clinical Institute Withdrawal Assessment (CIWA) chart. If during the monitoring, the inmate exhibits signs of withdrawal, the physician is notified and verbal orders received to begin the appropriate withdrawal protocol.

If an inmate reports past history of withdrawal problems, the physician is notified and orders received to begin the appropriate withdrawal protocol immediately. In the event of severe withdrawal symptoms, the inmate will immediately be transferred to the Huntsville Hospital Emergency Room.

All inmates found to be demonstrating the signs and symptoms of drug or alcohol withdrawal will be evaluated by the medical staff and the physician's treatment plan for detox will be followed. Inmates experiencing severe, life threatening intoxication or withdrawal must be seen by the physician, if on-site, or sent to the emergency room for treatment.

55.

MADISON COUNTY (ACH) 0482

The inmate must be monitored on a consistent basis and all findings charged in his/her medical record.

Please refer to the jail protocols for treatment methods and/or the physician's detox protocols.

Documentation of the patient's detoxification shall be monitored and reviewed by all medical staff members in order to maintain the patient's care while incarcerated.

The inmate may be referred to the Psych Nurse for assessment regarding his/her dependency issues.

Reference: NCCHC J-G-06
Effective Date: November 2007

56.

MADISON COUNTY (ACH) 0483

**INMATES WITH ALCOHOL OR
OTHER DRUG PROBLEMS
POLICY 150**

**PURPOSE:**

To assess, treat and refer patient with chemical dependencies.

**POLICY:**

Advanced Correctional Healthcare's policy requires that all inmates be screened for abuse of or dependency on alcohol or drugs at the time of their commitment.

**PROCEDURE:**

Those inmates demonstrating a significant potential for dependency on such substances as demonstrated by history or clinical symptoms, will be referred to the Psych Nurse. Any inmate committed under the influence of alcohol or drugs shall be separated from the general population and kept under close observation for a reasonable period of time. Security staff should notify the medical staff of an inmate's status on a consistent basis until his/her release into the general population.

Any prior treatment plans should be obtained from the prior treating physician and/or facility and must be reviewed by the physician and medical staff. These records should be placed in the inmate's medical record.

The physician will be responsible for making a diagnosis of dependency or non-dependence and determining whether or not treatment is appropriate. Where treatment is determined to be appropriate, individualized treatment plans will be developed for each inmate and these plans will be implemented by the medical staff.

The inmate may be referred to a local rehab facility upon his/her release.

Reference: NCCHC J-G-08
Effective Date: November 2007

58.

MADISON COUNTY (ACH) 0487