UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| MADISON COUNTY, SHERIFF BLAKE DORNING, et al., | ) ) ) | |
| Plaintiffs | ) ) | |
| vs. | ) ) | Case No.   5:15-cv-01997-HNJ |
| EVANSTON INSURANCE COMPANY, et al., | ) ) ) | |
| Defendants | ) ) | |

## <u>AMENDED MEMORANDUM OPINION</u>

This civil action proceeds before the court on Defendant Advanced Correctional Healthcare, Inc.'s ("ACH") Motion for Summary Judgment (Doc. 89), Defendant Evanston Insurance Company's ("Evanston") Motion for Summary Judgment (Doc. 91), Evanston's Motion to Strike Exhibits in Support of Plaintiffs' Brief in Opposition (Doc. 106), and Plaintiffs' Request for Judicial Notice. (Doc. 116).

Based upon the following analyses, the court will **GRANT** Evanston's summary judgment motion; **DENY** ACH's summary judgment motion as to Plaintiffs' fraud, breach-of-contract, and indemnity claims; **GRANT** ACH's motion as to Plaintiffs' promissory estoppel claim; **DENY** Plaintiffs' Request for Judicial Notice; and **DENY** Evanston's Motion to Strike as moot.

## STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a). Defendants, as the parties seeking summary judgment, bear the initial responsibility of informing the district court of the basis for their motions, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element of a non-movant's claim or defense. *Id.* at 323 (emphasis in original).

A non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted). The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

## BACKGROUND

The undersigned sets forth the following facts for the summary judgment determination, drawn from the evidence taken in the light most favorable to Plaintiffs.

Plaintiff Blake Dorning ("Dorning") serves as the Sheriff of Madison County, Alabama ("County"). As Sheriff, Dorning's duties include (1) managing and operating the Madison County Jail ("Jail") and (2) providing services that tend to inmates' needs,

3

including housing, food, and medical care. A November 2000 consent decree binds Dorning to provide constitutionally adequate medical care to the Jail's inmates, and Dorning utilizes funding from the County to comply with the consent decree's requirements. (Doc. 95-11 at 3-23). The County retains a statutory duty to fund the operation of the Jail through the Sheriff's budget, which includes funding at a necessary level to provide constitutionally adequate medical care.

In 2002, Dr. Norman Johnson ("Johnson") founded Advanced Correctional Health Care, Inc. ("ACH"). ACH provides healthcare in seventeen (17) states at approximately three-hundred (300) correctional facilities, serving as the largest privately-owned provider of correctional healthcare.

On July 29, 2005, Dorning and the County (collectively, "Plaintiffs") issued a Request for Proposals (RFP) to administer a comprehensive, healthcare services system at the Jail. (Doc. 95-9 at 27). The RFP indicated that the selected provider would serve as the sole supplier of healthcare services, and the coordinator of the healthcare delivery system, at the Jail. (*Id.* at 28). The RFP required that the selected provider carry "acceptable professional liability insurance providing coverage for claims including professional liability, negligence, and claims asserted pursuant to 42 U.S.C. § 1983 . . . and name Madison County, the Sheriff, and their agents and employees as additional insureds." (*Id.* at 34). The RFP also required that the selected provider "indemnify, defend, and hold harmless the Sheriff, Madison County and any and all of their agents

4

and employees from any claims arising from the delivery of healthcare services to inmates at the [Jail]." (*Id.*)

**ACH and Plaintiffs Enter into a Health Services Agreement**

ACH, along with several other companies, responded to the RFP. Although the County rejected ACH's first proposal, the County subsequently engaged ACH to negotiate a contract for the provision of healthcare at the Jail. The discussions between ACH and the County culminated in a Health Services Agreement in July 2006 ("Agreement"). (Doc. 94-2 at 8 through Doc. 94-3 at 12). The parties subsequently renewed the Agreement on May 1, 2009 (Doc. 95-11 at 33-49); May 1, 2012 (Doc. 95-11 at 51 through Doc. 95-12 at 18); and February 1, 2014. (Doc. 95-13 at 2-22).

All versions of the Agreement state that ACH would serve as the "sole supplier of healthcare services (including pharmacy) and coordinator of the healthcare delivery system" at the Jail. (Doc. 94-2 at 8; Doc. 95-11 at 33, Doc. 95-11 at 51; Doc. 95-13 at 2). The Agreement required ACH to "develop, manage and staff a comprehensive healthcare services system," yet Dorning retained responsibility for the Jail's operations. (Doc. 94-2 at 8-9; Doc. 95-11 at 33-34; Doc. 95-11 at 51-52; Doc. 95-13 at 2-3). Additionally, the Agreement stated the following:

> 6. MINIMUM QUALIFICATIONS AND REQUIREMENTS: The Sheriff requires and ACH represents and warrants that it will meet certain minimum requirements. At a minimum, ACH will strictly comply with the following:

. . . . . .

  B. INSURANCE: ACH covenants to furnish, and it is understood and agreed that ACH shall procure at its own expense, and maintain in force throughout the entire term of this Agreement, including any renewal terms, General Liability, Professional Liability, and Medical Malpractice Insurance providing coverage for claims including professional liability, negligence, and claims asserted pursuant to 42 U.S.C. § 1983 in the amount of One Million Dollars ($1,000,000) per occurrence, and Three Million Dollars ($3,000,000) aggregate, insuring all claims that may arise out of the course and scope of this Agreement. Madison County and the Sheriff shall be additional named insureds on the aforesaid policies of insurance.

(Doc. 94-2 at 9; Doc. 95-11 at 34; Doc. 95-11 at 52; Doc. 95-13 at 3).

The Agreement accorded that "[a]s between insurance coverage provided by other sources to the above named entities and individuals and ACH's insurance coverage, ACH's insurance coverage shall be primary." (*Id.*). The Agreement also required ACH to furnish the Madison County Administrator with a copy of ACH's insurance policy obtained in compliance with the Agreement. (*Id.*) Furthermore, it provided that "all claims, litigation costs, attorney fees and any judgment or settlement money will be paid by ACH" should "ACH's insurance provider withdraw coverage or become insolvent." (Doc. 94-2 at 10; Doc. 95-11 at 35; Doc. 95-12 at 1; Doc. 95-13 at 4).

The Agreement also contained bilateral indemnification provisions:

D.      INDEMNIFICATION:

ACH agrees to indemnify and save harmless Madison County, and the Sheriff, and their respective supervisors, agents, officers, employees, and officials from and against any and all liability, loss, damages, interest, judgments and liens growing out of any and all costs and expenses (including, but not limited to, reasonable attorney fees and disbursements) arising out of or incurred in connections with any and all claims, demands, suits, actions or proceedings, which may be brought against Madison County, the Sheriff, respective supervisors, agents, officers, employees, and officials by reason of, or as the result of (1) acts or omissions of ACH, its agents, servants, or employees related in any way to or while in the performance of this Agreement; (2) any allegations of an act or omission, conduct or misconduct, of ACH, its agents, servants or employees not included in the paragraph above and for which the County, the Sheriff, or their agents, servants, or employees are alleged to be liable; and (3) any allegation of employment discrimination by an ACH employee.

Madison County and the Sheriff agree to indemnify and save harmless ACH from and against any and all liability, loss, damages, interest, judgments and liens growing out of any and all costs and expenses (including, but not limited to, reasonable attorney fees and disbursements) arising out of or incurred in connection with any and all claims, demands, suits, actions or proceedings, which may be brought against ACH by reason of, or as the result of (1) acts or omissions of Madison County, the Sheriff, or their respective supervisors, agents, officers, employees, and officials related in any way to or while in the performance of this Agreement; (2) any allegations of an act or omission, conduct or misconduct, of Madison County, the Sheriff, or their respective supervisors, agents, officers, employees, and officials not included in paragraph above and for which ACH is alleged to be liable; and (3) any allegation of employment discrimination by Madison County, the Sheriff, or their respective supervisors, agents, officers, employees, and officials.

(*Id.*). Jeffrey Rich ("Rich"), the County's attorney, drafted the aforementioned insurance and indemnification provisions in the Agreement.

The parties understood that ACH agreed to defend and indemnify claims related to ACH's provision of healthcare services. (Doc. 95-1 at 112, ll. 19-22). On June 27, 2006, ACH acquired a Certificate of Liability Insurance that designated the Jail as the Certificate Holder and included Madison County as "additional insured under the General Liability if required by contract in writing." (Doc. 95-13 at 24). An updated Certificate in September 2006 stated that "Madison County Jail, AL and the Madison County Sheriff's Office, AL are included as additional insured under the General Liability and Professional Liability coverage if required by contract in writing. Coverage applies to operations in correctional facilities." (*Id.* at 15). However, Rich objected that these two entities were not legal entities and requested a name change. (*Id.* at 13).

A November 2006 Certificate added the Jail and the Sheriff of Madison County as "additional insured" under the General Liability, Professional Liability, and Civil Rights Liability coverage "if required by contract in writing." (Doc. 95-13 at 26). Furthermore, the Certificate limited the coverage to ACH operations in correctional facilities only. This language consistently remained in the yearly-renewed Certificates through July 2014. (Doc. 95-1 at 104-07; Doc. 95-10 at 32, 34; Doc. 95-13 at 26, 28, 29, 30, 31; Doc. 96-6 at 29).

The County retained insurance through Atlantic Specialty Insurance Company, an affiliate of OneBeacon Insurance Group, Ltd. ("OneBeacon"), to cover claims against the County, Dorning, and other County officials that stem from alleged acts or omissions by the County, Dorning, and other County officials. OneBeacon's policy contains a Law Enforcement Liability Endorsement, which enacts a "Transfer of Rights of Recovery Against Others to Us" clause providing as follows:

> If any insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

(Doc. 93-8 at 62).

Johnson sent several letters to Dorning updating him on the progress ACH employees undertook in the Jail to comply with the Agreement. (Doc. 95-10 at 8-14). Between 2006 and 2014, Plaintiffs expressed no concerns regarding the medical care ACH provided. (Doc. 95-1 at 33). On January 5, 2011, Rich sent a letter to Jefferson County Sheriff Mike Hale, recommending ACH's services "without reservation." (Doc. 95-14 at 2-3). Rich praised ACH's ability to "improve the healthcare of the offenders housed in [the] facility, while controlling the medical costs and providing risk management." (*Id.*)

**ACH Procures Insurance**

In June 2006, Rich, the County Attorney, requested assurance from ACH that it would acquire insurance in accordance with the terms of the Agreement. Specifically, Rich requested that the insurance include Madison County, the Madison County Sheriff, and their employees as additional insureds. ACH endeavored with its insurance broker, Rob Bielenberg of Callender & Co. in Peoria, Illinois, to procure insurance through Essex Insurance Company ("Evanston").[1] Evanston has no employees, and Markel Services, Inc., ("Markel") serves as Evanston's claims manager. (Doc. 96-4 at 6-8).

Beginning in July 2006, ACH procured and maintained general liability, professional liability, and medical malpractice insurance at its own expense. ACH's insurance covered professional and medical liability, negligence, and claims brought pursuant to 42 U.S.C § 1983. Furthermore, as the Agreement required, ACH maintained policy limits of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) aggregate. Although ACH eventually procured insurance, Bielenberg informed Johnson of the difficulties in acquiring insurance that complied with the Agreement. (Doc. 95-10 at 16).

---

[1] On June 30, 2016, Essex Insurance Company merged into Evanston Insurance Company, one of the named defendants in this action. The court will refer to Essex as "Evanston" in the remainder of the opinion.

On May 31, 2013, ACH submitted an Application for Locum Tenens and Contract Staffing Organizations Professional and General Liability to Evanston. (Doc. 94-9 at 1). As part of its application, ACH included a copy of its standard template contract. (Doc. 94-11 at 15 – Doc. 94-13 at 1). ACH's standard template contract does not contain the required insurance coverage terms found in the Agreement's Section 6(B). As a result of the application, Evanston issued ACH a claims-made insurance policy for "Locum Tenens and Contract Staffing Professional Liability Insurance" ("Policy") for the policy period of August 1, 2013, to August 1, 2014. (Doc. 94-4 at 19). Evanston then renewed the Policy with a policy period of August 1, 2014, to August 1, 2015.

The Policy provides in relevant part:

INSURING AGREEMENT

A. **Professional Liability and Claims Made Clause:**
   The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of Claims first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section Claims A., Claim Reporting Provision:

1. under Coverage A. Individual Professional Liability: because of Malpractice or Professional Personal Injury, sustained by a patient and committed by the Coverage A. Insured, or by any person for whose Malpractice or Professional Personal Injury the Coverage A. Insured is legally responsible, except as a member, stockholder or partner of an association, corporation, partnership or limited liability company, arising out of the conduct of the Insured's Medical Services;

2. under Coverage B. Organization Liability: because of Malpractice or Professional Personal Injury, sustained by a patient and committed by any person for whom the Coverage B. Named Insured is legally responsible, arising out of the conduct of the Insured's Professional Healthcare Services;

. . . . . .

DEFINITIONS

. . . . . .

G.    Malpractice means an act, error or omission in Medical Services rendered or that should have been rendered.

H.    Medical Services means services . . . provided in the medical care or treatment of any patient . . . within the scope of the Healthcare Provider's license, certificate or other qualification to practice Medical Services.

. . . . . .

J.    Professional Personal Injury means . . . any bodily injury, mental injury, sickness, disease, emotional distress or mental anguish, including death resulting therefrom of any patient, arising out of Malpractice.

(Doc. 94-5 at 13).

Evanston also issued ACH an "Amendatory Endorsement – Civil Rights Violation." This endorsement states in pertinent part:

1. Section Definition H. ["Medical Services"] is amended by the addition of the following:

4.      an allegation of a civil rights violation pursuant to the Civil Rights Act of 1871 (42 U.S.C. § 1983 *et seq.*) and amendments thereto, provided that such allegation is the result of any patient receiving Medical Services

. . . . . .

3. Section The Exclusions ["This insurance does not apply to"] F. is deleted and replaced with the following:

F. any Claim based upon or arising out of any unlawful discrimination by any insured; provided, however, this exclusion shall not apply to any civil rights violation alleged pursuant to the Civil Rights Act of 1871 (42 U.S.C. § 1983 *et seq.*) and amendments thereto, provided that such civil rights violation arises out of Medical Services for which the Insured is legally liable.

(Doc. 94-4 at 23-24)(emphasis added).

Furthermore, ACH's insurance policy with Evanston included an "additional insured" endorsement:

ADDITIONAL INSURED ENDORSEMENT – PROFESSIONAL LIABILTY

This endorsement modified insurance provided under the following:

LOCUM TENENS AND CONTRACT STAFFING PROFESSIONAL LIABILITY INSURANCE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. Section The Insured is amended by the addition of the following:

Whenever used in this Policy, the unqualified word Insured shall also mean Additional Insured.

2. Additional Insured means, whenever used in this endorsement, the following:

State, Municipal Department of Corrections, Office of the Sheriff, or other Officials to whom the Coverage B. Named Insured is obligated by valid written contract to provide coverage as an additional insured to such person or organization but only as respects liability in rendering

13

Professional Services caused by the negligence of the Named Insured and only for coverage not otherwise excluded in the policy.

3. Coverage provided to any Additional Insured as defined herein shall apply solely with respect to any Claim or Claim Expenses arising from Professional Services rendered by the Named Insured specified in Item 1. of the Declarations.

4. Where no coverage shall apply herein for the Coverage A or Coverage B Named Insured, no coverage or defense shall be afforded to the above Additional Insured.

. . . . . .

7. This insurance shall be excess and non-contributory insurance over any other insurance afforded to the Additional Insured.

(Doc. 94-4 at 28). Upon the renewal of the Policy in August 2014, Evanston issued a revised Additional Insured endorsement that eliminated paragraph 7, deeming Evanston's Policy no longer "excess." (Doc. 93-8 at 41)("It is understood and agreed to that Endorsement No. 5 [the original "Additional Insured" endorsement] is deleted in its entirety and replaced with [this revised version.]")

Although the yearly Certificates of Liability Insurance ("Certificates") list Plaintiffs as "Additional Insureds," neither the Certificates, Policy, or endorsements list Dorning or the County as "Additional Named Insureds."

**Evanston Provides Defense for Plaintiffs in State Court Cases**

On April 27, 2011, Randolph and Angela Moore commenced a civil action in the Circuit Court of Madison County, Alabama, against ACH, Dorning, and the Madison

14

County Commission. (Doc. 95-14 at 27). Mr. Moore arrived at the Jail on April 7, 2010, and subsequently he gave a blood sample to authorities. Upon review of the blood sample, the Sheriff's Department incorrectly told Moore that he tested positive for a sexually transmitted disease. Despite his insistence that the test could not be accurate, the defendants ordered Moore to visit the Madison County Health Department and receive treatment for his STD. Moore's wife also commenced treatment at the Madison County Health Department and took medication for two weeks, causing adverse side effects for her. The complaint also avers the Sheriff's Department was not properly funded or staffed, and the Madison County Commission failed to provide such funding.

The amended complaint, filed on September 12, 2011, alleges claims of negligence, wantonness, and violations of the Alabama Medical Liability Act (§ 6-5-542, *et seq.*) of the Code of Alabama (1975) against all defendants. (Doc. 95-14 at 32). Neither the original nor the amended complaint alleged § 1983 claims. After completing its coverage review, Evanston agreed to provide a defense and indemnity under a reservation of rights and appointed defense counsel for Plaintiffs. (Doc. 95-4 at 16).

On May 5, 2015, Rodricus Hammonds initiated a pro se civil action in the Circuit Court of Madison County, Alabama, against the Madison County Sheriff's Department, the Madison County Medical Staff, and Dr. Arthur Williams. (Doc. 95-14 at 18). Hammonds arrived at the Jail in January 2014, after which he began suffering itches on his body. Hammonds alleges that he proceeded through the proper procedures and

filed a sick call to see a medical staff member, and medical personnel placed him on the waiting list to see Dr. Williams. Hammonds alleges he waited for over three weeks, and the itching progressively worsened. After he visited Dr. Williams, he avers Dr. Williams indicated the absence of any ailments. However, Hammonds alleges that the itching worsened and he developed rashes.

Two months later, upon reports of a scabies breakout in his section of the Jail, Hammonds returned to Dr. Williams. Hammonds alleges that Dr. Williams sent him back to his cell, and Hammonds transitioned to a medical cell after a nurse discovered Hammonds's open wounds from the itching. Hammonds avers that he remained in the medical unit from March through August 2014 without receiving any treatment, and it was during his transition to federal custody in August 2014 that he finally received treatment for scabies.

Hammonds filed an amended complaint on September 2, 2015, alleging identical facts to his original complaint and a state law claim of medical malpractice against all defendants. (Doc. 97-1). After completing its coverage review, Evanston agreed to defend the allegations under a reservation of rights and appointed defense counsel for the plaintiffs. (Doc. 95-14 at 20-26).

**The Underlying Actions**

This case centers on a question regarding the applicability of insurance coverage in five cases against Dorning and the County ("the Underlying Actions"). The facts in

each case reveal a mixture of claims against ACH, Dorning, the County, and numerous individuals employed by and/or affiliated with ACH and the County. The following five cases raise the same procedural question: whether ACH and Evanston owed a duty to defend and indemnify the County and Dorning.

**(1)  The *Listau* Complaint**

On July 8, 2014, Robert Elliott, as the personal representative of the estate of Nikki Listau ("Listau"), commenced a civil action in the United States District Court for the Northern District of Alabama (No. 5:14-cv-01309-CLS). The claims below stem from the most recent version of the complaint, filed on October 31, 2014. (Doc. 97-2).

The complaint alleges the defendants—including Madison County, Dorning, and ACH—acted deliberately indifferent to Listau's medical needs in violation of the Fourteenth Amendment. Specifically, the complaint alleges that upon Listau's arrival at the Jail, she exhibited symptoms from alcohol withdrawal, and thus, officials placed her in a medical observation cell. The complaint alleges that, from prior jail admissions, both ACH and Jail personnel knew that Listau struggled with alcoholism and suffered from a history of advanced delirium tremens (DTs) and seizures during withdrawal. Shortly after Listau arrived at the Jail, a nurse affiliated with ACH examined Listau and identified her as suffering from severe DTs.

The complaint alleges correctional officers at the Jail checked on Listau every fifteen minutes, yet ACH employees failed to sufficiently monitor Listau's vital signs.

The day after Listau's arrival, personnel found Listau unresponsive in her cell, and Listau died the day after at Huntsville Hospital. The autopsy report indicated that Listau died from severe blunt force injuries, including a broken left femur and multiple rib fractures.

Count I of the complaint alleges a claim of deliberate indifference to serious medical needs, pursuant to 42 U.S.C. § 1983, against all defendants. Count I alleges that certain individual defendants, including Dorning and specific ACH employees, act as supervisory officials for the jail and failed to fulfill their responsibility for development and implementation of policies and procedures for medical care. Furthermore, Count I states Madison County intentionally refused to adequately fund medical care with deliberate indifference to the serious medical needs of inmates such as Listau. Finally, Count I alleges Dorning remains liable for the acts of ACH and its policymakers, and the defendants' conduct caused Listau to suffer physical and emotional injuries that led to her death.

Count II of the complaint alleges state law claims of negligence and wantonness against individual ACH defendants and unknown ACH employees. Specifically, Count II alleges ACH employees involved with Listau's care owed a duty to satisfy the standard of care applicable to inmates and/or to ensure those under their supervision were adequately trained regarding the proper care of such inmates, and that these employees negligently and/or wantonly violated this standard of care. Furthermore,

Count II states that because ACH personnel acted within the scope of their employment, defendant ACH remains liable for their negligence and/or wantonness.

On July 9, 2014, Rich sent a letter to Johnson stating demands for indemnification pursuant to the Agreement. Furthermore, the letter requested ACH provide notice to its insurer for it to consider Dorning and Madison County as "additional insureds" under the Policy. Madison County, Dorning, and ACH retained separate counsel to defend the *Listau* action, and the parties ultimately reached a settlement. Evanston and OneBeacon separately contributed to the settlement of the individual claims against their respective insureds. Rich states that OneBeacon decided to settle based on the allegations in the *Listau* complaint and the risk and exposure to the insurer and its insureds. The court dismissed the action on October 6, 2016. (Doc. 97-6).

**(2) The *Woods* Complaint**

On April 15, 2014, Rich sent a letter to Johnson stating that Dorning received correspondence from an attorney representing the Estate of Deundrez Woods. (Doc. 93-9 at 4). Woods died while he was an inmate at the Jail in August 2013. Rich's letter served as notice of Dorning's demand for indemnification pursuant to the Agreement. (*Id.*) Furthermore, the letter requested that ACH provide notice to its insurer for it to consider Dorning as an "additional insured" under the Policy. (*Id.*).

On October 14, 2014, Tanyatta Woods, as the personal representative of the estate of Deundrez Woods ("Woods"), commenced a civil action in the United States District Court for the Northern District of Alabama (No. 5:14-cv-1964-KOB). The claims below stem from the most recent version of the complaint, filed on October 29, 2014. (Doc. 97-7).

The complaint alleges that the defendants—including Madison County, Dorning, and ACH—acted deliberately indifferent to Woods's medical needs in violation of his Fourteenth Amendment rights as a pretrial detainee. Specifically, the complaint alleges Woods arrived at the Jail in late June 2013, and Woods's mental functioning underwent a severe change between late July and early August 2013. This decline in Woods's mental functioning led personnel to move him to a medical observation cell. The complaint states that over a two-week period, Woods's condition deteriorated—he began hallucinating, remained in a confused state, and became unable to communicate with correctional and medical personnel. Correctional personnel tased Woods at least three times over this period.

Over this period, Woods did not eat or drink, and records indicated that correctional personnel cut off Woods's water supply a week before his death. The complaint alleges that both County and ACH personnel knew of Woods's deteriorating condition and did nothing to alleviate it. During this period, Woods's right foot became gangrenous, and the complaint alleges that correctional personnel remained aware of

Woods's condition but did nothing to help him. The complaint also argues that in the week leading up to Woods's death, no ACH personnel took Woods's temperature, checked his blood pressure, checked his blood sugar, or otherwise attempted to assess Woods's condition. On August 19, 2013, someone found Woods completely non-responsive, and he died two days later at Huntsville Hospital.

Count I of the complaint alleges a claim of deliberate indifference to serious medical needs, pursuant to 42 U.S.C. § 1983, against all defendants. Count I alleges that certain individual defendants, including Dorning and specific ACH employees, act as supervisory officials for the jail and failed to fulfill their responsibility for development and implementation of policies and procedures for medical care. Count I further argues these individuals' action and inaction established unconstitutional customs and policies regarding the provision of medical care. Count I states Madison County intentionally refused to adequately fund medical care with deliberate indifference to the serious medical needs of inmates such as Woods. Finally, Count I alleges Dorning remains liable for the acts of ACH and its policymakers, and the defendants' conduct caused Woods to suffer physical and emotional injuries that led to his death.

Count II of the complaint alleges state law claims of negligence and wantonness against individual ACH defendants and unknown ACH employees. Specifically, Count II alleges that the ACH employees involved with Woods's care owed a duty to satisfy the standard of care applicable to inmates and/or to ensure those under their

supervision were adequately trained regarding the proper care of such inmates, and that these employees negligently and/or wantonly violated this standard of care. Furthermore, Count II states that because ACH personnel acted within the scope of their employment, defendant ACH remains liable for their negligence and/or wantonness.

Madison County, Dorning, and ACH retained separate counsel to defend the *Woods* action, and the parties ultimately reached a settlement. Evanston and OneBeacon separately contributed to the settlement of the individual claims against their respective insureds. Rich states that OneBeacon decided to settle based on the allegations in the Woods complaint and the risk and exposure to the insurer and its insureds. The court dismissed the action on February 2, 2017. (Doc. 97-10).

### (3)    The *Jefferson* Complaint

On April 8, 2014, Rich sent a letter to Johnson stating that Dorning received correspondence from an attorney representing the Estate of Tanisha Jefferson. (Doc. 93-9). Jefferson died while she was an inmate at the Jail in October 2013. Rich's letter served as a notice of Dorning's demand for indemnification pursuant to the February 2014 Agreement. (*Id.*) Furthermore, the letter requested that ACH provide notice to its insurer for it to consider Dorning as an "additional insured" under the Policy. (*Id.*).

On October 14, 2014, Carolyn Jefferson, as the personal representative of the estate of Tanisha Jefferson ("Jefferson"), commenced a civil action in the United States

District Court for the Northern District of Alabama (No. 5:14-cv-1959-AKK). The claims below stem from the most recent version of the complaint, filed October 29, 2014. (Doc. 99-1).

The complaint alleges that the defendants—including Madison County, Dorning, and ACH—acted deliberately indifferent to Jefferson's medical needs in violation of her Fourteenth Amendment rights as a pretrial detainee. Specifically, the complaint alleges Jefferson arrived at the Jail in mid-October 2013, and Jefferson began complaining of rectal and abdominal pain on October 19, 2013. The complaint asserts Jefferson requested on numerous occasions to see a doctor and filed at least one medical grievance, and she finally saw an ACH doctor on October 29, 2013. However, the complaint alleges the doctor misrepresented Jefferson's condition in his notes by omitting her symptoms of severe and worsening abdominal pain, lack of appetite, rectal pain, and vomiting. The doctor did not perform a rectal exam, but he prescribed laxatives for Jefferson.

The complaint states Jefferson's condition worsened over the following days, and she exhibited sweating and labored breathing. On the morning of October 31, 2013, Jefferson allegedly saw an ACH nurse and reported her condition, but the nurse sent her back to her cell. That evening, despite ACH personnel knowing of her early morning complaint, Jefferson passed out in her cell while complaining of extreme

abdominal pain. An hour later, ACH personnel called an ambulance as Jefferson was nonresponsive.

The complaint states Jefferson died that day as a result of complications related to a bowel obstruction, yet an autopsy reveals that Jefferson died of cardiomyopathy. The autopsy also diagnosed Jefferson with hypertensive cardiovascular disease and blunt force injuries in the right upper extremity and lower extremities. (Doc. 95-1 at 125).

Count I of the complaint alleges a claim of deliberate indifference to serious medical needs, pursuant to 42 U.S.C. § 1983, against all individual defendants. Count I alleges certain individual defendants, including Dorning and specific ACH employees, act as supervisory officials for the jail and failed to fulfill their responsibility for development and implementation of policies and procedures for medical care. Count I further argues these individuals' action and inaction established unconstitutional customs and policies regarding the provision of medical care. Count I states Madison County intentionally refused to adequately fund medical care with deliberate indifference to the serious medical needs of inmates such as Jefferson. Finally, Count I alleges Dorning remains liable for the acts of ACH and its policymakers, and the defendants' conduct caused Woods to suffer physical and emotional injuries that led to her death.

Count II of the complaint alleges state law claims of negligence and wantonness against individual ACH defendants and unknown ACH employees. Specifically, Count II alleges ACH employees involved with Jefferson's care owed a duty to satisfy the standard of care applicable to inmates and/or to ensure those under their supervision were adequately trained regarding the proper care of such inmates, and these employees negligently and/or wantonly violated this standard of care. Furthermore, Count II states that because ACH personnel acted within the scope of their employment, defendant ACH remains liable for their negligence and/or wantonness.

Madison County, Dorning, and ACH retained separate counsel to defend the *Jefferson* action, and the parties ultimately reached a settlement. Evanston and OneBeacon separately contributed to the settlement of the individual claims against their respective insureds. Rich states that OneBeacon decided to settle based on the allegations in the Jefferson complaint and the risk and exposure to the insurer and its insureds. The court dismissed the action on July 25, 2017. (Doc. 99-8).

**(4)    The *Foster* Complaint**

On May 16, 2014, Rich sent a letter to Johnson that attached correspondence from an attorney on behalf of Whitney Foster. (Doc. 108-2). The letter stated that Foster suffered injuries while she was an inmate at the Jail in April 2014. The letter also served a notice of Dorning's demand for defense and indemnification pursuant to the Agreement, and a request that ACH provide notice to the insurer**.** (*Id.*) This letter also

requests that ACH's insurer add Dorning as an "additional insured." On March 12, 2015, Rich sent another letter to Johnson stating that the Madison County Commission received a notice of a claim from Foster. (Doc. 93-9 at 8). Rich's letter served as another notice of demand for indemnification pursuant to the Agreement. (*Id.*) Rich sent Johnson another letter on April 8, 2016, reiterating the same demands. (Doc. 94-13 at 6).

On March 16, 2016, Whitney Foster ("Foster") commenced a civil action in the United States District Court for the Northern District of Alabama (No. 5:16-cv-0521-MHH). The claims below stem from the most recent version of the complaint, filed June 8, 2017. (Doc. 99-9).

The complaint alleges the defendants—including Madison County, Dorning, and ACH—acted deliberately indifferent to Foster's medical needs in violation of her Fourteenth Amendment rights as a pretrial detainee. Specifically, the complaint alleges Foster arrived at the Jail on April 4, 2014. Documentation from ACH personnel indicated the "Methadone Clinic" in Huntsville, Alabama, was treating Foster, and Foster expressed she was experiencing methadone withdrawal symptoms. The complaint asserts none of the defendants verified this information, despite the fact ACH personnel documented the information from their interview with Foster. The complaint further states that within a week of Foster's arrival at the Jail, she displayed visible signs of weakness and methadone withdrawal that worsened daily. Foster avers

that although the defendants knew she suffered from withdrawal, they did nothing to help her.

The complaint avers ACH personnel took actions that worsened Foster's condition and inaccurately reported blood pressure numbers that Foster exhibited. On April 21, 2014, Foster's cellmate called for medical assistance because Foster was shaking and sweating, and ACH personnel placed Foster under medical observation. The complaint alleges correctional personnel harassed and ridiculed Foster while she endured numerous strokes and seizures, and individual correctional officers left her sprawled on a floor during a commissary visit. The complaint further alleges a medical nurse continuously picked up and dropped Foster while yelling at her. At some point thereafter, ACH and correctional personnel physically placed Foster in a shower because she urinated on herself.

On April 22, 2014, another inmate requested emergency assistance for Foster because she was "twitching" in her bunk. Correctional personnel assisted Foster into a wheelchair and took her to triage with ACH personnel. ACH personnel placed Foster under medical observation, yet her condition worsened. The following day, after both correctional and ACH personnel observed Foster's worsening symptoms, they sent her to Huntsville Hospital for treatment due to signs of a stroke. The complaint alleges Foster arrived at the hospital with high blood pressure readings and marks indicating she had been beaten. Foster remained in the hospital for three weeks, and hospital

personnel diagnosed her with Posterior Reversible Encephalopathy Syndrome (PRES). The complaint alleges Foster struggles with severe physical and mental ramifications from PRES.

Count I of the complaint alleges a claim of deliberate indifference to serious medical needs, pursuant to 42 U.S.C. § 1983, against all defendants. Count I alleges certain defendants, including Madison County, Dorning, and specific ACH employees, created and perpetuated deliberately indifferent customs or policies regarding the serious medical needs of prisoners, such as Foster. Count I clarified Foster is suing Madison County only for its deliberate indifference to the constitutional rights of detainees at the Jail through its lack of adequate funding.

Count II of the complaint alleges a claim of conspiracy to violate civil rights, pursuant to 42 U.S.C. § 1983, against Madison County, Dorning, and other County and ACH individuals. Specifically, Count II alleges a conspiracy existed between the individuals and entities that resulted in the actual denial of Foster's constitutional right to medical care for her serious medical needs.

Count III alleges a claim of negligent medical practice against ACH and ACH employees pursuant to the Alabama Medical Liability Acts. (Ala. Code §§ 6-5-480, et seq.). Count III alleges ACH, its supervisors, and its employees negligently breached its duty to follow the reasonable care standard in their medical treatment of Foster. Furthermore, Count III states ACH, as an entity, remains vicariously liable for the

negligent conduct of its supervisors and employees under the doctrines of respondeat superior, apparent agency, nondelegable duties, and other doctrines.

Count IV alleges a state law claim of negligent correctional care against Madison County and individual correctional officers. Count IV alleges Madison County negligently funded the Jail, and this underfunding contributed to Foster's injuries and damages.

Count V alleges a state law claim of wantonness against all defendants, except Dorning and another County individual. Count V alleges that defendants consciously took actions and/or failed to take actions with the knowledge that Foster would incur injuries. Furthermore, Count V states that this wanton conduct led to the direct and proximate result of Foster incurring the injuries. Count V also alleges ACH, as an entity, remains vicariously liable for the wanton conduct of its supervisors and employees under the doctrines of respondeat superior, apparent agency, nondelegable duty, and other doctrines.

Finally, Count VI alleges a state law claim of civil conspiracy against Madison County, ACH, and an individual ACH employee. Specifically, Count VI alleges a conspiracy existed between Madison County, ACH, and other ACH employees which resulted in the actual denial of Foster's constitutional right to medical care for her serious medical needs.

Madison County, Dorning, and ACH retained separate counsel to defend the Foster Complaint. The Foster case remains pending. (Memorandum Opinion, *Foster v. Advanced Correctional Healthcare Inc. et al*, No. 5:16-cv-0521-MHH (N.D. Ala. Sept. 21, 2018), ECF No. 108).

### (5)   The *Davis* Complaint

On July 14, 2016, Roy Lee Davis ("Davis") commenced a civil action in the U.S. District Court for the Northern District of Alabama (No. 5:16-cv-1166-AKK). The claims below stem from the most recent version of the complaint, filed January 30, 2017. (Doc. 99-14). ("Davis Complaint").

The nature of the Davis Complaint alleges the defendants—including Madison County, Dorning, and ACH—acted deliberately indifferent to Davis's medical needs in violation of his Fourteenth Amendment rights as a pretrial detainee. Specifically, the complaint alleges Davis arrived at the Jail on July 17, 2014. The Davis Complaint alleges that over the succeeding days, Davis began experiencing withdrawal symptoms, yet neither ACH nor County personnel identified him as a person likely to experience withdrawal. On July 21, 2014, ACH personnel examined Davis after his symptoms worsened and identified him as experiencing severe delirium tremens (DTs). That evening, ACH personnel placed Davis in a medical observation cell.

The Davis Complaint states that over the succeeding two days, Davis's condition deteriorated, and numerous ACH and County personnel observed him during this time

period. By July 23, 2014, Davis was mainly unresponsive and could not walk. Only July 24, 2014, Jail management personnel contacted court personnel to inquire about releasing Davis to avoid incurring the costs of sending him to the hospital. Upon release, Davis's family transported him to Madison Hospital.

Count I of the complaint alleges a claim of deliberate indifference to serious medical needs, pursuant to 42 U.S.C. § 1983, against all defendants except Dorning. Count I alleges that certain individual defendants, including Dorning and specific ACH employees, act as supervisory officials for the jail and failed to fulfill their responsibility for development and implementation of policies and procedures for medical care at the Jail. Count I further argues these individuals' action and inaction established unconstitutional customs and policies regarding the provision of medical care at the Jail. Count I alleges ACH, as an entity, remains liable because its customs and policies caused the violation of Davis's rights. Count I states Madison County intentionally refused to adequately fund medical care with deliberate indifference to the serious medical needs of inmates such as Davis. Finally, Count I alleges Dorning remains liable for the acts of ACH and its policymakers, as he delegated his final policymaking authority to ACH, and the defendants' conduct caused Woods to suffer physical and emotional injuries that led to his death.

Count II of the complaint alleges state law claims of negligence and wantonness against individual ACH defendants and unknown ACH employees. Specifically, Count

II alleges ACH employees involved with Davis's care owed a duty to satisfy the standard of care applicable to inmates and/or to ensure those under their supervision were adequately trained regarding the proper care of such inmates, and that these employees negligently and/or wantonly violated this standard of care. Furthermore, Count II states that because ACH personnel acted within the scope of their employment, defendant ACH, as an entity, remains liable for their negligence and/or wantonness.

On July 20, 2016, Rich sent a letter to Johnson that served as a notice of demand for indemnification pursuant to the Agreement. Furthermore, the letter requested ACH provide notice to its insurer. Madison County, Dorning, and ACH retained separate counsel to defend the *Davis* Complaint. On July 31, 2018, the court entered a Memorandum Opinion and Final Judgment dismissing with prejudice all claims against all defendants.[2] (Memorandum Opinion & Final Judgment, *Davis v. Madison County Alabama et al.*, No. 5:16-cv-1166--AKK (N.D. Ala. July. 21, 2018), ECF Nos. 154 and 155).

---

[2] On June 1, 2018, Plaintiffs filed a Request for Judicial Notice in Opposition to Defendants' Motions for Summary Judgment. (Doc. 116). Plaintiffs requested that the Court take judicial notice pursuant to Federal Rule of Evidence 201 of Davis's Consolidated Response to Defendants' Motion for Summary Judgment in the *Davis* case. In their Request, Plaintiffs argue that Davis's brief demonstrates there were no claims regarding independent actions of the County and Sheriff at that stage of litigation. (*Id.* at 2-3).

Davis's brief provides no relevant evidence for the main issues in this action. As explained further in this opinion, the allegations set out in the *complaint* in the *Davis* action determines whether Evanston owed a duty to defend. Therefore, the court will **DENY** Plaintiffs' Request for Judicial Notice.

The County paid a $50,000 deductible to OneBeacon for each of the *Listau*, *Woods*, *Jefferson*, *Foster*, and *Davis* claims. (Doc. 95-2 at 38-40).

**Evanston and ACH Limit, and then Deny, Insurance Coverage to the County and Dorning for the Underlying Actions**

Although the County and Dorning issued letters to ACH demanding a defense and indemnification for each of the five underlying cases, the County never directly contacted Evanston regarding any of the actions. (Doc. 95-2 at 139-140). After ACH first notified Evanston of the *Listau* case, Evanston reached out to its claims service manager, Markel. Markel retained the law firm Hand Arendall to review coverage, and Hand Arendall subsequently sent a letter to Rich and Dorning on October 27, 2014. The letter states that the *Listau* Complaint alleged claims against the County and Dorning that arose from their own actions, yet Evanston would "nonetheless defend Madison County and Sheriff Dorning in this matter at this time subject to a full and complete reservation of any and all rights." (Doc. 96-5 at 12). Evanston appointed an attorney to defend the County and Dorning in this matter.

On January 15, 2015, Hand Arendall sent another letter to Rich and Dorning in response to the filings of the Woods and Jefferson Complaints. Although the letter rendered statements similar to the October 2014 letter, it also stated:

> The [Evanston] Policy provides coverage for Sheriff Dorning and
> Madison County as Additional Insureds <u>only</u> with respect to liability
> Sheriff Dorning and Madison County may have resulting from the
> negligence of ACH and its employees in providing medical care or

treatment to the inmates and/or staffing/hiring decisions. The [Evanston] Policy does not provide any coverage to Sheriff Dorning or Madison County for damages relating to their independent actions.

As is apparent, the One Beacon Policy provides coverage to Sheriff Dorning and Madison County for their wrongful acts. The [Evanston] Policy provides no coverage for Sheriff Dorning and Madison County for their wrongful acts.

(Doc. 96-5 at 24).

The letter stated that the *Listau*, *Woods*, and *Jefferson* Complaints "also make independent allegations against Madison County and Sheriff Dorning based on its or his own conduct that are not covered by the [Evanston] Policy."(*Id.* at 22). Thus, because OneBeacon's policy covered direct actions by Dorning and the County, and the Evanston Policy only covered Dorning's and County's liability on the basis of ACH's conduct, Evanston proposed that Dorning and the County consent to OneBeacon and Evanston each paying half of the defense costs. (*Id.* at 24). This offer never culminated into a formal proposal, and the County rejected the offer. Presumably, OneBeacon paid all of Plaintiffs' defense costs in the Underlying Actions. OneBeacon also funded the County and Dorning's share of settlement in the *Listau*, *Woods*, and *Jefferson* cases.

In early 2015, ACH and Plaintiffs encountered several obstacles while discussing the possible renewal of the Healthcare Agreement. On March 18, 2015, ACH's in-house counsel, Jessica Young, sent a letter to Rich upon reviewing the primary insurance and additional named insured questions with Evanston. In the letter, Young

stated ACH had named the County as an additional insured on ACH's insurance policies since 2006. Young states that although ACH never intended to be deemed responsible for the negligent acts and omissions of County employees, ACH now understood that the Agreement read otherwise.

Nevertheless, Young informed Rich the County would not receive any coverage beyond recompense for their own conduct based upon "the industry standard . . . and how [ACH] operate[s] at every other jail nationwide." (Doc. 99-24 at 22). Young also stated ACH would indemnify the County if it is drawn into a lawsuit through ACH's negligence. Young also informed Rich that ACH remained unable to sign the Agreement as currently written due to these issues.

On April 22, 2015, Rich sent a letter to Johnson and Young reminding them of Rich's prior March 2015 letter listing several demands. These demands included: (1) acknowledge its obligation to pay all claims, litigation costs, attorney fees, and any judgment or settlement money for which the County or Dorning is or may become liable for or obligated to pay in the *Woods*, *Jefferson*, or *Listau* actions; (2) immediately obtain primary insurance covering the County and Dorning as named insureds for all claims that may arise out of the course and scope of the Agreement; and (3) acknowledge its indemnity obligations under the Agreement as it relates to the *Woods*, *Jefferson*, or *Listau* actions. (Doc. 103-1 at 2). Rich's letter states that ACH neither cured its breach of the Agreement nor complied with the County's and Dorning's demands.

Therefore, Rich states in the letter that "ACH is hereby notified that as of Monday, June 22, 2015, ACH's services at the [Jail] will end." (*Id.* at 3). The Agreement between the County, Dorning, and ACH ultimately expired in June 2015. (Sheriff Depo., 95:1-6).

On September 7, 2016, Plaintiffs' counsel contacted ACH's counsel via letter and notified him of the upcoming mediation of the *Listau*, *Woods*, and *Jefferson* actions. (Doc. 103-4 at 2-3). The letter also served as another demand for indemnification for Plaintiffs. ACH never responded to the request.

After the filing of the Davis Complaint in July 2016, Markel retained a different law firm—Swift, Currie, McGee & Hiers LLP ("Swift Currie")—to review coverage on behalf of Evanston. On October 24, 2016, Swift Currie sent a letter to Rich and Dorning communicating Evanston's agreement to defend the Davis action under a reservation of rights. (Doc. 99-25). The letter stated independent allegations existed against both the County and Dorning based on their own conduct, and Evanston's Policy likely would not cover some of these allegations. The letter further explained the County and Dorning would remain responsible for acquiring insurance to protect its or his interests in all non-covered claims.

On March 13, 2017, Judge Abdul Kallon issued a Memorandum Opinion in the *Davis* case that dismissed several claims and assessed the remaining survivable claims. (Memorandum Opinion & Final Judgment, *Davis v. Madison County Alabama et al.*, No. 5:16-cv-1166--AKK (N.D. Ala. July 21, 2018), ECF No. 102). The surviving claims

included the claim of deliberate indifference based on inadequate funding against Madison County. On June 29, 2017, Swift Currie sent a letter to the attorney representing Madison County, David Hodge. This letter served as Evanston's intent to withdraw its defense of the County, and repeated the offer to reimburse OneBeacon for half of the defense expenses incurred on the County's behalf up through March 13, 2017.

After the filing of the *Foster* Complaint in March 2016, Markel retained Swift Currie again to review coverage on behalf of Evanston. On February 23, 2017, Swift Currie sent a letter to Rich and Dorning containing similar reservation-of-rights language in Evanston's agreement to provide a defense to the County and Dorning.

On October 2, 2015, Plaintiffs filed a civil action against Evanston and ACH in the Circuit Court of Madison County, Alabama. On November 6, 2015, Evanston and ACH filed a Notice of Removal. (Doc. 1). The most recent version of Plaintiffs' complaint alleges claims of breach of contract and bad faith against Evanston and claims of breach of contract, indemnification, fraud, suppression, and promissory estoppel against ACH. (Doc. 73).

## ANALYSIS

## I. THE EVANSTON INSURANCE POLICIES DO NOT COVER PLAINTIFFS FOR THE SECTION 1983 CLAIMS

Evanston argues that its policies including Plaintiffs as additional insureds do not provide coverage for the Underlying Actions' § 1983 claims against Plaintiffs.[3]   Based upon the Additional Insured endorsements, the court agrees, thus warranting summary judgment in Evanston's favor.

---

[3] The parties dispute whether the Underlying Actions' claims arise under Evanston's 2013 or 2014 policy, which diverge substantively because the 2013 Additional Insured endorsement affords Plaintiffs excess coverage whereas the applicable 2014 endorsement provides primary coverage. Evanston argues in its Reply and a Motion to Strike that Plaintiffs may not rely upon the 2014 policy because it never averred liability under such policy in any of their pleadings.

As an initial matter, pursuant to Federal Rule of Civil Procedure 15(b)(1) the court may amend pleadings as late as trial to conform them to admissible evidence tendered by the parties, so long as an amendment would not prejudice any opposing party.   *See Muhs v. River Rats, Inc.*, 586 F. Supp. 2d 1364, 1375-76 (S.D. Ga. 2008) (pursuant to Rule 15(b)(1), court amended pleadings at summary judgment stage to permit plaintiff to proceed on claim as to mechanical part different from part averred defective in complaint) (citing, *inter alia*, *Brown v. Hughes*, 894 F.2d 1533, 1539 (11ᵗʰ Cir. 1990) (permitting Rule 15(b) amendment in connection with a pretrial motion)); *Cain v. Geren*, No. 2:07-CV-2191-RDP, 2010 WL 11561383, at *28 (N.D. Ala. Mar. 25, 2010) (permitting Rule 15(b)(1) amendment at summary judgment stage to adjudicate adverse action date different from date averred in pleadings) (citing *Muhs, supra*, 586 F. Supp. 2d at 1375-76).   "Although the general rule is that 'a plaintiff may not amend his complaint through argument in a brief opposing summary judgment,' *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11ᵗʰ Cir. 2004) (citation omitted)," the "*Gilmour* approach applies when a litigant attempts to propose a new theory of recovery -- not when a litigant attempts to prove an underlying fact." *Cain*, 2010 WL 11561383, at *28.   In the instant dispute, the parties dispute an underlying fact regarding the applicable policy covering the Underlying Actions, and Plaintiffs presented evidence Evanston litigated features of the 2014 policy during discovery, thus obviating any prejudice from a Rule 15(b)(1) amendment.

However, Plaintiffs falter because four of the five Underlying Actions clearly fall within the 2013 policy's purview.   Evanston provided claims-made policies to ACH, and the policies' provisions control as to the definition of a legal claim so long as they properly defined such terms.   *See St. Paul Fire & Marine Ins. Co. v. Edge Mem'l Hosp.*, 584 So. 2d 1316, 1322 (Ala. 1991) (noting that a policy's definition of "claim" controls in a claims-made policy); *Scottsdale Ins. Co. v. Town of Orange Beach*, 618 So.

38

## A.    Legal Standard

Pursuant to Alabama statute "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended or modified by any rider, endorsement or application which is a part of the policy."    Ala. Code § 27-14-17(a).    "Insurance contracts, like other contracts, are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions."  *Attorneys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C.*, 703 So. 2d 866, 870 (Ala. 1996) (citation omitted).    When its intention is clear and unambiguous, the court shall enforce an insurance policy as written. *Sentinel Ins. Co. v. Alabama Mun. Ins. Corp.*, 188 So. 3d 640, 644 (Ala. 2015) (citation omitted).    Furthermore, "[i]f the terms of an insurance policy are

---

2d 1323, 1325 (Ala. 1993) (faulting insurer for not defining the term "claim" in its claims-made policy); *Attorneys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C.*, 703 So. 2d 866, 870 (Ala. 1996) (applying definition of "claim" including in claims-made policy).

The 2013 policy obligates Evanston to remunerate insureds "as a result of Claims first made against the Insured during the Policy Period."    (Doc. 93-6 at 33).    The policy defines the term "claim" as "a demand for monetary damages or services" *or* "the service of suit" against the insured.    (Doc. 93-6 at 33).    The 2013 Policy Period spanned August 1, 2013, to August 1, 2014.    (*Id.* at 11).    Plaintiffs requested ACH and Evanston defend and indemnify them as to the *Listau, Jefferson, Woods,* and *Foster* actions during the 2013 Policy Period. (*See* Doc. 93-9 at 2, 4, 6, 9; Doc. 108-2); *see St. Paul Fire & Marine Ins. Co. v. Tinney*, 920 F.2d 861, 863 (11th Cir. 1991) (generally "[n]o matter what the form of notice of loss may be, if it operates to bring the attention of the insurer to the loss or accident, sets forth the essential facts upon which liability of the insurer depends, and appears credible, it is sufficient") (quoting *Hopkins v. Lawyers Title Ins. Corp.*, 514 So.2d 786, 788 (Ala.1986), *overruled on other grounds by State Farm Fire and Casualty Company v. Owen*, 729 So. 2d 834 (Ala. 1998)).

In any event, whether advanced under the 2013 or 2014 Policy, the Additional Insured endorsements in all of the policies did not cover 42 U.S.C. § 1983 claims against Plaintiffs, as discussed herein.

plain and unambiguous, the interpretation of the contract and its legal effect are questions of law." *Id.* (citing *Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 697 (Ala. 2003)).

"'In determining whether an ambiguity exists, a court should apply the common interpretation of the language alleged to be ambiguous. . . . This means that the terms of an insurance policy should be given a rational and practical construction.'" *Porterfield v. Audubon Indem. Co.*, 856 So.2d 789, 799 (Ala. 2002) (citations omitted). "The terms of an insurance policy are ambiguous only if the policy's provisions are reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to their meaning*.*" *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 308–09 (Ala. 1999) (citation omitted). "'Where there is added to a printed form a written or typewritten clause, that clause should be considered as superseding those clauses in conflict which are printed in the form.'" *Atlanta Cas. Co. v. Russell*, 798 So. 2d 664, 667 (Ala. 2001) (citations omitted). "[I]n the absence of statutory provisions to the contrary, insurers have the right to limit their liability by writing policies with narrow coverage." *St. Paul Mercury Ins. Co. v. Chilton–Shelby Mental Health Ctr.*, 595 So.2d 1375, 1377 (Ala. 1992).

### B.     Evanston's Policies Do Not Cover Constitutional Tort Claims

Pursuant to the referenced legal standard, Evanston's endorsements including Plaintiffs as Additional Insureds are not ambiguous. The 2013 Additional Insured endorsement provides as follows:

Additional Insured means, whenever used in this endorsement, the following:

State, Municipal Department of Corrections, Office of the Sheriff, or other officials to whom the Coverage B. insured is obligated by valid written contract to provide coverage as an additional insured to such person or organization *but only as respects liability* in rendering Professional Services *caused by the negligence* of the Named Insured . . . .

(Doc. 93-6 at 20) (emphasis added). Therefore, the 2013 policy's Additional Insured endorsement, as do the like endorsements in ACH's other policies with Evanston regarding the Plaintiffs, limits coverage to "liability in rendering Professional Services *caused by the negligence of the Named Insured,*" the Named Insured referencing ACH. (*Id.*) (emphasis added). In essence, ACH contracted with Evanston to provide Plaintiffs coverage of ACH's purported negligent liability.

However, the Underlying Actions' claims against Plaintiffs – whether against Plaintiffs directly or via delegation of their duties to ACH – sound in 42 U.S.C. § 1983 constitutional tort liability, not mere negligence (save for one claim in the *Foster* action, which the court will dispose of momentarily). Section 1983 does not provide the substantive standards for constitutional violations. *Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("§ 1983 contains no independent state-of-mind requirement"). Rather, courts must rely upon the underlying constitutional torts to provide the applicable standards. In this context, the Eighth Amendment's cruel and unusual punishment clause proscribes the "deliberate indifference to serious medical needs" as offensive to

the "evolving standards of decency." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Accordingly,

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation . . . .

*Estelle*, 429 U.S. at 105-06; *see also Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) ("'However, not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'") (quoting *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999)).

Although the Underlying Actions' claims for inadequate medical care arise under the Fourteenth Amendment's Due Process Clause because the plaintiffs therein were pretrial detainees, the Eighth Amendment's deliberate indifference standard applies to the plaintiffs' due process claims of inadequate medical care. *See Taylor v. Adams*, 221 F.3d 1254, 1257 n.3 (11th Cir. 2000) (inadequate medical care claims "are analyzed in identical fashion regardless of whether they arise under the Due Process Clause or the Cruel and Unusual Punishment Clause") (citing *Lancaster v. Monroe County, Alabama*, 116 F.3d 1419, 1425 n. 6 (11th Cir.1997), *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317 (11th Cir. 2009)). More critically, litigants cannot maintain Fourteenth Amendment due process claims on a negligence theory of recovery, regardless of the

claim theory underlying the purported due process violation. *See Porter v. White*, 483 F.3d 1294, 1307 (11th Cir. 2007) ("'the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property'") (quoting *Daniel*, 474 U.S. at 328); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process") (citation omitted); *Porter*, 483 F.3d at 1308 ("'the protections of the Due Process Clause, *whether procedural or substantive*, are just not triggered by lack of due care'") (quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)).

Based on the foregoing explication, Evanston's Additional Insured endorsements do not contemplate coverage of § 1983 Due Process Clause claims. As reviewed, the plain, unambiguous meaning of the Additional Insured endorsements limits coverage to claims asserted against Plaintiffs based upon ACH's alleged negligence/medical malpractice. However, the Underlying Actions aver § 1983 claims against Plaintiffs directly or for ACH's purported transgressions, all sounding in constitutional tort pursuant to the Fourteenth Amendment's Due Process Clause.[4] Therefore, Evanston's Additional Insured endorsements protecting Plaintiffs do not

---

[4] The *Foster* action's Count IV does aver a negligence claim against Madison County and individual correctional officers. However, Evanston's Additional Insured endorsement covers Plaintiffs for liability "caused by the negligence *of the Named Insured.*" (Doc. 93-6 at 20) (emphasis added). The *Foster* action's Count IV avers claims for Plaintiffs' own negligence, not that of ACH, the named insured. Therefore, the Additional Insured endorsement does not over the *Foster* action's Count IV.

provide coverage of § 1983 claims, despite coverage for ACH under the Civil Rights endorsements.[5]

### C. Evanston's Failure to Deliver the Policy to Plaintiffs Does Not Prevent Summary Judgment in Evanston's Favor

To counteract Evanston's summary judgment showing, Plaintiffs contend that Evanston's failure to deliver the applicable policies to them precludes enforcement of the limitation in the Additional Insured Endorsement. Evanston retorts with several arguments against Plaintiffs' entreaty, only one of which definitively forecloses Plaintiffs' contention.

Alabama Code § 27-14-19 provides that "every policy shall be mailed or delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance . . . ." As construed by the Alabama Supreme Court, Section 27-14-19 "requires that the insurance policy be 'mailed or delivered' to the purchaser of a policy and to the named insured, and that an insurer may be estopped from asserting conditions of, or exclusions from, coverage where such a purchaser or insured is

---

[5] Evanston's coverage of Plaintiffs for the *Moore* and *Hammonds* actions do not shade this finding. As recounted in the Background, both of those actions fall within the Additional Insured endorsement because they averred malpractice actions against Plaintiffs based upon ACH's conduct, and Evanston defended the *Hammonds* action under a reservation of rights.

In addition, that Evanston offered to defend Plaintiffs on the Underlying Actions' § 1983 claims do not obviate the court's conclusion. Evanston maintained reservation of rights as to the insurance coverage for Plaintiffs. And that Evanston withdrew coverage on its belief that the § 1983 claims regarded Plaintiffs' own conduct, not that of ACH, does not forestall the plain meaning of the insurance policy's terms that it did not cover any § 1983 claims averred against Plaintiffs for ACH's conduct.

prejudiced by the insurer's failure to comply with the statute." *Brown Mach. Works & Supply Co. v. Ins. Co. of N. Am.*, 659 So. 2d 51, 61 (Ala. 1995); *see also W.G. Yates & Sons Const. Co. v. Zurich Am. Ins. Co.*, No. CIV.A. 06-0803-WS-B, 2008 WL 161921, at *8 (S.D. Ala. Jan. 8, 2008) ("Alabama courts have stringently enforced [§27-14-19's] requirement, and under certain circumstances have imposed draconian penalties on insurers who fail to comply."). Plaintiffs maintain that the foregoing interpretation of § 27-14-19 precludes enforcement of the Additional Insured endorsement (indisputably, Evanston did not deliver copies of its policies to Plaintiffs).

At first blush, § 27-14-19 appears to apply to Evanston's policies. Alabama Code § 27-14-1 defines the term "policy" as a "written contract of, or written agreement for, or effecting, insurance, by whatever name called, and includes all clauses, riders, endorsements, and papers attached, or issued, and delivered for attachment thereto and made a part thereof." Therefore, § 27-14-19's applicability to a "policy" includes endorsements to said policy. *See Ex parte Clarke*, 728 So. 2d 135, 140 (Ala. 1998) ("Section 27–14–1(1), Ala. Code 1975, defines the term 'policy,' as it is used in § 27–14–19(a), as including 'endorsements' to insurance contracts."); *Alabama Farm Bureau Mut. Cas. Ins. Co. v. City of Hartselle*, 460 So. 2d 1219, 1224 (Ala. 1984) ("an insurance policy is

45

a formal written contract containing all of the agreements pertaining to the insurance" (citing *Prudential Casualty Company v. Kerr*, 202 Ala. 259, 80 So. 97 (1919)).[6]

Moreover, disputable issues of fact exist whether Evanston's failure to deliver the policies to Plaintiffs prejudiced them. *See Nance v. Southerland*, 79 So. 3d 612, 622 (Ala. Civ. App. 2010) ("Prejudice obviously may occur when an insured has no actual or constructive knowledge of a limitation on, or exclusion from, coverage until delivery of the policy . . . .") (citing *Clarke*, 728 So.2d 135); *Akpan v. Farmers Ins. Exch., Inc.*, 961 So. 2d 865, 871 (Ala. Civ. App. 2007) (plaintiffs did not establish prejudice because they received the policy more than ten months before the insurer enforced a duty to submit to examinations under oath, notwithstanding failure to originally deliver policies upon establishing coverage); *New Hampshire Ins., Co. v. Flowers Ins. Agency*, LLC, No. 1:09-CV-730-MEF, 2011 WL 1740135, at *6 (M.D. Ala. May 5, 2011) ("prejudice can occur where the insured has no actual or constructive knowledge of the exclusions") (citations omitted); *W.G. Yates & Sons Const. Co. v. Zurich Am. Ins. Co.*, No. CIV.A. 06-0803-WS-B, 2008 WL 161921, at *9 (S.D. Ala. Jan. 8, 2008) (plaintiff did not establish prejudice from failure to deliver policy because no indication review of policy would have alerted plaintiff coverage unavailable). In the case at bar, genuine issues of

---

[6] Contrary to Evanston's assertions, *Cent. Reserve Life Ins. Co. v. Kiefer*, 211 F.R.D. 445, 451 (S.D. Ala. 2002) does not provide persuasive value given the inclusion of endorsements and riders within the statutory definition of the term "policy," Ala. Code § 27-14-1, as reviewed previously.

fact demonstrate Plaintiffs did not know Evanston's policies only covered ACH's alleged negligence, which contrasts with the coverage accorded in the Agreement.

Moreover, disputable issues of fact remain as to whether additional insureds such as Plaintiffs may rely upon § 21-14-19 for relief:

> [I]t is instructive to employ a hypothetical spectrum of possible insureds or of persons to whom benefits may possibly be owed under an insurance policy. On one end of the spectrum are the purchaser of the policy and the named insured, both of whom we have concluded are definitely included in the phrase "the insured or ... the person entitled thereto," as it is used in § 27–14–19. On the other end are incidental beneficiaries and beneficiaries of a group policy, who we conclude are probably excluded from the statutory phrase and are therefore not individually entitled to copies of the policy, absent an inquiry, even though they may be "insureds." We do not read the statute as being so broad as to extend the right to receive a copy of a policy to all persons who may claim some coverage rights under the policy. A balance must be struck between the beneficent purpose of the statute and the burden it places upon the insurance company.
>
> Between the ends of the spectrum are the remainder of the classes of insureds: *named and unnamed additional insureds*, third-party beneficiaries, fleet policy beneficiaries, etc. The question of [a given class's] status, given the evidence in this case, and the question of which end of the spectrum the . . . policy is closest to are for the parties to argue to the trier of fact.

*Brown Mach. Works*, 659 So. 2d at 60.   In the circumstances at bar, surely a genuine issue of fact arises as to whether Plaintiffs as additional insureds constitute more than incidental beneficiaries entitled to delivery of Evanston's policies.   This question involves fact inquiries, especially as the Agreement obligated ACH to provide Plaintiffs copies of the pertinent policies.

However, § 27-14-19's estoppel bar still does not apply to Evanston's Additional Insured endorsements. First, the legal precedent interpreting § 27-14-19 specifically imposes estoppel of "conditions" and "exclusions," not coverage. *See Brown Mach. Works*, 659 So. 2d at 61. This choice of language may be critical, as longstanding Alabama precedent does not permit traditional estoppel doctrine to enlarge a policy's coverage. *See Payne v. Mut. Sav. Life Ins. Co.*, 58 So. 3d 108, 110 (Ala. 2010) ("Coverage under an insurance policy *cannot be created or enlarged by waiver or estoppel* and, if there is no ambiguity, it is the duty of the court to enforce the policy as written.") (citing *Home Indem. Co. v. Reed Equip. Co.*, 381 So.2d 45, 51 (Ala. 1980)); *McGee v. Guardian Life Ins. Co.*, 472 So. 2d 993, 996 (Ala. 1985) ("Although the doctrine of waiver may extend to practically every ground on which an insurer may deny liability based on forfeiture, the doctrine is not available to bring within the coverage of a policy risks not covered by its terms or risks expressly excluded therefrom.") (quoting *Reed Equip.*, 381 So. 2d at 50-51); *Allstate Ins. Co. v. Moore*, 429 So. 2d 1087, 1089 (Ala. Civ. App. 1983) ("Waiver or estoppel can only have a field of operation when the subject-matter is within the terms of the contract.") (citations omitted). Evanston's Additional Insured endorsements limit Plaintiffs' coverage to the negligence of ACH; this language does not equate to the highly technical insurance terms "exclusions" and "conditions."[7]

---

[7] One notes the Alabama precedent applying § 27-14-19's estoppel doctrine to the terms "limitation" on coverage. *See Nance v. Southerland*, 79 So. 3d 612, 622 (Ala. Civ. App. 2010) ("Prejudice obviously

Most importantly, as Evanston demonstrated § 27-14-19 only applies to policies issued for delivery and delivered in Alabama. *See* Ala. Code 27-14-2 ("This chapter applies as to all insurance contracts and annuity contracts other than . . . (2) Policies or contracts not issued for delivery in this state nor delivered in this state . . . ."). As Evanston demonstrated, there exists no genuine dispute of fact that it issued for delivery, and delivered, the policies regarding this case in the State of Illinois. (Doc. 93-7 at 11). Although some decisions in other states construed similar statutory provisions to afford constructive delivery in certain circumstances, Plaintiffs did not lodge any arguments nor submit any evidence of such delivery in this case. *See Tillman ex rel. Estate of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1303-04 (10th Cir. 2005) (Under Oklahoma law, delivery of insurance policy to Oklahoma Department of Insurance was a constructive "delivery" of policy to owner, within meaning of Oklahoma statute requiring policy to be "delivered or issued for delivery within the state"); *Blue Cross of Fla., Inc. v. Turner*, 363 So. 2d 133, 134-35 (Fla. Dist. Ct. App. 1978) (insured falls under insurance statute because policy "issued for delivery or delivered in

---

may occur when an insured has no actual or constructive knowledge of *a limitation on,* or exclusion from, coverage until delivery of the policy . . . .") (emphasis added, citation omitted). Although this citation may indicate § 27-14-19's estoppel bar applies to limit coverage, effecting a major deviation from Alabama precedent should not proceed on scant evidence that an Alabama court endeavored to accomplish such a result. Furthermore, the Alabama Supreme Court's declarations bind the court in diversity actions in circumstances such as these.

this state" by delivery of master policy to state corporation in state).[8]   Therefore, § 27-14-19 does not apply to Evanston's policies.

### D.   Evanston's Other Contentions Would Not Garner Summary Judgment

To conclude this portion of the opinion, although unnecessary one notes Evanston's other arguments would not warrant summary judgment.   First, a genuine issue of disputable fact would exist as to whether Plaintiffs prevented Evanston from covering the Underlying Actions.   Evanston contends Plaintiffs prevented it from sharing pro rata in defense costs with Plaintiffs' primary liability insurer, OneBeacon. Evanston's contention constitutes an estoppel affirmative defense upon which it secures the burden of persuasion.   Plaintiffs tendered evidence of notice, demand, and

---

[8] Plaintiffs may not rely upon the certificates of insurance they received, which indicated coverage of Plaintiffs as additional insureds under ACH's policy for a vaguely phrased civil rights liability.   (Doc. 96-1 at 69; Doc. 95-13 at 31).   Not only do the certificates disclaim any modification of the underlying policies (Doc. 96-1 at 69; Doc. 95-13 at 31), Alabama law prohibits such modification:

> [T]he Alabama Insurance Regulations prohibit the modification of an insurance policy through the issuance of a certificate of insurance. The regulations provide:
>
> * * * No certificate of insurance may be used to amend, extend, restrict or alter coverage afforded by the policies to which the certificate makes reference.
>
> Alabama Dept. of Insurance Reg. No. 62 § III [now codified at Ala. Dept. Ins. Reg. 482-1-062-.03(5)].

*St. Paul Fire & Marine Ins. Co. v. Newman*, No. CIV. 99-0645-AH-C, 2000 WL 1367980, at *8 (S.D. Ala. Sept. 5, 2000); *but see Brown Mach. Works & Supply Co. v. Ins. Co. of N. Am.*, 659 So. 2d 51, 61 (Ala. 1995) ("[P]roceeding in the spectrum away from those to whom [Alabama Code § 27-14-19] definitely applies [i.e., a policy's purchaser and named insureds], it becomes more likely that provisions of undelivered policies will control over the terms of a delivered certificate of insurance if the certificate disclaims any effect on the coverage contained in the policy and if it does not 'definitely contradict' the policy . . . .").

non-payment regarding Evanston's obligations under its policies, (*see* Doc. 99-17 at 74;

Doc. 93-12 at 92-93; Doc. 105-5; Doc. 105-6; Doc. 105-9; Doc. 105-17 at 4), so the trier

of fact would have undertaken the task of resolving the dispute.

Second, OneBeacon's subrogation rights would not prevent Plaintiffs from

recovering on their own damages.[9] Evanston argues correctly that OneBeacon exists as

a real party in interest regarding its payments on the Underlying Actions. *See Broadnax*

---

[9] In their Response to Evanston's Motion for Summary Judgment, Plaintiffs introduced the argument that OneBeacon asserted a subrogation interest as to Plaintiffs' claims in this action, and that Plaintiffs are entitled to pursue these claims on behalf of OneBeacon. (Doc. 104 at 38. 54, 57-60, 70). Plaintiffs tendered a letter dated January 17, 2018—over two years after the commencement of this action—from Aaron Stone, the Vice President of Claims at OneBeacon. (Doc. 104-3). In this letter, addressed to Rich, the County Attorney, Stone asserts that Atlantic Specialty maintains subrogation rights for the sums paid on the *Woods*, *Listau*, *Jefferson*, and *Foster* matters. Stone also communicates Atlantic Specialty's request that "Madison County protect Atlantic Specialty's interests and assert[] the sums paid by Atlantic Specialty . . . as damages in the action against [Defendants]." (*Id.* at 2).

In its Motion to Strike, Evanston properly argues that Plaintiffs never claimed OneBeacon's subrogation interest in their previous pleadings. In addition, ACH filed a Response in Support of, and Joinder in, Evanston's Motion to Strike Plaintiffs' Subrogation Claim, asserting that Plaintiffs never apprised Defendants of any alleged direct claim by OneBeacon regarding the money it paid on the Underlying Actions. (Doc. 110 at 3). Defendants argue that, similar to Plaintiffs' introduction of Evanston's 2014 Policy in its Response, Plaintiffs inappropriately added OneBeacon's subrogation interest in its Response to Evanston's Motion for Summary Judgment.

Contrary to the Court's finding that Plaintiffs' reliance upon the 2014 policy did not occasion any potential prejudice from a Rule 15(b)(1) amendment, Plaintiffs' assertion of OneBeacon's subrogation interest operates as a tardy attempt to claim an alternative ground for recovery. Plaintiffs refer to OneBeacon's subrogation interest as a basis for several arguments in its Response, including their claim for damages. (Doc. 104 at 54, 57-60, 70). Furthermore, while several witnesses extensively reviewed the 2014 policy in depositions, so far as the parties indicate Rich remains the only witness to refer to OneBeacon's subrogation interest, and he mentioned it only once in his deposition. *See* Doc. 95-2 at 137, ll. 20-21 ("[OneBeacon has] a subrogation interest, legally, I believe, that exists.") Plaintiffs "may not amend [their] complaint through argument in a brief opposing summary judgment", especially when proposing a new theory of recovery. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citation omitted); *Cain v. Geren*, No. 2:07-CV-2191-RDP, 2010 WL 11561383, at *28 (N.D. Ala. Mar. 25, 2010). Nevertheless, because the Court finds that Plaintiffs need not rely upon OneBeacon's subrogation rights to recover damages or assert their other claims, this opinion renders moot Defendants' motion to strike Plaintiffs' subrogation claim.

*v. Griswold*, 17 So. 3d 656, 660-61 (Ala. Civ. App. 2008) (Under terms of automobile policy, insurer's payment to insured automobile owner divested owner of any right she might have had to recover damages from driver and made the insurer the real party in interest in owner's negligence action against driver.); *Thomas v. Safeway Ins. Co. of Alabama, Inc.*, 244 So. 3d 965, 973 (Ala. Civ. App. 2017) ("'where there is a right of subrogation, an insured maintains the right of recovery, but that recovery is subject to the right of subrogation'") (citation omitted); *Ex parte ReLife, Inc.*, 679 So. 2d 664, 667 (Ala. 1996) ("It has long been settled that a corporation, just like an individual, must enforce its own rights and privileges.") (citations omitted). However, Plaintiffs would have secured rights to recover its own damages after OneBeacon's setoffs, including the $250,000 in deductibles paid under the OneBeacon policy. *See Har-Mar Collisions, Inc. v. Scottsdale Ins. Co.*, 212 So. 3d 892, 904, 908–09 (Ala. 2016) ("[It is not the nature of the *claims and allegations* against separate insurers that determines whether a setoff is applicable; rather, it is the nature of the *obligations* to the insured undertaken by the separate insurers. * * * If the policies of two insurance companies are in force at the date of the loss and the status of the two insurers is that of insurers of the same property of the same insured against the same hazard, they are each proportionately and severally liable for the loss at the ratio which the amount of their respective policies bears to the whole insurance covering the property against the perils involved.") (citations omitted).[10]

---

[10] Evanston's reliance upon decisions declining to apply the collateral source rule to contract disputes

Third, genuine issues of fact would prevent Evanston from prevailing on its policies' voluntary payment provisions. *See Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co.*, 480 F.3d 1254, 1258 (11th Cir. 2007) ("In Alabama, when an insurer has a right to defend its insured, receives notice of settlement negotiations, and refuses to participate, the insurer waives the right to assert the no-action clause in a later suit to determine coverage. . . . The insurer becomes 'bound to pay the amount of any settlement made in good faith,' and for which coverage exists." (citing *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co.*, 851 So.2d 466, 475 (Ala. 2002)). As Plaintiffs submitted evidence that they sought Evanston's participation in settling the applicable Underlying Actions, a genuine issue of facts exists as to whether Evanston would have to pay for any good-faith settlements falling within its policies' putative coverage.

Of course, notwithstanding the foregoing findings Evanston prevails on its summary judgment motion because its Additional Insured endorsements do not cover Plaintiffs for ACH's alleged, § 1983 liability. Therefore, the court will **GRANT** Evanston's summary judgment motion.

---

is misplaced. *See Garofalo v. Empire Blue Cross & Blue Shield*, 67 F. Supp. 2d 343, 347 (S.D.N.Y. 1999) ("the collateral source rule does not apply because 'no one should profit more from the breach of an obligation than from its full performance'") (citations omitted); *Asher v. Unarco Material Handling, Inc.*, 862 F. Supp. 2d 551, 555 (E.D. Ky. 2012) ("Applying the collateral source rule to contract law would "contravene [the principle of contractual, economic damages] by awarding the non-breaching party more damages than necessary to compensate it for the breach.") (citation omitted). Surely, Plaintiffs' contract damages would include payments that its primary insurer OneBeacon did not cover, including $250,000 in deductibles.

## II. EVANSTON DID NOT ACT IN BAD FAITH IN LIMITING AND DENYING PLAINTIFFS' INSURANCE COVERAGE

The Alabama Supreme Court recognizes two methods by which Plaintiffs may establish a bad faith refusal to pay an insurance claim. *State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 306 (Ala. 1999); *Employees' Benefit Ass'n v. Grissett*, 732 So.2d 968, 976 (Ala. 1998). In this action, Plaintiffs plead both "ordinary" and "extraordinary" theories of bad-faith liability against Evanston. (Doc. 73 at 31). Based on the foregoing summary judgment ruling on the breach-of-contract claim, and for other reasons discussed herein, Evanston merits summary judgment on both methods.

### A. Evanston's Summary Judgment Entitlement on Plaintiffs' Breach of Contract Claim Proves Fatal to Plaintiffs' "Ordinary" Bad Faith Claim

Plaintiffs bear a heavy burden when asserting an "ordinary" bad-faith claim. *LeFevre v. Westberry*, 590 So.2d 154, 159 (Ala. 1991)(citing *National Sav. Life Ins. Co. v. Dutton*, 419 So.2d 1357, 1362 (Ala. 1982)). To recover on such a claim, Plaintiffs must prove: "(1) the existence of an insurance contract; (2) an intentional refusal to pay the claim; and (3) the absence of any lawful basis for refusal and the insurer's knowledge of that fact or the insurer's intentional failure to determine whether there is any lawful basis for its refusal." *Acceptance Ins. Co. v. Brown*, 832 So.2d 1, 16 (Ala. 2001). "In short, [Plaintiffs] must go beyond a mere showing of nonpayment and prove a *bad faith*

nonpayment, a nonpayment without any reasonable ground for dispute." *National Sec. Fire & Cas. Co. v. Bowen*, 417 So.2d 179, 183 (Ala. 1982).

Plaintiffs' burden to establish the absence of a debatable reason for insurance denial represents a high bar: "in the ['ordinary'] case, a plaintiff's bad-faith claim may not be submitted to the jury unless she shows that she is entitled to a directed verdict on the contract claim." *Alfa Mutual Fire Ins. Co. v. Thomas*, 738 So.2d 815, 822 (Ala. 1999). Therefore, "[i]f any one reason for denial of coverage is at least 'arguable,' [a] court need not look any further, and a claim for bad faith refusal to pay will not lie." *Weaver v .Allstate Ins. Co.,* 574 So. 2d 771, 774 (Ala. 1990)(quoting *McLaughlin v. Ala. Farm Bureau Mut. Cas. Ins. Co.*, 437 So. 2d 86, 91 (Ala. 1983)(holding that to succeed at summary judgment, the defendant insurer maintains merely the burden of demonstrating "that it had a legitimate or arguable basis for the denial of the claim.").

Evanston successfully accomplished summary judgment on Plaintiffs' breach-of-contract claim, striking a blow to Plaintiffs' ability to assert their entitlement to a directed verdict. Therefore, Plaintiffs' "ordinary" bad-faith claim fails.

**B.    Evanston's Investigation of Plaintiffs' Demands for Defense and Indemnification and Its Lawful Basis for Refusal Prove Sufficient for Summary Judgment on Plaintiffs' "Extraordinary" Bad-Faith Claim**

"However, 'keenly aware of the fact that there [existed] countervailing policy considerations that weighed in favor of an insured's right to have his claim properly

evaluated and promptly paid by the insurer,' [the Alabama Supreme Court] recognized 'a different standard to be applied in certain unusual or *extraordinary* cases.'" *Thomas v. Principal Fin. Grp.*, 566 So. 2d 735, 742-43 (Ala. 1990)(emphasis added). "The rule in [extraordinary] cases [of bad faith] dispensed with the predicate of a preverdict JML for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation." *Grissett*, 732 So.2d at 976.

To recover under a theory of an "extraordinary" case of bad faith failure to investigate an insurance claim, an insured must prove: (1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim. *Shelter Mut. Ins. Co. v. Burton*, 822 So.2d 1149, 1160 (Ala. 2001). The Alabama Supreme Court limits these "extraordinary" cases to circumstances in which the plaintiff produced substantial evidence portraying the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim. *Slade*, 747 So.2d at 306-07.

Regardless whether the claim proceeds on an "ordinary" or "extraordinary" theory, the tort of bad faith still requires the absence of a legitimate reason for insurance denial. *State Farm and Fire Cas. Co. v. Brechbill*, 144 So. 3d 248, 258 (Ala. 2013). Where the "[insurer's] investigation established a legitimate or arguable reason for refusing to pay [the insured]'s claim, [that] is all that is required." *Weaver v. Allstate Ins. Co.*, 574 So. 2d 771, 774 (Ala. 1990).

Evanston secures summary judgment on Plaintiffs' "extraordinary" bad-faith claim by demonstrating the absence of a genuine issue of material fact regarding the following factors: (1) the Policy's applicable provisions remain unambiguous; (2) Evanston properly investigated Plaintiffs' claims; and (3) Evanston relied on an arguable basis for limiting and later denying Plaintiffs' demands for defense and indemnification.

The Additional Insured endorsement grants coverage to "State, Municipal Department of Corrections, Office of the Sheriff, or other Officials to whom [ACH] is obligated by valid written contract to provide coverage as an additional insured." (Doc. 94-4 at 28). As determined regarding Plaintiffs' breach-of-contract claims, although the Agreement requires ACH to provide coverage to the Plaintiffs, the Additional Insured *endorsement* limits coverage to "*liability in rendering Professional Services caused by the negligence of the Named Insured* [ACH] . . . ." (Doc. 94-4 at 28) (emphasis added). As discussed previously, this provision clearly limits coverage to ACH's negligent conduct.

57

Furthermore, the Additional Insured endorsement provides that "[c]overage provided to any Additional Insured . . . shall apply solely with respect to any Claim or Claim Expenses arising from Professional Services rendered by the Named Insured." (*Id.*) This provision does not afford any coverage for Plaintiffs' own conduct; rather, it limits Plaintiffs' coverage to conduct perpetrated by ACH.

Plaintiffs insist that this limitation conflicts with the Civil Rights endorsement, which provides coverage for allegations of civil rights violations pursuant to § 1983 that stem from the provision of medical services. Although Plaintiffs correctly describe the scope of the Civil Rights endorsement, its scope does not overlap with the limitations placed on Plaintiffs through the Additional Insured endorsement. Under the Additional Insured endorsement, Evanston insures Plaintiffs only for liability that stems from *negligence* in ACH's performance of "Professional Services."[11] Plaintiffs also offer no

---

[11] *See* Ala. Code § 27-14-17(a) ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended or modified by any rider, endorsement or application which is a part of the policy."); *see also   Ward v. Check Into Cash of Alabama, LLC*, 981 So.2d 434, 438 (Ala. Civ. App. 2007) ("a specific provision prevails over a general provision relating to the same subject matter"), *cited in, Stevens v. GFC Lending, LLC*, 138 F. Supp. 3d 1345, 1351 (N.D. Ala. 2015); *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So. 2d 33, 36 (Ala. 1998) ("'[S]pecific terms and exact terms are given greater weight than general language.'") (quoting Restatement (Second) of Contracts § 203(c) (1981)), *cited in, Progressive Specialty Ins. Co. v. Hall*, No. 2:14-CV-02047-RDP, 2016 WL 3854232, at *4 (N.D. Ala. July 15, 2016); *City of Prichard v. First Alabama Bank*, 646 So. 2d 552, 559 (Ala. 1994) ("'When there is a conflict in a contract, the specific substantive provisions control over general provisions.'") (quoting *ERA Commander Realty, Inc. v. Harrigan*, 514 So.2d 1329, 1335 (Ala. 1987)); *McKinney Drilling Co. v. Collins Co.*, 517 F. Supp. 320, 324 (N.D. Ala. 1981), *aff'd*, 701 F.2d 132 (11th Cir. 1983) ("when a conflict exists between the general and specific provisions, the specific clauses control") (citing *Western Oil Fields, Inc. v. Pennzoil United, Inc.*, 421 F.2d 387, 389 (5th Cir. 1970); *Atlanta Nat'l League Baseball Club, Inc. v. Kuhn*, 432 F. Supp. 1213, 1224 n.9 (N.D. Ga. 1977); Restatement of Contracts § 236(c) (1932)).

additional evidence to show that Evanston relied on any potentially ambiguous provision to limit Plaintiffs' insurance coverage.

To bolster their bad-faith claim against Evanston, Plaintiffs argue Evanston failed to properly investigate their claims. Specifically, Plaintiffs fault Jagady Blue, Evanston's claims manager, for determining coverage by reviewing the allegations in the Underlying Actions' complaints. (Doc. 96-4 at 117-120). "An insurance company's duty to defend its insured is determined by the language of the insurance policy and by the allegations in the complaint giving rise to the action against the insured." *American States Insurance Co. v. Cooper*, 518 So. 2d 708 (Ala. 1987)(internal citation omitted). Therefore, "it is necessary to look first to the allegations in the complaints and second to the language of the insurance policies." *Id.* Blue testified that he based each claim decision in this action on the underlying complaint, the Agreement, and the Policy. (Doc. 93-10 at 163, ll. 8-12; at 187, ll. 12-18).

Evanston further supports the adequacy of its investigation via the detailed claims letters corresponded between Evanston's and Plaintiffs' representatives. (Doc. 95-3 at 10-27 (Letter re: *Foster* Case); Doc. 95-14 at 6-15 (Letter re: *Listau* Case); Doc. 95-14 at 42 through Doc. 95-15 at 5 (Letter re: *Listau*, *Woods*, and *Jefferson* Cases); Doc. 99-25 (Letter re: *Davis* case)). These letters reviewed the Policy language, the claims alleged in each of the Underlying Actions, and the analysis that determined which claims

the Policy covered. For each of the cases, Evanston granted at minimum a defense under reservation of rights for the potentially covered claims.

Furthermore, Evanston attempted to reach a cost-sharing agreement for several of the Underlying Actions. Blue and Barbara McConnell of OneBeacon exchanged several emails with Rich in late December 2014, indicating that Evanston's designation of the policy as "excess" was unintentional and proposing a 50/50 split on indemnity and defense costs under Evanston's Reservation of Rights. (Doc. 95-8 at 4-7). Although a proposal never fully culminated, Evanston's attempts counter Plaintiffs' claim of bad faith.

Finally, Evanston based its decisions on lawful and adequate reasons. Evanston utilized the Policy's clear language, compared it to the allegations in the complaints of each Underlying Action, and integrated both documents in its analysis. Evanston's investigation established a legitimate reason to not defend and indemnify Plaintiffs in certain Underlying Actions, thereby defeating Plaintiffs' bad faith claim.

Evanston's actions do not qualify as the intentional or reckless actions necessary to prove an "extraordinary" bad-faith claim. The court finds that Plaintiffs fail to satisfy its burden in countering Evanston's evidence that it properly investigated the requests for defense and indemnification.

## III. GENUINE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFFS' BREACH OF CONTRACT CLAIM AGAINST ACH

ACH moves for summary judgment against Plaintiffs' breach-of-contract claim regarding the parties' Agreement for ACH to procure insurance coverage for Plaintiffs. Although Plaintiffs list several other alleged breaches of the Agreement, most of them, save the indemnity claim, coalesce under the allegation ACH failed to procure particular insurance coverage. The alleged failures – to secure Plaintiffs as Additional Named Insureds; to ensure primary insurance coverage for Plaintiffs; to insure all claims arising out of the course and scope of the Agreement; to furnish Plaintiffs a copy of the policy; to recompense deductible amounts paid on other policies for claims related to the Agreement; and to pay all costs if ACH's insurance company were to deny or withdraw coverage – all converge under Plaintiffs' failure-to-procure, breach-of-contract claim. As the following analysis portrays, genuine issues of material fact regarding some aspects of Plaintiffs' claim precludes summary judgment in ACH's favor.

### A. Legal Standard

To recover on a breach-of-contract claim, "a party must establish: (1) the existence of a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) damages." *Capmark Bank v. RGR, LLC*, 81 So. 3d 1258, 1267 (Ala. 2011) (citation omitted). The primary issues on ACH's summary judgment motion involve its performance under the Agreement and

the nature of any purported damages. Whether ACH performed properly incites interpretation of the Agreement's provision regarding the procurement of insurance.

"Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning." *Once Upon a Time, LLC v. Chappelle Properties, LLC*, 209 So. 3d 1094, 1097 (Ala. 2016) (citations and internal quotation marks omitted). When interpreting a contract, the court "must first look to the plain language of the contract and determine whether that language is ambiguous. A court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state." *Ex parte Textron, Inc.*, 67 So. 3d 61, 71 (Ala. 2011) (citations and internal quotation marks omitted). "A contractual provision is ambiguous if it is reasonably susceptible of more than one meaning." *FabArc Steel Supply, Inc. v. Composite Constr. Sys., Inc.*, 914 So.2d 344, 357 (Ala. 2005).

"The question whether a contract is ambiguous is for a court to decide. . . . As long as the contractual terms are clear and unambiguous, questions of their legal effect are questions of law." *Hall v. Envtl. Litig. Grp., P.C.*, 248 So. 3d 949, 958 (Ala. 2017) (citations and quotation marks omitted). In construing contractual language, "the mere fact that a word or a phrase is not defined in a document does not mean that the

word or phrase is inherently ambiguous. . . .  In the absence of a definition, the court should construe the word or phrase according to the meaning a person of ordinary intelligence would reasonably give it." *Id.* (citations, quotation marks, and internal alterations omitted).

"A term in a contract is ambiguous only if, *when given the context*, the term can reasonably be open to different interpretations by people of ordinary intelligence." *Once Upon a Time*, 209 So. 3d at 1098 (citations and quotation marks omitted).  "If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written." *Once Upon a Time*, 209 So. 3d at 1097 (citation omitted).

"On the other hand, if the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity." *Id.* (citation omitted).  If the application of such rules does not resolve the ambiguity, factual issues arise because "one must go beyond the four corners of the agreement" to examine "the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement . . . ." *FabArc Steel*, 914 So. 2d at 358 (citations omitted).  "Where factual issues arise, the resolution of the ambiguity becomes a task for the jury." *Id.* (citation omitted).

Regarding the particular breach-of-contract claim at bar, "'[a]greements to procure insurance are generally enforceable under Alabama law, and a party who breaches such an agreement is liable for damages resulting from the failure to obtain the promised insurance.'" *Doster Const. Co. v. Marathon Elec. Contractors, Inc.*, 32 So. 3d 1277, 1284 (Ala. 2009) (quoting *Goodyear Tire & Rubber Co. v. J.M. Tull Metals Co.*, 629 So.2d 633, 639 (Ala. 1993)); *see also Turner v. Deutz-Allis Credit Corp.*, 544 So. 2d 840, 844 (Ala. 1988) (citing cases for "the general principle that an action can lie for a breach of an agreement to insure"). "A contractual obligation to indemnify is distinct from a contractual obligation to procure insurance. Under an agreement to indemnify, the promisor assumes liability for all injuries and damages upon the occurrence of a contingency. In contrast, an agreement to obtain insurance involves the promisor's agreement to obtain or purchase insurance coverage, regardless of whether [a] contingency occurs." *Doster*, 32 So. 3d at 1284 (quoting *Goodyear*, 629 So. 2d at 639); *see also McInnis Corp. v. Nichols Concrete Const., Inc.*, 733 So. 2d 418, 421 (Ala. Civ. App. 1998) (defendant's "obligation to procure insurance is separate from and independent of any obligation to indemnify").

## B.    Plaintiffs Proceed to Trial on Their Breach-of-Contract, Failure-to-Procure Claim

There exist genuine issues of material fact whether ACH breached its obligation to procure particular insurance coverage for Plaintiffs.  The Agreement states ACH

"shall procure . . . insurance providing coverage for claims . . . asserted pursuant to 42 U.S.C. § 1983 . . . that may arise out of the course and scope" of the parties' contract. (Doc. 94-5 at 22; Doc. 94-7 at 4). Immediately thereafter, the Agreement provides that Plaintiffs "shall be additional named insureds on the aforesaid policies of insurance." (Doc. 94-5 at 22; Doc. 94-7 at 4). The Agreement continues that "ACH's insurance coverage shall be primary," and ACH agreed "to pay on demand any deductible amount . . . required by . . . any insurance policy of Madison County . . . on any claim made against Madison County, or the Sheriff . . . as a result of any service from or related" to the contract. (Doc. 94-5 at 22; Doc. 94-7 at 4).

As an initial matter, there should be no dispute ACH did not perform its obligation to procure insurance coverage for the Plaintiffs against § 1983 claims, given the summary judgment ruling on Evanston's motion that its policies did not provide such coverage for Plaintiffs. That finding constitutes a matter of law that governs the interpretation of the Agreement.

Nevertheless, the Agreement obligated § 1983 coverage for "claims that may arise out of the course and scope" of the contract, and the provision of payment of deductibles emanating from other policies likewise required that pertinent claims result from "any service from or related" to the contract. The plain and ordinary meaning of these terms requires § 1983 coverage against claims that incite the purpose of the Agreement – ACH's provision of medical care for Plaintiffs' detainees. *See* 44 C.J.S.

65

Insurance § 420 ("In order to be entitled to an award of damages for a failure to procure insurance, however, plaintiff must establish a causal relation between the defendant's breach and the damages. Thus, a party may not recover damages unless the insurance, if it had been procured, would have covered the loss . . . .") (footnotes omitted).

The parties dispute whether the Underlying Actions – in particular the claims against Plaintiffs – involve circumstances arising from ACH's provision of medical care. Upon reviewing the Underlying Actions, there exist genuine issues of material fact whether they assert § 1983 claims against Plaintiffs based upon ACH's provision of medical care to detainees, or whether they involve such claims against Plaintiffs for conduct unrelated to ACH's provision of medical care.

As discussed extensively in the Background, the first counts of the Underlying Actions consistently aver claims of deliberate indifference to serious medical needs, pursuant to 42 U.S.C. § 1983, against all defendants. They allege certain individual defendants, including Dorning and specific ACH employees, act as supervisory officials for the jail and failed to fulfill their responsibility for development and implementation of policies and procedures for medical care at the jail. Furthermore, the counts state Madison County intentionally refused to adequately fund medical care with deliberate indifference to the serious medical needs of inmates. Finally, the counts allege Dorning remains liable for the acts of ACH and its policymakers, and the parties' conduct caused the plaintiffs in the Underlying Actions to suffer physical and emotional injuries.

Clearly, a reasonable factfinder may determine these counts in the Underlying Actions averred § 1983 liability for Plaintiffs for the conduct of ACH's employees, and thus, genuine issues of material fact remain as to this determination.

In addition, there exists a genuine issue of material fact whether ACH performed its obligation under the Agreement to procure coverage with Plaintiffs as "additional named insureds" on the policies. This issue most appropriately influences any putative measure of damages if the trial factfinder deems ACH liable. Evanston's Additional Insured Endorsement lists Plaintiffs as Additional Insureds, yet, as reviewed, the pertinent policy does not cover § 1983 claims. Notwithstanding this finding, ACH essentially maintains it still escapes damages if it proves the Underlying Actions against Plaintiffs did not arise under the course or scope of, or in relation to, ACH's provision of medical care. ACH couches its interpretation on the terms "additional named insured," contending that the terms only require coverage for claims regarding the provision of medical care. Therefore, if the Underlying Actions only involve claims against the Plaintiffs for their own conduct, the failure to secure insurance for such claims caused no harm because the parties only contracted for Plaintiffs' "additional insured" status in relation to ACH's provision of medical care.

Plaintiffs contend otherwise, construing the terms "additional named insured" to require ACH to provide insurance coverage for Plaintiffs against all claims, regardless of such claims' relation to ACH's provision of medical care. Under such an

interpretation, even if the Underlying Actions only involve claims against the Plaintiffs for their own conduct, the Agreement still obligated ACH to secure primary insurance coverage for such claims on Plaintiffs' behalf.

In this guise, the genuine issue of fact manifests. The Agreement is ambiguous because its "four corners" do not provide a basis for construing the meaning of "additional named insureds," and the factfinder must resort to facts external to the terms of the Agreement to discern the parties' intended meaning. Indeed, the parties provide sparse guidance as to the distinction between "additional insureds" and "additional named insureds." Although there exist some cases referencing the terms "additional named insureds," they provide no basis for deciphering the phrase. *See e.g., McInnis Corp. v. Nichols Concrete Const., Inc.*, 733 So. 2d 418, 421 (Ala. Civ. App. 1998) (mentioning "additional named insured"); *Official Cargo Transp. Co. v. Underwriters at Lloyd's of London*, 143 F. App'x 173, 175 (11th Cir. 2005)(same). And there exists no Alabama cases distinguishing the terms.

More readily, the distinction between the terms does not admit of a facile discernment. One commentator notes:

> The greatest confusion surrounding categories of insureds concerns the differences between "additional *named* insured" status and "additional insured" status. The debate continues because of semantic inconsistencies. Some risk managers add to the confusion by insisting that their companies be identified as named insureds on an indemnitor's liability policy. These companies are thus branded as additional named insureds by some scholars, instead of being described as additional

68

insureds. Furthermore, even commentators and scholars cannot agree on the definitions of "additional named insured" and "additional insured," for some commentators define an additional insured as "a party protected under a liability policy without being named therein," and an "additional named insured" as a party designated as an insured after the policy is issued. It is no small wonder that confusion abounds and that policyholders, indemnitees, and insurers routinely argue over their respective rights and obligations.

Douglas R. Richmond, *The Additional Problems of Additional Insureds*, 33 Tort & Ins. L.J.

945, 947-48 (1998) (footnotes omitted).

Another commentator notes:

A scholarly debate has raged as to whether additional insured status differs in meaning or function from additional "named" insured status. One school of thought holds that additional named insured status has no widely accepted definition, and therefore is open to subjective interpretation. Parties who negotiate whether to enter into an additional insured agreement or additional named insured agreement are either bargaining for unintended coverage or simply wasting their time since there currently exists no meaningful difference between additional insured and additional named insured status. Proponents of this view seem to accept that until additional named insured status can be more clearly and universally defined, all added parties to liability policies should be treated as additional insureds.

Another school of thought, forwarded most clearly by Mark Pomerantz in *Recognizing the Unique Status of Additional Named Insured*, holds that courts have wrongly treated additional named insured status and additional insured status as if they were identical. As a result of this confusion, courts have usually reached decisions contrary to the contracting parties' intent. He contends that by choosing to specifically designate a party as an additional named insured, parties to the contract intend that the added party be treated more like the named insured, rather than just a third party donee beneficiary (as is the treatment afforded additional insureds). * * *

As demonstrated by the foregoing, different scholars have asserted their own views on this issue and even forwarded their own definitions of additional named insured status. Hence the debate over whether any meaningful difference exists between the two statuses remains unresolved. For the purpose of this article, additional insured and additional named insured will be afforded treatment similar to that provided by most courts: they will be treated as identical.

Samir B. Mehta, *Additional Insured Status in Construction Contracts and Moral Hazard*, 3 Conn. Ins. L.J. 169, 172-73 (1997) (footnotes omitted).

Still another provides:

One issue that comes up from time to time is whether the party that desires additional-insured status should be named as an "additional named insured" or an "additional insured." As discussed earlier in this article, an excellent reference source is IRMI's The Additional Insured Book (5th ed., 2004). In chapter 4, the authors explain why they believe it is more prudent to be named as an additional insured, rather than an additional named insured. The primary reason in support of their position is that exclusions only apply to the named insured. The authors also note that there is no formal definition of "additional named insured" that has been accepted by the insurance industry; nor is there a standard endorsement for an additional named insured. Additionally, the authors express concern that if a party is named as an additional named insured, there could be some obligation to share in the cost of the premium or contribute to the deductible. The authors conclude that being named as an additional insured on a standard industry endorsement provides a relatively known scope of protection that is preferable to requesting to be named as an additional named insured.

Terry J. Galganski, Andrea G. Woods, V. Samuel Laurin, Y. Lisa Colon-Heron, *A Construction Lawyer's Top 10 Additional-Insured Considerations*, Constr. Law., Fall 2010, at 5, 14.

As revealed, caselaw and the commentators abound in disarray as to any meaningful distinction between the terms. However, such confusion does not detract from the previous assessment of this issue. Even if a definitive legal meaning of the phrases eludes the interpreter's grasp, the parties argue that they effected diverging intentions in the Agreement, regardless of the nomenclature: either the Agreement required ACH to cover Plaintiffs for all claims, or the Agreement limited ACH's obligation to only cover Plaintiffs for claims emanating from the provision of medical care. There exists a genuine issue of fact on that issue reserved for the factfinder at trial.

To be sure, ACH argues that the "unavailability" of additional named insured coverage precludes enforcement of a failure-to-procure claim in this action. As an initial matter, ACH pens its argument on the testimony of one of its witnesses, which, of course, represents testimony the court must disregard at the summary-judgment stage. *Reeves*, 530 U.S. at 151 ("[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'") *Id.* (citation omitted). Furthermore, one queries the basis for such an assertion given the findings by the afore-cited commentators and scholars that a definitive delineation of additional named insured status does not exist.

In any event, an even more concrete legal doctrine suppresses ACH's argument: litigants may not resort to a defense of unavailability in the contract breach realm. In support of its argument, ACH relies upon cases finding that the unavailability of certain types of insurance coverage defeats a plaintiff's failure-to-procure claim. *See Hawk v. Roger Watts Ins. Agency*, 989 So. 2d 584, 590-91 (Ala. Civ. App. 2008); *Express Oil Change, LLC v. ANB Ins. Servs., Inc.*, 933 F. Supp. 2d 1313, 1350-51 (N.D. Ala. 2013). However, these cases buttress their findings on the claims at issue, namely negligent failure-to-procure insurance claims. *Hawk*, 989 So. 2d at 590; *Express Oil Change*, 933 F. Supp. 2d at 1350. Such negligence claims arise under the theory that

> When an insurance agent or broker, with a view to compensation, undertakes to procure insurance for a client, and unjustifiably or negligently fails to do so, he becomes liable for any damage resulting therefrom. . . . Once the parties have come to an agreement on the procurement of insurance, the agent or broker must exercise reasonable skill, care, and diligence in effecting coverage. . . . When the agent or broker has failed in the duty he assumes, the principal may sue either for breach of the contract or, in tort, for breach of the duty imposed on the agent or broker.

*Cornett v. Johnson*, 578 So. 2d 1259, 1262–63 (Ala. 1991) (quoting *Montz v. Mead & Charles, Inc.*, 557 So.2d 1, 4 (Ala.1987)) (other citations, quotation marks, and internal alterations omitted). The *Hawk* and *Express Oil* decisions determined that the plaintiffs therein could not recover on their negligent failure-to-procure claims because the defendants owned no duty to procure – and concomitantly there existed no causation – when

certain types of insurance were unavailable in the market. *See Hawk*, 989 So.2d at 591; *Express Oil*, 933 F. Supp. 2d at 1350.

Plaintiffs' claim at bar, however, arises upon the asserted breach of a contract duty, not a tort-based duty, based upon the alleged failure of ACH to uphold a promise in the Agreement to procure insurance. "Alabama law does not recognize a tort-like cause of action for the breach of a duty created by a contract. . . . A negligent failure to perform a contract . . . is but a breach of the contract." *Buckentin v. SunTrust Mortg. Corp.*, 928 F. Supp. 2d 1273, 1290 (N.D. Ala. 2013) (citations, quotation marks, and internal alterations omitted). "[I]if there is a failure or refusal to perform a promise the action is in contract; if there is a negligent performance of a contractual duty or the negligent breach of a duty implied by law, such duty being not expressed in the contract, but arising by implication of law from the relation of the parties created by the contract, the action may be either in contract or tort." *Citizens Bank & Tr. v. LPS Nat. Flood, LLC*, 51 F. Supp. 3d 1157, 1170 (N.D. Ala. 2014) (citation omitted). As the Alabama Supreme Court discerns:

> It was said in one of our leading cases that 'if the cause of action as stated in our cases arises from a breach of the contract, the action is ex contractu, but if the cause of action arises from a breach of duty growing out of the contract it is in form ex delicto and case.' * * *
>
> 'When there is a contract, either express or implied, from which a common law duty results, an action on the case lies for the breach of that duty: in which case, the contract is laid as mere inducement, and the tort arising from the breach of duty as the gravamen of the action. * * *

73

[T]he breach of a contract in *not performing* the obligation there expressed, or not doing it in the way specified, is not in tort. If defendant omits to enter upon the duty to perform, however negligent that might be, that is not a negligent performance and not a tort. But if he does undertake to perform, *his performance may be negligent*, giving rise to a tort.' * * *

But even when the complaint shows that the breach of the contract was also a negligent failure to perform a duty which the law imposes by reason of such contract, the injured employee may sue either for the breach of the contract when he is a party to it, or it is made for his direct benefit, or may sue in tort for the breach of the duty imposed by law. * * *

It will be observed that a negligent *failure* to perform a contract express or implied . . . is but a breach of the contract. But if in performing it, it is alleged that defendant negligently caused personal injury or property damage to plaintiff, the remedy is in tort, for it is not the breach of a contract express or implied, but the breach of an implied duty to exercise due care not to injure plaintiff or her property which is the gravamen of the action.

*Vines v. Crescent Transit Co.*, 85 So. 2d 436, 439–40 (1955) (citations omitted); *see also*

*Brown-Marx Assocs., Ltd. v. Emigrant Sav. Bank*, 703 F.2d 1361, 1371 (11ᵗʰ Cir. 1983) ("It is

possible for a tort to arise in Alabama out of a breach of a duty implied by or arising out

of a contract, but the Alabama Supreme Court has stated that an ordinary breach of

contract will not give rise to a tort.") (citation and footnote omitted).

Based upon the foregoing explication, there should be no dispute Plaintiffs'

failure-to-procure claim states a failure to perform under the Agreement rather than a

negligent undertaking of a duty under the Agreement. Indeed, the Plaintiffs'

complaints do not come close to alleging a tort-based, failure-to-procure claim, and the parties have only briefed the claim under breach-of-contract principles.

And this critical observation forestalls ACH's unavailability argument. Alabama "has not recognized the defense of impossibility or impracticability. 'Where one by his contract undertakes an obligation which is absolute, he is required to perform within the terms of the contract or answer in damages, despite an act of God, unexpected difficulty, or hardship, because these contingencies could have been provided against by his contract.'" *Silverman v. Charmac, Inc.*, 414 So. 2d 892, 894 (Ala. 1982) (citations omitted); *see also*, *Peppertree Apartments, Ltd. v. Peppertree Apartments*, 631 So. 2d 873, 879 (Ala. 1993) ("The general rule is that, where the performance of a contract becomes impossible subsequent to the making of same, the promisor is not thereby discharged. But this rule has its exceptions, and these exceptions are where the performance becomes impossible by law, or by some action or authority of the government.") (quoting *Greil Brothers Co. v. Mabson*, 60 So. 876, 878 (Ala. 1912)); *Jewell v. Jackson & Whitsitt Cotton Co.*, 313 So. 2d 157, 159-60 (Ala. 1975) ("Generally, where a person by his contract charges himself with an obligation possible to be performed, he must perform it, unless its performance is rendered impossible by the act of God, by the law, or by the other party.") (citing *Kamburis v. Stearns*, 145 So. 449 (Ala. 1933)).

As revealed, ACH's unavailability defense constitutes an impossibility or impracticability defense foreclosed by Alabama law. ACH could have contracted

against the contingency regarding the supposed unavailability of additional named insurance, yet it failed to do so.

Finally, there remain genuine issues of fact as to damages afforded Plaintiffs if ACH failed to perform under the Agreement. A "party who breaches [a failure-to-procure contract] is liable for damages resulting from the failure to obtain the promised insurance.'" *Doster Const. Co. v. Marathon Elec. Contractors, Inc.*, 32 So. 3d 1277, 1284 (Ala. 2009) (quoting *Goodyear Tire & Rubber Co. v. J.M. Tull Metals Co.*, 629 So.2d 633, 639 (Ala. 1993)). Such economic, contractual damages generally incite the following considerations:

> The measure of damages for breach of the contract to procure insurance is the amount which might have been recovered under such insurance if procured as agreed, not to the amount of insurance applied for. Nominal damages may also be recovered even though no actual loss is shown. Where a promisee has its own insurance coverage, recovery for breach of a contract to procure insurance is limited to the promisee's out-of-pocket expenses in obtaining and maintaining such insurance[.] In some situations, however, the breaching party may be liable for the costs of defending a suit which would have been defended by an insurance company if insurance had been procured. Even so, the award of defense costs will be premature where there has not yet been a finding that the breaching party was responsible for the loss. In any case, the plaintiff may have a duty to make reasonable exertions to mitigate or minimize the damages liable to result from a breach, although such obligation does not require the plaintiff to incur extraordinary expense and risk.

> Plaintiff is not entitled to recover the amount paid to the defendant to effect the insurance, however, since if the plaintiff was entitled to the insurance or its equivalent by way of damages the plaintiff would be required to pay the cost of a policy.

In situations where a subcontractor, in violation of a contract, fails to procure insurance on behalf of the general contractor and the contractor obtains its own insurance, the contractor is limited to damages, in connection with an injured construction worker's scaffold law action against the contractor, for any out-of-pocket expenses such as premiums and any additional costs incurred including deductibles, copayments, and increased future premiums.

44 C.J.S. Insurance § 420 (footnotes omitted).

Based on the foregoing, if Plaintiffs prove ACH breached the Agreement, the failure-to-procure claim garners damages, even if OneBeacon covered some claims. These damages potentially include out-of-pocket expenses, including deductibles paid under the OneBeacon policy, premiums paid on the OneBeacon policy, and increases in premiums on the OneBeacon policy. *See Inchaustegui v. 666 5th Ave. Ltd. P'ship*, 749 N.E.2d 196, 198-99, 725 N.Y.S. 2d 627, 630 (2001) (landlord's damages limited to "its out-of-pocket expenses (notably, the premiums and any additional costs it incurred such as deductibles, co-payments and increased future premiums)" for failure-to-procure claim because it "obtained its own insurance and therefore sustained no loss beyond its out-of-pocket costs"); *Mavashev v. Shalosh Realty*, 233 A.D.2d 301, 303, 649 N.Y.S.2d 718, 720 (1996) (damages for failure to name individuals as additional insureds on liability insurance policy "limited to the cost of that liability insurance" because individuals procured their own insurance); *Richfield Properties, Ltd. v. Galaxy Knitting Mills, Inc.*, 269 A.D.2d 516, 517, 704 N.Y.S.2d 505 (2000) ("After finding that Galaxy had breached its lease by failing to procure liability insurance for the benefit of

Consol, the court properly limited Consol's damages to the costs of obtaining its own liability policy since such a policy was in effect at the time of the accident from which the underlying tort claim arises . . . .") (citations omitted). Moreover, the measure of these potential damages remains a genuine issue of material fact. Therefore, the court must preclude summary judgment on this additional basis.

### C. Genuine Issues of Material Fact Exist as to ACH's Estoppel and Waiver Defenses

ACH asserts the affirmative defenses of equitable estoppel and waiver against Plaintiffs' breach-of-contract claim. Principally, ACH contends that the Certificates of Insurance it provided regarding Evanston's underlying policies placed Plaintiffs on notice that they were only covered for claims arising out of ACH's provision of medical care. After review, genuine issues of material fact persist as to the estoppel and waiver defenses, thus warranting denial of summary judgment on these issues.

Because the defendant bears the burden of proof on its defenses at trial, its status as the summary-judgment movant requires it to establish there is no genuine dispute of material fact as to all of the elements of its defense and, concomitantly, that it deserves judgment as a matter of law on the defense. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) ("The movant must show . . . on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.").

Equitable estoppel comprises the following elements:

"(1) [t]he person against whom estoppel is asserted, who usually must have knowledge of the facts, communicates something in a misleading way, either by words, conduct, or silence, with the intention that the communication will be acted on; (2) the person seeking to assert estoppel, who lacks knowledge of the facts, relies upon that communication; and (3) the person relying would be harmed materially if the actor is later permitted to assert a claim inconsistent with his earlier conduct."

*EvaBank v. Traditions Bank*, No. 1160495, -- So.3d --, 2018 WL 797542, at *3 (Ala. Feb. 9, 2018) (quoting *General Elec. Credit Corp. v. Strickland Div. of Rebel Lumber Co.*, 437 So.2d 1240, 1243 (Ala. 1983)).[12]

Upon citation to the equitable estoppel elements, the flaw in ACH's efforts to secure summary judgment on this defense readily manifests. As to the first factor, ACH has not submitted any facts indicating Plaintiffs knew that Evanston's insurance policies limited their coverage to claims arising solely from ACH's negligence; indeed, the Certificates of Insurance ostensibly stated otherwise. Furthermore, Plaintiffs contend they did not know that Evanston's policy only provided against liability arising out of ACH's provision of medical services. *See* Doc. 93-6 at 20 (the Additional Insured endorsement "provide[s] coverage . . . only as respects liability in rendering Professional Services *caused by the negligence of the Named Insured* . . . .) (emphasis added). Plaintiffs hotly contest whether they contracted for coverage of their own conduct, so

---

[12] Although Alabama law provides that the equitable estoppel defense should be sparingly applied against local governmental units, such precedent clearly maintains that this caution does not apply when the government's alleged representation regards facts and not legal restrictions. *City of Orange Beach v. Benjamin*, 821 So. 2d 193, 196 (Ala. 2001).

apparently they did not know Evanston's policy failed to even accord such coverage. Therefore, ACH cannot obtain summary judgment on its equitable estoppel defense because genuine issues of material fact remain for resolution by the factfinder at trial.

The same result manifests for the waiver defense. "Waiver is the intentional relinquishment of a known right. . . .   Intentional relinquishment must be shown in an unequivocal manner.   A party's intent to waive a right may be found from conduct that is inconsistent with the assertion of that right." *Edwards v. Allied Home Mortg. Capital Corp.*, 962 So. 2d 194, 208-09 (Ala. 2007) (citations omitted).   That is, "it is well established that a party's intention to waive a right is to be ascertained from the external acts manifesting the waiver. . . .   This intention to waive a right may be found where one's course of conduct indicates the same or is inconsistent with any other intention." *Hughes v. Mitchell Co.*, 49 So. 3d 192, 201-02 (Ala. 2010) (citations omitted). Furthermore, the party asserting waiver must have "been induced by such conduct to act upon the belief that there has been a waiver and has incurred trouble or expense thereby." *Alabama State Docks v. Saxon*, 631 So. 2d 943, 946 (Ala. 1994).   "Whether a party has intentionally waived a known right is normally a jury question." *Edwards*, 962 So. 2d at 209.[13]

---

[13] The parties dispute the applicability of *Stone Bldg. Co. v. Star Elec. Contractors, Inc.*, 796 So. 2d 1076, 1089 (Ala. 2000).   In *Stone*, the Alabama Supreme Court ruled that plaintiff waived its failure-to-procure claim because defendant sent a certificate of insurance revealing plaintiff's non-coverage. *Id.* at 1089.   In addition, defendant presented an affidavit from plaintiff's former president acknowledging a letter he sent accepting the insurance according no coverage of plaintiff.

During the course of the parties' relationship, ACH provided certificates of insurance indicating that Plaintiffs were "Additional Insureds" under Evanston's policies. Given the importance the parties place on a supposed distinction between the phrases "additional insureds" and "additional named insureds" – which serve as proxies for the parties' dispute whether they contracted for primary insurance coverage of Plaintiffs' own conduct bereft of any reference to ACH's provision of medical care – the factfinder may conclude Plaintiffs waived their right to the substance of "additional named insured" coverage by accepting the certificates and not further inquiring about the discrepancy. That the certificates did not alter or modify their referenced insurance policies does not obviate this finding; the factfinder may still find that Plaintiffs should have inspected the underlying policies to ascertain the desired status, at which case it would have discovered its designation as an "additional insured" (among other critical discoveries).

In addition, that ACH failed to provide Plaintiffs copies of the insurance policies does not preclude a genuine issue of fact on the waiver defense. Plaintiffs cannot

---

*Stone* does not establish a per se rule according automatic waiver effect to certificates of insurance that contrast with a contracted obligation to procure insurance. Rather, the facts of *Stone* merely reveal that the plaintiff's course of conduct – accepting the certificates of insurance indicating non-coverage and sending a letter acknowledging the same – evinces an intention to waive a right. Therefore, ACH may not rely upon *Stone* as establishing a legal rule regarding certificates of insurance. Indeed, the certificates of insurance at issue in this case clearly state that they do not alter the terms of Evanston's insurance policies, and, as established previously, Alabama insurance regulations preclude such modifications by insurance certificates.

defeat one waiver defense against a particular right by asserting another right they arguably waived by their course of conduct. In such circumstances, ACH's failure to provide copies of the policies would not preclude its waiver argument as a matter of law, yet genuine issues of material fact remain as to its application in this action. Therefore, ACH cannot obtain summary judgment on the waiver defense.

## IV. PLAINTIFFS PROCEED TO TRIAL ON THEIR INDEMNITY CLAIM

Plaintiffs claim ACH must indemnify them against the claims averred in the Underlying Actions. Based upon the terms of the Agreement, there exist genuine issues of material fact on this assertion.

"Under an agreement to indemnify, the promisor assumes liability for all injuries and damages upon the occurrence of a contingency." *Goodyear Tire & Rubber Co. v. J.M. Tull Metals Co.*, 629 So. 2d 633, 639 (Ala. 1993). Courts apply "general rules of contract interpretation" when construing an indemnity agreement. *Once Upon a Time, LLC v. Chappelle Properties, LLC*, 209 So. 3d 1094, 1097 (Ala. 2016) (citations omitted). An "indemnity agreement 'cannot be extended to losses or damages neither expressly within its terms, nor of such character that it may reasonably be inferred that the parties intended to covenant against them.'" *Id.* (citations omitted).

The pertinent indemnity clause in the Agreement provides as follows:

ACH agrees to indemnify and save harmless [Plaintiffs], and their respective supervisors, agents, officers, employees and officials from and

82

against any and all liability loss, damages, interest, judgments and liens growing out of any and all costs and expenses (including, but not limited to, reasonable attorney fees and disbursements) arising out of or incurred in connection with any and all claims, demands, suits, actions or proceedings, which may be brought [against Plaintiffs] by reason of, or as the result of (1) acts or omissions of ACH, its agents, servants, or employees related in any way to or while in the performance of this Agreement; [and] (2) any allegations of an act or omission, conduct or misconduct, of ACH, its agents, servants or employees not included in the paragraph above and for which the [Plaintiffs], or their agents, servants, or employees are alleged to be liable.

(Doc. 94-5 at 23; Doc. 94-7 at 5).

As an initial matter, the parties dispute whether the indemnity clause obligates the indemnitor, ACH, to indemnify the indemnitees, Plaintiffs, for Plaintiffs' own negligence. "Agreements by which one party agrees to indemnify another for the consequences of the other's acts or omissions are carefully scrutinized. . . . An agreement by one person to indemnify another for the other's negligent conduct is enforceable only if the indemnity provisions are unambiguous and unequivocal." *City of Montgomery v. JYD Int'l, Inc.*, 534 So. 2d 592, 594 (Ala. 1988) (citation omitted).[14]

---

[14] The parties dispute the applicability of the equitable exception from *Stone Bldg. Co. v. Star Elec. Contractors, Inc.*, 796 So. 2d 1076 (Ala. 2000), whereby "'indemnification, including attorney fees, is allowed where one is defending claims predicated solely upon another defendant's negligence; however, where one is defending for his own benefit, an award of attorney fees will not be allowed.'" *Id.* (at 1092 (quoting *Jack Smith Enters. v. Northside Packing Co.*, 569 So.2d 745, 746 (Ala. Civ. App. 1990)). Thus, "'an indemnitee is precluded from recovering attorney fees where the indemnitee has been required to defend accusations which encompass his own separate wrongful acts.'" *Wells Fargo Bank, N.A. v. Nat'l Bank of Commerce*, 240 So. 3d 541, 549 (Ala. 2017) (quoting *Stone Bldg. Co.*, 796 So.2d at 1092).

As revealed, this exception primarily concerns attorneys' fees coverage under indemnity clauses, not the provision of the duty to defend and save harmless generally. The exception's applicability to this

The Agreement's indemnity clause does not contain an "unambiguous and unequivocal" declaration that ACH will indemnify Plaintiffs for their own acts or omissions. Indeed, the clause unambiguously provides otherwise: ACH indemnifies Plaintiffs solely against ACH's acts, omissions, conduct, or misconduct "related in any way to or while in the performance" of the Agreement, or against other actions allegedly perpetrated by ACH. Therefore, the indemnity clause covers Plaintiffs for ACH's actions in providing medical care to detainees or for other conduct at the facility. Properly construed, the Agreement does not obligate ACH to indemnify Plaintiffs for their own conduct.[15]

---

case proceeds upon whether the Underlying Actions aver claims against Plaintiffs based upon ACH's conduct, Plaintiffs' conduct, or both. As these questions rest upon genuine issues of material fact, the court cannot resolve the exception's applicability to this case at this stage.

[15] In addition, *Walter L. Couse & Co. v. Hardy Corp.*, 274 So. 2d 316 (Ala. Civ. App. 1972), does not warrant a different finding. Although the *Couse* decision found that a contract required a subcontractor to indemnify a contractor for the contractor's own negligence, it ruled so because the indemnity clause provided that the subcontractor shall indemnify contractor for all claims "arising out of or connected with the performance" of their contract. *Id.* at 318. The court determined "the language of the indemnity agreement in question to be clear and unequivocal that the subcontractor was to indemnify the contractor against claims from a third party when such claims arose out of or were connected with the performance of the subcontract even though the contractor himself may have been guilty as a matter of law of negligence to the third party." *Id.* at 19.

Here, the Agreement obligates ACH to indemnify Plaintiffs against claims "related in any way to or while in the performance" of the contract, which mirrors the indemnity terms in *Couse* regarding indemnity against claims arising out of "the performance" of the contract therein. However, the Agreement here contains additional, limiting language expressly stating that ACH shall indemnify Plaintiffs solely against ACH's own acts, omission, conduct, or misconduct "related in any way to or while in the performance" of the contract. Therefore, the Agreement does not reach as broadly as the contract as in *Couse*, and thus, *Couse* provides no aid for Plaintiffs' entreaty.

However, as determined for the breach-of-contract claim, there exist genuine issues of material facts whether the Underlying Actions assert claims against Plaintiffs based upon ACH's conduct, or whether they involve claims against Plaintiffs for conduct unrelated to ACH's acts or omissions.

As discussed extensively in the Background, the first counts of the Underlying Actions consistently aver claims of deliberate indifference to serious medical needs, pursuant to 42 U.S.C. § 1983, against all defendants. They allege certain individual defendants, including Dorning and specific ACH employees, act as supervisory officials for the jail and failed to fulfill their responsibility for development and implementation of policies and procedures for medical care at the jail. Furthermore, the counts state Madison County intentionally refused to adequately fund medical care with deliberate indifference to the serious medical needs of inmates. Finally, the counts allege Dorning remains liable for the acts of ACH and its policymakers, and the parties' conduct caused the plaintiffs in the Underlying Actions to suffer physical and emotional injuries. Clearly, a reasonable factfinder may determine these counts in the Underlying Actions averred § 1983 liability for Plaintiffs for the conduct of ACH's employees, and thus, genuine issues of material fact remain as to this determination.

Finally, this issue proceeds to trial notwithstanding the absence of any fault determination judicially dispensed in the Underlying Actions. As Alabama law provides:

When the indemnitor has the requisite notice and an opportunity to participate in the underlying action, the indemnitee, in its indemnity action, does not have to show its actual liability to the original plaintiff, i.e., that its agent was responsible and that, as the principal, it was in turn liable to the original plaintiff. Instead, "when the indemnitor has notice of the claim and refuses to defend, the indemnitor is bound by any good faith reasonable settlement, and the indemnitee need only show potential liability."

*Stone Bldg. Co. v. Star Elec. Contractors, Inc.*, 796 So.2d 1076, 1090 (Ala. 2000) (quoting 41 Am. Jur. 2d Indemnity § 46 at 382–83 (1995) (footnotes and emphasis omitted)).

There exists no dispute ACH received notice and an opportunity to participate before Plaintiffs settled the pertinent Underlying Actions, and the question of Plaintiffs' potential liability for the Underlying Actions incite genuine issues of material fact.

Therefore, Plaintiffs' indemnity claim will proceed to trial.

## V. GENUINE ISSUES OF MATERIAL FACT EXIST AS TO PLAINTIFFS' FRAUD CLAIMS AGAINST ACH

Plaintiffs allege a claim of fraud against ACH pursuant to Ala. Code § 6-5-101. Under Alabama law, "misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted upon by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud." Ala. Code § 6-5-101. Regardless whether the individual rendered the representation willfully, recklessly, or mistakenly, a plaintiff alleging fraud must prove four elements: "(1) a false representation; (2) of a material existing fact; (3) reasonably relied upon by the plaintiff; and (4) who suffered damage as a proximate consequence of the misrepresentation."

86

*Southland Bank v. A&A Drywall Supply Co., Inc.*, 21 So. 3d 1196, 1210 (Ala. 2008)(citing *Ex parte Michelin North America, Inc.*, 795 So. 2d 674, 678 (Ala. 2001)).

Plaintiffs allege promissory fraud against ACH.[16] A claim of promissory fraud hinges on "a promise to act or not to act in the future." *Ex parte Michelin North America, Inc.*, 795 So. 2d 674, 678 (Ala. 2001)(quoting *Padgett v. Hughes*, 535 So. 2d 140, 142 (Ala. 1988)). To prevail on a promissory fraud claim, Plaintiffs must satisfy two additional elements in addition to the afore-cited factors: (5) proof that, at the time of the misrepresentation, the defendant possessed the intent not to perform the act promised; and (6) proof that Defendants possessed the intent to deceive. *See Robinson v. Sovran Acquisition Ltd. P'ship*, 70 So. 3d 390, 396 (Ala. Civ. App. 2011)(quoting *Coastal Concrete Co. v. Patterson*, 503 So. 2d 824, 826 (Ala. 1987)). A plaintiff pursuing a theory of promissory fraud, which requires proof of intent, bears a heavier burden than one who relies solely on misrepresentation. *N. Alabama Elec. Co-op v. Tennessee Valley Auth.*, 862 F.

---

[16] ACH contends from the outset that Plaintiffs "improperly attempt to convert their breach of contract claim into a fraud claim." (Doc. 90 at 53). ACH specifically cites a concurrence in *Dickinson v. Land Developers Constr. Co., Inc.*, 882 So. 2d 291 (Ala. 2003): "to assert a fraud claim that stems from the same general facts as one's breach-of-contract claim, the fraud claim must be based on representations independent from the promises in the contract." *Dickinson*, 882 So. 2d at 303-04. ACH concludes its alleged failures only constitute a possible breach-of-contract claim because Plaintiffs rely on the Agreement itself for alleged misrepresentations.

However, the *Dickinson* concurrence does not constitute controlling law in Alabama and therefore does not preclude Plaintiffs' fraud claims. Rather, the Alabama Supreme Court entertains claims of fraud and breach-of-contract that stem from the same representations in the same document. *See Heisz v. Galt Industries, Inc.*, 93 So. 3d 918, 925 (2012) ("Thus, the only alleged misrepresentations identified at trial that would support the promissory-fraud claim submitted to the jury are those made in the [allegedly breached] assert-purchase agreement.").

Supp. 2d 1291, 1302 (N.D. Ala. 2012)(citing *Intercorp v. Pennzoil*, 877 F.2d 1524, 1534 (11th Cir. 1989)).

As detailed below, there exist genuine issues of material fact as to whether ACH rendered a misrepresentation and displayed the requisite intent not to perform and the intent to deceive, and whether Plaintiffs reasonably relied on ACH's misrepresentations.

### A. A Genuine Issue of Material Fact Exists as to Whether ACH Rendered False Representations and Possessed the Intent Not to Perform and to Deceive

The parties appear to diverge in their arguments regarding misrepresentation and promissory fraud. ACH argues that there exists no misrepresentation in the Agreement. Plaintiffs counter ACH's misrepresentation argument, yet they also contend ACH demonstrated a fraudulent intent not to perform. (Doc. 102 at 40). ACH does not respond to Plaintiffs' promissory fraud argument in its Reply, appearing to proceed on its argument regarding the basic elements of fraud notwithstanding Plaintiffs' invocation of promissory fraud in its opposition. (Doc. 102 at 37-38, 40). In any event, the discrepancy does not detract from the following conclusions as the same facts demonstrate genuine issues of material fact regarding the misrepresentation and intent elements.[17]

---

[17] In its Motion for Summary Judgment, ACH refers to numerous undisputed facts to bolster its argument that it did not misrepresent any facts regarding the promises set forth in the Agreement.

"Although the denomination of a representation as one of opinion or fact is not in itself conclusive, the ultimate determination of the true nature of a given representation depends upon all the circumstances of the particular case." *Jones v. McGuffin*, 454 So.2d 509, 512 (Ala. 1984). Plaintiffs allege that ACH falsely represented the following material facts to the County and Dorning: (1) ACH procured and maintained adequate, primary insurance covering all claims that may arise out of the course and scope of ACH's work, including claims for professional liability, negligence, and constitutional torts; and (2) the insurance would deem the County and Dorning "additional named insureds." (Doc. 73 at 36).

On a promissory fraud claim, Plaintiffs must establish ACH possessed the requisite intent to deceive when they executed the Agreement. *Southland*, 21 So. 3d at 1211(citing *Martin v. American Medical Int'l, Inc.*, 516 So. 2d 640 (Ala. 1987)). Plaintiffs cannot satisfy their burden of proving intent to deceive merely on the basis that ACH failed to keep its promise. *Wright v. AmSouth Bancorporation*, 320 F.3d 1198, 1204 (11th Cir. 2003)(applying Alabama law). However, Plaintiffs can establish intent to deceive "through circumstantial evidence that relates to events that occurred after the alleged misrepresentations were made." *Vance v. Huff*, 568 So.2d 745, 750 (Ala. 1990)(citation

---

(Doc. 90 at 47-49). For example, ACH asserts it maintained a successful contractual relationship with the County and Dorning for nearly a decade, renewing the Agreement on a yearly basis. Moreover, ACH points to Plaintiffs' consistent, positive evaluations of ACH's healthcare services at the Jail, and their routine meetings with ACH leadership about the quality of services, as facts disproving any potential misrepresentations. However, these facts bear no relevance on the issue whether ACH ultimately misrepresented Plaintiffs in its discussions surrounding its acquisition of insurance.

omitted). Nevertheless, the circumstantial evidence must remain substantial, and misrepresentations made recklessly or innocently cannot sustain an action for promissory fraud. *See Graham Foods, Inc. v. First Alabama Bank*, 567 So. 2d 859, 862 ("Reckless misrepresentation will not support a charge of promissory fraud."); *City of Prattville v. Post*, 831 So. 2d 622, 629 (Ala. Civ. App. 2002)(holding that a claim of promissory fraud based on an implied or negligent representation "could not be sustained").

Furthermore, "failure to perform alone is not sufficient evidence to show a present intent not to perform. If it were, then every breach of contract would be 'tantamount to fraud.'" *Gadsden Paper & Supply Co. v. Washburn*, 554 So. 2d 983, 987 (Ala. 1989)(citing and quoting *Purcell Co. v. Spriggs Enters., Inc.*, 431 So.2d 515, 519 (Ala. 1983)). Therefore, Plaintiffs must submit evidence that indicates a present intent not to perform at the time ACH rendered the alleged misrepresentation, even if that evidence remains circumstantial. *See Byrd v. Lamar*, 846 So. 2d 334, 347 (Ala. 2002)("Circumstantial evidence is appropriate proof of a present intent not to perform in a promissory-fraud case.").

From the beginning of their relationship with ACH, Plaintiffs placed great emphasis on the necessary acquisition of sufficient liability insurance. Rob Bielenberg of Callender & Co. served as a liaison to ACH to obtain the proper insurance coverage, yet ACH did not send Bielenberg a copy of the Agreement until all parties had signed it.

(Doc. 96-1 at 20, ll. 9-12). On August 29, 2006, Bielenberg wrote to Johnson and explained his difficulties in finding an insurance carrier willing to adopt the wording set out in the Agreement—specifically, providing insurance for "Madison County, its officers, agents and employees, and the Sheriff and all agents and employees of the Sheriff." (Doc. 94-2 at 9).

Rich, Johnson, and Dorning exchanged correspondence several times in late 2006, constantly referring to the importance of acquiring the insurance as described in the Agreement and the difficulties in obtaining said insurance. *See* Doc. 95-10 at 12-14 (September 12, 2006, letter from Johnson to Dorning, communicating Rich's frustrations with the wording on the Certificate of Liability Insurance not matching the language set out in the Agreement); Doc. 95-10 at 17-18 (September 14, 2006, letter from Johnson to Rich, summarizing Johnson's efforts to acquire Eighth Amendment insurance that included the wording from the Agreement); Doc. 95-7 at 12 (October 16, 2006, letter from Rich to Johnson, emphasizing that "insurance coverage is a matter of significant concern to [the County and Dorning]" and requesting an update on the status of ACH's insurance coverage); Doc. 95-10 at 25-27 (October 23, 2006, letter from Johnson to Rich, updating Rich on communications with Bielenberg regarding the ongoing insurance search).

Bielenberg testified that he always received a copy of the policy that Evanston issued for ACH, and Bielenberg would then send the policies to Neil Leuthold, ACH's

president. (Doc. 96-1 at 68, ll. 9-16). Rich testified that he never received any of the insurance policies issued to ACH. (Doc. 95-2 at 28, ll. 17-20).

At first blush, the numerous documents evincing the negotiations underlying the initial 2006 Agreement, and following the initial execution of the 2006 Agreement, depict the parties engaging in attempts to comply with said Agreement by acquiring the requisite insurance. During that period, the parties all remained aware of the importance that Plaintiffs placed on receiving adequate coverage in liability insurance. Therefore, the 2006 Agreement does not indicate any misrepresentations or intents to deceive or not perform a promise at the time the parties' executed the contract.

However, evidence of misrepresentation, and an intent to deceive and not perform, exists as to the 2012 and 2014 Agreements pertinent to the claims at bar. Notwithstanding ACH's efforts in 2006 to secure insurance coverage reflecting the Agreement's promises, it ultimately failed to do so. Indeed, ACH maintains that insurers do not offer "Additional Named Insured" coverage. Furthermore, it provided a template to Evanston that did not accord with Plaintiffs' promised coverage, and it possess the policies and Additional Insured endorsements unambiguously covering Plaintiffs solely for excess coverage on negligent conduct perpetrated by ACH's agents.

Despite knowledge of these facts six years after 2006, ACH still executed contracts stating that it would provide Plaintiffs' primary coverage for § 1983 claims. Furthermore, ACH delivered certificates of insurance essentially stating that the

insurance policies covered Plaintiffs for civil rights liability, with no indication whether such [false] coverage was primary or excess. A reasonable juror may determine that ACH's execution of the 2012 and 2014 Agreements – despite the afore-mentioned facts indicating it could not provide the coverage sought by Plaintiffs – constitutes misrepresentations, an intent to deceive, and an intent not to perform its obligations.

To combat Plaintiffs' fraud claim, ACH argues that it could not have misled Plaintiffs because ACH repeatedly provided Plaintiffs with Certificates of Liability Insurance that identified the insurance coverage. However, the Certificates list information that conflicts with Evanston's Policy: specifically, ACH's insurance remained "primary" for Plaintiffs when it was excess in the Policy, and the Certificates failed to inform that Evanston narrowed Plaintiffs' coverage to acts of negligence committed by ACH, thus excluding § 1983 constitutional torts. Plaintiffs provided evidence demonstrating ACH retained copies of both the Certificates and the Policy, so it should have discerned the discrepancies between the Certificates and the actual policies. Therefore, the trier of fact could reasonably determine that ACH's act of delivering the Certificates actually constituted a misrepresentation itself as to the coverage afforded by the underlying policies.

### B. Genuine Issues of Fact Exist Whether Plaintiffs Unreasonably Relied on ACH's Alleged Misrepresentations

The same conclusion manifests on the issue whether Plaintiffs reasonably relied upon ACH's alleged misrepresentations. To recover damages for fraud, Plaintiffs must prove that they reasonably relied on ACH's alleged misrepresentation. *AmerUS Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1207 (Ala. 2008). The reasonable-reliance standard imposes on Plaintiffs "a general duty . . . to read the documents received in connection with a particular transaction." *Foremost Insurance Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997). When reviewing a plaintiff's actions pursuant to the reasonable-reliance standard, the Alabama Supreme Court consistently holds that a plaintiff does not reasonably rely upon representations that contradict written terms in documents when it is capable of reading them yet does not do so or investigate facts that should provoke inquiry. *Traylor v. Bell*, 518 So. 2d 719 (Ala. 1987).

As more fully explained:

> To recover in a fraud action filed after March 14, 1997, a plaintiff must prove that he or she *reasonably relied* on the defendant's alleged misrepresentation." * * * Under *Foremost* and its progeny, ""'it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests,'"" and, as our supreme court has noted, " ' "the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests""'; thus, as our supreme court has held, ""'[i]f the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover.'"" *Gant v. Azalea City Credit Union,* 69 So.3d 880, 883 (Ala. Civ. App .2011) (quoting *AmerUs Life Ins. Co. v. Smith,* 5 So.3d 1200, 1207 (Ala. 2008),

quoting in turn *Torres v. State Farm Fire & Cas. Co.,* 438 So.2d 757, 758–59 (Ala. 1983), *which was overruled on other grounds by Hickox v. Stover*, 551 So. 2d 259 (Ala. 1989)). Further, the reasonable-reliance standard "'imposes ... on a plaintiff a "general duty ... to read the documents received in connection with a particular transaction," together with a duty to inquire and investigate'"; thus, as a matter of law, "'a plaintiff who is capable of reading documents, but who does not read them or investigate facts that should provoke inquiry, has not reasonably relied upon'" statements "'that contradict the written terms in the documents.'" *Gant,* 69 So.3d at 883-84 (quoting *AmerUs Life Ins. Co.,* 5 So.3d at 1208, quoting in turn *Foremost,* 693 So.2d at 421).

*Med. Park Station, LLC v. 72 Madison, LLC*, 216 So. 3d 453, 457-58 (Ala. Civ. App. 2016); *see also AmerUs Life Ins.*, 5 So. 3d at 1208 ("Fraud is deemed to have been discovered when the person either actually discovered, or when the person ought to or should have discovered, facts which would provoke inquiry by a person of ordinary prudence, and, by simple investigation of the facts, the fraud would have been discovered.") (citing *Gonzales v. U–J Chevrolet Co.*, 451 So.2d 244, 247 (Ala. 1984)).

In a case closely on point, the Alabama Supreme Court held that an additional insured cannot rely on certificates of insurance alone as proof of coverage as "the insurance policy is the controlling document." *Ala. Elec. Coop. Inc., v. Bailey Constr. Co., Inc.*, 950 So. 2d 280, 285 (Ala. 2006). "Where an entity requires another to procure insurance naming it an additional insured, that party should not rely on a mere certificate of insurance, but should insist on a copy of the policy. A certificate of insurance is not part of the policy—if it states that there is coverage but the policy does not, the policy controls." *Id.* (citing 17 Lee R. Russ & Thomas F. Segalla, Couch on

Insurance § 242:33 (3d ed. 1997)); *see also Webb v. Reese*, 505 So. 2d 321 (Ala. 1987)(under the reasonable reliance standard, a fraud claim cannot be sustained when the alleged misrepresentations run counter to the language of the document governing the rights of the parties to that contract).

On first analysis, the foregoing standards starkly portend summary judgment for ACH. The Certificates that ACH sent Plaintiffs deem Plaintiffs as "additional insureds" rather than the coveted "additional named insured" status. Furthermore, the Certificates include a disclaimer that they are "ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW." Arguably, these facts about the Certificates should have incited Plaintiffs to investigate their insured status with Evanston.

However, the reasonable reliance precedent invoking the duty for plaintiffs to read documents or investigate facts involves circumstances where the plaintiffs actually possess the documents contravening the alleged misrepresentations. *See, e.g., Sandoz, Inc. v. State*, 100 So. 3d 514 (Ala. 2012); *AmerUS Life Ins. Co. v. Smith*, 5 So. 3d 1200 (Ala. 2008); *Foremost Insurance Co. v. Parham*, 693 So. 2d 409 (Ala. 1997); *Traylor v. Bell*, 518 So. 2d 719 (Ala. 1987); *Med. Park Station, LLC v. 72 Madison, LLC*, 216 So. 3d 453 (Ala. Civ.

App. 2016). In this action, Plaintiffs did not possess the insurance policies which would have put them on notice that ACH failed to procure the requested coverage.

To be sure, in *Ala. Elec. Coop.* the plaintiff therein did not possess copies of the pertinent insurance policies contrasting the certificates of insurance, and the court still ruled they did not reasonably rely upon the alleged misrepresentations because they could have insisted on obtaining the policies. 950 So. 2d at 285. However, the court signals its conclusion may have differed if the plaintiffs therein actually requested the policies and yet were denied access. *Id.* at 286 and n.2.

And therewith resides the critical distinguishing feature of this case. Plaintiffs actually contracted with ACH in the Agreement to obtain copies of the insurance policies. For all of the controlling Agreements – 2006, 2009, 2012, and 2014 – ACH maintained the contractual obligation to provide copies of the insurance policies. A reasonable factfinder may conclude that its failure to provide copies when it sustained the contractual obligation to do so constitutes a denial of access to the documents, especially vis-à-vis the later documents when it contracted to procure insurance that it ostensibly could not – and of course, did not – obtain.

If ACH would not have breached its contractual duty to provide the insurance policies, Plaintiffs may have discovered the features of the policies contrasting with the Agreement. Sure, Plaintiffs may have retained the duty to investigate the nature of the policies upon examining the Certificates, yet ACH retained the duty to provide copies

of the policies to facilitate such examination. In effect, determining reasonable reliance as a matter of law against Plaintiffs on these facts would occasion an unjust benefit for ACH, as it would profit from the wrongful breach of its contractual duty to provide information that could have unveiled the alleged misrepresentations. In turn, such a ruling may incentivize entities to deny access to documents subject to a contractual disclosure duty as a means of concealing detrimental information. Courts should be loath to facilitate such a development, and thus, seek to deter it.

In these circumstances, the reasonableness of Plaintiffs' reliance upon ACH's alleged misrepresentations constitutes a close, difficult question, which establishes its domain for the factfinder at trial, not a legal decision at summary judgment.

## VI. PLAINTIFFS' SUPPRESSION CLAIM SURVIVES SUMMARY JUDGMENT

Plaintiffs allege fraudulent suppression against ACH pursuant to Ala. Code § 6-5-102. Plaintiffs' fraudulent suppression claim avers that ACH sustained a duty to reveal material facts bearing on ACH's representation that it procured the insurance coverage sought after in the Agreement. "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud." Ala. Code § 6-5-102. To prove fraudulent suppression, Plaintiffs must produce substantial evidence establishing that: (1) ACH possessed a duty to disclose an existing material fact; (2) ACH concealed or suppressed that material fact; (3) ACH's suppression induced Plaintiffs to act or

refrain from acting; and (4) Plaintiffs suffered actual damage as a proximate result. *Coilplus-Alabama, Inc. v. Vann*, 53 So. 3d 898, 909 (Ala. 2010).

The parties dispute whether ACH warrants summary judgment on the first element, the duty to disclose, and the third element, which equates to reasonable reliance. The court has already determined genuine issues of fact exists as to the reasonable reliance element, and the same conclusion manifests as to whether ACH owed a duty to disclose material facts to Plaintiffs.

## A. A Genuine Issue of Material Fact Exists as to Whether ACH Owed a Duty to Disclose to Plaintiffs on the Fraudulent Suppression Claim

"Without a duty to disclose, there can be no recovery for suppression." *Pearson's Pharmacy, Inc. v. Express Scripts, Inc.*, 505 F. Supp. 2d 1272, 1278 (M.D. Ala. 2007)(internal quotation and citation omitted). The "existence of a duty is a question of law to be determined by the trial judge . . . ." *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 839 (Ala. 1998). However, the judge and jury assume certain obligations on the duty to disclose issue:

> We think that the proper duty analysis should preserve the respective functions of both the judge and the jury. The judge should decide whether, assuming as truth all of the plaintiff's factual assertions, they are sufficient to give rise to a legal duty. If, even presuming that all of the plaintiff's facts are true, the judge determines that, as a matter of law, no duty was owed, then a summary judgment or a directed verdict is appropriate. If the judge finds that the circumstances as alleged would be enough to create a legal duty, then he should instruct the jury as to what that duty would be if these circumstances did exist. The jury then decides

whether those circumstances indeed existed. Should the plaintiff fail to prove her facts to the jury's satisfaction, then the jury can determine that the plaintiff did not present sufficient evidence to justify holding the defendant to the legal duty as charged by the judge. By this process, the judge retains his ability to state what the law is, while the jury retains its responsibility to state what the facts are and whether the facts as proven justify the finding of a duty under the law.

*Id.* at 840 (footnote omitted).

"A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of a duty to disclose is not fraudulent." *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1192 (Ala. 2008) (citations omitted). The following factors apply in assessing whether alleged circumstances create a duty of disclosure: "'(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances.'" *Bethel v. Thorn*, 757 So. 2d 1154, 1162 (Ala. 1999)(quoting *Owen*, 729 So.2d at 842-43 (Ala. 1998)). The parties do not enjoy a confidential relationship occasioning the duty to disclose, so one must rely upon the other factors to assess its existence.

"When one party has superior knowledge of a fact that is unknown to the other party, and the lack of knowledge will induce the other party to act in a manner in which he otherwise might not act, the obligation to disclose is 'particularly compelling.'"

*Flying J*, 12 So. 3d at 1192 (citations and internal quotation marks omitted). However, superior knowledge of a fact, without more, does not impose upon a party a legal duty to disclose such information. *Id.* (citations and internal quotation marks omitted). "One may also recover for fraudulent concealment by showing active concealment of a material fact with an intent to deceive or mislead." *Auburn's Gameday Ctr. at Magnolia Corner Owners Ass'n, Inc. v. Murray*, 138 So. 3d 317, 330 (Ala. Civ. App. 2013) (citations omitted).

Taking the Plaintiffs' facts as true, they establish a duty for ACH to disclose information to Plaintiffs, especially as a duty specifically arises under the Agreement. ACH represented that it secured for Plaintiffs "General Liability, Professional Liability, and Medical Malpractice Insurance providing [primary] coverage for claims including professional liability, negligence, and claims asserted pursuant to 42 U.S.C. § 1983," and it also held "Madison County . . . and the Sheriff . . . shall be additional named insureds on the aforesaid policies of insurance." (Doc. 94-2 at 9).

Plaintiffs and ACH communicated in great detail regarding Plaintiffs' desire to ensure ACH maintained adequate insurance coverage pursuant to the Agreement. Johnson became aware of the ongoing insurance issues that Bielenberg faced in attempting to secure insurance for ACH that matched the Agreement's language. (Doc. 95-10 at 24-27). The scope of insurance that ACH acquired for Plaintiffs remained a

valuable and even dispositive factor in the negotiations that culminated in the Agreement.

As already established, a duty arises when a party receives a request for information. *Flying J*, 12 So. 3d at 1192. In addition, if a party undertakes to speak he or she must "disclose those facts that are material to the ones already stated so as to make them truthful." *Freightliner, LLC v. Whatley Contract Carriers, LLC*, 932 So. 2d 883, 895 (Ala. 2005). Both of these factors play prominent roles in the determination at bar, leading to the conclusion ACH sustained the duty to fully disclose the underlying policies' coverage. First and foremost, the Agreement required ACH to deliver to Plaintiffs copies of the Policy; that is, the Agreement contained a contractual request for information. The desired information, of course, contravenes ACH's representations that it secured desired insurance coverage. (Doc. 94-2 at 9). Furthermore, ACH provided Plaintiffs certificates of insurance; that is, it undertook to speak on a valuable subject, i.e., the substance of the coverage sought by Plaintiffs. ACH's undertaking clearly failed to fully disclose the limitations in Evanston's policies. Although ACH contends that nothing prevented Plaintiffs from contacting ACH or Evanston to obtain information about the Policy, nonetheless ACH regularly received copies of the Policy from Evanston and was obligated to deliver them to Plaintiffs. (Doc. 98-1 at 68, ll. 9-16).

Based upon the foregoing analysis, the Plaintiffs' facts, taken as true, establishes a duty for ACH to disclose material facts, i.e., Evanston's insurance policies. Therefore, the jury retains the charge to determine whether those circumstances actually existed. As a result, genuine issues of material fact exist as to whether ACH maintained a duty to disclose material facts to Plaintiffs. *See Bethel*, 757 So. 2d at 1162 (fraudulent concealment of facts after a contract has been made can support both a breach-of-contract claim and a fraud claim).

**B.      Genuine Issues of Material Fact Remain as to Whether Plaintiffs Reasonably Relied on ACH Representations**

"[R]easonable reliance is an essential element of a suppression claim." *Mike Brooks Car World, Inc. v. Sudduth*, 54 So. 3d 364, 370 (Ala. Civ. App. 2010) (citing *Johnson v. Sorensen*, 914 So.2d 830, 837 (Ala. 2005)) ("Although the term 'inducement' has often been used in the description of the fourth element of suppression, it is clear that a plaintiff's ['reasonable reliance'] is an essential element of a suppression claim.").

As stated in the analysis of Plaintiffs' promissory fraud claim, genuine issues of material fact exist whether Plaintiffs reasonably relied on ACH's alleged misrepresentations. Therefore, the court will **DENY** ACH's summary judgment motion as to this claim.

## VII. PLAINTIFFS' PROMISSORY ESTOPPEL CLAIM AGAINST ACH DOES NOT APPLY IN THIS CASE

Alabama law follows the definition of promissory estoppel as set forth in the Restatement of Contracts: "A promise which the promisor should reasonably expect to induce action or forbearance of definite and substantial character and which does so is binding if injustice can be avoided only by enforcement thereof." *Bush v. Bush*, 177 So.2d 568, 570 (1964)(quoting Restatement (First) of Contracts § 90). "[T]he gravamen of the claim of promissory estoppel [in Alabama] is detrimental reliance." *Wyatt v. BellSouth, Inc.*, 18 F. Supp. 2d 1324, 1326 (M.D. Ala. 1998); *see also Bush*, 177 So. 2d at 570 (Promissory estoppel operates as a "doctrine of action in reliance.").

A promissory estoppel claim has no viability in the presence of a valid breach-of-contract claim regarding the same promise. Howard O. Hunter, Modern Law of Contracts § 6:13 (Mar. 2018 ed.); *see also Shane v. Bunzi Distrib. USA, Inc.*, 200 F. App'x 397, 404 (6th Cir. 2006)(affirming the "widely accepted principle that promissory estoppel is applicable only in the absence of an otherwise enforceable contract" on the subject matter); *Heating & Air Specialists, Inc. v. Jones*, 180 F. 3d 923, 934 (8th Cir. 1999)(citing numerous state courts so holding). The court may assess a promissory estoppel claim when it has "determined that no binding contract existed." *Aldridge v. DaimlerChrysler Corp.*, 809 So. 2d 785, 794 (Ala. 2001) ("When one seeks to impose liability under the doctrine of promissory estoppel, we look to the facts to determine

whether that doctrine can be used to create liability, once we have determined that no binding contract existed.").

Plaintiffs allege a claim of promissory estoppel against ACH. However, the parties do not dispute that a valid contract existed between them—the Agreement—which governed their respective right and obligations. That the parties dispute the meaning of the phrase "additional named insured" in the Agreement does not eviscerate the validity of the contract. That is, construal of the phrase "additional named insured" to Plaintiffs' detriment does not disinter another promise regarding the phrase buried in circumstances outside of the Agreement. Any promises ride or die on the interpretation of the valid contract consummated by the parties.

Therefore, the court will **GRANT** summary judgment on Plaintiffs' promissory estoppel claim.

## CONCLUSION

Based upon the foregoing analyses, the court will **GRANT** Evanston's summary judgment motion; **DENY** ACH's summary judgment motion as to Plaintiffs' fraud, breach-of-contract, and indemnity claims; **GRANT** ACH's motion as to Plaintiffs' promissory estoppel claim; **DENY** Plaintiffs' Request for Judicial Notice; and **DENY** Evanston's Motion to Strike as moot.

**DONE** and **ORDERED** this 2nd day of November, 2018.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE